## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | Case No. 2:22-cv-11120-BAF-APP |
| Plaintiff, | Hon. Bernard A. Friedman |
| v. | |
| **FINANCIAL EDUCATION SERVICES, INC.**, a Michigan corporation, | |
| **UNITED WEALTH SERVICES, INC.**, a Michigan corporation, | |
| **VR-TECH, LLC**, a Michigan limited liability company, | |
| **VR-TECH MGT, LLC**, a Michigan limited liability company, | |
| **CM RENT INC.**, a Colorado corporation, | |
| **YOUTH FINANCIAL LITERACY FOUNDATION**, a Michigan nonprofit corporation, | |
| **PARIMAL NAIK**, in his individual and corporate capacity, | |
| **MICHAEL TOLOFF**, in his individual and corporate capacity, | |
| **CHRISTOPHER TOLOFF**, in his individual and corporate capacity, and | |
| **GERALD THOMPSON**, in his individual and corporate capacity, | |
| Defendants. | |

## COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, Section 410(b) of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679h(b), and Section 6(b) of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105(b), which authorize the FTC to seek, and the Court to order, temporary, preliminary, and permanent injunctive relief, monetary relief, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), multiple provisions of CROA, 15 U.S.C. §§ 1679-1679*l*, and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, in connection with Defendants' marketing and sale of credit repair services and investment opportunities.

## SUMMARY OF CASE

2. Since at least 2015, Defendants have operated an unlawful credit repair scam that has deceived consumers across the country. Through Internet websites, social media, telemarketing, and using a network of sales agents ("FES Agents"), Defendants falsely claim they can improve consumers' credit scores by removing all negative items from their credit reports and adding

credit building products.  Defendants often provide FES Agents with the necessary promotional and marketing materials, including social media-ready advertising and scripts, to market Defendants' credit repair services to English- and Spanish-speaking consumers.  And Defendants routinely take prohibited advance fees from consumers for their credit repair services and do not make required disclosures regarding those services.

3.     In addition, Defendants market an investment opportunity—encouraging consumers to become FES Agents and then recruit other consumers to purchase Defendants' credit repair services (often at the same time as marketing their credit repair services).  Defendants falsely claim that FES Agents will earn substantial income.  Defendants often provide FES Agents with the necessary marketing materials, including social media-ready advertising and scripts, to recruit new agents.  In reality, however, Defendants' purported investment opportunity is an illegal pyramid scheme. Defendants' compensation plan incentivizes recruiting new FES Agents over selling credit repair services, and few consumers ever realize the promised earnings.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

5.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1),

and (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFF

6.    The FTC is an independent agency of the United States Government created

by the FTC Act, which authorizes the FTC to commence this district court

civil action by its own attorneys.  15 U.S.C. §§ 41-58.  The FTC enforces

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or

deceptive acts or practices in or affecting commerce.  The FTC also enforces

CROA, 15 U.S.C. §§ 1679-1679*l*, which prohibits untrue or misleading

representations to induce the purchase of credit repair services, requires

certain affirmative disclosures in the offering or sale of credit repair services,

and prohibits credit repair service organizations from charging or receiving

money or other valuable consideration for the performance of credit repair

services before such services are fully performed.  The FTC also enforces the

Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing

Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which

prohibits deceptive and abusive telemarketing acts or practices.

## DEFENDANTS

7.    Defendant **Financial Education Services, Inc.** ("FES") is a Michigan

corporation with its principal place of business at 37637 Five Mile Road,

Suite 397, Livonia, Michigan.  FES was originally incorporated as Credit

4

Education Services, Inc.  FES has also done business as American Credit Education Premium Services, American Credit Education Services, United Credit Education Premium Services, United Credit Education Services, United Wealth Education, and VR-Tech Marketing Group.  At all times relevant to this Complaint, acting alone or in concert with others, FES has marketed and sold credit repair services and investment opportunities to consumers throughout the United States.  FES transacts or has transacted business in this District and throughout the United States.

8.    Defendant **United Wealth Services, Inc.** ("United Wealth") is a Michigan corporation with its principal place of business at 37735 Enterprise Court, Suite 600, Farmington Hills, Michigan.  United Wealth has also used an address of 37637 Five Mile Road, Suite 397, Livonia, Michigan.  United Wealth has also done business as United Wealth Education.  At all times relevant to this Complaint, acting alone or in concert with others, United Wealth has marketed and sold credit repair services and investment opportunities to consumers throughout the United States.  United Wealth transacts or has transacted business in this District and throughout the United States.

9.    Defendant **VR-Tech, LLC** ("VR-Tech") is a Michigan limited liability company with its principal place of business at 37735 Enterprise Court, Suite 600, Farmington Hills, Michigan.  VR-Tech was formed from the merger of

three previously incorporated Michigan companies, VR-Tech Data Processing Solutions, LLC, VR-Tech Software Solutions, LLC, and VR-Tech Marketing Group, LLC.  VR-Tech has also done business as Financial Education & Services, LLC.  At all times relevant to this Complaint, acting alone or in concert with others, VR-Tech has marketed and sold credit repair services and investment opportunities to consumers throughout the United States.  VR-Tech transacts or has transacted business in this District and throughout the United States.

10.  Defendant **VR-Tech MGT, LLC** ("VR-Tech Mgt") is a Michigan limited liability company with its principal place of business at 37735 Enterprise Court, Suite 600, Farmington Hills, Michigan.  At all times relevant to this Complaint, acting alone or in concert with others, VR-Tech Mgt has marketed and sold credit repair services and investment opportunities to consumers throughout the United States.  VR-Tech Mgt transacts or has transacted business in this District and throughout the United States.

11.  Defendant **CM Rent Inc.** ("CM Rent") is a Colorado company with its principal place of business at 1415 Park Avenue, Denver, Colorado.  CM Rent is registered as a foreign corporation in Michigan, with an address of 1 Towne Square, Suite 1835, Southfield, Michigan.  CM Rent has also done business as Credit My Rent.  At all times relevant to this Complaint, acting alone or in concert with others, CM-Rent has marketed and sold credit repair

services and investment opportunities to consumers throughout the United

States.  CM-Rent transacts or has transacted business in this District and

throughout the United States.

12.   Defendant **Youth Financial Literacy Foundation** ("Youth Financial") is a

Michigan nonprofit corporation with its principal place of business at 37637

Five Mile Road, Suite 397, Livonia, Michigan.  Youth Financial was

originally incorporated as MSU Common Sense, Inc., which changed its

name to The Thompson Scholarship Foundation, Inc., which changed its

name to Patro Scholarship Foundation, Inc., which changed its name to Youth

Financial.  Youth Financial has also done business as American Credit

Education Services, Financial Education, Financial Literacy Education

Services, and United Credit Education Services.  At all times relevant to this

Complaint, Youth Financial has carried on business for its own profit or that

of its members.  At all times relevant to this Complaint, acting alone or in

concert with others, Youth Financial has marketed and sold credit repair

services and investment opportunities to consumers throughout the United

States.  Youth Financial transacts or has transacted business in this District

and throughout the United States.

13.   Defendant **Parimal Naik** is or was an owner, officer, director, or manager of

Youth Financial, FES, and VR-Tech.  He is an authorized signatory on many

of Defendants' bank accounts.  Defendants' telecommunications services are

often paid using his credit card.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Parimal Naik resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

14.   Defendant **Michael Toloff** is or was an owner, officer, director, or manager of Youth Financial, FES, and VR-Tech Mgt.  He is an authorized signatory on many of Defendants' bank accounts.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Michael Toloff resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

15.   Defendant **Christopher Toloff** is or was an owner, officer, director, or manager of Youth Financial and CM Rent.  He is an authorized signatory on many of Defendants' bank accounts.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Christopher Toloff resides in this District and,

in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

16. Defendant **Gerald Thompson** is or was an owner, officer, director, or manager of Youth Financial and FES. He is an authorized signatory on many of Defendants' bank accounts. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Gerald Thompson resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

17. Defendants FES, United Wealth, VR-Tech, VR-Tech Mgt, CM Rent, and Youth Financial (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the unlawful acts and practices alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that commingled funds. Because these Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

**COMMERCE**

18.  At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' UNLAWFUL BUSINESS ACTIVITES**

**Defendants' Unlawful Credit Repair Services**

***Defendants' Deceptive Internet and Social Media Claims***

19.  To induce consumers to purchase their credit repair services, Defendants and their agents utilize Internet websites, including ucesprotectionplan.com, united-credit.org, creditmyrent.com, financialeducationservices.com and fesprotectionplan.com, as well as social media sites, such as Facebook, Instagram, and YouTube on which they make deceptive claims regarding their services.

20.  Defendants claim they can successfully and permanently remove all negative information from consumers' credit histories or credit reports.  Defendants also claim they will build a positive payment history for consumers by reporting their rental payments to credit reporting agencies, through their Credit My Rent service.  Defendants also claim they can obtain for consumers credit-building products, such as secured credit cards.  Defendants claim that these activities will significantly increase consumers' credit scores and their eligibility for funding at lower interest rates.

10

21.  For example, Defendants and their agents have made the following statements regarding Defendants' credit repair services:

- Who needs negative items removed from their credit report Permanently???

- Attention!! If you have 400-500 credit score and want a 700-800 score, I have a connection that legally erases negative things..repos, foreclosures, late payments, medical, student loans evictions, and more.

- If you have 400-675 credit score and want a 700-800 credit score, David can LEGALLY erase negative items…repos, foreclosures, late payments, medical, student loans, evictions, and more

- Good morning!  Did You Know? Late payments can be removed from your credit report & increase your score by 100 points!!

- Si tu puntaje de credito es menos de 600 nosotros tenemos los servicios financieros para aumentar tu credito [translation: If your credit score is less than 600 we have the financial services to increase your credit]

- Si usted tiene un credito entre 499-699 puntos le borramos legalmente todo lo que la esta afectando a su credito. [translation: If you have a credit between 499-699 points, we legally erase everything that is affecting your credit.]

- [YouTube video presenter states:] Now this is what I love, is Credit My Rent.  For a lot of people, they're biggest expense is their rent, but it's not being reported to the credit bureaus.  Now this is a separate service where you can actually back date up to two years of your rent payments, have them reported to – we actually do work with Transunion and Equifax right now – and it can help you boost your credit score anywhere from 50 to 100 points.

- Student Loans ⃠ Deleted
  Medical bills ⃠ Deleted
  Late payments ⃠ Deleted

11

Collections ⃠ Deleted
Bankruptcy ⃠ Deleted
Evictions ⃠ Deleted
Repossessions ⃠ Deleted
Any negative items on your credit report that are currently affecting your
score ⃠ Deleted !!

- Build Credit, the Smart Way
  CreditMyRent is the fastest & most effective way to build credit without
  taking on new debt

- The [secured credit] card is designed to advance the accumulation of new
  information in a credit file by reporting account activity to all three of the
  major national credit bureaus every month.

22.  Defendants and their agents also depict purported success stories of

consumers for whom Defendants allegedly raised their credit.  The

testimonials include the following statements:

- I had three student loans removed from my credit reports within 45 days and
  my credit score increased from a 590 to a 662!

- When I started in the service I had a low 500 credit score and within six
  months it jumped to over 700 and I was able to purchase a new Mercedes
  Benz!

- My credit score went up 140 points, from a 530 to a 670, in my first 30 days,
  allowing me to purchase a new home!

- When I started my credit score was a 505 and I had 23 derogatory items on
  my credit reports.  After just 60 days, 18 of the 23 were deleted and my
  credit score went up 174 points to a 679!

- My credit score has gone up 120 points, from a 660 to a 780, and I was able
  to get a new car at 1.9% interest.  It really works!

- In January of 2014 I had a 412 credit score and by March 2014, my score went up to 714. This service is AMAZING!!!

- In just 60 days in the credit restoration service my credit score jumped 120 points, from a 505 to 625!

- United Wealth Education has been a godsend for me and my family. Since enrolling in the company my credit score has increased over 180 points. This company is amazing!

- Lo hice por 16 meses, donde mi estado crediticio cambio de 25 artículos negativos con 430 puntos en mi crédito, a escalarlo a 749 en solamente 16 meses [English translation: I did it for 16 months, where my credit status changed from 25 negative accounts and a 430 credit score to 749 in just 16 months]

- Christina began using the services over a year ago and within a four month period her score increased 150 points!!

- [YouTube video presenter states:] I signed up for the program, my credit score went up 130-something points within the first 45 days.  I went from a 465 to a 538, by month three I went from that 538 to a 610.  I added on the other products they offer which is a secured credit card and CreditMyRent which we'll discuss in a minute, and my score went from the 610 to the 700.  And so the same thing that happened to me can definitely happen to you.

- [YouTube video presenter states:] Within three months my score went from a 540 to a 750—210 points in three months.  I was able to go and get my dream car, a Dodge Challenger Hemi.

- [YouTube video presenter states:] I not only got my child support judgment removed within 30 days, they also removed $20,000 of medical collections in the same 30 days.  And then on top of that, because of everything

Jacqueline went over, including the CreditMyRent, I was able to take my score from a 540 to a 705 within four months of the program.

- [YouTube presenter states:] Within a few months, her credit score jumped 200 points, she had about 13 items deleted from her credit . . . now she's a homeowner.

- [Slide from YouTube video presentation:] My credit score went from a 586 to a 748 allowing me to purchase a new car with no money down and a very low monthly payment!

- [Slide from YouTube video presentation:]  I took advantage of the protection plan and my score went up 269 points in the first 4 months.

### *Defendants' Deceptive Telemarketing Activity*

23.  Defendants' and their agents' Internet websites and social media accounts often list telephone numbers for consumers to call for more information. Their social media accounts also encourage consumers to message their contact information to receive a telephone call for more information.

24.  When consumers then speak with Defendants' representatives over the telephone, the representatives make many of the same deceptive representations included on Defendants' websites and social media accounts. For example, in numerous instances, Defendants' representatives falsely claim that Defendants can remove negative items from consumers' credit reports, including student loans, child support judgments, and bankruptcies. Defendants' representatives explain that they achieve their results by sending manual dispute letters to the credit reporting agencies.  Defendants'

14

representatives sometimes refer to their dispute process as something "the credit bureaus don't want you to know about."

25. In numerous instances, Defendants' representatives claim that as a result of Defendants' services, consumers' credit scores will improve significantly within 30 to 90 days.

### *Defendants' COVID-Related Claims*

26. Defendants and their agents have also made numerous recent statements that prey on consumers' fears regarding the financial uncertainty associated with the COVID-19 pandemic as a reason for purchasing their credit repair services. For example, in YouTube video presentations, Defendants and their agents have made statements such as:

- During this pandemic a lot of people didn't expect to have gotten laid off, going through divorces and things like that. Bad things happen to good people all the time. But ultimately a good credit score opens up possibilities to create the lifestyle that you deserve.

- Now over 43 million Americans have a credit score of a 599, or less than perfect credit. And this was before COVID. Guys this number has doubled. It is over 80 million, ladies and gentlemen, people with less than perfect credit. Now when you have less than perfect credit, you know, you were like me when I had a 509 credit score, you know, I had anxiety, I was embarrassed to even go apply for a car or even try to go rent an apartment because guys I was afraid of getting denied.

- Over 43 million Americans have a credit score of 599 or less, and that was pre-pandemic. Now that number has multiplied by three, almost four times.

Imagine over 90 million people with a credit score less than 599.  Can we agree that we're offering something that people need?

27.    Meanwhile, in some instances, Defendants encourage FES Agents to market their credit repair services by saying, without any substantiation, that because of the COVID-19 pandemic, the credit bureau and creditor work force would be less likely to respond timely to dispute letters, resulting in the automatic removal of the disputed items.

### *Defendants' Unlawful Enrollment Process*

28.    Before providing any of the promised credit repair services, Defendants require consumers to make an upfront payment for these services. Defendants' representatives typically tell consumers that Defendants' services cost $89 per month with a one-time payment of $99, variously referred to as a registration or activation fee.  In more recent instances, the monthly fee drops to $69 per month after 3 months of enrollment, and then to $49 per month after one year.  To enroll, Defendants require consumers to pay the $99 registration fee and the first month fee of $89, for a total of $188.  In some instances, Defendants will offer to lower or waive the registration fee if the consumers agree to sign up on the call.

29.    Consumers enrolling in Defendants' Credit My Rent service must pay additional fees before receiving services.  The base fee is $14.95 per month, for which Defendants purport to report one rent payment each month.  For an

additional upfront payment of $99 (in addition to the monthly fee),
Defendants purport to report 12 months of past rental history.  For an
additional upfront payment of $149, Defendants purport to report 24 months
of past rental history.

30.  Defendants require consumers to provide their financial information,
including their credit or debit card number or account routing number and
bank account number, on the phone.  In numerous instances, shortly after
consumers provide Defendants with their billing information, Defendants
charge consumers' credit or debit cards or withdraw payment from
consumers' bank accounts before fully performing the promised credit repair
services.  In some instances, Defendants create or cause to be created
remotely created checks as payment for their credit repair services.

31.  In numerous instances, Defendants fail to provide or obtain written and dated
contracts signed by consumers that contain:  (1) the terms and conditions of
payment, including the total amount of all payments to be made by the
consumer to Defendants or to any other person, (2) a full and detailed
description of the credit repair services to be performed by Defendants for the
consumer, including (a) all guarantees of performance, and (b) an estimate of
(i) the date by which the performance of the services (to be performed by
Defendants or any other person) will be complete or (ii) the length of the
period necessary to perform such services; (3) Defendants' name and

principal business address; or (4) a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: "You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right."

32. In numerous instances, Defendants fail to provide consumers with a written statement containing prescribed language concerning "Consumer Credit File Rights Under State and Federal Law" before any contract or agreement is executed.

33. In numerous instances, Defendants fail to provide consumers with a "Notice of Cancellation" form, in duplicate, containing prescribed language concerning consumers' three-day right to cancel that consumers can use to cancel the contract.

### *Defendants Do Not Follow Through on Credit Repair Promises*

34. In numerous instances, Defendants email consumers form dispute letters challenging, without support, all or almost all negative information in consumers' credit reports. Defendants instruct consumers to print the letters and mail them directly to the credit reporting agencies. In numerous instances, however, these unsupported challenges have not caused credit reporting agencies to delete permanently or change the information.

35.  Further, in many instances, the credit building products offered by Defendants do not have the positive impact on the consumer's credit score promised by Defendants.  For example, through their CreditMyRent brand, Defendants claim to report consumers' positive rental history to TransUnion and Equifax.  Rental payments, however, do not factor in FICO® Score 8, the FICO score commonly used by lenders.

36.  In short, in numerous instances, Defendants fail to remove negative information permanently from consumers' credit reports.  And in numerous instances, consumers who purchase Defendants' credit repair services do not obtain the promised improvements to their credit scores.  In fact, in some instances, consumers reported that their credit scores actually worsened after purchasing Defendants' credit repair services.

**Defendants' Unlawful Investment Opportunity and Pyramid Scheme**

37.  In addition to marketing their credit repair services, Defendants also market a purported investment opportunity, soliciting consumers to become FES Agents to recruit additional consumers to purchase Defendants' credit repair services and become FES Agents themselves.  This investment opportunity is, in reality, an illegal pyramid scheme.

*Defendants' Deceptive Internet and Social Media Claims*

38.  Defendants and their agents utilize Internet websites, including myuwe.net, financialeducationservices.com, fesuniversity.com, and

19

momentumsociety.net, as well as social media sites, including Facebook, Instagram, and YouTube, on which they make deceptive claims regarding their investment opportunities.

39. Defendants claim that consumers who enroll as FES Agents will earn substantial income, typically in the form of commissions and bonuses, for the recruitment of new FES Agents and downstream revenue from the purchases by consumers of credit repair services.

40. For example, Defendants and their agents have made the following statements regarding Defendants' investment opportunity:

- If I could show you how to earn a [sic] extra 500-1000 a week in a home based business that you can run in all 50 states would you be willing to hear more information?

  Imagine creating your own weekly $1200 check…would that help your family

- [YouTube presenter states:] Then the next way we get paid is called our Monthly Infinity Bonus. And it starts at Sales Director. So at Sales Director, at $10,000 a month in volume, you're bringing in it's 0.5%, which is about $50, but that's just a bonus, guys. . . . So we're always getting this every single month. But if you skip down a couple to where J[] G[] is, at Executive Sales Director, she's bringing in over $50,000 a month in business, her and her whole team, she's getting 1% of that. So she's getting a bonus every month of $500. And then if you skip a few and go down to Executive Vice President where we currently are, that's the whole team, we're generating about half a million in business, every 30 days. So 2 percent of that, guys I'm getting $10,000, that's a six-figure income just in this bonus, every single month. . . . Shout out to our senior vice President X[] M[] because he's currently bringing in, with the team and all of us,

about a million dollars every single 30 days in business.  At 2.25 percent, that's over $22,000 he's getting as a bonus.  And then Pinnacle Senior Vice President, shout out to Mr. N[], at $10 million in business volume a month he's bringing in 3 percent, So this infinity bonus for him, he's getting over $300,000 a month guys.

- [YouTube presenter states:] Just imagine how this could grow.  Obviously if you did it once a month you could be looking at, "hey I'm earning about $5,000 a month."  Or what if this happened once a week? Then the numbers grow and you could be looking at $20,000 a month.  And these are substantial figures, but I can assure you that this company produces individuals that have gone out and had the ability to earn this kind of money.  And what if you did this twice a week? I mean it's phenomenal.

- Trabaja de donde sea en Puerto Rico y Estados Unidos, trabaja tus horas, Gana DINERO extra, Pasa mas tiempo con tu familia [English translation: Work from wherever in Puerto Rico and the United States, work your own hours, earn extra income, spend more time with your family]

- [YouTube presenter states:] te van a dar lo que es residuales, no solamente de lo que tú vas a referir, si no de lo que va a referir tu red, aparte de las comisiones.  O sea que es tremendo este plan de compensación que tú puedes ejercer, y aparte de eso también van a pagar tu automóvil, van a pagar tu casa, te van a dar bonus en cash, te dan todo tipo de compensación mientras tú te estructures, a medida tu vayas escalando estas gradas que miras hasta al éxito, ellos van a irte dando más beneficios para que tu no tengas que pagar por tu auto, por tu casa, y ahorrar todo tu dinero. ¿Qué te parece eso? [translation: they are going to give you what is residual, not only from what you will refer, but from what your network will refer, apart from the commissions. So this tremendous compensation plan that you can exercise, and apart from that they will also pay your automobile, they will pay your house, they will give you a cash bonus, they give you all types of compensation while you structure yourself, as you go climbing these stairs that you look at to success, they are going to give you more benefits so that you don't have to pay for your auto, for your house, and [so that you can] save all your money. How does that sound to you?]

21

- THE FIVE DIMENSIONS OF THE PAY PLAN
  Personal Income
    - Earn Directly for each Protection Plan Member you enroll.
  Team Income
    - Compound your success by building a strong team
  Expansion Income
    - Grow you [sic] local market or network with people from across the United States
  Residual Income
    - Earn over-and-over based on the sale of services to your team and their customers
  Bonus Income
    - The Compensation Plan features six ways to earn, including lucrative bonus opportunities

- R&R CLUB
  In addition to Four Dimensions of income, you could earn special R&R Club perks, designed specifically to set you up for long-term wealth-generating success.
  Level 1: $600 monthly expense allowance
  Level 2-3: $10K cash bonus, $1,500 car allowance
  Level 4: $25K cash bonus
  Level 5: $50K cash bonus with automobile upgrade option
  Level 6: $5K monthly house payment
  Level 7-10: Monthly retirement bonus up to $25K, monthly bonus from $100K-$250K

- HOW IT WORKS:
  As an Independent Agent, you have the ability to share the suite of wealth-building products with your network, either online or in person.
    - Earn direct commissions for each sale
    - Build a team and earn weekly residual bonuses
    - Qualify for free services and products

41.  Defendants and their agents also depict purported success stories of

consumers who became FES Agents.  The testimonials include the following

statements:

- As a wife, mom of four growing boys and one disabled, I needed an opportunity that would give me more income and time flexibility with my family.  While I did make a lot of money with my first work from-home opportunity, I didn't get time with family like I wanted.  Then, a Friend introduced me to FES after a financial crisis hit my family…I'm forever grateful because I really needed the services! Now, it's been five years since I said "YES to FES" and my life has truly changed! I've become Pinnacle Senior Vice President, earned the Bentley, house payment and numerous company cruises.

- Never in a million years did we hope or dream that there could be an opportunity that would potentially replace my Six Figure Real Estate income, create a secure lifestyle, an at the same time build a legacy for my family.

- I'm a high school drop out.  Worked at a call center for over 10 years. Relied on payday loans.  Overworked and under paid. I was struggling financially. Got started with FES.  My finances drastically changed. I was able to have the time freedom I wanted.  Fast forward. I was able to purchase the car I wanted and the condo I wanted.  I am living life on my own terms. FES has changed my family tree.  We are the first millionaires in our family.

- [photo of what purports to be five FES Agents with the accompanying statement:] 2020 AVERAGE INCOME $214,329

- [Slide from YouTube video presentation:] We joined FES a little over 15 months ago.  Getting Laid off as a P.E. Teacher.  My wife and I didn't have money saved, took a chance at what I believed would be just some extra income for us.  Fast forward to now, we've been blessed to become Six figure earners, be awarded a free Audi, cruise contest winners, and hit level two in the R&R Club.  Our life has changed drastically!

- Knew this was coming!!!! This single mom moved to Atlanta 4 years ago, retired hair stylist slept on a friends [sic] couch fast forward to joining our company and becoming a millionaire! I posted her getting her G wagon last year and now it's paid off! She can legit sell this for 280k IF she were to ever go broke and need cash! . . . Wealth is the goal!!!! #unitedwealtheducation

### *Defendants' Deceptive Telemarketing Activity*

42. When consumers speak with Defendants' representatives regarding Defendants' credit repair services, typically by telephone, the representatives often also try to recruit consumers to become FES Agents.  In other instances, consumers are invited to participate in telephonic conferences, such as Zoom calls or Facebook Live videos.  During these calls, Defendants' representatives make many of the same representations included on Defendants' websites and social media accounts.  For example, in numerous instances, Defendants' representatives state that consumers who become FES Agents will make commissions on recruitment of additional consumers to become FES Agents as well as from purchases by consumers of credit repair services.  In numerous instances, Defendants' representatives claim consumers can earn thousands of dollars per week or tens of thousands of dollars per month as an FES Agent.  Defendants' representatives also entice consumers by stating that FES Agents who rise high enough can get rewards like a new car.

*Defendants' COVID-Related Claims*

43.   Defendants and their agents have also made numerous recent statements that

prey on consumers' fears regarding the COVID-19 pandemic and its financial

effects as reason for enrolling in their investment opportunity.  For example,

in YouTube video presentations, Defendants and their agents have made

statements regarding the benefits of Defendants' investment opportunity such

as:

- You can imagine during Covid how many restaurant owners, how many different people that have brick and mortars lost money because of that. And so I like to joke and tell people, but it's true, in this day and age it's not brick and mortar, everything is click and mortar.  And so you gotta figure it out, right? And so this is the best way.

- And I just heard a sad story you know the other day, you know somebody that never had COVID, went and got you know the shot, and the second shot, they ended up dying.  And so you know tell somebody, if anything tonight that you guys gain from this, tell your family, friends, and loved ones you love them.  Because you never know when you're gonna see them.  So United Wealth Education, right, we provide agents the ability to build a business by marketing innovative financial literacy tools and products and services from the comfort of your phone or home.

- Well first of all, because of COVID, I lost my job.  So I had no job. Then I started working as a driver, long hours, low paying, not really worth it. . . . Actually I got sick, missed a month back, I was really down low, had barely money. . . had to max out my credit cards.  So that reason, my cousin's wife, she's a Sales Director right now, she introduced me to the company.

### *Signup Process*

44. In order to become an FES Agent, Defendants require consumers to pay an upfront fee of $299.  The fee consists of a one-time "set up" fee, purportedly to cover administrative costs associated with setting up the FES Agent's business.  In addition, Defendants require consumers who want to become FES Agents to enroll in Defendants' credit repair services if they have not already done so, regardless of the prospective FES Agent's credit score.  The first month's fee of $89 is added to the administrative fee.  FES Agents then pay $89 per month thereafter (although in more recent instances, the monthly fee drops to $69 per month after three months, and then to $49 per month after one year).  Defendants inform FES Agents, however, that if they recruit and maintain a certain number of new FES Agents in a month, the next month's fee will be waived.

45. Defendants require consumers to provide their financial information, including their credit or debit card number or account routing number and bank account number, on the phone.

### *Defendants Provide Consumers with Deceptive Advertising Materials*

46. In numerous instances after signing up, Defendants provide new FES Agents with marketing materials necessary for FES Agents to market Defendants' credit repair services and recruit additional FES Agents.  For example, in numerous instances, consumers are provided with scripts to use when

speaking with consumers for both credit repair and agent recruitment. Defendants also provide consumers with ads for consumers to post on their social media accounts.

47. Defendants also provide numerous training sessions, including Zoom calls and Facebook Live videos (and often in group format), in which consumers are provided strategies and techniques both to market credit repair services and recruit new agents.

48. In numerous instances, these marketing materials contain many of the deceptive statements described in Paragraphs 19-27 and 38-43 above.

### Defendants' Investment Opportunity Is an Illegal Pyramid Scheme

49. FES Agents are eligible to receive payment through a myriad of commissions and bonuses that incentivize recruiting new FES Agents over the sale of credit repair services. In addition, Defendants' representatives often emphasize the importance of recruiting new agents in communications with consumers. Defendants' trainings also focus more on, and emphasize, how to recruit new agents over selling credit repair services.

50. Defendants explain their commissions and bonuses in a compensation plan they provide to prospective and new FES Agents, which is often described during calls with Defendants' representatives or during training sessions.

51. The first way FES Agents are purportedly eligible to be paid is through commissions on purchases by consumers of credit repair services. An FES

Agent earns a $12 commission for each person who enrolls in Defendants'
credit repair services, and $12 each month thereafter as long as the person
continues to make his or her payments to Defendants.

52. The second, and main, way FES Agents are purportedly eligible to be paid is
by creating "lineage organizations" and "building a team." This is commonly
referred to as a "downline." By urging FES Agents to create lineage
organizations and build a team, Defendants stress that an FES Agent has the
ability to make significantly more money by recruiting new agents. Through
the combination of new agent recruitment and purchases of credit repair
services, FES Agents can achieve "titles" and trigger "bonuses."

53. When first recruited, an FES Agent is called an "agent" and makes the base
amount of commission on purchases by consumers of credit repair services.
By meeting specific requirements, FES Agents can go through a series of
promotions from agent, to field trainer, to senior field trainer, to sales
director, to regional sales director, to executive sales director, to vice
president, to regional vice president, to executive vice president, to senior
vice president, to senior regional vice president, to senior executive vice
president, and culminating in pinnacle senior vice president. A higher title
corresponds to more money paid out on bonuses.

54. Each title has its own prerequisites to achieving it, but each one essentially
boils down to needing a larger number of people in an FES Agent's downline,

a certain number of downline FES Agents having achieved their own titles, and a certain dollar amount in personal credit repair services revenue each month.  For example, to move from "agent" to "field trainer," an FES Agent needs to have two FES Agents in his or her downline (each referred to as a "leg"), with each downline FES Agent bringing in a minimum of $400 in monthly revenue and the FES Agent and the downline FES Agents together bringing in a minimum of $1,600 in monthly revenue.  To become a "senior field trainer," in addition to an increase in the dollar amount of monthly revenue, the FES Agent needs to have both downline FES Agents themselves become "field trainers" (*i.e.*, each must have recruited an additional two FES Agents).  Nothing in the compensation plan requires that some or all of the monthly revenue requirements be met through sales to non-participants.  Thus FES Agents have the ability to meet the requirement solely through purchases of credit repair services by themselves and other FES Agents, including in the form of continued payment of monthly fees for credit repair services.

55. Defendants explain to consumers that if an FES Agent establishes a strong enough set of "teams" in his or her downline that are consistently performing at a high level (*i.e.*, in terms of new agent recruitment and purchases of credit repair services), the FES Agent at the top can maintain a high title on a monthly basis (and all commensurate bonuses) without having to do very much personal work.

56.  Defendants explain that FES Agents can earn bonuses when a qualified FES
     Agent enrolls a new FES Agent who produces a certain minimum of personal
     revenue within a specific time frame.  If those conditions are met, the
     enrolling FES Agent and any upline FES Agents receive bonuses.  Additional
     bonuses are available to FES Agents who achieve higher titles and provide
     significantly more money to those with larger downlines.  The amounts of the
     bonuses increase significantly as the FES Agent earns higher titles, further
     emphasizing that the most lucrative rewards come from recruiting new FES
     Agents rather than the purchase by non-agents of credit repair services.  For
     example, Defendants purport to pay what they call a "customer acquisition
     bonus" or "CAB" that is generated when an FES Agent enrolls a new agent.
     "Agents" typically receive a CAB of $100, "field trainers" receive $160,
     "senior field trainers" receive $240, and "pinnacle senior vice presidents"
     receive $560.  Another bonus is called the "infinity bonus" that starts for FES
     Agents who rise to the "sales director" level.  The infinity bonus is a
     percentage of the revenue brought in by the FES Agent's entire downline.  A
     "sales director" typically gets an infinity bonus of 0.5%, a "regional sales
     director" receives 0.75%, and so on up to "pinnacle senior vice presidents"
     who receive 3% of his or her downline's revenue.  Meanwhile, "generation
     bonuses" start at the "executive sales director" level and typically pay an
     additional 1% (going up to 2.75% for "pinnacle senior vice president").

30

57. Defendants and their agents often encourage FES Agents to "sponsor" new recruits, *i.e.*, if a potential recruit is unwilling to pay the $288 sign-up fee, the FES Agent should pay some or all of those fees on the recruit's behalf in order to inflate artificially the original FES Agent's downline and qualify the FES Agent for bonuses or other compensation.

58. Many FES Agents, to remain FES Agents, continue to pay the monthly credit repair fee and many FES Agents are encouraged to pay, and do pay, registration fees for new FES Agents to improve their downline.  As a result, in many instances, FES Agents end up paying more money to Defendants than they receive from them.

59. In some instances, Defendants do not pay promised bonuses to FES Agents.

60. In numerous instances, consumers do not realize the earnings promised by Defendants, and many consumers lose money as FES Agents.

## Consumer Harm

61. Defendants have collected at least $213,000,000 from consumers through their unlawful credit repair and investment opportunity scheme in the three years prior to the filing of this Complaint.

## Ongoing Nature of Defendants' Unlawful Practices

62. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC.

## VIOLATIONS OF THE FTC ACT

63. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

64. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### COUNT I
### Misrepresentations Regarding Credit Repair Services

65. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of credit repair services, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants will significantly improve consumers' credit scores by, among other things, removing negative information permanently from consumers' credit reports or profiles or adding positive payment history to consumers' credit reports or profiles.

66. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 65 of this Complaint, such representations were false or misleading or not substantiated at the time Defendants made them.

67. Therefore, Defendants' making of the representations as set forth in Paragraph 65 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II
## Illegal Pyramid

68. Defendants operate or promote participation in a scheme in which consumers pay money to Defendants in return for which they receive (1) the right to market and sell Defendants' credit repair services, and (2) in return for recruiting other consumers to sell Defendants' credit repair services, the right to receive rewards that are unrelated to the sale of credit repair services to ultimate users.

69. Defendants' operation or promotion of this type of scheme, often referred to as a pyramid scheme, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III
## Misrepresentations Regarding Investment Opportunities

70. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of investment opportunities, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who become agents of Defendants are likely to earn substantial income.

71. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 70 of this Complaint, such representations were false or misleading or not substantiated at the time Defendants made them.

33

72. Therefore, Defendants' making of the representations as set forth in Paragraph 70 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV
## Means and Instrumentalities

73. By furnishing consumers with promotional materials and instructions to be used in recruiting other consumers to purchase Defendants' credit repair services and investment opportunities that contain false, misleading, or unsubstantiated representations, Defendants have provided the means and instrumentalities for the commission of deceptive acts and practices.

74. Therefore, Defendants' practices as set forth in Paragraph 73 constitute deceptive acts or practices in violation of in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT

75. The Credit Repair Organizations Act took effect on April 1, 1997, and has since that date remained in full force and effect.

76. The purposes of CROA, according to Congress, are (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or

deceptive advertising and business practices by credit repair organizations. 15 U.S.C. § 1679(b).

77. CROA defines a "credit repair organization" as "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that they can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of . . . improving any consumers' credit record, credit history, or credit rating. . . ."  15 U.S.C. § 1679a(3).

78. Defendants are a "credit repair organization."

79. CROA prohibits all persons from making or using any untrue or misleading representation of the services of the credit repair organization.  15 U.S.C. § 1679b(a)(3).

80. CROA prohibits credit repair organizations from charging or receiving any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform before such service is fully performed.  15 U.S.C. § 1679b(b).

81. CROA requires credit repair organizations to provide consumers with a written statement containing prescribed language concerning "Consumer Credit File Rights Under State and Federal Law" before any contract or agreement is executed.  15 U.S.C. § 1679c(a).

82. CROA prohibits credit repair organizations from providing any services to a consumer unless the credit repair organization has obtained a written and dated contract that has been signed by the consumer.  15 U.S.C. § 1679d(a).

83. CROA requires credit repair organizations to include the following terms and conditions in their contracts for services:  (1) the terms and conditions of payment, including the total amount of all payments to be made by the consumer to the credit repair organization or to any other person, (2) a full and detailed description of the credit repair services to be performed by the credit repair organization for the consumer, including (a) all guarantees of performance, and (b) an estimate of (i) the date by which the performance of the services (to be performed by the credit repair organization or any other person) will be complete or (ii) the length of the period necessary to perform such services; (3) the credit repair organization's name and principal business address; and (4) a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: "You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract.  See the attached notice of cancellation form for an explanation of this right."  15 U.S.C. § 1679d(b).

84. CROA requires credit repair organizations to provide consumers with a "Notice of Cancellation" form, in duplicate, containing prescribed language

concerning consumers' three-day right to cancel that consumers can use to cancel the contract.  15 U.S.C. § 1679e(b).

85.  CROA requires that any consumer who enters into a contract with a credit repair organization shall be given a copy of the completed contract and all disclosures required under the Act and a copy of any other document the credit repair organization requires the consumer to sign.  15 U.S.C. § 1679e(c).

86.  Pursuant to Section 410(b)(1) of CROA, 15 U.S.C. § 1679h(b)(1), any violation of any requirement or prohibition of CROA constitutes an unfair or deceptive act or practice in commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  Pursuant to Section 410(b)(2) of CROA, 15 U.S.C. § 1679h(b)(2), all functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance with CROA in the same manner as if the violation had been a violation of any FTC trade regulation rule. Section 19(a)(1) of the FTC Act, 15 U.S.C. § 57b(a)(1), provides that the FTC may commence a civil action against "any person, partnership, or corporation" who "violates any rule . . . respecting unfair or deceptive acts or practices."  Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), provides that in any action commenced under Section 19(a)(1), the court "shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers, including but not limited to rescission or reformation of contracts,

and the refund of money or return of property, the payment of damages, and public notification."

## COUNT V
## Misrepresentations Regarding Credit Repair Services

87. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of services to consumers by a credit repair organization, as that term is defined in Section 403(3) of CROA, 15 U.S.C. § 1679a(3), Defendants have made untrue or misleading representations to consumers, including that Defendants will significantly improve consumers' credit scores by, among other things removing negative information permanently from consumers' credit reports or adding positive payment history to consumers' credit reports or profiles.

88. Therefore, Defendants' acts or practices as set forth in Paragraph 87 violate Section 404(a)(3) of CROA, 15 U.S.C. § 1679b(a)(3).

## COUNT VI
## Violation of Prohibition against Charging Advanced Fees for Credit Repair Services

89. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of services to consumers by a credit repair organization, as that term is defined in Section 403(3) of CROA, 15 U.S.C. § 1679a(3), Defendants have charged or received money or other valuable consideration for the performance of credit repair services that

Defendants have agreed to perform before such services were fully performed.

90. Therefore, Defendants' acts or practices as set forth in Paragraph 89 violate Section 404(b) of CROA, 15 U.S.C. § 1679b(b).

## COUNT VII
## Failure to Make Required Disclosures

91. In numerous instances, in connection with the sale of services to consumers by a credit repair organization, as that term is defined in Section 403(3) of CROA, 15 U.S.C. § 1679a(3), Defendants have failed to provide a written statement of "Consumer Credit File Rights Under State and Federal Law," in the form and manner required by CROA, to consumers before any contract or agreement was executed.

92. Therefore, Defendants' acts or practices as set forth in Paragraph 91 violate Section 405(a) of CROA, 15 U.S.C. § 1679c(a).

## COUNT VIII
## Failure to Obtain Signed Contracts from Consumers

93. In numerous instances, in connection with the sale of services to consumers by a credit repair organization, as that term is defined in Section 403(3) of CROA, 15 U.S.C. § 1679a(3), Defendants have provided services to consumers without first having obtained a written and dated contract for the purchase of credit repair services that has been signed by consumers.

94.   Therefore, Defendants' acts or practices as set forth in Paragraph 93 violate
      Section 406(a) of CROA, 15 U.S.C. § 1679d(a).

## COUNT IX
### Failure to Include Required Terms and Conditions in Contracts

95.   In numerous instances, in connection with the sale of services to consumers
      by a credit repair organization, as that term is defined in Section 403(3) of
      CROA, 15 U.S.C. § 1679a(3), Defendants have failed to include in their
      consumer contracts the following required terms and conditions:  (1) the
      terms and conditions of payment, including the total amount of all payments
      to be made by the consumer to Defendants or to any other person, (2) a full
      and detailed description of the credit repair services to be performed by
      Defendants for the consumer, including (a) all guarantees of performance, and
      (b) an estimate of (i) the date by which the performance of the services (to be
      performed by Defendants or any other person) will be complete or (ii) the
      length of the period necessary to perform such services; (3) Defendants' name
      and principal business address; or (4) the specific conspicuous statement in
      bold face type, in immediate proximity to the space reserved for the
      consumer's signature on the contract, regarding the consumers' right to cancel
      the contracts without penalty or obligation at any time before the third
      business day after the date on which consumers signed the contracts.

96.   Therefore, Defendants' acts or practices as set forth in Paragraph 95 violate

Section 406(b) of CROA, 15 U.S.C. § 1679d(b).

## COUNT X
## Failure to Provide Cancellation Form

97.   In numerous instances, in connection with the sale of services to consumers

by a credit repair organization, as that term is defined in Section 403(3) of

CROA, 15 U.S.C. § 1679a(3), Defendants have failed to provide with their

consumer contracts a form with the heading "Notice of Cancellation," in the

form and manner required by CROA to consumers.

98.   Therefore, Defendants' acts or practices as set forth in Paragraph 97 violate

Section 407(b) of CROA, 15 U.S.C. § 1679e(b).

## COUNT XI
## Failure to Provide Consumers with Copy of Contract and Other Disclosures

99.   In numerous instances, in connection with the sale of services to consumers

by a credit repair organization, as that term is defined in Section 403(3) of

CROA, 15 U.S.C. § 1679a(3), Defendants have failed to provide consumers

who entered into a contract with Defendants a copy of the completed contract

and all disclosures required under CROA and a copy of any other document

Defendants required the consumers to sign.

100.  Therefore, Defendants' acts or practices as set forth in Paragraph 99 violate

Section 407(c) of CROA, 15 U.S.C. § 1679e(c).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

101. In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original Telemarketing Sales Rule in 1995, extensively amended it in 2003, and amended certain sections thereafter.  16 C.F.R. Part 310.

102. Under the TSR, a "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a consumer or donor.  16 C.F.R. § 310.2(ff).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.  16 C.F.R. § 310.2(dd).

103. Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as those terms are defined in the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

104. The TSR defines "investment opportunity[ies]" to mean "anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.  16 C.F.R. § 310.2(s).

105. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or

central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii).

106. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of an investment opportunity, including but not limited to, risk, liquidity, earnings potential, or profitability. 16 C.F.R. § 310.3(a)(2)(vi).

107. The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until: (a) the time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and (b) the seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. 16 C.F.R. § 310.4(a)(2).

108. The TSR prohibits sellers and telemarketers from creating or causing to be created, directly or indirectly, a remotely created payment order as payment for goods or services offered or sold through telemarketing. 16 C.F.R. § 310.4(a)(9). A remotely created payment order includes a remotely created check. 16 C.F.R. § 310.2(cc).

109. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Section 19(a)(1) of the FTC Act, 15 U.S.C. § 57b(a)(1), provides that the FTC may commence a civil action against "any person, partnership, or corporation" who "violates any rule . . . respecting unfair or deceptive acts or practices." Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), provides that in any action commenced under Section 19(a)(1), the court "shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers, including but not limited to rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification."

## COUNT XII
### Misrepresentations Regarding Credit Repair Services

110. In numerous instances, in connection with the telemarketing of credit repair services, Defendants have misrepresented, directly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of their credit repair services, including but not limited to, that Defendants will significantly improve consumers' credit scores by, among other things removing negative information permanently from consumers' credit reports

or profiles or adding positive payment history to consumers' credit reports or profiles.

111. Therefore, Defendants' acts or practices as set forth in Paragraph 110 violate Section 310.3(a)(2)(iii) of the TSR, 16 C.F.R. § 310.3(a)(2)(iii).

## COUNT XIII
## Misrepresentations Regarding Investment Opportunities

112. In numerous instances, in connection with the telemarketing of investment opportunities, Defendants have misrepresented, directly or by implication, material aspects of their investment opportunities, including, but not limited to, risk, liquidity, earnings potential, or profitability, by, among other things, representing that consumers who become agents of Defendants are likely to earn substantial income.

113. Therefore, Defendants' acts or practices as set forth in Paragraph 112 violate Section 310.3(a)(2)(vi) of the TSR, 16 C.F.R. § 310.3(a)(2)(vi).

## COUNT XIV
## Violation of Prohibition against Charging Advanced Fees for Credit Repair Services

114. In numerous instances, in connection with the telemarketing of credit repair services, Defendants have requested or received payment of a fee or consideration for credit repair services before: (a) the time frame in which Defendants have represented all of the credit repair services will be provided to consumers has expired; and (b) Defendants have provided consumers with

documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.

115. Therefore, Defendants' acts or practices as set forth in Paragraph 114 violate Section 310.4(a)(2) of the TSR, 16 C.F.R. § 310.4(a)(2).

## COUNT XV
## Use of Remotely Created Checks

116. In numerous instances, in connection with the telemarketing of credit repair services and/or investment opportunities, Defendants have created or caused to be created, directly or indirectly, a remotely created payment order as payment for credit repair services and/or investment opportunities.

117. Therefore, Defendants' acts or practices as set forth in Paragraph 116 violate Section 310.4(a)(9) of the TSR, 16 C.F.R. § 310.4(a)(9).

## CONSUMER INJURY

118. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, CROA, and the TSR.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC requests that the Court:

A.    Grant preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access to business premises, and appointment of a receiver;

B.    Enter a permanent injunction to prevent future violations of the FTC Act, CROA, and the TSR by Defendants;

C.    Award monetary and other relief within the Court's power to grant; and

D.    Award any additional relief as the Court determines to be just and proper.

Dated:  May 23, 2022                    Respectfully submitted,


                                        /s/Gregory A. Ashe
                                        GREGORY A. ASHE
                                        K. MICHELLE GRAJALES
                                        JULIA E. HEALD
                                        Federal Trade Commission
                                        600 Pennsylvania Avenue NW
                                        Washington, DC 20580
                                        Telephone: 202-326-3719 (Ashe)
                                        Telephone: 202-326-3172 (Grajales)
                                        Telephone: 202-326-3589 (Heald)
                                        Facsimile: 202-326-3768
                                        Email: gashe@ftc.gov, mgrajales@ftc.gov,
                                            jheald@ftc.gov

                                        DAWN N. ISON
                                        United States Attorney

                                        PETER A. CAPLAN (P30643)
                                        Assistant United States Attorney
                                        211 W. Fort Street, Suite 2001
                                        Detroit, MI 48226
                                        Telephone: 313-226-9784
                                        Email: peter.caplan@usdoj.gov

                                        Attorneys for Plaintiff

                                        FEDERAL TRADE COMMISSION