## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**FEDERAL TRADE COMMISSION**,

    Plaintiff,

      v.

**FINANCIAL EDUCATION SERVICES, INC.**, *et al.*,

        Defendants.

Case No. 2:22-cv-11120-BAF-APP

Hon. Bernard A. Friedman

## FTC'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER WITH AN ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF

Plaintiff Federal Trade Commission ("FTC"), pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 410(b) of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679h(b), Section 6(b) of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6105(b), and Federal Rule of Civil Procedure 65(b), hereby applies to this Court *ex parte* for a temporary restraining order ("TRO") with an asset freeze, appointment of a receiver, and other equitable relief against Defendants Financial Education Services, Inc., United Wealth Services, Inc., VR-Tech, LLC, VR-Tech Mgt, LLC, CM Rent inc., Youth Financial Literacy Foundation, Parimal Naik, Michael Toloff, Christopher Toloff, and Gerald Thompson ("Defendants").  In support of its

motion, the FTC submits the accompanying memorandum, exhibits, and certification, and states as follows:

1. The FTC brings this action to halt a pernicious credit repair and investment scheme that has defrauded hundreds of millions of dollars from consumers nationwide.  Since at least 2015, Defendants have operated an unlawful credit repair scam and investment scheme that, collectively, has taken at least $213 million from consumers.  Through Internet websites, social media, telemarketing, and using a network of sales agents, Defendants have targeted consumers with false promises that (1) they will substantially improve consumers' credit scores by removing all negative items from their credit reports and adding credit building products and (2) by becoming sales agents they will earn substantial income.  And Defendants investment scheme is, in fact, an illegal pyramid scheme.  In addition, Defendants routinely take prohibited advanced fees for their credit repair services and do not make required disclosures regarding their services.

2. Defendants' acts and practices violate (1) Section 5 of the FTC Act, 15 U.S.C. § 45, (2) multiple provisions of CROA, 15 U.S.C. §§ 1679-1679*l*, and (3) multiple provisions of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

3.  The FTC therefore seeks an *ex parte* TRO:

    a.  Temporarily restraining Defendants from engaging in unfair and deceptive practices in connection with the marketing and sale of credit repair services and investment opportunities and from violating Section 5(a) of the FTC Act, CROA, and the TSR;

    b.  Temporarily freezing Defendants' assets;

    c.  Appointing a Receiver over the Corporate Defendants;

    d.  Restraining and enjoining Defendants and certain third parties from destroying or concealing documents, and from transferring, encumbering, or otherwise disposing of assets;

    e.  Requiring Defendants to identify all assets, repatriate assets located outside the United States, and make an accounting of their present financial condition and certain business information;

    f.  Allowing the Receiver and FTC immediate access to all of Defendants' business premises for the purpose of inspecting, copying, and imaging material relevant to this action, including financial records, computer data, electronically stored information, and other information concerning Defendants' business practices and assets;

    g.  Allowing the FTC to conduct limited expedited discovery; and

    h.  Providing other equitable relief.

3

4. Pursuant to E.D. Mich. LR 7.1(d), a brief in support of this Motion is attached herewith.  A supporting certification and declaration of FTC counsel Gregory A. Ashe is also attached herewith and is incorporated by reference.

5. Pursuant to E.D. Mich. LR 65.1, the FTC has not provided notice of this motion to Defendants nor sought their concurrence under E.D. Mich. LR 7.1(a).  As discussed in the accompanying brief and declaration of FTC counsel, the interests of justice require that this motion be heard without notice, pursuant to Fed. R. Civ. P. 65(b).  Advance notice of this action to Defendants would likely lead to dissipation or concealment of assets and destruction of documents, causing immediate and irreparable damage by impeding the FTC's efforts to seek meaningful relief for Defendants' law violations.  Issuing the TRO with an asset freeze, appointment of receiver, immediate access to business premises, and other requested relief without notice will preserve this Court's ability to award full and effective relief by preserving the status quo pending a hearing on the requested preliminary injunction.

6. If the Court enters the proposed TRO, the FTC will promptly serve notice of the order on all Defendants and will move for a preliminary injunction extending such temporary relief pending an adjudication on the merits.

7. A proposed TRO has been submitted in accordance with ECF Policies and Procedures R12.

4

WHEREFORE, the FTC respectfully requests that this Court grant this

motion by entering the proposed TRO without notice to defendants.

Dated:  May 23, 2022                    Respectfully submitted,


                                        /s/Gregory A. Ashe
                                        GREGORY A. ASHE
                                        K. MICHELLE GRAJALES
                                        JULIA E. HEALD
                                        Federal Trade Commission
                                        600 Pennsylvania Avenue NW
                                        Washington, DC 20580
                                        Telephone: 202-326-3719 (Ashe)
                                        Telephone: 202-326-3172 (Grajales)
                                        Telephone: 202-326-3589 (Heald)
                                        Facsimile: 202-326-3768
                                        Email:gashe@ftc.gov, mgrajales@ftc.gov,
                                                jheald@ftc.gov

                                        DAWN N. ISON
                                        United States Attorney

                                        PETER A. CAPLAN (P30643)
                                        Assistant United States Attorney
                                        211 W. Fort Street, Suite 2001
                                        Detroit, MI 48226
                                        Telephone: 313-226-9784
                                        Email: peter.caplan@usdoj.gov

                                        Attorneys for Plaintiff
                                        FEDERAL TRADE COMMISSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | Case No. 2:22-cv-11120-BAF-APP |
| Plaintiff, | Hon. Bernard A. Friedman |
| v. | |
| **FINANCIAL EDUCATION SERVICES, INC.**, *et al.*, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF THE FTC'S *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER WITH AN ASSET FREEZE,
APPOINTMENT OF A RECEIVER, AND OTHER EQUITABLE RELIEF**

## ISSUE PRESENTED

Whether, in an action by the Federal Trade Commission against Defendants for their violations of Section 5 of the FTC Act, multiple provisions of the Credit Repair Organizations Act, and multiple provisions of the Telemarketing Sales Rule, in connection with the marketing and sale of credit repair services and investment opportunities and where the FTC has presented evidence of likely asset dissipation and document destruction, the Court may issue an *ex parte* Temporary Restraining Order with asset freeze, appointment of receiver, immediate access to business premises, and other ancillary relief to halt Defendants' ongoing fraudulent scheme and to freeze Defendants' assets to preserve the ability to redress injured consumers.

## CONTROLLING AUTHORITIES

The controlling or otherwise most useful authorities are:

- Sections 5, 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 45, 53(b) and 57b
- the Credit Repair Organizations Act, 15 U.S.C. §§ 1679 – 1679*l*
- Section 6(b) of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6105(b), and the Telemarketing Sales Rule, 16 C.F.R Part 310
- *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014)
- *United States v. Gold Unlimited, Inc*., 177 F.3d 472 (6th Cir. 1999)
- *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty*., 796 F.3d 636 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1246 (2016).

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.  THE PARTIES.....................................................................................2

     A. Federal Trade Commission..............................................................2

     B. Defendants ...................................................................................3

III. DEFENDANTS' UNLAWFUL BUSINESS PRACTICES................................9

     A. Defendants' Unlawful Credit Repair Practices .................................9

          1. Defendants' False Claims Regarding the Efficacy of their Credit Repair
             Services......................................................................................9

               a. Defendants Claim They Will Improve Consumers' Credit Scores by
                  Removing Negative Information and Adding Positive Credit Building
                  Products ..............................................................................14

               b. Defendants Do Not Substantially Improve Consumers' Credit
                  Scores ................................................................................22

          2. Defendants Fail to Make Required CROA Disclosures and Provide
             Consumers with Written Contracts ...........................................28

          3. Defendants Illegally Collect Advance Fees for Credit Repair and
             Extensions of Credit ...............................................................30

     B. Defendants' Unlawful Investment Opportunity ..............................32

          1. Defendants' False Claims Regarding the Amount of Income Consumers
             Can Earn as FES Agents...........................................................33

               a. Defendants Claim Consumers Can Earn Substantial Income as FES
                  Agents................................................................................34

b.  Consumers Do Not Realize Promised Earnings..................................37

2.  Defendants' Investment Opportunity Is an Illegal Pyramid Scheme.......40

a.  Defendants' Investment Opportunity Satisfies the First Prong of the *Koscot* Test—The Signup Process .....................................................41

b.  Defendants' Investment Opportunity Satisfies the Second Prong of the *Koscot* Test—The Compensation Plan Incentivizes Recruitment over Sales......................................................................................................42

3.  Defendants Provide Consumers with Marketing Materials and Training Thereby Providing Consumers with the Means and Instrumentalities to Engage in Deceptive Practices ................................................................54

C. Consumer Injury ...........................................................................................56

IV.   A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST DEFENDANTS ................................................................................................57

A. This Court Has the Authority to Grant the Requested Relief.......................57

B. The FTC Meets the Standard for Preliminary Injunctive Relief..................62

1.  The FTC Has Demonstrated Its Likelihood of Success on the Merits.....62

2.  Irreparable Harm Exists............................................................................63

3.  Because an Injunction Would Not Harm Others, the Equities Weigh in Favor of Granting Injunctive Relief .........................................................64

4.  The Public Interest Weighs in Favor of Injunctive Relief .......................65

C. Defendants Are a Common Enterprise and Jointly and Severally Liable for the Law Violations.........................................................................................66

D. The Individual Defendants Are Liable for Injunctive and Monetary Relief...............................................................................................................67

V.  THE SCOPE OF THE PROPOSED *EX PARTE* TRO IS APPROPRIATE IN
    LIGHT OF DEFENDANTS' CONDUCT ........................................................69

    A. Conduct Relief ...................................................................................69

    B. An Asset Preservation Order and an Accounting of Assets Are Necessary to
       Preserve the Possibility of Final Effective Relief .........................................70

    C. A Receiver Is Necessary to Protect the Public and Injured Consumers........73

    D. Preservation of Records.................................................................74

    E. Immediate Access and Expedited Discovery .................................75

    F. The TRO Should Be Issued *Ex Parte* to Preserve the Court's Ability to
       Fashion Meaningful Relief.............................................................76

VI.  CONCLUSION......................................................................................77

# TABLE OF AUTHORITIES

## CASES

*Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*,
796 F.3d 636 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1246 (2016) ............62

*AT&T Broadband v. Tech Commc'ns.*,
381 F.3d 1309 (11th Cir. 2004) ...................................................................76

*Baker v. Family Credit Counseling Corp.*,
440 F. Supp. 2d 392 (E.D. Pa. 2006)............................................................13

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999)......................................................................................58

*Cenergy Corp. v. Bryson Oil & Gas P.L.C.*,
657 F. Supp. 867 (D. Nev. 1987)..................................................................76

*CFTC v. British Am. Commodity Options Corp.*,
560 F.2d 135 (2d Cir. 1977) .........................................................................65

*CFTC v. Hunt*,
591 F.2d 1211 (7th Cir. 1979) ......................................................................64

*Chas. A. Brewer & Sons v. FTC*,
158 F.2d 74 (6th Cir. 1946) ..........................................................................54

*City of New York v. Golden Feather Smoke Shop, Inc.,*
597 F.3d 115 (2d Cir. 2010) .........................................................................63

*Cmty. Blood Bank of the Kansas City Area v. FTC*,
405 F.2d 1011 (8th Cir. 1969) ......................................................................59

*Daniel Chapter One v. FTC*,
405 F. App'x 505 (D.C. Cir. 2010) ..............................................................61

*Deckert v. Independence Shares Corp.*,
311 U.S. 282 (1940)......................................................................................70

*Del. Watch Co. v. FTC*,
    332 F.2d 745 (2d Cir. 1964) ........................................................................66

*Exposition Press, Inc. v. FTC*,
    295 F.2d 869 (2d Cir. 1961) ........................................................................13

*Fed. Express Corp. v. Fed. Expresso, Inc.*,
    1997 U.S. Dist. LEXIS 19144 (N.D.N.Y. Nov. 24, 1997)............................75

*First Tech. Safety Sys., Inc. v. Depinet*,
    11 F.3d 641 (6th Cir. 1993) ........................................................................76

*FSLIC v. Dixon*,
    835 F.2d 554 (5th Cir. 1987) ......................................................................75

*FTC v. Absolute Fin. Servs.*,
    2020 U.S. Dist. LEXIS 260869 (D.S.C. Jul. 17, 2020)................................65

*FTC v. Affordable Media, LLC*,
    179 F.3d 1228 (9th Cir. 1999) ........................................................57, 68, 71

*FTC v. Ameridebt, Inc.*,
    343 F. Supp. 2d 451 (D. Md. 2004)..............................................................61

*FTC v. Amy Travel Serv. Inc.*,
    875 F.2d 564 (7th Cir. 1989) ....................................................57, 67, 68, 70

*FTC v. Beatrice Foods Co.*,
    587 F.2d 1225 (D.C. Cir. 1978)....................................................................62

*FTC v. BlueHippo Funding, LLC*,
    762 F.3d 238 (2d Cir. 2014) ........................................................................12

*FTC v. Bronson Partners, LLC*,
    564 F. Supp. 2d 119 (D. Conn. 2008) ....................................................10, 11

*FTC v. BurnLounge, Inc.*,
    753 F.3d 878 (9th Cir. 2014) ..........................................................40, 42, 43

*FTC v. Campbell Capital LLC*,
  2018 U.S. Dist. LEXIS 186728 (W.D.N.Y. Oct. 24, 2018) .........................65

*FTC v. Consumer Def., LLC*,
  926 F.3d 1208 (9th Cir. 2019) .......................................................................63

*FTC v. D Squared Sols., LLC*,
  2003 WL 22881377 (D. Md. Oct. 30, 2003) .................................................72

*FTC v. Direct Mktg. Concepts, Inc.*,
  624 F.3d 1 (1st Cir. 2010)..............................................................................11

*FTC et al. v. Educare Centre Servs. Inc.*,
  2020 U.S. Dist. LEXIS 135341 (W.D. Tex. Apr. 3, 2020) ...........................65

*FTC v. E.M.A. Nationwide, Inc.*,
  767 F.3d 611 (6th 2014) .................................... 10, 11, 12, 13, 38, 66, 67, 68

*FTC v. Figgie Int'l*,
  994 F.2d 595 (9th 1993) .................................................................................12

*FTC v. Five-Star Auto Club*,
  97 F. Supp. 2d 502 (S.D.N.Y. 2000) ..................................................10, 54, 64

*FTC v. Gill*,
  265 F.3d 944 (9th Cir. 2001) ...................................................................13, 30

*FTC v. Gill*,
  183 F. Supp. 2d 1171 (C.D. Cal. 2001) ........................................................61

*FTC v. Gill*,
  71 F. Supp. 2d 1030 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944
  (9th Cir. 2001) ...............................................................................................11

*FTC v. H.N. Singer, Inc.*,
  668 F.2d 1107 (9th Cir. 1982) .......................................................................57

*FTC v. IAB Mktg.*,
  746 F.3d 1228 (11th Cir. 2014) .....................................................................70

*FTC v. Innovative Designs, Inc.*,
    489 F. Supp. 3d 378 (W.D. Pa. 2020) ............................................................54

*FTC v. Int'l Computer, Concepts Inc.*,
    1995 U.S. Dist. LEXIS 22702 (N.D. Ohio Oct. 24, 1995)............................10

*FTC v. Mallett*,
    818 F. Supp. 2d 142 (D.D.C. 2011)................................................................65

*FTC v. Moses*,
    913 F.3d 297 (2d Cir. 2019) ..........................................................................68

*FTC v. Nat'l Urological Group, Inc.*,
    645 F. Supp. 2d 1167 (N.D. Ga. 2008), *aff'd* 356 Fed. Appx. 358
    (11th Cir. 2009) ..............................................................................................68

*FTC v. Noland*,
    2021 U.S. Dist. LEXIS 171265 (D. Ariz. Sep. 9, 2021) ...............................54

*FTC v. OMICS Grp. Inc.*,
    2017 U.S. Dist. LEXIS 161910 (D. Nev. Sep. 29, 2017)..............................12

*FTC v. RCA Credit Servs., LLC*,
    727 F. Supp. 2d 1320 (M.D. Fla. 2010) ........................................................13

*FTC v. Ross*,
    743 F.3d 886 (4th Cir. 2014) .........................................................................57

*FTC v. Simple Health Plans, LLC*,
    379 F. Supp. 3d 1346 (S.D. Fla. 2019).........................................................65

*FTC v. Southwest Sunsites, Inc.*,
    665 F.2d 711 (5th Cir. 1982) .........................................................................57

*FTC v. Sterling Drug, Inc.*,
    317 F.2d 669 (2d Cir. 1963) ..........................................................................11

*FTC v. Strano*,
    528 F. App'x 47 (2d Cir. 2013)......................................................................70

*FTC v. Univ. Health, Inc.*,
    938 F.2d 1206 (11th Cir. 1991) ......................................................62

*FTC v. USA Beverages, Inc.*,
    2005 U.S. Dist. LEXIS 39075 (S.D. Fla. Dec. 5, 2005)...............................71

*FTC v. USA Fin., LLC*,
    415 Fed. Appx. 970 (11th Cir. 2011) ...........................................67

*FTC v. U.S. Oil & Gas Corp.*,
    748 F.2d 1431 (11th Cir. 1984) .........................................57, 58, 73

*FTC v. Vemma Nutrition Co.*,
    2015 U.S. Dist. LEXIS 179855 (D. Ariz. Sep. 18, 2015) ......................42, 54

*FTC v. Verity Int'l Ltd.*,
    443 F.3d 48 (2d Cir. 2006) ......................................................12

*FTC v. Voc. Guides, Inc.*,
    2006 U.S. Dist. LEXIS 82308 (M.D. Tenn. Nov. 9, 2006)...........................12

*FTC v. Winsted Hosiery Co.*,
    258 U.S. 483 (1922)...............................................................53

*FTC v. World Travel Vacation Brokers*,
    861 F.2d 1020 (7th Cir. 1988) ...............................................12, 70

*FTC v. World Wide Factors, Ltd.*,
    882 F.2d 344 (9th Cir. 1989) ...............................................62, 64

*Flynt Distrib. Co. Inc. v. Harvey*,
    734 F.2d 1389 (9th Cir. 1984) ...................................................62

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) .....................................................70

*Heideman v. S. Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) ..................................................62

*Kemp v. Peterson,*
    940 F.2d 110 (4th Cir. 1991) ............................................................................ 63

*Kerrigan v. Visalus, Inc.,*
    112 F. Supp. 3d 580 (E.D. Mich. 2015) ..................................................... 41, 43

*King v. Capital One Bank (USA), N.A.,*
    2012 U.S. Dist. LEXIS 163562 (W.D. Va. Nov. 15, 2012) ........................... 13

*In re Koscot Interplanetary, Inc.,*
    86 F.T.C. 1106 (1975) ................................................................................... 40

*In the Matter of McGaughey,*
    748 F.3d 904 (7th Cir. 1997) ........................................................................ 73

*McGirr v. Rehme,*
    891 F.3d 603 (6th Cir. 2018) ........................................................................ 63

*Mullins v. City of New York,*
    626 F.3d 47 (2d Cir. 2010) ............................................................................ 62

*Nat'l Soc'y of Prof. Eng'rs. v. United States,*
    435 U.S. 679 (1978) ...................................................................................... 65

*Ohio Christian College,*
    80 F.T.C. 815 (1972) ..................................................................................... 59

*P.F. Collier & Son Corp. v. FTC,*
    427 F.2d 261 (6th Cir. 1970) ........................................................................ 66

*Porter v. Warner Holding Co.,*
    328 U.S. 395 (1946) ...................................................................................... 75

*Removatron Int'l Corp. v. FTC,*
    884 F.2d 1489 (1st Cir. 1989) ........................................................... 11, 12, 38

*Resort Car Rental Sys., Inc. v. FTC,*
    518 F.2d 962 (9th Cir. 1975) ........................................................................ 13

*SEC v. Bravata*,
    2009 U.S. Dist. LEXIS 64609 (E.D. Mich. Jul. 27, 2009)............................75

*SEC v. First Fin. Grp. of Tex.*,
    645 F.2d 429 (5th Cir. Unit A May 1981).....................................................73

*SEC v. Prater*,
    289 F. Supp. 2d 39 (D. Conn. 2003) .............................................................66

*SEC v. R.J. Allen & Assoc., Inc.*,
    386 F. Supp. 866 (S.D. Fla. 1974)..........................................................64, 73

*SEC v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990) ........................................................................74

*In re Thompson Medical Co.*,
    104 F.T.C. 648 (1984), aff'd, 791 F.2d 189 (D.C. Cir. 1986)......................10

*United States v. City and County of San Francisco*,
    310 U.S. 16 (1940).........................................................................................63

*United States v. Diapulse Corp. of Am.*,
    457 F.2d 25 (2d Cir. 1972) .......................................................................63, 64

*United States v. First Nat'l City Bank*,
    379 U.S. 378 (1965).......................................................................................71

*United States v. Gold Unlimited, Inc.*,
    177 F.3d 472 (6th Cir. 1999) .............................................................40, 41, 42

*Versah v. UI Amin Indus.*,
    2020 U.S. Dist. LEXIS 230761 (E.D. Mich. Dec. 9, 2020).........................71

*In re Vuitton et Fils, S.A.*,
    606 F.2d 1 (2d. Cir. 1979) .............................................................................76

*Waltham Watch Co. v. FTC*,
    318 F.2d 28 (7th Cir. 1963) ...........................................................................54

*Webster v. Omnitrition Int'l,*
    79 F.3d 776 (9th Cir. 1996) ...............................................................40, 41, 43

*Williamson v. Recovery Ltd. P'ship,*
    731 F.3d 608 (6th Cir. 2013) ...............................................................63, 64, 71

*Zimmerman v. Cambridge Credit Counseling Corp.,*
    409 F.3d 473 (1st Cir. 2005).................................................................13, 60

## STATUTES

15 U.S.C. §§ 41–58 .................................................................................2

15 U.S.C. § 44 .......................................................................................58

15 U.S.C. § 45 .........................................................................1, 9, 33, 53

15 U.S.C. § 45(a) ....................................................................................2

15 U.S.C. § 53(b) .........................................................................2, 3, 56, 57

15 U.S.C. § 57b .......................................................................................2, 3

15 U.S.C. § 57b(b) .................................................................................57

15 U.S.C. §§ 1679–1679j .......................................................................1, 2, 3

15 U.S.C. § 1679a(3) .............................................................................13

15 U.S.C. § 1679b(a)(3) .........................................................................13

15 U.S.C. § 1679b(b) .............................................................................30

15 U.S.C. § 1679c(a) .............................................................................28

15 U.S.C. § 1679d(b)(2) .........................................................................28

15 U.S.C. § 1679d(b)(4) .........................................................................29

15 U.S.C. § 1679e(b) ......................................................................................29

15 U.S.C. § 1679e(c) ......................................................................................29

15 U.S.C. § 1679h(b) .......................................................................................3

15 U.S.C. § 1679h(b)(1) ................................................................................57

15 U.S.C. § 1679h(b)(2) ................................................................................57

15 U.S.C. §§ 6101–6108 ..................................................................................3

15 U.S.C. § 6105(b) ..........................................................................................3

16 C.F.R. Part 310...................................................................................... 2, 3

16 C.F.R. § 310.3(a)(2)(iii) ...........................................................................14

16 C.F.R. § 310.3(a)(2)(vi) ...........................................................................33

16 C.F.R. § 310.4(a)(2) ..................................................................................30

16 C.F.R. § 310.6(b)(5)............................................................................ 14, 33

Mich. Comp. Laws § 450.2131(2) ................................................................60

Fed. R. Civ. P. 65(b) ................................................................................ 75, 76

## MISCELLANEOUS

S. Rep. No. 130, 103rd  Cong., 2d Sess. 15-16, reprinted in 1994 U.S. Code Cong.
& Admin. News 1776 ......................................................................................76

## I.    INTRODUCTION

Plaintiff, the Federal Trade Commission ("FTC"), brings this action to halt an illegal credit repair and pyramid scheme that has defrauded hundreds of millions of dollars from consumers nationwide.  Through Internet websites, social media, telemarketing, and a network of sales agents, Defendants target both English and Spanish-speaking consumers with false promises that they will substantially improve consumers' credit scores by removing all negative items on their credit reports and adding purported credit building products.  Despite their promises and the extraction of sometimes hundreds of dollars in illegal advance fees from individual consumers, Defendants routinely fail to repair consumers' credit or raise their credit scores.

Defendants also solicit consumers to become sales agents ("FES Agents") to market their credit repair services with promises of substantial income.  In reality, however, Defendants are running an illegal pyramid scheme and few consumers ever realize the promised earnings.  Defendants' compensation plan and policies and procedures show that they incentivize recruitment of new FES Agents over selling credit repair services.

Defendants' actions violate Section 5 of the FTC Act, 15 U.S.C. § 45, multiple provisions of the Credit Repair Organizations Act ("CROA"), 15 U.S.C.

§§ 1679–1679j, and multiple provisions of the FTC's Telemarketing Sales Rule

("TSR"), 16 C.F.R. Part 310.

Although the state of Georgia brought a state court proceeding against them

in 2019, Defendants' unlawful practices continue unabated.  Accordingly, to put an

immediate stop to Defendants' illegal conduct, the FTC seeks, pursuant to Sections

13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, an *ex parte* temporary

restraining order ("TRO") that would enjoin Defendants' illegal practices, freeze

their assets, appoint a temporary receiver over the Corporate Defendants (defined

below), allow the receiver and the FTC immediate access to Defendants' business

premises to inspect and copy documents, and impose other relief.  These measures

are necessary to prevent continued consumer injury, dissipation of assets, and the

destruction of evidence, thereby preserving this Court's ability to provide effective

final relief.

## II.   THE PARTIES

### A. Federal Trade Commission

Plaintiff FTC is an independent agency of the United States government

created by the FTC Act, 15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of

the FTC Act, 15 U.S.C. § 45 (a), which prohibits unfair and deceptive acts or

practices in or affecting commerce.  In addition, the FTC also enforces the

following statutes, rules, and regulations:

- CROA, 15 U.S.C. §§ 1679–1679j, which prohibits untrue or misleading representations relating to credit repair services, requires certain affirmative disclosures, and prohibits the charging of advance fees before such services are fully performed.

- The TSR, 16 C.F.R. Part 310, promulgated by the FTC pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101–6108, which prohibits deceptive and abusive telemarketing acts or practices.

Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and specific provisions in the statutes and rules listed above[1] authorize the FTC, through its own attorneys, to initiate federal court proceedings to enjoin violations of the FTC Act, CROA, and the TSR, and to secure such relief as the Court finds necessary to redress injury to consumers or other persons, including rescission or reformation of contracts and the refund of money or return of property, the payment of damages, and public notification.

**B. Defendants**

Defendants include six interrelated corporations operating as a common enterprise (the "Corporate Defendants") and four individuals who manage and run the credit repair and investment opportunity scams (the "Individual Defendants"). The Corporate Defendants are:

- **Financial Education Services, Inc.** ("FES") is a Michigan company incorporated on March 13, 2007, under the name Credit Education Services,

---

[1] *See* Section 410(b) of CROA, 15 U.S.C. § 1679h(b), Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b).

Inc.  (PX16 at 1 ¶ 2; PX24 at 9 ¶ 45, Att. I at 263-65.)  It changed its name
to FES on September 7, 2007.  (PX24 at 9 ¶ 46, Att. I at 266-67.)  FES also
does (or has done) business under the names American Credit Education
Premium Services, American Credit Education Services, United Credit
Education Premium Services, United Credit Education Services, United
Wealth Education, and VR-Tech Marketing Group.  (PX24 at 9 ¶ 48, Att. I
at 269-71.)

- **United Wealth Services, Inc.** ("United Wealth") is a Michigan company
  incorporated on May 28, 2021.  (PX24 at 18 ¶ 91, Att. AA at 529-30.)
  United Wealth also does business under the name United Wealth Education.
  (PX24 at 18 ¶ 92, Att. AA at 531, 533-34.)

- **VR-Tech, LLC** ("VR-Tech") is a Michigan limited liability company
  formed on June 9, 2003, under the name VR-Tech Data Processing
  Solutions, LLC.  (PX24 at 12 ¶ 62, Att. O at 401.)  It changed its name to
  VR-Tech on May 14, 2008.  (PX24 at 12 ¶ 63, Att. O at 402.)  On July 7,
  2008, VR-Tech merged with two previously incorporated Michigan
  companies, VR-Tech Software Solutions, LLC (formed June 17, 2003) and
  VR-Tech Marketing Group, LLC (formed October 6, 2004).  (PX24 at 12-13
  ¶¶ 62, 64, Att. O at 403-06.)  VR-Tech also does business under the name
  Financial Education & Services, LLC.  (PX13 ¶ 66, Att. O at 410.)

- **VR-Tech MGT, LLC** ("VR-Tech MGT") is a Michigan limited liability
  company formed on November 19, 2009.  (PX24 at 15 ¶ 78, Att. U at 487.)

- **CM Rent Inc.** ("CM Rent") is a Colorado company incorporated on July 10,
  2017.  (PX24 at 16 ¶ 82, Att. W at 495-97.)  CM Rent was registered as a
  foreign corporation in Michigan on July 12, 2017.  (PX24 at 16 ¶ 83, Att. W
  at 498-99.)

- **Youth Financial Literacy Foundation** ("Youth Financial") is a purported
  non-profit company incorporated in Michigan on April 7, 2003, under the
  name MSU Common Sense, Inc., which changed its name to The Thompson
  Scholarship Foundation, Inc. on February 8, 2006, which changed its name
  to Patro Scholarship Foundation, Inc. on April 30, 2009, which changed its
  name to Youth Financial on January 29, 2010.  (PX16 at 1 ¶ 3; PX17 at 2-3
  ¶ 15; PX18 at 2 ¶ 11; PX24 at 4-5 ¶¶ 16-18, 20, Att. B at 178-191.)  Youth
  Financial also does business (or has done business) under the names

American Credit Education Services, Financial Education, Financial Literacy Education Services, and United Credit Education Services.  (PX16 at 2 ¶ 5; PX17 at 2-3 ¶ 15; PX18 at 1 ¶ 4; PX24 at 5 ¶¶ 22-23, 7 ¶ 33, Att. B at 193-95, 197, Att. RR at 730.)  Although Youth Financial may be registered with the Internal Revenue Service ("IRS") as a 501(c)(3) organization, as discussed in Section IV.A below, it is in fact a sham non-profit that Defendants use to funnel the proceeds of their wrongdoing to themselves.

The Individual Defendants are:

- **Parimal Naik** is or was an owner, officer, director, or manager of FES (president, chief executive officer, vice-president, secretary, treasurer, director), United Wealth (chief executive officer), VR-Tech (manager, chief executive officer), and Youth Financial (president, secretary, director). (PX17 at 2 ¶ 9; PX18 at 1 ¶ 2; PX24 at 4 ¶ 19, 5 ¶¶ 22, 24, 6 ¶ 30, 9 ¶ 47, 10 ¶¶ 49, 51, 53, 10-11 ¶¶ 54-55, 11 ¶ 56, 11-12 ¶ 58, 12-13 ¶ 64, 13 ¶¶ 65-67, 14 ¶ 74, 18-19 ¶ 93, 28 ¶ 108, Att. B at 193-94, 196, Att. C at 205, Att. I at 268, 272-73, 277, 280, Att. J at 283, Att. M at 376, Att. O at 406, 412-21, Att. P at 423-24, Att. S at 456, Att. BB at 536, Att. C at 541, Att. SS at 767.) He is an authorized signatory on many of Defendants' bank accounts. (PX24 at 6 ¶ 30, 10-11 ¶¶ 54-55, 13 ¶ 67, 15 ¶ 77, 18-19 ¶ 93, 34 ¶ 123, Att. C at 205, Att. J at 283-84, Att. P at 424, Att. BB at 536.)  He is the registrant and contact for Defendants' websites and telecommunications services. (PX24 at 14 ¶ 70, 19-20 ¶ 98, Att. Q at 426-46, Att. T at 470, Att. EE at 558-64.)  The operation's telecommunications services are often paid using his credit card.  (PX24 at 20 ¶ 101, Att. Q at 435, 441, Att. T at 472-78, 480-83, 485.)

- **Michael Toloff** is or was an owner, officer, director, or manager of FES (president, treasurer, and director), VR-Tech Mgt (manager, president, chief executive officer), and Youth Financial (president, treasurer, director). (PX16 at 1 ¶ 1; PX17 at 1 ¶ 1; PX24 at 4 ¶ 19, 6 ¶ 30, 7 ¶¶ 35-37, 8 ¶ 40, 9 ¶¶ 46-48, 10 ¶¶ 49, 51, 10-11 ¶ 54, 11 ¶¶ 56-57, 12-13 ¶ 64, 13 ¶ 65, 14 ¶ 71, 16 ¶ 80, 29 ¶ 108, Att. B at 196, Att. C at 205, Att. D at 217, 221-22, Att. I at 267-68, 271-73, 277, Att. J at 283, Att. K at 287-88, Att. L at 292, 296-98, 374, Att. R at 448-49, Att. U at 488-89, Att. V at 491, Att. SS at 767.) He is an authorized signatory on many of Defendants' bank accounts. (PX24 at 6 ¶ 30, 10-11 ¶ 54, 15 ¶ 77, 16 ¶ 80, 34 ¶ 123, Att. C at 205, Att. J

at 283, Att. V at 491.)  The operation's telecommunications services have
been paid using his credit card.  (PX24 Att. T at 484.)

- **Christopher Toloff** is or was an owner, officer, director, or manager of FES
  (treasurer, director, chief financial officer), VR-Tech (chief financial
  officer), VR-Tech Mgt (chief financial officer), CM Rent (chief financial
  officer, secretary), and Youth Financial (chief financial officer).  (PX24 at 6-
  7 ¶¶ 30-32, 8 ¶¶ 42, 43, 10 ¶ 49, 10-11 ¶¶ 54-55, 13 ¶ 67, 16 ¶ 80, 17 ¶¶ 85-
  87, 18 ¶ 90, 30 ¶ 108, Att. C at 205-07, Att. F at 251, Att. G at 258, Att. I at
  272-73, Att. J at 283, Att. P at 423-24, Att. V at 491, Att. X at 510, 516, Att.
  Z at 527.)  He is an authorized signatory on many of Defendants' bank
  accounts.  (PX24 at 6-7 ¶¶ 30-32, 10-11 ¶¶ 54-55, 13 ¶ 67, 15 ¶ 77, 16 ¶
  80.), 17 ¶¶ 85-87, 18-19 ¶ 93, 34 ¶ 123, Att. C at 205-07, Att. J at 283-84,
  Att. P at 424, Att. V at 491, Att. X at 510-16, Att. BB at 537; PX25 Att. C at
  27.)

- **Gerald Thompson** is or was an owner, officer, director, or manager of FES
  (secretary, director), United Wealth (authorized agent), and Youth Financial
  (president, secretary, director).  (PX17 at 2 ¶ 10; PX19 at 1 ¶ 2; PX24 at 5 ¶¶
  21, 23-26, 6-7 ¶¶ 28-29, 31-32, 8 ¶ 39, 9 ¶ 47, 10 ¶¶ 49-50, 30 ¶ 108, Att. B
  at 192, 195-202, Att. C at 206-07, Att. E at 225, 227, Att. I at 268, 272-73,
  Att. VV at 868.)  He is an authorized signatory on many of Defendants'
  bank accounts.  (PX07 Att. K at 62-63; PX24 at 6-7 ¶¶ 31-32, 34 ¶ 123, Att.
  C at 206-07.) The operation's telecommunications services have been paid
  using his credit card.  (PX24 Att. H at 261.)

Defendants operate as a common enterprise, defrauding consumers with
their credit repair and pyramid scheme.  There is substantial evidence of the
entities' intertwinement.  Corporate records and documents show that the various
Corporate Defendants are commonly owned or managed by the Individual
Defendants and share employees and addresses.  (PX16 at 1 ¶¶ 2-3 (FES and
Youth Financial share same principal place of business); PX17 at 1 ¶¶ 2-3 (same);
PX18 at 1 ¶¶ 3-4 (same); PX24 at 8 ¶ 42 (same payroll account covers Youth

Financial, FES, VR-Tech, and VR-Tech MGT), 22-27 ¶ 107, 28-30 ¶ 108, 31-32

¶¶ 113-114, Att. F at 238-52, Att. VV at 913 (when asked if Youth Financial and

FES employees were one and the same, Defendant Thompson stated "It's the same

group of people acting in dual capacity").)  Bank records demonstrate routine

commingling of funds, with regular transfers between the various companies.

(PX24 at 37 ¶ 130.)  Defendants appear to use each company for distinct functions,

*e.g.*, FES and United Wealth market the credit repair services and investment

opportunity; Youth Financial and CM Rent nominally provide the credit repair

services; and the operations' websites and telecommunications services are in the

name of VR-Tech and VR-Tech Mgt.  (PX16 at 2 ¶¶ 5-8; PX17 at 2-3 ¶¶ 13-14,

18; PX18 at 2 ¶ 12; PX19 at 2 ¶ 8; PX24 at 13 ¶ 69, 15 ¶ 75, 46 ¶ 157, Att. L at

367, Att. Q at 426-46, Att. T at 470, Att. RR at 729, 732, 742-44, Att. VV at 914.)

Defendants, however, blur corporate distinctions when interacting with

consumers—for example, consumers' payments are processed by various merchant

accounts in the names of Youth Financial, CM Rent, VR-Tech, and FES.

(*Compare* PX07 Att. C at 16 (consumer referred to as FES customer) *with* Att. J at

51-60 (consumer's payments processed by United Credit Education) *and* Att. K at

62 (refund issued by Youth Financial); PX12 Att. H at 32-26 (consumer variously

billed by United Credit Education and Financial Education Service); PX13 at 1-2 ¶

6 (consumer understood that United Credit Education Services provided credit

repair while FES ran the investment opportunity), 7 ¶ 31 (consumer who enrolled with FES in 2019 learned in 2021 that FES now operating under name United Wealth Education); PX24 at 15 ¶ 75, Att. R at 448-54, Att. S at 456-68, Att. CC at 541, Att. UU at 823, Att. VV at 896-97; PX25 Att. A at 10-21 (over six month period, monthly fees were debited by "Financial Education," "FES/UWE," and "UWE/UCES"), Att. B at 24 (refund issued by UWE/UCES), Att. C at 27 (additional refund issued by Financial Education Services); PX26 at 18-19 ¶ 53 (consumer told that FES was now United Credit Education Services), Att. B at 95-97.)

Defendants market their credit repair services and investment opportunity using their network of FES Agents located throughout the United States.  (PX16 at 2 ¶ 8.)  Their corporate headquarters are located at 37735 Enterprise Court, Farmington Hills, Michigan.  (PX16 at 1 ¶¶ 2, 3; PX17 at 1 ¶ 2; PX18 at 1 ¶¶ 3-4; PX19 at 1 ¶ 3; PX24 at 8 ¶ 41, 17 ¶ 87, 18 ¶¶ 90-91, 42 ¶ 147, Att. A at 100, 125, 147, Att. O at 421, Att. T at 471, Att. U at 489, Att. X at 516, Att. Z at 525, Att. CC at 541.)  They also have maintained several P.O. boxes in communications with consumers.  (PX07 Att. E at 21 (PO Box 130 Farmington, MI); PX11 Att. C at 10 (PO Box 417, Farmington, MI); PX14 Att. F at 33 (same); PX25 Att. C at 27 (same).)

The FTC's action is not Defendants' first tangle with law enforcement concerning these activities. The State of Georgia sued Financial Education Services, Michael Toloff, and Parimal Naik in May 2019 for unlawful credit repair services and pyramid scheme activities. (PX24 at 41 ¶ 141, Att. WW at 919-44; *See also* PX01 at 4-5 ¶ 14, Att. F at 32.) The parties entered into a consent judgment in July 2019 that, among other things, banned Defendants from operating within the state of Georgia and imposed a monetary judgment of $1.75 million. (PX24 Att. XX at 946-72.)

## III. DEFENDANTS' UNLAWFUL BUSINESS PRACTICES

### A. Defendants' Unlawful Credit Repair Services

Since at least 2015, Defendants have deceptively marketed credit repair services online and through telemarketing. Defendants' unlawful credit repair practices fall into four categories: (1) false promises that they will improve consumers' credit scores by removing negative information and adding credit building products (such as purporting to report consumers' rent payments or offering secured credit cards); and (2) failures to make required CROA disclosures and provide written contracts; and (3) collection of prohibited advance fees.

#### 1. Defendants' False Claims Regarding the Efficacy of their Credit Repair Services

Section 5 of the FTC Act prohibits "unfair or deceptive practices in or affecting commerce." 15 U.S.C. § 45. To establish that an act or practice is

deceptive under Section 5(a), the FTC must demonstrate that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630-31 (6th Cir. 2014) (citation omitted).

A "material" misrepresentation is one that is "likely to affect a consumer's decision to buy a product or service." *Id.* at 631. Express claims are presumed material, and require no extrinsic evidence regarding how a reasonable consumer would have perceived them. *See FTC v. Bronson Partners, LLC,* 564 F. Supp. 2d 119, 125, 135 (D. Conn. 2008); *In re Thompson Medical Co*., 104 F.T.C. 648, 788-89 (1984), *aff'd* 791 F.2d 189 (D.C. Cir. 1986).

In considering whether a claim is deceptive, the Court must consider the "net impression" created by the representation. *E.M.A. Nationwide*, 767 F.3d at 631; *FTC v. Int'l Computer, Concepts Inc*., 1995 U.S. Dist. LEXIS 22702, at *7-8 (N.D. Ohio Oct. 24, 1995) ("In determining the message conveyed by a representation, it is the overall net impression that counts. Fine print or ineffective disclaimers do not change the message conveyed if the overall net impression is different."); *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) ("[T]he Court must consider the misrepresentations at issue, by viewing [them] as a whole without emphasizing isolated words or phrases apart from their context."); *FTC v.*

*Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963) ("The entire mosaic should be viewed rather than each tile separately."). Defendants cannot make considerable material misrepresentations to consumers and then bury corrections and disclaimers in subsequent communications. *E.M.A. Nationwide*, 767 F.3d at 633; *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) (finding that disclaimers appearing in contracts signed by consumers were insufficient to create a genuine dispute of material fact "because each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information").

Further, "[w]hen an advertisement contains a testimonial reflecting the experience of an individual with a product, there is an implicit representation that such experience reflects the typical or ordinary results anyone may anticipate from use of the product." *Bronson Partners*, 564 F. Supp. 2d at 125 (citation omitted). Advertisements featuring testimonials of atypical or extraordinary outcomes are therefore misleading.

A representation is also deceptive if the maker of the representation lacks a reasonable basis for the claim. *See FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010). Where the maker lacks adequate substantiation evidence, they necessarily lack any reasonable basis for their claims. *Id.*; *see also Removatron*

*Int'l Corp.*, 884 F.2d at 1498; *FTC v. OMICS Grp. Inc.*, 2017 U.S. Dist. LEXIS 161910, at *5 (D. Nev. Sep. 29, 2017).

The FTC need not prove reliance by each consumer misled by Defendants. *See FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 244 (2d Cir. 2014); *FTC v. Figgie Int'l*, 994 F2d 595, 605 (9th Cir. 1993); *FTC v. Voc. Guides, Inc.*, 2006 U.S. Dist. LEXIS 82308, at *49 (M.D. Tenn. Nov. 9, 2006).  Instead, "the FTC is entitled to a presumption of consumer reliance upon showing that (1) the defendant made material misrepresentations . . . of a kind usually relied upon by reasonable prudent persons; (2) [that] were widely disseminated; and (3) consumers actually purchased the defendants' products." *BlueHippo Funding*, 762 F.3d at 244; *Figgie Int'l*, 994 F2d at 605; *Voc. Guides*, 2006 U.S. Dist. LEXIS 82308, at *49-50.  And the FTC need not prove that Defendants' misrepresentations were made with an intent to defraud or deceive or were made in bad faith.  *See*, *e.g.*, *E.M.A. Nationwide*, 767 F.3d at 631; *FTC v. Verity Int'l, Ltd.*, 443 F. 3d 48, 63 (2d Cir. 2006); *Removatron*, 884 F.2d at 1495; *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1029 (7th Cir. 1988).

Further, it is unlawful to entice consumers with misrepresentations, even if a defendant later reveals the truth.  This is because the FTC Act is violated "if the first contact or interview is secured by deception . . . , even though the true facts are made known to the buyer before he enters into the contract of purchase."

*E.M.A. Nationwide*, 767 F.3d at 632; *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975); *Exposition Press, Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961).

Similarly, Section 404(a)(3) of CROA prohibits credit repair organizations from making or using "any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(3).[2] To establish a violation of this provision of CROA, the FTC only needs to show an untrue or misleading statement regarding a credit repair service; the statement need not be designed to induce the consumer's purchase. *FTC v. Gill*, 265 F.3d 944, 955 (9th Cir. 2001); *FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1334 (M.D. Fla. 2010).

---

[2] Defendants fall under CROA's broad definition of "credit repair organization," which covers any person who uses any instrumentality of interstate commerce or the mails to offer to provide services, in return for a fee, to improve a consumer's credit record, credit history, or credit rating. 15 U.S.C. § 1679a(3). And none of the Defendants can avail themselves of CROA exceptions. Although Youth Financial is a 501(c)(3) entity, it is still a "credit repair organization" subject to CROA. In *Zimmerman v. Cambridge Credit Counseling Corp.*, the First Circuit held that CROA's nonprofit organization exemption requires both that the organization "actually operates as a nonprofit entity" and that it holds 501(c)(3) status. 409 F.3d 473, 475 (1st Cir. 2005). Although not binding in the Sixth Circuit, district courts in other circuits have found *Zimmerman*'s ruling persuasive. *See King v. Capital One Bank (USA), N.A.*, 2012 U.S. Dist. LEXIS 163562, at *5 n.3 (W.D. Va. Nov. 15, 2012); *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 405 (E.D. Pa. 2006). As discussed in Section IV.A below, the evidence demonstrates that Youth Financial is a sham non-profit; thus, the Court should find that it is subject to CROA despite its 501(c)(3) status.

Meanwhile, Section 310.3(a)(2)(iii) of the TSR prohibits sellers and telemarketers from "misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(iii).[3]

Here, Defendants' core misrepresentation is that their purported credit repair services will substantially improve consumers' credit scores. On websites, social media accounts, and during sales calls with consumers, Defendants and their agents promise to remove negative items from consumers' credit reports. Defendants also claim they can add "credit building products" to consumers' credit histories. These credit building products include a service called Credit My Rent, which purports to report consumers' on-time rent payments to the credit reporting agencies ("CRAs"), and a secured credit card.

### a. Defendants Claim They Will Improve Consumers' Credit Scores by Removing Negative Information and Adding Positive Credit Building Products

Many consumers learn about Defendants' services by searching the Internet for credit repair companies and clicking on one of Defendants' websites or from various social media accounts run by Defendants and FES Agents on such

---

[3] Defendants' telemarketing activities—both inbound and outbound calls—are covered by the TSR. Although Section 310.6(b)(5) of the TSR generally exempts from TSR coverage inbound telemarketing calls in response to general medium advertising, there is an exception to the exemption for inbound calls relating to credit repair services. 16 C.F.R. § 310.6(b)(5).

platforms as Instagram, Facebook, and YouTube.  (PX01 at 1 ¶ 4; PX02 at 1 ¶ 2;

PX04 at 1 ¶ 2; PX05 at 1 ¶ 4; PX07 at 1 ¶¶ 4-6; PX09 at 19 ¶ 4; PX11 at 1 ¶ 2;

PX13 at 1 ¶ 3; PX14 at 1 ¶ 3; PX15 at 1 ¶ 4; PX26 at 2-3 ¶ 7, 15 ¶ 43, 57 ¶ 156.)

On their websites and in their agents' social media accounts and text and

direct message exchanges, Defendants promise to improve consumers' credit by

removing permanently negative information from consumers' files with the CRAs.

(PX01 at 1 ¶ 6, Att. C at 12, Att. D at 17 (Defendants' agent messaged consumer

that she knew about "a particular program" that could "help me remove negative

marks from my credit report and help raise my credit score" and do so within about

one month); PX02 Att. E at 28 ("Maximize Your Credit Score"); PX04 at 1 ¶¶ 2-3

(Defendants messaged consumer that they could increase her credit score by

removing negative items even if they were legitimate, including bankruptcies);

PX05 Att. G at 33 ("Do you have inaccurate, obsolete, or unverifiable items on

your credit report? We can work with…collections, bankruptcy, evictions,

repossessions, foreclosures, child support, student loans, medical bills, late

payments, and more…"); PX08 at 7 ¶ 21, Att. C at 17-21 ("If you seriously need to

have late payments, medical bills, or student loans removed from your credit report

comment 'I do' below!" and "IF YOUR CREDIT SCORE STARTS WITH A 3, 4,

5, or 6, Please DM me, I can help with that"); PX13 at 1 ¶ 4 (Facebook posts

claiming Defendants can remove negative items), Att. A at 10 ("Imagine being told

you can't even rent an apartment with your credit [emoji] after enrol [sic] in my program, 215 points later it's now HOME OWNER"), 18 (Did You Know? Late payments can be removed from your credit report & increase your score by 100 points!!"); PX15 Att. A at 9 ("Who needs negative items removed from their credit report Permanently???"), 10 ("$24,628 in student loans delete [sic]"), 11 ("9 student loans removed 31 collections removed  Who else can I help?"), 15 ("If your credit score starts with 3, 4, 5, or 6 contact me immediately.  We can help you change that"), 17 ("Attention!! If you have 400-500 credit score and want a 700-800 score, I have a connection that legally erases negative things"); PX25 Att. D at 29 ("Don't pay Collections or charge offs You can get them disputed from your credit"), 30 ("Does you credit score start with a 4, 5, or 6? Follow me & comment below to start your credit repair process today"); PX26 Att. A at 88, Att. C at 99, Att. K at 393 ("Any negative items on your credit score that are currently effecting your score Deleted!!"), 393 ("If you credit score is below 600 we have the financial services to help increase your credit").)

Defendants also promise to increase consumers' credit scores through various credit building products, including claims that consumers can "build credit within days!" using their Credit My Rent service and "build or rebuild credit" and "establish credit history" with a secured credit card.  (PX01 at 2 ¶ 8, Att. D at 18 (Defendants' agent discussed a "credit building system" that Defendants had

involving a secured card); PX05 at 3-4 ¶ 11 (as an FES Agent, consumer learned about Defendants' service that used rent payments to improve credit); PX05 Att. H at 35 ("Hey guys post … below if you'd be interested in having your rent help raise your credit!"); PX15 Att. A at 16 ("Who needs a Secured credit card to help boost their score?"), 22 ("Increase Your Credit Score Report Your Rent To Your Credit . . . Build your credit history and gain the credit you deserve with your on-time rent payments"); PX24 Att. HH at 577, 580 ("Build Credit Within Days!"), 586 ("it can help you dramatically build credit history"), Att. LL at 651-52, Att. MM at 670-71.)

Defendants claim that their services will substantially improve consumers' credit scores, including claims that "many of our clients have seen an increase of 100 points or more."  (PX01 at 3-4 ¶ 12 (Defendants' agents stated during Zoom presentation that Defendants would significantly raise consumers' credit scores by as much as 100 points); PX05 at 1 ¶ 4 (Facebook posts claiming 40-50 point credit score increases); PX07 at 1 ¶ 4 (Instagram post claiming 100 point score increase); PX13 at 1 ¶ 4 (Facebook posts with purported examples of consumers who saw 100 and 150 point increases or more); PX24 Att. II at 598 ("Many of our clients have seen an increase of 100 points or more"); PX25 Att. D at 31 ("We can help you get to 700 credit score and higher"); PX26 at 26 ¶ 77 (consumer told her score

would increase by up to 100 points), 50 ¶ 138, 60-61 ¶ 164 (consumer told she could see credit score increase by up to 200 points).)

When consumers contact Defendants' representatives, the representatives reiterate the online claims during the telephone conversations. (PX02 at 1-2 ¶ 4 (representative told consumer that Defendants "would remove negative information off my credit report, even if the negative entries were legitimate, like my medical debts"); PX03 at 1 ¶¶ 2, 5 (consumer recalled representative stating "the company had an office of attorneys who would draft letters to send to the credit bureaus" and that she would see "significant improvement to my credit score" within 90 days); PX04 at 1 ¶ 3 (representative assured consumer that Defendants "could remove a three-year old bankruptcy filing from [her] credit report"); PX05 at 1 ¶ 5 (consumer was promised that "every negative item [she] had would be disputed off [her] credit report" within three months); PX06 at 1 ¶ 5 (representative said Defendants would get negative marks removed from consumer's credit report, which would improve her credit); PX07 at 2 ¶ 7 (consumer recalled that representative told her they would "remove all negative marks and late payments" from her credit report, including bankruptcies and that Defendants had a dispute process "the credit bureaus don't want you to know about" and had lawyers that would write dispute letters); PX09 at 20 ¶ 7 (representative stated that consumer's score would rise from around 500 to 620 or

630 in just two months); PX11 at 1 ¶ 3 (representative told consumer Defendants could get rid of negative items on her credit report, such as medical bills or student loans, even if those items were legitimate and raise her score into the 600 to 700 point range in three months); PX12 at 1 ¶ 5 (representative told consumer that she "could expect to see a 30 to 60 point increase" within "30 and 90 days" after she enrolled), 4-5 ¶ 17 (during training as an FES Agent, representatives discussed Credit My Rent that purportedly used consumers' on-time rental payments to boost their credit and a secured card that also supposedly helped consumers build credit); PX14 at 2 ¶ 7 (consumer told that purchasing the Credit My Rent service would boost her score at least 80 points in a just a few weeks and would continue to climb the longer she used the service); PX24 Att. RR at 733-35; PX25 at 1-2 ¶ 6 (representative stated Defendants would "erase all negative accounts" and raise consumer's credit score to "700+ points"), 2 ¶ 9 (representative later claimed Defendants could make a court ordered debt "disappear altogether"); PX26 at 3 ¶ 8 (Defendants would remove student loan accounts); PX26 at 7-8 ¶ 20 (Defendants would remove late child support payments and bump consumer's credit above 700), 15-16 ¶ 44 (Defendants could remove bankruptcy), 23-24 ¶ 70 (consumer told his score would improve to 750 or higher.)  Indeed, a former employee who worked in customer service stated that she was instructed to refer unhappy

customers to Credit My Rent as another "means of raising a customer's credit score."  (PX24 at 54 ¶ 155.)

Defendants and their agents bolster these claims with numerous testimonials from purported satisfied customers.  (PX02 at 1 ¶ 3 (during Zoom meeting, FES agents described how consumers saw 150-point increases using Defendants' credit repair services); PX02 Att. C at 16 ("Huge Congratulations, New Home Owner!! She increased her credit 155 points"), 17 ("within a four month period her score increased 150 points!!"); PX05 at 6-7 ¶ 21, Att. G at 31 ("Y'all my girl just got a 42 point credit increase, and now qualifies for the best rate to buy her first home this spring!!"), 32 ("Your score has changed +55 pts"); PX13 Att. A at 12 ("When I started this journey I had a 514 credit score . . . Now life is so different after seeing a 196 point increase and other 20 point increase after that.  65 negative items deleted total!"), 13 ("Imagine being told that you COULD'NT [sic] GET and +111 POINTS LATER BOOM" . . . What we can do in MONTHS could take you YEARS to do"), 14 ("If you have 400-675 credit score and want a 700-800 credit score, David can LEGALLY erase negative items…repos, foreclosures, late payments, medical, student loans, evictions, and more"), 16 ("Congratulations to another client and his wife on a 202 point increase in his credit profile"), 17 ("This program really works!! I have witnessed my credit score increased by over +200 points"), 20 ("Real Clients Real Results! . . . 2 Delinquencies removed and 116

point increase!!"); PX24 Att. KK at 639 ("My credit score went up 140 points, from a 530 to a 670, in my first 30 days"), 640 ("I had three student loans removed from my credit reports within 45 days and my credit score increased from a 590 to a 662"), 641 ("when I started in the service I had a low 500 credit score and within six months it jumped to over 700 and I was able to purchase a new Mercedes Benz!"), 643 ("my credit score went up 174 points"), 644 ("My credit score went from a 586 to a 748"), 645 ("My credit score has gone up 120 points"), 646 ("after just four months, my credit score has climbed [from 490] to 610"), 647 ("Wow! My score increased from a 540 to a 696 in four months!"), 648 (score went from 412 to 714 in three months), 649 ("my credit score jumped 120 points"); PX26 at 12 ¶ 33, 15-16 ¶ 44, 21-22 ¶ 62, 60-61 ¶ 164, 78-79 ¶ 203 ("Lo hice por 16 meses, donde mi estado crediticio cambio de 25 artículos negativos con 430 puntos en mi crédito, a escalarlo a 749 en solamente 16 meses. [English translation: I did it for 16 months, where my credit status changed from 25 negative accounts and a 430 credit score to 749 in just 16 months.]"), Att. C at 100; PX26 Att. F at 254.)  Many consumers report that their decision to purchase Defendants' credit repair services was based in part on the many testimonials they saw.  (PX04 at 1 ¶ 4; PX14 at 1 ¶ 3.)

### b. Defendants Do Not Substantially Improve Consumers' Credit Scores

Despite their express guarantees, Defendants generally fail to improve consumers' credit scores or remove negative items from their credit reports. Defendants prepare and send to consumers manual dispute letters that they claim will remove negative information, thereby improving consumers' credit. (PX01 at 2 ¶ 8, Att. D at 18 (Defendants' representative explained that Defendants would generate "letters that would dispute negative marks" and that "Lawyers would carefully write these letters using proper legal verbiage."); PX02 at 2 ¶ 7; PX03 at 2 ¶ 8; PX04 at 2 ¶ 9; PX05 at 4 ¶ 12, Att. D at 16-19; PX07 at 2 ¶ 7, 4 ¶¶ 13-14, Att. D at 18, Att. E at 18-27; PX08 at 5-6 ¶ 17; PX09 at 19-20 ¶ 6 (Defendants would prepare letters to dispute all derogatory accounts), Att. C at 28-33; PX11 at 1 ¶ 3, 2 ¶ 9; PX14 at 2-3 ¶ 8; PX15 at 5 ¶ 17; PX24 at 43-44 ¶ 151, Att. KK at 636, Att. UU at 848-49; PX25 at 2 ¶ 7; PX26 at 6 ¶ 16, 8-9 ¶ 22, 10-11 ¶ 28, 17 ¶ 49.) Defendants then instruct consumers to sign and mail the letters to the various CRAs. (PX02 at 2 ¶ 7; PX03 at 2 ¶ 8; PX04 at 2 ¶ 10; PX05 at 4 ¶ 12; PX07 at 2 ¶ 7, 4 ¶¶ 13-14, Att. D at 18, Att. E at 18; PX08 at 5-6 ¶ 17; PX09 at 20 ¶ 11; PX14 Att. C at 13; PX25 at 3-4 ¶ 14.) Consumer declarants report that they received the letters as uneditable PDFs and that all they did was sign and mail them.[4] (PX04 at

---

[4] Indeed, one consumer recalled wanting to change some of the language in the letter she received because they were disputing items that were supposed to be on

2 ¶ 10; PX07 at 4 ¶ 13.)  In some instances, Defendants explain that the reason

their manual dispute letters worked was because eventually the credit bureaus

would stop responding to disputes in time, "forcing them to remove the disputed

accounts."  (PX01 at 2 ¶ 8, Att. D at 21; PX07 at 4 ¶ 13; PX25 at 2 ¶ 7.)  Indeed,

consumer Peter Markham recalled that Defendants encouraged FES Agents to

market their credit repair services by saying that because of the COVID-19

pandemic, the credit bureau and creditor work force would be less likely to

respond timely to dispute letters resulting in the automatic removal of the disputed

items.  (PX08 at 5-6 ¶ 17.)  A former employee-turned-informant who worked in

customer service explained that her manager stated that customer service was "the

first line of defense in getting customers to maintain their [credit repair]

subscriptions" and that the employees' job was "to do whatever was needed to

prevent customers from cancelling their subscriptions" and to emphasize that

Defendants "are a company that helps you restore your credit."  (PX24 at 44-45 ¶¶

153-54.)

Defendants also instruct consumers to forward to them any responses the

consumers obtain from the CRAs, explaining that they will review those responses

---

her credit report.  (PX07 at 5 ¶ 15.)  Defendants responded by saying the "credit
litigation team" said the "dispute letters' language could not be adjusted" and that
the consumer "would need to send the letters in the exact manner they were
written."  (PX07 at 5 ¶ 15, Att. G at 37.)

and prepare additional dispute letters.  (PX03 at 2 ¶ 8; PX04 at 2 ¶ 9, Att. B at 9,

Att. E at 18; PX08 at 5-6 ¶¶ 17-18; PX14 Att. C at 13; PX26 at 13 ¶ 35.)  Those

additional dispute letters, however, are often identical except for the date.  (PX03

at 2-3 ¶ 9.)  Given Defendants' fee structure, in which consumers make monthly

payments to Defendants to maintain access to their services, their manual dispute

letter process extends the period of time in which consumers pay the monthly fee.

(*See* PX03 at 2 ¶ 8 (consumer was told she had to wait 30-45 days between

rounds); PX07 at 5 ¶ 17, 6 ¶ 21; PX26 at 8-9 ¶ 22, 13 ¶ 35.)  Indeed, consumer

Peter Markham stated that when he was being trained to be an FES Agent, upline

FES Agents explained that "because credit repair consumers had to pay monthly

$89 fees for the service, elongating the service period meant additional revenue for

FES."  (PX08 at 6 ¶ 18.)

No credit repair company can remove accurate negative information that is

not obsolete on a consumer's credit report.  (PX20 at 2 ¶ 8; PX21 at 2-3 ¶¶ 7-8;

PX23 at 1 ¶ 6.)  The manual dispute letters prepared by Defendants do not increase

the odds of success.  (PX20 at 3-4 ¶ 14; PX23 at 3-4 ¶ 17.)  According to CRAs

Equifax and TransUnion, generally an unsupported assertion that information on a

credit report does not pertain to that consumer is not sufficient to cause a CRA to

delete the information without an attempt to verify the consumer's claim.  (PX20 at

4 ¶ 15; PX23 at 3-4 ¶ 17.)  Typically, when CRAs receive dispute letters that state

no specific basis for the disputes or dispute the same information previously

verified, they do not investigate the disputes.  (PX20 at 4 ¶ 16.)  And Defendants

do not instruct consumers to include documentation to justify removal of negative

information with their non-specific dispute letters.  (PX03 at 2 ¶ 8; PX07 Att. D at

18, Att. E at 21; PX09 Att. B at 26, PX14 Att. C at 13; PX25 at 3 ¶ 13.)  Indeed,

both Equifax and TransUnion affirm that the dispute letters generated by

Defendants are the sort of unsupported letters that are not sufficient to cause the

CRAs to delete or change information.  (PX20 at 4 ¶ 17; PX23 at 3-4 ¶ 17.)

As with their claims to remove negative information, Defendants' promises

that their credit building products will substantially improve consumers' credit

scores fall short.  With respect to their Credit My Rent service, Equifax (one of the

CRAs to which Defendants purport to report rent payments (PX24 Att. LL at 651;

PX26 Att. F at 258)) states that it has no relationship with Defendants and does not

accept rent payment history directly from them.[5]  (PX20 at 5 ¶ 19.)  But even if

Defendants instead report payment history to a third-party that does report directly

to Equifax or TransUnion, such reporting has little to no effect on credit scores.

First, according to FICO, rent payments are not factored into FICO Score 8 (the

---

[5] Defendants explained to consumer Renata Wilkins that Credit My Rent would
increase her credit score by reaching out to her landlord.  (PX14 at 3-4 ¶ 11.)  After
several weeks had gone by, she contacted her landlord who reported they had
never been contacted by anyone.  (*Id*.)  In any event, the CRAs only accept rent
payment history from rent payment reporting services.  (PX20 at 5 ¶ 18.)

score most commonly used by lenders).  (PX21 at 4-5 ¶ 12.)  Second, even with respect to the newly-introduced FICO Score 9 and FICO Score 10 (which do factor rent payments), Defendants' scheme would not improve most consumers' credit scores, especially by the magnitude promised.  (PX21 at 4-5 ¶ 12.)  The positive effect from any single creditor, including a landlord, is often minimal because a consumer's credit score is based on many factors.  (PX21 at 4-5 ¶ 12.)  And it often takes many months of on-time payments before any positive improvement to a credit score is observed.  (PX21 at 4-5 ¶ 12.)

With respect to the secured credit card marketed by Defendants, as with rent payment history, positive credit history can have a corresponding positive impact on a consumer's credit score but the effect from any single creditor is minimal and can take months to be observed.  (PX21 at 4 ¶ 11.)  Further, because secured credit cards often have substantially lower credit limits than unsecured credit cards, the benefit from reporting on-time payment history for a secured credit card is generally correspondingly smaller.  (PX21 at 4 ¶ 11.)  Thus, the addition of either credit building products does not guarantee an increase in a consumer's credit score.

Interviews with consumers confirm that Defendants generally fail to improve consumers' credit as promised.  (PX02 at 5 ¶ 20 (despite paying the monthly fee for nine months, consumer saw no increase to her credit score); PX04

at 4 ¶ 18 (consumer paid over $500 without seeing any increase in her credit score

or the removal of any negative items from her credit repor); PX05 at 8 ¶ 24

(consumer reported that her credit never improved while using Defendants'

services); PX06 at 3 ¶ 12 (consumer stated that no negative items were removed

nor did her credit score improve despite paying Defendants for over six months);

PX07 at 8 ¶ 26 (consumer saw no changes to her credit report or credit score even

after paying a total of $455 to Defendants); PX09 at 21 ¶ 12 (after four months of

payments, no negative items were removed and there was no change to consumer's

credit score); PX11 at 3 ¶ 10 (consumer's credit score never changed during all

months she was enrolled); PX14 at 4-5 ¶¶ 13, 18, 20 (consumer laments that

despite paying Defendants hundreds of dollars for their credit repair services and

Credit My Rent services, she saw no increase in her credit score); PX25 at 5 ¶ 18, 8

¶ 28 (no change after six months of payments); PX26 at 5-6 ¶ 15 (same), 9-10 ¶ 25

(promised results never materialized), 56 ¶ 152.)  Adding insult to injury, not only

did some consumers not have any negative items removed from their credit reports

after paying $89 per month for months but their credit scores actually decreased

after using Defendants' services.  (PX03 at 3 ¶¶ 10-11 (consumer's scores

decreased from 690 to 524), 4-5 ¶¶ 16-18 (consumer's husband, who separately

signed up for Defendants' credit repair services, saw a 100-200 point "nosedive" in

his credit score); PX12 at 10 ¶ 32 (consumer similarly saw her credit score

decrease 20 points after using Defendants' services); PX24 at 44 ¶ 153; PX26 at

17-18 ¶ 50 (in addition to no score improvement, Defendants put hard inquiry on

his credit report).)

Accordingly, Defendants violate Section 5 of the FTC Act, as alleged in

Count I of the Complaint, Section 404(a)(3) of CROA, as alleged in Count V of the

Complaint, and Section 310.3(a)(2)(iii) of the TSR, as alleged in Count XII of the

Complaint.

### 2. Defendants Fail to Make Required CROA Disclosures and Provide Consumers with Written Contracts

CROA requires credit repair organizations to make specific disclosures and

provide consumers with written contracts that comply with the requirements of the

statute.  CROA's requirements include (1) a written statement using prescribed

language regarding "Consumer Credit File Rights Under State and Federal Law"

before any contract or agreement is executed, 15 U.S.C. § 1679c(a); (2) a full and

detailed description of the services to be performed and an estimate of the date by

which the performance of the services will be complete, 15 U.S.C. § 1679d(b)(2);

(3) a conspicuous statement in bold face type, in immediate proximity to the space

reserved for the consumer's signature on the contract, which reads as follows:

"You may cancel this contract without penalty or obligation at any time before

midnight of the 3rd business day after the date on which you signed the contract.

See the attached notice of cancellation form for an explanation of this right."  15

U.S.C. § 1679d(b)(4); (4) a separate "Notice of Cancellation" form, 15 U.S.C. § 1679e(b); and (5) a copy of the completed contract.  15 U.S.C. § 1679e(c).

Here, in numerous instances, Defendants do not ask consumers to sign any contract.  Numerous consumer declarants stated that after agreeing to purchase Defendants' credit repair services, they were simply instructed to email or text a copy of their credit or debit card (back and front), social security card, and driver's license, although some recalled submitting information through an online system or providing information over the phone.  (PX02 at 2 ¶ 5; PX03 at 2 ¶ 6; PX04 at 1 ¶ 4, 2 ¶ 7; PX05 at 2-3 ¶ 9; PX06 at 1 ¶ 6; PX07 at 3 ¶ 10; PX09 at 20 ¶ 8; PX11 at 2 ¶ 6; PX12 at 4 ¶ 15; PX13 at 2 ¶ 7; PX25 at 2-3 ¶ 10; PX26 at 3-4 ¶¶ 9-10, 8 ¶ 21, 11 ¶ 29, 27 ¶ 81, 61-62 ¶ 167.)  These consumers also report never receiving a written contract summarizing the terms and conditions of the promised credit repair services, never receiving a written statement regarding their credit file rights, and never receiving a Notice of Cancellation form.  (PX02 at 2 ¶ 5; PX03 at 2 ¶ 6; PX04 at 2 ¶ 7; PX05 at 2-3 ¶ 9; PX06 at 2 ¶ 7; PX07 at 3 ¶ 11; PX09 at 20 ¶ 9; PX11 at 2 ¶ 6; PX12 at 4 ¶ 15; PX13 at 2 ¶ 7; PX14 at 1-2 ¶ 6; PX25 at 2-3 ¶ 10; PX26 at 4 ¶ 10, 11 ¶ 30, 17 ¶ 48, 27-28 ¶ 82, 42-43 ¶ 123, 58-59 ¶ 159.)  Indeed, when consumer Edene Shirley Lakpa asked if she was going to receive any documentation, Defendants' representative said "FES doesn't do contracts." (PX07 at 3 ¶ 11.)

Accordingly, Defendants violate Sections 405(a), 406(a), 406(b), 407(b), and 407(c) of CROA, as alleged in Counts VII, VIII, IX, X, and IX of the Complaint.

### 3. Defendants Illegally Collect Advance Fees for Credit Repair Services

Section 404(b) of CROA prohibits credit repair organizations from "charg[ing] or receiv[ing] any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform before such service is fully performed."  15 U.S.C. § 1679b(b); *see also Gill*, 265 F.3d. at 956 ("The CRO Act prohibits acceptance of any payment before fully performing all services (even assuming [the defendant] could and did do what he represented he would do).").  Similarly, Section 310.4(a)(2) of the TSR prohibits sellers and telemarketers from "requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until: (a) the time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and (b) the seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved."  16 C.F.R. § 310.4(a)(2).

In violation of these laws, Defendants collect illegal advance fees for their credit repair services. Defendants charge consumers an upfront payment of $99, variously referred to as a registration or activation fee, and a monthly payment of $49 to $89. (PX01 at 2-3 ¶ 9, Att. D at 22; PX03 at 2 ¶¶ 6-7; PX04 at 2 ¶ 8, Att. A at 6; PX05 at 1 ¶ 6, 4 ¶ 12, Att. B at 12; PX07 at 2 ¶ 8, Att. J at 51-60; PX09 at 20 ¶ 10, Att. A at 24; PX11 at 2 ¶ 7; PX12 at 4 ¶ 15, Att. H at 32-36; PX14 at 1 ¶ 4; PX15 at 4-5 ¶ 16; PX24 at 43 ¶ 149, Att. VV at 900-01; PX25 at 2 ¶ 9 (representative told consumers to stop paying on a court ordered debt and "reallocate that money and use it towards the credit repair service's enrollment fees"), Att. A at 10-21; PX26 at 4 ¶ 11, 11-12 ¶ 31, 19 ¶ 54, 27 ¶ 79, Att. B at 95-97, Att. D at 208.) To enroll, Defendants require consumers to pay the registration and first month's fee, for a total of $188. (PX01 at 2-3 ¶ 9, Att. D at 22; PX02 at 2 ¶ 6; PX04 at 2 ¶ 6, Att. A at 6; PX05 at 4 ¶ 12; PX07 at 2 ¶ 8; PX09 at 20 ¶ 10; PX14 at 1 ¶ 4, Att. A at 8; PX15 at 4-5 ¶ 16; PX25 at 2 ¶ 9; PX26 at 4 ¶ 11, 11-12 ¶ 31, 19 ¶ 54, 23-24 ¶ 70, 27 ¶ 81.) In some instances, Defendants' sales representatives agree to lower or waive the registration fee if the consumer agrees to sign up on the call. (PX07 at 2 ¶ 8 (representative waived registration fee since consumer "was a Howard alum"); PX08 at 3 ¶ 10 (during training FES Agent instructed to offer limited time discounts); PX12 at 7 ¶ 23 (same); PX24 Att. VV at 902 (agents have discretion to lower prices); PX26 at 4 ¶ 11, 46-47 ¶ 132.)

Meanwhile, Defendants charge additional fees for their Credit My Rent service—the base fee is $14.95 per month, for which Defendants purport to report one rent payment each month on a forward-going basis, and for additional upfront payments of $99 or $149, Defendants purport to report 12 or 24 months, respectively, of past rent payment history.  (PX12 at 4-5 ¶ 17; PX14 at 2 ¶ 5; PX24 Att. HH at 579, Att. LL at 651.)  Defendants set up the recurring monthly payments and require consumers to provide their bank, debit, or credit card account information at the time consumers sign up for their credit repair services, and charge consumers' credit cards or debit their bank accounts the upfront payment before any services have been provided.  (PX03 at 2 ¶ 6; PX04 at 2 ¶ 8; PX06 at 2 ¶ 7; PX07 Att. J at 51-60; PX09 Att. A at 24; PX11 at 2 ¶ 7; PX12 at 4 ¶ 15; PX14 at 1 ¶ 4; PX25 Att. A at 10-21; PX26 at 4 ¶ 11, 11-12 ¶ 31)

Thus, Defendants violate Section 404(b) of CROA, as alleged in Count VI of the Complaint, and Section 310.4(a)(2) of the TSR, as alleged in Count XIV of the Complaint.

### B. Defendants' Unlawful Investment Opportunity

In addition to marketing credit repair services, Defendants also market an investment opportunity—soliciting consumers to become FES Agents to recruit additional consumers to purchase their credit repair services and become FES Agents themselves.  Defendants' unlawful investment opportunity practices fall

into three main categories: (1) they falsely promise that consumers will earn substantial income by becoming FES Agents; (2) as demonstrated by their compensation plan and dishonest earnings claims, their investment opportunity is, in fact, an illegal pyramid scheme; and (3) they provide consumers with the means and instrumentalities to commit deceptive acts and practices.

### 1. Defendants' False Claims Regarding the Amount of Income Consumers Can Earn as FES Agents

Defendants' core misrepresentation, made on websites, social media accounts, and during sales calls with consumers, is that consumers who purchase Defendants' investment opportunity can earn substantial income as FES Agents. Their false claims violate Section 5 of the FTC Act, 15 U.S.C. §45, and Section 310.3(a)(2)(vi) of the TSR, 16 C.F.R. § 310.3(a)(2)(vi).

The legal standard for violations of Section 5 of the FTC Act is discussed in Section III.A.1 above. Meanwhile, Section 310.3(a)(2)(vi) of the TSR prohibits sellers and telemarketers from "misrepresenting, directly or by implication, any material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability." 16 C.F.R. § 310.3(a)(2)(vi).[6]

---

[6] Defendants' telemarketing activities—both inbound and outbound calls—are covered by the TSR. Although Section 310.6(b)(5) of the TSR generally exempts from TSR coverage inbound telemarketing calls in response to general medium advertising, there is an exception to the exemption for inbound calls relating to investment opportunities. 16 C.F.R. § 310.6(b)(5).

### a. Defendants Claim Consumers Can Earn Substantial Income as FES Agents

Defendants claim that consumers who enroll as FES Agents will earn substantial income, typically in the form of commissions and bonuses, from the downstream sale of credit repair services and bringing on new FES Agents.  For example, their websites describe how "true freedom comes with generating residual income" and tell consumers "learn how to change your financial future forever."  (PX24 Att. JJ at 611, 624.)  Their websites then describe how consumers can earn "Weekly Pay" and "Commission, Rewards, Bonuses."  (PX24 Att. JJ at 624.)  Defendants refer to "the five dimensions of the pay plan" that includes personal income ("earn directly for each Protection Plan Member you enroll"), team income, expansion income, residual income ("earn over-and-over based on the sale of services to your team and their customers"), and bonus income ("the Compensation Plan features six ways to earn, including lucrative bonus opportunities").  (PX24 Att. MM at 684-85.)  These bonuses include, among other things, customer acquisition bonuses for enrolling new FES Agents (ranging from $40 to $550) and membership in the so-called "R&R Club" which includes such bonuses as a "$10K cash bonus, $1,500 car allowance" for "Level 2-3," a "25K cash bonus" for "Level 4," a "$50K cash bonus" at "Level 5," and a "monthly bonus from $100K-$250K" for the highest levels.  (PX08 at 5 ¶ 14, Att. A at 12-13, Att. B at 15; PX24 Att. MM at 686; PX26 Att. C at 121-32, 173-78, 181, Att. F

at 219-33.)  Their agents repeat these claims on their social media accounts.
(PX02 at 1 ¶ 2 (Facebook post asked if consumers were interested in making
money from home and getting paid every week), Att. A at 8; PX08 at 1 ¶ 4
(Facebook post followed up by direct message exchange claiming consumer could
make $1,200 a week), 7 ¶ 22, Att. C at 23 ("Imagine creating your own weekly
$1200 check…would that help your family"); PX12 at 1¶ 5 (Instagram post
claimed consumers could make $500 a week), Att. D at 21, Att. E at 25; PX15 Att.
B at 26 ("Work From Home . . . Learn How To: earn weekly pay, commissions,
bonuses & residual"), 29 ("If I could show you how to earn a extra 500-1000 a
week in a home based business that you can run in all 50 states would you be
willing to hear more information?"); PX26 at 19 ¶ 55 (social media posts of FES
Agents with Maseratis supposedly purchased with their earnings), 40 ¶ 118, 79-81
¶ 205, Att. C at 171, Att. K at 411 ("What could an extra $500 a week do for
you?").)

When consumers contact Defendants' representatives, the representatives
reiterate the online claims during the telephone conversations or during live
presentations.  (PX01 at 4 ¶ 13 (during Zoom presentation, Defendants'
representative stated they were able to quit their former job because of how much
money they were making as an FES agent); PX02 at 3 ¶ 9; PX08 at 1-2 ¶ 5 (when
consumer was being recruited, an FES Agent explained that he was making around

$27,000 a month as an FES Agent and that another upline FES Agent had become a millionaire as an agent); PX11 at 1 ¶ 4 (consumer was told she could receive regular commissions as an agent); PX12 at 3 ¶ 12 (during Zoom presentation, FES Agent showed consumer what appeared to be screenshots of the agent's paychecks showing he was making over $1,000 per week); PX13 at 3 ¶ 12 (representative told consumer she would earn $100 for each consumer she signed up as a new FES Agent); PX15 at 5 ¶ 19 (consumer recalled that the FES Agent who recruited her talked about her six-figure income and that she would also be able to accomplish those earnings if she worked hard); PX26 at 16 ¶ 45 (representative promised consumer he would earn a lot of money as an agent), 24 ¶ 71 (consumer told agents were making six figures), 32-33 ¶ 97, 41-42 ¶ 121 (consumer understood she could earn between $200-$500 per month).)

Defendants bolster these earning claims with numerous testimonials from purported satisfied customers.  (PX13 at 7 ¶ 31, Att. D at 33 (FES Agent posted a Facebook photo of what purports to be five FES Agents with the caption "2020 AVERAGE INCOME $214,329"); PX24 Att. JJ at 629 ("FES has changed my family tree.  We are the first millionaires in our family."); PX26 Att. C at 186-91, Att. E at 217, Att. F at 238, Att. J at 384 ("This single mom moved to Atlanta 4 years ago, retired hair stylist slept on a friend couch fast forward to joining our company and becoming millionaire!").) For example, one testimonial claims: "We

joined FES a little over 15 months ago.  My wife and I didn't have money saved, took a chance at what I believed would be just some extra income for us.  Fast forward to now, we've been blessed to become Six figure earners, be awarded a free Audi, cruise contest winners, and hit level two in the R&R Club."

### b.  Consumers Do Not Realize Promised Earnings

Despite Defendants' express claims of substantial income, few, if any, consumers ever realize these earnings.  None of the consumers the FTC interviewed reported making any of the promised earnings.  First, many never received their promised bonuses.  (PX08 at 8 ¶ 24 (consumer stated that despite generating a sizeable downline, he was never paid the promised benefits, for example, in one month, despite bringing in eight different customers, he only received a total of $100, and that the largest paycheck he ever received was around $200, after bringing in over twenty new customers, and that he never rose more than one rank—from agent to "field trainer"); PX13 at 4 ¶ 15 (consumer never received promised bonus for signing up new agents); PX26 at 36 ¶ 107 (consumer only received two months totaling a couple hundred dollars.)  Further, because, as discussed below, many consumers, to remain FES Agents, continue to pay the monthly credit repair fee and many consumers are encouraged to pay, and do pay, registration fees for new FES Agents to improve their downline, in many instances, consumers end up paying more money to Defendants than they receive from them.

(PX02 at 5 ¶ 18 (not only did consumer not make any money as an FES Agent, she

lost $1,500 in fees paid to Defendants); PX08 at 9 ¶ 29 (when consumer quit

several months after enrolling, he had earned only $1,400 total, despite the claims

of $1,200 per week posted on social media); PX12 at 10 ¶ 32 (consumer lamented

that she actually lost money rather than earn the $500 per week she had been

promised when first recruited); PX13 at 5-6 ¶ 21 (consumer was not making any

money and started falling into dire financial situation because she was using her

own money to register new FES Agents), 6 ¶ 24 (consumer further described that

following Defendants' instructions to use their own money to enroll new agents

caused them to not be able to afford bills, groceries, and consumer's chemotherapy

medication); PX26 at 36 ¶ 105, 38-39 ¶ 114.)[7]

Indeed, Defendants' own poorly-disclosed income disclosure statement

demonstrates that Defendants' claims are false for most consumers.[8]  For example,

---

[7] The FTC's expert, Dr. David Givens, explains how one form of compensation available to certain FES Agents, the so-called "infinity bonus," is significantly harder to qualify for than suggested by FES's marketing materials, as achieving the spending required for the bonus with the number of recruits identified in the FES compensation plan "is inconsistent with rational behavior."  (PX22 at 24-25 ¶¶ 131-39.)

[8] The income disclosure statement is not adequately disclosed.  It appears as a hyperlink at the bottom of Defendants' websites and nowhere in the main body of the websites are consumers directed to view the statement.  (PX24 Att. MM at 661-88.)  Defendants cannot make considerable material misrepresentations to consumers and then bury corrections and disclaimers in subsequent communications. *E.M.A. Nationwide*, 767 F.3d at 633; *Removatron*, 884 F.2d at 1497 (disclaimers or qualifications in any particular advertisement are not adequate

in 2021, 91.59% of FES Agents, 92,082 were at the lowest level of Defendants'

compensation structure.[9]  (PX24 Att. MM at 689.)  Defendants report that the

average annual income for FES Agents at that lowest level was only $3,636.78.

(PX24 Att. MM at 689.)  Not until an FES Agent rises to the 5th level does the

average annual income reflect earnings approaching $30,000, and it is two levels

above that before an FES Agent reportedly breaks $100,000, although only 0.1%

of FE Agents are at that level or higher.  (PX24 Att. MM at 689.)  Indeed, the

weighted average annual income over all levels reflected in this document is only

$4,270.74, substantially less than what Defendants and their agents promise.

Similar numbers hold for 2020, 2019, 2018, 2017, and 2016, where the weighted

average annual incomes over all levels appears to be only $5,194.71, 4,048.04,

$4,372.16, $3,827.70, and $3,593.85, respectively.[10]  (PX24 Att. JJ at 615-22;

PX26 Att. F at 242, Att. G at 351.)

---

[9] Defendants' compensation structure is discussed in more detail in Section
III.B.2.b below.

[10] Dr. Givens explains that FES's compensation structure, discussed further in
Section III.B.2 below, "is likely to fuel exaggerated income and lifestyle claims
because it implies endless geometric growth in the number of participants,
explosive growth in compensation, and minimal effort after the first few recruits."
(PX22 at 5 ¶ 22.)  "The mere marketing of FES's business model as an opportunity
that can work for all participants constitutes a form of deception, since the model
in fact relegates the majority of participants to financial loss in order to deliver

to avoid liability for deceptive advertising unless they are sufficiently prominent
and unambiguous to change apparent meaning of claims and to leave accurate
impression).

Thus, many consumers do not realize the earnings promised by Defendants, and, in fact, lose money as FES Agents.  (PX02 at 5 ¶ 18; PX08 at 9 ¶ 29; PX12 at 10 ¶ 32; PX13 at 5-6 ¶ 21; PX15 at 5-6 ¶ 21; PX26 at 36 ¶ 107.)  Accordingly, Defendants violate Section 5 of the FTC Act, as alleged in Count III of the Complaint, and Section 310.3(a)(2)(vi) of the TSR, as alleged in Count XIII of the Complaint.

### 2.  Defendants' Investment Opportunity Is an Illegal Pyramid Scheme

Defendants' investment opportunity is, in fact, an illegal pyramid scheme. Pyramid schemes are inherently deceptive under Section 5 of the FTC Act.  *FTC v. BurnLounge, Inc.,* 753 F.3d 878, 880 (9th Cir. 2014) (citing *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1180 (1975)); *see also United States v. Gold Unlimited, Inc*., 177 F.3d 472, 484 (6th Cir. 1999) ("Unquestionably, an illegal pyramid scheme constitutes a scheme to defraud."); *Webster v. Omnitrition Int'l*, 79 F.3d 776, 781 (9th Cir. 1996) (pyramid schemes are "inherently fraudulent" because they "must end up disappointing those at the bottom who can find no recruits").  The Sixth Circuit employs the *Koscot* test to determine whether a pyramid scheme exists; specifically, such schemes are characterized by "the payment by participants of money to the company in return for which they receive

---

promised income to a few."  (PX22 at 44 ¶ 258; *see also id.* at 48 ¶ 289.)

(1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users." *Gold*, 177 F.3d at 480; *Kerrigan v. Visalus, Inc*., 112 F. Supp. 3d 580, 592 (E.D. Mich. 2015). Defendants' investment opportunity meets both prongs of the *Koscot* test.

### a. Defendants' Investment Opportunity Satisfies the First Prong of the *Koscot* Test—The Signup Process

*Koscot's* first prong—payment of money by participants for the right to sell a product or service—may take several different forms, including mandatory fees to join or renew and required purchases. *See Omnitrition Int'l*, 79 F.3d at 782. Here, in order to make sales to customers as an FES Agent, Defendants charge consumers an upfront fee that has varied over time from $288 to $299. (PX02 at 2 ¶ 6; PX05 at 2 ¶ 7, Att. A at 10; PX08 at 1 ¶ 4; PX11 at 1-2 ¶¶ 5, 7; PX12 at 4 ¶ 15, Att. H at 32-36; PX13 at 1-2 ¶ 6; PX14 at 1-2 ¶ 6; PX24 Att. RR at 750, Att. SS at 787, Att. YY at 977 ¶ 30; PX26 at 33 ¶ 99, 42 ¶ 122, 61 ¶ 166, Att. C at 194.) In addition, all FES Agents are required to enroll in Defendants' credit repair services, whether they need them or not. (PX08 at 2-3 ¶ 9; PX12 at 4 ¶ 15; PX15 at 1-2 ¶ 6; PX24 Att. UU at 858; PX26 at 23 ¶ 67, 34-35 ¶ 102, 41 ¶ 120, 61 ¶ 166, Att. C at 194.) The first month's payment for the credit repair services is included in the upfront fee, with consumers seeing $89 charges per month each month thereafter. (PX08 at 2-3 ¶ 9; PX12 at 2 ¶ 9, 4 ¶ 15; PX22 at 4 ¶ 20; PX26 at 61 ¶

166.)  Although not included in the FES compensation plan, Defendants tell

consumers elsewhere, however, that if they enroll five new customers in a month,

the next month's credit repair charge will be waived.  (PX01 at 2-3 ¶ 9, Att. D at

23; PX02 at 3 ¶ 11; PX05 at 1-2 ¶ 6; PX07 at 6 ¶ 20; PX08 at 2-3 ¶ 9; PX11 at 1-2

¶¶ 5, 7; PX12 at 2 ¶ 9; PX15 at 2 ¶ 7; PX22 at 9 ¶ 47 & n.6; PX26 at 34-35 ¶ 102,

62 ¶ 168.)

> **b. Defendants' Investment Opportunity Satisfies the Second Prong of the *Koscot* Test—The Compensation Plan Incentivizes Recruitment over Sales**

"The satisfaction of the second element of the [*In re*] *Koscot* test is the sine

qua non of a pyramid scheme."  *Gold*, 177 F.3d at 480.  Whether rewards are

unrelated to the sale of products is a fact-based question that depends on how a

company's compensation plan works in practice; an illegal pyramid structure can

exist even if rewards are not *completely* unrelated to product sales.  *BurnLounge*,

753 F.3d at 884, 887.  "Courts have consistently found MLM businesses to be

illegal pyramids where their focus was on recruitment and where rewards were

paid in exchange for recruiting others, rather than simply selling products." *Id.* at

884.  Evidence that distributors purchase and consume product for the purpose of

qualifying for recruitment incentives is evidence of a pyramid scheme.  *FTC v.

Vemma Nutrition Co.*, 2015 U.S. Dist. LEXIS 179855, at *10 (D. Ariz. Sep. 18,

2015) (citing *BurnLounge*, 753 F.3d at 886-87); *see also BurnLounge*, 753 F.3d at

887 (finding that even where some sales were made to participants who were the "ultimate users" of the product, it was still "incorrect to conclude that all rewards paid on those sales were related to the sale of products to ultimate users" based on the realities of how the bonus structure functioned).  Further, an alleged pyramid scheme "cannot save itself simply by pointing to the fact that it makes some retail sales . . . [if t]he mere structure of the scheme suggests that [its] focus was in promoting *the program* rather than selling *the products*."  *Kerrigan*, 112 F. Supp. 3d at 593 (citing *Omnitrition*, 79 F.3d at 782) (emphasis in original).

Here, Defendants' compensation plan incentivizes agent recruitment over sale of credit repair services to outside consumers.  Defendants provide FES Agents two documents, titled "Compensation Plan Overview" and "Statement of Policies and Procedures" that lay out the manner in which FES Agents are paid. All but one form of compensation paid to FES Agents requires enrolling other Agents.  (PX22 at 4 ¶ 20; PX26 Att. C at 120-34, Att. F at 219-33, Att. G at 287-350.)  The one way FES Agents are paid that does not require recruitment is through commissions on sales of credit services.  (PX08 at 3 ¶ 10; PX22 at 4 ¶ 20; PX26 at 44-45 ¶ 128, Att. C at 103, Att. C at 123, 128, 170, Att. F at 222-23.)  An FES Agent may earn a one-time payment of as much as $100 for each customer who enrolls in Defendants' credit repair services, and $12-$6 each month thereafter as long as the customer continues to make his or her payments to

Defendants.  (PX08 at 4 ¶ 12; PX11 at 1-2 ¶¶ 4-5; PX22 at 12 ¶ 69; PX26 at 44-45 ¶ 128, Att. C at 103, 123, 128, 170, Att. F at 222-23.)  As the FTC's expert Dr. Givens explains, various rules about the payment of these commissions serve to limit their effectiveness at incentivizing retail sales by FES Agents. (PX22 at 12-14 ¶¶ 70-81.)  Dr. Givens explains, these "customer sales represent a minor hurdle to be cleared rather than a significant foundation for achieving advertised income." (PX22 at 4 ¶ 17.)

The other, and main, way FES Agents are paid is by recruiting additional consumers to become FES Agents, and encouraging them to recruit additional consumers.  This is commonly referred to as a "downline."  (*See* PX22 at 4 ¶ 18; PX26 at 62 ¶ 168.)  By urging FES Agents to build their downline, Defendants stress that an FES Agent has the ability to make significantly more money by combining sales of Defendants' credit services and new agent recruitment.  (*See, e.g.*, PX01 at 4 ¶ 13; PX02 at 3 ¶ 10; PX11 at 1-2 ¶ 5; PX12 at 2 ¶¶ 9, 10; PX26 at 35 ¶ 103; PX26 at 45 ¶ 129.)  By combining new agent recruitment and credit services sales, FES Agents can achieve "titles" and trigger "bonuses."  (PX08 at 3-4 ¶ 11; PX12 at 2-3 ¶ 10; PX26 Att. C at 103, 126-27, 129-32.)

When first recruited, an FES Agent is called an "agent" and makes the base amount of commission on credit services sales.  By meeting specific requirements, FES Agents can go through a series of promotions from agent, to field trainer, to

senior field trainer, to sales director, to regional sales director, to executive sales director, to vice president, to regional vice president, to executive vice president, to senior vice president, to senior regional vice president, to senior executive vice president, and culminating in pinnacle senior vice president.  (PX24 Att. UU at 836; PX26 at 45 ¶ 129, 47-48 ¶ 133, Att. C at 129, Att. F at 229.)  A higher title corresponds to more money paid out on bonuses.  (PX08 at 3-4 ¶ 11; PX12 at 2-3 ¶ 10; PX26 Att. C at 121-32, Att. F at 219-33.)

Each title has its own prerequisites to achieving it, but each one essentially boils down to needing a larger number of people in an FES Agent's downline, a certain number of downline FES Agents having achieved their own titles, and a certain dollar amount in personal credit services sales each month.  (PX05 at 4-5 ¶ 13; PX08 at 3-4 ¶ 11; PX12 at 3 ¶ 11; PX15 at 2 ¶ 8; PX22 at 19 ¶¶ 98-99; PX24 Att. UU at 836-37; PX26 at 25 ¶ 73, 46 ¶ 131, 47-48 ¶¶ 133-34, Att. C at 129, Att. F at 229.)  For example, to move from "agent" to "field trainer," an FES Agent needs to have two FES Agents in his or her downline (each referred to as a "leg"), with each downline FES Agent bringing in a minimum of $400 in monthly sales and the FES Agent and the downline FES Agents together bringing in a minimum of $1,600 in monthly sales.  (PX24 Att. UU at 839-40; PX26 Att. C at 129, Att. F at 229.)  Nothing in the compensation plan requires that some or all of the monthly sales requirements be met through sales to non-participants, thus FES Agents have

the ability to meet the requirement solely through sales to other FES Agents, including in the form of continued payment of monthly fees for credit repair services.  (PX26 Att. C at 120-34, Att. F at 219-33.)  To become a "senior field trainer," in addition to an increase in the dollar amount of monthly sales volume, the FES Agent needs to have both downline FES Agents themselves become "field trainers" (*i.e.*, each must have recruited an additional two FES Agents).  (PX24 Att. UU at 842; PX26 Att. C at 129, Att. F at 229.)  Higher levels require larger downlines.  For example, to move from "senior field trainer" to "sales director" requires three downline legs (i.e., not only does the FES Agent need to ensure his or her existing two legs remain "field trainers" but he or she must recruit another FES Agent who in term recruits two new FES Agents).  (PX24 Att. UU at 842-43; PX26 Att. C at 129, Att. F at 229.)

Defendants explain that FES Agents can earn bonuses when a qualified FES Agent enrolls a new FES Agent who produces a certain minimum of personal sales volume within a specific time frame.  (PX08 at 3-4 ¶ 11; PX13 at 3 ¶ 12, 4 ¶ 15; PX15 at 2 ¶ 8.)  If those conditions are met, the enrolling FES Agent and any upline FES Agents receive bonuses.  (PX13 at 4 ¶ 15.)  The amount of the bonus increases significantly as the FES Agent earns higher titles.  (PX08 at 3-4 ¶ 11; PX12 at 2-3 ¶ 10; PX15 at 2 ¶ 8; PX22 at 28 ¶¶ 155-59; PX26 Att. C at 121-32, 180, Att. F at 219-33.)

46

For example, Defendants purport to pay what they call a "customer acquisition bonus" or "CAB" that is generated when an FES Agent enrolls a new agent who in turn recruits two customers. (PX08 at 3-4 ¶ 11, Att. A at 12-13; PX13 at 3 ¶¶ 12-13; PX22 at 16 ¶ 85; PX26 Att. C at 126, 173-78, Att. F at 225-26.)[11] Agents receive $100, field trainers receive $160, senior field trainers receive $240, up to pinnacle who receive $560, though these amounts are forfeited if the new enrollees fail to make three monthly payments. (PX08 at 3-4 ¶ 11, Att. A at 12-3; PX12 at 2-3 ¶ 10; PX13 at 3 ¶¶ 12-13; PX22 at 16 ¶ 85, 18 ¶ 94, 19-20 ¶104; PX26 Att. C at 126, 173-78, Att. F at 226.) Another bonus is called the "infinity bonus" that starts for FES Agents who rise to the sales director level. (PX01 Att. E at 30; PX26 Att. C at 129-30, 134, Att. F at 229-30.) The infinity bonus is a percentage of the sales volume brought in by the FES Agent's entire downline. (PX01 Att. E at 30; PX26 Att. C at 129, 134, Att. F at 229-30.) A sales director gets an infinity bonus of 0.5%, a regional sales director receives 0.75%, and so on up to pinnacle senior vice presidents who receive 3% of his or her downline's sales volume. (PX01 Att. E at 30; PX26 Att. C at 129, 134, Att. F at 229-30.) The infinity bonus incentivizes FES Agents to recruit new Agents and simultaneously

---

[11] The actual requirements for earning CABs are complex and described ambiguously in the FES compensation plan and marketing materials, but seem to require recruitment of two customers for payment. (PX22 at 15 ¶ 83; PX26 Att. C at 126, Att. F at 229-30.)

discouraging them from focusing on retail sales; there is no minimum retail sales requirement, and retailing alone is insufficient in any amount to qualify FES Agents for an infinity bonus.  (PX22 at 22 ¶¶ 123-24; PX26 Att. C at 129-30, 134, Att. F at 229-30.)  As Dr. Givens concludes, an FES Agent in pursuit of an infinity bonus will find that "retail customers, where they materialize, will represent a second-best outcome for recruiters because they amount to terminal nodes in the Agent's over-arching project of network enlargement."  (PX22 at 26 ¶ 145.)[12] Meanwhile, "generation bonuses" start at the executive sales director level and pay an additional 1% (going up to 2.75% for pinnacle).  (PX26 Att. C at 130, Att. F at 231.)

Finally, as mentioned above, Defendants' compensation plan has a reward club called the "R&R Club."  (PX08 at 5 ¶ 14; PX26 Att. C at 132, 181, Att. F at 232.)  FES Agents obtain levels based on a combination of the number of credit repair customers and FES Agents in an FES Agent's downline and the amount of sales volume generated.  (PX26 Att. C at 132, Att. F at 232.)  For example, to be at Level 1, an FES Agent must have at least 7 credit repair services customers or

---

[12] Dr. Givens further concludes that an infinity bonus is challenging to qualify for, estimating that in a best-case scenario just 1.6% of FES Agents could achieve the necessary recruitment and retention.  (PX22 at 26 ¶ 147.)  "These upper bounds of success are structural limits built into the compensation mechanism itself.  They are not the result of scarcity of talent, effort, intelligence or perseverance in the population of recruits."  (PX22 at 26 ¶ 148.)

downline FES Agents and $10,000 in sales, while Level 2 requires 10 and $15,000,
respectively, up to Level 10 which requires 45 customers or FES Agents and
$125,000.  (PX26 Att. C at 132, Att. F at 232.)  At the lowest level (Level 1), an
FES Agent can obtain a $600 monthly expense allowance, Level 2 earns a one-
time of $10,000 bonus (available for up to three months), and so on up to Level 10
which provides a $250,000 bonus for 12 months.  (PX26 Att. C at 132, Att. F at
232.)

Dr. Givens explains that the various forms of compensation available
incentivize FES Agents to recruit, and teach their recruits to recruit, by allowing
FES Agents to "capitalize on geometric growth in the number of recruits, should it
ever materialize," and by using "reward convexity," or "suppressing the payoff for
modest amounts of recruitment in order to boost the payoff for big feats of
recruitment."  (PX22 at 27-28 ¶¶ 153, 155-56.)

In short, Defendants encourage FES Agents to focus on recruiting new FES
Agents rather than selling credit repair services to consumers.  As discussed,
Defendants directly reward FES Agents for recruiting (as opposed to retail sales)
through the bonuses in its compensation plan.  Indeed, Defendants and their agents
routinely encourage FES Agents to "sponsor" new recruits (by paying some or all
of the recruit's registration fees in order to build their downline) claiming they will
make up the cost in future bonuses.  (PX08 at 2 ¶ 6, 4-5 ¶ 13; PX11 at 3 ¶ 12;

PX13 at 3-4 ¶¶ 14, 17; PX26 at 48-49 ¶ 135.)[13]  And advancement is based almost

exclusively on the number of FES Agents in a particular FES Agent's downline.

As Dr. Givens concludes based on his review of the FES compensation structure,

"[r]ecruitment is the only path to achieving advertised earnings but can deliver for

just a tiny fraction of those who seek it."  (PX22 at 31 ¶ 177.)[14]

    For example, consumer declarants recalled that Defendants told them that

they had to maintain at least five people in their downline at any given time—two

of whom had to also be FES Agents.  (PX15 at 2 ¶ 7.)  Consumer Adrena Womack

reported that Defendants referred to FES Agents who had at least five people in

their downline as "coachable," whereas FES Agents who failed to meet this quota

were known as "uncoachable."  (PX15 at 2 ¶ 7.)  Consumer Katia Templar was

instructed to use her own money to pay for new FES Agents' registration fees to

help her meet her recruitment goals; she describes how Defendants' representative

explained how she could "trigger my cabs" by enrolling new FES Agents using her

own money and then registering some of them below others.  (PX13 at 3-4 ¶ 14.)

---

[13] Dr. Givens explains how the FES compensation structure incentivizes making fake purchases when an agent sits just below a threshold that will result in higher bonuses.  (PX22 at 28-30 ¶¶ 159-65.)

[14] Defendants' misrepresentations about their credit repair services discussed above in Section III.A create an additional incentive for FES Agents to pursue income through recruiting.  As Dr. Givens explains, a service that would not be capable of competing in the marketplace when marketed truthfully, when sold through multi-level marketing, encourages distributors to focus on pursuing income elsewhere. (PX22 at 3 ¶¶ 13-14.)

During Zoom training, she recalls representatives stating "if you want to increase your rank quickly and make more money, you should use your own money" to register new FES Agents and that they "would make our money back when we hit our cabs." (PX13 at 4 ¶ 17.) In another Zoom training session, a representative explained "how to deceive clients into signing up as agents" by telling consumers that the credit repair cost $288 and then enrolling them as FES Agents. (PX13 at 4-5 ¶ 18.) She also recalled that Defendants did not care about how many credit repair customers she enrolled, they only cared about recruiting new FES Agents. (PX13 at 5 ¶ 20.) She reported that she "felt very pressured to recruit more people" and she was told she would lose her position if she "did not recruit enough people." (PX13 at 5 ¶ 20.) Consumer Peter Markham was encouraged to recruit his fiancée as an FES Agent and to pay her registration fee. (PX08 at 4-5 ¶ 13.) His recruiting FES Agent explained that this would help not just him rise in the ranks but the recruiting agent and all of her upstreams as well, qualifying them for greater bonuses. (PX08 at 4-5 ¶ 13.) During a Zoom presentation, consumer Samuel Cassamas recalls FES Agents explaining that although they made money selling credit repair services, they "generated more profits engaging in the recruitment side of the business." (PX01 at 4 ¶ 13.)

Further, because FES Agents must be enrolled in Defendants' credit repair services, a majority of Defendants' revenues appears to be from credit repair sales

to FES Agents rather than outside consumers.[15]  For example, according to

Defendants' 2020 income disclosure statement from their websites, in 2020, there

were 97,202 FES Agents at the "field trainer" and "agent" level (*i.e.*, the levels for

which an FES Agent likely does not yet have the required downline to have the

monthly credit repair fee waived).  (PX26 Att. F at 242, Att. G at 351.)  Not

counting the one-time initial registration fee, that number of agents corresponds to

$8,650,978 in monthly revenue to Defendants from the monthly $89 credit repair

charge.  Based on bank records, Defendants' average total monthly income in 2020

was $11,558,256.  (PX24 at 49 ¶ 169.)  Thus, monies extracted from FES Agents

alone could account for almost 75% of Defendants' total monthly income.  As Dr.

Givens concludes, successful FES Agents "will have earned a substantial portion

of their rewards from compulsory payments made in expectation of qualifying for

rewards, as in a chain letter," thereby causing "the overwhelming majority of

aspiring Agents to lose money as a result of participating in FES."  (PX22 at 31 ¶

177.)  Dr. Givens also concluded that a hypothetical FES Agent operating in a

best-case scenario to maximize her income under the terms of the FES

---

[15] The FTC's calculations are based on bank records and documents obtained from
Defendants' Internet websites.  In addition, the FTC's expert has reviewed
Defendants' compensation plan, policies and procedures, independent sales
representative agreement, selected websites, and consumer declarations and
concludes that facially Defendants' investment opportunity is operating as an
illegal pyramid scheme.  (PX22 at 52 ¶ 318.)

compensation plan would derive 57.5% of her compensation from compulsory purchases made by FES Agents in her downline, rewards "not in any way contingent on sales to ultimate users." (PX22 at 31 ¶ 179, 37 ¶ 213, 38 ¶ 216-17.) The same hypothetical Agent considered by Dr. Givens received 99.8% of her compensation from FES as a result of her recruiting additional FES Agents, with only 0.2% of her income due to her own retail sales. (PX22 at 38-39 ¶¶ 220-21.)[16] Because Dr. Givens's analysis demonstrates that the "dominant strategy . . . for every Agent under the FES compensation plan is to 'pay, recruit, teach," he concludes that "FES can be said to be operating as a pyramid scheme."  (PX22 at 39 ¶ 228.)

Accordingly, Defendants violate Section 5 of the FTC Act, as alleged in Count II of the Complaint.

### 3. Defendants Provide FES Agents with Marketing Materials and Training Thereby Providing FES Agents with the Means and Instrumentalities to Engage in Deceptive Practices

Courts have long held that providing the means and instrumentalities to commit deceptive acts or practices is itself a deceptive act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.  *See FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 494 (1922) ("[A] person is a wrongdoer who so furnishes another

---

[16] Considering the FES Agents in the hypothetical optimal FES Agent's downline, Dr. Givens concluded that approximately 87% would be "operating at a cumulative net financial loss."  (PX22 at 40 ¶ 231.)

with the means of consummating a fraud has long been a part of the law of unfair competition."); *Waltham Watch Co. v. FTC,* 318 F.2d 28, 32 (7th Cir. 1963) ("Those who put into the hands of others the means by which they may mislead the public, are themselves guilty of a violation of Section 5."); *Chas. A. Brewer & Sons v. FTC*, 158 F.2d 74, 77 (6th Cir. 1946); *FTC v. Noland*, 2021 U.S. Dist. LEXIS 171265, at *81 (D. Ariz. Sep. 9, 2021); *FTC v. Innovative Designs, Inc*., 489 F. Supp. 3d 378, 402 (W.D. Pa. 2020); *Vemma Nutrition*, 2015 U.S. Dist. LEXIS 179855 at *17; *Five-Star Auto Club,* 97 F. Supp. 2d at 530.  Indeed, in the context of pyramid schemes, courts have held that providing the "means and instrumentalities" includes providing agents with "promotional, recruiting and training materials containing false or misleading income representations."  *Vemma Nutrition*, 2015 U.S. Dist. LEXIS 179855 at *20.

Here, Defendants provide FES Agents with the same material that the *Vemma Nutrition* Court found to be providing the "means and instrumentalities." In particular, consumer declarants all report that shortly after enrolling as FES Agents they underwent what was called training, which consisted mostly of online webinars on Zoom or Facebook Live.  (PX02 at 4 ¶¶ 12-14; PX05 at 3 ¶ 10, 5-7 ¶¶ 16-21; PX08 at 5-6 ¶¶ 16-18; PX12 at 4-5 ¶ 17, 5-6 ¶¶ 20-22; PX13 at 4-5 ¶¶17-18; PX15 at 3 ¶ 10; PX24 Att. SS at 763, 782, Att. UU at 826-27; PX26 at 43-44 ¶ 126.)  They also report being added to multiple online Facebook groups and

Instagram group chats with fellow FES Agents.  (PX05 at 3 ¶ 10; PX08 at 7 ¶ 23; PX12 at 5-6 ¶¶ 20-22; PX13 at 2 ¶ 8; PX15 at 3-4 ¶ 11.)  They were also provided marketing materials.  For example, numerous consumers recalled that the FES Agents who recruited them (as well as other FES Agents) provided them with marketing scripts and pitches as well as ads and infographics that they could use on their social media accounts both to market Defendants' credit repair services and recruit new FES Agents.  (PX02 at 4 ¶ 13; PX05 at 5-6 ¶¶ 16-17, Att. E at 21-24, Att. G at 31-33, Att. H at 35-39; PX08 at 5-6 ¶ 17, 7 ¶¶ 21-22; PX12 at 5-6 ¶ 18, 7 ¶ 23, Att. D at 21-23, Att. E at 25, Att. F at 27-28; PX13 at 2-3 ¶ 10; PX15 at 2-3 ¶ 9, 4 ¶¶ 12-13; PX24 Att. RR at 746, Att. VV at 904-05; PX26 at 49-50 ¶¶ 136-37, 62-63 ¶¶ 171-72, Att. C at 101-02, 104-19, 137.)  Consumer declarants also recalled that they were encouraged to use social media posts that other FES Agents were using.  (PX02 at 4 ¶ 13; PX05 at 5-6 ¶ 17, 7 ¶ 22, Att. F at 26-29; PX08 at 7 ¶ 21; PX12 at 7 ¶ 23, 8 ¶ 25; PX13 at 2-3 ¶ 10; PX15 at 4 ¶ 12.)  And as discussed in Sections III.A.1 and III.B.1 above, these marketing materials contain the false representations that (a) Defendants' credit repair services will substantially improve consumers credit scores and (b) by becoming FES Agents, consumers will earn substantial income.

Accordingly, Defendants violate Section 5 of the FTC Act, as alleged in Count IV of the Complaint.

### C. Defendants' Practices Have Bilked Hundreds of Millions of Dollars from Consumers

Bank records show that Defendants have taken in net revenues (gross revenues less chargebacks and refunds) of at least $467 million between January 2015 and December 2021 from their credit repair and pyramid scheme.[17]  (PX24 at 35 ¶ 126.)

Defendants have marketed their credit repair services and investment opportunities to consumers located throughout the United States.  (*See, e.g.*, PX01 at 1 ¶ 2 (Georgia); PX02 at 1 ¶ 1 (West Virginia); PX03 at 1 ¶ 1 (California); PX04 at 1 ¶ 1 (Michigan); PX05 at 1 ¶ 2 (Oregon); PX06 at 1 ¶ 2 (Tennessee); PX07 at 1 ¶ 2 (Maryland); PX08 at 1 ¶ 2 (Virginia); PX09 at 19 ¶ 2 (Florida); PX12 at 1 ¶ 2 (New York); PX14 at 1 ¶ 1 (South Carolina); PX15 at 1 ¶ 2 (Connecticut); PX26 at 2 ¶ 6 (Texas), 15 ¶ 42 (Nevada), 21 ¶ 61 (Hawaii), 60 ¶ 162 (Oklahoma).)

## IV.   A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST DEFENDANTS

### A. This Court Has the Authority to Grant the Requested Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek, and the Court to issue, temporary, preliminary, and permanent injunctions.  The second proviso of Section 13(b), under which this action is brought, states that "the

---

[17] The gross revenue in the three-year period prior to the filing of the Complaint was approximately $281 million.  (PX24 at 35 ¶ 126 n.13.)

Commission may seek, and after proper proof, the court may issue, a permanent

injunction" against violations of "any provision of law enforced by the Federal

Trade Commission."[18]  15 U.S.C. § 53(b).  *See also FTC v. Ross*, 743 F.3d 886,

890 (4th Cir. 2014); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564,571 (7th Cir.

1989).  Meanwhile, Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), expressly

authorizes courts to grant "such relief as the court finds necessary" for violations of

CROA, and the TSR, including "the refund of money or return of property."[19]  By

enabling the courts to use their full range of equitable powers, Congress gave them

authority to grant preliminary relief, including a temporary restraining order,

preliminary injunction, and asset freeze.  *FTC v. Southwest Sunsites, Inc.*, 665 F.2d

711, 718-19 (5th Cir. 1982); *FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1232

& n.2 (9th Cir. 1999); *U.S. Oil & Gas*, 748 F.2d at 1434 ("Congress did not limit

---

[18] This action is not brought pursuant to the first proviso of Section 13(b), which
addresses the circumstances under which the FTC can seek preliminary injunctive
relief before or during the pendency of an administrative proceeding.  Because the
FTC brings this case pursuant to the second proviso of Section 13(b), its complaint
is not subject to the procedural and notice requirements in the first proviso.  *FTC v.
H.N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982) (holding that routine fraud
cases may be brought under second proviso, without being conditioned on the first
proviso requirement that the FTC institute an administrative proceeding); *FTC v.
U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984).

[19] Section 410(b)(1) of CROA, 15 U.S.C. § 1679h(b)(1), states that a violation of
CROA "shall constitute an unfair or deceptive act or practice in commerce in
violation of section 5(a) of the Federal Trade Commission Act."  Section 410(b)(2)
of CROA, 15 U.S.C. § 1679h(b)(2), provides that the FTC may enforce violations
of CROA "in the same manner as if the violation had been a violation of any
Federal Trade Commission trade regulation rule."

the court's powers under the final proviso of §13(b), and as a result this Court's inherent equitable powers may be employed to issue a preliminary injunction, including a freeze of assets, during the pendency of an action for permanent injunctive relief."). The Court therefore can order the full range of equitable relief sought and can do so on an *ex parte* basis. *Id.* at 1432 (authorizing preliminary injunction and asset freeze).[20]

Further, although one of the Corporate Defendants—Youth Financial—is registered as a non-profit, because it in fact profits from the deception at issue and, accordingly, is a sham non-profit, the FTC has jurisdiction over it and the Court is authorized to impose the requested relief against it. Section 4 of the FTC Act defines "corporations" subject to the FTC's jurisdiction as "any company. . . which is organized to carry on business for its own profit or that of its members." 15 U.S.C. § 44. This definition does not restrict the FTC's regulatory authority over non-profit corporations merely because of the charter of such corporations, but rather requires an analysis that looks beyond the technical form of a corporation's organization. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 767-68 (1999) (because "[n]onprofit entities organized on behalf of for-profit members have the same capacity and derivatively, at least, the same incentives as for-profit organizations to

---

[20] Numerous courts in this district and throughout the Sixth Circuit have granted or affirmed *ex parte* temporary injunctive relief similar to that requested here. (*See* Decl. Pl.'s Counsel ¶ 11 and cases cited therein [filed concurrently herewith].)

engage in unfair methods of competition or unfair and deceptive acts," the Court had "no difficulty in concluding that the Commission has jurisdiction over the [nonprofit]"); *Cmty. Blood Bank of the Kansas City Area v. FTC*, 405 F.2d 1011, 1017-18 (8th Cir. 1969) ("Congress did not intend to provide a blanket exclusion of all non-profit corporations, for it was also aware that corporations ostensibly organized not-for-profit . . . were merely vehicles through which a pecuniary profit could be realized for themselves or their members."); *Ohio Christian College*, 80 F.T.C. 815, 849 (1972) (FTC has jurisdiction over a corporation that exists as a mere shell, cloaking for-profit activities).

In conducting this analysis, courts have considered whether the corporation at issue is organized as a non-profit, whether it has been granted tax exempt status by the IRS, whether funds are distributed or inure to the profit of members or shareholders, or whether profit realized in the corporation's operations is devoted exclusively to charitable purposes. *Cmty. Blood Bank*, 405 F.2d at 1019. Courts also examine whether the nonprofit engages in "congeries of activities" that confer "far more than *de minimis* or merely presumed economic benefits" on its members. *Cal. Dental Ass'n*, 526 U.S. at 767.

Here, although Youth Financial has been granted tax exempt status,[21] the evidence shows that its profits are not devoted to charitable purposes and it has

---

[21] Michigan's acceptance of an organization's designation as a non-profit is solely

operated to profit from consumer deception.  For example, Youth Financial's profit and loss statements for 2015, 2016, and 2020 show gross revenues of $117 million but less than $700,000 in charitable contributions, or only 0.5%.  (PX24 Att. NN at 701, 703, 712-13.)  Its 2017, 2018, and 2019 tax returns report gross income of $16.6 million but charitable donations of less than $850,000 (or barely 5%).[22] (PX24 Att. A at 100, 125, 147.)  The profit and loss statements further show that almost 80% of Youth Financial's income in 2015, 2016, and 2020 was paid out as commissions to FES Agents or other employees.  (PX24 Att. NN at 701, 703, 712-13.)  Meanwhile, Defendants' bank statements show that since 2015, Youth Financial has taken in approximately $296 million directly from consumers, of

---

ministerial.  Mich. Comp. Laws § 450.2131(2) (if a submitted document "substantially conforms to the requirements of [the Nonprofit Corporation Act], the administrator *shall* endorse on it the word 'filed' with his or her official title and the dates of receipt and of filing, and shall file and index the document") (emphasis added).  Further, as courts recognize, "the IRS usually grants section 501(c)(3) status based solely on representations made by the applying entity. . .  In fact, the IRS' subsequent notification that an entity has qualified for tax-exempt status contains a disclaimer stating that the IRS has made its determination based solely on representations provided to it by the party seeking the status." *Zimmerman*, 409 F.3d at 476-77.

[22] Curiously, Youth Financial's 2015 and 2016 profit and loss statements (provided to a merchant processor as part of the underwriting process) list $6,848,663 and $13,278,954, respectively, in gross income but its 2015 and 2016 federal tax returns only report $2,017,321 and $2,949,456, respectively, in gross income. (*Compare* PX24 Att. NN at 701, 703 *with* Att. A at 53, 79.)  The amount of charitable donations listed on both profit and loss statements, however, is identical to what Youth Financial reported on its tax returns.  (*Compare* PX24 Att. NN at 701, 703 *with* Att. A at 53, 79.)

which approximately $240 million was transferred to FES.  (PX24 at 35 ¶ 126, 37 ¶ 130.)  Thus, the evidence indicates that Youth Financial's "congeries of activities" confer "far more than *de minimis* or merely presumed economic benefits" for the profit of the common enterprise and is not exempt from FTC jurisdiction.  *See Daniel Chapter One v. FTC*, 405 F. App'x 505, 506 (D.C. Cir. 2010) ("Because DCO operates, in substance, as a for-profit entity generating sales revenue and providing 'far more than *de minimis* or merely presumed economic benefits' to [the defendant] and his wife, the Commission had jurisdiction."); *FTC v. Ameridebt, Inc.*, 343 F. Supp. 2d 451, 460 (D. Md. 2004) ("Although Ameridebt is incorporated as a nonstock corporation with tax-exempt status, the Court finds this insufficient to insulate it from the regulatory coverage of the FTC Act."); *FTC v. Gill*, 183 F. Supp. 2d 1171, 1184 (C.D. Cal. 2001) ("[W]hile certain nonprofit corporations are exempt from liability for violations of section 5(a)(1) of the FTC Act, the exemption does not apply to sham corporations that are the mere alter ego of the contemner.").

## B. The FTC Meets the Standard for Preliminary Injunctive Relief

In deciding whether to issue a temporary restraining order, a district court must weigh the same factors as for a preliminary injunction:  (1) the likelihood of success on the merits, (2) irreparable injury, (3) whether the injunction would cause substantial harm to others (balance of equities), and (4) public interest.  *Am.*

*Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1246 (2016). Here, the FTC meets all four factors.

### 1. The FTC Has Demonstrated Its Likelihood of Success on the Merits

Generally, the FTC meets its burden on the likelihood of success issue if it shows preliminarily, by affidavit or other proof, "that it has a fair and tenable chance of ultimate success on the merits." *FTC v. Beatrice Foods Co*., 587 F.2d 1225, 1229 (D.C. Cir. 1978); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991); *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989). Moreover, in considering an application for a TRO or preliminary injunction, "courts are permitted to consider hearsay and otherwise inadmissible evidence." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (stating that court may give inadmissible evidence some weight when doing so "serves the purpose of preventing irreparable harm before trial"); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings."); *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).

As set forth in Section III above, the FTC has presented ample evidence, including Defendants' own websites and social media accounts and declarations from Defendants' customers, showing that it is likely to succeed on the merits of its claims that Defendants violated Section 5 of the FTC Act, multiple provisions

of CROA, and multiple provision of the TSR in connection with their marketing and sale of credit repair services and investment opportunities.

### 2. Irreparable Harm Exists

Where, as here, Defendants are charged with violating multiple federal statutes, there is a "presumption of irreparable harm based on a statutory violation." *City of New York v. Golden Feather Smoke Shop, Inc*., 597 F.3d 115, 120 (2d Cir. 2010); *FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1212 (9th Cir. 2019); *Kemp v. Peterson*, 940 F.2d 110, 113 (4th Cir. 1991). The passage of the FTC Act, CROA, and the Telemarketing Act are "in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained." *United States v. Diapulse Corp of America*, 457 F.2d 25, 28 (2d Cir. 1972 (citing *United States v. City and County of San Francisco*, 310 U.S. 16 (1940)). Even without this presumption, as described in detail in Section III above, vulnerable consumers will continue to be injured by Defendants' unlawful credit repair practices and pyramid scheme. Without the requested relief, the public will suffer irreparable harm from the continuation of Defendants' scheme. And as discussed in more detail in Section V.B below, the likelihood of "concealment and dissipation of assets" further establishes irreparable harm. *McGirr v. Rehme*, 891 F.3d 603, 613-14 (6th Cir. 2018); *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 628 (6th Cir.

2013) (asset freeze injunction appropriate where defendant's "questionable financial transactions" foreshadowed a fraudulent dissipation of assets).

### 3.   Because an Injunction Would Not Harm Others, the Equities Weigh in Favor of Granting Injunctive Relief

Here, the balance of equities justifies the relief sought.  The evidence demonstrates that the public equities—protection of consumers from Defendants' deceptive and unfair practices, effective enforcement of the law, and the preservation of Defendants' assets for final relief—weigh heavily in favor of granting the requested injunctive relief.  Granting such relief is also necessary because Defendants' conduct indicates that they will likely continue to deceive the public.  *Five-Star Auto Club,* 97 F. Supp. 2d at 536 ("[P]ast illegal conduct is highly suggestive of the likelihood of future violations."); *SEC v. R.J. Allen & Assoc., Inc*., 386 F. Supp. 866, 877 (S.D. Fla. 1974) (past misconduct suggests likelihood of future violations); *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).

By contrast, the private equities in this case are not compelling.  Defendants "can have no vested interest in a business activity found to be illegal," *Diapulse Corp.*, 457 F.2d at 29, and compliance with the law is hardly an unreasonable burden.  *See World Wide Factors*, 882 F.2d at 347 ("[T]here is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or

64

concealment.").  Because the injunction will preclude only harmful, illegal

behavior, the public equities supporting the proposed injunctive relief outweigh

any burden imposed by such relief on Defendants.  *See, e.g., Nat'l Soc'y of Prof.*

*Eng'rs. v. United States*, 435 U.S. 679, 697 (1978); *see also CFTC v. British Am.*

*Commodity Options Corp*., 560 F.2d 135, 143 (2d Cir. 1977) ("A court of equity is

under no duty to protect illegitimate profits or advance business which is

conducted illegally").

### 4.  The Public Interest Weighs in Favor of Injunctive Relief

"The public interest in ensuring the enforcement of federal consumer

protection laws is strong."  *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C.

2011); *FTC v. Campbell Capital LLC*, 2018 U.S. Dist. LEXIS 186728, at *7

(W.D.N.Y. Oct. 24, 2018) (finding "compelling public interest" in halting unlawful

practices); *FTC v. Absolute Fin. Servs*., 2020 U.S. Dist. LEXIS 260869, at *7

(D.S.C. Jul. 17, 2020); *FTC et al. v. Educare Centre Servs., Inc*., 2020 U.S. Dist.

LEXIS 135341, at *15 (W.D. Tex. Apr. 3, 2020); *FTC v. Simple Health Plans,*

*LLC*, 379 F. Supp. 3d 1346, 1364 (S.D. Fla. 2019).  Further, the public interest in

halting Defendants' unlawful conduct, preserving evidence, and preserving assets

to provide redress to consumers far outweighs any interest Defendants may have in

continuing to operate their fraudulent business.  Moreover, where, as here, a

defendant's conduct "reflects systematic wrongdoing rather than a mere incidental

violation, it presents strong grounds for the issuance of a preliminary injunction."

*SEC v. Prater*, 289 F. Supp. 2d 39, 54 (D. Conn. 2003).

### C. Defendants Are a Common Enterprise and Jointly and Severally Liable for the Law Violations

Where the same individuals transact business through a "maze of integrated business entities," the whole enterprise may be held liable as a joint enterprise. *E.M.A. Nationwide*, 767 F.3d at 637. In deciding whether a common enterprise exists, courts consider various factors in determining whether a common enterprise exists, such as: (1) common control, (2) sharing of office space and officers, (3) whether business is transacted through "a maze of interrelated companies," (4) the commingling of corporate funds, and failure to maintain separation of companies, (5) unified advertising, and (6) any other evidence revealing that no real distinction exists between the corporate defendants. *Id*. at 637; *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 267-70 (6th Cir. 1970). No one factor is controlling, rather, "the pattern and frame-work of the whole enterprise must be taken into consideration." *Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964).

As discussed in Section II.B above, Defendants form a classic common enterprise, the touchstone of which is operating through a "maze of interrelated companies" operated by the Individual Defendants. The companies share addresses and ownership, and engage in unified advertising via interconnected websites, social media, and telemarketing. The Corporate Defendants routinely

66

commingle funds and transfer funds into the personal accounts of the Individual Defendants.  Accordingly, each Defendant can be held liable for the actions of the whole.

### D. The Individual Defendants Are Liable for Injunctive and Monetary Relief

As the controlling forces behind Defendants' scheme, the Individual Defendants are liable for the law violations committed by the Corporate Defendants.  Under the FTC Act, individual defendants may be liable for injunctive relief for corporate acts or practices if they: (1) participated directly in the challenged conduct or (2) had the authority to control it.  *E.M.A. Nationwide*, 767 F.3d at 636.  In general, an individual's status as a corporate officer and his or her authority to sign documents on behalf of the corporation gives rise to a presumption of control of a small, closely-held corporation.  *Id*. at 636.  Even where an individual is not officially designated as an officer, participation or control in an entity's unlawful activity can be shown by a defendant's "active involvement in business affairs and the making of corporate policy."  *Amy Travel Serv.*, 875 F.2d at 573.  Bank signatory authority or acquiring services on behalf of a corporation also evidences authority to control.  *See FTC v. USA Fin., LLC*, 415 F. App'x. 970, 974-75 (11th Cir. 2011).

An individual may be held liable for monetary redress for corporate practices if he or she had, or should have had, knowledge of the corporate

defendant's misrepresentations. *E.M.A. Nationwide*, 767 F.3d at 636. The FTC

need not establish that "the defendant had actual and explicit knowledge of the

particular deception at issue." *FTC v. Moses*, 913 F.3d 297, 307 (2d Cir. 2019).

Instead, the FTC need only demonstrate that the defendant had actual knowledge

of material misrepresentations, reckless indifference to the truth or falsity of such

representations, or had an awareness of a high probability of fraud with an

intentional avoidance of the truth. *Id.; Amy Travel Serv.*, 875 F.2d at 574.

Participation in corporate affairs is probative of knowledge. *Moses*, 913 F.3d at

309. "[T]he extent of an individual's involvement in a fraudulent scheme alone is

sufficient to establish the requisite knowledge for personal restitutionary liability."

*Affordable Media*, 179 F.3d at 1235. When a common enterprise is present, an

individual's liability for monetary relief is joint and several with all entities

participating in the enterprise. *See FTC v. Nat'l Urological Grp., Inc.*, 645 F.

Supp. 2d 1167, 1213-14 (N.D. Ga. 2008), *aff'd*, 356 Fed. Appx. 358 (11th Cir.

2009).

Here, as discussed above, the Individual Defendants have authority to

control, and knowledge of, Defendants' wrongful acts. As discussed in Section

II.B above, they are the principal officers of the Corporate Defendants. They have

signatory authority over the Corporate Defendants' financial accounts, and the

points of contact for Defendants' service providers. And they are copied on

consumer communications.  Moreover, as also discussed above, Defendants were previously sued by the state of Georgia for the same conduct, further demonstrating their knowledge.  Accordingly, the Individual Defendants are liable for injunctive and monetary relief.

## V.   THE SCOPE OF THE PROPOSED *EX PARTE* TRO IS APPROPRIATE IN LIGHT OF DEFENDANTS' CONDUCT

As the evidence has forcefully shown, the FTC is likely to succeed in proving that Defendants' credit repair activities and investment opportunities violate the FTC Act and the other statutes listed in the Complaint, that irreparable harm exists, and that the balance of equities strongly favors the public interest. Preliminary injunctive relief is thus justified.

### A. Conduct Relief

To prevent ongoing consumer injury, the proposed TRO prohibits Defendants from making future misrepresentations concerning credit repair services and investment opportunities, charging advanced fees, and failing to provide CROA-mandated disclosures.

As discussed above, this Court has broad equitable authority under Sections 13(b) and 19 of the FTC Act to grant ancillary relief necessary to accomplish complete justice.  The requested prohibitions simply order Defendants to comply with the law.

### B. An Asset Preservation Order and an Accounting of Assets Are Necessary to Preserve the Possibility of Final Effective Relief

When a district court determines that the FTC is likely to prevail in a final determination on the merits, it has "a duty to ensure that . . . assets . . . [are] available to make restitution to the injured customers." *World Travel Vacation Brokers*, 861 F.2d at 1031; *see also FTC v. IAB Marketing*, 746 F.3d 1228, 1234 (11th Cir. 2014). To help ensure the availability of assets, preserve the status quo, and guard against the dissipation and diversion of assets, this Court may freeze the assets of corporate and individual defendants and require an accounting where, as here, the Individual Defendants controlled the deceptive activity and had actual or constructive knowledge of the deceptive nature of the practices.[23] *See, e.g.*, *FTC v. Strano*, 528 F. App'x 47, 49-52 (2d Cir. 2013) (upholding asset freeze); *Amy Travel Serv.*, 875 F.2d at 574-75.

This Court has the authority to direct third parties to effectuate the purpose of the TRO. *See, e.g.*, *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940) (courts have authority to direct third parties to preserve assets); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 130-33 (2d Cir. 2014) (courts have equitable power to impose asset freeze and accounting where plaintiff is pursuing a claim for

---

[23] Courts in this District and throughout the Sixth Circuit have frozen defendants' assets and ordered an accounting in many FTC enforcement actions. (*See* Decl. Pl.'s Counsel ¶ 11 and cases cited therein.)

equitable relief).  Further, the Court can order Defendants' assets to be frozen whether the assets are inside or outside the United States.  *See United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965) ("Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under its control, whether the property be within or without the United States.").[24]

Without an asset freeze, the dissipation and misuse of assets is likely. Defendants who have engaged in illegal activities are likely to waste assets prior to resolution of the action.  *See Williamson*, 731 F.3d at 628 (asset freeze injunction appropriate where defendant's "questionable financial transactions" foreshadowed a fraudulent dissipation of assets); *Versah v. UI Amin Indus*., 2020 U.S. Dist. LEXIS 230761, at *17 (E.D. Mich. Dec. 9, 2020) (asset freeze appropriate "to prevent Defendants from transferring or otherwise hiding their financial assets"). Moreover, the risk is heightened where, as here, "[t]he scope of the monetary liability for Defendants' unlawful conduct is enormous and provides considerable motivation for defendants to place their assets beyond the Court's reach."  *FTC v. USA Beverages, Inc*., 2005 U.S. Dist. LEXIS 39075, at *24-25 (S.D. Fla. Dec. 5,

---

[24] The TRO also includes a provision that restrains Defendants from taking any action that may result in the encumbrance or dissipation of foreign assets, including taking any action that would invoke a duress clause.  This provision is important because Defendants may have created offshore asset protection trusts that could frustrate the Court's ability to provide consumer redress.  *See Affordable Media*, 179 F.3d at 1239-44.

2005).  Indeed, in the FTC's experience, defendants engaged in similar unlawful practices secreted assets upon learning of an impending law enforcement action. (Decl. Pl.'s Counsel ¶ 9.)

Here, Defendants have taken in net deposits of approximately $467 million through an enterprise permeated by deception and unlawful activity.  They churn through merchant accounts, which is further indicia of fraud.  (PX24 at 48 ¶ 167.) Further, they constantly shift funds through the various corporate bank accounts, and regularly move money to the Individual Defendants' personal accounts. (PX24 at 37 ¶ 130, 38-41 ¶¶ 135-140.)  Defendants also regularly make funds either untraceable or move funds offshore.  (PX24 at 37-38 ¶¶ 131-134.)  Indeed, in November 2021, Defendants closed many of their bank accounts converting over $10 million to cash in order to obscure the trail of money.  (PX24 at 49 ¶ 168, Att. OO at 716, Att. PP at 718, Att. QQ at 720-21.)  Therefore, an asset freeze is required to preserve the funds derived from Defendants' unlawful activities so that the Court can retain its ability to fashion meaningful final relief.  In addition, requiring Defendants to complete and return to the FTC financial statements on the forms attached to the proposed TRO will increase the likelihood of preserving existing assets pending final determination of this matter.  *See, e.g., FTC v. D Squared Sols., LLC*, 2003 WL 22881377, at *4 (D. Md. Oct. 30, 2003) (ordering immediate accounting of assets).

### C. A Receiver Is Necessary to Protect the Public and Injured Consumers

The appointment of a receiver is a sound equitable remedy in cases involving deception.[25]  *In the Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1997); *see also U.S. Oil & Gas*, 748 F.2d at 1432.  A receiver is necessary to take control of the corporate defendant's operations; prevent the destruction of documents and computer records; help identify injured consumers and the extent of consumer harm; determine the corporate defendant's financial status; and locate, marshal, and safeguard corporate assets.  *See SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 438 (5th Cir. Unit A May 1981); *see also McGaughey*, 24 F.3d at 907; *U.S. Oil & Gas*, 748 F.2d at 1432.

A receiver is necessary here because, as shown above, Defendants' business is permeated by deceptive activities. *See R. J. Allen & Assoc.*, 386 F. Supp. at 878 ("[T]he appointment of a receiver is necessary to prevent diversion or waste of assets to the detriment of those for whose benefit, in some measure, the injunction action is brought.").  Moreover, bank records indicate numerous questionable expenditures warranting independent review.  Further, a receiver would be able to secure multiple locations, as well as perform standard functions such as ensuring corporate compliance with any order, tracing and securing assets, and taking

---

[25] Courts throughout the Sixth Circuit have appointed receivers in many FTC enforcement actions.  (*See* Decl. Pl.'s Counsel ¶ 11 and cases cited therein.)

73

possession of computers, documents, and other evidence of Defendants' illegal practices. The FTC has identified a qualified candidate for the Court's consideration in the pleading entitled "FTC's Recommendation for Temporary Receiver," filed simultaneously with this memorandum.

### D. Preservation of Records

In addition, the proposed order contains a provision directing Defendants to preserve records, including electronic records, and evidence. It is appropriate to enjoin Defendants charged with deception from destroying evidence, and doing so would place no significant burden on them. *See SEC v. Unifund SAL*, 910 F.2d 1028, 1040 n.11 (2d Cir. 1990) (characterizing such orders as "innocuous"). In the FTC's experience, defendants engaged in similarly serious unlawful practices destroyed documents upon learning of an impending law enforcement action. (Decl. Pl.'s Counsel ¶ 10.)

### E. Immediate Access and Expedited Discovery

To facilitate the FTC's and the receiver's efforts to locate documents and assets related to Defendants' unlawful activities, the FTC seeks leave of Court for limited discovery to locate and identify documents and assets and to allow the FTC and the receiver immediate access to Defendants' business premises. District courts are authorized to depart from normal discovery procedures and fashion discovery to meet discovery needs in particular cases. Federal Rules of Civil

Procedure 26(d), 33(a), and 34(b) authorize the Court to alter the standard

provisions, including applicable time frames, that govern depositions and

production of documents. This type of discovery order reflects the Court's broad

and flexible authority in equity to grant preliminary emergency relief in cases

involving the public interest.[26]  *See Porter v. Warner Holding*, 328 U.S. 395, 398

(1946); *FSLIC v. Dixon*, 835 F.2d 554, 562 (5th Cir. 1987); *Fed. Express Corp. v.*

*Fed. Expresso, Inc.,* 1997 U.S. Dist. LEXIS 19144, at * 6 (N.D.N.Y. Nov. 24,

1997) (early discovery "will be appropriate in some cases, such as those involving

requests for a preliminary injunction") (quoting commentary to Fed. R. Civ. P.

26(d)).

### F.  The TRO Should Be Issued *Ex Parte* to Preserve the Court's Ability to Fashion Meaningful Relief

The substantial risk of asset dissipation and document destruction in this

case, coupled with Defendants' ongoing and deliberate statutory violations,

justifies *ex parte* relief without notice.  *See SEC v. Bravata*, 2009 U.S. Dist. LEXIS

64609, at *4-5 (E.D. Mich. Jul. 27, 2009) (*ex parte* relief appropriate where notice

"might stimulate the very actions the restraining order is intended to prevent").

Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte* orders

---

[26] Courts throughout the Sixth Circuit have ordered immediate access to business premises and/or expedited discovery in FTC enforcement actions.  (*See* Decl. Pl.'s Counsel ¶ 11 and cases cited therein.)

upon a clear showing that "immediate and irreparable injury, loss, or damage will result" if notice is given. *Ex parte* orders are proper in cases "where such notice would render fruitless the further prosecution of the action." *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641,650 (6th Cir. 1993); *In re Vuitton et Fils, S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979); *see also AT&T Broadband v. Tech Commc'ns.*, 381 F.3d 1309, 1319 (11th Cir. 2004). The court noted in *Cenergy Corp. v. Bryson Oil & Gas P.L.C.*, 657 F. Supp. 867, 870 (D. Nev. 1987), that given the pervasive deception in the case, "it [is] proper to enter the TRO without notice, for giving notice itself may defeat the very purpose for the TRO." Mindful of this problem, courts have regularly granted the FTC's request for *ex parte* temporary restraining orders in Section 13(b) cases.[27]

As discussed above, Defendants' business operations are permeated by, and reliant upon, unlawful practices. The FTC's past experiences have shown that, upon discovery of impending legal action, defendants engaged in fraudulent schemes withdrew funds from bank accounts and destroyed records. (Decl. Pl.'s Counsel ¶¶ 9-10.) Defendants' conduct—including large wire transfers to offshore

---

[27] (*See* Decl. Pl.'s Counsel ¶ 11 and cases cited therein.) Indeed, Congress has looked favorably on the availability of *ex parte* relief under the FTC Act: "Section 13 of the FTC Act authorizes the FTC to file suit to enjoin any violation of the FTC [Act]. The FTC can go into court *ex parte* to obtain an order freezing assets, and is also able to obtain consumer redress." S. Rep. No. 130, 103rd Cong., 2d Sess. 15-16, *reprinted in* 1994 U.S. Code Cong. & Admin. News 1776, 1790-91.

accounts and to Individual Defendants' accounts—and the nature of Defendants' illegal scheme provide ample evidence that Defendants would likely conceal or dissipate assets and destroy evidence absent *ex parte* relief. Thus, this case fits squarely into the narrow category of situations where *ex parte* relief is appropriate to make possible full and effective final relief.

## VI. CONCLUSION

For the above reasons, the FTC respectfully requests that this Court issue the attached proposed TRO with asset freeze, appointment of receiver, expedited discovery, and other equitable relief.

Dated:  May 23, 2022                    Respectfully submitted,


  */s/Gregory A. Ashe*
GREGORY A. ASHE
K. MICHELLE GRAJALES
JULIA E. HEALD
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Telephone: 202-326-3719 (Ashe)
Telephone: 202-326-3172 (Grajales)
Telephone: 202-326-3589 (Heald)
Facsimile: 202-326-3768
Email:gashe@ftc.gov, mgrajales@ftc.gov,
      jheald@ftc.gov

DAWN N. ISON
United States Attorney

PETER A. CAPLAN (P30643)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Telephone: 313-226-9784
Email: peter.caplan@usdoj.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION