# FTC MOTION FOR TEMPORARY RESTRAINING ORDER

# EXHIBIT 21

**Declaration of FICO Vice President of Analytic Development-Scores Ethan Dornhelm**

DECLARATION OF ETHAN DORNHELM
PURSUANT TO 28 U.S.C. § 1746

I, Ethan Dornhelm, hereby state that I have personal knowledge of the facts set forth below and am competent to testify about them. If called as a witness, I could and would testify as follows:

1. I am a Vice President of Analytic Development-Scores for Fair Isaac Corporation ("FICO"). My business address is 200 Smith Ranch Road, San Rafael, CA 94903. I have been employed by FICO from 1999 to 2011, and from 2012 to the present. I am currently the global head of analytic development for the Scores unit of FICO, which includes FICO's credit scoring solutions and services. My duties include leading a team of approximately thirty analysts and programmers who have primary responsibility for the research, development, and maintenance of products and services for the Scores unit.

2. FICO is the leading provider of analytics and decision management technology. FICO pioneered the development of statistically based credit risk evaluation systems, commonly known as credit scoring systems. FICO developed the first-ever credit scoring model in 1958.

3. Generally available credit scores calculated using FICO's proprietary credit scoring models are referred to as FICO® Scores. When using the term "FICO® Scores" in this declaration, I am specifically referring to FICO's generally available credit scores in the United States that are calculated solely through the use of traditional credit bureau data. FICO® Scores are the industry leader and a fixture of consumer lending in the United States. To produce a FICO® Score, a consumer reporting agency applies one of FICO's proprietary credit scoring models to the data in a consumer's credit report, producing a score generally in a range between 300 and 850. Under this model, consumers are rank-ordered according to the likelihood that they will repay their credit obligations. Higher FICO® Scores correspond to lower levels of risk.

1

4. FICO® Scores analyze five types of data elements: (1) payment history (accounting for approximately 35% of a consumer's FICO® Score); (2) outstanding debts (approx. 30%); (3) length of credit history (approx. 15%); (4) pursuit of new credit (approx. 10%); and (5) mix of types of credit (approx. 10%).

5. I understand that a "hard inquiry" occurs when a lender or other third party checks a consumer's credit report or score when the consumer applies for credit. Hard inquiries from the past year are considered by FICO® Scores, but their impact is usually relatively small. I understand that a "soft inquiry" typically occurs when a consumer's credit report or score is pulled without the consumer applying for credit (for example, when a credit card issuer sends a consumer a pre-approved credit card offer), or when a consumer pulls his or her own credit report or score. Soft inquiries do not affect a consumer's FICO® Scores.

6. FICO® Scores are an important part of a consumer's financial profile. FICO® Scores are used by 90% of top lenders in making credit decisions. Among other uses, FICO® Scores are used by credit grantors to evaluate applicants for new credit.

7. I understand that some credit repair companies claim that they can raise consumers' credit scores by removing negative information from consumers' credit reports. Without having detailed information about a consumer's current FICO® Score and accurate credit history, no credit repair organization can guarantee that it can lawfully improve a particular consumer's FICO® Score by a specific amount within a specific time period. Further, I am not aware of any legal method for credit repair companies to remove accurate and non-obsolete negative information from consumers' credit reports.

8. I also understand that some credit repair companies claim that they can raise consumers' credit scores by removing hard inquiries from consumers' credit reports. I am not aware of

2

any legal method for credit repair companies to remove accurate and non-obsolete hard or soft inquiries from consumers' credit reports. Further, as discussed above, hard inquiries more than a year old and soft inquiries are not considered in the calculation of a consumer's FICO® Score in the United States. Thus, even if there was a method to remove those types of inquiries, there would be no effect on the consumer's FICO® Score.

9. I also understand that some credit repair companies claim that they can raise consumers' credit scores by adding tradelines to consumers' credit histories (that is, they claim to add consumers as additional authorized users on one or more credit cards or other credit accounts held by unrelated account holders). The addition of tradelines does not guarantee an increase in a consumer's FICO® Score in all cases. For instance, if the tradeline incurred a delinquency or had a high utilization rate, an authorized user's FICO® Score could decrease. In addition, without detailed information about a consumer's current FICO® Score and accurate credit history, no credit repair organization can guarantee that the addition of a tradeline will improve a particular consumer's FICO® Score by a specific amount within a specific time period. Finally, recent versions of the FICO® Score incorporate a sophisticated weighting of authorized user tradelines in a manner that is commensurate with the risk predication they provide. Consequently, beginning with FICO® Score 8, which was first introduced to the market in January 2009, the impact authorized user tradelines have on the overall score has been reduced.

10. I also understand that some credit repair companies claim that they can raise consumers' credit scores by getting consumers approved for certain credit building products, such as store credit cards (i.e., a credit card that can only be used to purchase goods or services from a particular merchant). While it is true that a positive credit history (*i.e.*, a history of on-time

payments to a creditor) can have a corresponding positive impact on a consumer's credit score, because a consumer's credit score is based on many factors and calculated across the full breadth of the consumer's credit report, the effect of any single account can be minimal. In addition, it is possible that it can take many months of on-time payments on an account before any positive improvement to a credit score is observed. Further, because store credit cards often have substantially lower credit limits than bank-issued general purpose credit cards, and because the FICO® Score contains some variables that focus solely on bank-issued general purpose credit cards, the effect of a store credit card is generally smaller than that of a bank-issued general purpose credit card on the FICO® Score.

11. I also understand that some credit repair companies claim that they can raise consumers' credit scores by getting consumers approved for certain credit building products, such as secured credit cards (i.e., a credit card secured by a deposit made by the cardholder). While it is true that a positive credit history (*i.e.*, a history of on-time payments to a creditor) can have a corresponding positive impact on a consumer's credit score, because a consumer's credit score is based on many factors and calculated across the full breadth of the consumer's credit report, the effect of any single account can be minimal. In addition, it is possible that it can take many months of on-time payments on an account before any positive improvement to a credit score is observed. Further, because secured credit cards often have substantially lower credit limits than unsecured credit cards, the effect of a secured credit card is generally smaller than that of an unsecured credit card on the FICO® Score.

12. I also understand that some credit repair companies claim that they can raise consumers' credit scores by having consumers' on-time rental payments reported to consumer reporting agencies. To the extent rental payments are reported by a credit furnisher as rental payments,

these payments do not factor into FICO® Score 8, which is the FICO Score most commonly used by lenders. In October 2014, FICO introduced to the market FICO® Score 9. Rental history, when it is reported, does factor into FICO® Score 9 and 10; thus, under these FICO® Score versions, a positive rental history (*i.e.*, a history of on-time rent payments) can have a corresponding positive impact on the score. Because a consumer's credit score is based on many factors and calculated across the full breadth of the consumer's credit report, however, the effect of positive rental history can be minimal. In addition, it is possible that it can take many months of on-time rent payments before any positive improvement to a credit score is observed.

13. FICO® Score 9 and 10 (unlike previous versions of the FICO Score) ignore paid collections accounts. Further, unpaid medical collections accounts have less impact on FICO® Score 9 and 10 than they had on previous versions of the FICO Score.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the statements made in this declaration are true and correct.

Executed this 16 day of May, 2022, in San Rafael, California.

Ethan Dornhelm