# FTC MOTION FOR TEMPORARY RESTRAINING ORDER

# EXHIBIT 22

**Declaration of FTC Expert Dr. David Givens**

## DECLARATION OF FTC EXPERT DR. DAVID GIVENS
### Pursuant to 28 U.S.C. § 1746

### Contents

I.  Introduction ................................................................................................................. 2

II.  Summary of conclusions ............................................................................................ 3

III.  Conceptual framework ............................................................................................... 5

IV.  Analysis of FES compensation structure .................................................................. 8

    A.  Compensation plan ............................................................................................... 8

        1.  Compulsory purchasing ................................................................................. 9

        2.  Sources of income ........................................................................................ 12

    B.  Optimal scenario analysis ................................................................................... 31

        1.  Introduction .................................................................................................. 31

        2.  Setup ............................................................................................................ 32

        3.  Key assumptions .......................................................................................... 32

        4.  Results .......................................................................................................... 34

        5.  Conclusion on the optimal scenario ............................................................ 42

V.  Promotional and training messaging ....................................................................... 43

    A.  Introduction ......................................................................................................... 43

    B.  Does FES market participation as a business? .................................................... 44

    C.  Income and lifestyle claims ................................................................................ 46

    D.  Income disclosures .............................................................................................. 49

        1.  What income disclosures can do, in general ................................................ 49

        2.  General impressions of FES income disclosures .......................................... 50

VI.  Conclusion ............................................................................................................... 52

VII.  Appendix .................................................................................................................. 52

    A.  Optimal scenarios with "Power of 5" Program .................................................. 52

    B.  Legal Opinion Letter by Kevin Thompson............................................................ 54

VIII. Sources ..................................................................................................................... 57

I, David Givens, hereby state that I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify as follows:

## I.      Introduction

1.      I am an economist in the Consumer Protection Division of the Bureau of Economics at the Federal Trade Commission ("FTC"). As part of my duties at the FTC, I am assigned to assist on matters with the FTC's Bureau of Consumer Protection ("BCP").

2.      I received a Ph.D. in Economics from the University of Maryland in 2010 and a B.A. in Economics from the University of Virginia in 1998.

3.      I have been working at the FTC in Washington, D.C. since September 2010. I have attached, as Attachment A, a copy of my curriculum vitae, including a list of publications I have authored.

4.      I have never testified as an expert at trial or by deposition, affidavit, or declaration.

5.      I am a full-time, salaried employee at the FTC. I am not receiving any additional compensation for my services as an expert for the FTC in this case, and my performance is not evaluated based on the conclusions I draw or the outcome of the litigation.

6.      I have been asked by BCP staff to provide expert testimony in the case *FTC v. Financial Education Services, Inc., et al.*, currently pending in the United States District Court for the Eastern District of Michigan. I understand the defendants in the case are Financial Education Services, Inc., United Wealth Services, Inc., VR-Tech, LLC, VR-Tech MGT, LLC, CM Rent Inc., Youth Financial Literacy Foundation, Parimal Naik, Michael Toloff, Christopher Toloff, and Gerald Thompson (collectively, "Defendants" or "FES"). In particular, BCP staff requested my assistance in analyzing the FES marketing program to determine whether FES is operating as a pyramid scheme and whether the company and its representatives are making misleading representations to consumers.

7.      In this report, I present an analysis that proceeds in the following way. I begin with a brief summary of my conclusions with respect to the pyramid and misrepresentation questions. I then delve into the basis for these conclusions, including the overall conceptual framework and legal assumptions on which I rely, as well as my evaluation of FES, specifically. Finally, I summarize my analysis and findings in a brief conclusion.

8.      The opinions that I present in this report are based upon materials made available to me by BCP staff. A complete listing of the materials I reviewed is provided in the Sources section at the end of this document.

9.      These materials include documents and other content produced by FES itself (e.g., the compensation plan, income disclosure statement, and company web pages); promotional videos produced by independent FES Agents in the field; and consumer declarations to the FTC by former FES Agents and Customers.

## II.    Summary of conclusions

10.    FES is a multi-level marketing company, or "MLM." MLMs brings two offerings to the marketplace: 1) a product or service that is retailed to customers, and 2) an investment opportunity in which participants retail the product or service and recruit other participants.

11.    On the retail side, FES markets an array of financial services that appear to target consumers with poor credit. Its marquee offering is a credit repair "Protection Plan," for which it charges a flat fee of $99-$188 at signup, plus a recurring monthly fee of between $49 and $89 per month.

12.    On the investment opportunity side, an FES participant (an "Agent") may pursue income by 1) marketing FES financial services to customers and 2) enrolling other Agents. A key objective of this report will be to assess the relative importance of each of these two activities in achieving financial success as an FES Agent. As explained below, this question lies at the heart of determining whether FES is operating as a pyramid scheme.

13.    One part of this assessment involves determining the value of FES services to consumers and the extent to which Agents can earn retail profit by marketing these services. Customer declarations supplied to me by BCP staff suggest the FES Protection Plan is of dubious value, that it is marketed deceptively, that consumers routinely overestimate the utility of enrolling, and that they face obstacles when attempting to cancel enrollment. This evidence leads me to suspect the Protection Plan may not be a viable service capable of competing in the marketplace when marketed truthfully.[1]

14.    A non-viable product sold through deception imposes losses on consumers. When marketed through an MLM, it also creates the further problem of incentivizing distributors to concentrate their pursuit of income elsewhere – specifically, in the compensation paid in connection with recruiting other participants. As a general matter, an MLM in which a participant's success depends primarily or exclusively on recruiting other participants is a pyramid scheme. I set forth the full conceptual and legal background for my pyramid analysis in Section III, below.

15.    A pivotal determinant of the ways in which MLM distributors pursue income is the MLM's compensation structure and the incentives that flow from it. I have analyzed the FES compensation plan, and I conclude that success in the business depends primarily on Agent recruitment and not on making customer sales.

16.    Earning compensation as an FES Agent is overwhelmingly a matter of:
    a)  staying "Active" as an enrollee in their credit repair Protection Plan (typically by paying a monthly fee of $49-$89);
    b)  continually recruiting new Agents and inducing them to stay Active; and,

---

[1] Unfortunately, I cannot speak to the competitive viability of any other FES service because no data or evidence provided to me touches on consumers' experiences with those services.

     c) ensuring that every Agent brought into the business adopts priorities 1) and 2), ad infinitum.

17. Customer sales can contribute to earnings, but in the overall scheme set forth by the compensation structure, customer sales represent a minor hurdle to be cleared rather than a significant foundation for achieving advertised income. Maintaining a focus on steps a)-c) listed above is the essential recipe for success.

18. This strategy of "pay, recruit, teach to pay and recruit" is known in the MLM world as the strategy of "duplication." Incentives to pursue duplication arise when an MLM's compensation plan rewards a participant for the activity of both her *direct* recruits (i.e., individuals she personally recruits) and her *indirect* recruits (i.e., her recruits' recruits, their recruits, and so on, down any number of levels). One's direct and indirect recruits are known collectively as the participant's "downline."

19. Duplication incentives can hyper-charge the focus on recruitment throughout an MLM – both because individual distributors are no longer satisfied with merely recruiting (they now want their recruits to recruit, and so on…), and because the marginal recruit generates commission income for several incumbent participants instead of just one. Disbursement of compensation across multiple incumbents widens the pool of participants with a financial interest in seeing the chain of recruitment continue without end.

20. The FES Plan is a duplication plan. It incentivizes a singular focus on building a downline of recruitment-focused Agents. The three elements (pay, recruit, teach) are manifest in the FES compensation plan:

- **"Pay"** FES Agents must be enrolled in the company's Protection Plan at a cost of $49-$89 per month in order to be eligible for compensation, regardless of their credit score and regardless of the Plan's effectiveness in raising it over time.
- **"Recruit"** All but one form of compensation requires enrolling other Agents. Level Overrides, CABs, CAB Overrides, the Infinity Bonus, the Generation Bonus, Medallion Club Rewards, and R&R Club Rewards all require Agent recruitment. Only Direct Commissions are payable on sales to one's own retail customers, and this reward may be revoked ("retracted") if a customer cancels her subscription before making her third monthly payment. The customer declarations that I have read suggest that many customers may cancel quickly.
- **"Teach"** The vast majority of potential earnings in the FES investment opportunity come not from direct recruits but from the Level Overrides and Infinity Bonuses generated by indirect recruits. My analysis of the compensation plan later in this declaration will demonstrate the reasons for this and will quantify the dependence. One consequence is that an Agent is reliant on others to carry out a substantial share of the recruitment that generates her rewards. Thus, seeing to it that every level is taught to prioritize "pay-and-recruit" is imperative for achieving advertised earnings.

21. In summary, based on the materials made available to me, I conclude that FES is operating in a manner consistent with being a pyramid scheme. Selling FES services to customers

likely results in negligible consumer value, and, in any case, does little to advance FES Agents in the investment opportunity.

22. The MLM's compensation structure diminishes retailing's importance while strongly incentivizing Agent duplication. Mandatory Agent purchasing is likely funding a significant fraction - if not a majority - of the rewards paid to successful recruiters. The structure of compensation is likely to fuel exaggerated income and lifestyle claims because it implies endless geometric growth in the number of participants, explosive growth in compensation, and minimal effort after the first few recruits.

23. Success under this type of compensation structure cannot be obtained by more than a tiny fraction of those who pursue it even under the best of circumstances, something that makes FES's marketing of its plan to a general audience inherently deceptive. Yet the hypothetical feasibility of duplication-based earnings for even a few individuals acts as a basis for exaggerated representations that make the opportunity appealing to many.

24. I emphasize that I have not seen company data on enrollment, purchasing, compensation, tenure, etc. Such data could shed light on the way the organization functions in practice, showing, e.g., the level of retail demand for FES services, Agent expenditures, Agent advancement and tenure, amounts and sources of Agent compensation, etc. It is possible that some opinions in this report will need to be revised if/when I am given access to company data. My assessments of the compensation structure, participant incentives, and marketing and training materials are unlikely to be affected. However, empirical outcomes, like Agents' ability to find customers and recruits, Agent expenditures and dollar losses, and typical tenure before quitting are very hard to predict. Any statements in these topic areas are more likely to need updating once company data becomes available.

## III.   Conceptual framework

25. In assessing FES's compensation structure, I rely on the following economic characterization of a pyramid scheme: a recursive arrangement in which a participant pays into a scheme in return for the right to earn commissions on the payments made by others whom she recruits and convinces to chase the same opportunity.

26. Put differently, a pyramid is a recruitment-based transfer scheme in which the payments of newer entrants are transferred to earlier entrants.[2]

27. The right to earn commissions may extend down many levels of what is known as a participant's "downline" (her recruits, her recruits' recruits, etc.).[3] These commissions can, in theory, grow to be very large if the number of levels in the participant's downline grows and grows. The population in each level increases geometrically under a typical recruitment

---

[2] The economic characterization of a pyramid scheme used in this declaration is based on ideas in Wosińska et al. (2021), Vander Nat and Keep (2002), and Keep and Vander Nat (2014).

[3] The levels of recruiters above a given participant in the recruitment tree are referred to as the participant's "upline."

pattern whereby each participant recruits multiple other participants. For instance, if each participant recruits three others, then an individual's total downline will reach 363 participants by its fifth level.

28.   Compensating based on recruitment creates an irresolvable dilemma in that no participant can be made whole without imposing losses on multiple other participants. Stopping the chain of recruitment at any given moment would leave the vast majority of existing participants unable to recoup their investments, while allowing it to continue would only increase the population in a loss position.

29.   This dilemma can play out in different ways. If participants all succeed at recruiting multiple other individuals as prescribed, then the un-recruited population eventually dwindles and recruiting grinds to a halt. At that moment, the majority of participants, by virtue of geometric growth, will reside at the bottom of the organization in a position of financial loss, having just entered but lacking the recruits with which to recoup their investment. The scheme will collapse under a wave of exit that begins among the newest and least-compensated recruits and works its way upward through the organization.

30.   In this scenario, participants suffer losses only once the scheme collapses. However, this is not the only possible scenario. Participants can be harmed in an ongoing manner as the pyramid operates. Furthermore, a pyramid need not ever collapse.

31.   Pyramids can persist indefinitely because, in practice, recruiting can be difficult, and participants at every point in time can face a high likelihood of failing to meet their recruiting objectives. These participants fail to recoup their investments and drop out, but their exit does not necessarily threaten the viability of the organization as a whole. The steady stream of failures and exits can, paradoxically, prolong the pyramid's survival by slowing its overall rate of expansion to a pace that does not exhaust the recruitable population. The situation is then one in which most participants individually recruit too few participants to make a profit but where, nevertheless, enough recruits are being found in the aggregate for the organization as a whole to continue lumbering along at a relatively stable size. A constant or even expanding organization can mask a tremendous amount of churn and loss under the surface.

32.   A simple, illustrative example of a pyramid scheme is a chain letter, where the profits of earlier entrants are funded entirely out of the payments of later entrants, and where consequently, the vast majority of participants at any one time are in a position of financial loss.

33.   However, pyramid schemes also can be operated by companies that market products or services through the distribution channel known as multi-level marketing (MLM).

34.   MLM compensation structures vary, but, broadly speaking, they compensate participants both for product sales to retail customers and for downline activity – i.e., for the purchases, retail sales, and recruiting activity of others whom they directly or indirectly recruit into the business.

35. Broadly speaking, an MLM amounts to a pyramid scheme if, like a chain letter, its compensation structure makes recruiting necessary for success.

36. The mere existence of products or services and customer sales do not necessarily prevent an MLM from being a pyramid scheme. The compensation plan must make it possible for retailing to provide participants a viable path to advertised levels of income. If not, then success effectively requires recruiting. The MLM's continued viability in that case rests on an endless recruiting chain that dooms the vast majority of participants to failure.

37. It is my understanding that the *Koscot* test is the legal standard for determining whether an MLM is, in fact, operating as a pyramid scheme. This test was adopted by the FTC in *In re Koscot Interplanetary, Inc*., 86 F.T.C. 1106 (1975) and has been interpreted for me by BCP legal staff. In *Koscot* the Commission found:

> "[Pyramid] schemes are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users."

38. In the paragraph immediately following the one quoted above, the Opinion of the Commission highlights the parallel between MLM-type pyramid schemes and chain letters:

> "…the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed."

39. The Opinion goes on to emphasize the centrality of the endless-chain element in a pyramid's power to inflict harm. The Opinion holds that making success contingent on recruiting is *still* injurious even when recruitment-related rewards are based on the downline's <u>retail sales</u>, as opposed to the downline's personal purchases:

> "Indeed, even where rewards are based upon sales to consumers, a scheme which represents to all comers that they can recoup their investments by virtue of the product sales of their *recruits* must end up disappointing those at the bottom who can find no recruits capable of making retail sales."

40. This passage shows that retail sales are necessary but not sufficient for an MLM to avoid functioning as a pyramid scheme. The compensation structure also plays a key role. If retail sales only or primarily benefit <u>recruiters</u> ("…by virtue of the product sales of their *recruits*…"), then participants cannot profit from retailing and must recruit to recoup their investment.

41. I interpret the *Koscot* language to place the endless-chain element at the center of a determination of whether an MLM is operating as a pyramid scheme. I also consider the

7

*Koscot* conceptualization of pyramid scheme to be in agreement with the economic characterization of pyramids as recruitment-based transfer schemes.

42. I reiterate that this declaration does not purport to provide a legal interpretation of the pyramid standard as handed down in *Koscot* and as affirmed in later court decisions. I highlight the *Koscot* language above only to orient the reader toward the analytical framework employed in this declaration's assessment of the FES compensation structure.

## IV. Analysis of FES compensation structure

43. I begin my analysis with a walk-through of the FES compensation plan and finish with a quantitative model of participation called the "optimal scenario."

### A. Compensation plan

44. FES sells a suite of financial services and markets an investment opportunity that consists in selling these services and recruiting other investment opportunity participants (called "Agents").[4]

45. Both activities – selling and recruiting – potentially generate income for the Agent. Selling an FES Plan to a customer enables the Agent to earn a one-time bonus (a customer acquisition bonus, or "CAB") followed by monthly commissions of 11%-13% of the customer's monthly enrollment fees for as long as the customer remains enrolled.

46. Recruiting an Agent into the business works differently. Recruiting can generate the direct, immediate compensation of a customer sale (through an "Initial CAB"), but its most lucrative benefit is the way it opens up the ability to earn far greater compensation through CABs, Overrides and various other rewards paid on indirect recruits. Recruitment of other Agents is essential for achieving significant income in FES.

---

[4] FES markets several products, and in the Appendix to this report I briefly describe the ones of which I am aware. From the materials that I have reviewed, the most frequently referenced product is the "Protection Plan," a credit repair service sold on a monthly subscription basis. I have yet to see data reflecting sales of the various FES products, and so it is impossible for me to determine which products sell most widely or contribute the most to FES revenue. For the purposes of this report, I will focus exclusively on the Protection Plan product. One consumer declaration (Harris) indicates it was the focus of the investment opportunity: "Despite FES selling a wide range of products, the main one we were supposed to sell was the credit repair service." Should new data come to light suggesting a need to revise any conclusions herein, I will update this report.

### 1. Compulsory purchasing

47. Participation in the FES investment opportunity costs money. Agents must be in an "Active" status in order to be eligible for compensation.[5] Agents are "Active" only while enrolled in FES's "Protection Plan." Enrollment costs an Agent $288 in the first month; $89 per month in months 2-3, $69 per month in months 4-12, and $49 per month in months 13 and onward.[6] Protection Plan enrollment is required in all months, regardless of the Agent's credit score or the Plan's impact on the score over time.

48. This compulsory aspect clouds the interpretation of Agent enrollment: how many Agents would still purchase a Protection Plan if eligibility for compensation did not hinge on it? An Agent's choice *not* to enroll at lower cost as a "Customer" suggests that she valued the investment opportunity per se, but it does not rule out that she may have valued the credit repair service as well.[7]

49. "Inventory loading" is a technique used by pyramid schemes to obscure the underlying transfer of money from recruits to recruiters. In inventory loading, participants are required to purchase the MLM's product or service as a condition of participation, and some fraction of revenue on those required purchases is paid upline to recruiters as a commission – generally, without regard for whether the product ever is re-sold at retail (profitably or otherwise). In an MLM that markets physical goods, these compulsory distributor purchases translate into excess physical inventory. In an MLM like FES that markets services, these compulsory purchases do not result in excess physical inventory but can impose financial losses all the same.

50. What makes a given instance of compulsory purchasing "inventory loading" is its tendency, situated within the broader context of an MLM's retail opportunity and compensation scheme, to act primarily as a money-transfer mechanism rather than an inducement to find new retail customers and serve unmet retail demand.

51. Inventory loading imposes its most damaging losses on participants in the lowest levels of an MLM, who tend to comprise the majority of overall membership. Their losses result

---

[5] I am aware of one exception to the Activity requirement: Agents may receive Direct Commissions whether they are Active of not. Direct Commissions are one-time rewards paid on certain sales (e.g. Protection Plan) made to retail Customers.

[6] Certain materials that I have reviewed imply that an Agent's monthly fee ($49-$89 per month) is waived in months during which she has at least five Customers or recruits simultaneously enrolled in a Protection Plan. The Compensation Plan does not mention this "Power of 5" program, but a company-produced online video and multiple consumer declarations reference the benefit. It is not clear to me when the Power of 5 offer started and whether it remains in effect. As discussed in note 22 and in the Appendix, whether or not the Power of 5 program is in effect will have a minimal effect on Agents' overall costs and earnings.

[7] The default first-month cost of Protection Plan enrollment is $188 for Customers but $288 for Agents. Discounts may be given for either type of signup, so the final cost to individual Customers or Agents is not knowable without access to company data.

from their inability to resell inventory purchased without regard for retail demand, and from a lack of recruits on whom they can earn commissions.

52. FES's requirement that Agents be enrolled in its Protection Plan in order to participate constitutes compulsory purchasing of a service – one that cannot be stored, returned or re-sold. To assess the potential legitimate justifications for this practice, I review below several arguments that MLMs have used to defend the practice of compulsory distributor purchases:

   a) *Purchases are not compulsory.* MLMs may deny that such purchases are, in fact, compulsory, pointing to avenues that may exist for pursuing the business without the benefits afforded by meeting minimum-purchase requirements.
   b) *Purchases are compulsory but can be resold for profit.* MLMs may claim that robust consumer demand outside the network of distributors means that unwanted inventory always can be profitably resold at retail.
   c) *Purchases are compulsory but can be returned.* MLMs may point to a return policy and argue that its protections eliminate financial risk of excessive inventory investment.
   d) *Only compulsory purchases can separate distributors from retail customers.* MLMs may argue that a minimum purchase requirement functions like a volume discount, separating consumers (who pay at suggested retail price, or SRP) from distributors (who are given access to a discounted wholesale price so they may earn a retail margin).
   e) *Compulsory purchases are needed to motivate retailing.* MLMs may argue that minimum purchase requirements can act as an ongoing inducement to engage in retailing.
   f) *Compulsory purchases do not affect behavior.* Finally, MLMs may claim that, practically speaking, purchase "requirements" are not actually binding on distributors, because distributors tend to be devoted customers and would buy at least the required amount for their own consumption even absent the requirements.[8]

53. The merits of defenses a) - f) depend in large measure on the practices of the particular MLM that is offering them. For instance, on a): what advantages (discounts, rewards, opportunities for promotion) are lost by failing to make the required purchases, and how viable is the investment opportunity without those advantages? On b): what evidence of external retail demand can the MLM demonstrate? On c): how generously is the return policy administered; what fraction of distributors know about it; and is quitting the business required in order to get a refund?

54. Of the six possible defenses, FES can only possibly avail itself of the sixth.

55. On a), the path to significant income in FES requires enrolling in a Protection Plan. On b),

---

[8] A more subtle argument MLMs may use to justify purchase requirements is that they discourage a form of manipulation called "stacking," in which recruiters themselves pay for new purchases and place them under fake recruits in order to capture commission payments that otherwise would go to other participants upline. Stacking is often prohibited explicitly by MLM rules but may be difficult to police. Minimum purchase requirements can reduce incentive to stack by imposing a cost (the cost of the required purchase) on enrolling a fake recruit.

PX22 - 10

there is no way for an Agent to recoup her expenses by reselling her Protection Plan membership to someone else. On c), there is no official return policy (although I have read that some Agents who quit do obtain partial refunds if they are persistent). On d), the FES purchase requirement does not separate consumers from distributors (Agents purchase in the same quantity as Customers, and in any case, Protection Plans cannot be stockpiled and resold). Finally, on e), it is hard to see how an Agent's own enrollment provides additional impetus for her to retail to customers.

56. The only plausible defense that FES could offer of its purchase requirement is f): that it is *unnecessary* - that Agents would voluntarily enroll in the Protection Plan even absent a requirement, because they value the service.

57. I have not seen an instance of FES making this argument, but I consider its merits, nevertheless, in order to assess whether FES's purchase requirement might not be inflicting losses characteristic of inventory loading.

58. A factor in support of this argument is that participation in a Protection Plan and participation in the investment opportunity tend to be marketed together, as a joint exercise in financial self-improvement.

59. One way FES jointly markets the investment opportunity and the Protection Plan is through the use of language applicable to both domains, like, "eliminate the burden of financial uncertainty," "achieve financial wellness," and "transformational lifestyle movement."[9]

60. Another way is by suggesting that enrollment in the Protection Plan and pursuit of the business naturally go hand in hand. For instance, the UWE Member Benefits video describes FES as a "word-of-mouth marketing program," meaning "marketers" (i.e., Agents) will also be customers. At the end of the same video, the point is reiterated when the narrator suggests the viewer might be wondering "how I can get my monthly Protection Plan subscription fee waived" by enrolling others. (UWE Member Benefits video). The UWE home page states: "OUR MISSION … we strive to eliminate the burden of financial uncertainty while creating a plan of action and peace of mind for the future." This message could apply equally well to the opportunity to sell financial services, or to the financial services themselves.

61. If Agents are attracted to the product first and view the business merely as a way to defray the cost of consuming, then in those instances, purchase requirements are unlikely to be causing harm. However, when Agents join primarily to earn income, then purchase requirements potentially cause harm.

62. I do not rule out the possibility that some Agents may have valued the Protection Plan. However, my examination of the FES compensation plan convinces me that its purchasing requirements would have routinely stimulated Agents to purchase Protection Plan subscriptions without regard for their personal need for the service. Furthermore, the

---

[9] UWE homepage.

promise of earning commissions and overrides on the compulsory subscriptions of other
Agents seems to be used to justify the financial wisdom of enrolling in a Protection Plan
irrespective of one's need for the service. In this way, the "business" begins to look like an
interlocking system of taking losses and recouping them off the losses of others.

## 2. Sources of income

63. Earning significant income in FES requires recruiting Agents, enrolling them in Protection
    Plans, and inducing them to replicate these same steps through as many levels of
    recruitment as possible.

64. Pursuing this strategy is not guaranteed to produce success for an Agent; in fact, by
    construction, it will have to fail for the vast majority of Agents who attempt it. However,
    FES structures compensation such that is there is no viable alternative.

65. In the sections below, I analyze the different types of rewards offered by FES and
    categorize them with respect to their connection to retailing vs. recruiting activity.

### a. Rewards for retailing

66. Broadly speaking, retailing in FES generates two kinds of monetary rewards: 1) those paid
    to the retailers themselves, and 2) those paid to the retailer's upline (the retailer's recruiter,
    her recruiter's recruiter, …etc. up several levels).

67. The first type of reward compensates the act of selling, while the second type rewards the
    recruitment of Agents who directly or indirectly generate retail sales. This bright-line
    distinction glosses over some nuances to be discussed below, but it is, for the most part, a
    simple and accurate way of comparing the incentives from different types of rewards
    connected with customer sales.

*i. Rewards paid to retailers (i.e., Direct Commissions)*

68. An Agent has the right to earn commissions on the sale of certain FES services to retail
    customers. These commissions ("Direct Commissions") include both one-time payments
    made upon a customer's enrollment ("one-time commissions"), and recurring monthly
    commissions that are paid for as long as the customer remains enrolled with FES ("monthly
    commissions").

69. For example, an Agent can earn a one-time commission of as much as $100 for enrolling a
    new retail customer into an FES Protection Plan. The monthly commission for this sale
    starts at $12 per month and declines over time to $6 per month in the customer's 13th and
    later months of enrollment.

70. In theory, Direct Commissions on customer sales create an avenue for business income that
    does not entail transfer payments between participants or widespread financial losses. In
    practice, however, certain stipulations around the payment of Direct Commissions,

combined with other terms and conditions in the compensation plan, make it unlikely that a viable business can be built around customer sales.

71.   Direct Commissions are offered within a context of tradeoffs that make them less effective than they otherwise might be at incentivizing retail sales.

72.   For example, payment of the one-time commission hinges on the Agent's ability to collect a setup fee from the new customer. To earn a $100 one-time commission, the Agent must collect a $99 setup fee. The Agent could, instead, charge a $49 setup fee - or no setup fee at all. The $49 setup fee generates a $50 one-time commission, and the $0 fee generates no one-time commission. While Agents are under no obligation to waive the setup fee, they may elect to do so if the fee endangers a retail sale.

73.   A second trade-off consists in the fact that collecting a one-time commission postpones the flow of recurring commissions.

74.   More precisely, if an Agent charges a setup fee and collects the one-time commission at signup, then the $12 monthly commissions she would have received beginning in the customer's first month are withheld until the customer's fourth month – if the customer remains enrolled.[10] Since a retail customer generates the same amount of net revenue for FES whether she pays a setup fee or not, the company's ability to pay monthly commissions on that customer is the same in both cases. The reason for the delay is not explained in the compensation plan or in any other document that I have seen.

75.   Given the trade-off to one-time commissions, what will an Agent likely do? Consider how the costs and benefits of collecting a setup fee could vary with a customer's length of tenure:

   a)   If the new customer remains enrolled for at least four months, the Agent who charged a setup fee receives all the accrued monthly commissions on that customer and loses only the time value of that money for the intervening period.
   b)   If the new customer remains enrolled for fewer than four months, an Agent who charged a setup fee loses the accrued monthly commissions that she could have earned if she had *not* collected a setup fee. However, the foregone commissions total, at most, $36, whereas the one-time commission enabled by the setup fee was at least $50.[11]

---

[10] When the retail customer makes her fourth monthly Protection Plan payment, the monthly commission "for that month and the previous three months will be released, paying the total of $48 to the agent."

[11] The Compensation Plan does not specify what happens to monthly commissions accrued on customers who drop out before their fourth payment. I infer from context that these commissions are retained by FES and never paid out, since otherwise, a promise to release these commissions upon the fourth payment would not create any additional motivation to retain customers for a fourth month. To see this, imagine a customer between her third and fourth month, who is considering dropping out. The Agent faces a stronger incentive to keep the customer enrolled for

76.   The conclusion seems to be that the Agent is always better off charging the setup fee, collecting a one-time commission, and risking total loss of monthly commissions on customers that drop out before their fourth payment.

77.   In effect, the rules around Direct Commissions appear designed to reduce the company's obligation to reward retailing through its own revenue. Scenarios 1 and 2 above show that Agents facing the FES compensation plan will opt to collect setup fees from customers whenever possible. The fees fully fund the Agent's one-time commission and reduce the odds that FES will be on the hook to pay monthly commissions out of its own revenue. In the case of a customer who remains enrolled for at least four months, these machinations do not end up benefitting FES. However, over the population of all customers, some fraction can be expected to drop out before their fourth payment, and the rules incentivizing Agents to collect setup fees will have saved the company money on those customers. Company data on customer purchasing and tenure could reveal the extent to which FES benefits in this way.

78.   A third trade-off implicit in earning Direct Commissions comes from a feature of the compensation plan called "placement." That is, the Agent's ability to keep Direct Commissions (both one-time and monthly) depends on whether she retains the customer for herself, or "places" the customer beneath an Agent in her downline.

79.   As explained below in more detail, placing customers can qualify the upline Agent for certain rewards and titles that hinge on the volume and configuration of the Agents in her downline. Placing a customer in the right spot can make the difference between the Agent qualifying and not qualifying for lucrative rewards in various instances. However, placing customers also can mean foregoing some or all of the Direct Commissions payable on that customer.

80.   In summary, while Direct Commissions can provide a measure of compensation for selling to customers, it may not be optimal for Agents to take advantage of these commissions due to trade-offs built into the compensation plan.

81.   The necessity to collect setup fees; the possibility of losing one type of Direct Commission if the other is earned; and the opportunity cost (in recruitment rewards) of retaining the customer rather than placing her downline all diminish the incentive to build a retail-based business.

---

another month if FES retains commissions accrued on early dropouts than she would face if FES paid them. In the former case, the Agent earns a marginal $48, whereas in the latter case she earns a marginal $12.

*ii. Customer Acquisition Bonus ("CAB")*

82. The CAB, ostensibly a reward for finding new retail customers, comprises a web of thresholds and payouts incentivizing a combination of recruitment, customer placement, and duplication.

83. I register upfront my uncertainty with respect to the actual requirements for earning CABs given ambiguities in the compensation plan. In the discussion below, I have had to make certain assumptions in order to move forward with the analysis. I have interpreted the CAB requirements in a way that appears most likely, based on the text of the compensation plan and based on explanations in two recruiting videos in which CABs are discussed: "United Wealth Education – What is UWE.mp4" (at 35:00") and "United Wealth Education – What you need to know about UWE.mp4" (at 17:00"). However, I cannot be certain I have interpreted the language around CABs accurately.[12]

84. I begin by explaining the basic mechanism behind a CAB. A CAB comprises two successive reward payments – an "initial" CAB, and a "remaining" CAB. The particular requirements triggering the two payments will be discussed shortly. First, Figure 1, below, provides a schematic overview for earning the full CAB.[13]

---

[12] The principal point of confusion is whether earning the full CAB (i.e., "Initial" plus "Remaining") requires recruitment of one vs. two retail customers. Language in the compensation plan is ambiguous on this point, referring only to a requirement for "two UCESPP customer payments." An explicit requirement for two *customers* is conspicuously absent in the text, and furthermore the one-customer interpretation is supported by certain contextual usages such as "three total customer payments" (bottom of p. 7) which almost certainly references a count of payments and not a count of customers. However, the two recruiting videos cited in the text above more definitively suggest that CABs requires two customers and not one. For the purpose of this declaration, I have adopted the "two-customer" interpretation of CAB requirements.

[13] Some passages of the compensation plan could be read to imply that CABs are paid to the Agent who finds the retail customer (i.e., A2 in Figure1). However, a thorough consideration of all the relevant sections supports only one plausible reading: CABs are paid to an Agent for recruiting another Agent and (directly or indirectly) two new retail customers.

PX22 - 15



FIGURE 1. Basic structure of the Customer Acquisition Bonus (CAB). The full CAB is paid to Agent A1 when Agent recruit A2 and customers C1 and C2 enroll in Protection Plans. A1's upline earn CAB "overrides" on the same activity.

85. Earning a full CAB requires meeting specific conditions. I draw on the schematic in Figure 1, where Agent A1 earns the full CAB based on the activity of A2, C1 and C2. The conditions are the following:

   1. A1 must recruit A2 into the business, and A2 must pay $288 at signup and enroll in a Protection Plan.

      ➢ At this point, A1 receives the first installment on her CAB, the so-called "initial" CAB (see Figure 2, below). The dollar amount varies depending on A1's "Paid As Title" (i.e., her rank).

   2. Next, retail customers C1 and C2 each must be enrolled into Protection Plans (by either A1 or A2) within A2's first 70 days in the business.

      ➢ At this point, A1 receives the second installment on her CAB, the so-called "remaining" CAB (see Figure 2, below). The dollar amount varies depending on A1's "Paid As Title."

   3. "Retention" requirements. A2, C1 and C2 must go on to make a minimum number of monthly payments in order for A1 to be allowed to retain the CAB rewards that FES paid her.

      ➢ A1 keeps the full *initial* CAB if A2 makes three monthly Protection Plan payments; A1 forfeits 25% of her initial CAB if only two payments are made, and she forfeits 50% of her initial CAB if only one payment is made.

PX22 - 16

> A1 keeps the full *remaining* CAB if C1 and C2, combined, make three monthly Protection Plan payments. If three total payments are not made, A1 forfeits her entire remaining CAB.[14]

86. The segmentation into "initial" and "remaining" payments is an important aspect of CAB structure. Figure 2, below, shows the relationship.



FIGURE 2. A1's CAB is broken into two payments – the "initial" CAB for recruiting A2, and the "remaining" CAB for enrolling C1 and C2.

87. FES conditions A1's initial CAB on the signup of A2, and it conditions A1's remaining CAB on the signups of C1 and C2. This observation raises a question: must a retail customer *ever* be recruited in order for A1 to earn an <u>initial</u> CAB?

88. By my reading, the answer is probably 'no,' but I find the compensation plan ambiguous on this point. Internal distributor data likely could resolve the question.

89. The source of the ambiguity is the following. In some places, the compensation plan implies that initial CABs require a customer (p. 6, emphasis mine):

   *"It [a CAB] is a commission paid when a new Agent produces the required amount of Protection Plan __customer__ payments…"*

   *"The CAB will trigger…when Agents…receive two UCESPP __customer__ payments."*

90. In the above passages, no distinction is made between initial and remaining CABs. A plausible interpretation is that *all* CAB compensation is conditional on "customer payments." Under this interpretation, no customer => no CAB reward of any kind.

91. Elsewhere, however, the plan language suggests that earning an initial CAB only requires recruiting an Agent (p.6, emphasis mine):

   *"The initial CAB __for new Agents__ with a Protection Plan Membership is contingent on the receipt of three consecutive monthly Protection Plan payments."*

---

[14] As the compensation plan states (p. 7, emphasis in the original): "Retention of a remaining CAB is contingent on three **total** customer payments. If three total payments are not received, the remaining CAB is subject to a full retraction."

17

And (on p. 7),

> **Initial CAB Upon Enrollment at $288**
> **Initial CAB:** Partial CAB payouts.
> > ➢ New Agent comes into the business as a Protection Plan Member.

92. A plausible reading of the above passages is that initial CABs depend only on three payments by the recruited Agent (A2, in our example), and that neither the number of customer payments nor the enrollment of customers is of any relevance. Note that the $288 figure in the excerpted passage above corresponds to the amount that new Agents (not new customers) pay at signup.

93. It will be important to determine whether initial CABs require a customer to be enrolled or not. If customer enrollment is not required, then CABs offer a reward for mere recruitment of new Agents.

94. Putting aside this ambiguity for the moment, enough can be determined about the structure of CABs to conclude that CABs incentivize Agents to pursue duplication. The incentive to duplicate emanates from two CAB mechanisms that I will discuss next: rank contingency, and overrides. These mechanisms work as follows.

- *Rank contingency.* Distributors at higher "Paid As Titles" (i.e., steps, or ranks) receive higher CABs. For example,

  - o "Agents" (step 1 of 13 in the FES hierarchy) are eligible for a **$100** CAB.
  - o "Vice Presidents" (step 7) are eligible for a **$500** CAB.
  - o "Pinnacles" (step 13 – the highest rank) are eligible for a **$560** CAB.
  - o Rank contingency means that recipients earn more money for the same activity if they occupy a higher rank.

- *Overrides.*[15] CAB overrides are commissions paid upline when a downline Agent like A1 earns a CAB. Overrides may be paid to each of up to 12 levels of recruiters above the Agent who generates the CAB.

  - o If CAB is earned by an "Agent," then **$460** is paid upline in CAB overrides.
  - o If CAB is earned by a "Vice President," then **$60** is paid upline in CAB overrides.
  - o If CAB is earned by a "Pinnacle," then **$0** is paid upline in CAB overrides.

95. The same total amount of distributor compensation is always paid out for every CAB: $560. Rank-contingency incentivizes Agents to strive for higher ranks by allowing them to keep more of that $560 if they are promoted. The portion that a CAB earner is ineligible to keep is passed upline as CAB overrides (see top table on p. 7 of compensation plan).

---

[15] "Override" is a word sometimes used in MLM compensation plans to refer to a commission paid to one agent for the sales or other activity of agents in her downline.

96. The amount passed upline in CAB overrides is distributed over the various levels of recruiters according to their ranks, following a formula set forth in the bottom table on page 7 of the compensation plan.

97. Through rank-contingency, even modest promotions in rank can increase a CAB earner's reward substantially from the base $100 level earned by "Agents":

- Promotion to the second rank ("Field Trainer") raises a CAB from $100 to $160.
- Promotion to third rank ("Senior Field Trainer") raises the CAB from $160 to $240.
- Promotion to the fourth rank ("Sales Director") raises the CAB from $240 to $380.

98. An Agent captures these increased CAB payments not by finding new customers or making additional retail sales, but by being promoted in rank. Qualifying for promotions to higher ranks, at bottom, entails amassing deeper Agent downlines and higher Group Volume ("GV").

99. The objectives of deeper downlines and higher GV are not necessarily at odds with retailing, but they are not dependent on retailing, either. To the best of my understanding, no promotion in FES requires an increase in customer sales, while every promotion requires some amount of additional Agent recruitment.

100. For this reason, I conclude that CABs contribute to the incentive to duplicate. Agents get much more out of CABs if they have first been successful at recruiting recruiters.

101. Through rank-contingency, duplication enables distributors to earn more from their own CABs. Through CAB overrides, duplication enables distributors to earn from the CABs of other distributors.

102. It is possible to earn more from a CAB override than was earned by the Agent responsible for the CAB. For instance, an "Agent" is entitled to an initial CAB of $40, whereas her first upline "Senior Director" is entitled to an override of $50 on that activity. An "Agent" is entitled to a $60 remaining CAB, whereas her first upline Senior Director is entitled to a $90 override.

103. Even when CAB overrides are relatively small (they can be as small as $2), the fact that they can be earned on an unlimited number of downline Agents makes them potentially very lucrative and augments the financial payoff to pursuing duplication.

104. The company's rules for divvying up the $560 CAB payout between CAB and CAB overrides seem to reflect a determination to reward recruiting over retailing. The bulk of the $560 CAB payout flows toward distributors with the most success in duplication. Consider these hypothetical cases:

- Case 1: *CAB is earned by a distributor who is successful at duplication*. In this case, the CAB exceeds the sum of CAB overrides, and the high-ranking distributor captures nearly all the CAB payout:
    - Example: CAB earner is a "Vice President"
    - Ranks of Vice President and above comprise approximately the top 0.1% of distributors in FES, according to the 2020 Income Disclosure Statement.
    - A Vice President is entitled to a $500 CAB, i.e., 89% of the full $560 payout.
- Case 2: *CAB is earned by a distributor with no success at duplication*. In this case, the CAB is considerably smaller than the sum of CAB overrides paid to successful duplicators upline.
    - Example: CAB earner is an "Agent"
    - Rank of Agent comprises approximately the bottom 92% of distributors in FES, according to the 2020 Income Disclosure Statement.
    - An Agent is entitled to a $100 CAB, i.e., 18% of the full $560 payout.
    - The remaining $460 (78% of the total payout) go upline as overrides to successful recruiters.
- These cases depict CAB earners on extreme ends of the distributor hierarchy. They demonstrate the tendency for CAB payments to flow towards accomplished recruiters.

105. A CAB earner could occupy a rank in between these two extremes, such as "Senior Field Trainer." A Senior Field Trainer is entitled to a $240 CAB, which amounts to 43% of the total CAB payout. The outcome for Senior Field Trainer lies along a continuum in which greater recruiting success produces higher CAB payments. Distributor data from FES could reveal the way that CABs and CAB overrides are allocated in practice. Even absent distributor data, it is already clear from the compensation plan that CAB payments incentivize recruiting recruiters.

106. Do CABs also incentivize retail sales? The answer is not straightforward. I start by restating some basic findings from above:
    a) An Agent cannot earn a CAB by retailing alone.
    b) An Agent can earn a CAB even if she does not retail.
    c) An Agent cannot earn a CAB without recruiting an Agent.

107. From these basic facts we can infer that the intent of CABs is different from that of Direct Commissions, discussed earlier, which (under certain conditions) pay Agents for their personal retailing.

108. One intent of CABs surely must be Agent recruitment, since no CAB can be earned without first accomplishing this goal.

109. Having recruited an Agent, two retail customers are needed. If the *recruited* Agent, A2, enrolls these customers, then the CAB cannot be said to have incentivized retailing, since the retailer, A2, received nothing from the CAB (it is her *recruiting* agent, A1, who receives the CAB).

20

110. Alternatively, if the *recruiting* Agent, A1, enrolls the customers, then the CAB can be said to have incentivized retailing. However, because A1 must place the customers beneath A2 in order to trigger the CAB, A1 likely foregoes some or all of the Direct Commissions that she could have earned on those customers had she *not* pursued the CAB. Will A1 place her customers beneath A2 and trigger a CAB?

111. At lower ranks, such as "Agent," the answer is probably 'no.' The reason is that CAB compensation at these ranks is similar in magnitude to Direct Commissions but requires the additional step of recruiting an Agent. Why go to the added trouble unless the goal is to pursue duplication? Consequently, I predict that lower-ranked distributors who find retail customers are unlikely to take advantage of CABs. CABs, as a practical matter, will not offer these distributors any additional incentive to retail beyond the incentive already offered by Direct Commissions.

112. At higher ranks, distributors are eligible for higher CAB amounts and may find in CABs a meaningful incentive to engage in more retailing.

113. Thus the answer to whether CABs incentivize retailing may be a qualified 'yes.' However, the qualification is a serious one vis a vis the pyramid allegation, because it means that CABs do not enable distributors who lack recruits to recoup their investment through retail sales. CABs are unlikely to offer such a pathway because of the need to recruit Agents and because of the potential need to sacrifice Direct Commissions.

### b. Rewards for duplication

114. This section discusses the other forms of distributor compensation paid by FES, outside of the Direct Commissions and CABs analyzed in the preceding section. These other rewards include:

a) "Level Overrides" – commissions paid on purchase volume in the first six levels of downline.
b) "Generation Bonus" – commissions paid on purchase volume in the 7th and 8th levels of downline.
c) "Infinity Bonus" – commissions paid on total Group Volume in the entire downline (paid to Senior Directors and above only).
d) "R&R Club Rewards" – cash bonuses for reaching threshold amounts of Protection Plan sales.

115. I categorize all the rewards above as "rewards for duplication." While each one is unique in certain respects, all of these rewards share the following characteristics:

a) None requires retailing (either by the reward recipient or by her downline).
b) All require recruitment.
c) All permit earning on multiple – in some cases, unlimited – levels of downline Agents.
d) All are rank-contingent, meaning some (or all) of the following stipulations apply:

21

   i. The recipient must satisfy a minimum-rank requirement.
   ii. The recipient's downline Agents must satisfy minimum-rank requirements.
   iii. Earning percentages increase with rank.
   iv. Earning percentages increase with "Group Volume."
   v. Earnings depend on "Team (leg) Requirements," which relate to the balancing of Group Volume across the "legs" of a downline structure.

 e) All require ongoing enrollment in a Protection Plan (i.e., "staying Active") as a precondition for earning.

 f) Rewards accruing to inactive distributors "roll up" (i.e., are forfeited) to Active distributors in the upline.

116. The stipulations around "rewards for duplication" can be understood as a system for incentivizing a particular way of "doing the business."

117. In short, greater rewards come from being promoted, which in turn, relies on succeeding at a particular, recursive kind of escalation in the scale of purchasing and recruitment.

118. Retailing can help in this project but is neither necessary nor sufficient for advancement. Mere recruitment of others also is not enough, because recruits themselves must achieve their own recruiting milestones in order for those above them to advance in rank.

119. Looked at comprehensively, the rewards analyzed in this section are designed to elicit a "pay, recruit, teach" approach to participation.

### c. "Infinity Bonus": A lesson in the need to duplicate

120. To understand concretely how FES rewards can incentivize duplication and discourage a focus on retailing, I consider FES's Infinity Bonus.

121. On page 10 of UWE compensation plan, FES explains this reward as follows:

> "The Infinity Bonus is designed to recognize and reward outstanding sales achievement by Agents who excel at building active, successful organizations. This monthly bonus is paid when an Agent achieves the Paid As position of Sales Director or above."

122. I make three points about the incentives that flow from the Infinity Bonus.

123. First, the Infinity Bonus, like every reward discussed in this section, has no necessary connection to retail sales. There is no minimum qualifying amount of retail customers or retail sales to earn this reward. Presumably, the "outstanding sales achievement" in the excerpt quoted above references either purchases of Protection Plans by recruited Agents (required), or incidental sales of Protection Plans to retail customers (not required).

124. Second, apart from being not *necessary*, retailing is also not *sufficient* in any quantity to qualify Agents for the Infinity Bonus. A distributor must reach at least the rank of Sales Director to qualify, but that rank is impossible to reach through retailing.

125. Sales Director implies a nontrivial degree of duplication success. To see this point, I present an excerpt from a table found on page 10 of the UWE Compensation Plan:

## Title Qualifications & Infinity Bonus

| Position | Monthly Group Volume | Agent Requirements | Team (Leg) Requirements |
|---|---|---|---|
| Field Trainer | $1,600.00 | 2 Personally Sponsored Active Agents | **2 Separate Legs:** w/Minimum $400 Per Leg |
| Senior Field Trainer | $5,000.00 | 2 Personally Sponsored Active Agents | **2 Separate Legs:** w/Minimum $500 Per Leg & Minimum 2 Active FT- 1 Must Be Lineage |
| Sales Director | $10,000.00 | 3 Personally Sponsored Active Agents | **3 Separate Legs:** w/Minimum $1000 Per Leg & Minimum 3 Active FT- 2 Must Be Lineage |
| Regional Sales Director | $25,000.00 | 3 Personally Sponsored Active Agents | **3 Separate Legs:** w/Minimum $2000 Per Leg & Minimum 3 Active SFT- 2 Must Be Lineage |

FIGURE 3. Requirements for promotion to the first four ranks in the FES hierarchy. Red box around rank of Sales Director, the minimum rank at which the distributors become eligible for the Infinity Bonus.

126. Figure 3 shows that reaching Sales Director and qualifying for the Infinity Bonus requires the agent, A1, to:

1. "Personally sponsor" (i.e., recruit) three Agents and enroll them in Protection Plans
2. Ensure at least $1,000 in volume per Agent "leg." (A leg is a directly recruited Agent, her personal customers, and all the Agents and customers in her downline.)
3. Ensure that all three direct recruits reach the rank of "Field Trainer" or higher (see the requirements for "Field Trainer" in Figure 3).
4. Generate "Group Volume" of at least $10,000 per month (Group Volume counts the purchases of A1, her customers, and all those in A1's Agent legs.)

127. Based on the Table's requirements, I depict a *minimally* qualifying downline organization in Figure 4, below, where "SD," "FT" and "A" stand for Sales Director, Field Trainer and Agent, respectively:



FIGURE 4. Minimally qualifying downline configuration necessary for A1 to reach the rank of Sales Director and qualify for the Infinity Bonus.

23

128. A minimally qualifying downline organization enabling A1 to earn the entry-level Infinity Bonus entails three direct and six indirect recruits, positioned as in Figure 4, and with all the relevant GV thresholds satisfied at each level.

129. The connection between the Infinity Bonus and duplication should be apparent from Figure 4, which shows that A1 must:

  1. "**Pay.**" A1 is ineligible unless she pays $89 per month for a Protection Plan.[16]
  2. "**Recruit.**" A1 must recruit at least three Agents.
  3. "**Teach (to pay and recruit).**" A1 must ensure each direct recruit reaches Field Trainer by paying for a Protection Plan, recruiting two additional Agents, and ensuring each Agent generates $400 in volume.

130. Assuming the downline organization depicted in Figure 4 and a total GV of exactly $10,000, A1's monthly Infinity Bonus would be approximately $50 (0.5% x $10,000 "Lineage GV" = $50).

131. My third and final point about the Infinity Bonus relates to how difficult it may be to qualify for it, even with the downline depicted in Figure 4.

132. The nine-person downline depicted in Figure 4 is almost certainly insufficient, on its own, to generate the group volume required for A1 to reach Sales Director ($10,000 GV per month).

133. The potential shortfall in volume can be appreciated by comparing the GV that is *required* for qualification to the GV that can be *expected*, given a downline of self-interested Agents.

134. A reasonable starting point is to consider what happens if each distributor in Figure 4 contributes exactly $89 to GV. This amount corresponds to the minimum personal spending needed for an Agent to remain "Active."[17]  In this case, the six recruits in the bottom level generate a collective $534 GV per month; the three recruits in the middle level generate a collective $267 GV per month; and, A1 herself generates $89 GV per month.[18]  Total GV

---

[16]  If the "Power of 5" Program is in effect, then A1's required monthly payment would go to zero if she had five direct recruits (Agents and/or retail customers, combined) enrolled simultaneously in Protection Plans.

[17]  A Protection Plan membership costs between $49 per month and $89 per month but generates more in volume points under certain circumstances. When sold to a retail customer, payments generate 200 PSV (personal sales volume) in month one and 100 PSV per month in months two and three.

[18]  After an Agent's third month, her PSV to stay active would fall to $69 per month, and after her 12th month, it would fall again to $49 per month Thus, $89 per month per Agent produces the highest possible level of compulsory spending.

for A1's entire group (including A1) is then $890 GV, or less than <u>one-tenth</u> of the amount required for A1 to reach Sales Director ($10,000 GV).

135. One can also observe that A1's three direct recruits (middle row of Figure 4) fall short of *their* GV requirements as well. Instead of the $1,600 GV required to reach Field Trainer, they each accumulate just $267 GV and fail to qualify. The resulting lack of Field Trainers, in turn, constitutes a second dimension along which A1 falls short of Sales Director requirements.

136. This simple thought experiment shows that qualifying for the Infinity Bonus is likely to require considerably more recruitment and/or customer enrollment than suggested by FES in its "Title Qualifications & Infinity Bonus" table.

137. The implied amount of per capita spending that would be necessary to reach $10,000 GV with just nine recruits is inconsistent with rational behavior.

138. Even if one attributes, say, three Protection Plan retail customers to each of the ten Agents in Figure 4, total GV could never exceed $6,890 GV in any month. This amount is still nearly one-third below the required amount of $10,000 GV.

139. This gulf between reasonable spending at the individual level, and required spending at the group level, constitutes a hidden barrier to promotions in FES. It may go underappreciated by new recruits who assume that FES's suggested recruiting scenarios lead automatically to the required amount of group volume.

140. Faced with this gulf, A1 and her downline Agents could generate the missing $9,110 GV through a combination of more recruitment, higher personal spending, and customer sales.[19] Predicting how A1 and her downline optimally fill this volume gap requires a model of decision-making under the incentives put forward by the compensation plan.

141. In Section IV.B, I build a model along these lines, called an "optimal scenario." The optimal scenario combines a rational level of personal spending per Agent with a pattern of Agent recruitment and customer acquisition that is consistent with guidance found in training materials and other documents.

142. I will borrow from those results now in order to analyze the Infinity Bonus example at hand. In section IV.B, below, I will provide a detailed account of the methodology, results, and take-aways of exercise.

143. The optimal scenario results offer a ready prediction of the additional recruiting and retailing that may be necessary for A1 to reach Sales Director. It predicts that A1 achieves Sales Director only after establishing a six-level downline organization with 62 Agent recruits and 96 retail customers (including A1's customers, and those of her downline). Compared to the nine recruits and zero customers from Figure 4, the model's scenario

---

[19] A1's nine-person downline generates $1,000 GV under the assumption of $100 PSV per participant. "Missing" $9,000 = required $10,000 – actual $1,000.

represents a gargantuan achievement in recruiting, retailing and coordination over a vast network of distributors.

144. Of course, this is just one of innumerable ways by which A1 could generate the necessary GV to qualify for Sales Director. Other pathways could involve less duplication and more retail sales. The optimal scenario does not predict such strategies, however, because incentives in the compensation plan do not appear to favor them.

145. To conclude, the Infinity Bonus renders duplication indispensable. Retailing can play a supporting role in the pursuit of this reward, but it is not required. Retail customers, where they materialize, will represent a second-best outcome for recruiters because they amount to terminal nodes in the Agent's over-arching project of network enlargement.

146. I have used the shorthand "duplication" to characterize this reward and others like it, because "pay, recruit, teach" encapsulates the only strategy capable of obtaining it.

147. Merely qualifying for the Infinity Bonus entails a feat of recruitment and retention that, by the company's own projection, is achievable by, at most, 10% of Agents who try (see Figures 3, 4). My optimal scenario results suggest that in fact the upper bound is considerably lower – at best, 1 out of 63, or 1.6% of Agents. Even this projection is a best-cast scenario that ignores all the real-world impediments facing actual participants.

148. These upper bounds on success are structural limits built into the compensation mechanism itself. They are not the result of a scarcity of talent, effort, intelligence or perseverance in the population of recruits.

149. The upper bounds do not go away with time as the pattern of recruitment continues and the pyramid grows in size. Rather, they are a fixed ceiling on the generalizability of the business model.

150. Although individual Agents, through duplication, may move out of a position of net loss and into profitability, the overall fraction of participants in the organization who experience a net loss necessarily will remain high.

### d. Beyond Infinity: General insights on duplication rewards in FES

151. The key conclusions from my analysis of the Infinity Bonus generalize to all four types of "rewards for duplication" listed in paragraph 113. Each reward incentivizes a "pay, recruit, teach" approach, and each is funded in part through lower-level recruits who make payments in pursuit of these same rewards.

152. Common structural features of "rewards for duplication" include: paying on multiple (or unlimited) levels of downline; treating compulsory Agent purchases as equivalent to retail sales; failing to require retail sales; and, increasing payouts discontinuously when a recipient reaches higher ranks. Figure 5, below, summarizes key features of FES rewards for duplication.

| REWARD | BASIS FOR REWARD | EARNING % OR $ AMOUNT | DOWNLINE LEVELS REWARDABLE | QUALIFICATION NOTES |
|---|---|---|---|---|
| *Level Override* | Purchase volume of recruits and customers through the downline | $0.50 - $24 per monthly payment | 1-6 | Higher rank => right to earn on additional levels of downline (up to level 6) |
| *Generation Bonus* | | 0.5% - 2.75% | 7, 8 | (for Executive Sales Director and up)<br><br>Higher rank => higher earning percentages on levels 7 & 8 |
| *Infinity Bonus* | Lineage GV[20] | 0.5% - 3% | Unlimited | (for Sales Director and up)<br><br>Higher rank => higher earning percentages<br><br>Highest tiers of this reward require ongoing recruiting (e.g., 10 new recruits or customers in past 90 days) |
| *R&R Club Rewards* | Protection Plan sales by self and downline | Various: e.g., cash bonuses of $10K - $250K | | Min. qualification: 500 Protection Plans sold by downline Agents<br><br>Higher tiers of this reward require ongoing recruiting (e.g., 10 new recruits or customers in past 90 days) |

FIGURE 5. FES rewards for duplication. These rewards incentivize deep downlines; they reward Agent purchases and retail sales equally; they do not require retailing (by the recipient or her recruits); and, they increase discontinuously when recipients reach higher rank.

153. The duplication rewards in Figure 5 derive their appeal from the way they allow a participant to capitalize on geometric growth in the number of recruits, should it ever materialize.

154. To take a simple illustration, a perfect "recruit-3" pattern in which each Agent recruits three others would, by its eighth level, yield a total downline of 9,841 recruits and roughly 500,000-1,000,000 GV per month in compulsory Agent purchases. Duplication rewards like

---

[20] Lineage GV (Lineage Group Volume) equals an Agent's total downline volume less any volume attributable to Agents or customers "placed" beneath the Agent by someone upline.

those in Figure 5 enable a recruiter to earn commissions on all eight levels of that activity. If recruiting continues beyond the 8th level, the recruiter can continue to earn on that growth through the Infinity Bonus.

155. Tethering compensation to geometric growth is not the only way these rewards incentivize duplication. There is a second element in their design, whereby bigger downlines generate higher rewards *per unit of volume* than smaller downlines do. I will refer to this characteristic as "reward convexity," or simply "convexity." Among its effects, reward convexity super-charges the payoff to "hitting it big."[21]

156. Reward convexity means suppressing the payoff for modest amounts of recruitment in order to boost the payoff for big feats of recruitment. The elements that lead to convexity in the FES compensation structure include:

- A ratcheting up of earning percentages as Group Volume increases - e.g., paying 3% commissions when GV<10,000 but paying 4% when GV>10,000.
- An expansion of the earn base at certain performance thresholds - e.g., allowing an Agent to earn on an additional level of downline activity if she earns promotion to higher rank.

157. Reward convexity further concentrates distributor compensation in the realm of more-extreme (and less likely) levels of recruiting success. Consequently, it makes a participant even more reliant on recruitment done by others (those downline) in order to be successful. The "teach" part of "pay, recruit, teach" becomes more vital for this reason, and the overall organizational emphasis on recruitment is likely to be intensified.

158. Reward convexity also can rationalize a participant's early losses by framing them as investments with a high expected return in the future.

159. Finally, reward convexity as implemented in FES can incentivize fake purchases, or "inventory loading" on the part of Agents, as depicted below in Figure 7. Inventory-loading incentives arise because of discontinuities, or "jumps," in rewards at certain thresholds.

---

[21] The role of convexity is most apparent in Level Overrides, the Generation Bonus and the Infinity Bonus. The R&R Club Rewards are difficult to assess along these lines because they escalate in a less uniform manner and without explicit connection to Group Volume.



FIGURE 7. Risk of inventory loading when rewards jump discontinuously at thresholds (red ovals).

160. Figure 7 is a stylized depiction of the reward convexity and does not represent any particular FES reward. Each of the vertical dashed lines in Figure 7 represents a threshold at which rewards per unit volume increases abruptly on *all* volume (not just on marginal volume above the threshold).

161. When rewards are structured in this way, it can be worthwhile for a distributor to inventory-load whenever her GV sits just below a threshold. The reason is that the marginal rewards for crossing the threshold can exceed the marginal cost to the Agent of making fake purchases.

162. This kind of threshold-driven convexity is a pervasive feature of FES duplication rewards. To take one example, consider a hypothetical Regional Sales Director who falls just below the group volume needed for promotion to Executive Sales Director. If she crosses the threshold, her earnings jump abruptly due to several features in the comp plan:

  1. She qualifies for the Generation Bonus, earning the right to overrides on a 7th and 8th level of downline activity (previously, she could earn on only 6 levels).
  2. She is entitled to a higher CAB ($475, up from $430).
  3. Her earning percentage for the Infinity Bonus increases from 0.75% to 1% of Lineage GV.

163. When a participant is nearing the GV threshold for Executive Sales Director, the boost in rewards from these three mechanisms could exceed the cost of buying the Protection Plan enrollments (or other FES services) sufficient to reach the threshold.

164. An incentive will exist to purchase FES services purely for qualification purposes. In MLMs selling physical goods, inventory loading may take the form of buying excess product inventory that is later consumed, sold, given away or simply disposed of. In the case of FES, "inventory loading" is likely to take the form of the recruiter paying for Protection Plan enrollments of others out of her own pocket. In some of the consumer

29

declarations that I have read, consumers report their recruiters advising them to pay the entry fees of Agents they recruit, if necessary.

165. Abrupt jumps in rewards occur throughout the FES compensation plan – not only at the threshold to Executive Sales Director. At all ranks, purchasing for advancement irrespective of end-user demand can make financial sense for the distributor.

166. Inventory loading is not harmless. It can be rational ex ante but costly ex post. That is, it is a bet that can turn out well or badly for the participant.

167. Consider a distributor who *expects* the benefits of qualifying through inventory loading to exceed the cost. Whether she *actually* benefits depends on the decisions of multiple other distributors, which she cannot control (e.g., how much they buy, retail, recruit, and whether they quit).

168. For this reason, inventory loading can lead to consumer losses, as participants pay to qualify but later find qualification less valuable than expected.

169. In summary, FES's duplication rewards hold out the prospect of massive earnings based on a geometrically expanding base of recruits. Additionally, FES uses reward convexity to boost payoffs at the extreme end of recruiting success, increasing the allure of duplication even further. When participants expect such big payouts, they can think of early losses as rational investments, even though in almost all cases, participants cannot realize a positive return. Finally, discontinuities can motivate participants to make expenditures purely for qualification purposes (i.e., "inventory load").

### e.   Conclusion on sources of income

170. Rewards for duplication – Level Overrides, Generation Bonus, Infinity Bonus and R&R Club Rewards – orient distributors toward building self-replicating networks of other distributors, without regard for underlying retail demand for FES products.

171. Some amount of retailing – one's own, or a downline's – is likely necessary in order to reach the Group Volume targets that trigger these rewards. However, analysis in the preceding section indicates that retailing per se is unlikely to be a profitable enterprise except, possibly, for participants who already have achieved recruiting success.

172. FES rewards retailing to a degree. Direct Commissions theoretically offer a basis for building a retail-based income stream, but they come with significant limitations and ultimately require finding and retaining retail customers who value FES services. Customer declarations suggest that this task could be challenging. Distributor data may reveal the extent to which Direct Commissions support profitable retailing in FES.

173. The other purported retailing reward – the Customer Acquisition Bonus - appears to incentivize Agent recruitment at least as much as it incentivizes finding retail customers. I flag once more my uncertainty around the rules governing CABs and look forward to

additional documents or distributor data capable of resolving this uncertainty and of demonstrating CABs' impact on the viability of retailing.

174. It appears that retail sales function chiefly as a second-best source of extra volume, useful for unlocking recruitment rewards and for enriching upline recruiters through Level Overrides and CAB Overrides. My prediction is that, for an FES Agent, a viable business cannot be sustained through retailing alone.

175. If distributor data show that commissions from retail sales provide sustained, positive net income for a non-trivial share of distributors who choose not to recruit, then this would lead me to question the conclusions above.

176. Such a finding would suggest that distributors are finding profit as retailers and need not rely on transfer payments from other distributors that they recruit. I leave open this possibility, but for now I continue to reason from the available evidence, which I find substantial and compelling.

177. The overall compensation structure is deeply problematic. Recruitment is the only path to achieving advertised earnings but can deliver for just a tiny fraction of those who seek it. The successful will have earned a substantial portion of their rewards from compulsory payments made in expectation of qualifying for rewards, as in a chain letter. For this reason, I expect the overwhelming majority of aspiring Agents to lose money as a result of participating in FES.

## B. Optimal scenario analysis

### 1. Introduction

178. In this section, I model participation in the FES investment opportunity using a technique I will label the "optimal scenario."

179. An optimal scenario is a best-case hypothetical that models the activity of a representative distributor and her downline over time, as they seek to maximize net income under the terms of the compensation plan.

180. Beginning with the enrollment of a single, representative FES Agent ("A1"), a downline of Agents and retail customers is accumulated through a pattern of recruitment and customer acquisition executed in an identical fashion by each new entrant. Agents and customers all enroll in the FES Protection Plan upon entry. Enrollment by Agents ensures eligibility for rewards. Enrollment by customers reflects a presumption that the service is valuable to consumers.

181. I assume that all distributors in the scenario face no practical constraints along the way: e.g., weak product demand, a shortage of recruits, time constraints, bad luck, etc. These assumptions are unrealistically optimistic, but imposing them can reveal the extent to which FES, under the most fortuitous circumstances possible, could deliver on its income representations.

31

### 2. Setup

182. The optimal scenario is built upon a conjectured profit-maximizing strategy for participation, which every Agent is presumed to follow. I begin by laying out the strategy itself, and in the next section I discuss the reasoning behind particular assumptions underlying it.

183. In the optimal scenario, each distributor follows a uniform strategy upon joining FES, recruiting a total of five Agents and three retail customers over the course of her first six months in the business:
   - Month 1: Join FES, pay $288, enroll in Protection Plan.
   - Month 2: Enroll first Agent and first retail customer in Protection Plans (Agent recruit pays $288; retail customer pays $188)
   - Month 3: Enroll second Agent and second retail customer in Protection Plans
   - Month 4: Enroll third Agent and third retail customer in Protection Plans
   - Month 5: Enroll fourth Agent in Protection Plan
   - Month 6: Enroll fourth Agent in Protection Plan

184. Initial distributor "A1" is the first to join and will be the focus of my analysis.

185. A1's "Month 1" is the optimal scenario's "Month 1." More broadly, A1's month $t$ will be synonymous with "scenario month $t$" in this discussion.

186. Successive cohorts of Agents enter and reach milestones at one-month intervals. For example, A1 joins and pays $288 in Month 1; A1's first Agent recruit (A2) joins and pays $288 in Month 2.

187. Likewise, A1's *second* Agent recruit (A3) and A2's *first* Agent recruit (A2₁) join and make their $288 payments in Month 3. And so on.

188. By the end of A1's sixth month in FES, she has built a downline of five directly recruited Agents, three personally enrolled retail customers, and a growing number of indirectly recruited Agents and retail customers. Her personal recruiting activity stops after her sixth month, but her downline continues to grow through indirect recruitment.

### 3. Key assumptions

189. In this section, I explain the reasoning for the key behavioral assumptions driving scenario results.

#### a. "Five recruits" assumption

190. I have assumed that each Agent recruits <u>five</u> others. That number is a compromise figure chosen for illustrative purposes. Assuming more or fewer recruits would affect the pace of organizational growth, and the upper bound on achievable income in the scenario but would

32

not significantly alter the individual Agent's optimal balance of retailing and recruiting, or the predicted loss rate (i.e., the fraction of Agents who lose money).

191. **Are five recruits too few?** When examining a best-case scenario of advancement in the FES investment opportunity, one could argue that any number of recruits less than eight is too small. Eight recruits is the minimum number needed to qualify for "Pinnacle," the highest rank in FES.

192. Five recruits are sufficient to reach the eighth of twelve ranks - Executive Vice President (EVP). Five recruits would be too few if there were a need to analyze promotions to the very highest levels in FES, but EVP is already exceptional, historically. According to the 2020 FES income disclosure, just 0.04% of all distributors who were enrolled with FES during 2020 reached Executive Vice President or higher in that year. The "Annual Average Income" of EVPs was $314,794 according to the same disclosure.

193. **Are five recruits too many?** Assuming fewer than five recruits risks compromising the objective of the exercise, which is to assume successful advancement along the path put forth by the company as achievable by all distributors. This path of advancement culminates at the "Pinnacle" level, requiring $10M in monthly Group Volume, eight direct recruits, and other requirements on the downline.

   b. **"Three customers" assumption**

194. I have assumed that each Agent recruits three retail customers, also a compromise figure.

195. Assuming less (0-2 customers) would contradict the presumption that FES offers any meaningful retailing opportunity and would be tantamount to labeling FES a pyramid.

196. On the other hand, assuming more (>3 customers) would ignore the fact that retailing is poorly compensated and is not required for advancement or earnings. In addition, some of the customer declarations that I have read (e.g., declarations of King, Lapka, Dimbo, Counts, Wilkins, and Markham) suggest that FES's product line (in particular, the Protection Plan) offers little or no consumer value and would be challenging to sell on its own, without it being paired with an investment opportunity.

197. These factors suggest a weakly incentivized and non-viable retailing venture. Assuming three customers per recruit is therefore a compromise, meant to balance company claims of a retail opportunity with company incentives (and product quality) that make expansive retailing unlikely.

   c. **Timing assumptions**

198. The scenario assumes that an Agent enrolls other Agents and retail customers at a rate of one per month, rather than all at once in a single month.

199. The compensation plan itself is silent on the issue of timing and does not, to my knowledge, make any reward or promotion contingent on the speed with which new customers or new

33

Agent are brought into the business. For this reason, one cannot base a presumption about the speed of recruitment on the compensation plan.

200. In the absence of official, company-authored recommendations and incentives, I have assumed that each Agent enrolls one Agent and one retail customer per month, for a fixed number of months.

201. An alternative would be to assume that all recruitment takes place within a single month (e.g., the month after joining). However, recruitment at this pace theoretically results in an organization of over 38 billion Agents by the 16th month. This outcome is plainly implausible.

202. Slowing presumed recruitment to one Agent per month reduces the overall size of the downline at any moment and decelerates the pace of A1's advancement into higher ranks. Without distributor data, I cannot say how this presumption compares to recruiting in the real world, but clearly real Agents, on average, must do less (or slower) recruiting than in the optimal scenario, or FES would be much larger than its current size.

### 4.  Results

#### a.  Key results

203. Original Agent "A1" joins FES in scenario month 1. Her total expenditure in that month is $288, which includes the $199 Agent signup fee plus the first $89 monthly payment for her mandatory Protection Plan enrollment.

204. Her recruiting activity begins the following month when she enrolls one Agent and one retail customer in Protection Plans.

205. By the end of scenario month 6, her recruiting phase is complete, having directly recruited five Agents and three retail customers.[22] From scenario month 7 onward, all of A1's rank advancement and earnings growth is the result of recruitment and customer acquisition carried out by Agents in her downline. A timeline of key developments in the optimal scenario is shown in Figure 8, below.

---

[22] In addition to the optimal scenario discussed in the body of this declaration, I constructed an alternative version in which, following the certain FES recruiting materials (e.g., UWE Member Benefits video), assumes that Agents stop making their $89 monthly payments once they have enrolled five other individuals (Agents and retail customers, combined) in Protection Plans. This offer is called the "Power of 5" Program. The overall results in this alternative scenario differ minimally. For instance, A1's total gross spending over her first 16 months falls $748 - from $1,283 to $535 – and her net cumulative financial position at the end of month 16 rises by an equivalent amount from $674,513 to $675,796. The fraction of participants experiencing a cumulative net loss at any moment is unaffected. I document the key results from this "Power of 5"-based scenario in adjusted versions of Figures 8 and 12 included in the Appendix.

| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| Scenario month | A1's spending | A1's personal enrollments (Agents, Customers) | Total downline (# Agents) | Total retail customers (incl. A1's) | Agent share of volume points | Agent share of dollars spent | A1's retailing rewards* | A1's recruiting rewards* | A1's total rewards | A1's cumulative net financial position |
| 1 | $ 288 | (0,0) | - | - | 100% | 100% | $ - | $ - | $ - | $ (288) |
| 2 | $ 89 | (1,1) | 1 | 1 | 71% | 67% | $ 100 | $ 40 | $ 140 | $ (237) |
| 3 | $ 89 | (2,2) | 3 | 3 | 66% | 62% | $ 112 | $ 46 | $ 158 | $ (168) |
| 4 | $ 69 | (3,3) | 7 | 7 | 60% | 59% | $ 184 | $ 144 | $ 328 | $ 91 |
| 5 | $ 69 | (4,3) | 15 | 14 | 61% | 61% | $ 92 | $ 306 | $ 398 | $ 420 |
| 6 | $ 69 | (5,3) | 31 | 28 | 61% | 61% | $ 128 | $ 625 | $ 753 | $ 1,104 |
| 7 | $ 69 | (5,3) | 62 | 56 | 61% | 60% | $ 124 | $ 1,596 | $ 1,720 | $ 2,755 |
| 8 | $ 69 | (5,3) | 123 | 111 | 61% | 60% | $ 124 | $ 5,287 | $ 5,411 | $ 8,097 |
| 9 | $ 69 | (5,3) | 243 | 219 | 61% | 60% | $ 24 | $ 10,501 | $ 10,525 | $ 18,553 |
| 10 | $ 69 | (5,3) | 479 | 431 | 61% | 60% | $ 24 | $ 20,473 | $ 20,497 | $ 38,981 |
| 11 | $ 69 | (5,3) | 943 | 848 | 61% | 60% | $ 24 | $ 17,225 | $ 17,249 | $ 56,161 |
| 12 | $ 69 | (5,3) | 1,855 | 1,668 | 61% | 60% | $ 24 | $ 25,882 | $ 25,906 | $ 81,998 |
| 13 | $ 49 | (5,3) | 3,648 | 3,280 | 61% | 60% | $ 24 | $ 50,375 | $ 50,399 | $ 132,349 |
| 14 | $ 49 | (5,3) | 7,173 | 6,449 | 61% | 60% | $ 22 | $ 97,419 | $ 97,441 | $ 229,741 |
| 15 | $ 49 | (5,3) | 14,103 | 12,679 | 61% | 60% | $ 20 | $ 149,941 | $ 149,961 | $ 379,653 |
| 16 | $ 49 | (5,3) | 27,727 | 24,927 | 61% | 60% | $ 18 | $ 294,891 | $ 294,909 | $ 674,513 |
| TOTAL | $ 1,283 | | | | | | $ 1,044 | $ 674,752 | $ 675,796 | |

*  Retailing rewards include i) Direct Commissions paid on customer enrollments, and ii) Remaining CABs.   Recruiting  rewards include i) Initial CABs, ii) all forms of Overrides, iii) Infinity Bonus, and iv) Generation Bonus. Medallion Club and R&R Club rewards are excluded from this analysis.

FIGURE 8. Timeline of key events in the optimal scenario.

206. A1's rewards start off small and grow slowly during her recruitment phase.[23] Column 11 shows that A1 transitions to a positive cumulative return in her fourth month, after building a downline of 7 other Agents.

207. Because A1's experience is representative, we can infer that the 7 recruits enabling her swing to profitability are themselves losing money as of that moment. I discuss the distribution of profits and losses within A1's downline organization in more detail, below.

208. A1's rewards explode in lockstep with the growth in her downline organization, as shown in Figure 9, below.

---

[23] Some forms of compensation have not been included in the optimal scenario. For the sake of simplicity, I have excluded Medallion Club and R&R Club Rewards. Only the latter are significant (the highest-tier Medallion Club reward is a $550 watch.) With respect to R&R Club Rewards, they are excluded from the optimal scenario because calculating them would require knowledge of company-wide Protection Plan sales, something the scenario itself does not predict. I predict that a downline organization evolving as A1's does in the optimal scenario will generate progressively larger R&R Club Rewards for A1 over time.

35



FIGURE 9. A1's monthly compensation in the optimal scenario grows at an accelerating pace due to geometric growth in her downline organization and to certain features in the compensation structure.

209. One year after joining, A1's downline organization has reached 1,855 Agents and 1,668 retail customers. Her gross compensation in month 12 is $25,906, of which $24 comes from her own retailing to personal customers, while the remaining $25,882 comes from rewards on downline activity. A1's rank is Vice President, and her cumulative net income since joining is $81,998.

210. By the end of scenario month 16, A1's fortunes look extraordinarily good:

- Rank: Executive Vice President ("EVP")
- Gross compensation in month: $294,909
  - From personal retailing: $18
  - From downline activity: $294,891
- Cumulative net income since joining: $674,513
- Downline organization size:
  - 27,727 Agents
  - 24,927 retail customers

211. Upon reaching Executive Vice President, no further rank advancement is possible for A1 unless she recruits a sixth Agent. On the other hand, her earnings may continue to grow indefinitely thanks to the Infinity Bonus, which theoretically affords the right to earn on activity infinitely deep in the downline.[24]

---

[24] Regarding the Infinity Bonus, there is one point on which I cannot be certain that I have interpreted the compensation plan correctly, and so I register here a caveat to my scenario

36

### b.  Sources of income

212. I shift attention from the *size* of A1's earnings to the *source* of those earnings. My objective is to quantify the roles that retailing and recruiting play in generating income for A1.

213. One way to investigate this question is by categorizing A1's rewards according to whether they were paid on Agent volume vs. Customer volume. This exercise answers the question: how much of A1's compensation comes from retail sales (made by A1 or Agents in her downline), and how much comes from compulsory Agent purchases? The results are in Figure 10, below. The dollar amounts represent cumulative gross rewards since joining.

| | A1's Rewards on Customer Purchases (Remaining CAB; Overrides on Remaining CAB; Direct Commissions; Level Overrides on customer purchases; the portions of Infinity Bonus and Generation Bonus generated by customer purchases) | A1's Rewards on Agent Purchases (Initial CAB; Overrides on Initial CAB; Level Overrides on Agent purchases; the portions of Infinity Bonus and Generation Bonus generated by Agent purchases) | Total |
|---|---|---|---|
| In $ | $287,195.55 | $388,600.39 | $675,795.94 |
| In % | 42.5% | 57.5% | 100.0% |

FIGURE 10. A1's cumulative gross rewards in the optimal scenario after 16 months of participation. A slight majority of her rewards are funded by compulsory Agent purchases.

214. Figure 10 shows that 42.5% of A1's rewards in the optimal scenario are rooted in sales (by A1 or Agents in her downline) to retail customers.[25]

215. The results in Figure 10 speak to the *Koscot* test by showing that a portion of A1's rewards

---

results. In the discussion of the Infinity Bonus on page 11 of the UWE compensation plan, the language does not make clear whether A1 is entitled unconditionally to the full percentage listed in the table (as I have assumed in the optimal scenario), or whether she is entitled only to the residual percentage remaining after subtracting the percentage for which her direct recruits are eligible. The implications for A1 (and all participants) are significant, as the following example will show. In scenario month 16, A1 is an Executive Vice President (eligible for 2% Infinity Bonus), while her five direct recruits are all Regional Vice Presidents (each eligible for 1.75% Infinity Bonus). If A1's 2% eligibility is unconditional, then she earns a $109,357 Infinity Bonus for the month. If, however, she is eligible only for a residual percentage of 0.25% (i.e., 2% - 1.75% = 0.25%), then she earns just $27,339. Taking into account the magnitude of the potential overstatement and the relative importance of the Infinity Bonus in A1's total compensation, the result is that I may be overstating A1's total earnings during scenario months 10-16 by between 25% and 50%. More documentation from FES and/or internal data on distributor compensation will clarify how the Infinity Bonus is computed.

[25] In the optimal scenario results, the share of rewards attributable to Agent purchases (57.5%) does not equal the share of volume purchased by Agents (61%) because Agent and customer purchases are not rewarded equivalently in the FES compensation plan. Customer purchasing, on average, generates greater rewards per unit volume than does Agent purchasing due to the $100 "Direct Commissions" paid on customer enrollments.

(42.5%) is related to sales for ultimate use while another, slightly larger portion (57.5%) is not. In my view, this division, on its own, does not resolve the question at the heart of *Koscot*, but I reiterate that I am not qualified to offer a detailed analysis of the legal precedents around pyramid schemes. I have been informed, however, that as a legal matter, *Koscot* and a later decision (*BurnLounge*, 2014) established that MLM distributors may constitute "ultimate users" in certain circumstances but not others, and that the context of a distributor's purchases matters in this determination. In particular, it is my understanding that distributor purchases made to satisfy requirements for participation in the compensation plan are not considered end use, as a legal matter.

216. Accordingly, the 57.5% of A1's rewards based in compulsory distributor purchases is highly relevant to an application of the *Koscot* test. Notwithstanding its basis in a hypothetical scenario, the 57.5% result demonstrates concretely that FES offers the "the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users."

217. The "unrelated" descriptor fits here because these rewards are paid based on compulsory distributor purchases and are not in any way contingent on sales to ultimate users as defined in the case law.

218. The mix of customer vs. distributor volume shown in Figure 10 plays a role in an economic assessment of the pyramid question, but it does not, on its own, resolve the question. The mere presence of retail sales (even a lot of them) will not guarantee that participants can succeed without recruiting.[26]

219. An economic assessment of the pyramid question centers on the behavior incentivized by the compensation plan, and whether, at an aggregate level, these incentives imply an endless chain of recruitment. Reliance on "endless chain" logic is what makes pyramids inherently deceptive and what dooms the vast majority of participants to failure.

220. Consequently, in Figure 11, below, I divide up A1's income according to what she did to earn it. Figure 11 categorizes A1's rewards according to whether she earns them through her retailing or her recruiting.

---

[26] On the other hand, if there are no (or virtually no) retail sales outside the network of distributors, this is a conclusive sign that the MLM is operating as a pyramid scheme. As stated in paragraph 40, retail sales are a *necessary* but not *sufficient* condition for an MLM to avoid inflicting pyramid harm.

| | A1's rewards for retailing (Direct Commissions; Remaining CAB) | A1's rewards for recruiting (Initial CAB; Overrides on Initial CAB; Overrides on Remaining CAB; Level Overrides; Infinity Bonus; Generation Bonus) | Total |
|---|---|---|---|
| In $ | $1,044.00 | $674,751.94 | $675,795.94 |
| In % | 0.2% | 99.8% | 100.0% |

FIGURE 11. A1's cumulative income over her first 16 months. A1 earns virtually all this compensation through recruitment of recruiters (i.e. "duplication").

221. The breakdown in Figure 11 is more lopsided than in Figure 10. Fully 99.8% of A1's compensation in the optimal scenario comes from her recruiting activity, and just 0.2% comes from her retailing activity.

222. This bifurcation speaks directly to the question of incentives and reveals in a stark manner the activity to which aspiring FES Agents should devote their time and money if they seek to maximize the income potential of the income opportunity. To someone in A1's position, retailing likely seems like a waste of time.

223. Taken together, Figures 10 and 11 show how it is possible for an MLM's participants to face an imperative to recruit even as the MLM overall boasts of significant retail sales.

224. This paradox results when a compensation plan diverts proceeds from retail sales to recruiters situated upline of the retailers themselves. Participants then must "pay, recruit, teach" in order to capture those rewards. Retail sales serve to augment the payoff to duplication rather than to incentivize direct selling.

225. Will retailing happen in FES? I predict that it will. Retail sales will occur in some amount despite the apparently weak incentivization. First, the $100 one-time Direct Commissions will look comparatively lucrative to new recruits who lack a downline. Second, retail customers are likely to be acquired incidentally, as a by-product of trying to recruit Agents.

226. However, the bulk of compensation flowing from these sales will go upline to recruiters through the Infinity Bonus, Generation Bonus, Level Overrides, and Overrides on remaining CABs.

227. To take one example, whenever a retailer earns a $12 monthly commission on her Protection Plan customer, an additional $17 in Level Overrides is paid upline to as many as six levels of recruiters above her. Still more compensation on that retail sale will flow upline through the Infinity Bonus.

228. In short, the dominant strategy A1 and for every Agent under the FES compensation plan is to "pay, recruit, teach." No matter the prevalence of retail customer sales, this strategy is the path to achieving advertised earnings. On these grounds, FES can be said to be operating as a pyramid scheme.

### c.   Losses in the downline

229. Figure 11 illustrates not only the central role of recruiting in A1's success but also the need to look beyond her private fortunes when assessing the full impact of FES's operation on participants as a whole. A1's success relied on the investments and effort of 27,727 other Agents.

230. To understand how FES's operation affects all involved and not just the most successful, I focus now on A1's downline.

231. My analysis will show that, so long as the recruitment pattern of the optimal scenario is maintained, approximately 87% of Agents enrolled with FES are operating at a cumulative net financial loss.

232. This loss rate is a durable feature of the FES compensation structure. It does not change as Agents move up the promotional hierarchy each month. As new Agents enter, existing Agents are promoted into more lucrative positions. The identities of the Agents at the bottom of the recruitment tree change over time, but the fraction of Agents in a loss position never changes.

233. To visualize this dynamic more clearly, Figure 12 takes a financial snapshot of A1's downline at a fixed moment in time - the end of scenario month 16. Each row in the table corresponds to a particular cohort in A1's downline, as it exists at that moment in time. A cohort is the set of Agents who join in a particular month of the optimal scenario.

**Optimal Scenario - Participant Net Income, by Months of Tenure**
(Evaluated at End of Scenario Month 16)

| | | | | Net income during scenario month 16 | | Cumulative net income since joining, as of end of scenario month 16 | |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Months of tenure | Agents with this tenure (#) | % of all Agents | cumulative % | Per participant | Total | Per participant | Total |
| 16 | 1 | 0.00% | 100.00% | $ 294,860 | $ 294,860 | $ 674,513 | $ 674,513 |
| 15 | 1 | 0.00% | 100.00% | $ 149,912 | $ 149,912 | $ 379,653 | $ 379,653 |
| 14 | 2 | 0.01% | 99.99% | $ 97,392 | $ 194,785 | $ 229,741 | $ 459,482 |
| 13 | 4 | 0.01% | 99.99% | $ 50,350 | $ 201,402 | $ 132,349 | $ 529,395 |
| 12 | 8 | 0.03% | 99.97% | $ 25,837 | $ 206,697 | $ 81,998 | $ 655,987 |
| 11 | 16 | 0.06% | 99.94% | $ 17,180 | $ 274,886 | $ 56,161 | $ 898,580 |
| 10 | 31 | 0.11% | 99.88% | $ 20,428 | $ 633,262 | $ 38,981 | $ 1,208,406 |
| 9 | 61 | 0.22% | 99.77% | $ 10,456 | $ 637,788 | $ 18,553 | $ 1,131,735 |
| 8 | 120 | 0.43% | 99.55% | $ 5,342 | $ 641,098 | $ 8,097 | $ 971,698 |
| 7 | 236 | 0.85% | 99.12% | $ 1,651 | $ 389,636 | $ 2,755 | $ 650,180 |
| 6 | 464 | 1.67% | 98.27% | $ 684 | $ 317,376 | $ 1,104 | $ 512,256 |
| 5 | 912 | 3.29% | 96.60% | $ 329 | $ 300,048 | $ 420 | $ 383,040 |
| 4 | 1,793 | 6.47% | 93.31% | $ 259 | $ 464,387 | $ 91 | $ 163,163 |
| 3 | 3,525 | 12.71% | 86.84% | $ 69 | $ 243,225 | $ (168) | $ (592,200) |
| 2 | 6,930 | 24.99% | 74.13% | $ 51 | $ 353,430 | $ (237) | $ (1,642,410) |
| 1 | 13,624 | 49.13% | 49.13% | $ (288) | $ (3,923,712) | $ (288) | $ (3,923,712) |
| TOTAL | 27,728 | 100.00% | | $ 49.74 | $ 1,379,080 | $ 88.71 | $ 2,459,766 |

FIGURE 12. Participant net income, by cohort. In the top row is A1, with 16 months of tenure. In the bottom row are the 13,624 Agents who join in scenario month 16 and have one month of tenure.

40

234. In Figure 12, cohorts are referred to by their "tenure" as of month 16. For example, in the top row, with 16 months of tenure, is A1 herself, who joined in scenario month 1.

235. In the bottom row is the newest cohort - the 13,624 Agents who joined in scenario month 16 and who have just one month of tenure. The Agents of this newest cohort comprise just under half (49%) of A1's entire downline.

236. More generally, one can see from column 2 that each successive cohort is just under double the size of the previous one. This rate of growth results directly from the recruitment pattern specified in the setup to the optimal scenario.

237. Column 7 of Figure 12 shows that the three newest cohorts, collectively comprising 87% of A1's organization, are running cumulative net losses.

238. When a cohort reaches its fourth month of tenure, it achieves a positive cumulative return. This result echoes the finding from Figure 8, where it was shown that A1 achieves cumulative net profit in her fourth month, after accumulating a downline of 7 Agents. This 7:1 ratio of net losers to net winners is what drives the 87% loss rate cited at the beginning of this section. That is, roughly 7 out of 8 participants (87.5%) in any given month are losing money in FES.

239. What drives the prevalence of losses in the optimal scenario? High loss rates are characteristic of recruiting schemes, in general.[27]  However, widespread losses are not predetermined in the FES optimal scenario because the level of retail sales that I have presumed in the setup are adequate to prevent that from happening.

240. Proof of this assertion lies in the Total for column 7 in Figure 12: $88.71. This number is the weighted average of cumulative participant returns. The fact that the number is positive indicates FES as a whole – operating as assumed in the optimal scenario – is positive-sum. In the aggregate, participants in the optimal scenario receive more in compensation from FES than they pay the company.[28]

241. To put it differently: total distributor compensation paid over the course of 16 months of the optimal scenario would suffice to provide all 27,728 distributors with a cumulative net

---

[27] In the conceptual framework section, the example of a chain letter was discussed. Chain letter schemes can suffer loss rates in the range of 80%-90%, depending on their structure. Such pervasive losses are perhaps foreseeable, since a chain letter is, by construction, a zero-sum transfer scheme where the profits of a few participants are financed entirely out of the payment of other participants.

[28] I emphasize that this hypothetical positive average return is coming from the favorable assumptions I have made about retail sales that may not obtain for the typical participant in real life. I also note that this average-return assessment leaves out all other expenses of participation. An investment opportunity that appears positive-sum considering some expenses may become negative-sum once all expenses are factored in (including the opportunity cost of time).

income of \$88.71 as of the end of month 16.[29]  This theoretical positive average payoff is made possible by the sales to retail customers.[30]

242.  Positive-sum designates only a hypothetical feasibility; it does not mean that all participants actually earn back more than they paid in to the enterprise (they clearly do not in the optimal scenario). Positive-sum means only that outside revenue from retail customers would suffice to make such an allocation feasible.

243.  The relevance of the positive-sum result is that it shows that widespread Agent losses were not pre-determined by my assumptions in the setup for the optimal scenario. Rather, the level of retailing presumed in the scenario is, in fact, adequate to provide a positive average participant return (i.e., a 0% loss rate).

244.  Instead, what drives the 87% predicted loss rate is the fact that Agents remain in a loss position until they have built a downline organization of 7 other Agents. This prerequisite guarantees that, at any one moment, the last three cohorts to have entered FES will be losing money. These three cohorts make up the vast majority (87%) of the overall organization.

245.  To my knowledge, neither the legal standard nor economic theory stipulates that being positive-sum necessarily prevents an MLM from inflicting pyramid harm.

246.  Certainly, a negative-sum MLM *has to be* a pyramid, since it functions like a chain letter, paying profits wholly or primarily out of the payments of recruits. However, a positive-sum MLM may inflict the same type of injury on participants if the compensation plan makes recruiting essential for achieving advertised income.

### 5.  Conclusion on the optimal scenario

247.  The optimal scenario results show that the FES investment opportunity, operating under maximally favorable conditions, still results in the vast majority of participants operating at a financial loss.

248.  The central problem – which follows directly from the compensation plan – is the necessity to recoup one's investment through the recruitment of other Agents.

---

[29]  A similar conclusion follows from column 5, which looks at participants' net income in month 16 only (rather than at their cumulative net income since joining). Column 5's TOTAL shows that participants earned an average monthly return of \$49.74 in the month. If Agent and customer behavior follow the pattern in the optimal scenario, then total distributor compensation paid in that month would suffice to provide every distributor with a net income of \$49.74 in that month.

[30]  To be precise, the positive-sum outcome is made possible by the magnitude of retail sales relative to FES corporate expenses. By "corporate expenses," I have in mind the portion of its gross revenue that FES does *not* pay back to Agents in the form of rewards. The lower these expenses, the smaller the magnitude of retail sales required to produce a positive-sum outcome.

249. This structure creates a situation whereby participants are incentivized to recruit others under the premise that such recruitment can continue indefinitely.

250. Under the favorable assumptions used in this optimal scenario, retail sales finance a nontrivial share of A1's compensation (42.5%). Upon further inspection, however, it becomes clear that no Agent should bother with retailing if even the slightest amount of extra time or money is required. Over 99% of potential compensation emanates from downline activity, not from retailing to one's personal customers.

251. Some amount of retailing is likely to occur due to the one-time Direct Commissions, which will seem relatively lucrative in the early months of a distributor's tenure, before her downline has grown to a significant size. Retail customers also may result incidentally from failed attempts to recruit Agents.

252. For a number of reasons, actual FES Agents are unlikely to achieve A1's success or anything like it. Real-world constraints ignored by the optimal scenario (e.g., time constraints, other participation costs, difficulty finding recruits and customers, etc.) will make it difficult to meet the recruiting and Group Volume requirements for advancement to higher ranks. Without advancement, Agents never transition to profitability and eventually drop out. For these reasons, the actual participant loss rate is likely to be higher than the 87% predicted in the optimal scenario.

## V.  Promotional and training messaging

253. In this section, I consider the types of messaging that FES and its recruiters use to attract and train new Agents.

### A. Introduction

254. Promotional and training materials help to attract recruits, set their income expectations and guide their pursuit of the business.

255. One preliminary but important question that these materials help answer is whether the MLM represents itself as a business venture at all. I believe promotional materials show that FES unambiguously represents itself as an investment opportunity, and individuals who sign up as Agents will expect to make money. While this proposition may seem obvious from the material already examined in this declaration, establishing that participants wanted to make money is necessary before taking up the question of whether income claims deceived participants.

256. These materials are important for other reasons as well. They can reveal areas on which distributors are encouraged to focus and how the organization is supposed to operate in practice (e.g., the role of recruiting, the importance of consuming the product). They also can make claims about the payoff to participation (e.g., earnings, improved lifestyle, more free time).

257. Claims about the costs and benefits to participating must be truthful in order not to mislead participants into investing time and money that they wouldn't have under an accurate understanding of the opportunity.

258. The mere marketing of FES's business model as an opportunity that can work for all participants constitutes a form of deception, since the model in fact relegates the majority of participants to financial loss in order to deliver promised income to a few. I label this inherent form of deception "pyramid deception."

259. Promotional messaging can deceive participants in other ways as well. There can be false or exaggerated claims about the role of retailing, risk of loss, attrition rate, expense of participation, typical earnings, ease of finding customers, etc. These misrepresentations can work synergistically with pyramid deception to mislead recruits – for example, by preying on misconceptions about geometric growth to make a given level of income appear attainable within a short period of time.

260. I assess a sample of FES earnings and lifestyle claims used to attract participants. I discuss the plausibility of these claims in light of the results from my compensation plan analysis and optimal scenario. I also examine FES income disclosures, discuss what is discernible from them, and surmise how these disclosures may have influenced consumers' decisions to sign up as FES Agents.

261. I reiterate that I have not seen any empirical data on Agent earnings and, therefore, cannot measure FES income claims and income disclosures against actual historical earnings.

**B.  Does FES market participation as a business?**

262. Based on the promotional materials that I have reviewed, it appears that FES and some recruiters have represented participation unambiguously as a business venture with significant income potential.

263. The United Wealth Education (UWE) home page (myuwe.net/Default.html) urges, "Run your own Business," explaining, "With UWE, you can run your own business with training and technology backed by an established company."

264. The UWE Member Benefits video from the same website claims to offer participants "enriching business opportunities," allowing them to "…get paid for sharing programs and services that everybody already needs." The video suggests, "let's talk about the ways you get paid" in FES and informs viewers, "you can get paid six different ways." The video elaborates, "two of the six ways to earn are by referring customers, and four of the six ways are by enrolling new Agents," drawing attention to the dominant role of recruiting, as demonstrated earlier in this declaration through the optimal scenario. Toward the end of the this video, viewers are told that FES participants get "proven strategies all the top earners are using to build a successful business, and everything you'll need for massive growth in your business."

44

265. In the video "United Wealth Education Services – What you need to know about UWE.mp4," FES Agent David Marquez, who claims to be an Executive Vice President, introduces the investment opportunity with a slide (at 6:03) that says, "UWE provides its Agents the ability to build a business by marketing innovative financial literacy tools, products and services."

266. The same video shows the following slide at 12:51, suggesting not only "income" but the ability to "make a living":



FIGURE 13. Screen capture from promotional video "United Wealth Education Services – What you need to know about UWE.mp4"

267. In "Career Opportunity – Financial Educational Services.pdf" (evidently, a screenshot from an FES recruitment website), the text asks, "Where do you want to be in 5 years? 10 years? What about right now?" following up with, "What if you could have the benefits of a traditional business career, but without someone else controlling your income, hours, partners and overall job security?" Finally, the page exhorts readers to "Build a team and earn weekly bonuses!," "True freedom comes with generating residual income," and "Earn Direct Commission for each sale!"

268. In "Career Opportunity – Financial Educational Services 2.pdf" (evidently, a screenshot from the same FES recruitment website), the text proclaims, "Our career opportunity provides a foundation for individuals and teams that are driven, highly motivated and looking for access to immeasurable success – while positively changing lives across the country." The website continues, "Your success is within reach at Financial Education Services. Contact the representative above for information on how you can join our limitless opportunity. Build a business with us, offering services you can trust." While steering clear of specific income claims, the web page clearly suggests the opportunity to go into business and earn profit with FES.

45

269. The web page in "Career Opportunity – Financial Educational Services 3.pdf" (evidently, a screenshot from the same FES recruitment website) invokes a comparison to the reader's current job and implies that FES participation involves a "sales team": "Does your current job take you on an annual weeklong all-inclusive Royal Caribbean Cruise? … Take a trip with the cofounders of the company, training executives and the best in your sales team."

270. The only plausible interpretation of this language is as a solicitation to enroll in an opportunity to make significant income.

271. That interpretation aligns with statements apparently made by FES participants in "Financial Education Services 16JAN2021.pdf." These are testimonials of a rags-to-riches variety.

- One agent reached Pinnacle (the highest rank possible) and earned a Bentley. She claims that FES gave her high income and "time flexibility."

- Another claims that "FES has transformed my life, having the freedom to travel, spend time with my family and set my own schedule has been a dream come true."

- A third says, "FES can and will change your life if you get started, trained, follow the system and dream big."

- A fourth claims, "My finances drastically changed. I was able to have the time freedom I wanted. …I was able to purchase the car I wanted and the condo I wanted. I am living life on my own terms. FES has changed my family tree. We are the first millionaires in our family. Both Nandi and I get to give our kids everything and more."

- A fifth says "I borrowed the money to get started. …I became a Regional vice President in 90 days and decided to go full time. … I am grateful to be on a platform where 'time freedom' is possible if you are willing to sacrifice temporarily and follow our system."

- Finally, a sixth endorser, a former Uber driver says, "I was driving 12 hours a day, 7 days a week…and within four months of me joining FES, I was able to walk away from Uber. It's given me time freedom to have with my wife and my grandbaby."

272. Collectively, these testimonials make clear the business nature of involvement, suggesting that the potential payoff from participation is worth near-term financial sacrifice.

## C. Income and lifestyle claims

273. Some of the same statements that signal the business nature of FES participation also make earnings or lifestyle claims, using phrases such as: "time freedom," "able to purchase the car I wanted," "first millionaires in our family," "living life on my own terms," "able to walk away from Uber," "earned a Bentley," and "freedom to travel."

274. While I do not know the effect of this language on the typical reader, I suspect that FES

46

intended it to convey a sense of possibility for earning part-time or full-time income through participation although the specifics are clearly left to the reader to fill in on her own.

275. Consumer declarations sometimes mention income claims encountered while being recruited to join FES.

276. For instance, consumer Stoute states that she encountered a claim that participants could make $500/week, and that her recruiter shared images of checks showing his own earnings were $1,000/week. Stoute also says her recruiter explained the opportunity as one in which "Agents received $100 every time they enrolled a new Agent," and that "this figure [$100] would continue to increase as we enrolled more people."

277. These messages likely would have set expectations around both the level of income that is attainable ($500-$1,000 per week) and the method of earning it (recruitment).

278. Consumer Templar heard some of the same types of claims: "Initially, I had learned from FES's training sessions and David that I would receive $100 for each person I registered … This is how FES explains the compensation system in beginning trainings for agents." It is true that under certain conditions, an FES Agent can earn a $100 Direct Commission for signing up a new retail customer, although the claim does not indicate the typical number of customers an Agents reasonably could expect to enroll.

279. Lamenting the lack of product information and product testimonials in a Facebook Live training for FES Agents, consumer Harris states, "The only testimonials were by agents boasting about how much money they were making. One testimonial I remember was of an agent claiming they 'got rich enough to buy [their] own car.'"

280. Consumer Markham states that his recruiter posted an ad on social media offering the chance "to make $1,200 a week working from home," and that she reiterated the $1,200 per week figure in a direct message to him. A second recruiter that Markham encountered claimed to be earning $27,000 per month "as a part-time FES Agent" and claimed that his own recruiter "had become a millionaire through FES." Markham did not earn the compensation he expected to and claims to have been cheated out of recruiting income by his upline. He states, "I would never have signed up with FES had I understood that I would not earn the promised income."

281. I do not know whether the recruiter's income claims attested to by these consumers are typical. It is not possible to generalize from such a small number of consumer experiences. It could be that other recruiters made more modest income claims when attempting to recruit new Agents.

282. However, the recruiters' claims attested to by these consumers are in line with those one might expect, given the language in the company's own promotional messaging, where phrases such as "limitless opportunity," "immeasurable success," "build a successful business" and "benefits of a traditional business career" are used.

283. These company-authored phrases are vague and open to interpretation but suggest a range of possible outcomes that includes, on the high end, replacement of an existing full-time job with FES income. Such projections are also in keeping with the upper end of rewards listed in the compensation plan. R&R Club rewards, for instance, promise $100,000-$250,000 cash bonuses for certain achievements.

284. A pattern that appears to hold in the materials I have reviewed is that individual recruiters in the field use specific dollar figures in their earning claims, while FES itself uses vaguer claims such as "True freedom comes with generating residual income!".

285. "Residual income" is a theme in FES marketing materials. The video "United Wealth Education Services – What you need to know about UWE.mp4" invokes the concept to portray the FES opportunity favorably relative to traditional wage or salary income.

286. In this video, speaker David Marquez, an Executive Vice President, contrasts residual income to "linear income" in which a worker "trade[s] time for money." Marquez recalls, "I remember when I worked in corporate America, where if I didn't work that week, I wasn't getting paid." In contrast, he says he prefers the "residual income" or "passive income" offered by UWE (FES), citing by way of explanation the purported words of a billionaire: "I'd rather have 1% of a hundred peoples' efforts than 100% of my own efforts."

287. Likewise, in "What is UWE (UNITED WEALTH EDUCATION) 2021.mp4," speaker Jebecca Jones uses the same graphic as David Marquez to make the same point about residual income vs. linear income. The secret to residual income, Jones says, is the ability to "leverage a network." Jones does not define this phrase, but I interpret him to mean profiting from a downline.

288. The use of the phrases "residual income" and "passive income" may be meant to convey the idea of ongoing income without ongoing personal effort. Through this terminology, the opportunity is likened to an investment capable of delivering steady returns after a one-time period of investment. Recall that the optimal scenario portrayed a six-month period of recruiting, followed by an open-ended period of significant monthly income from the activity of a downline.

289. Based on my analysis of the FES compensation plan, I would regard almost any representation of positive net earnings as likely to be misleading. Recall that the optimal scenario already showed an 87% predicted loss rate, and that the actual fraction losing money in FES is likely to be higher because of i) the real-world difficulties of meeting recruiting and group volume thresholds, and ii) the added costs of participation not accounted for in the scenario. Income claims of $500-$1,000 per week (as Stoute heard from her recruiter) seem especially exaggerated. Only 1%-2% of optimal scenario participants earn at least $500 per week, while less than 1% earn at least $1,000 per week. Again, the actual percentage of participants earning at these levels is almost certainly lower for the reasons cited.

48

290. I do not know how these income representations tend to be understood by potential recruits, and in particular, whether they are regarded as *typical*, or rather *upper bounds* on what is possible. Nevertheless, I surmise that participants would not adequately understand the very high likelihood that they will *lose* money as opposed to simply *earn less* than the amounts claimed.

### D.  Income disclosures

291. FES publishes annual income disclosures that report on gross earnings of Agents at various ranks.

### 1.  What income disclosures can do, in general

292. In theory, income disclosures offer a way to correct misimpressions around potential earnings by showing recruits the actual earnings of current and past participants. When income disclosures convey the true distribution of participant outcomes in a manner comprehensible to the target population, then they can empower potential participants to make informed decisions about signing up and investing time, money and effort.

293. Income disclosures have the power to fix misleading earning claims but not "pyramid deception." Income disclosures can demonstrate that high incomes are historically rare, but they will not, on their own, link the paucity of high earners to features inherent in pyramid-style compensation structures. For this reason, even clear, effective income disclosures are unlikely to make pyramid compensation schemes non-deceptive.

294. This caveat is important to keep in mind; publishing an income disclosure cannot undo or remedy the deception from operating as a pyramid scheme, although, if done well, it may make the operation seem less lucrative than it otherwise might and may, consequently, reduce the inflow of new recruits somewhat.

295. Remedying earning-claims deception requires a disclosure that is accurate, relevant, and transparently constructed. Earnings data must be correct, updated and comprehensive. The disclosure must account for participant attrition, periods of inactivity, non-earners, and other complications using statistically valid techniques.

296. Finally, all methodology must be fully and clearly explained. Any terms used to characterize results (e.g., "Active," "earnings," etc.) should be transparently defined.

297. The analysis of the FES income disclosures that I provide in the next section reflect my own impressions and nothing more. I have not seen copy tests, testimonials, consumer declarations, or any other evidence touching on consumer take-aways from FES income disclosure.

298. I begin with broad impressions and then present methodological questions, which, in my view, render the disclosures irredeemably ambiguous.

299. Ambiguous terminology and a general lack of transparency regarding statistical methods together severely undermine the potential effectiveness of the FES disclosures in correcting any misimpressions.

### 2.   General impressions of FES income disclosures

300. The disclosures indicate that the vast majority (over 90%) of FES participants occupy the entry-level rank of "Agent." Disclosures covering calendar years 2016 to 2020 all list a similar fraction of participants at the "Agent" rank. In 2016 the proportion was 95.7%, and in 2020 it was 92%. If accurate, such a high fraction of participants residing at the entry-level rank would not be surprising, given the necessity to recruit in order to advance.

301. Recall that the optimal scenario predicted that 87% of participants in any given month will be in their first three months of tenure and will occupy the rank of "Agent." The slightly higher "Agent" fraction indicated in the disclosures (92%-96%) could reflect real-world difficulties not accounted for by the best-case assumptions used in the optimal scenario.

302. The disclosures also appear to show that the vast majority of those at the "Agent" level do not advance beyond that rank. I infer this from the fact that the combined population of distributors at all ranks above "Agent" in any year is small relative to the "Agent" population in previous years. Thus, judging from the disclosures, FES does not operate like the optimal scenario, in which all cohorts steadily advance up the promotional hierarchy.

303. What this lack of advancement indicates about the experiences of "Agents" is not clear, however. Failure to advance is not necessarily equivalent to business failure. Without participant-level data, I cannot determine whether participants who failed to advance in rank remained active participants or dropped out.

304. The income disclosures report surprisingly high average incomes for entry-level participants. Apparently, "Agents" consistently averaged $3,000-$4,000 annually, which translates to $250-$333 per month.

305. Recall that in the optimal scenario, a participant does not reach this range of gross income until her fourth month, when she reaches Field Trainer and has accumulated a downline of seven Agents and seven retail customers. Gross rewards during the fourth month are $328.

306. Even accounting for the fact, conveyed in footnotes to the disclosures, that income figures include only "Active" participants, I remain surprised to see Agents averaging $250-$333 per month. and yet so few of them advancing to higher ranks.

307. The disclosures do not separate retailing income from recruiting income, nor do they separate out income based on customer vs. distributor volume. If they did, it might be clearer how "Agents" can average such high levels of compensation. If carried out in a valid and transparent manner, such categorizations also might enable prospective participants to understand better the activities required to reach their income expectations.

308. Beyond these few top-line observations, the FES income disclosures raise a number of questions about Agent compensation.

309. First, the definition of "Active" plays a key role in the computation of average incomes but is not fully explained. The word as used in the disclosures appears to mean something different than it means in the compensation plan, where "Active" designates an Agent who is enrolled in a Protection Plan and therefore eligible to receive compensation. By contrast, the income disclosures characterize an Active participant as one who has recruited someone and earned at least one recruitment commission. This reveals enough to differentiate it from the compensation plan's definition, but not enough to fully understand its implication for the income figures in the disclosure. For instance, how long does "Active" status persist? Are Agents who were active one year automatically considered active in the next, or do they need to re-qualify?

310. Second, how are participants assigned to ranks in the disclosure table? Is a participant assigned to her maximum rank achieved in that year, or maximum rank ever attained, or the rank she occupied on December 31, or their longest-held rank, or none of these?

311. Third, how common is promotion? That is, what fraction of participants ranked higher than "Agent" have been at those ranks for multiple years, and what fraction are promoted into those ranks during an average year? As time passes and markets mature, it could be getting more difficult to find recruits and reach higher rank.

312. Fourth, how is "annual average income" computed? What are the full criteria for including or excluding participants from the sample? Which months of tenure are included and which, if any, are excluded? How is partial-year participation handled – e.g., a participant who joins in July? Are incomes "annualized"? For example, is a single month's income multiplied by 12 to yield an "annual" income?

313. Fifth, what are *net* earnings? The income figures appear to represent *gross* compensation before any expenses are accounted for. Do higher earners tend to have higher expenses also?

314. Sixth, how much compensation results from retailing to personal customers, and how much results from the activity of recruits?

315. Without the answers to these questions, I find it impossible to determine the true historical distribution of financial success among FES Agents.

316. I find it still more difficult to predict the impact of these disclosures on prospective recruits. Recruits are unlikely to have analyzed the compensation plan extensively and may never see it before signing up. Without an understanding of the compensation structure, recruits are less equipped to understand how the levels of income in the disclosures could be earned, and whether the claimed incomes appear reasonable given the way the business works.

317. The context in which recruits are shown income disclosures is likely important. Recruits will have been subject to a recruiting pitch from an existing Agent with a financial interest

51

in making the opportunity appear as lucrative as possible. Finally, I have not seen any evidence touching on the fraction of recruits who are presented with the disclosures. It is unclear to me what steps, if any, FES takes to ensure recruits view and understand them.

## VI.    Conclusion

318.   Based on my assessment of the compensation plan, promotional and training messages, and consumer declarations, I conclude that FES is operating as a pyramid scheme. Potentially achieving advertised income demands pursuing the "pay, recruit, teach" strategy known as duplication. Compensation structures reliant on recruitment doom the vast majority of participants to suffering losses.

319.   FES deceives consumers when it markets a recruitment-based transfer scheme as a "business" opportunity. It exacerbates the deception by making exaggerated income and lifestyle claims.

320.   These conclusions about the investment opportunity would hold even if the services offered by FES (in particular, it's Protection Plan) delivered real value to consumers. However, based on the consumer declarations that I have read, FES services may be of little to no value. Consumers in these declarations quickly regretted enrolling, once the ineffectiveness of the service became apparent. A deceptively marketed product would be an additional source of consumer injury.

## VII.   Appendix

### A.  Optimal scenarios with "Power of 5" Program

321.   Figures A1 and A2 are adjusted versions of Figures 8 and 12, respectively, from the text. A1 and A2 display the results from an alternative optimal scenario based on FES's "Power of 5" program in which Agents earn the right to stop making $89 monthly once they have enrolled five individuals in a Protection Plan. The five enrollees may be Agents, retail customers, or any combination of the two. Under the timing of the scenario, this milestone is reached at the end of month four, meaning Agents face zero expenses beginning in their fifth month of tenure.

### Alternative Optimal Scenario - "Power of 5" Program

*Under "Power of 5" Program, Agents pay no monthly fee once they have enrolled five other individuals (Agents and/or customers) in a Protection Plan*

| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| Scenario month | A1's spending (Agents, Customers) | A1's personal enrollments (Agents, Customers) | Total downline (# Agents) | Total retail customers (incl. A1's) | Agent share of volume points | Agent share of dollars spent | A1's retailing rewards* | A1's recruiting rewards* | A1's total rewards | A1's cumulative net financial position |
| 1 | $ 288 | (0,0) | - | - | 100% | 100% | $ * | $ - | $ - | (288) |
| 2 | $ 89 | (1,1) | 1 | 1 | 71% | 67% | $ 100 | $ 40 | $ 140 | (237) |
| 3 | $ 89 | (2,2) | 3 | 3 | 66% | 62% | $ 112 | $ 46 | $ 158 | (168) |
| 4 | $ 69 | (3,3) | 7 | 7 | 60% | 59% | $ 184 | $ 144 | $ 328 | 91 |
| 5 | $ - | (4,3) | 15 | 14 | 61% | 60% | $ 92 | $ 306 | $ 398 | 489 |
| 6 | $ - | (5,3) | 31 | 28 | 61% | 60% | $ 128 | $ 625 | $ 753 | 1,242 |
| 7 | $ - | (5,3) | 62 | 56 | 61% | 60% | $ 124 | $ 1,596 | $ 1,720 | 2,962 |
| 8 | $ - | (5,3) | 123 | 111 | 61% | 60% | $ 124 | $ 5,287 | $ 5,411 | 8,373 |
| 9 | $ - | (5,3) | 243 | 219 | 61% | 60% | $ 24 | $ 10,501 | $ 10,525 | 18,898 |
| 10 | $ - | (5,3) | 479 | 431 | 61% | 60% | $ 24 | $ 20,473 | $ 20,497 | 39,395 |
| 11 | $ - | (5,3) | 943 | 848 | 61% | 60% | $ 24 | $ 17,225 | $ 17,249 | 56,644 |
| 12 | $ - | (5,3) | 1,855 | 1,668 | 61% | 60% | $ 24 | $ 25,882 | $ 25,906 | 82,550 |
| 13 | $ - | (5,3) | 3,648 | 3,280 | 61% | 60% | $ 24 | $ 50,375 | $ 50,399 | 132,950 |
| 14 | $ - | (5,3) | 7,173 | 6,449 | 61% | 60% | $ 22 | $ 97,419 | $ 97,441 | 230,391 |
| 15 | $ - | (5,3) | 14,103 | 12,679 | 61% | 60% | $ 20 | $ 149,941 | $ 149,961 | 380,352 |
| 16 | $ - | (5,3) | 27,727 | 24,927 | 61% | 60% | $ 18 | $ 294,909 | $ 294,909 | 675,261 |
| TOTAL | $ 535 | | | | | | $ 1,044 | $ 674,752 | $ 675,796 | |

*  Retailing  rewards include i) Direct Commissions paid on customer enrollments, and ii) Remaining CABs.  Recruiting  rewards include i) Initial CABs, ii) all forms of Overrides, iii) Infinity Bonus, and iv) Generation Bonus. Medallion Club and R&R Club rewards are excluded from this analysis.

FIGURE A1. Timeline of key events in a "Power of 5" version of the optimal scenario.

### Altnernative Optimal Scenario, Assuming "Power of 5" Program - Participant Net Income, by Months of Tenure
(Evaluated at End of Scenario Month 16)

| | | | | Net income during scenario month 16 | | Cumulative net income since joining, as of end of scenario month 16 | |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Months of tenure | Agents with this tenure (#) | % of all Agents | cumulative % | Per participant | Total | Per participant | Total |
| 16 | 1 | 0.00% | 100.00% | $ 294,909 | $ 294,909 | $ 675,261 | $ 675,261 |
| 15 | 1 | 0.00% | 100.00% | $ 149,961 | $ 149,961 | $ 380,352 | $ 380,352 |
| 14 | 2 | 0.01% | 99.99% | $ 97,441 | $ 194,883 | $ 230,391 | $ 460,782 |
| 13 | 4 | 0.01% | 99.99% | $ 50,399 | $ 201,598 | $ 132,950 | $ 531,799 |
| 12 | 8 | 0.03% | 99.97% | $ 25,906 | $ 207,249 | $ 82,550 | $ 660,403 |
| 11 | 16 | 0.06% | 99.94% | $ 17,249 | $ 275,990 | $ 56,644 | $ 906,308 |
| 10 | 31 | 0.11% | 99.88% | $ 20,497 | $ 635,401 | $ 39,395 | $ 1,221,240 |
| 9 | 61 | 0.22% | 99.77% | $ 10,525 | $ 641,997 | $ 18,898 | $ 1,152,780 |
| 8 | 120 | 0.43% | 99.55% | $ 5,411 | $ 649,378 | $ 8,373 | $ 1,004,818 |
| 7 | 236 | 0.85% | 99.12% | $ 1,720 | $ 405,920 | $ 2,962 | $ 699,032 |
| 6 | 464 | 1.67% | 98.27% | $ 753 | $ 349,392 | $ 1,242 | $ 576,288 |
| 5 | 912 | 3.29% | 96.60% | $ 398 | $ 362,976 | $ 489 | $ 445,968 |
| 4 | 1,793 | 6.47% | 93.31% | $ 259 | $ 464,387 | $ 91 | $ 163,163 |
| 3 | 3,525 | 12.71% | 86.84% | $ 69 | $ 243,225 | $ (168) | $ (592,200) |
| 2 | 6,930 | 24.99% | 74.13% | $ 51 | $ 353,430 | $ (237) | $ (1,642,410) |
| 1 | 13,624 | 49.13% | 49.13% | $ (288) | $ (3,923,712) | $ (288) | $ (3,923,712) |
| TOTAL | 27,728 | 100.00% | 49.13% | $ 54.35 | $ 1,506,984 | $ 98.09 | $ 2,719,872 |

FIGURE A2. Participant net income, by cohort, in a "Power of 5" version of the optimal scenario. In the top row is A1, with 16 months of tenure. In the bottom row are the 13,624 Agents who join in scenario month 16 and have one month of tenure.

53

### B. Legal Opinion Letter by Kevin Thompson

322. I reviewed a letter that appears to be a legal analysis of FES, written by Kevin Thompson, and dated January 31, 2018 (henceforth, "Thompson letter"). From the letter, I understand that Kevin Thompson is a Managing Partner at the law firm of Thompson Burton PLLC, where he works as a "MLM attorney specializing in representing network marketing companies similarly situated to Financial Education Services." I have been asked by BCP staff to briefly provide my opinions regarding the pyramid scheme analysis contained in the Thompson letter.[31]

323. The final section of the Thompson letter is entitled "Legal Opinion," which would seem to put it outside the boundaries I set for myself, but I will offer opinions on it nevertheless because of certain assertions made in that section, which are closely intertwined with economic analyses that I undertake in the body of this declaration.

324. The core conclusion of the "Legal Opinion" section is Mr. Thompson's determination that FES, "has the capability to operate within the legal confines of the law." The letter later makes clear that, in determining FES's "capability" to function legally, Mr. Thompson has not determined that FES *is* functioning legally: "This letter must never be used as validation of the Financial Education Services business model, as legality largely hinges on how the business operates in practice." In the body of this declaration, I have considered whether FES is, in fact, operating as a pyramid scheme.

325. I will now assess certain claims made in the letter about pyramids in general and FES in particular.

326. First among the letter's assertions is that FES "places a proper emphasis on its product offering and retail sales." Mr. Thompson does not present his basis for this determination, nor does he explain the delineation of "proper" from "improper."

327. Mr. Thompson states that he reviewed "the [FES] business plan, descriptions of the service offered, and an assortment of company contracts, from Policies and Procedures to the Independent Sales Representative Agreement." However, Mr. Thompson does not indicate where, in these or any other materials, FES exhibits emphasis on product offering and retail sales, or on what basis he finds it to be the "proper" amount.

328. In my analysis, I find that the emphasis in the FES income opportunity is on recruiting and duplication. The compensation structure heavily incentivizes recruitment over retailing, and promotional and marketing materials related to the income opportunity tend to emphasize the ability to earn high income based on the work of others, by building a downline.

---

[31] I am not an attorney and am not qualified to render a detailed analysis of pyramid scheme legal precedents. I provide opinions only on those parts of the Thompson letter that intersect with my own economic analysis of FES, provided in the body of this declaration. Accordingly, the section of the letter entitled "Network Marketing and the Law," where Mr. Thompson provides his interpretation of *Koscot* and later pyramid cases is outside the scope of my analysis.

Marketing materials do highlight the purported value of FES products, but consumer declarations suggest these claims may be overblown. Whatever the emphasis on products and retail sales, potential earnings are concentrated within recruitment-related rewards, creating a chain-letter dynamic to participation.

329. The Thompson letter goes on to contrast FES with "illegal operations, which place an unhealthy emphasis on the income opportunity associated with the business," but this elaboration only raises more questions. His equating of "illegal" with "unhealthy emphasis" is too vague to be of any analytical use. He leaves fundamental questions unanswered: What do "improper," and "unhealthy" mean in this context? What are the relevant FES practices being assessed, and how would they fall outside of the "improper" and "unhealthy" zones? Finally, how does all of this connect with the applicable legal standard for pyramid schemes?

330. The Thompson letter concludes its substantive analysis with the following proposition:

    "…pyramid scheme analysis boils down to three things: (1) commissions derived from product sales; (2), legitimate value for products and services; and (3) proper emphasis of the product over the financial opportunity."

331. From the context, I interpret Mr. Thompson to be asserting, roughly, that an MLM that has these "three things" is not a pyramid scheme. Beyond this, however, I cannot provide any sort of detailed examination of the "three things" framework, because the letter does not specify how to apply it as a formal pyramid test and does not define the key terms involved. Item (1)'s linking of commissions to sales might allude to *Koscot's* second prong. Item (2) is uninterpretable without additional guidance, since it is unclear what "legitimate value" means or who is doing the valuing. Finally, there is item (3), on which I have slightly more to say.

332. Item (3) again suggests that legal MLMs must emphasize the "product" over the "financial opportunity." This is an echo of the framing used just above it ("product offering and retail sales" over "income opportunity"), and it puzzles me because, again, the more typical dichotomy one encounters in pyramid analyses is between *sources of participant income –* retailing vs. recruiting – and not between the "financial opportunity" itself and the "product."

333. I think the most likely explanation based on the context is that in item (3), Mr. Thompson means to imply that lawful MLMs emphasize retailing (i.e., selling the *product*) over recruiting (i.e., selling the *financial opportunity*). This interpretation is speculative, and I am ultimately uncertain of Mr. Thompson's true intended meaning. If my interpretation happens to be correct, Thompson's assertion with item (3) is true enough as a general rule of thumb but not very helpful in assessing the specifics of any particular case.

334. After laying out the "three things," the Thompson letter implies that FES has all three, because:

"… [A] commissions are solely driven from the sale of its product suite and [B] the enrollment fee is not included in the pay plan. Furthermore, [C] the company has represented to me that they have generated significant retail sales activity over the prior 12 months."

335. Are claims [A] – [C] accurate, how do they connect to items (1) – (3), and what, ultimately, do they establish about FES?

336. Claim [A] is true in some respects but not in others. For instance, so far as I am aware, some sale (either to a recruit or a retail customer) *is* required for an Agent's first dollar of compensation. In this respect Thompson's claim [A] is accurate.   On the other hand, there are ways for an Agent to increase her earnings on a given quantity of volume without additional product sales. For instance, an Agent may earn a higher one-time Direct Commission simply by charging a higher enrollment fee to the retail customer. Additionally, in my discussion of reward convexity, I demonstrated how compensation may increase more than proportionally to an increase in volume at certain important thresholds, and that such jumps were a result, in part, of a boost in earning percentages applied to volume below the threshold. Is the additional compensation on pre-existing volume "driven from the sale" of product? The company simply agrees to pay more on the same old volume because the Agent reached new recruiting and volume targets. This area raises complicated questions of interpretation. There may not be one unequivocally right answer, but the situation is not as clear-cut as Mr. Thompson's claim [A] implies.

337. Furthermore, claim [A]'s use of the word "sales" to refer to purchases by customers *or* Agents obscures an important distinction. Presumably, one intent here is to imply that FES does not pay rewards for mere recruitment of new Agents. However, because new Agents *must* purchase a Protection Plan enrollment in order to participate in the opportunity, I do not view the rewards paid on these compulsory purchases as being "commissions…driven from the sale of [FES] products." In the literal sense, these rewards *can* be connected to a "sale," but as argued in previous court decisions (and in my own economic analysis), mandatory distributor purchases are not equivalent to "sales to ultimate users" in a pyramid analysis.

338. Finally, as I emphasize in my declaration, even rewards "driven from" sales to retail customers can incentivize recruiting when they are allocated like FES allocates them. Thus, I contend, it is not enough simply to look at whose purchases generate rewards.

339. Ultimately, I conclude that claim [A] is only partially accurate and, in any case, offers weak support for the legitimacy of FES's operations because it leaves out important factors in the way that compensation is paid and the incentives that are created for participants.

340. Claim [B] is not easy to interpret but may refer to the fact that FES pays one-time Direct Commissions on retail customer enrollments but not on Agent enrollments. If this is the intended meaning, then the claim is accurate so far as it goes but merely establishes that FES avoids the most obvious of pyramid practices. Further, one must also hold in mind the evidence, discussed in the body of this declaration, that Agents may earn "Initial" CABs for

enrolling other Agents. As stated earlier, I am not certain initial CABs may be earned without the ultimate enrollment of retail customers, but the language in the compensation plan does suggest that. Thus, ultimately, claim [B] may be contain some truth, but it establishes little for FES's legitimacy.

341. Finally, claim [C] is too vague and unsupported for me to evaluate. Without more specificity and documentation, I think the claim ought to play no role in the determination of whether FES is operating as a pyramid scheme.

342. In summary, both the "three things" test, and the arguments implying FES could pass it, fail to alter my assessment that FES is operating as a pyramid scheme.

343. I also wish to point out that the Thompson letter's reliance on a set of unsubstantiated and exonerating assumptions further weakens its endorsement of FES. On page 1, Mr. Thompson writes,

"…I have assumed, for purposes of the opinions expressed in this letter, that:

a. The services offered are priced appropriately to reach a broad market of customers throughout its approved territories;
b. Participants…in Financial Education Services derive their income via customer fees paid to the company; and
c. Financial Educational Services is sufficiently staffed with adequate personnel for customer support and compliance administration."

344. No evidence is offered for these assumptions, nor are any documents cited for the reader to consult. These assumptions are consequential ones to make in a pyramid analysis, touching on important issues such as the retail viability of the product line, the sources of distributor compensation, and company efforts to stamp out pyramiding behavior by distributors (e.g., partaking in or encouragement of inventory loading; or, making false earning claims).

345. In light of these assumptions, it is not even clear how to interpret certain conclusions that come later in the letter, which are presented as if they follow from an empirical examination of FES but which, in hindsight, seem to follow necessarily from the assumptions made on page 1. For instance, assumption b states that participants derive their compensation from "customer fees paid to the company." In that case, the letter's later finding that compensation is "solely driven from sales of the product suite" seems predetermined. In summary, the assumptions relied upon for the letter's opinion further undercut the strength of its attestation for the legality of FES's operations.

## VIII. Sources

346. In formulating my opinions set forth above, I have considered the following documents that were provided to me by BCP Staff:

- Legal opinion letter by Kevin Thompson, dated January 31, 2018 - "Thompson Letter

Pyramid Scheme Analysis_2018.01.31.pdf"
- The following consumer declarations obtained by BCP staff:
  - ➢ Declaration of Ronetta Stoute
  - ➢ Declaration of Katia Templar
  - ➢ Declaration of Amber Harris
  - ➢ Declaration of Peter Markham
  - ➢ Declaration of Adrena Womack
  - ➢ Declaration of Betty King
  - ➢ Declaration of Carla Robins
  - ➢ Declaration of Edine Shirley Lapka
  - ➢ Declaration of Monica Dimbo
  - ➢ Declaration of Patryce Counts
  - ➢ Declaration of Renata Wilkins
  - ➢ Declaration of Samual Cassamas
  - ➢ Declaration of Tonesha Copning

- The following documents that BCP staff informed me they obtained from downloads of various versions of FES's websites:
  - ➢ UWE – COMP PLAN
  - ➢ FES Policies and Procedures.pdf
  - ➢ FES Independent Sales Rep Agreement.pdf
  - ➢ Income Disclosure Statement – 2016
  - ➢ Income Disclosure Statement – 2017
  - ➢ Income Disclosure Statement – 2018
  - ➢ Income Disclosure Statement – 2019
  - ➢ Income Disclosure Statement – 2020
  - ➢ Financial Education Services 16JAN2021.pdf.
  - ➢ Career Opportunity – Financial Education Services.pdf
  - ➢ Career Opportunity – Financial Education Services 2.pdf
  - ➢ Career Opportunity – Financial Education Services 3.pdf
  - ➢ FES Protection Plan.pdf, FES Protection Plan 2.pdf, …, FES Protection Plan 16.pdf
  - ➢ United Wealth Education home page
  - ➢ Credit My Rent home page

- The following video files of FES Agents that BCP staff informed me they downloaded from the Internet:
  - ➢ BEST UWE PRESENTATION.mp4
  - ➢ The Secret to Financial Literacy!!! #uwe #credit #award #winning #850 #uces #protectionplan.mp4
  - ➢ What is UWE (UNITED WEALTH EDUCATION 2021).mp4
  - ➢ United Wealth Education – What you need to know about UWE.mp4
  - ➢ United Wealth Education – What is UWE.mp4

347. In formulating my opinions set forth above, I have also considered the following documents that I obtained on my own:

- Keep, W. and P. Vander Nat. (2002) Marketing Fraud: An Approach for Differentiating Multilevel Marketing from Pyramid Schemes. *Journal of Public Policy & Marketing*. 21(1): pp. 139-151.
- Keep, W. and P. Vander Nat. (2014). Multilevel marketing and pyramid schemes in the United States. *Journal of Historical Research in Marketing*. Vol. 6, No. 2.
- Wosińska, M., Givens, D., Lau, Y. et al. (2021) Economics at the FTC: Multi-level Marketing and a Coal Joint Venture. *Review of Industrial Organization* 59, pp. 629–650.
- *In the Matter of Koscot Interplanetary, Inc. et al*.; Order, Opinion Etc. In Regard to Alleged Violation of The Federal Trade Commission Act and Sec. 2 of The Clayton Act. *Docket 8888. Complaint May 24, 1972 – Final Order, Nov. 18, 1975. Accessed at: https://www.ftc.gov/sites/default/files/documents/commission_decision_volumes/volume-86/ftc_volume_decision_86_july_-_december_1975pages_1106-1202.pdf#page=1.*

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17th day of ___May___, 2022, in Washington, D.C.

David Givens

60

# ATTACHMENT A

**DAVID GIVENS**
Tel: 202-326-3397 (work), 202-469-0669 (mobile)
Email: dgivens@ftc.gov

**EDUCATION**
Ph.D.   Economics, University of Maryland, College Park, MD, December 2010
B.A.    Economics, Russian Lang. & Lit. (with distinction), University of Virginia, August 1998

**DISSERTATION**
*Four Essays in the Measurement of Governance Institutions*
Committee chair: Prof. Peter Murrell

**PUBLICATIONS**
Givens, David. "Defining governance matters: A factor analytic assessment of governance institutions." *Journal of Comparative Economics* 41, Issue 4, pp. 1026-1053 (Nov 2013).

Wosińska, M., Givens, D., Lau, Y. et al. "Economics at the FTC: Multi-level Marketing and a Coal Joint Venture." *Rev. Ind. Organ.* 59, 629–650 (2021).

**WORKING PAPERS**
Givens, David. "Leveling Up to Literacy: Measuring the Impact of the FTC's Online Advertising Literacy Game, 'Admongo,'" SSRN Working Paper No. 346, 2020.

**PRESENTATIONS**
"Leveling Up to Literacy: Measuring the Impact of the FTC's Online Advertising Literacy Game, 'Admongo,'" AMA Marketing and Public Policy Conference (MPPC). Columbus, OH (2018).

**FIELDS OF SPECIALIZATION**
Primary: Institutions, Development and Growth
Secondary: Applied Econometrics, Microeconomics, Law and Economics

**TEACHING EXPERIENCE**
*Instructor*, Law and Economics, University of Maryland, Spring 2010; Spring 2009; Spring, Fall 2008; Winter, Spring, Fall 2007; Fall 2006
*Teaching Assistant*, Principles of Microeconomics, University of Maryland, Spring 2006
*Teaching Assistant*, Principles of Macroeconomics, University of Maryland, Fall 2005
*Teaching Assistant:* Money and Banking, University of Maryland, Spring 2005; Fall 2004

**RESEARCH/WORK EXPERIENCE**
*Economist*, Federal Trade Commission,        Washington, D.C., 2010-present
*Graduate Assistantship*, University of Maryland, 2004-2010
*Economist*, Economy.com, West Chester, PA, 2000-2004
*Translator (Russ. to Eng.)*, *Notes of a Sniper*, (memoir of Vassily Zaitsev), 2826 Press Inc., 2000
*Volunteer*, U.S. Peace Corps, Uzbekistan, 1999-2000
*Research Assistant*, Federal Trade Commission, 1998-1999