# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**FEDERAL TRADE COMMISSION**,

    Plaintiff,

    v.

**FINANCIAL EDUCATION SERVICES, INC.,** a Michigan corporation,
**UNITED WEALTH SERVICES, INC.**, a Michigan corporation,
**VR-TECH, LLC**, a Michigan limited liability company,
**VR-TECH MGT, LLC**, a Michigan limited liability company,
**CM RENT INC.**, a Colorado corporation,
**YOUTH FINANCIAL LITERACY FOUNDATION**, a Michigan nonprofit corporation,
**PARIMAL NAIK**, in his individual and corporate capacity,
**MICHAEL TOLOFF**, in his individual and corporate capacity,
**CHRISTOPHER TOLOFF**, in his individual and corporate capacity, and
**GERALD THOMPSON**, in his individual and corporate capacity,

    Defendants.

Case No. 2:22-cv-11120-BAF-APP

Hon. Bernard A. Friedman

**DEFENDANT GERALD THOMPSON'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND TO DISSOLVE THE TRO**

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

GREGORY A. ASHE
K. MICHELLE GRAJALES
JULIA E. HEALD
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC  20580
Telephone:  202-326-3179 (Ashe)
Telephone:  202-326-3172 (Grajales)
Telephone:  202-326-3589 (Heald)
Facsimile:  202-326-3768
Email:  gashe@ftc.gov,
mgrajales@ftc.gov, jheald@ftc.gov

DAWN N. ISON
United States Attorney

PETER A. CAPLAN (P30643)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Telephone:  peter.caplan@usdoj.gov

Attorneys for Plaintiff

RICHARD W. EPSTEIN
ROY TAUB
Greenspoon Marder LLP
200 E. Broward Blvd., Suite 1800
Fort Lauderdale, FL 33301
Telephone: 954-527-2427 (Krimsky)
Telephone: 954-491-1120 (Epstein)
Facsimile: 954-333-4027
beth-ann.krimsky@gmlaw.com
richard.epstein@gmlaw.com
Attorneys for Financial Education
Services, Inc, United Wealth Services,
Inc., VR-Tech, LLC, Youth Financial
Literacy Foundation, and Parimal M.
Naik, only.

GEORGE S. FISH
Young Basile Hanlon & MacFarlane, P.C.
3001 W. Big Beaver Road, Suite 624
Troy, MI 48084
fish@youngbasile.com

DAVID W. WARREN
EMILY R. WARREN
Joelson, Rosenberg,
30665 Northwestern Highway
Suite 200
Farmington Hills, MI 48334
248-855-2233
Fax: 248-855-2388
Email: dwarren@jrlawplc.com
Email: emrwarren@gmail.com
Attorneys for VR-Tech MGT, LLC, CM
Rent, Michael Toloff and Christopher
Toloff, only.

ERICA R. HOLLAR
HELEN MAC MURRAY
LISA MESSNER
WALTER CHARLES BLACKHAM

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

Mac Murray & Shuster LLP
6525 West Campus Oval
Suite 210
New Albany, OH 43054
614-939-9955
Fax: 614-939-9954
Email: ehollar@mslawgroup.com
Email: hmacmurray@mslawgroup.com
Email: lmessner@mslawgroup.com
Email: cblackham@mslawgroup.com
Attorneys for VR-Tech MGT, LLC, CM
Rent, Michael Toloff and Christopher
Toloff, only.

KERRY L. MORGAN (P32645)
Pentiuk, Couvreur & Kobiljak, P.C.
2915 Biddle Avenue, Suite 200
Wyandotte, MI  48192
Telephone:  734-281-7100
Fascimile:    734-281-7102
Email: Kmorgan@pck-law.com
Attorneys for Defendant Gerald
Thompson, only.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .......................................................................... ii-iii

ISSUES PRESENTED……………………………………………………….iv

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ....................... v

DEFENDANT THOMPSON CONCURS WITH AND JOINS IN
THE BRIEF OF YFLF ...................................................................................... 1

STANDARD OF REVIEW ............................................................................... 1

FACTUAL BACKGROUND............................................................................. 2

ARGUMENT..................................................................................................... 4

      A.    The TRO's Entry On An *Ex-Parte* Basis Was Legally
            Deficient Warranting an Order Setting it Aside ............................... 4

      B.    Since YFLF Is Exempt From CROA, Defendant Thompson
            as its President is Likewise Exempt................................................. 6

      C.    Defendant Thompson is Neither a Telemarketer nor Seller
            Under the Telemarketing Sales Rule ............................................. 13

      D.    The FTC Fails To Allege Any Illegal Pyramid Involving
            Defendant Thompson...................................................................... 16

      E.    The FTC Fails To Allege Any Specific Violation Of
            15 U.S.C. § 45(a) Pertaining To Defendant Thompson ................ 16

      F.    The Preliminary Injunction Standards Are Not Met...................... 18

CONCLUSION................................................................................................ 23

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

Bahdouchi v. Third Eye, Inc.,
   No. 04-CV-l2997-DT, (January 21, 2005) ........................................................ 10

Blue Cross & Blue Shield Mut. Of Ohio v. Blue Cross
   and Blue Shield Association v. Columbia/HCA Healthcare Corporation,
   110 F.3d 318 (1997) ............................................................................................ 22

Civil Liberties Union Fund of Mich. v. Livingston Cty.,
   796 F.3d 636, 642 (6th Cir. 2015), cert. denied, 136 S. Ct. 1246 (2016) ........1-2

F.T.C. v. Butterworth Health Corp.,
   946 F. Supp. 1285, 1289 (W.D. Mich. 1996)
   (internal quotation omitted), *aff'd*, 121 F.3d 708 (6th Cir. 1997) ...................... 18

FTC v. Moses,
   913 F.3d 297, 307 (2d Cir. 2019) ...................................................................... 22

In Re National Credit Management Group. LLC,
   21 F. Supp. 2d 424, 458 (N.D.N.J. 1998)............................................................7

Overstreet v. Lexington-Fayette Urban County Government,
   305 F.3d 566 (2002) ........................................................................................... 23

Union Home Mortgage Corporation v. Cromer,
   31 F.4th 356, 363 (Sixth Cir. 2022)................................................................... 21

Zimmerman v. Cambridge Credit Counseling,
   322 F Supp 2d 95, 2004 WL 1447342 322 F. Supp. 2d
   95 (D. Mass. 2004) rev'd, 409 F3d 473 (1st Cir. 2005)............................. 8, 9, 10

Zimmerman v. Puccio,
   613 F.3d 60 (1st Cir. 2010)................................................................................ 10

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

**United States Code**                                                   **Page(s)**

15 U.S.C. § 45(a) .................................................................... 16, 17, 18
15 U.S.C. § 1679 et seq. ................................................................. 6
15 U.S.C. § 1679a(3) ...................................................................... 7
15 U.S.C. § 1679a(3)(b)(i) ........................................................... 9, 12
15 U.S.C. § 1679b(a)(3) ................................................................. 10
15 U.S.C. § 1679b ........................................................................... 6
15 U.S.C. § 1679b(b) ....................................................................... 8
26 U.S.C. 501(a) .............................................................................. 7
26 U.S.C. 501(c)(3) .................................................... 1, 6-12, 19

**Code of Federal Regulations**

16 C.F.R. § 310.2(dd), (ff), and (gg) ............................................. 13

**Michigan Statutes**

MCL 450.2106 ........................................................................ 10, 11

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 12 .......................................................................... 16
Fed. R. Civ. P. 65 ..................................................................... 5, 21
Fed. R. Civ. P. 65(b) ....................................................................... 5

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

**ISSUES PRESENTED**

1. Should the Ex Parte Temporary Restraining Order entered against Defendant Gerald Thompson (Dkt. No. 10) (the "TRO") be dissolved?

   Defendant Gerald Thompson Says:          "YES"
   Plaintiff Says:                          "NO"

2. Does any count in the Complaint against Defendant Gerald Thompson establish a substantial likelihood of prevailing on the merits warranting a Preliminary Injunction?

   Defendant Gerald Thompson Says:          "NO"
   Plaintiff Says:                          "YES"

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

iv

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Case(s)**                                                                                                    **Page(s)**

Bahdouchi v. Third Eye, Inc.,
  No. 04-CV-l2997-DT, (January 21, 2005)
  (Honorable Robert Cleland) .............................................................................. 10

FTC v. Moses,
  913 F.3d 297, 307 (2d Cir. 2019) .................................................................... 22

Overstreet v. Lexington-Fayette Urban County Government,
  305 F.3d 566 (2002) .......................................................................................... 23

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 65................................................................................................. 5, 21

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

v

NOW COMES Defendant, GERALD THOMPSON, and for his Response in Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. 3) and to dissolve the TRO (Dkt. 10) states as follows:

## DEFENDANT THOMPSON CONCURS WITH AND JOINS IN THE BRIEF OF YFLF

Defendant Gerald Thompson joins with and concurs in the Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction, and to Dissolve the TRO as filed by co-Defendant Youth Financial Literacy Foundation (YFLF).

Yet, Defendant Thompson also files his own response highlighting his relationship to the other Defendants, as well as additional arguments specific to himself. Defendant Thompson is sued herein solely because he is the President/Director of Defendant YFLF, a 501(c)(3) exempt corporation. ECF No. 1, PageID.9, para 16. He is sued in no other official capacity.

As such, his fate is tied in part for the purposes of this motion, to that of YFLF who's Brief in opposition he joins. Yet, he presents additional arguments as follows.

## STANDARD OF REVIEW

A district court must weigh the following factors for a preliminary injunction: (1) the likelihood of success on the merits, (2) irreparable injury, (3) whether the injunction would cause substantial harm to others (balance of equities), and (4) public interest. <u>Civil Liberties Union Fund of Mich. v.</u>

PENTIUK, COUVREUR & KOBILJAK, P.C. · ATTORNEYS AND COUNSELLORS AT LAW · EDELSON BUILDING, SUITE 200 · 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 · (734) 281-7100

1

Livingston Cty., 796 F.3d 636, 642 (6th Cir. 2015), cert. denied, 136 S. Ct. 1246 (2016).

## FACTUAL BACKGROUND

The Plaintiff named Defendant Gerald Thompson in this suit because he is President of YFLF. That fact is merely the beginning of the factual story. What is unpled is that Mr. Thompson is an unpaid volunteer. He is not an employee. He received no wage as President. He is uncompensated by YFLF. He has no office at the corporate location. He has no hours or fixed hours he is required to be present. He signed corporate tax returns prepared by YFLF tax professionals. His digital signature automatically appears on YFLF checks without him seeing them, which is not at all unusual for a corporation. He also signs the annual Form 990 return for YFLF usually prepared by another. He was not involved in the daily operations of YFLF. He performed no operational oversight. He chaired no meetings. He did not make policy or implement policy. As a Director of YFLF he would attend sporadic Board meetings, but the last meeting of the Board was in 2013.

Mr. Thompson is also a licensed attorney. His law firm provided legal service to YFLF and FES. These services related to corporate transactions and compliance. He filed corporate annual reports, assumed name certificates, corporate filings, amended articles, etc. He drafted bylaws, Independent agent

2

and employee policies and procedures. (He also served as Resident Agent for both YFLF and FES, but this was purely in his legal advisor capacity.) In fact, everything done by him in connection with either YFLF or FES was done in his capacity as legal counsel, at the request of or according to instructions given by his clients. Such legal services included, without limitation, serving as a director and the President of YFLF for the convenience of the client.

As an attorney, Mr. Thompson is well versed in non-profit and tax exempt law. He provided legal counsel in this area and was compensated through his law firm, which billed for its transaction and compliance legal service. This arrangement was eventually reduced to providing legal services as an attorney on a weekly retainer for the administrative convenience of the parties. This is a typical attorney-client relationship, and there is nothing nefarious about it. ECF No. 5-28, PageID.1607.  This is the summation of his "involvement."

Yet the FTC alleges that he as President, "had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or had an awareness of a high probability of fraud with an intentional avoidance of the truth."  ECF No. 3, PageID.146. This is simply not the case. In short, Mr. Thompson advised the client in many matters, but the decisions were made exclusively by the client. He was a counselor, not a manager.

3

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

## ARGUMENT

**A.     The TRO's Entry On An *Ex-Parte* Basis Was Legally Deficient Warranting an Order Setting it Aside.**

In obtaining its *ex parte* Temporary Restraining Order, the FTC plead that "The State of Georgia sued Financial Education Services, Michael Toloff, and Parimal Naik in May 2019 for unlawful credit repair services and pyramid scheme activities. (PX24 at 41 ¶ 141, Att. WW at 919-44; See also, PX01 at 4-5 ¶14, Att. F at 32.)"[1] EFC No. 3, pageID.87. Looking at ECF No. 5-28, PageID.1602, the undersigned legal counsel's name and contact information is easily seen as representing Youth Financial Literacy Foundation and Mr. Gerald Thompson at his Georgia Deposition in that proceeding.

Having knowledge of the Georgia litigation, including the Deposition of Gerald R. Thompson (Attachment VV) and the Consent Judgment and Injunction (Attachment XX) clearly identifying undersigned counsel, it stands to

---

[1] The reference to PX24 is the Declaration of FTC Investigator Michael B. Goldstein. He declared that:

"The Georgia Office of Consumer Protection conducted an investigation of the Defendants and ultimately filed a lawsuit against them on May 28, 2019, State of Georgia v. Financial Education Services, Inc., et al. True and correct copies of documents from that investigation, lawsuit, and related actions are appended as follows: . . .

e. Deposition of Gerald R. Thompson (Attachment VV);

f. Complaint (Attachment WW);

g. Consent Judgment and Injunction (Attachment XX)." ECF No. 5-24, PageID.775.

4

reason that *ex-parte* relief would not be warranted.  Defendant's counsel should have received notice.

Yet, despite this actual knowledge, the FTC nevertheless averred as a basis justifying *ex-parte* relief that "4. The FTC has no information or belief as to the identity of counsel representing Defendants in connection with the allegations alleged in the FTC's complaint. The FTC has not attempted to provide notice to Defendants—nor should notice be required—for the reasons set forth herein." ECF No. 3-1, PageID.158.

Defendant asks this Court to consider this incongruity. YFLF and Mr. Thompson should have been given notice of the litigation and an *ex-parte* motion seeking a TRO averring as much should have been denied to allow this matter to proceed with notice.[2]  Certainly the FTC knew of legal counsel's identity, address and phone number prior to the action.

While Defendant recognizes that this Court may entertain other factors as urged upon it by the Plaintiff, Defendant maintains that a close reading of Plaintiff's concern about asset dissipation establish only that they are speculative fears regarding *possible* dissipation of assets. These speculative fears about what Defendants may do in this case are only grounded in the FTC's "experience"

---

[2]  Defendant is likewise unaware if the FTA made "any efforts . . . to give notice . . . ." Fed. R. Civ. P. 65(b).

PENTIUK, COUVREUR & KOBILJAK, P.C.  •  ATTORNEYS AND COUNSELLORS AT LAW  •  EDELSON BUILDING, SUITE 200  •  2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192  •  (734) 281-7100

that such dissipation "often" occurs, rather than the specific facts of this case that dissipation is substantially likely to occur.[3]  No such experience justifies the entry of an *ex-parte* TRO here.  Accordingly the TRO should be dissolved, as well as for those reasons pled by co-defendant.

**B.    Since YFLF Is Exempt From CROA, Defendant Thompson as its President is Likewise Exempt.**

The Credit Repair Organizations Act (CROA), 15 U.S.C. § 1679 et seq., effective April 1, 1997, imposes restrictions on credit repair organizations, including forbidding the making of untrue or misleading statements and forbidding advance payment, before services are fully performed. 15 U.S.C. § 1679b. Significantly, section 501(c)(3) non-profit organizations are excluded from regulation under the CROA.

The CROA defines a credit repair organization as:

The term "credit repair organization"—
(A) means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—
        (i) improving any consumer's credit record, credit history, or credit rating; or

---

[3]  "It has been the FTC's *experience* that FTC defendants who have engaged in deceptive schemes and who receive notice of the filing of an action by the FTC or of the FTC's intent to file an action alleging consumer deception, *often* attempt to undermine the FTC's efforts by dissipating or concealing assets." ECF No. 3-1, PageID.159.

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i); and

(B) does not include—

**(i) any nonprofit organization which is exempt from taxation under section 501(c)(3) of title 26**;

(ii) any creditor (as defined in section 1602 of this title), with respect to any consumer, to the extent the creditor is assisting the consumer to restructure any debt owed by the consumer to the creditor; or

(iii) any depository institution (as that term is defined in section 1813 of title 12) or any Federal or State credit union (as those terms are defined in section 1752 of title 12), or any affiliate or subsidiary of such a depository institution or credit union.

15 U.S.C. § 1679a(3). The Federal Trade Commission's policy is that if an entity communicates with consumers in any way about the consumers' credit situation, it is providing a service covered by the CROA. In Re National Credit Management Group. LLC, 21 F. Supp. 2d 424, 458 (N.D.N.J. 1998).

Yet, under the unambiguous text of the statute, a credit repair organization does not include a tax exempt 501(c)(3) non-profit organization, a creditor or a depository institution. On December 31, 2003, MSU Common Sense Inc., as YFLF was then known, received a determination from the Internal Revenue Services ("IRS") that it was exempt from federal income tax under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(3). A copy of the December 31, 2003 letter from the IRS is attached hereto as Exhibit "A."

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

The IRS reconfirmed this 501(c)(3) classification for YFLF in August 23, 2010 after its most recent name change to YFLF. A copy of the August 23, 2010 letter from the IRS is attached hereto as Exhibit "B." To date YFLF has maintained its 501(c)(3) status.

To be clear, YFLF is not an "exempt" credit repair organization, but rather it is not a credit repair organization at all.  As such, CROA in its entirety does not apply to YFLF. Likewise, the statutory prohibition against charging an advanced fee only applies to a "credit repair organization."  15 U.S. Code § 1679b(b). There is no advanced fee prohibition applicable to non-credit services organizations or exempt organizations.  So in YFLF's case, the advanced fee stipulation is non-applicable and irrelevant.

The importance of this benefit has raised a question of whether an organization will qualify for immunity under CROA based solely on a Section 501(c)(3) determination letter from the Service or whether the organization must also establish it is incorporated under state law as a non-profit. This was the issue raised in <u>Zimmerman v. Cambridge Credit Counseling,</u> 322 F Supp 2d 95, 2004 WL 1447342 322 F. Supp. 2d 95 (D. Mass. 2004) rev'd, 409 F3d 473 (1st Cir. 2005). The district court held that determination by the Service that the organization was exempt under Section 501(c)(3) established its immunity from

claims under CROA and held further that the plaintiffs did not have standing to challenge the exempt status of Cambridge Credit Counseling.[4]

The First Circuit reversed the district court's decision, holding that the language of CROA §1679a(3)(b)(i) established that a credit counseling organization would be immune from suit only if it were *both* a nonprofit organization and a Section 501(c)(3) organization. In the instant case, however, Plaintiff itself alleges that YFLF "is a Michigan nonprofit corporation with its principal place of business at 37637 Five Mile Road, Suite 397, Livonia, Michigan. Youth Financial was originally incorporated as MSU Common Sense, Inc., which changed its name to The Thompson Scholarship Foundation, Inc., which changed its name to Patro Scholarship Foundation, Inc., which changed

---

[4] "If courts possessed the power, as plaintiffs suggest, to go behind the IRS's designation and proceed to make their own independent determinations, on a case-by-case basis, of an entity's substantive classification according to section 501(c)(3), the uncertainty not only for the entity itself, but for all persons or parties dealing with it, would be almost boundless. An entity might enjoy 501(c)(3) for some purposes and not for others, or before some courts and not others. Every 501(c)(3) entity would have to be on guard for the possibility that at some future date, in some discrete piece of litigation, some action or some failure to act on its part might be construed as justifying forfeiture of some of the myriad protections afforded by 501(c)(3) status. Much is gained by giving the IRS exclusive power to award 501(c)(3) status and, where appropriate, to remove that status. Much would be lost by making an entity's 501(c)(3) status, and subsequent statutory protections, dependent on any trial court's ad hoc determinations." Zimmerman v. Cambridge Credit Counseling, 322 F. Supp. 2d 95, 100 (D. Mass. 2004).

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

its name to Youth Financial." ECF No. 1, PageID.7. Thus YLF meets both the

CROA exemption criteria *as a matter of law*.

Moreover, even if the First Circuit's *Zimmerman* decision is broadly

applied to somehow open the door for the FTC to enlist the court to undertake an

"ad hoc determination" challenging YFLF's non-profit status, the FTC has failed

to even plead such a count in its complaint.[5]  The issue of YFLF's fidelity to its

non-profit incorporated state is not before the court, either directly or indirectly.

Indeed, the Honorable Robert J. Cleland rejected a similar invitation in

Bahdouchi v. Third Eye, Inc., No. 04-CV-l2997-DT, (January 21, 2005) ("The

---

[5] *Zimmerman* is non-precedential in this case because it can be distinguished on its facts. The FTC's failure to plead is easily distinguished from the *Zimmerman* trial court's ultimate determination on remand from the First Circuit.  In that remand the trial court found that Defendant's failure to respond to requests to admit warranted the court ruling that the requests were admitted. As a result of this awkward procedural ruling, Defendants were deemed to have admitted that they did not operate as a non-profit.  But such a procedural posture there lends no support for the FTC here.  Zimmerman v. Cambridge Credit Counseling Corp., 529 F. Supp. 2d 254, 277 (D. Mass. 2008), aff'd sub nom. Zimmerman v. Puccio, 613 F.3d 60 (1st Cir. 2010).  Moreover in that case liability also turned on piercing the corporate veil to support a Section 1679b(a)(3) violation, a situation not present in the instant case. 613 F.3d at 73.  Finally, FTC's authority is limited to its statute which does not authorize it to contest the Michigan's Department of Licensing and Regulatory Affairs recognition of YFLF as a non-profit corporation.   MCL 450.2106 itself solves the Zimmerman dilemma because the validity of YFLF as a non-profit corporation itself turns on its qualification as a 501(c)(3) IRS exempt entity. "Sec. 106. (1) "Charitable purpose corporation" means a domestic corporation that meets any of the following: (a) Is recognized by the United States internal revenue service as exempt or qualifies for exemption under section 501(c)(3) of the internal revenue code of 1986, 26 USC 501."

10

issue of whether Defendants misled the IRS or are not properly carrying out their purported philanthropic mission is not properly before the court. That issue is between Defendants and the IRS. There may be doubt as to whether Defendants continue to deserve their tax exempt status, but this Plaintiff has no standing to challenge Defendants' status." Doc # 20 Filed 01/21/05 Pg 11 of 14 Pg ID 560) See Exhibit "C".

Moreover, even if the FTC could challenge YFLF's non-profit status essentially stepping into the shoes of the Michigan's Department of Licensing and Regulatory Affairs, MCL 450.2106 itself blocks the *Zimmerman* appeal court's approach. The validity of YFLF as a non-profit corporation itself under Michigan law turns on its qualification as a 501(c)(3) IRS exempt entity. "Sec. 106. (1) "Charitable purpose corporation" means a domestic corporation that meets any of the following: (a) Is recognized by the United States internal revenue service as exempt or qualifies for exemption under section 501(c)(3) of the internal revenue code of 1986, 26 USC 501." In other words, the legal hallmark of a Michigan non-profit is its federal tax exempt status. The FTC cannot attack YFLF's non-profit status without also attacking its federal tax exception, which is solely for the IRS to determine.

Therefore, returning to the main argument, since none of the alleged CROA violations in the Plaintiff's complaint apply to YFLF, none can possibly

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

apply to Mr. Thompson as its President.  As President of a Michigan non-profit and IRS tax exempt organization, Mr. Thompson has no duty whatsoever to comply with CROA.  Further, the FTC cannot challenge the status of YFLF as an organization exempt from CROA because notwithstanding the FTC's "common enterprise" argument, it lacks standing to challenge YFLF's status as a 501(c)(3) organization and has simply not plead any counts (nor could it) that challenge its Michigan non-profit status, likewise based on IRS exempt status.

Only the IRS, not the FTC has jurisdiction to challenge the IRS's determination of YFLF as an exempt entity.  The FTC cannot plead YFLF's way into any violation of 5 U.S.C. § 1679a(3)(b)(i) by mere disagreement with the IRS's exclusive determination. Frankly, whether YFLF was or was not operated exclusively for exempt purposes is none of the FTC's business. The IRS has not been sleeping.  It can police its own determinations.[6]  As such, Counts 4–11 must fail as a matter of law.  Plaintiff has no likelihood of success on the merits regarding any of these CROA related claims.

---

[6]  IRS reviews are described in a series of documents issued in May 2006. Internal Revenue Service, Executive Summary Credit Counseling Compliance Project, 2006 TNT 94-10 (May 15, 2006); Internal Revenue Service, Credit Counseling Compliance Project Frequently Asked Questions, 2006 TNT 94-11 (May 15, 2006); IRS News Release IR-2006-80 (May 15, 2006), IRS Takes Steps on Credit Counseling Groups Following Widespread Abuse, at 2006 TNT 94-9. See also, Treasury Inspector General for Tax Administration, Final Audit Report—Abuses in the Tax-Exempt Credit Counseling Industry Are Being Addressed, but Further Actions Are Needed To Ensure Overall Industry Compliance (Audit # 200510020), at 2006 TNT 100-19 (May 2006).

**C.    Defendant Thompson is Neither a Telemarketer nor Seller Under the Telemarketer Sales Rule**.

Plaintiff alleges that "103. Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as those terms are defined in the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg). TSR." ECF No. 1, PageID.42. Under the Telemarketing Sales Rule (TSR), a "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a consumer or donor. 16 C.F.R. § 310.2(ff). A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration. 16 C.F.R. § 310.2(dd).

The Plaintiff has presented no support in its complaint or exhibits that Defendant Thompson as YFLF's President ever made or received a single phone call, or that he did so to a consumer or donor, or that he did so in connection with telemarketing. There is no record evidence that he engaged in a telemarketing transaction or specifically did anything as a "seller."

As noted, Mr. Thompson is President of YFLF, but is an unpaid volunteer. He is not an employee. He received no wage. He is uncompensated. He has no office at the corporate location. He has no hours or fixed hours he is required to be present. He signed corporate returns and his digital signature automatically appears on YFLF checks. He signed the annual Form 990 return for YFLF. He

13

was not involved in the daily operations of YFLF and performed no operational oversight. As a Director of YFLF he would attend sporadic Board meeting. The last meeting of the Board was in 2013.

Mr. Thompson is also a licensed attorney.  His firm provided legal service to YFLF.  These services relate to corporate transactions and compliance. He filed corporate annual reports, assumed name certificates, corporate filings, amended articles, etc. He drafted bylaws, independent agent and employee policies and procedures.  Mr. Thompson is well versed in non-profit and tax exempt law.  He provided legal counsel in this area and was compensated through his law firm, which billed for its transaction and compliance legal service.  This arrangement was eventually reduced to providing legal services as an attorney on a monthly retainer for the administrative convenience of the parties. This is a typical attorney-client relationship. ECF No. 5-28, PageID.1607.

The FTC is aware of these legal services as it submitted Mr. Thompson's Georgia deposition taken under oath as an exhibit to its complaint. ECF No. 5-28, PageID.1606 (See Deposition of Gerald Thompson, February 24, 2016). ECF No. 5-28, PageID.1601 et al.  Regarding the functions he performed as an attorney, Mr. Thompson is beyond the jurisdiction or reach of the TSR or any allegation made by the FTC in this matter.

14

Nevertheless, the telemarketer sales rule only applies to the use of a telephone to solicit customers. YFLF only maintained websites as a means of marketing, and websites are not covered by the TSR. To the extent telemarketing occurred, if at all, in connection with credit repair activities, it would have been *wrongly* done exclusively by independent sales representatives, or ISR's. YFLF's ISR's were only "authorized to refer potential customers to a website approved by YFLF for the purpose of customer enrollment for credit restoration services." They were "not authorized to act on behalf of YFLF for any other purpose." See Exhibit "D" (Youth Financial Literacy Foundation Independent Sales Representative Agreement Marketing Agreement, effective 2015). Agents were only authorized to refer potential customers to an approved website. They were never authorized to make telephone sales calls.

Thus, none of the misrepresentations or misconduct of the ISR's can be attributed to Mr. Thompson as President of YFL. Nor can any of Plaintiff's allegations that ISR's were "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as those terms are defined in the TSR, be attributable to YFLF or Mr. Thompson when the actual agent agreement specifically states that agents are not authorized to do anything other than refer potential consumers to a *website*. Therefore, TSR related Counts 12-15 are without legal merit and must

15

fail as a matter of law against Mr. Thompson. Plaintiff has no likelihood of success on the merits regarding any of its TSR claims.

**D.     The FTC Fails To Allege Any Illegal Pyramid Involving Defendant Thompson.**

Plaintiff's general factual allegation about pyramid schemes in paragraphs 37-60 of its complaint are exclusively directed to FES. ECF No. 1, PageID.19-31.  They are not directed toward YFL or Mr. Thompson as its President. Neither YFLF nor Mr. Thompson are even mentioned or plead. Likewise, Count 2 alleges an illegal pyramid consisting of two conclusory paragraphs which add no new information and likewise never mentions YFLF or Mr. Thompson specifically. This failure to plead is more than enough to warrant dismissal under Fed. R. Civ. P. 12. It is therefore; certainly enough for this Court to find that Count 2 is without legal merit as to Mr. Thompson and that Plaintiff has no likelihood of success on the merits regarding its pyramid claim.

**E.     The FTC Fails To Allege Any Specific Violation Of 15 U.S.C. § 45(a) Pertaining To Defendant Thompson.**

The remaining counts likewise reflect no reasonable likelihood of success of the merits. Count 1 (Misrepresentations Regarding Credit Repair Services), Count 2 as noted (Illegal Pyramid) and Count 3 (Misrepresentations Regarding Investment Opportunities) all allege a violation of 15 U.S.C. § 45(a). That section defines unfair *methods of competition* in or affecting commerce, and

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

unfair or deceptive acts or practices in or affecting commerce, and then asserts they are "declared unlawful." The balance of the section deals with the Commission's administrative authority to prevent persons and "from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce."[7]

Recall that in argument 4 *supra*, all of the allegations regarding Count 2 pertained to FES only and, as such, were irrelevant to state a claim or establish a substantial likelihood of Plaintiff prevailing against Defendant Thompson. The same reasoning applies to Counts 1 and 3, as they all point to the same alleged statutory violation--15 U.S.C. § 45(a).[8]

---

[7] 15 U.S.C. § 45(a) states in relevant part:
(1)Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.
(2)The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.
(3)This subsection shall not apply to unfair methods of competition involving commerce with foreign nations (other than import commerce) unless— . . .
(4) (A)For purposes of subsection (a), the term "unfair or deceptive acts or practices" includes such acts or practices involving foreign commerce that . . . .

[8] The FTC notes in its research that Mr. Thompson was at one time Director and Secretary for FES, but these positions held back in 2011 and 2013, are too distant in time to be relevant in this case. ECF No. 5-24, PageID.758. As such, the FTC only chose to allege his YFLF rather than FES relationship for purposes of its complaint. ECF No. 1, PageID.9, para 14.

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

FES is responsible for all aspects of the business opportunity, none of which was handled by YFLF. Thus, as President of YFL Thompson played no part in the management, organization or (mis)representation of the business opportunity, and those counts of the complaint simply do not apply to him. Therefore, Counts 1-3 are without legal merit and must fail as a matter of law against Mr. Thompson. Plaintiff has no likelihood of success on the merits regarding any of its FTC statutory claims under 15 U.S.C. § 45(a).

## F.    The Preliminary Injunction Standards Are Not Met.

Applying all of the forgoing argument to the preliminary injunction standards, it is clear that the FTC's instant motion must fail. To show a likelihood of ultimate success, the FTC must raise questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." F.T.C. v. Butterworth Health Corp., 946 F. Supp. 1285, 1289 (W.D. Mich. 1996) (internal quotation omitted), aff'd, 121 F.3d 708 (6th Cir. 1997). Concerning Mr. Thompson, the FTC has not satisfied this standard.

The FTC tries to meet its "Irreparable Harm Exists" burden by alleging that Defendants have violated the FTC Act, CROA, and the Telemarketing Sales Rule. ECF No. 3, PageID.139. The FTC asserts that mere allegations get it past

18

the goal line. But as stated below, CROA does not apply to YFLF because it is both a 501(c)(3) and a non-profit organization. Therefore, CROA does not apply to Thompson as its President. The Telemarketing Sales Rule likewise does not apply to YFLF or Thompson because its independent agents were only contractually authorized to refer customers to an approved website, and not to make any telephone calls whatsoever. Nor does the FTC Act apply because its section 5 allegations in the Complaint are only directed against FES, not YFLF or Mr. Thompson.

Regarding the "harm to others" element, the FTC bets the farm on its argument that "[b]ecause the injunction will preclude only harmful, illegal behavior, the public equities supporting the proposed injunctive relief outweigh any burden imposed by such relief on Defendants." ECF No. 3, PageID.143. The equities are wildly misbalanced. Since the FTC Act, CROA, and the Telemarketing Sales Rule, as noted above, have no application to Defendant Thompson, whatever "harmful" or "illegal behavior" may be alleged has no nexus to him. No balancing against Thompson's interest even applies.

As to the fourth element concerning the protection of the public interest, the FTC notes that the "public interest in ensuring the enforcement of federal consumer protection laws is strong." (citations omitted). It further claims a public interest "in halting Defendants' unlawful conduct, preserving evidence,

19

and preserving assets to provide redress to consumers." Of course, the FTC could have provided notice to the Defendants and directed them to preserve evidence subject to sanction for failure to do so. Courts have fashioned a common law duty to preserve evidence which, with rare exceptions, is addressed in federal court through exercise of a court's inherent power. So the FTC's argument is not really a "public interest" one.

Likewise preserving assets for "redress to consumers" is unlikely as typical judgments, consent or otherwise, have historically ended up in the FTC's pocket. As to actually protecting real consumers that were being served within the law up to the moment the FTC and receiver entered the business premises, marched all employees out the door, and shut down all activities, left real consumers with no recourse to continue enjoying the products they purchased. The FTC produces no testimonial of any such consumers or their harm caused by the receiver.

Moreover the FTC was well aware that the "Protection Plan" included at least 11 separate services including many non-credit repairs items such as a will and trust service and a savings goal planner. ECF No. 5-24, PageID.777. ECF No. 3, PageID.112. "An injunction is 'overly broad' when there is a risk that it restrains legal conduct, or the injunction prohibits illegal conduct that is not the subject of the litigation or is not closely related to the conduct found to justify

20

injunctive relief. Fed. R. Civ. P. 65. <u>Union Home Mortgage Corporation v. Cromer</u>, 31 F.4th 356, 363 (Sixth Cir. 2022). By enjoining FTC unregulated non-credit services, the TRO and proposed injunction are overly broad. Even so, the TRO provided that the receiver could "T. Suspend business operations of the Receivership Entities if in the judgment of the Receiver such operations cannot be continued legally and profitably." ECF No. 10, PageID.2263. Yet the temporary receiver suspended all business activities hurting the very non-credit consumers the FTC claims to protect.

In any event, an asset freeze as applied to Mr. Thompson's own personal bank account is completely unwarranted in balancing the equities or as a means to protect the public by ordering an asset freeze.[9] As previously asserted, as President of YFLF he was an uncompensated volunteer. He was not even an employee. He was not involved in the daily operations of YFLF and performed no operational oversight. As a licensed attorney, he rendered legal services and was paid for those services. He provided advice and counsel only, and did not participate in his clients' business or legal decisions, nor did he manage their affairs.

---

[9] The TRO also provides that "Any party, person, or entity (except the FTC) seeking recovery from the Receiver or any Retained Personnel for conduct in the course of the administration of the estate must first obtain leave from this Court." ECF No. 10, PageID.2270.

21

Despite his narrow figurehead involvement, the FTC tries to reach all of Mr. Thompson's assets.  Just to subsist at a basic level, he proposed to the receiver's legal counsel on June 1, 2022, to release a portion of his assets to allow him to pay unobjectionable common personal and household expenses, but such permission has not been granted. Perhaps the receiver will have a change in heart before the June 30, 2022 hearing.  See Exhibit "E."

Even so, the FTC admits that the relief it now seeks must first "demonstrate that the defendant had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or had an awareness of a high probability of fraud with an intentional avoidance of the truth."  *Citing* FTC v. Moses, 913 F.3d 297, 307 (2d Cir. 2019). ECF No. 3, PageID.146. Nothing in the forgoing nominal description of what Mr. Thompson actually did, however, comes close to "actual knowledge" or "reckless" or an awareness of a "high probability of fraud."

As such, the FTC meets none of the four injunction factors pertaining to Defendant Thompson. Nor is an asset freeze of his assets likely to find "a strong likelihood of success on the merits." Blue Cross & Blue Shield Mut. Of Ohio v. Blue Cross and Blue Shield Association v. Columbia/HCA Healthcare Corporation, 110 F.3d 318 (1997). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of

22

proving that the circumstances clearly demand it." <u>Overstreet v. Lexington-Fayette Urban County Government,</u> 305 F.3d 566 (2002).

<b><u>CONCLUSION</u></b>

For the reasons stated, Mr. Thompson prays this Court deny Plaintiff's Motion for a Preliminary Injunction, dissolve the TRO, and direct that all of his assets, property and accounts, either frozen, acquired or controlled by the receiver be immediately returned to him by the receiver. In the alternative, Defendant prays that the Court would order the temporary receiver to immediately release his assets to such an extent that allows him to pay common personal and household expenses as requested to the receiver on June 1, 2022. Exhibit "E". Otherwise Mr. Thompson will not be able to pay his mortgage or utilities, pay for his post liver transplant medication and health care, or buy groceries. This cannot be what balancing the equities requires.

Respectfully Submitted,

PENTIUK, COUVREUR &
 KOBILJAK, P.C.

By: <u>/s/Kerry L. Morgan</u>
Kerry L. Morgan (P32645)
*Attorneys for Defendant,*
 *Gerald Thompson*
2915 Biddle Avenue, Suite 200
Wyandotte, MI  48192
Telephone:  734-281-7100
Fascimile:   734-281-7102
Email: <u>Kmorgan@pck-law.com</u>

23

PENTIUK, COUVREUR & KOBILJAK, P.C. • ATTORNEYS AND COUNSELLORS AT LAW • EDELSON BUILDING, SUITE 200 • 2915 BIDDLE AVENUE, WYANDOTTE, MICHIGAN 48192 • (734) 281-7100

## CERTIFICATE OF SERVICE

I hereby certify that, on June 27, 2022, a true and correct copy of the foregoing was served on all counsel of record via ECF.

/s/ *Kerry L. Morgan*
Kerry L. Morgan

24

## <u>TABLE OF EXHIBITS</u>

IRS LETTER DATED DECEMBER 31, 2003 ......................................EXHIBIT A

IRS LETTER DATED AUGUST 23, 2010............................................EXHIBIT B

<u>BAHDOUCHI v. THIRD EYE, INC.</u>
  ORDER GRANTING DEFENDANT'S "MOTION TO
  DISMISS" AND DENYING PLAINTIFF'S "MOTION
  FOR LEAVE TO AMEND"................................................................EXHIBIT C

YOUTH FINANCIAL LITERACY FOUNDATION
  INDEPENDENT SALES REPRESENTATIVE AGREEMENT .........EXHIBIT D

LETTER REGARDING RELEASE OF FUNDS…………………….EXHIBIT E

# EXHIBIT A

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH  45201

DEPARTMENT OF THE TREASURY

Date: DEC 3 1 2003

MSU COMMON SENSE INC
C/O ROBERT R THOMPSON
39555 ORCHARD HILL PL STE 205
NOVI, MI  48375-0000

Employer Identification Number:
 80-0056165
DLN:
 17053282028023
Contact Person:
 MRS. Y. NOBLES          ID# 75095
Contact Telephone Number:
 (877) 829-5500
Accounting Period Ending:
   December 31
Foundation Status Classification:
   509(a)(1)
Advance Ruling Period Begins:
   April 7, 2003
Advance Ruling Period Ends:
   December 31, 2007
Addendum Applies:
   No

Dear Applicant:

    Based on information you supplied, and assuming your operations will be as
stated in your application for recognition of exemption, we have determined you
are exempt from federal income tax under section 501(a) of the Internal Revenue
Code as an organization described in section 501(c)(3).

    Because you are a newly created organization, we are not now making a
final determination of your foundation status under section 509(a) of the Code.
However, we have determined that you can reasonably expect to be a publicly
supported organization described in sections 509(a)(1) and 170(b)(1)(A)(vi).

    Accordingly, during an advance ruling period you will be treated as a
publicly supported organization, and not as a private foundation.  This advance
ruling period begins and ends on the dates shown above.

    Within 90 days after the end of your advance ruling period, you must
send us the information needed to determine whether you have met the require-
ments of the applicable support test during the advance ruling period.  If you
establish that you have been a publicly supported organization, we will classi-
fy you as a section 509(a)(1) or 509(a)(2) organization as long as you continue
to meet the requirements of the applicable support test.  If you do not meet
the public support requirements during the advance ruling period, we will
classify you as a private foundation for future periods.  Also, if we classify
you as a private foundation, we will treat you as a private foundation from
your beginning date for purposes of section 507(d) and 4940.

    Grantors and contributors may rely on our determination that you are not a
private foundation until 90 days after the end of your advance ruling period.
If you send us the required information within the 90 days, grantors and
contributors may continue to rely on the advance determination until we make

Letter 1045 (DO/CG)

-2-

MSU COMMON SENSE INC

a final determination of your foundation status.

If we publish a notice in the Internal Revenue Bulletin stating that we will no longer treat you as a publicly supported organization, grantors and contributors may not rely on this determination after the date we publish the notice. In addition, if you lose your status as a publicly supported organization, and a grantor or contributor was responsible for, or was aware of, the act or failure to act, that resulted in your loss of such status, that person may not rely on this determination from the date of the act or failure to act. Also, if a grantor or contributor learned that we had given notice that you would be removed from classification as a publicly supported organization, then that person may not rely on this determination as of the date he or she acquired such knowledge.

If you change your sources of support, your purposes, character, or method of operation, please let us know so we can consider the effect of the change on your exempt status and foundation status. If you amend your organizational document or bylaws, please send us a copy of the amended document or bylaws. Also, let us know all changes in your name or address.

As of January 1, 1984, you are liable for social security taxes under the Federal Insurance Contributions Act on amounts of $100 or more you pay to each of your employees during a calendar year. You are not liable for the tax imposed under the Federal Unemployment Tax Act (FUTA).

Organizations that are not private foundations are not subject to the private foundation excise taxes under Chapter 42 of the Internal Revenue Code. However, you are not automatically exempt from other federal excise taxes. If you have any questions about excise, employment, or other federal taxes, please let us know.

Donors may deduct contributions to you as provided in section 170 of the Internal Revenue Code. Bequests, legacies, devises, transfers, or gifts to you or for your use are deductible for Federal estate and gift tax purposes if they meet the applicable provisions of sections 2055, 2106, and 2522 of the Code.

Donors may deduct contributions to you only to the extent that their contributions are gifts, with no consideration received. Ticket purchases and similar payments in conjunction with fundraising events may not necessarily qualify as deductible contributions, depending on the circumstances. Revenue Ruling 67-246, published in Cumulative Bulletin 1967-2, on page 104, gives guidelines regarding when taxpayers may deduct payments for admission to, or other participation in, fundraising activities for charity.

You are not required to file Form 990, Return of Organization Exempt From Income Tax, if your gross receipts each year are normally $25,000 or less. If you receive a Form 990 package in the mail, simply attach the label provided, check the box in the heading to indicate that your annual gross receipts are normally $25,000 or less, and sign the return. Because you will be treated as a public charity for return filing purposes during your entire advance ruling period, you should file Form 990 for each year in your advance ruling period

-3-

MSU COMMON SENSE INC

that you exceed the $25,000 filing threshold even if your sources of support do not satisfy the public support test specified in the heading of this letter.

If a return is required, it must be filed by the 15th day of the fifth month after the end of your annual accounting period. A penalty of $20 a day is charged when a return is filed late, unless there is reasonable cause for the delay. However, the maximum penalty charged cannot exceed $10,000 or 5 percent of your gross receipts for the year, whichever is less. For organizations with gross receipts exceeding $1,000,000 in any year, the penalty is $100 per day per return, unless there is reasonable cause for the delay. The maximum penalty for an organization with gross receipts exceeding $1,000,000 shall not exceed $50,000. This penalty may also be charged if a return is not complete. So, please be sure your return is complete before you file it.

You are not required to file federal income tax returns unless you are subject to the tax on unrelated business income under section 511 of the Code. If you are subject to this tax, you must file an income tax return on Form 990-T, Exempt Organization Business Income Tax Return. In this letter we are not determining whether any of your present or proposed activities are unre- lated trade or business as defined in section 513 of the Code.

You are required to make your annual information return, Form 990 or Form 990-EZ, available for public inspection for three years after the later of the due date of the return or the date the return is filed. You are also required to make available for public inspection your exemption application, any supporting documents, and your exemption letter. Copies of these documents are also required to be provided to any individual upon written or in person request without charge other than reasonable fees for copying and postage. You may fulfill this requirement by placing these documents on the Internet. Penalties may be imposed for failure to comply with these requirements. Additional information is available in Publication 557, Tax-Exempt Status for Your Organization, or you may call our toll free number shown above.

You need an employer identification number even if you have no employees. If an employer identification number was not entered on your application, we will assign a number to you and advise you of it. Please use that number on all returns you file and in all correspondence with the Internal Revenue Service.

If we said in the heading of this letter that an addendum applies, the addendum enclosed is an integral part of this letter.

Because this letter could help us resolve any questions about your exempt status and foundation status, you should keep it in your permanent records.

We have sent a copy of this letter to your representative as indicated in your power of attorney.

Letter 1045 (DO/CG)

-4-

MSU COMMON SENSE INC

    If you have any questions, please contact the person whose name and
telephone number are shown in the heading of this letter.

                              Sincerely yours,

                              Lois G. Lerner
                              Director, Exempt Organizations
                              Rulings and Agreements

Form 872-C

EXHIBIT B

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH  45201

DEPARTMENT OF THE TREASURY

Date: AUG 23 2010

YOUTH FINANCIAL LITERACY FOUNDATION
C/O ROBERT R THOMPSON
39555 ORCHARD HILL PL STE 205
NOVI, MI  48375

Employer Identification Number:
 80-0056165
DLN:
 300218001
Contact Person:
 FAITH E CUMMINS            ID# 31534
Contact Telephone Number:
 (877) 829-5500
Public Charity Status:
 509(a)(2)

Dear Applicant:

Our letter dated January 2004, stated you would be exempt from Federal
income tax under section 501(c)(3) of the Internal Revenue Code, and you would
be treated as a public charity, rather than as a private foundation, during
an advance ruling period.

Based on the information you submitted, you are classified as a public charity
under the Code section listed in the heading of this letter.  Since your
exempt status was not under consideration, you continue to be classified as
an organization exempt from Federal income tax under section 501(c)(3) of the
Code.

Publication 557, Tax-Exempt Status for Your Organization, provides detailed
information about your rights and responsibilities as an exempt organization.
You may request a copy by calling the toll-free number for forms,
(800) 829-3676.  Information is also available on our Internet Web Site at
www.irs.gov.

If you have general questions about exempt organizations, please call our
toll-free number shown in the heading.

Please keep this letter in your permanent records.

Sincerely yours,

Robert Choi
Director, Exempt Organizations
Rulings and Agreements

Letter 1050 (DO/CG)

# EXHIBIT C

Case 2:22-cv-11287-BAF-APP ECF No. 50, PageID.3409 Filed 06/27/22 Page 42 of 61
2:04-cv-72997-NNC-DAS Doc # 20 Filed 01/21/05 Pg 1 of 14 Pg ID 550

14

CLOSED

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

RANIA BAHDOUCHI on behalf of herself and all
others similarly situated,

        Plaintiffs,

v.

        Case No. 04-CV-72997-DT

THIRD EYE, INC. and AMERICAN CREDIT
EDUCATION AND CONSULTING, INC.,

        Defendants.

_____/



## ORDER GRANTING DEFENDANTS' "MOTION TO DISMISS"
## AND
## DENYING PLAINTIFF'S "MOTION FOR LEAVE TO AMEND"

    Pending before the court are Defendants' "Motion to Dismiss" and Plaintiff's

"Motion for Leave to Amend."  The court held a hearing in this matter on January 12,

2005.  For the reasons set forth below, the court will grant Defendants' motion and will

deny Plaintiff's motion.

## I. BACKGROUND

    In her Complaint, filed on August 6, 2004, Plaintiff alleges that she "sought to

obtain Third Eye's credit repair services and obtained information from Third Eye's

website." (Pl.'s Compl. at ¶ 20.)  Plaintiff further asserts that Defendants are credit

repair organizations as defined by the Credit Organizations Repair Act ("CROA") and do

not hold tax exempt status under 26 U.S.C. § 501(c)(3).  (*Id.* at ¶¶ 12-13.)  Plaintiff also

claims that she "downloaded Third Eye's enrollment application and contacted Third

Eye to request to pay in installments."  (*Id.* at ¶ 22.)  In addition, Plaintiff avers that "a

representative of Third Eye advised Plaintiff that she could pay half up front and half later [for Defendant Third Eye's services]. Plaintiff completed the application and sent it to Third Eye along with a money order for half of the fee." (*Id*. at ¶ 23.) Plaintiff claims that "Defendants charged and received half of their fee from Plaintiff prior to providing any service to Plaintiff, much less fully performing services for her." (*Id*. at ¶ 24.) Plaintiff asserts that "after Plaintiff sent in her application and money order, Plaintiff attempted to contact Third Eye on 3-5 occasions. However, Plaintiff was unable to reach Defendants relating to her application." (*Id*. at ¶ 25.) Plaintiff brought her claim as a class action, alleging Defendants' violation of CROA, 15 U.S.C. §1679b(b). (*Id*. at 4-6.)

In their "Motion to Dismiss," filed on November 9, 2004, Defendants Third Eye, Inc. and American Credit Education and Consulting, Inc., ("ACEC") state that Defendant Third Eye, Inc. is "exempt from the reach of the Credit Repair Organization Act because it is a 501(c)(3) non-profit organization" and Defendant American Credit Education and Consulting, Inc. "must also be dismissed because, taking Plaintiff's Complaint as plead, no allegation is made that Defendant provided credit repair to Plaintiffs. Moreover, as plead, American Credit is the alter ego of Third Eye, Inc., an exempt organization, ergo same result." (Defs.' Mot. at 1.)

## II. STANDARD

### A. Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to

2

judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has

carried its burden of showing that the pleadings, depositions, answers to

interrogatories, admissions and affidavits in the record construed favorably to the non-

moving party, do not raise a genuine issue of material fact for trial, entry of summary

judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

     Summary judgment is not appropriate when "the evidence presents a sufficient

disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 251-52 (1986).  The existence of some factual dispute, however, does not

defeat a properly supported motion for summary judgment; the disputed factual issue

must be material.  *See id* at 252 ("The judge's inquiry, therefore, unavoidably asks

whether reasonable jurors could find by a preponderance of the evidence that the

plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can

properly proceed to find a verdict for the party producing it, upon whom the *onus* of

proof is imposed.'").  A fact is "material" for purposes of summary judgment when proof

of that fact would have the effect of establishing or refuting an essential element of the

claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174

(6th Cir. 1984).

     In considering a motion for summary judgment, the court must view the facts and

draw all reasonable inferences from those facts in a manner most favorable to the

nonmoving party.  *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)

3

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). The court is not to weigh the evidence to determine the truth of the matter, but must determine if there is a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## B. Fed. R. Civ. P. 15

The decision whether to grant leave to amend the pleadings is governed by Federal Rule of Civil Procedure 15. Rule 15 provides, in pertinent part, that after a responsive pleading has been filed, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15. "In [making] the decision whether to permit an amendment, some of the factors which may be considered by the trial court are undue 'delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment.'" *General Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990) (citing *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973)).

## III. DISCUSSION

Defendants aver that Defendant Third Eye is a "Michigan nonprofit corporation created . . . on or about December 5, 1995, under MCL 450.2101, the Nonprofit Corporation Act. . . . Third Eye was granted an exemption from federal income tax under Section 501(c)(3) of the Internal Revenue Code on March 23, 1998." (Defs.' Mot. Br. at 4.) Defendants also assert that "American Credit is a Michigan nonprofit

4

corporation created on or about January 29, 2004, under MCL 450.2101, the Nonprofit

Corporation Act." (*Id.*)

The CROA, 15 U.S.C. § 1679a(3)(B)(i), provides that the Act does not include

"any nonprofit organization which is exempt from taxation under section 501(c)(3) of the

Internal Revenue Code of 1986." 15 U.S.C. § 1679a(3)(B)(i). Both parties agree that

the crux of the issue in this case is whether Defendants are tax exempt organizations,

and Plaintiff has repeatedly stated that "if Third Eye is a bona fide tax exempt entity,

[she] will dismiss the claims against it promptly." (*Id.* at Ex. 7; Pl.'s Resp. at 11.)

### A. Defendant Third Eye's Tax Exempt Status

In support of their claim that Defendant Third Eye is a 501(c)(3) organization,

Defendants have attached a letter from the Internal Revenue Service, addressed to

Defendant Third Eye, which states "we have determined you are exempt from federal

income tax under section 501(a) of the Internal Revenue Code as an organization

describe in section 501(c)(3). . . . In accordance with section 508(a) of the Code, the

effective date of this determination letter is December 5, 1995." (Defs.' Mot. Br. at Ex.

3.) Defendants have also produced an exhibit that appears to be a printed page from

the Internal Revenue Service's web page. In that exhibit, Defendant Third Eye is

described as being a "public charity with a 50% deductibility limitation." (*Id.* at Ex. 8.)

Defendants assert that "the 50% issue does not relate to the non-profit nature or status

of the corporation, but, rather to the deductibility of those who make donations to the

corporation." (*Id.* at 6.) Defendants have also attached Defendant Third Eye's "Articles

of Incorporation" which state that the organization's purpose is "to promote and conduct

5

various programs for the social welfare and development of the youth within our urban

community." (*Id.* at 2.) In addition, Plaintiff has provided the court with a copy of

Defendant Third Eye's "Application for Recognition of Exemption," in which Defendant

Third Eye stated:

> As we grow, we will continuously promote Social and Economic
> Revitalization by facilitating financial planning seminars for all residents of
> the community. We will also work with local businesses to initiate
> economically interdependent networks. We will also assist community
> businesses to reciprocate support funding into the neighborhoods of their
> core supporters. We also will assist youth in gaining experience and
> learning trades through employment opportunities provided through our
> future Economic Revitalization initiatives. We are committed to the
> evocation of entrepreneur activities in the communities where we work.
> Third Eye's goal is to unify the community by educating youth on
> economically progressive activities, as they matriculate into adulthood. . . .
> The members of Third Eye Incorporated . . . in submission to God and
> recognition of our ancestral legacy; . . . pledge our collective vocation the
> unification of indigenous Africans by reinvesting in our community;
> Developing and maintaining our economic base and land; Promoting self-
> esteem and instilling values in our youth to assist them in making ethical
> decisions to affirm their unlimited potential.

(Pl.'s Mot. to Supp. at Ex. A.)

In her response, Plaintiff claims that "Defendants are committing a fraud on the

[c]ourt, the Internal Revenue Service and the State of Michigan [in asserting that they

are tax exempt organizations]." (Pl.'s Mot. at 1.) Plaintiff claims that "Defendant Third

Eye, Inc. represents that it is a charitable organization whose mission is to operate

youth mentoring and development programs in Detroit. In reality, Third Eye runs a

credit repair and pyramid marketing scheme for profit." (*Id.* at 1.) Plaintiff maintains

that even if Defendant Third Eye was once considered a 501(c)(3) organization,

"Plaintiff does not know whether Third Eye ever engaged in . . . charitable activities as

its primary business." (*Id.* at 15.) In support of her contention, Plaintiff points to

6

Defendant Third Eye's 2004 mission statement that states that "it is engaged in credit repair and marketing, omitting any mention of the youth development charitable purposes." (*Id.* at 16.) Plaintiff also asserts that "Third Eye clearly does not describe any youth mentoring or development as its 'mission' or 'goal' but only reveals credit repair as the 'industry' that it is engaged in." (*Id.*) In Exhibit A of Plaintiff's "Supplement Response in Opposition to Defendants' Rule 12(b)(6) Motion for Summary Judgment and Plaintiff's Motion for Leave to Amend," Plaintiff states that Third Eye "did not disclose its credit repair operation to the IRS, Third Eye's Form 1023 falsely claims its financial education services are free and fails to disclose that Third Eye is engaged in the business of credit repair, and Third Eye is not concerned with the youth of metro-Detroit." (Pl.'s Supp. Resp. at 1-4.)

Plaintiff relies on *The Synanon Church v. Commissioner,* T.C. Memo 1989-270 (U.S. Tax Ct. 1989), in support of its argument that the court should refuse to accept the Internal Revenue Service's grant of tax exempt status to Defendant Third Eye, and should instead determine on its own whether Defendants qualify as tax exempt organizations. In *Synanon Church*, the *Synanon* court stated that "if the character, purpose, activities or method of operation of the organization itself changes from those on which the ruling was based, the organization ceases as a matter of law to qualify as a tax-exempt organization. Its exemption . . . may be revoked retroactively." *Id.*

The court notes, however, that the facts in *Synanon Church* are very different from the facts in the instant case. In *Synanon Church*:

Petitioner Synanon Church had received a ruling by the IRS on July 7,

7

1960, that it was tax-exempt under section 501(c)(3) and that contributions to it were deemed tax-deductible under section 170. [However, as] a result of an *IRS audit* of Synanon's fiscal years 1969, 1970, and 1971, the Commissioner determined that one of Synanon's activities, its Advertising Gift and Premiums activity (Adgap), was a business unrelated to its charitable activities and was subject to the section 511 unrelated business income tax. [The *Synanon* court determined that] by the beginning of its fiscal year 1977, Synanon's character and activities had changed substantially.

*Id.* (emphasis added)

Ultimately, the Commissioner revoked petitioner's tax exemption retroactively to fiscal year 1977 and determined the deficiencies for the years listed above. *Id.*

The *Synanon Church* case does not apply to the instant case, because in *Synanon Church* the Internal Revenue Service and a private entity were adverse parties, and the main issue in the case was how the past deficiencies that the *Internal Revenue Service had identified* based on the Synagon Church's abuse of its 501(c)(3) status would be calculated. The instant case involves two private parties and the court has not been presented with any evidence that the Internal Revenue Service has made a determination that Defendant Third Eye is not properly classified as a tax exempt organization.

Moreover, in *Zimmerman v. Cambridge Credit Counseling Corp.*, 322 F. Supp. 2d 95 (D. Mass. 2004), the *Zimmerman* court determined that the plaintiff had no standing to attack the validity of the IRS's determination that the defendants in the case were 501(c)(3) organizations. According to the *Zimmerman* court:

if courts possessed the power . . . to go behind the IRS's designation and proceed to make their own independent determinations, on a case-by-case basis, of an entity's substantive classification according to section 501(c)(3), the uncertainty not only for the entity itself, but for all persons or

parties dealing with it, would be almost boundless.  An entity might enjoy 501(c)(3) status for some purposes and not for others, or before some courts and not others.  Every 501(c)(3) entity would have to be on guard for the possibility that at some future date, in some discrete piece of litigation, some action or some failure to act on its part might be construed as justifying forfeiture of some of the myriad protections afforded by 501(c)(3) status.  Much is gained by giving the IRS *exclusive* power to award 501(c)(3) status.

*Id.* at 100. (emphasis added)

The *Zimmerman* court held that "standing in [such a] context requires "(1) an injury in fact, (2) fairly traceable to the granting of tax-exempt status . . . (3) that is likely to be redressed by enjoining the further grant of tax-exempt status."  *Id.*  Ultimately, the *Zimmerman* court determined that "any standing claim by the plaintiffs would clearly fail to satisfy the second prong.  The only strand connecting Cambridge's tax-exempt status to plaintiffs' alleged injury is the statement that they chose Cambridge because they assumed a nonprofit would charge lower rates.  This, alone, does not render plaintiffs' alleged injury 'fairly traceable" to Cambridge's tax exempt status."  *Id.*

In another case where a plaintiff challenged the tax exempt status of a defendant, *Research Consulting Assocs. v. Electric Power Research Inst.*, 626 F. Supp. 1310, 1314 (D. Mass. 1986), the court outlined the same standard, that "in order to squeeze through that 'barely ajar' door and establish standing, plaintiffs must demonstrate '(1) an injury in fact, (2) fairly traceable to the granting of tax exempt status . . . (3) that is likely to be redressed by enjoining the further grant of tax exempt status.'"  *Id.*  In order to meet the first element of the test, the plaintiff must show that she "'suffered . . . serious financial losses as a consequence of the [defendant's] enjoying tax exempt status.'"  *Id.*  As for the second prong, the plaintiff must prove that her injury

9

is "fairly traceable to the [defendant's] tax exempt status." *Id.* The third element requires that the revocation of tax exempt status "redress the injury complained of." *Id.*

In the instant case, Plaintiff does not assert in her Complaint that she contacted Third Eye based on its tax exempt status or that Third Eye's alleged practices would have been different if it were a 501(c)(3) organization. *Research Consulting Assocs.*, 626 F. Supp. at 1314. The injury is alleged to have been caused by Defendant, not by the Internal Revenue Service's grant of 501(c)(3) status. Therefore, Plaintiff's challenge to Defendants' tax exempt status fails for lack of standing.

### B. ACEC

Plaintiff further claims that ACEC is not "entitled to rely on Third Eye's purported exemption" because "Third Eye is not a bona fide tax exempt entity." (*Id.* at 10.)

Because the court accepts Defendant Third Eye's tax exempt status, and Plaintiff has alleged that ACEC is the alter ego of Defendant Third Eye and the court takes the Plaintiff's allegations as true for the purposes of this motion, Plaintiff's claim against Defendant ACEC is dismissed as well.

In reviewing the various evidence presented in support of and against Defendants' contention that both Defendants Third Eye and ACEC are tax exempt organizations, the court finds that Third Eye has presented objective evidence from the Internal Revenue Service in regards to its tax exempt status. The issue of whether Defendants misled the IRS or are not properly carrying out their purported philanthropic mission is not properly before the court. That issue is between Defendants and the IRS. *Zimmerman v. Cambridge Credit Counseling Corp., et al.*, 322 F. Supp.2d at 100;

10

*Research Consulting Assocs.*, 626 F. Supp. at 1314. Defendant Third Eye had presented evidence to the court that it is a tax exempt organization. There may be doubt as to whether Defendants continue to deserve their tax exempt status, but this Plaintiff has no standing to challenge Defendants' status. *Id.*

### C. Plaintiff's "Motion For Leave to Amend"

In her "Supplement Response in Opposition to Defendants' Rule 12(b)(6) Motion for Summary Judgment and Plaintiff's Motion for Leave to Amend," Plaintiff requests "leave to file a First Amended Complaint under FRCP 15 to add the IRS and the Treasury Department as parties and to request revocation of Third Eye's purported exemption." (Pl.'s Supp. Resp. at 18.) "In [making] the decision whether to permit an amendment, some of the factors which may be considered by the trial court are 'undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment.'" *General Elec. Co.*, 916 F.2d at 1130.

In the instant case, the court finds that there has been an undue delay in Plaintiff's filing of her motion. Plaintiff filed her Complaint on August 6, 2004. However, Plaintiff did not file this motion until December 27, 2004, even though she has stated on several occasions that the primary factor in the viability of her case is Defendants' tax exempt status as determined by the Internal Revenue Service. (Defs.' Mot. Br. at Ex. 5.) The court does not base its denial of Plaintiff's motion solely on her undue delay, *Wade v. Knoxville Utilities Board*, 259 F. 3d 452, 459 (6th Cir. 2001) ("delay by itself is not sufficient reason to deny a motion to amend."). But, the court additionally finds that

11

the introduction of the Internal Revenue Service and Treasury Service through Plaintiff's

amendment of her Complaint would be futile. In *Fulani v. Brady*, 935 F.2d 1324, 1325

(D.C. Cir. 1991),

> Appellant Lenora Fulani brought [an] action against the Internal Revenue
> ("IRS") challenging the tax-exempt status of the Commission for the
> Presidential Debates ("CPD"), the sponsor of the 1988 presidential
> debates. Fulani allege[d] that the CPD did not meet the qualifications for
> tax-exempt status under Internal Revenue Code § 501(c)(3) because it
> presented a partisan political viewpoint by excluding her from the
> presidential debates.

In *Fulani*, Appellant contended that she was "injured by the fact that the CPD is

engaging in a program of political misinformation, perpetuating bipartisan rather than

nonpartisan, political debates," and sought to have the Internal Revenue Service revoke

CPD's tax exempt status. *Id.* at 1326. Ultimately, the *Fulani* court determined that "the

statutory scheme created by Congress is inconsistent with, if not preclusive of, third

party litigation of tax-exempt status." *Id.* at 1327. "Where a party is seeking simply to

remove a third party's entitlement to a tax exemption, the exemption likely will not bear

sufficient links of traceability and redressibility to the alleged injury to warrant standing."

*Id.* at 1328. In making its decision in regards to Appellant's lack of standing to

challenge CPD's tax-exempt status, the *Fulani* court held that if it were:

> to order revocation of the CPD's tax exempt status, the CPD might decline
> to sponsor presidential debates altogether. This would remove the
> allegedly unfair advantage to Fulani's competitors, but would prevent
> Fulani from receiving the same benefit. Or the CPD could choose to
> include Fulani within the debates in order to retain its tax-exempt status, in
> which case the two major-party candidates might decline to participate in
> debates that do not present them as the two salient candidates, thus
> depriving the debates of the media appeal that Fulani seeks. . . .Thus,
> while the IRS's decision to provide the CPD with tax-exempt status is a
> cause of Fulani's claimed injury, it is merely one in a chain of independent

causal factors necessary to achieve this injury. . . . Moreover, given the number of causal factors significant to Fulani's alleged injury, we find that the claim lacks sufficient redressability to warrant standing under the Supreme Court's test.

*Id.* at 1329.

Ultimately, the *Fulani* court held that:

Fulani [was] challenging the actions of the IRS only as a means of affecting the behavior of the CPD. The IRS's actions caused her alleged injury only due to other intervening causal factors, including the FEC's regulations, the CPD's actions, and the anticipated behavior of other debate participants. Thus, the redressability of Fulani's injury depends on those factors as well. . . . Fulani's injury does not bear sufficient traceability to the IRS's grant of tax-exempt status to the CPD, nor does the requested relief redress her alleged injury sufficiently to warrant standing in this Court.

*Id.* at 1331.

As in *Fulani*, in this case the Internal Revenue Service's actions have not caused Plaintiff's injury. Therefore, Plaintiff does not have standing to bring a claim against the Internal Revenue Service and the Treasury Department. Moreover, Plaintiff seeks the same relief in her "Supplement Response in Opposition to Defendants' Rule 12(b)(6) Motion for Summary Judgment and Plaintiff's Motion for Leave to Amend" that she did in opposing Defendants' motion. The only difference in her "Motion for Leave to Amend" is that she seeks to bring in two additional parties through an amended complaint. Essentially, Plaintiff seeks to add additional parties in the effort to achieve a result that the court has already determined she does not have standing to pursue. Accordingly,

## IV.  CONCLUSION

IT IS ORDERED that Defendants' "Motion to Dismiss" [Dkt. # 8] is GRANTED

and Plaintiff's "Motion for Leave to Amend" [Dkt. # 18] is DENIED.

ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  January, _21_, 2005


PURSUANT TO RULE 77 (d), FED. R. CIV. P.
COPIES MAILED TO ATTORNEYS FOR ALL
PARTIES ON ___ 1/21, 20 05

DEPUTY COURT CLERK

# EXHIBIT D

Youth Financial Literacy Foundation
Independent Sales Representative Agreement

1.  Limited Agency.  Simultaneously with your enrollment as an Independent Agent of Financial Education Services, Inc. (FES) for the purpose of selling its various non-credit repair services and products, you may also enroll as an Independent Agent for the purpose of selling the credit restoration service products offered by Youth Financial Literacy Foundation ("YFL").  YFL is exempt under the Credit Repair Organization Act (15 U.S.C. §§1679, et. seq.) as a charitable organization which is tax exempt under §501(c)(3) of the Internal Revenue Code, and is not a federal credit repair organization.

As such, you are authorized to refer potential customers to a website approved by YFL for the purpose of customer enrollment for credit restoration services. You are not authorized to act on behalf of YFL for any other purpose.

2.  You do not have the power to bind YFL to any contract or to sign any document on behalf of YFL, to accept any moneys from a consumer on behalf of YFL, to perform any credit restoration services for any consumer, or to provide any customer support to any customer of YFL. All agreements, funds, services and customer support with respect to credit restoration services will be handled exclusively by YFL directly and its employees authorized to act on its behalf.

Pursuant to an agreement between FES and YFL, FES also performs certain administrative services of behalf of the sales force of YFL independent sales representatives.  Accordingly, as an agent of YFL, your payment and compensation will be processed by FES as the administrative agent on behalf of YFL.  If you have any questions or concerns about your status as an agent of YFL, please direct them to its administrative agent, *i.e.*, FES.

3.  Authorization and Contract.  By executing this Independent Sales Representative Agreement ("ISR Agreement" or "Independent Agent Agreement"), you acknowledge that prior to signing you have received, read and understood the YFL Income Disclosure Statement, that you have read and understood the YFL Policies and Procedures, which are incorporated into this Agreement and made part of it as if restated in full, and that you have read and agree to all terms set forth in this Agreement. YFL reserves the right to reject any application for any reason within 30 days of receipt.

4.  Expiration, Renewal, and Termination.  You will be recognized as an agent of YFL to the same extent, under the same terms and conditions, and for the same term, as are applicable to you as an independent sales representative of FES. As a limited agent of YFL, you are covered by the same policies and procedures as you are as an agent of FES. If you have a change in status as an independent sales representative of FES, it will be mirrored in your relationship with YFL for administrative purposes.

5.  Independent Contractor Status. You agree this authorization does not make you an employee, officer, or legal representative of YFL or your Sponsoring Independent Agent. As a self-employed independent contractor, you will be operating your own independent business, buying and selling services available through YFL on your own account. YFL has the right to control or direct only the result of your work and not what will be done or how it will be done. You have complete freedom

in determining the number of hours that you will devote to your business, and you have the sole discretion of scheduling such hours. You will receive an IRS Form 1099-MISC issued by the administrative agent for YFL to the EIN or social security number on your account reflecting the amount of income paid to you during the calendar year. It will be your sole responsibility to account for such income on your individual income tax returns.

6.  Selling the Service. You agree to make no representations or claims about any of the services beyond those shown in official YFL literature. You further agree to sell services available through YFL only in authorized territories.

7.  YFL's Proprietary Information and Trade Secrets. You recognize and agree that, as further set forth in the Policies and Procedures, information compiled by or maintained by YFL, including Line of Sponsorship (LOS) information (*i.e.*, information that discloses or relates to all or part of the specific arrangement of sponsorship within the YFL business including, without limitation, Independent Agent lists, sponsorship trees, and all YFL Independent Agent information generated therefrom, in its present or future forms), constitutes a commercially advantageous, unique and proprietary trade secret of YFL, which it keeps as proprietary and confidential and treats as a trade secret. During the term of your contract with YFL, YFL grants you a personal, non-exclusive, non-transferable and revocable right to use trade secret, confidential, and proprietary business information (Proprietary Information), which includes, without limitation, LOS information, business reports/ manufacturing and service developments/ and Independent Agent sales, earnings and other financial reports to facilitate your YFL business.

8.  Non-Solicitation Agreement. in accordance with the Policies and Procedures, you agree that during the period while you are a Independent Agent, and for one calendar year following resignation, nonrenewal, or termination of your business, you will not encourage, solicit/ or otherwise attempt to recruit or persuade any other YFL Independent Agent to compete with the business of YFL.

9. Images / Recordings / Consents. You agree to permit YFL to obtain photographs, videos, and other recorded media of you or your likeness. You acknowledge and agree to allow any such recorded media to be used by YFL for any lawful purpose, and without compensation.

10.  Modification of Terms / Copies. The terms of this Agreement may be modified as specified in Rule 1 in the Policies and Procedures.

11. Jurisdiction and Governing Law. The formation, construction, interpretation, and enforceability of your contract with YFL as set forth in this Independent Agent Agreement and any incorporated documents shall be governed by and interpreted in all respects under the laws of the State of Michigan without regard to conflict of law provisions. Louisiana residents: notwithstanding the foregoing, Louisiana residents may bring an action against YFL with jurisdiction and venue as provided by Louisiana law.

12.  Dispute Resolution. All disputes and claims relating to YFL, its services, the rights and obligations of an Independent Agent and YFL, or any other claims or causes of action relating to the performance of either an Independent Agent or YFL under the Agreement or the YFL Policies and

Procedures shall be settled totally and finally by arbitration as enumerated in the Policies and Procedures in Farmington Hills, Michigan, or such other location as YFL prescribes, in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association. Additionally, you agree not to initiate or participate in any class action proceeding against YFL, whether in a judicial or mediation or arbitration proceeding, and you waive all rights to become a member of any certified class in any lawsuit or proceeding. This agreement to arbitrate shall survive any termination or expiration of the Agreement. Nothing in the Agreement shall prevent YFL from applying to and obtaining from any court having jurisdiction a writ of attachment, garnishment, temporary injunction, preliminary injunction, permanent injunction or other equitable relief available to safeguard and protect its interest prior to, during or following the filing of any arbitration or other proceeding or pending the rendition of a decision or award in connection with any arbitration or other proceeding.

13.   Time limitation. If an Independent Agent wishes to bring an action against YFL for any act or omission relating to or arising from the Agreement, such action must be brought within one year from the date of the alleged conduct giving rise to the cause of action. Independent Agent waives all claims that any other statutes of limitations apply.

14.   Miscellaneous. If any provision of the Agreement is held to be invalid or unenforceable, such provision shall be reformed only to the extent necessary to make it enforceable, and the balance of the Agreement will remain in full force and effect. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument. The provisions of this Agreement, including all documents incorporated herein by reference, embody the whole agreement between you and YFL and supersedes any prior agreements, understandings and obligations between you and YFL concerning the subject matter of your contract with YFL.  A faxed copy of the Agreement shall be treated as an original in all respects.

15.   Montana residents: A Montana resident may cancel his or her Independent Agent Agreement within 15 days from the date of enrollment.

16.   Notice of Right to Cancel. You may request a refund on your enrollment fee if it's done within three business days from the date of enrollment. If you cancel, any enrollment fees paid will be returned within TEN BUSINESS DAYS following receipt by YFL of your cancellation notice. To cancel this transaction, notify agent support by phone or email not later than midnight of the third business day following the date of this agreement. No refunds will be issued after the cancellation period.

Signature _____ Date _____

# EXHIBIT E

**From:** kmorganesq@aol.com,
**To:** David.Hall@btlaw.com,
**Subject:** Household expense.Motion in 2:22-cv-11120-BAF-APP Federal Trade Commission v. Finacial Education Services, Inc
**Date:** Wed, Jun 1, 2022 10:35 pm
**Attachments:**

---

Mr. Hall:
I am following up my inquiry of last week regarding common personal and household expenses. I have asked my only client Mr. Thompson to provide me a list of June living expenses.  They are posted below.  I am requesting your client the Receiver's approval to permit these expenses to be paid from his personal bank account. Mr. Thompson has one kidney and is on his second liver transplant.  His wife is deceased. He is an attorney.

His involvement with FES was as its legal advisor for which he rendered legal services on a monthly retainer as a Michigan licensed Attorney. He was also President of YFL. I am advised and will confirm that he received no compensation and did not actively participate in the finances or daily operation of the corporation. I will confirm.  Frankly we do not believe any of the 15 counts are sustainable against him factually.

There is nothing extraordinary in this list except the generator which he previously made a down payment well prior to the suit.  In the meantime he has almost completed the financial questionnaire. Do you know when these are due as I understand the date was pushed back? We recognize that the stip provides the TRO continues.  We are asking the receiver to allow Mr. Thompson to make these reasonable payments in the interim.  They are well within a reasonable range.  Please advise.

| | | |
|---|---|---|
| 05/31/22 | Second mortgage | $206.65 |
| 06/01/22 | Dept of Ed - School loan | $182.08 |
| 06/02/22 | Primary mortgage | $1,282.13 |
| 6/5/2022 | American Express | $168.81 |
| 6/5/2022 | Healthcare Insurance | $190.35 |
| 06/09/22 | Water bill | $97.35 |
| 06/13/22 | Cell phone | $58.66 |
| 06/18/22 | Car payment | $548.49 |
| 06/18/22 | Car insurance | $135.27 |
| 06/20/22 | Internet | $19.95 |
| 06/21/22 | Capital One Mastercard | $146.28 |
| 06/21/22 | Consumers Energy | $140.00 |
| 06/21/22 | DTE Energy | $120.00 |
| 06/21/22 | Cable TV/Phone | $190.69 |
| 06/22/22 | Generator install (second payment) | $5,949.00 |
| | Meijer (groceries) | $150.00 |
| | Busch's (groceries) | $200.00 |
| | CVS (medications) | $145.00 |

Sincerely,
Kerry Lee Morgan
734-281-7100
Of Counsel at Pentiuk, Couvreur & Kobiljak, P.C.