## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | Case No.: 2:22-CV-11120-BAF-APP |
| Plaintiff, | |
| vs. | Honorable Judge Bernard A. Friedman |
| **FINANCIAL EDUCATION SERVICES, INC.,** *ET AL*, | |
| Defendants. | |

## DECLARATION OF MICHAEL TOLOFF

## PURSUANT TO 28 U.S.C. § 1746

I, Michael Toloff, have personal knowledge of the facts below and am competent to testify about them:

1. I am sixty-eight years old. I suffer from lymphoma, an incurable cancer. If I stop my treatment, it will reoccur.

2. I am a resident of Novi, Michigan.

3. I am a 99% owner of V-R Tech MGT, LLC with 100% profit and loss sharing interest and a part-time consultant for Financial Education, Services, Inc. ("FES") (collectively, the "Companies").

4. Christopher Toloff ("Chris") is my son. Although he was informally called the Chief Financial Officer, his role was primarily bookkeeping and clerical. I have reviewed his declaration filed in this matter including Exhibit A, a list

of Chris' job duties, and everything he states is true and correct. He never had the authority to hire or fire individuals or to approve expenses for anyone. Chris never attended a FES conference.

5. In September 2019, I sold my ownership interest in FES and agreed to work as a part-time consultant. This work consisted of supplying the Georgia compliance reports, state licensing and state bond work, provide information to attorneys who represented FES in legal actions, and updated the FES income disclosures. Parimal Naik, FES' sole owner, reviewed and approved the income disclosures. In addition, I contributed to additional ad-hoc projects at the direction of Mr. Naik. I was not involved in the day-to-day operations. I no longer directed or controlled any FES activities including financial or investment decisions.

6. FES does not have a YouTube channel. I reviewed the YouTube videos from Jerry Thompson referenced in the declaration submitted by the FTC. This Jerry Thompson was not employed at FES. He was affiliated with a separate company unrelated to the allegations in this matter. The Gerald Thompson named in this suit is a separate individual unrelated to those videos. Further, FES does not have the ability to take down or remove any YouTube or other social media postings by its former agents.

7. In 2021, FES hired Chet Seeley as the Vice President of Growth and Development.

8. When I co-owned FES, Naik and I agreed that only operational expenses would come out of FES. All other payments and distributions were equally sent to VR-Tech, LLC and VR-Tech MGT, LLC and personal expenses were charged out of those accounts. Then we each could choose to allocate additional funds. I was the sole owner of VR-Tech MGT, LLC and Naik was the sole owner of VR-Tech, LLC. The ownership of the three companies was transparent to everyone. I had no intent to hide behind anything as the FTC alleges. The segregation was also to make sure all proper income taxes were paid on an annual basis for each owner.

9. FES worked with Bill Butler when he was at an employee at a different rent reporting company before starting CM Rent. Mr. Naik and I thought the product was very valuable to our customers. Bill left that company and asked if we were interested in helping him start CM Rent Inc. We agreed and initially Mr. Naik and I were both 35% owners. After one of the other owners died, we became 40% owners. Bill runs the company with my son-in-law.

10. The CM Rent product was never a part of the YFL Protection Plan. Anyone could purchase the program through the FES website. CM Rent marketed its service to other consumers who had no relationship with FES.

11. CM Rent has a contract with Equifax dated in 2019. Attached as Exhibit A to this Declaration is a true and accurate copy of that contract. Equifax touted these partnerships in a Jan. 8, 2020 press release entitled, "Equifax Expands Partnerships with Rent Reporting Service Providers." https://investor.equifax.com/news-events/press-releases/detail/84/equifax-expands-partnerships-with-rent-reporting-service (last accessed June 27, 2022). Attached hereto as Exhibit B is a true and correct copy of this press release.

12. CM Rent also entered into a contract with TransUnion is October 2017. Attached as Exhibit C to this Declaration is a true and accurate copy of that contract.

13. CM Rent has many competitors in the rent reporting space. When you Google "rent reporting companies," dozens of rent reporting companies appear.

14. In addition, I am the sole financial support for my wife Gayle Toloff, who is sixty-six (66) years old, and myself, besides our Social Security payments. Due to our age, neither Gayle nor I have looked for new sources of incomes or jobs.

15. The funds I receive from the Corporate Defendants in this matter are my only source of income.

16. Without my income or support, Gayle has no other sources of income except the Gayle L. Toloff Revocable Trust.

17. My name is on a PNC Account jointly held with Amanda Fuller.

18. I have not ever deposited, withdrawn, or otherwise accessed any funds from the PNC Account, account No. ending *9025, jointly held with Amanda Fuller. I only provided my name to the bank because of Amanda's young age and because she was in college at the time.

19. The expenses I have requested in the Motion for Limited Modification and in the accompanying exhibits to this Declaration are true and accurate to the best of my knowledge.

20. I declare under penalty of perjury that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: June 27, 2022          *Michael Toloff*
                              Michael Toloff (Jun 27, 2022 17:08 EDT)
                              MICHAEL TOLOFF

# Exhibit C- Declaration of Michael Toloff

Final Audit Report                                                2022-06-27

| | |
|---|---|
| Created: | 2022-06-27 |
| By: | Devyn Quick (dquick@mslawgroup.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAxPOT0bceDUMiJU8ModKp113sroKeK72a |

## "Exhibit C- Declaration of Michael Toloff" History

Document created by Devyn Quick (dquick@mslawgroup.com)
2022-06-27 - 9:06:36 PM GMT- IP address: 71.66.0.106

Document emailed to toloffmike@gmail.com for signature
2022-06-27 - 9:06:52 PM GMT

Email viewed by toloffmike@gmail.com
2022-06-27 - 9:07:16 PM GMT- IP address: 66.102.8.25

Document e-signed by Michael Toloff (toloffmike@gmail.com)
Signature Date: 2022-06-27 - 9:08:49 PM GMT - Time Source: server- IP address: 97.70.182.219

Agreement completed.
2022-06-27 - 9:08:49 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT A

# DATA CONTRIBUTION AGREEMENT

This Data Contribution Agreement ("Agreement") is entered into on this _____ day of February 2019, by and between Equifax Information Services LLC, a Georgia Limited Liability Company ("Equifax") and CreditMyRent ("Contributor").

WHEREAS, Equifax is a nationwide consumer reporting agency; and

WHEREAS, Contributor maintains a service that enables consumers who grant express written permission ("Consumers") to allow property management companies ("Members") to report the consumer's rental data to Contributor for further reporting to consumer reporting agencies.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

1. Contributor understands, covenants and agrees that because it is collecting rental information on behalf of and as a direct result of requests through one or more Contributor channels (e.g. Internet, in-person/ point of sale, telephone, etc.) from consumer tenants who reside in the United States and desire to have their rental history reported to Equifax ("Consumer Initiated Process"). Contributor thus must (i) initiate the Consumer Initiated Process, pursuant to Section 604(c)(A)(1) of the FCRA, (ii) have Consumer supply their name, address, social security number (if applicable) and/or other required identifying information and verify such Consumer's identity, (iii) and prior to requesting any Consumer information from the Consumer and Members, it shall first obtain, capture, and archive the properly authenticated Consumer consent to obtain the Consumer Information from Members ("Authorization") via the process below and in conjunction with the same shall also educate each Consumer subject regarding the process and the scope of their Authorization by means of appropriate disclosures and educational content to be utilized by Contributor in conjunction with the reporting of such Consumer's rental history, and for no additional purposes. Contributor further understands that it shall not provide any Consumer information to Equifax received from individual landlords and can only receive information and provide Consumer information to Equifax received from Members (e.g. property management companies). Equifax reserves the right to audit such data received by Contributor and the sources where such data was received.

2. Contributor will prepare and deliver to Equifax, each month and at Contributor's expense, its most current account information received from the Members (the "Information"), in a mutually agreeable form and medium, on consumers who have accounts with Contributor or its Members as a result of being tenants of certain Member properties and paying monthly rental payments to Members. Without limiting the generality of the foregoing, Contributor will encrypt all Information as directed by Equifax, and further, with respect to the Information, Contributor agrees to comply with such other data security policies as Equifax may from time to time make known to Contributor in writing. For avoidance of doubt, Contributor understands and agrees that its compliance with the security policies of Equifax will not relieve Contributor of the obligation to observe any other or further contractual, legal, or regulatory requirements, rules or terms applicable to the security of the Information, nor does Equifax assume any responsibility or liability for the security of the Information prior to the time Equifax receives it. At its expense, Equifax may incorporate the Information into Equifax's computerized credit reporting system in a form and manner determined by Equifax. Information contributed to Equifax, whether or not incorporated into Equifax's computerized credit reporting system, will cease to be the property of Contributor and will become the property of Equifax. Nothing in the preceding sentence will affect Contributor's ownership rights in the current account information from which the Information was derived. Contributor will notify Equifax promptly upon learning that Information supplied is inaccurate or misleading. Contributor will provide Equifax with any corrections or additional information necessary to make the Information supplied complete and accurate and will implement procedures to avoid re-reporting Information that is inaccurate. Contributor may be liable under state or federal law if Information furnished is false or furnished with malice or willful intent to injure the consumer or with conscious indifference to potential inaccuracies.

3. Contributor certifies that it will comply, and will ensure that Members comply, with applicable provisions of applicable laws, including, without limitation, the provisions of the Fair Credit Reporting Act (FCRA), all state law counterparts of it (including, without limitation, conducting an investigation of any disputed Information), and all consumer protection laws and regulations. Contributor will also comply, and will ensure that all Members also comply, with Equifax policies and procedures for data contributors, as may be changed from time to time.

4. Contributor agrees and covenants that it shall conduct, or require its Members to conduct, Consumer rental payment verifications each month, document and maintain proof of any and all such verification and provide a report to Equifax of such verifications upon request. Equifax requires Contributor, and its Members, to report to Equifax Consumer's rental payments for the full term of Consumer's lease ("Lease Term"). Even if Consumer requests that Contributor cease reporting such rental payments before the expiration of the Lease Term, Contributor agrees to report to Equifax the ongoing status of Consumer's rental payments each month through the end of the Lease Term. Contributor additionally agrees and covenants that it shall as a part of its verification of Consumer, provide written notice of such reporting requirements under this Agreement to Consumer and receive Consumer's written acknowledgement of such reporting requirement.

5. Contributor additionally agrees and covenants that it shall as a part of the Consumer Initiated Process, verify Consumer's residency, the terms of Consumer's lease and Consumer's identification. Contributor shall document and maintain physical proof of any and all such verification and provide a report to Equifax of such verifications upon request.

6. Equifax may provide or furnish to any party which is under contract for its credit reporting services with mailing lists or customer lists, marketing lists or lists classified as to credit performance, locality or economic indicators; provided, however, Equifax will

comply with Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. Sec. 6801 et seq. ("GLB") and the implementing regulations issued thereunder and will not use or disclose any Information that Contributor furnishes to Equifax on Contributor's or its Members' consumers or customers other than in accordance with Section 6802(c) or with one of the General Exceptions of Section 6802 (e) of the GLB and applicable regulations.  No such list(s) will be provided or furnished by Equifax that will identify any person on the lists as a credit customer of Contributor or any Member, and no list will consist primarily of credit customers of Contributor.

7.   Contributor will exercise its best efforts to provide to Equifax accurate, correct, complete and reliable credit data, and each contribution to Equifax will be deemed a certification by Contributor that such Information is complete and accurate.  Contributor will not contribute any property rent payment data that is self-reported by a consumer and not independently verified by a Member.

8.   Contributor shall indemnify and defend Equifax and its directors, officers, agents, employees, contractors, licensors, affiliated companies ("Affiliated Persons and Entities") from and against any loss, damage, cost, liability and expense (including reasonable attorneys' fees) arising from or relating to the investigation, defense, settlement or satisfaction of claims or causes of action of a third party against any such indemnitee ("Claim") arising out of or relating to (i) a violation (or alleged violation) by Contributor or any Member of any applicable laws, including consumer protection laws and the FCRA (and state law counterparts), (ii) a violation (or alleged violation) by Contributor or any Member of any Equifax policies and procedures for data contributors, or (iii) intentional or willful misconduct by Contributor or any Member. Equifax and Contributor will cooperate with each other in any investigation or settlement of or defense against any Claim.  Equifax will not settle any Claim without the written consent of Contributor if such settlement (i) involves a remedy other than the payment of money by the indemnitee, (ii) does not include as an unconditional term thereof the release of the indemnifying party and its affiliates from all liability in respect of such Claim, (iii) includes a finding or admission of (A) any violation of any law by any indemnifying party or any affiliate or representative thereof or (B) any violation of the rights of any person, or (iv) may affect any other Claims of a similar nature that may be made against the Contributor or any affiliate thereof.

9.   Contributor shall credential all Members in accordance with Equifax's data contributor boarding standards and the credentialing standards attached hereto at Attachment A ("Credentialing Standards").  Equifax may change its standards from time to time, and Equifax may require Contributor to modify or update the Credentialing Standards, in Equifax's sole discretion.  Any such required changes will be deemed an amendment to the Credentialing Standards attached hereto without need for any mutually executed amendments.  Prior to contributing any Member payment information to Equifax, Contributor will have an enforceable agreement with each such Member (each, a "Member Agreement"), that is compliant with the Fair Credit and Reporting Act, the Gramm-Leach-Bliley Act and all other applicable laws and regulations.

10.  Equifax may reject any data from a Member for any reason, even if such Member met the Equifax-provided or credentialing standards or the Credentialing Standards attached hereto or otherwise approved in writing.  Notwithstanding anything to the contrary herein, Equifax may include and accept the Information in its sole discretion.

11.  In order to determine Contributor's and each Member's compliance with this Agreement, Equifax or its designated representative shall have the right, from time to time, to: (1) upon reasonable notice to Contributor and each Consumer Members, enter into Contributor's and/or any Member's facilities during normal business hours and conduct on-site audits of Contributor's and each Member's practices and procedures relating to Contributor's and each Member's compliance with this Agreement; and (2) conduct audits by mail, email or similar electronic means that may require Contributor and/or Members to provide documentation regarding compliance with this Agreement. Contributor and/or Members shall promptly provide Equifax with copies of or access to all requested documents and records and use reasonable efforts to otherwise cooperate with Equifax in all such audits.

12.  This Agreement continues in force without a fixed date of termination, but either party may terminate this Agreement upon thirty (30) days prior written notice to the other.  Notwithstanding anything to the contrary herein, Equifax may include and accept the Information in its sole discretion.

13.  **To the maximum extent allowable by applicable law, Equifax's and its affiliates' obligations hereunder are provided on an "as is" basis and Contributor and each Member hereby disclaim any and all other promises, representations, guarantees and warranties whether express or implied or statutory regarding the services provided hereunder.  Neither Equifax, nor any of its affiliates will be liable to Contributor or any Member for any loss or injury relating to, arising out of, or caused in whole or in part by, their acts or omissions, even if negligent, relating to Equifax's or its affiliates' performance hereunder.  In no event will Equifax or any of its affiliates be responsible for consequential, incidental, indirect, exemplary or special damages, including lost profits (even if they have been advised of the possibility or likelihood of such damages).**

14.  Miscellaneous.

   a.   This Agreement contains the entire agreement relating to its subject matter between the parties and supersedes any prior or contemporaneous oral or written agreements or representations.  It may be modified only by a written agreement duly executed by the respective authorized representatives of each Equifax and Contributor.  Neither this Agreement nor any provisions set forth herein is intended to, or shall, create any rights in or confer any benefits upon any person other than the parties hereto.

   b.   This Agreement will be interpreted in accordance with the laws of the State of Georgia.

   c.   This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective heirs, assigns and successors.

d.   Neither party shall use the name of the other party or any of its affiliates or the fact that either party is performing or receiving services hereunder in any press release, marketing materials, website or website content, media statement or public communication, or otherwise publicize this Agreement without the other party's prior review and consent.  Neither party shall use the other party's (or its affiliates') logos, trademarks, service marks or trade names in any way without the other party's prior consent.  Notwithstanding the foregoing, nothing herein shall prohibit Equifax from disclosing the name of Contributor or any of the Members as contributor(s) to Equifax, including such names, when appropriate, in its products and services from its computerized credit reporting system.  Contributor specifically agrees to submit to Equifax for review and approval any and all marketing materials and/or website content referencing Equifax or any Equifax products and services, including, but not limited to any information regarding the purported benefits to a Consumer of reporting rental payments and data to a credit reporting agency.

e.   If any provision of this Agreement is declared invalid or unenforceable, such provision shall be deemed modified to the minimum extent necessary and possible to render it valid and enforceable. In any event, the unenforceability or invalidity of any provision shall not affect any other provision of this Agreement, and this Agreement shall continue in full force and effect, and be construed and enforced, as if such provision had not been included, or had been modified as above provided, as the case may be.

f.   The persons signing below represent and warrant that he or she has the necessary authority to bind the principal(s) set forth below.

IN WITNESS WHEREOF, the parties have caused this Agreement to become effective as of the first date set forth above.

Contributor: CreditMyRent

Signature: _____

Typed Name: Bill Butler

Title: President

Equifax Information Services LLC

Signature: _____

Typed Name: Chris Holiday

Title: VP USIS Programs + Exchanges Leader

**Exhibit B**

**CREDENTIALING STANDARDS AND REQUIREMENTS**

**Credentialing Standards and Requirements**

In order to ensure that Equifax Credit Information is safeguarded and only provided to companies that have been appropriately verified and credentialed, Contributor is required to complete the following due diligence on any Member prior to being provided access to Equifax Information. Proof of all verifications as outlined in Sections 4 and 5 of the Agreement and this Attachment A must be retained and provided to Equifax upon request.

As it relates to the Consumer, Contributor must receive and retain proof of Consumer's consent to access and provide any Consumer Information received by Contributor to Equifax. Additionally, Contributor agrees, and shall require its Members, to verify and report all of Consumer's rental history and information to Equifax for the duration of Consumer's lease term with Member(s), regardless of whether Consumer stop paying for Contributor's services.

Additionally, Contributor must confirm that the potential Member, any DBA, contact information, and/ or any associated individuals are not on the Equifax Alert List (refer to the "Use of The Equifax Alert List" set forth in **Attachment B**).

Verification of the business to include

- Verification that name, address, DBA are consistent on business license and Application for Service
- Proof of verification of a valid business license via copy of the business license/other required license(s) or validation through state appropriate websites or appropriate data bases
    - Valid license should be current and have matching address to business location and application for service
    - Business name on license should match name of business and Application for Service
    - Where no business license is required by the state, county and city, validation of Federal Employer Identification Number (also known as Federal Tax Identification Number) is acceptable, an application applying for a Federal Employer Identification Number is not acceptable, or

- Proof of a professional license issued by the state, or
- Proof of regulation under the FCRA section 621 (b) (1,2, or 3), or
- Proof of 501(c) (3) status, or
- Proof of Articles of Incorporation or Partnership

☐ Conduct a verification of the company's website to validate business activities are consistent as indicated on Application for Service. In the event other business activity is uncovered that was not included on the Application for Service, then Equifax Credit Information cannot be provided if the other business is not permissible or operated from the same business location.
   o Use of open source research to verify ownership of the website and/or internet protocol (IP) address

   o Conduct an online search of the business

   o Search of social networking and information websites sites such as, but not limited to, facebook.com, and google.com of business and email addresses

   o Validation of the phone number provided by the business

   o Office of Foreign Asset Control (OFAC) search on business

Verification of the principal's relationship to the business to ensure he/she is related to the business activity conducted and represents the business. Methods to validate the principal and the business are related include, but not limited to:
   o confirmation that the email address of the principal is in the company's name

   o principal can be reached via the phone number of business

   o proof of financial responsibilities of the business obtained
Verification of permissible purpose
☐ Permissible purpose for access to Equifax Credit Information should be consistent with type of business and request for access
If the business is a publicly traded company that is under the regulatory authority of the U.S. Securities and Exchange Commission, a state and federal government agency or a company subject to the regulatory authority of any agency listed in the FCRA section 621 (b) (1, 2, or 3), principal information will be waived and an onsite inspection requirement will also be waived.

## Attachment B – Credentialing Requirements
## Use of the Equifax Alert List

On a monthly basis, Equifax issues an Alert List to VARs, via email, in a password protected file.  Equifax, from time to time, provides the cumulative Equifax Alert List to its VARs.  The companies listed have engaged in activity that is in non-compliance with their agreement for service and/or have failed to meet Equifax requirements for service. Equifax requires that VARs prevent the resale of Equifax Credit Information to these companies or to any individuals associated with these companies.

VARs must maintain an ongoing alert list, updating it upon receipt of the monthly changes.

To ensure Equifax Credit Information is not resold to companies and/or associated individuals on the alert list, VARs must utilize it when credentialing potential Subscribers as part of the new account credentialing requirements.

Additionally, VARs must compare each element of a listed company to its entire current customer base and take appropriate action should there be a match to any of their subscribers and associated individuals.

The alert list is comprised of the following elements:

Company Name
Also Known As (AKA) / Doing Business As (DBA)
Addresses
Associated Individuals
Telephone Number
Fax Number
Email Address
Website Address
Other Information

The resale of Equifax Credit Information to any company or associated individual on the Equifax Alert list may be considered grounds for immediate suspension or termination of a VAR's Equifax services.  Every necessary precaution must be taken to ensure Equifax Credit Information is not provided to these companies and/or associated individuals.

# EXHIBIT B

January 8, 2020



# Equifax Expands Partnerships with Rent Reporting Service Providers

## The direct-to-consumer partnerships will allow consumers to leverage on-time rent payment history in their credit reports

ATLANTA, Jan. 8, 2020 /PRNewswire/ --Equifax Inc. (NYSE: EFX), today announced new direct-to-consumer partnerships with Esusu, MoCaFi and Zingo that will help develop a more complete picture of a consumer's financial profile. Equifax wants to offer real solutions that meet people wherever they are on their personal finance journey. The rent-reporting platforms enable consumers to opt-in to include rental payment data as part of their respective credit report to allow a more complete picture of financial history. All three companies, as part of their credit education initiatives, will also present their users with a free weekly or monthly VantageScore® credit score so they can track score changes over time.



Most renters' on-time housing payments are not reflected on their credit reports — even though it is often one of the largest and recurring bills consumers pay. Having little to no credit can impact a consumer's ability to qualify for a mortgage, finance a car or take out college loans. These direct-to-consumer Equifax partnerships with Zingo, Esusu and MoCaFi continue to give the underserved population an opportunity to add additional payment depth to their credit histories.

Esusu has been at the forefront of the technology integration of rent reporting and partners with leading public and private sector housing developers to report rent payment data to credit bureaus. It enables tenants to build and establish their credit scores while helping property owners reduce turnover and missed payments to increase their operating income. "Esusu's partnership with Equifax will help accelerate our growth," said Abbey Wemimo and Samir Goel, Co-CEOs, Esusu. "It will also help in creating more financial opportunities and access for millions of Americans."

MoCaFi, short for Mobility Capital Finance, Inc., is a platform that seeks to provide banking services to the underbanked, while helping them build credit and improve their economic mobility. "MoCaFi's partnership with Equifax represents a new paradigm of what's possible when two organizations come together to drive financial inclusion," said Wole Caxum, Founder and CEO, Mobility Capital Finance, Inc. "Our work is already allowing people, especially communities of color, to see the benefits of using rent reporting to impact their credit scores. These are exciting times for us as our work is just getting started."

The Zingo platform collects, verifies and reports rental payments initiated by the consumer,

thus enhancing their credit profile when consistent payment history is reported. "The Zingo automated rent reporting platform puts the consumer in control," said Maria Gallegos, CEO for Zingo.  "Our mission to empower consumer-initiated rent-reporting to Equifax supports their goal to help consumers live their best financial lives."

"Our partnership with these market leading rent-reporting agencies reaffirms our commitment to become a more consumer friendly data and credit reporting agency," said Tom Madison, SVP and General Manager at Equifax Global Consumer Solutions. "This will help provide a more comprehensive view of consumers' payment histories and help people in the pivotal moments in their financial lives, such as applying for their first mortgage or buying a car."

"Everyone, regardless of their income or living situation, deserves the chance to reach their financial goals. Through these partnerships and continued efforts, Equifax aims to help consumers live their financial best by understanding their credit throughout their lifetime," Madison added

**About Equifax**
Equifax is a global data, analytics, and technology company and believes knowledge drives progress. The Company blends unique data, analytics, and technology with a passion for serving customers globally, to create insights that power decisions to move people forward. Headquartered in Atlanta, Equifax operates or has investments in 24 countries in North America, Central and South America, Europe and the Asia Pacific region. It is a member of Standard & Poor's (S&P) 500® Index, and its common stock is traded on the New York Stock Exchange (NYSE) under the symbol EFX. Equifax employs approximately 11,000 employees worldwide. For more information, visit Equifax.com and follow the company's news on Twitter and LinkedIn.

**FOR MORE INFORMATION**

Zehra Mehdi-Barlas
470-373-2376
mediainquiries@equifax.com


C View original content to download multimediahttp://www.prnewswire.com/news-releases/equifax-expands-partnerships-with-rent-reporting-service-providers-300981852.html

SOURCE Equifax Inc.

# EXHIBIT C



# TURSS Master Service Agreement

## TransUnion Rental Screening Solutions Master Agreement for Consumer Reporting and Ancillary Services

This Agreement ("Agreement") is made and entered into as of 10/2/17 (the "Effective Date"), by and between TransUnion Rental Screening Solutions, Inc. ("TURSS") with its principal place of business at 6430 S. Fiddlers Green Circle, Suite 500, Greenwood Village, CO 80111, and CM Rent , Inc , with its principal place of business at 1415 Park Ave W. Denver, CO 80205 ("Subscriber").

In consideration of the promises and mutual covenants hereinafter set forth, TURSS and Subscriber hereto agree as follows:

1. **Scope of Agreement**

   This Agreement applies to any of those information services which Subscriber may desire to receive from TURSS and which TURSS offers to Subscriber. Such information services shall herein be collectively referred to as "Services" and all information derived therefrom shall be collectively referred to as "Services Information."

   Subscriber enters in this Agreement on behalf of itself and its affiliates under common ownership and control, as identified on Exhibit A hereto ("Affiliates"), which Exhibit A may be amended by Subscriber from time to time upon written notice to TURSS, all of which are referred to collectively as Subscriber. Moreover, Subscriber represents and warrants that it has the authority to enter into this Agreement on behalf of the Properties listed on Exhibit B hereto ("Properties"). Subscriber shall immediately provide TURSS written notice upon any additions to or deletions from such Exhibit B.

   This Agreement consists of the general terms and conditions set forth in the body of this Agreement ("General Terms"), Exhibit A, Exhibit B, and Exhibit C ("Fair Isaac Scores"). If there is a conflict between the General Terms and the terms of Exhibit A or Exhibit B, the General Terms shall prevail; if there is a conflict between the General Terms and the terms of Exhibit C, Exhibit C shall prevail solely with respect to the FICO Scores as defined in Exhibit C.

2. **Subscriber's Business**

   Subscriber certifies that the nature of Subscriber's business is:

   ❏ Check one

   a. _____ ❏ Residential Property Lessor/Manager

THE USE OF THIS DOCUMENT IS INTENDED FOR THE EXCLUSIVE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT WAS PROVIDED AND SHOULD NOT BE DISCLOSED TO ANY THIRD PARTY WITHOUT TRANSUNION'S PRIOR WRITTEN CONSENT. NO PART OF THIS PUBLICATION MAY BE STORED IN A RETRIEVAL SYSTEM, TRANSMITTED, REPRODUCED, OR DISTRIBUTED IN ANY FORM OR BY ANY MEANS, ELECTRONIC OR OTHERWISE, WITHOUT THE EXPLICIT PRIOR WRITTEN PERMISSION OF TRANSUNION.

TURSS MASTER SERVICE AGREEMENT                                       APRIL 2015

b. _____   ☐ Employment Screening

c. Rental Services _____   ☑ Other:

**3.    Consumer Reporting Services**

**3.1   Consumer Reporting Information**

TURSS makes certain consumer report information services from consumer reporting databases, including but not limited to, consumer credit reports and criminal record reports ("Consumer Report[s]") available to its customers who have a permissible purpose for receiving such information in accordance with the Fair Credit Reporting Act (15 U.S.C. §1681 et seq.) including, without limitation, all amendments thereto ("FCRA").

**3.2   FCRA Penalties**

THE FCRA PROVIDES THAT ANY PERSON WHO KNOWINGLY AND WILLFULLY OBTAINS INFORMATION ON A CONSUMER FROM A CONSUMER REPORTING AGENCY UNDER FALSE PRETENSES SHALL BE FINED UNDER TITLE 18, OR IMPRISONED NOT MORE THAN TWO (2) YEARS, OR BOTH.

**3.3   Subscriber Certifications**

Subscriber certifies that it shall request Consumer Report Information solely for Subscriber's exclusive one-time use and use such information solely for the permissible purpose(s) that are indicated by Subscriber below in Section 3.4, and for no other purpose, subject however, to the additional restrictions set forth herein. Moreover, if requested by TURSS, Subscriber agrees to, and shall, individually certify the permissible purpose for each Consumer Report it requests, in addition to the blanket certification set forth herein. Such individual certification shall be made by Subscriber pursuant to instructions provided from time-to-time to Subscriber by TURSS. All information received from each Service is for Subscriber's exclusive one-time use.

**3.4   Consumer Report Information Permissible Purpose(s)**

☐ Check all that are applicable.

☑    To use the information in connection with Subscriber's legitimate business need for the information in connection with a business transaction that is initiated by a consumer for personal, family, or household purposes, including, but not limited to, tenant screening.

☐    To use the information in connection with Subscriber's legitimate business need for the information to review an account to determine whether the consumer continues to meet the terms of the account.

☑    Pursuant to the written authorization of the consumer who is the subject of the Consumer Report Information. Subscriber certifies that each such written authorization will expressly authorize Subscriber to obtain the Consumer Report Information, and will contain at a minimum the subject's name, address, Social Security number (where available), and

TransUnion

signature. Subscriber further agrees to retain copies of all such written authorizations for a minimum of five (5) years from the date of inquiry, and make such authorizations available to TURSS upon request. Nothing in this certification, or elsewhere in this Agreement, is intended to allow Subscriber to purchase consumer reports for the purpose of selling or giving the report, or information contained in or derived from it, to the subject of the report, or to any other third-party.

3.4.1  For purposes of this Agreement, the term "adverse action" shall have the same meaning as that term is defined in the FCRA.

3.5   Recommendations

Using Applicant and/or Tenant information provided to TURSS by Subscriber ("Applicant/Tenant Information"), TURSS will obtain Consumer Reports relating to each Applicant and/or Tenant and TURSS will evaluate the Consumer Reports ("Applicant/Tenant Reviews"). Based on the results of the Applicant/Tenant Reviews, TURSS will provide to Subscriber a Recommendation with respect to the Applicant and/or Tenant, based on the initial thresholds established by Subscriber. Such thresholds, delivery specifications, and decision criteria, and any changes thereto, shall be supplied or confirmed by Subscriber in writing. As part of the Recommendation service, TURSS shall also provide to Subscriber a sample letter containing information as to why the Applicant and/or Tenant was or was not approved. It is Subscriber's obligation, however, to ensure compliance with its legal obligations when providing such information to an Applicant and/or Tenant.

3.5.1  Applicant and/or Tenant Consent. Prior to initiating an Applicant/Tenant Review, Subscriber will obtain the written consent of each individual Applicant and/or Tenant.

3.5.2  All Rental Decisions to be made by Subscriber. Subscriber acknowledges and agrees that TURSS provides only Recommendations as to actions concerning an Applicant or a Tenant, and further acknowledges and agrees that all decisions of whether or not to rent property to a particular Applicant or Tenant, as well as the length of and terms of any such rental, will be made by Subscriber. Except in the case of gross negligence or willful misconduct, which are subject to the limitations on liability set forth herein, TURSS shall have no liability to Subscriber or to any Applicant, Tenant, or other person or entity for any rental, or the failure to rent, to any Applicant or Tenant, or the terms of any such rental, regardless of whether or not Subscriber's decision was based on Recommendations, credit reports, or other information provided to Subscriber by TURSS.

3.6   Consumer Report Retention

Unless otherwise stated in writing by TURSS, consumer reports are retained on behalf of Subscriber for a period of sixty (60) days. Notwithstanding section 3.3 above, Consumer Reports may be accessed by Subscriber within this retention period only for and in connection with the original permissible purpose certified by Subscriber and may not be used for any other subsequent use, even if the permissible purpose of any subsequent use is the same as that

TransUnion

originally certified by Subscriber. The parties agree that CreditRetriever Recommendations are based on Subscriber criteria and the may be retained by TURSS on behalf of Subscriber beyond sixty (60) days and used for depersonalized data analytics and customer service purposes.

## 3.7  Compliance with Laws

Each party hereto shall be responsible for compliance with all applicable Federal (including, but not limited to, the FCRA) and state laws, rules, regulations and judicial actions, as now or as may become effective, to which it is subject. When Subscriber requests a consumer report on a Vermont resident, Subscriber expressly agrees to obtain the consumer's consent before requesting said consumer report to the extent and in the manner required by Vermont law. In the event Subscriber obtains Office of Foreign Asset Control ("OFAC") Name Screen or other public record Services from TURSS in conjunction with Consumer Report or as an append to an ancillary service, Subscriber shall be solely responsible for taking any action that may be required by law as a result of a potential match to the OFAC information or other public record information, and shall not deny or otherwise take any adverse action against any consumer which is based, in whole or in part, on TURSS's OFAC Name Screen or any other public record information services. Such messages may be delivered with Consumer Reports as a convenience, but are not part of a consumer's file nor are they intended to be Consumer Reports.

## 4.  Ancillary Services

## 4.1  Fraud Prevention Services

TURSS offers several fraud prevention services that evaluate inquiry input elements against other input elements and/or against proprietary databases, to identify potential discrepancies and/or inaccuracies. Fraud prevention service messages may be delivered with Consumer Reports as a convenience, but are not part of a consumer's file nor are they intended to be Consumer Reports. In the event Subscriber obtains any fraud prevention services from TURSS in conjunction with a Consumer Report or as a standalone service, Subscriber shall not use the fraud prevention services, in whole or in part, as a factor in establishing an individual's creditworthiness, or eligibility for credit, or insurance, or employment, nor for any other purposes under the FCRA. Moreover, Subscriber shall not take any adverse action, which is based in whole or in part on the fraud prevention services, against any consumer. As a result of information obtained from the fraud prevention services, it is understood that Subscriber may choose to obtain additional information from one or more additional independent sources. Any action or decision as to any individual which is taken or made by Subscriber regarding any individual and based solely on such additional information obtained from independent source(s) shall not be prohibited by this paragraph.

## 4.1.1 Reference Services.

4.1.2  TURSS offers a suite of reference services from sources other than a Consumer Reporting Database ("Non-CRD Reference Services"), which it may make available to Subscriber under the

TransUnion

terms of this Agreement. Subscriber shall not use Non-CRD Reference Services for marketing purposes without the prior written consent of TURSS.

4.1.3  TURSS also offers the suite of reference services from a Consumer Reporting Database ("CRD Reference Services"). If Subscriber desires to receive CRD Reference Services, Subscriber hereby certifies that the specific purpose(s) for which the CRD Reference Services will be requested, obtained and used by Subscriber is one or more of the following uses as described in, and as may be interpreted from time to time, by competent legislative, regulatory or judicial authority, and as being encompassed by Section (6802)(e) of the Gramm-Leach-Bliley Act, Title V, Subtitle A, Financial Privacy (15 U.S.C. § 6801-6809) ("GLB") and the United States Federal Trade Commission rules promulgated thereunder. Subscriber shall not request, obtain or use such CRD Reference Services for any other purpose.

- As necessary to effect, administer, or enforce a transaction requested or authorized by the consumer, or in connection with servicing or processing a financial product or service requested or authorized by the consumer;

- As necessary to effect, administer, or enforce a transaction requested or authorized by the consumer, or in connection with maintaining or servicing the consumer's account with Subscriber and Subscriber is a financial institution;

- With the consent or at the direction of the consumer;

- To protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability;

- For use solely in conjunction with a legal or beneficial interest held by Subscriber and relating to the consumer; or,

- For use solely in Subscriber's fiduciary or representative capacity on behalf of the consumer.

## 4.2  Scores

Subscriber may request, in writing, that TURSS provide Subscriber certain scores (such as scores received from credit reporting agencies ["Bureau Score"] and CreditRetriever$^{SM}$ Score), in connection with the delivery of a Consumer Report obtained hereunder collectively referred to herein as "Scores" for Subscriber's exclusive use. TURSS agrees to perform such processing as reasonably practicable. Subscriber shall use Scores only in accordance with its permissible purpose under the FCRA, indicated in Section 3.4 above, and may store Scores solely for Subscriber's own use in furtherance of Subscriber's original purpose for obtaining the Scores. Subscriber shall not use the Scores for model development or model calibration and shall not reverse engineer the Scores.

### 4.2.1  Adverse Action Factors

Subscriber recognizes that factors other than the Scores may be considered in making a decision regarding a consumer. Such other factors include, but are not limited to, the credit report, the individual account history, application information, and economic factors. TURSS

TransUnion

may provide score reason codes to Subscriber, which are designed to indicate the principal factors that contributed to the Bureau Score, and may be disclosed to consumers as the reasons for taking adverse action, as required by the Equal Credit Opportunity Act ("ECOA") and its implementing Regulation ("Reg. B"). The Bureau Score itself, when accompanied by the corresponding reason codes, may also be disclosed to the consumer who is the subject of the Bureau Score. However, the Bureau Score itself may not be used as the reason for adverse action under Reg. B.

### 4.2.2 Confidentiality of Scores

The CreditRetriever[SM] Score is proprietary to TURSS and the Bureau Score is proprietary to the credit reporting agency supplying the Bureau Score and, accordingly, without appropriate prior written consent, neither the CreditRetriever[SM] Score nor the Bureau Score may be sold, licensed, copied, reused, disclosed, reproduced, revealed, or made accessible, in whole or in part, to any Person except: (a) as expressly permitted herein; (b) to those employees of Subscriber with a need to know and in the course of their employment; (c) to those third-party processing agents of Subscriber who have executed an agreement that limits the use of the Scores by the third-party only to the use permitted to Subscriber and contains the prohibitions set forth herein regarding model development, model calibration and reverse engineering; (d) when accompanied by the corresponding reason codes, to the consumer who is the subject of the Score; or (e) as required by law. Subscriber shall not, nor permit any third-party to, publicly disseminate any results of the validations or other reports derived from the Scores without prior written consent.

### 4.2.3 Score Performance

Certain Scores are implemented with standard minimum exclusion criteria. TURSS shall not be liable to Subscriber for any claim, injury, or damage suffered directly or indirectly by Subscriber as a result of any Subscriber-requested changes to the exclusion criteria which result in normally excluded records being scored by such Scores. TURSS warrants that the scoring algorithms used in the computation of the scoring services, provided under this Agreement, ("Models") are empirically derived from credit data and are a demonstrably and statistically sound method of rank-ordering candidate records with respect to the purpose of the Scores when applied to the population for which they were developed, and that no scoring algorithm used by a Score uses a "prohibited basis" as that term is defined in ECOA and Reg. B promulgated thereunder. The Bureau Score may appear on a credit report for convenience only, but is not a part of the credit report nor does it add to the information in the report on which it is based.

## 4.3 Depersonalized Data Services

From time to time, Subscriber may desire to obtain depersonalized data ("Data Services") identified in a Data Services request form or other mutually agreed upon document signed by an authorized representative of Subscriber ("Data Services Request" or "DSR").

Subscriber represents and warrants that Subscriber shall use any and all Data Services received pursuant to this Agreement solely for one or more of the following purposes:

A.        Determination of the validity of an existing risk score model or of certain data attributes, when such model or attributes will be used in conjunction with the evaluation of consumer report information received and used under this Agreement;

B.        Building Subscriber's own Consumer Report-based model which model shall be used solely in conjunction with the evaluation of Consumer Report(s) received and used under this Agreement;

C.        Review and validation of Subscriber's policies relating to credit eligibility or any other permissible purpose under the FCRA, which policies Subscriber shall use in conjunction with evaluating Consumer Report(s) received and used under this Agreement;

D.        Determination of the qualitative value of Consumer Report(s) TURSS provides under this Agreement; or,

E.        Other appropriate purpose as agreed to by TURSS and Subscriber in an applicable DSR.

Subscriber shall not use Data Services for any other purpose and shall take no action as to any individual consumer as the result of the Data Services received under this Agreement. With respect to each request for Data Services, Subscriber represents and warrants that Subscriber will make no attempt to re-personalize Data Services. Subscriber further represents and warrants that: (i) it does not have the ability to match the Data Services to the identity of any consumer; (ii) it shall make no attempt to obtain data permitting it to match the Data Services to the identity of any consumer; (iii) it will not accept any information from any third party that permits such a match; and, (iv) it will make no such match.

## 4.4   Third-Party Scores and Other Third-Party Services

TURSS has the capability to offer scores derived from models built by, or jointly with, third parties, and other services provided by third parties, that are subject to separate warranties offered or terms imposed by such third parties. If desired by Subscriber, such third-party scores and services shall be made available pursuant to separate agreement or an exhibit or  schedule to this Agreement.

## 4.5   Subscriber Forms

TURSS may electronically maintain and make available to Subscriber, at Subscriber's request and direction, Subscriber's forms including, but not limited to, lease forms, lease addenda, and consumer correspondence. Subscriber acknowledges and agrees that it is Subscriber's obligation to ensure the accuracy and completeness of the forms and to ensure its compliance with all applicable laws related to the use of such forms. TURSS makes no representations or warranties as to the content or use of such forms.

TransUnion

### 4.6 Subscriber Access

Subscriber agrees that TURSS may store data provided to Subscriber hereunder on behalf of Subscriber to be used by Subscriber solely for audit purposes and for no other purpose. All data stored on behalf of Subscriber by TURSS shall be owned by Subscriber and except as expressly described above, may not be modified in any manner.

## 5. Additional Terms and Conditions

### 5.1 Confidentiality

Subscriber shall hold all Services Information in confidence and shall not disclose the Services to any third-party, except as required by law (such as an order of a court or data request from an administrative or governmental agency with competent jurisdiction) to be disclosed; provided however, that Subscriber shall provide TURSS ten (10) days prior written notice before the disclosure of such information pursuant to this Section 5.1. However, this restriction shall not prohibit Subscriber from disclosing to the subject of the Consumer Report, who is the subject of an adverse action, the content of the Consumer Report as it relates to any such adverse action.

### 5.2 Website Access

TURSS will provide Subscriber with access to TURSS's website (the "TURSS Site") so that Subscriber may, by accessing the TURSS Site, (i) initiate Applicant Reviews and Tenant Reviews and (ii) obtain or review Recommendations provided under this Agreement. TURSS will assign one or more passwords and identification numbers or user IDs ("Program Codes") to Subscriber for use in accessing the TURSS Site. Subscriber represents and warrants that it will use its best reasonable efforts to ensure that: (1) only authorized Subscriber employees have access to the TURSS Site through workstations; (2) TURSS Services obtained by Subscriber via the TURSS Site are not accessible by unauthorized parties via Subscriber's connection to the Internet or otherwise; (3) all passwords are kept confidential and secure by such authorized Subscriber employees (e.g. Subscriber shall ensure that passwords are not stored on any workstation nor other storage and retrieval system and/or media and that Internet browser caching functionality is not used to store passwords); (4) each user ID and password is used solely by the authorized Subscriber employee to whom such user ID and password was issued; and (5) all documentation and other materials provided by TURSS to Subscriber under this Agreement are held in confidence by Subscriber (and accessible only to those Subscriber employees who Subscriber has authorized to utilize the TURSS Site). Subscriber shall immediately notify TURSS if a Subscriber user with access to Program Codes no longer works for Subscriber and shall be fully responsible for any use of the TURSS site by users accessing the site through the Program Codes assigned to the Subscriber. In the event of any compromise of security involving user IDs or passwords, Subscriber shall immediately notify TURSS.

### 5.3 Safeguards

TransUnion

Each party shall implement, and shall take measures to maintain, reasonable and appropriate administrative, technical, and physical security safeguards ("Safeguards") to (a) ensure the security and confidentiality of non-public personal information; (b) protect against anticipated threats or hazards to the security or integrity of non-public personal information; and (c) protect against unauthorized access or use of non-public personal information that could result in substantial harm or inconvenience to any consumer. When a consumer's first name or first initial and last name in combination with a Social Security number, driver's license or Identification Card Number, or account number, credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account ("Personal Information"), is delivered to Subscriber unencrypted, Subscriber shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information and to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure. Subscriber shall notify TURSS in writing as soon as practicable but in no event later than forty-eight (48) hours after which Subscriber becomes aware of any potential and/or actual misappropriation of, and/or any unauthorized disclosures of, any information provided to Subscriber by TURSS, including, but not limited to, theft, loss, or interception of Consumer Reports or information derived from Consumer Reports, unauthorized use of TURSS subscriber codes and passwords, unauthorized entry to the facilities where TURSS data may have been accessible, or unauthorized release of, or access to, TURSS data by an employee or Agent of Subscriber. Subscriber shall fully cooperate with TURSS in any communications to consumers regarding the data incident and mitigating, to the extent practicable, any damages due to such misappropriation and/or unauthorized disclosure. Such cooperation shall include, but not necessarily be limited to, allowing TURSS to participate in the investigation of the cause and extent of such misappropriation and/or unauthorized disclosure. Such cooperation shall not relieve Subscriber of any liability it may have as a result of such a misappropriation and/or unauthorized disclosure. Moreover, without TURSS's prior consent, Subscriber shall make no public notification, including but not limited, to press releases or consumer notifications, of the potential or actual occurrence of such misappropriation and/or unauthorized disclosure of any such information provided to Subscriber.

5.4 **Authorized Requests**

Subscriber shall use the Services: (a) solely for the Subscriber's certified use(s); (b) solely for Subscriber's exclusive one-time use; and (c) subject to the terms and conditions of this Agreement. Subscriber shall not request, obtain, or use Services for any other purpose including, but not limited to, for the purpose of selling, leasing, renting, or otherwise providing information obtained under this Agreement to any other party, whether alone, in conjunction with Subscriber's own data, or otherwise in any service which is derived from the Services. Services shall be requested by, and disclosed by Subscriber to only Subscriber's designated and authorized employees having a need to know and only to the extent necessary to enable Subscriber to use the Services in accordance with this Agreement. Subscriber shall ensure that such Subscriber designated and authorized employees shall not attempt to obtain any Services on themselves, associates, or any other person except in the exercise of their official duties.

TransUnion

## 5.5   Third-Party Intermediaries

In the event Subscriber will utilize a third-party intermediary (such as Internet service provider or other network provider) for the purpose of receiving Services, Subscriber shall first enter into an agreement with such third-party under which such third-party acts solely as a network conduit for the delivery of the Services to Subscriber and which prohibits such third-party from using, or otherwise accessing, the Services for any other purpose. Subscriber shall be solely liable for any actions or omissions of such third parties which result in a breach of this Agreement.

## 5.6   Rights to Services

Subscriber shall not attempt, directly or indirectly, to reverse engineer, decompile, or disassemble Services, or any confidential or proprietary criteria developed or used by TURSS relating to the Services provided under this Agreement. Except as explicitly set forth in this Agreement, the entire right, title, and interest in and to the Services shall at all times vest exclusively in TURSS. TURSS reserves all rights not explicitly granted to Subscriber under this Agreement.

## 5.7   Fees and Payments

Subscriber agrees to pay the fees and charges, as mutually agreed upon, for Services provided to Subscriber under this Agreement. Such pricing is hereby incorporated into this Agreement by reference. Any periodic and/or minimum Subscriber fees under this Agreement are non-refundable, in whole or in part, in the event of a termination of this Agreement. TURSS reserves the right to change the fees and charges from time-to-time, but no change in such charges shall become effective as to the Subscriber earlier than thirty (30) days after written notice thereof shall have been given by TURSS to Subscriber.

5.7.1   In addition, in the event that TURSS's cost of rendering Services increases as a result of federal, state, or local laws, ordinances or other regulatory, administrative, or governmental acts, then TURSS may implement a surcharge subject to the following: (a) any surcharge will be applicable generally to TURSS's customers; (b) TURSS will provide sixty (60) days prior written notice to Subscriber prior to implementing any new surcharge; and (c) any surcharge will be applied only to services pertaining to consumers in the geographic area so affected. A legislative surcharge is imposed on certain types of reports pertaining to consumers residing in the United States, and an additional surcharge is imposed on certain reports pertaining to only Colorado residents.

5.7.2   TURSS shall provide invoices to Subscriber and Subscriber shall pay such invoices within thirty (30) days of the invoice date. Invoices which are not paid within sixty (60) days of the invoice date shall be subject to a late charge of one and one-half percent (1.5%) per month (eighteen percent (18%) per year) or the maximum allowed by law, whichever is less. If collection efforts are required, Subscriber shall pay all costs of collection, including reasonable attorneys' fees.

## 5.8   Term, Termination, and Survival

This Agreement shall commence upon the Effective Date and remain in effect for one (1) year ("Initial Term"). Thereafter, unless earlier renewed by written amendment or earlier terminated as provided for herein, this Agreement will continue on a month to month basis and shall remain in effect until terminated by either party hereto for any reason whatsoever by providing thirty (30) days prior written notification to the other party. TURSS may also terminate this agreement for convenience at any time upon thirty (30) days notice to Subscriber. Moreover, without limiting any other remedies to which either party may be entitled if a party, in good faith, determines that the other party has materially breached any of its obligations under this Agreement, such party shall provide written notice to the other party of such determination. The breaching party shall have thirty (30) days to cure any alleged breach, provided that such breach is curable. If the breaching party fails to cure within thirty (30) days of receiving such written notice or if such breach is not curable, the non-breaching party shall have the right to immediately suspend its performance, in whole or in part, under this Agreement, immediately terminate this Agreement, or both.

5.8.1   The foregoing notwithstanding, TURSS reserves the right, at TURSS's sole option, to immediately suspend its performance, in whole or in part, under this Agreement, or immediately terminate this Agreement, if TURSS, in good faith, determines that (a) the requirements of any law, regulations, and/or judicial action have not been met; (b) as a result of any new, or changes in existing, laws, regulations, and/or judicial actions, that the requirements of any law, regulation, and/or judicial action will not be met; and/or (c) the use of the Services is the subject of litigation or threatened litigation by any governmental agency.

5.8.2   With the exception of TURSS's obligation to provide Services under this Agreement, all provisions of this Agreement shall survive any such termination of this Agreement including, but not limited to, all restrictions on Subscriber's use of Services Information. Moreover, any such termination shall not relieve Subscriber of any fees or other payments due to TURSS through the date of any such termination nor affect any rights, duties, or obligations of either party that accrue prior to the effective date of any such termination.

5.9   Limited Warranty

TURSS represents and warrants that the Services will be provided in a professional and workmanlike manner consistent with industry standards. **TURSS DOES NOT WARRANT THE SERVICES TO BE UNINTERRUPTED OR ERROR-FREE OR THAT THE SERVICES WILL MEET SUBSCRIBER'S REQUIREMENTS. THE WARRANTY SET FORTH IN THIS SECTION 5.9 IS IN LIEU OF ALL OTHER WARRANTIES, WHETHER STATUTORY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES THAT MIGHT BE IMPLIED FROM A COURSE OF PERFORMANCE OR DEALING OR TRADE USAGE OR WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

5.10   Limitation of Liability

**TURSS'S SOLE LIABILITY, AND SUBSCRIBER'S SOLE REMEDY, FOR NEGLIGENT VIOLATIONS OF THIS AGREEMENT BY TURSS OR FOR BREACH OF TURSS'S**

**OBLIGATIONS SET FORTH IN SECTION 5.9 ABOVE SHALL BE THE CORRECTION OF ANY DEFECTIVE SERVICE OR THE REFUND OF FEES PAID FOR SAME. SUBSCRIBER'S SOLE LIABILITY, AND TURSS'S SOLE REMEDY, FOR NEGLIGENT VIOLATIONS OF THIS AGREEMENT BY SUBSCRIBER SHALL BE CAPPED AT THE FEES BILLED UNDER THIS AGREEMENT FOR THE SERVICES GIVING RISE TO THE CLAIM. FOR ALL CLAIMS BY EITHER PARTY AGAINST THE OTHER ARISING OUT OF SUCH OTHER PARTY'S INTENTIONAL OR CRIMINAL MISCONDUCT OR WILLFUL VIOLATION OF THIS AGREEMENT, THE CULPABLE PARTY'S TOTAL LIABILITY SHALL BE CAPPED AT SIX (6) TIMES THE AVERAGE MONTHLY REVENUE BILLED UNDER THIS AGREEMENT PRIOR TO THE CLAIM(S) ARISING.**

5.10.1   IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES INCURRED BY THE OTHER PARTY AND ARISING OUT OF THE PERFORMANCE OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO LOSS OF GOOD WILL AND LOST PROFITS OR REVENUE, WHETHER OR NOT SUCH LOSS OR DAMAGE IS BASED IN CONTRACT, WARRANTY, TORT, NEGLIGENCE, STRICT LIABILITY, INDEMNITY, OR OTHERWISE, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

5.10.2   ADDITIONALLY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY AND ALL CLAIMS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT BROUGHT MORE THAN TWO (2) YEARS AFTER THE CAUSE OF ACTION HAS ACCRUED.

## 5.11 Assignment and Subcontracting

Neither party may assign or otherwise transfer this Agreement, in whole or in part without the prior written consent of the other, and such consent shall not be unreasonably withheld. Notwithstanding the foregoing, TURSS may assign or transfer this Agreement to a whollyowned subsidiary or in the event of a purchase of substantially all of TURSS's assets or in the event of a corporate form reorganization (e.g., LLC to C-Corporation), and Subscriber may assign or transfer its rights and/or obligations under this Agreement to any Affiliate of Subscriber identified on Exhibit A hereto. Moreover, TURSS shall have the unrestricted right to subcontract the Services to be provided to Subscriber by TURSS under this Agreement; provided however, that such subcontracting shall not relieve TURSS of its obligations under this Agreement. The limited warranty and limitation of liability provisions set forth in this Agreement shall also apply for the benefit of TURSS's licensors, subcontractors, and agents.

## 5.12 No Waiver

No failure on the part of either party to enforce any covenant, agreement, or condition of this Agreement shall operate as a discharge of such covenant, agreement, or condition, or render the

TransUnion

same invalid, or impair the right of either party to enforce the same in the event of any subsequent breach by the other party.

### 5.13 Independent Contractors

This Agreement is not intended to create or evidence any employer-employee arrangement, agency, partnership, joint venture, or similar relationship.

### 5.14 Severability

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

### 5.15 Force Majeure

TURSS shall not be liable for any delay in performance or failure to perform under this Agreement if such delay or failure as caused by conditions beyond TURSS' reasonable control.

### 5.16 Audit Rights

During the term of this Agreement and for a period of five (5) years thereafter, TURSS may audit Subscriber's policies, procedures, and records which pertain to this Agreement, to ensure compliance with this Agreement, upon reasonable notice and during normal business hours.

### 5.17 Governing Law

This Agreement shall be construed and governed by the laws of the State of Colorado, without reference to the choice of law principles thereof.

### 5.18 Notices

All communications or notices required or permitted by this Agreement shall be sufficiently given for all purposes hereunder if given in writing and delivered (i) personally, (ii) by United States first class mail, (iii) by reputable overnight delivery service, (iv) by electronic mail, or (v) by facsimile. All notices delivered in accordance with this Section shall be sent to the appropriate address or number, as set forth below:

| SUBSCRIBER | CM Rent, Inc |
| | 1415 Park Ave W |
| | Denver, CO 80205 |
| TURSS | TransUnion Rental Screening Solutions |

TransUnion

| | |
|---|---|
| | 6430 S. Fiddlers Green Circle |
| | Suite 500 |
| | Greenwood Village, CO 80111 |

5.19 **Trademarks**

Both Subscriber and TURSS shall submit to the other party for written approval, prior to use, distribution, or disclosure, any material including, but not limited to, all advertising, promotion, or publicity in which any trade name, trademark, service mark, and/or logo (hereinafter collectively referred to as the "Marks") of the other party are used (the "Materials"). Such party, from whom approval is being requested, will not unreasonably withhold its approval. Both parties shall have the right to require, at each party's respective discretion and as communicated in writing, the correction or deletion of any misleading, false, or objectionable material from any Materials. Moreover, when using the other party's Marks pursuant to this Agreement, a party shall take all reasonable measures required to protect the other party's rights in such Marks, including, but not limited to, the inclusion of a prominent legend identifying such Marks as the property of the other party. In using each other's Marks pursuant to this Agreement, each party acknowledges and agrees that (i) the other party's Marks are and shall remain the sole properties of the other party, (ii) nothing in this Agreement shall confer in a party any right of ownership in the other party's Marks, and (iii) neither party shall contest the validity of the other party's Marks. Notwithstanding anything in this Agreement to the contrary, without the prior written approval of Subscriber, TURSS shall have the right to disclose to third parties Subscriber's marks in consumer credit reports containing Subscriber's account information.

5.20 **CFPB Notices.** By signing this Agreement, Subscriber acknowledges receipt of a copy of the Consumer Financial Protection Bureau's (CFPB) "Notice to Users of Consumer Reports: Obligations of Users Under the FCRA" and a copy of the Consumer Financial Protection Bureau's "Notices to Furnishers of Information: Obligations of Furnishers Under the FCRA". Any future updates to the forgoing notices will be accessible by Subscriber on TransUnion's website.

5.21 **Authority.** The individual executing this Agreement has direct knowledge of all facts certified and the authority to both execute this Agreement on behalf of Subscriber and bind Subscriber to the terms of this Agreement.

5.22 **Entire Agreement**

**THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, ALL EXHIBITS AND ATTACHMENTS HERETO, CONSTITUTES THE ENTIRE AGREEMENT BETWEEN TURSS AND SUBSCRIBER AND SUPERSEDES ALL PREVIOUS AGREEMENTS AND UNDERSTANDINGS, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, SOLELY WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT. THIS AGREEMENT MAY NOT BE ALTERED, AMENDED, OR MODIFIED EXCEPT BY WRITTEN INSTRUMENT**

 © 2015 TransUnion LLC All Rights Reserved

TURSS MASTER SERVICE AGREEMENT                                                    APRIL 2015

**SIGNED BY THE DULY AUTHORIZED REPRESENTATIVES OF BOTH PARTIES. THIS
AGREEMENT SHALL NOT BE BINDING ON EITHER PARTY UNTIL SIGNED BY TURSS.**

**IN WITNESS WHEREOF,** the parties, intending to be legally bound, have caused this Agreement to be
executed by their duly authorized representatives. The parties hereto agree that a facsimile
transmission of this fully executed Agreement shall constitute an original and legally binding document.

TRANSUNION RENTAL SCREENING SOLUTIONS, INC

| | |
|---|---|
| | CM Rent, Inc |
| | COMPANY NAME |
| By: _____ | By: _____ |
| TURSS REPRESENTATIVE | COMPANY REPRESENTATIVE |
| _____ | Bill Butler, President |
| NAME AND TITLE OF SIGNER (PLEASE PRINT) | NAME AND TITLE OF SIGNER (PLEASE PRINT) |
| _____ | 10/2/17 |
| DATE SIGNED | DATE SIGNED |
| | _____ |
| | SUBSCRIBER CODE NUMBER ASSIGNED |

TransUnion

# EXHIBIT A

AFFILIATES

TransUnion

TURSS MASTER SERVICE AGREEMENT

APRIL 2015

# EXHIBIT B

PROPERTIES

TransUnion

# EXHIBIT C

## FAIR ISAAC SCORES

This Exhibit for Fair Isaac Scores is entered into pursuant to the terms of that certain TURSS Master Agreement for Consumer Reporting and Ancillary Services entered between TURSS and Subscriber. In the event of a conflict between this Exhibit and the Agreement, this Exhibit shall govern solely with respect to FICO Scores.

1.      This Exhibit governs the use by Subscriber of credit risk scores or insurance risk scores of Fair Isaac Corporation ("Fair Isaac") ("FICO Scores") Subscriber receives from TURSS. From time to time, Subscriber may request that TURSS provide FICO Scores (other than Archive Scores, as defined below), and TURSS agrees to perform such processing as reasonably practicable, for each one of the following purposes requested: (a) in connection with the review of an on-line consumer report it is obtaining from TURSS; (b) for the review of the portion of its own open accounts and/or closed accounts with balances owing that it designates; (c) as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; (d) for use as a selection criteria to deliver a list of names to Subscriber, or Subscriber's designated third party processor agent, for transactions not initiated by the consumer for the extension of a firm offer of credit or insurance; or (e) [with respect to the insurance risk scores only], for use in connection with the underwriting of insurance involving the consumer.  Subscriber shall use each such FICO Score only once and, with respect to FICO Scores other than Archive Scores, only in accordance with the permissible purpose under the FCRA for which Subscriber obtained the FICO Scores.

2.      Subscriber may also request that TURSS provide FICO Scores that utilize archived, depersonalized, consumer report information ("Archive Scores") and TURSS agrees to perform such processing as reasonably practicable.  Subscriber shall use the Archive Scores solely to determine the validity of the FICO Scores for the benefit of Subscriber for the single project for which the Archive Scores were acquired, but for no other purpose and for no other entity.  Determining validity of the FICO Scores consists solely of: (a) internal validation on Subscriber's own account performance data; (b) internal evaluation of the predictive strength of the FICO Scores as compared to other scores, (c) internal evaluation of the value of the FICO Scores as an internal component of custom models; and/or (d) establishing score cut-offs and strategies, as they relate to Subscriber's portfolios. Subscriber shall not make any attempt to link the Archive Scores to any information which identifies the individual consumers.

3.      Subscriber acknowledges that the FICO Scores are proprietary to Fair Isaac and that Fair Isaac retains all intellectual property rights in the FICO Scores and the Model(s) (defined below) used by TURSS to generate the FICO Scores.  Fair Isaac grants to Subscriber, effective during the term of this Exhibit, a personal, non-exclusive, non-transferable, limited license to use, internally, the FICO Scores solely for the particular purpose set forth in Section 1 or 2 above for which the FICO Scores were obtained, subject to the limitations set forth in this Exhibit, including, but not limited to the single use restrictions set forth above. Subscriber's use of the FICO Scores must comply at all times with applicable federal, state and local law and regulations, and Subscriber hereby certifies that it will use each FICO Score (other than Archive Scores) only for a permissible purpose under the FCRA. Subscriber shall not attempt to discover, reverse engineer, or similar or emulate the functionality of the FICO Scores, Models or other proprietary information of Fair Isaac, or use the FICO Scores in any manner not permitted under this Exhibit, including, without limitation, for resale to third parties, model development, model validation (except as expressly set forth above in Paragraph 2 of this Exhibit), model benchmarking, model calibration or any other purpose that may result in the replacement of or discontinued use of the FICO Scores. "Model" means Fair Isaac's proprietary scoring algorithm(s) embodied in its proprietary scoring software delivered to and operated by TURSS.

4.      Subscriber shall not disclose the FICO Scores nor the results of any validations or other reports derived from the FICO Scores to any third party (other than a consumer as expressly provided for below in this Section 4) unless: (a) such disclosure is clearly required by law; (b) Fair Isaac provides written consent in advance of such disclosure; and/or (c) such third party Subscriber's designated third party processor agent aforementioned

TransUnion

above in Section 1; provided however that in either (i.e., (b) or (c) above) event, Subscriber may make such disclosure (or in the event of (c), direct TURSS to deliver such lists) only after Subscriber has entered into an agreement with the third party that (i) limits use of the FICO Scores to only the use permitted to Subscriber hereunder; (ii) obligates the third party provider to otherwise comply with the terms of this Exhibit; and (iii) names Fair Isaac as an intended third party beneficiary of such agreement. Subscriber shall not disclose a FICO Score to the consumer to which it pertains unless such disclosure is required by law or is in connection with an adverse action (as defined by the FCRA) and then only when accompanied by the corresponding reason codes. For the avoidance of doubt, Subscriber is expressly prohibited from disclosing FICO Scores to consumers for any other purpose whatsoever, including, without limitation, in conjunction with any FICO Open Access program or any "scores on statements" type program.

5.      Subject to conditions which follow, Fair Isaac warrants that, as delivered to TURSS, the Models used to produce the FICO Scores delivered hereunder are empirically derived and demonstrably and statistically sound. These warranties are conditioned on: (a) Subscriber's use of each FICO Score for the purposes for which the respective Model was designed, as applied to the United States population used to develop the scoring algorithm, (b) Subscriber's compliance with all applicable federal, state and local laws pertaining to use of the FICO Scores, including Subscriber's duty (if any) to validate or revalidate the use of credit scoring systems under the Equal Credit Opportunity Act and its implementing Regulation B ("Reg. B") and (c) Subscriber's use of the FICO Scores otherwise remaining in compliance with the terms of this Exhibit. Fair Isaac also warrants that the credit scoring algorithm does not consider any "prohibited basis" as defined or restricted by Reg. B. FOR ANY BREACH OF THIS WARRANTY, SUBSCRIBER'S SOLE AND EXCLUSIVE REMEDY, AND FAIR ISAAC'S AND TURSS'S ENTIRE LIABILITY, SHALL BE RECALCULATION OF THE FICO SCORES THAT FORMED THE BASIS OF SUCH BREACH. FAIR ISAAC AND TURSS HEREBY DISCLAIM ALL OTHER WARRANTIES, WHETHER STATUTORY, EXPRESS OR IMPLIED INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND OTHER WARRANTIES THAT MIGHT BE IMPLIED FROM A COURSE OF PERFORMANCE OR DEALING OR TRADE USAGE.

6.      IN NO EVENT SHALL SUBSCRIBER, TURSS OR FAIR ISAAC BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES INCURRED BY ANY PARTY AND ARISING OUT OF THE PERFORMANCE OF THIS EXHIBIT, INCLUDING BUT NOT LIMITED TO LOSS OF GOOD WILL AND LOST PROFITS OR REVENUE, WHETHER OR NOT SUCH LOSS OR DAMAGE IS BASED IN CONTRACT, WARRANTY, TORT, NEGLIGENCE, STRICT LIABILITY, INDEMNITY, OR OTHERWISE, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND EVEN IF SUCH DAMAGES WERE REASONABLY FORESEEABLE. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. THE FOREGOING LIMITATIONS SHALL NOT APPLY TO FAIR ISAAC'S OR TURSS'S VIOLATION OF SUBSCRIBER'S INTELLECTUAL PROPERTY RIGHTS NOR SUBSCRIBER'S VIOLATION OF TURSS'S OR FAIR ISAAC'S INTELLECTUAL PROPERTY RIGHTS (INCLUDING THE USE OR DISCLOSURE OF FICO SCORES IN VIOLATION OF THE TERMS OF THIS EXHIBIT). ADDITIONALLY, NEITHER TURSS NOR FAIR ISAAC SHALL BE LIABLE FOR ANY CLAIM ARISING OUT OF OR IN CONNECTION WITH THIS EXHIBIT BROUGHT MORE THAN ONE (1) YEAR AFTER THE CAUSE OF ACTION HAS ACCRUED. IN NO EVENT SHALL TURSS'S AND FAIR ISAAC'S COMBINED AGGREGATE TOTAL LIABILITY UNDER THIS EXHIBIT EXCEED THE AMOUNTS PAID UNDER THIS EXHIBIT DURING THE PRECEDING TWELVE (12) MONTHS FOR THE FICO SCORES THAT ARE THE SUBJECT OF THE CLAIM(S) OR TEN THOUSAND DOLLARS ($10,000.00), WHICHEVER AMOUNT IS LESS.

7.      Upon prior written notice, Fair Isaac shall have the right to audit Subscriber to verify Subscriber's compliance with this Exhibit. Subscriber shall accommodate Fair Isaac in connection with such audit. Such accommodation shall include, but not be limited to on-site inspect of Subscriber's records, systems and such documentation as deemed reasonably necessary to demonstrate compliance with this Exhibit. TURSS and Subscriber acknowledge and agree that Fair Isaac is a third party beneficiary hereunder with respect to the Models, FICO Scores, and other Fair Isaac intellectual property and with fully enforceable rights. Subscriber

further acknowledges and agrees that Fair Isaac's rights with respect to the Models, FICO Scores, other Fair Isaac intellectual property, and all works derived therefrom are unconditional rights that shall survive the termination for any reason.

8.      This Exhibit constitutes the entire agreement among the parties hereto and supersedes all prior agreements, whether oral or written, express or implied, with respect to the FICO Scores.  This Exhibit may not be amended except by written instrument signed by the duly authorized representatives of all parties.

**Agreed and Accepted:**

CM Rent, Inc
Subscriber Name

By:
Subscriber Representative

Bill Butler, President
Name and Title of Signer (please print)

10/2/17
Date Signed

TURSS MASTER SERVICE AGREEMENT                                              APRIL 2015

> **All users of consumer reports must comply with all applicable regulations. Information about applicable regulations currently in effect can be found at the Consumer Financial Protection Bureau's website, www.consumerfinance.gov/learnmore.**

## NOTICE TO USERS OF CONSUMER REPORTS: OBLIGATIONS OF USERS UNDER THE FCRA

The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681-1681y, requires that this notice be provided to inform users of consumer reports of their legal obligations. State law may impose additional requirements. The text of the FCRA is set forth in full at the Consumer Financial Protection Bureau's ("CFPB") website at www.consumerfinance.gov/learnmore. At the end of this document is a list of United States Code citations for the FCRA. Other information about user duties is also available at the Bureau's website. **Users must consult the relevant provisions of the FCRA for details about their obligations under the FCRA.**

The first section of this summary sets forth the responsibilities imposed by the FCRA on all users of consumer reports. The subsequent sections discuss the duties of users of reports that contain specific types of information, or that are used for certain purposes, and the legal consequences of violations. If you are a furnisher of information to a consumer reporting agency ("CRA"), you have additional obligations and will receive a separate notice from the CRA describing your duties as a furnisher.

### I.   Obligations of All Users of Consumer Reports

#### A.   Users Must Have a Permissible Purpose

Congress has limited the use of consumer reports to protect consumers' privacy. All users must have a permissible purpose under the FCRA to obtain a consumer report. Section 604 contains a list of the permissible purposes under the law. These are:

- As ordered by a court or federal grand jury subpoena. Section 604(a)(1)

- As instructed by the consumer in writing. Section 604(a)(2)

- For the extension of credit as a result of an application from a consumer, or the review or collection of a consumer's account. Section 604(a)(3)(A)

- For employment purposes, including hiring and promotion decisions, where the consumer has given written permission. Section 604(a)(3)(B) and 604(b)

- For the underwriting of insurance as a result of an application from a consumer. Section 604(a)(3)(C)

- When there is a legitimate business need, in connection with a business transaction that is initiated by the consumer. Section 604(a)(3)(F)(i)

- To review a consumer's account to determine whether the consumer continues to meet the terms of the account. Section 604(a)(3)(F)(ii)

TransUnion

- To determine a consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status. Section 604(a)(3)(D)
- For use by a potential investor or servicer, or current insurer, in a valuation or assessment of the credit or prepayment risks associated with an existing credit obligation. Section 604(a)(3)(E)
- For use by state or local officials in connection with the determination of child support payments, or modifications and enforcement thereof. Sections 604(a)(4) and 604(a)(5).

In addition, creditors and insurers may obtain certain consumer report information for the purpose of making "prescreened" unsolicited offers of credit or insurance. Section 604(c). The particular obligations of users of "prescreened" information are described in Section VII below.

**B.    Users Must Provide Certifications**

Section 604(f) prohibits any person from obtaining a consumer report from a consumer reporting agency ("CRA") unless the person has certified to the CRA the permissible purpose(s) for which the report is being obtained and certifies that the report will not be used for any other purpose.

**C.    Users Must Notify Consumers When Adverse Actions Are Taken**

The term "adverse action" is defined very broadly by Section 603. "Adverse actions" include all business, credit, and employment actions affecting consumers that can be considered to have a negative impact as defined by Section 603(k) of the FCRA – such as denying or canceling credit or insurance, or denying employment or promotion. No adverse action occurs in a credit transaction where the creditor makes a counteroffer that is accepted by the consumer.

**1.    Adverse Actions Based on Information Obtained From a CRA**

If a user takes any type of adverse action as defined by the FCRA that is based at least in part on information contained in a consumer report, Section 615(a) requires the user to notify the consumer. The notification may be done in writing, orally, or by electronic means. It must include the following:

- The name, address, and telephone number of the CRA (including a toll-free telephone number, if it is a nationwide CRA) that provided the report.
- A statement that the CRA did not make the adverse decision and is not able to explain why the decision was made.
- A statement setting forth the consumer's right to obtain a free disclosure of the consumer's file from the CRA if the consumer makes a request within sixty (60) days.
- A statement setting forth the consumer's right to dispute directly with the CRA the accuracy or completeness of any information provided by the CRA.

**2.    Adverse Actions Based on Information Obtained from Third Parties Who Are Not Consumer Reporting Agencies**

If a person denies (or increases the charge for) credit for personal, family, or household purposes based either wholly or partly upon information from a person other than a CRA, and the information is the type of consumer information covered by the FCRA, Section 615(b)(1) requires that the user clearly and accurately disclose to the consumer his or her right to be told the nature of the information that was relied upon if the consumer makes a written request within sixty (60) days of notification. The user must provide the disclosure within a reasonable period of time following the consumer's written request.

**3.    Adverse Actions Based on Information Obtained From Affiliates**

If a person takes an adverse action involving insurance, employment, or a credit transaction initiated by the consumer, based on information of the type covered by the FCRA, and this information was obtained from an entity affiliated with the user of the information by common ownership or control, Section 615(b)(2) requires the user to notify the consumer of the adverse action. The notice must inform the consumer that he or she may obtain a disclosure of the nature of the information relied upon by making a written request within 60 days of receiving the adverse action notice. If the consumer makes such a request, the user must disclose the nature of the information not later than 30 days after receiving the request. If consumer report information is shared among affiliates and then used for an adverse action, the user must make an adverse action disclosure set forth in I.C.1 above.

**D.    Users Have Obligations When Fraud and Active Duty Military Alerts are in Files**

When a consumer has placed a fraud alert, including one relating to identity theft, or an active duty military alert with a nationwide consumer reporting agency as defined in Section 603(p) and resellers, Section 605A(h) imposes limitations on users of reports obtained from the consumer reporting agency in certain circumstances, including the establishment of a new credit plan and the issuance of additional credit cards. For initial fraud alerts and active duty alerts, the user must have reasonable policies and procedures in place to form a belief that the user knows the identity of the applicant or contact the consumer at a telephone number specified by the consumer; in the case of extended fraud alerts, the user must contact the consumer in accordance with the contact information provided in the consumer's alert.

**E.    Users Have Obligations When Notified of an Address Discrepancy**

Section 605(h) requires nationwide CRAs, as defined in Section 603(p), to notify users that request reports when the address for a consumer provided by the user in requesting the report is substantially different from the addresses in the consumer's file. When this occurs, users must comply with regulations specifying the procedures to be followed. Federal regulations are available at www.consumerfinance.gov/learnmore.

TransUnion

#### F. Users Have Obligations When Disposing of Records

Section 628 requires that all users of consumer report information have in place procedures to properly dispose of records containing this information. Federal regulations have been issued that cover disposal.

### II. Creditors Must Make Additional Disclosures

If a person uses a consumer report in connection with an application for, or a grant, extension, or provision of, credit to a consumer on material terms that are materially less favorable than the most favorable terms available to a substantial proportion of consumers from or through that person, based in whole or in part on a consumer report, the person must provide a risk-based pricing notice to the consumer in accordance with regulations prescribed by the Consumer Financial Protection Bureau. Section 609(g) requires a disclosure by all persons that make or arrange loans secured by residential real property (one to four units) and that use credit scores. These persons must provide credit scores and other information about credit scores to applicants, including the disclosure set forth in Section 609(g)(1)(D) ("Notice to the Home Loan Applicant").

### III. Obligations Of Users When Consumer Reports Are Obtained For Employment Purposes

#### A. Employment Other Than in the Trucking Industry

If information from a CRA is used for employment purposes, the user has specific duties, which are set forth in Section 604(b) of the FCRA. The user must:

- Make a clear and conspicuous written disclosure to the consumer before the report is obtained, in a document that consists solely of the disclosure, that a consumer report may be obtained.

- Obtain from the consumer prior written authorization. Authorization to access reports during the term of employment may be obtained at the time of employment.

- Certify to the CRA that the above steps have been followed, that the information being obtained will not be used in violation of any federal or state equal opportunity law or regulation, and that, if any adverse action is to be taken based on the consumer report, a copy of the report and a summary of the consumer's rights will be provided to the consumer.

- **Before** taking an adverse action, the user must provide a copy of the report to the consumer as well as the summary of the consumer's rights. (The user should receive this summary from the CRA.). A Section 615(a) adverse action notice should be sent after the adverse action is taken.

An adverse action notice also is required in employment situations if credit information (other than transactions and experience data) obtained from an affiliate is used to deny employment. Section 615(b)(2).

The procedures for investigative consumer reports and employee misconduct investigations are set forth below.

## B.   Employment in the Trucking Industry

Special rules apply for truck drivers where the only interaction between the consumer and the potential employer is by mail, telephone, or computer. In this case, the consumer may provide consent orally or electronically, and an adverse action may be made orally, in writing, or electronically. The consumer may obtain a copy of any report relied upon by the trucking company by contacting the company.

## IV.   Obligations When Investigative Consumer Reports Are Used

Investigative consumer reports are a special type of consumer report in which information about a consumer's character, general reputation, personal characteristics, and mode of living is obtained through personal interviews by an entity or person that is a consumer reporting agency. Consumers who are the subject of such reports are given special rights under the FCRA. If a user intends to obtain an investigative consumer report, Section 606 requires the following:

- The user must disclose to the consumer that an investigative consumer report may be obtained. This must be done in a written disclosure that is mailed, or otherwise delivered, to the consumer at some time before or not later than three days after the date on which the report was first requested. The disclosure must include a statement informing the consumer of his or her right to request additional disclosures of the nature and scope of the investigation as described below, and the summary of consumer rights required by Section 609 of the FCRA. (The summary of consumer rights will be provided by the CRA that conducts the investigation.)

- The user must certify to the CRA that the disclosures set forth above have been made and that the user will make the disclosure below.

- Upon written request of a consumer made within a reasonable period of time after the disclosures required above, the user must make a complete disclosure of the nature and scope of the investigation. This must be made in a written statement that is mailed, or otherwise delivered, to the consumer no later than five days after the date on which the request was received from the consumer or the report was first requested, whichever is later in time.

- Special Procedures for Employee Investigations

Section 603(x) provides special procedures for investigations of suspected misconduct by an employee or for compliance with Federal, state or local laws and regulations or the rules of a self- regulatory organization, and compliance with written policies of the employer. These investigations are not treated as consumer reports so long as the employer or its agent complies with the procedures set forth in Section 603(x), and a summary describing the nature and scope of the inquiry is made to the employee if an adverse action is taken based on the investigation.

## V.   Obligations Of Users Of Medical Information

Section 604(g) limits the use of medical information obtained from consumer reporting agencies (other than payment information that appears in a coded form that does not identify the medical provider). If the information is to be used for an insurance transaction, the consumer must give consent to the user of the report or the information must be coded. If the report is to be used for employment purposes - or

TransUnion

in connection with a credit transaction (except as provided in federal regulations) - the consumer must provide specific written consent and the medical information must be relevant. Any user who receives medical information shall not disclose the information to any other person (except where necessary to carry out the purpose for which the information was disclosed, or as permitted by statute, regulation, or order).

## VI.    Obligations Of Users Of "Prescreened" Lists

The FCRA permits creditors and insurers to obtain limited consumer report information for use in connection with unsolicited offers of credit or insurance under certain circumstances. Section 603(l), 604(c), 604(e), and 615(d). This practice is known as "prescreening" and typically involves obtaining from a CRA a list of consumers who meet certain pre-established criteria. If any person intends to use prescreened lists, that person must (1) before the offer is made, establish the criteria that will be relied upon to make the offer and to grant credit or insurance, and (2) maintain such criteria on file for a three-year period beginning on the date on which the offer is made to each consumer. In addition, any user must provide with each written solicitation a clear and conspicuous statement that:

- Information contained in a consumer's CRA file was used in connection with the transaction.

- The consumer received the offer because he or she satisfied the criteria for credit worthiness or insurability used to screen for the offer.

- Credit or insurance may not be extended if, after the consumer responds, it is determined that the consumer does not meet the criteria used for screening or any applicable criteria bearing on credit worthiness or insurability, or the consumer does not furnish required collateral.

- The consumer may prohibit the use of information in his or her file in connection with future prescreened offers of credit or insurance by contacting the notification system established by the CRA that provided the report. This statement must include the address and the toll-free telephone number of the appropriate notification system.

In addition, once the CFPB has established the format, type size, and manner of the disclosure required by Section 615(d), with which users must comply. The relevant regulation is 12 CFR 1022.54.

## VII.    Obligations of Resellers

## A.    Disclosure and Certification Requirements

Section 607(e) requires any person who obtains a consumer report for resale to take the following steps:

- Disclose the identity of the end-user to the source CRA.

- Identify to the source CRA each permissible purpose for which the report will be furnished to the end user.

- Establish and follow reasonable procedures to ensure that reports are resold only for permissible purposes, including procedures to obtain:

1)      the identity of all end-users;

2)      certifications from all users of each purposes for which reports will be used; and

3)      certifications that reports will not be used for any purpose other than the purpose(s) specified to the reseller. Resellers must make reasonable efforts to verify this information before selling the report.

**B.    Reinvestigations by Resellers**

Under Section 611(f), if a consumer disputes the accuracy or completeness of information in a report prepared by a reseller, the reseller must determine whether this is a result of an action or omission on its part and, if so, correct or delete the information. If not, the reseller must send the dispute to the source CRA for reinvestigation. When any CRA notifies the reseller of the results of an investigation, the reseller must immediately convey the information to the consumer.

**C.    Fraud Alerts and Resellers**

Section 605A(f) requires resellers who receive fraud alerts or active duty alerts from another consumer reporting agency to include these in their reports.

**VIII.  IX. Liability For Violations Of The FCRA**

Failure to comply with the FCRA can result in state government or federal government enforcement actions, as well as private lawsuits. Sections 616, 617, and 621. In addition, any person who knowingly and willfully obtains a consumer report under false pretenses may face criminal prosecution. Section 619.

**The CFPB's website, www.consumerfinance.gov/learnmore, has more information about the FCRA, including publications for businesses and the full text of the FCRA. Citations for the FCRA sections in the U.S. Code, 15 U.S.C. § 1681 et seq.:**

Section 602          15 U.S.C. 1681
Section 603          15 U.S.C. 1681a
Section 604          15 U.S.C. 1681b
Section 605          15 U.S.C. 1681c
Section 605A         15 U.S.C. 1681cA
Section 605B         15 U.S.C. 1681cB
Section 606          15 U.S.C. 1681d
Section 607          15 U.S.C. 1681e
Section 608          15 U.S.C. 1681f
Section 609          15 U.S.C. 1681g
Section 610          15 U.S.C. 1681h
Section 611          15 U.S.C. 1681i
Section 612          15 U.S.C. 1681j
Section 613          15 U.S.C. 1681k

TURSS MASTER SERVICE AGREEMENT                                                APRIL 2015

Section 614        15 U.S.C. 1681l
Section 615        15 U.S.C. 1681m
Section 616        15 U.S.C. 1681n
Section 617        15 U.S.C. 1681o
Section 618        15 U.S.C. 1681p
Section 619        15 U.S.C. 1681q
Section 620        15 U.S.C. 1681r
Section 621        15 U.S.C. 1681s
Section 622        15 U.S.C. 1681s-1
Section 623        15 U.S.C. 1681s-2
Section 624        15 U.S.C. 1681t
Section 625        15 U.S.C. 1681u
Section 626        15 U.S.C. 1681v
Section 627        15 U.S.C. 1681w
Section 628        15 U.S.C. 1681x
Section 629        15 U.S.C. 1681y

TransUnion

# NOTICE TO FURNISHERS OF INFORMATION:
## OBLIGATIONS OF FURNISHERS UNDER THE FCRA

All furnishers of consumer reports must comply with all applicable regulations. Information about applicable regulations currently in effect can be found at the Consumer Financial Protection Bureau's website, www.consumerfinance.gov/learnmore.

### NOTICE TO FURNISHERS OF INFORMATION:
### OBLIGATIONS OF FURNISHERS UNDER THE FCRA

The federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. 1681-1681y, imposes responsibilities on all persons who furnish information to consumer reporting agencies ("CRAs"). These responsibilities are found in Section 623 of the FCRA, 15 U.S.C. 1681s-2. State law may impose additional requirements on furnishers. All furnishers of information to CRAs should become familiar with the applicable laws and may want to consult with their counsel to ensure that they are in compliance. The text of the FCRA is available at the website of the Consumer Financial Protection Bureau ("CFPB"): www.consumerfinance.gov/learnmore. A list of the sections of the FCRA cross-referenced to the U.S. Code is at the end of this document.

Section 623 imposes the following duties upon furnishers:

#### Accuracy Guidelines

The FCRA requires furnishers to comply with federal regulations dealing with the accuracy of information provided to CRAs by furnishers. Federal regulations and guidelines are available at www.consumerfinance.gov/learnmore. Section 623(e).

#### General Prohibition on Reporting Inaccurate Information

The FCRA prohibits information furnishers from providing information to a CRA that they know or have reasonable cause to believe is inaccurate. However, the furnisher is not subject to this general prohibition if it clearly and conspicuously specifies an address to which consumers may write to notify the furnisher that certain information is inaccurate. Section 623(a)(1)(A) and (a)(1)(C).

#### Duty to Correct and Update Information

If at any time a person who regularly and in the ordinary course of business furnishes information to one or more CRAs determines that the information provided is not complete or accurate, the furnisher must provide complete and accurate information to the CRA. In addition, the furnisher must notify all CRAs that received the information of any corrections, and must thereafter report only the complete and accurate information. Section 623(a)(2).

#### Duties After Notice of Dispute from Consumer

TransUnion

If a consumer notifies a furnisher, at an address specified by the furnisher for such notices, that specific information is inaccurate, and the information is, in fact, inaccurate, the furnisher must thereafter report the correct information to CRAs. Section 623(a)(1)(B).

If a consumer notifies a furnisher that the consumer disputes the completeness or accuracy of any information reported by the furnisher, the furnisher may not subsequently report that information to a CRA without providing notice of the dispute. Section 623(a)(3).

Furnishers must comply with federal regulations that identify when an information furnisher must investigate a dispute made directly to the furnisher by a consumer. Under these regulations, furnishers must complete an investigation within 30 days (or 45 days, if the consumer later provides relevant additional information) unless the dispute is frivolous or irrelevant or comes from a "credit repair organization." Section 623(a)(8). Federal regulations are available at www.consumerfinance.gov. Section 623(a)(8).

## Duties After Notice of Dispute from Consumer Reporting Agency

If a CRA notifies a furnisher that a consumer disputes the completeness or accuracy of information provided by the furnisher, the furnisher has a duty to follow certain procedures. The furnisher must:

- Conduct an investigation and review all relevant information provided by the CRA, including information given to the CRA by the consumer. Section 623(b)(1)(A) and (b)(1)(B).

- Report the results to the CRA that referred the dispute, and, if the investigation establishes that the information was, in fact, incomplete or inaccurate, report the results to all CRAs to which the furnisher provided the information that compile and maintain files on a nationwide basis. Section 623(b)(1)(C) and (b)(1)(D).

- Complete the above steps within thirty (30) days from the date the CRA receives the dispute (or 45 days, if the consumer later provides relevant additional information to the CRA). Section 623(b)(2).

- Promptly modify or delete the information, or block its reporting. Section 623(b)(1)(E).

## Duty to Report Voluntary Closing of Credit Accounts:

If a consumer voluntarily closes a credit account, any person who regularly and in the ordinary course of business furnished information to one or more CRAs must report this fact when it provides information to CRAs for the time period in which the account was closed. Section 623(a)(4).

## Duty to Report Dates of Delinquencies:

If a furnisher reports information concerning a delinquent account placed for collection, charged to profit or loss, or subject to any similar action, the furnisher must, within 90 days after reporting the information, provide the CRA with the month and the year of the commencement of the delinquency that immediately preceded the action, so that the agency will know how long to keep the information in the consumer's file. Section 623(a)(5)

TransUnion

Any person, such as a debt collector, that has acquired or is responsible for collecting delinquent accounts and that reports information to CRAs may comply with the requirements of Section 623(a)(5) (until there is a consumer dispute) by reporting the same delinquency date previously reported by the creditor. If the creditor did not report this date, they may comply with the FCRA by establishing reasonable procedures to obtain and report delinquency dates, or, if a delinquency date cannot be reasonably obtained, by following reasonable procedures to ensure that the date precedes the date when the account was placed for collection, charged to profit or loss, or subjected to any similar action. Section 623(a)(5).

## Duties of Financial Institutions When Reporting Negative Information

Financial institutions that furnish information to "nationwide" consumer reporting agencies, as defined in Section 603(p), must notify consumers in writing if they may furnish or have furnished negative information to a CRA. Section 623(a)(7). The CFPB has prescribed model disclosures, 12 CFR Part 222, App.B.

## Duties When Furnishing Medical Information

A furnisher whose primary business is providing medical services, products, or devices (and such furnisher's agents or assignees) is a medical information furnisher for the purposes of the FCRA and must notify all CRAs to which it reports of this fact. Section 623(a)(9). This notice will enable CRAs comply with their duties under Section 604(g) when reporting medical information.

## Duties When ID Theft Occurs

All furnishers must have in place reasonable procedures to respond to notifications from CRAs that information furnished is the result of identity theft, and to prevent refurnishing the information in the future. A furnisher may not furnish information that a consumer has identified as resulting from identity theft unless the furnisher subsequently knows or is informed by the consumer that the information is correct. Section 623(a)(6). If a furnisher learns that it has furnished inaccurate information due to identity theft, it must notify each CRA of the correct information and must thereafter report only complete and accurate information. Section 623(a)(2). When any furnisher of information is notified pursuant to the procedures set forth in Section 605B that a debt has resulted from identity theft, the furnisher may not sell, transfer, or place for collection the debt except in certain limited circumstances. Section 615(f).

**The CFPB's website, www.consumerfinance.gov/learnmore, has more information about the FCRA, including publications for businesses and the full text of the FCRA.**

Citations for FCRA sections in the U.S. Code, 15 U.S. C § 1681 et seq.:

| | |
|---|---|
| Section 602 | 15 U.S.C. 1681 |
| Section 603 | 15 U.S.C. 1681a |
| Section 604 | 15 U.S.C. 1681b |
| Section 605 | 15 U.S.C. 1681c |
| Section 605A | 15 U.S.C. 1681c-1 |
| Section 605B | 15 U.S.C. 1681c-2 |
| Section 606 | 15 U.S.C. 1681d |
| Section 607 | 15 U.S.C. 1681e |

TransUnion

TURSS MASTER SERVICE AGREEMENT                                             APRIL 2015

Section 608          15 U.S.C. 1681f
Section 609          15 U.S.C. 1681g
Section 610          15 U.S.C. 1681h
Section 611          15 U.S.C. 1681i
Section 612          15 U.S.C. 1681j
Section 613          15 U.S.C. 1681k
Section 614          15 U.S.C. 1681l
Section 615          15 U.S.C. 1681m
Section 616          15 U.S.C. 1681n
Section 617          15 U.S.C. 1681o
Section 618          15 U.S.C. 1681p
Section 619          15 U.S.C. 1681q
Section 620          15 U.S.C. 1681r
Section 621          15 U.S.C. 1681s
Section 622          15 U.S.C. 1681s-1
Section 623          15 U.S.C. 1681s-2
Section 624          15 U.S.C. 1681t
Section 625          15 U.S.C. 1681u
Section 626          15 U.S.C. 1681v
Section 627          15 U.S.C. 1681w
Section 628          15 U.S.C. 1681x
Section 629          15 U.S.C. 1681y

### ADDENDUM TO THE TRANSUNION RENTAL SCREENING SOLUTIONS MASTER AGREEMENT FOR CONSUMER REPORTING AND ANCILLARY SERVICES

This addendum ("Addendum"), effective on the last signature date set forth below (the "Effective Date"), by and between TransUnion Rental Screening Services, Inc., with its principal place of business located at 6430 S. Fiddler's Green Circle, Suite 500, Greenwood Village, CO ("TURSS") and _CM Rent, Inc_ , with its principal place of business located at _1415 Park Ave W, Denver, CO 80205_ ("Subscriber"), is meant to supplement the terms of the existing TURSS Master Agreement for Consumer Reporting and Ancillary Services entered between TURSS and Subscriber (the "Agreement") as more fully set forth herein.

### Recitals

**WHEREAS**, Subscriber is a Residential Property Owner (defined as an entity or individual that has title to a property for which a rental payment is being made for the occupation of said property) or a Residential Property Manager (defined as an Agent client of a Property Owner that manages property and rental payments on behalf of the Property Owner); and

**WHEREAS** Subscriber desires to obtain public record Services from TURSS in conjunction with Consumer Report or as an append to an ancillary service; and

**WHEREAS**, TURSS has agreed to Subscriber's request subject to the terms and conditions contained herein.

**NOW THEREFORE**, in exchange of the mutual covenants and promises exchanged herein, the receipt and sufficiency of which is hereby acknowledged as adequate consideration, the parties agree as follows:

1. The foregoing Recitals are hereby incorporated by reference as a material part of this Addendum.

2. Capitalized terms not defined herein shall have the definition ascribed in the Agreement.

3. Notwithstanding anything to the contrary in the Agreement, TURSS hereby grants Subscriber a limited, non-exclusive, non-transferable license to the public record information ("Public Record Information"), and the TURSS Services derived from the Public Record Information. Consumer Reports delivered by TURSS and derived from Public Records Information may not be altered, edited, or otherwise changed without the prior written consent from TURSS. Subscriber understands and certifies that any redistribution of the Public Record Information or a Consumer Report shall contain the state-specific requirements described at **rentalscreening.transunion.com/datasourcerequirements**, which may be altered by TURSS from time to time and Subscriber shall comply with all such changes.

4. Notwithstanding anything to the contrary in the Agreement, use of Public Record Information, and the Services derived from the Public Record Information, from TURSS shall be subject to the following:

   a. THE PUBLIC RECORD INFORMATION IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. TURSS AND ITS DATA PROVIDERS MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE PUBLIC RECORD INFORMATION AND DISCLAIM ANY EXPRESS OR IMPLIED WARRANTIES WITH RESPECT THERETO. WITHOUT LIMITING THE FOREGOING, TURSS AND ITS DATA PROVIDERS DO NOT GUARANTEE OR WARRANT THE ACCURACY, TIMELINESS, COMPLETENESS, CURRENTNESS, MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PUBLIC RECORD INFORMATION AND SHALL NOT BE LIABLE FOR ANY LOSS OR INJURY ARISING OUT OF OR CAUSED IN WHOLE OR IN PART BY USE OF THE PUBLIC RECORD INFORMATION. Subscriber shall indemnify, defend, and hold harmless TURSS and its data providers, from and against any and all liabilities, damages, losses, claims, costs, fees, and expenses (including but not limited to reasonable attorney and expert witness fees and expenses) arising out of or related to Subscriber's use of the Public

TransUnion

Record Information obtained from TURSS.  Subscriber acknowledges and agrees that TURSS's data providers are a third party beneficiary of the provisions of this section, with right of enforcement.

5.  Subscriber shall comply with all requirements related to the Public Record Information and other applicable data use restrictions ("Data Source Requirements") at rentalscreening.transunion.com/datasourcerequirements, which may be altered by TURSS from time to time.

**IN WITNESS WHEREOF,** the parties, intending to be legally bound, have caused this Addendum to be executed by their duly authorized representatives as of the Effective Date. The parties hereto agree that a facsimile transmission of this fully executed Addendum shall constitute an original and legally binding document.

**TRANSUNION RENTAL SCREENING SERVICES, INC.**

| | |
|---|---|
| | CM Rent, Inc |
| | Name of SUBSCRIBER |
| Signed: | Signed: |
| Name: | Name: Bill Butler |
| Title: | Title: President |
| Date: | Date: 10/2/17 |