# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

**FEDERAL TRADE COMMISSION**,

Plaintiff,

v.

**FINANCIAL EDUCATION SERVICES** et al.,

Defendants

Case No. 2:22-cv-11120-BAF-AAP

Hon. Bernard A. Friedman

DECLARATION OF

# BRANKO JOVANOVIC, PH.D.

# SUBMITTED ON BEHALF OF DEFENDANTS

**JUNE 27, 2022**

CONTENTS

I.  **Introduction and Scope of Analyses**............................................................................3

II. **Qualifications**...........................................................................................................5

III. **Summary of Opinions**...............................................................................................6

IV. **Bases for Opinions**....................................................................................................8

    IV.A.           Overview of Defendants' Product Offerings and Multi-Level Marketing Business Models.........................................................................................................8

    IV.B.           The FTC Complaint Focuses on Only a Subset of the Products Offered by Defendants and Misrepresents Their Efficacy .............................................10

        IV.B.1.    The FTC Complaint Misrepresents the Efficacy of the Credit Restoration Product ................................................................................................11

        IV.B.2.    The FTC Complaint Misrepresents the Efficacy of the Credit My Rent Product ................................................................................................14

        IV.B.3.    The FTC Complaint Makes No Specific Allegations Regarding the Secured Credit Cards Offering.........................................................................17

    IV.C.           The FTC Complaint Allegations and Dr. Givens' Conclusion That Defendants Operate an Illegal Pyramid Scheme is Unfounded .....................................18

        IV.C.1.    Overview of MLMs and Application to the Matter at Hand ........................19

        IV.C.2.    Summary of Dr. Givens' Conclusions .........................................................20

        IV.C.3.    There Exists Genuine Demand for Defendants' Products ...........................22

        IV.C.4.    Dr. Givens' Criticism that Defendants' Compensation Plan Incentivizes Recruitment Is Misplaced....................................................................28

        IV.C.5.    The Observation that the Majority of the FESAs Are at the Lowest Rank of the Organization Does Not Imply that Defendants Operate a Pyramid Scheme......30

        IV.C.6.    Defendants' Refund Policy Resulted in Non-Trivial Share of Revenue Being Channeled Back to FESAs and Retail Customers................................32

**Appendix A : Curriculum Vitae** ......................................................................................**34**

**Appendix B : Materials Relied Upon** ...............................................................................**37**

**Appendix C :Share of FESAs and Retail Customers Who Have Expressed Interest in Individual Services Provided by the Defendants** ............................................**46**

**Appendix D : Description of Defendants' products**.........................................................**47**

# I.    Introduction and Scope of Analyses

1. On May 23, 2022, the Federal Trade Commission ("FTC") filed a Complaint against Financial Education Services, Inc., United Wealth Services, Inc., VR-Tech, LLC, VR-Tech MGT, LLC, CM Rent Inc., Youth Financial Literacy Foundation, Parimal Naik, Michael Toloff, Christopher Toloff, and Gerald Thompson ("Defendants") pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act, 15 U.S.C. §§ 53(b) and 57b, Section 410(b) of the Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679h(b), and Section 6(b) of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. ¶ 6105(b).[1] The FTC is seeking both temporary, preliminary, and permanent injunctive relief, as well as monetary relief, and other relief related to Defendants' business operation in connection with the sale of its "Protection Plan." The FTC alleges that the "Defendants have operated an unlawful credit repair scam that has deceived consumers across the country,"[2] and that the "Defendants' purported investment opportunity is an illegal pyramid scheme."[3]

2. Contemporaneous with its Complaint, the FTC filed a Motion to Seal the Complaint and other filings (ECF 2) and a Motion for a Temporary Restraining Order (ECF 3), which attached as exhibit a recommendation that the corporate Defendants be placed in receivership. (ECF 3-2).[4] The FTC further requested in its Motion for a Temporary Restraining Order, that should such motion be granted, "the FTC will promptly serve

---

[1]    *See* Complaint for Permanent Injunction, Monetary Relief and Other Relief, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-11120-BAF-APP, May 23, 2022 ("Complaint"), ¶ 1.

[2]    *See Ibid*, ¶ 2.

[3]    *See Ibid*, ¶ 3.

[4]    The FTC specifically requested that Patrick A. Miles, Jr. be appointed as temporary receiver. *See* ECF 3-2, FTC's Recommendation for Temporary Receiver, In the United States District Court for the Eastern District of Michigan, Case No. 11120-BAF-APP, May 23, 2022, at p. 1.

notice of the order on all Defendants and will move for a preliminary injunction extending
such temporary relief pending an adjudication on the merits."[5]

3.  On May 24, 2022, the Court granted the FTC's *ex parte* Motion for a Temporary Restraining
    Order, and appointed a receiver over the corporate Defendants.[6] Thereafter the FTC moved
    to lift the sealing of the case,[7] which the Court granted.[8]

4.  On June 1, 2022, the Parties collective stipulated to continue the hearing on the
    Preliminary Injunction to June 30, 2022, and agreed to keep in place the temporary
    injunction until such time,[9] which the Court granted.[10]

5.  Greenspoon Marder LLP, counsel for Defendant Financial Education Services, Inc., ("FES")
    United Wealth Services, Inc., ("UWS") VR-Tech, LLC, ("VR Tech") Youth Financial
    Literacy Foundation, ("YFL") and Parimal Naik ("Parimal"), has asked me to review the
    FTC's Complaint and opine on the allegations regarding the product offerings of these
    Defendants and Defendant CM Rent Inc., and the efficacy of the Defendants' products,
    and, separately, the charge that Defendants are operating an illegal pyramid scheme.[11]
    Counsel for Defendants has also asked me to review the declaration of Dr. David Givens[12]

---

[5]  *See* ECF 3, FTC's *Ex Parte* Motion for Temporary Restraining Order With an Asset Freeze, Appointment of
     Received, and Other Equitable Relief, In the United States District Court for the Eastern District of Michigan,
     Case No. 2:22-cv-11120-BAF-APP, May 23, 2022, ¶ 6.

[6]  *See* ECF 10, Temporary Restraining Order, In the United States District Court for the Eastern District of
     Michigan, Case No. 2:22-cv-11120-BAF-APP, May 24, 2022.

[7]  *See* ECF 11, FTC's *Ex Parte* Motion to Lift Temporary Seal and Memorandum Support Therof, In the United
     States District Court for the Eastern District of Michigan, Case No. 2:22-cv-11120-BAF-APP, May 26, 2022.

[8]  *See* ECF 12, Order Lifting Temporary Seal from Entire File, In the United States District Court for the Eastern
     District of Michigan, Case No. 2:22-cv-11120-BAF-APP, May 27, 2022.

[9]  *See* ECF 18, Stipulated Motion to Continue Hearing on Preliminary Injunction and Continuing Temporary
     Restraining Order, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-
     1112-BAF-APP, June 1, 2022.

[10] *See* ECF 19, Stipulated Order Continuing Preliminary Injunction Hearing and Continuing Temporary
     Restraining Order, In the United States District Court for the Eastern District of Michigan, June 2, 2022.

[11] This Declaration uses the terms "products" and "services" interchangeably when referring to the products and
     services provided by Defendants.

[12] Declaration of Dr. David Givens, In the United Stated District Court for the Eastern District of Michigan, Case
     No. 2:22-cv-11120-BAF-APP, May 23, 2022.

("Givens Declaration") submitted on behalf of the FTC, and opine on the methodology, assumptions, and various conclusions included therein.

## II.   Qualifications

6.   I am a Principal with The Brattle Group (Brattle), an international economic consulting firm. I have provided oral and/or written expert testimony in federal and state courts, and before the Securities and Exchange Commission, the International Chamber of Commerce International Court of Arbitration, and the American Arbitration Association.

7.   I received a bachelor's degree in Economics from the University of Belgrade, a master's degree in Economics from the Central European University, and a Ph.D. in Economics from Texas A&M University. My dissertation thesis and research were in the discipline of empirical labor economics, involving the analysis of individual-level data on the economic behavior of individuals using regression methods applied to cross-section and panel data. My research has been published in peer-reviewed journals and in professional publications. I also taught graduate-level econometrics (application of statistical and mathematical models to economic data for the purpose of testing theories, hypotheses, and future trends) at New York University and Johns Hopkins University.

8.   I have extensive experience analyzing the multi-level marketing (MLM) compensation models of nutrition, supplement, cosmetics, and other companies. In 2015, I was on the team led by Prof. Joseph Farrell that presented to the FTC staff and Illinois Attorney General Office the evidence contradicting the FTC's allegations regarding Herbalife's compensation model. Since then, I have provided consulting services (including supporting the testifying experts) to companies facing consumer class actions alleging that the defendants operate as pyramid schemes, to companies facing FTC investigations of their MLM business models, to companies conducting internal investigations of their MLM compensation models, and to companies considering acquisition of companies that utilize

MLM compensation model. Two articles I co-authored, A Look Into FTC's Thinking On Pyramid Scheme Potential and Prioritize Your Income Disclosure Statement, appeared in Law 360 and Direct Selling News.

9. A copy of my curriculum vitae is attached as Appendix A. Brattle is being compensated for my work on this engagement at the hourly rate of $700. In addition to my own time, I directed Brattle professionals who performed supporting work and analyses in connection with my preparation of this declaration. Brattle's compensation in this matter is not dependent on my findings or opinions, or on the outcome of this litigation.

10. A list of the materials I relied upon in preparing this report is attached as Appendix B.

## III.   Summary of Opinions

11. My opinions, discussed in more detail below, are as follows:

a) The FTC focuses on a small subset of three products Defendants offer and alleges, with no empirical evidence, that these products are ineffective. These allegations are demonstrably false:

- Defendants' Credit Restoration service has led to the removal of over 500,000 obsolete, unverifiable, and inaccurate items in the Defendants' customers' credit records during the 2019–2021 time period.

- Contrary to FTC's assertion that rental payment history does not factor in the FICO score commonly used by lenders, a number of studies dating as far as 2013 shows that rent reporting can be very effective for improving customers' credit scores. Furthermore, the FTC's suggestion that the Defendants do not report customers' positive rental history to TransUnion and Equifax is incorrect; specifically, Defendants have entered into Data Contribution Agreements with Equifax in February 2019 and with TransUnion in October 2017.

- While the FTC makes no specific allegations regarding the Defendants' Credit Building product, the efficacy of this type of product, and secured credit cards in particular, is widely recognized.

b) Dr. Givens' Declaration, prepared in support of the FTC's allegation that Defendants operate a pyramid scheme, reaches its conclusion with no empirical support and with assumptions that are directly contradicted by the available data. Furthermore, in a number of instances, Dr. Givens simply adopts assumptions that directly support his starting premise that Defendants operate a pyramid scheme.

- Dr. Givens' Declaration focuses on Credit Repair, a single product within the Protection Plan and, contrary to the empirical evidence, assumes that the product is worthless.

- Dr. Givens' conclusions that the Defendants' compensation plan incentivizes recruitment over retailing, that the majority of the FESAs being at the lowest rank implies that Defendants operate a pyramid scheme, and that Defendants' have no return policy are each demonstrably wrong.

c) Assessing whether a company operates as a legitimate MLM or as an illegal pyramid scheme is an empirical question that cannot be answered without access and analyses of distributor-level business intelligence data. Because of constraints imposed by the Receiver, Dr. Givens' and my opinions were reached without direct access to the Defendants' business intelligence data, which would, if accessible, have greatly contributed to our understanding of FESAs response to the compensation plan's incentives.

12. To form the opinions outlined above, I relied on a number of reports prepared by Mr. Michael Toloff and his team. Although I have no reason to doubt the accuracy of these reports, because of the data accessibility constraints, I have not been in a position to verify them independently. I reserve the right to expand, amend, and/or change this report based upon additional information that may be subsequently provided to or obtained by me.

# IV.   Bases for Opinions

## IV.A.  Overview of Defendants' Product Offerings and Multi-Level Marketing Business Models

13. Defendants Messrs. Parimal Naik and Michael Toloff founded Financial Education Services, Inc.[13] ("FES") in 2007, and entered into a contractual relationship with Youth Financial Literacy Foundation ("YFL"), in 2011.[14] Defendants offer a wide variety of products and services to customers. Their primary offering is a bundle of products referred to as the "Protection Plan," which encompasses a number of products aimed at increasing financial literacy and creditworthiness, and provides customers with the tools to raise their credit scores, protect and monitor their personal information from theft or fraud, pay-off debt, organize their estate, track budgets, provide educational tools for their children, and more. The Protection Plan accounted for 87 and 85 percent of Defendants' revenues in years 2019 and 2020, respectively.[15]

14. The Protection Plan is composed of the following products that I describe in detail in Appendix D: Credit Attorney, Will & Trust, Debt Payoff, Net Worth, Budgeting, Savings Goal, Financial Lockbox, Credit Builder, Credit Restoration, Identity Monitoring, Credit

---

[13]  FES is a for-profit corporation founded in 2007 that provides all of the contract vendors and programming for the non-credit restoration related products within the Protection Plan. *See* "Organizational History.PDF" prepared by Jerry Thompson, President of the YFL and shared with us by Mike Toloff on 6/25/22 at 1:56PM ET.

[14]  YFL is a registered 501(c) non-profit, charitable organization that provides, among other services, credit restoration and education services. YFL was founded in 2003 under the name of MSU Common Sense, Inc. *See* "Organizational History.PDF" prepared by Jerry Thompson, President of the YFL and shared with us by Mike Toloff on 6/25/22 at 1:56PM ET.

[15]  The percentage of annual revenue attributable to the sale of the Protection Plan was calculated using the total revenue reported for the sale of Protection Plan in "PROTECTION PlA.xlsx," Received from Mike Toloff, June 17, 2022 at 12:21 PM EST,  and total revenue reported in "Cash Deposits.xlsx," Received from Mike Toloff, June 17, 2022 at 12:03 PM EST.

Monitoring, and Rocket Lawyer.[16] In addition to these products, the Protection Plan includes "FamilyMint" program, operated by YFL, which involves presentations at schools and provides booklets and an on-line platform as part of a two-month program to teach money management to children, with donations being given to participating schools.[17]

15. In addition to the Protection Plan, Defendants offer six additional products available either as standalone products or as add-ons to the Protection Plan that are also outlined in Appendix D: Credit My Rent, Secured Card, My Care Plan, MyHealthcare2Go, Smart Credit, Ultra Score.

16. In addition to the products offered under the Protection Plan, consumers are provided with a comprehensive "Road Map" that is designed to maximize the benefits of each of the services offered. This Protection Plan Road Map is also aimed at guiding consumers through various stages of financial education and suggests which of the products should be used in months 1, 2-3, 4-6, 7-9, and 10+. It also provides tips to consumers for "Ongoing Financial Maintenance."[18]

17. Since FES/UWE was founded, Defendants utilized a network of independent contractors called FES Agents ("FESAs"), who participate in the business opportunity by earning

---

[16] For information regarding products included in the Protection Plan, see "Protection Plan," United Credit Education Services, last accessed June 26, 2022, available at: https://ucespp.memberaccount.net/UCESPP/Default.aspx. Link may require login information.

[17] *See* Declaration of Michael Toloff, Pursuant to 28 U.S.C. § 1746, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-11120-BAF-APP, June 27, 2022, at ¶¶ 5-10.

[18] *See "*roadmap.pdf," Received from Mike Toloff, June 16, 2022 at 2:41 PM EST.  The first stage of the Road Map, to be completed within the first month of signing up for the Protection Plan, guides users through setting up fundamental services, such as Credit Restoration, Credit Monitoring, and identity theft monitoring. The second stage, to be completed in months 2-3, suggests that consumers build their credit scores by utilizing the Credit Builder service, applying for the secured credit card, and reporting rental payments to the various credit bureaus. The third stage of the Road Map, to be completed in months 4-6, helps consumers track, organize, and potentially minimize existing debt by promoting the use of the Credit Attorney, Debt Payoff, and Budgeting products. The fourth stage, to be completed in months 7-9, encourages consumers to establish their family's security by utilizing the Will and Trust, Medical and Financial Power of Attorney, Financial Lock Box, and Savings Goal products. Finally, the last stage of the Road Map encourages consumers to stay on top of their finances by continuing to utilize the Credit Attorney service, calculating the value of the assets they own by utilizing the Net Worth product, and enrolling their children in the YFL Family Mint financial literacy program.

commissions on sales of Defendants' products and services, and by receiving compensation plan earnings based on the sales of Distributors in their downline.[19] Defendants' decision to adopt an MLM organization is not uncommon since many companies find the MLM organizational structure to be an attractive business model. For example, companies may believe that the most effective way to sell products or services is through personal contact from sellers who actually use a company's products or services rather than disinterested retail sales clerks. Moreover, customers may be more inclined to purchase from someone with whom they have a personal connection or someone with similar demographic characteristics.

## IV.B.  The FTC Complaint Focuses on Only a Subset of the Products Offered by Defendants and Misrepresents Their Efficacy

18. Although Defendants' offer a wide range of products, the Complaint makes allegations regarding three products: Credit Restoration, Credit My Rent, and Credit-Building,[20] which are demonstrably incorrect, as demonstrated in the remainder of this section. Specifically, the FTC Complaint alleges that:[21]

---

[19]   *See* "Financial Education Services Statement of Policies and Procedures DRAFT," Financial Education Services, May 15, 2020 #4.1; "United Wealth Education Compensation Plan Overview," United Wealth Education, #57.1; "Financial Education Services Compensation Plan Overview," Financial Education Services, #140.1; "Compensation Plan Overview Presentation," Financial Education Services, #154.1.

[20]   *See* Complaint, ¶¶ 20, 34 and 35.

[21]   In addition to the listed allegations, the FTC further alleged Defendants participated in deceptive telemarketing, internet and social media activities, created an unlawful enrollment process by failing to provide consumers with detailed contracts, and charged consumers for services "before fully performing the promised credit repair services." *See Ibid*, ¶¶ 30, 19–25, 28–33.

a) Defendants claimed to have the ability to successfully and permanently remove all negative information from consumers' credit histories or credit reports,[22] including student loans, child support judgments, and bankruptcies.[23]

b) Defendants reportedly claimed the ability to build positive payment histories through the reporting of rental payments to credit reporting agencies, with their Credit My Rent service.[24]

c) Defendants claimed to provide credit-building products, like secured credit cards.[25]

d) Defendants' services often do not result in the removal of negative items from consumers' credit reports, as Defendants provided consumers with letters to be sent to credit reporting agencies that contained unsupported challenges to consumers' credit reports.[26]

19. Each of these allegations misstates or exaggerates the facts or is otherwise demonstrably wrong.

## IV.B.1. The FTC Complaint Misrepresents the Efficacy of the Credit Restoration Product

20. Credit Restoration and Credit My Rent products are designed to improve ("repair") customers' credit reports. The credit repair process commonly involves identifying and disputing inaccuracies on a consumer's credit report with one of the three major national credit bureaus.[27, 28] Generally, credit bureaus calculate a consumer's credit score using a

---

[22]  *See Ibid*, ¶ 20.

[23]  *See Ibid*, ¶ 24.

[24]  *See Ibid*, ¶ 20.

[25]  *See Ibid*, ¶ 20.

[26]  *See Ibid*, ¶ 34.

[27]  *See* "Do Credit Repair Companies Really Work?" Investopedia, last modified November 14, 2021, last accessed June 26, 2022, available at: https://www.investopedia.com/do-credit-repair-companies-really-work-5076928.

[28]  Investopedia requires writers to use primary sources to support their work. These include white papers, government data, original reporting, and interviews with industry experts. Investopedia also references original research from other reputable publishers where appropriate. Investopedia accepts advertising, but maintains a strict and clear separation between advertising and editorial content. Editorial content on Investopedia is not

combination of information on that consumer's payment history, current amounts owed, length of credit history, mix of credit sources, and existence of new credit to arrive at a consolidated score.[29] Credit bureaus rely on information reported by lenders and creditors to perform this calculation,[30] so if any reported information is incorrect, the credit score can be affected. Such errors are relatively common: a study by the FTC itself concluded that "one in five consumers had an error on at least one of their three credit reports," and that if consumers do not regularly verify the content of their credit reports, "they are potentially putting their pocketbooks at risk."[31]

21. Identifying and disputing inaccuracies can be a complex process, involving the credit bureaus, individual creditors, and numerous forms.[32] Consumers can undertake this process themselves; or they can contract with a company that provides credit repair services, conducting the process on their behalf while providing additional services, saving the customer the time and effort of learning and going through the process.[33]

---

influenced by advertisements unless the content is sponsored content, in which case, the content will be clearly demarcated and identified with the title "Ad," "Advertisement," or "Sponsored", or a similar designation, indicating that the content is being provided by or on behalf of an advertiser or sponsor. Accordingly, this report does not cite Investopedia articles that have been clearly demarcated as provided by an advertiser or sponsor. For more details about Investopedia's standards, see the editorial policy available at: https://www.investopedia.com/legal-4768893#EditorialPolicy.

[29]  See "What's in my FICO® Scores?" myFICO, last accessed June 26, 2022, available at: https://www.myfico.com/credit-education/whats-in-your-credit-score.

[30]  See "Do Credit Repair Companies Really Work?" Investopedia, last accessed June 26, 2022, available at: https://www.investopedia.com/do-credit-repair-companies-really-work-5076928.

[31]  See "In FTC Study, Five Percent of Consumers Had Errors on Their Credit Reports That Could Result in Less Favorable Terms for Loans," Press Releases, FTC, last accessed June 26, 2022, available at: https://www.ftc.gov/news-events/news/press-releases/2013/02/ftc-study-five-percent-consumers-had-errors-their-credit-reports-could-result-less-favorable-terms.

[32]  See "Do Credit Repair Companies Really Work?" Investopedia, last accessed June 26, 2022, available at: https://www.investopedia.com/do-credit-repair-companies-really-work-5076928.

[33]  See "Do Credit Repair Companies Really Work?" Investopedia, last accessed June 26, 2022, available at: https://www.investopedia.com/do-credit-repair-companies-really-work-5076928.

22. Contrary to the FTC's assertion, Defendants' Credit Restoration service[34] has led to the removal of many obsolete, unverifiable, and inaccurate items in the Defendants' retail customers' credit records.  Figure 1 shows that based on the Defendants' data for the 2019–2021 period, retail customers who purchased the Protection Plan and expressed interest in Credit Restoration and offered feedback to the Defendants successfully removed over 300,000 obsolete, unverifiable, and inaccurate credit events from their credit reports.[35] Furthermore, over 500,000 obsolete, unverifiable, and inaccurate credit events were successfully removed for the customers who participated in the Product Protection Plan during this same period, regardless of their enrollment time.[36] Notably, the number of obsolete, unverifiable, and inaccurate credit events from retail customers' credit reports understates the actual number of such "deletions" since a number of retail customers have not reported the outcomes to the Defendants.

**FIGURE 1: CREDIT RESTORATION SERVICES**

|  | 2019 | 2020 | 2021 |
|---|---|---|---|
| Number of Retail Customers Expressing Interest | 81,206 | 203,443 | 129,863 |
| Number of Retail Customers Reporting Outcomes | 17,575 | 36,836 | 24,643 |
| Number of Negative Items Removed from Credit Reports | 100,324 | 153,106 | 84,972 |

Sources:  "CREDIT RESTORATION.xlsx," Received from Mike Toloff, June 18, 2022 at 11:58 AM EST.

---

[34]  The Credit Restoration product is provided by the third party YFL (*see* #153.2) and allows customers to "[w]ork with credit experts to remove any inaccurate, obsolete or erroneous accounts" (*see* "UCES Protection Plan Membership", #63.1).

[35]  "CREDIT RESTORATION.xlsx," Received from Mike Toloff, June 18, 2022 at 11:58 AM EST.

[36]  "CREDIT RESTORATION.xlsx," Received from Mike Toloff, June 16, 2022 at 3:37 PM EST.

## IV.B.2.  The FTC Complaint Misrepresents the Efficacy of the Credit My Rent Product

23. The FTC further falsely implies without substantiation that the Defendants' Credit My Rent service is ineffective,[37] and that rental payments do not affect the FICO score typically used by lenders.[38] Although only homeowners were typically viewed as able to build positive credit histories when they make mortgage payments on time,[39] services such as the Defendants' Credit My Rent enable renters to also use their monthly rental payments to effectively improve their credit scores. Contrary to the FTC's assertions, a 2015 pilot survey of residents living in affordable housing conducted by the Citi Foundation and Credit Builder Alliance shows that rent reporting can be very effective: 79 percent of study participants experienced an increase in credit score, with an average increase of 23 points. The positive effect of rent reporting is particularly pronounced for participants within the lowest (subprime) credit tier: "Ninety percent of those individuals experienced an increase in credit score by an average of 32 points due to the inclusion of positive rental payment history."[40] Moreover, all participants that were previously "unscorable became scorable at either the nonprime […] or prime[…] credit tiers".[41] These positive results have also been confirmed in several other studies.[42]

---

[37] *See* Complaint, ¶¶ 20–22.

[38] *See Ibid*, ¶ 35.

[39] *See* Citi Foundation and Credit Builder Alliance (2015) "The Power of Rent Reporting Pilot – A Credit Building Strategy", p. 4: "Although not making housing payments can damage the credit of renters just as much as that of homeowners, only homeowners have typically been able to build positive credit histories when they make mortgage payments on time."

[40] *See Ibid*, p. 17.

[41] *See Ibid*, p. 17.

[42] "Credit for Renting: The impact of positive rent reporting on subsidized housing residents," Experian Rent Bureau, 2013, last accessed June 26, 2022, available at: http://www.experian.com/assets/rentbureau/white-papers/experian-rentbureau-credit-for-rent-analysis.pdf;
"Expanding Credit Building Opportunities for Latino & Immigrant Renters," National Association of Latino Community Asset Builders, August 2020, last accessed June 26, 2022, available at: https://nalcab.org/wp-content/uploads/2020/09/Prudential-Rent-Reporting-Report_final-9.2.20.pdf;
"Making Rent Count: How NYC Tenant Can Lift Credit Scores and Save Money," New York City Office of the Comptroller, October 2017, last accessed June 26, 2022, available at:

24. In its complaint, the FTC further states that "Defendants claim to report consumers' positive rental history to TransUnion and Equifax,"[43] wrongly implying that this claim is untrue. Contrary to the FTC's implication, the Defendants ***do*** report customers' positive rental history to TransUnion and Equifax. Specifically, Defendants have entered into Data Contribution Agreements with Equifax in February 2019 and with TransUnion in October 2017.[44]

25. The FTC misleadingly asserts that "Rental payments, however, do not factor in FICO® Score 8, the FICO score commonly used by lenders."[45] While rental payments are only reflected in FICO scoring models that have been launched since 2014 (FICO 9 Score and higher),[46] "[m]any lenders are beginning to move away from the FICO Score 8 to FICO Score 9 for a more updated and predictive FICO® score evaluation that improves their

https://comptroller.nyc.gov/reports/making-rent-count/rent-and-credit-report/;
"Potential Impacts of Credit Reporting Public Housing Rental Payment Data," U.S. Department of Housing and Urban Development submitted by Policy and Economic Research Council, October 2019, last accessed June 26, 2022, available at: https://www.huduser.gov/portal/sites/default/files/pdf/Potential-Impacts-of-Credit-Reporting.pdf;
"The Power of Rent Reporting Pilot: A Credit Building Strategy," Credit Builders Alliance, 2015, last accessed June 26, 2022, available at: https://www.creditbuildersalliance.org/wp-content/uploads/2019/06/CBA-Power-of-Rent-Reporting-Pilot-White-Paper.pdf;
"TransUnion Analysis Finds Reporting of Rental Payments Could Benefit Renters in Just One Month," Transunion, 2014, last accessed June 26, 2022, available at:
http://newsroom.transunion.com/transunion-analysis-finds-reporting-of-rental-payments-could-benefit-renters-in-just-one-month;
"TransUnion Research Finds Rent Reporting Will Motivate Seven in 10 Renters to Make More On-Time Payments," Transunion, 2019, last accessed June 26, 2022, available at: https://www.globenewswire.com/news-release/2019/06/26/1874348/0/en/Rent-Reporting-Will-Motivate-Seven-in-10-Renters-to-Make-More-On-Time-Payments.html?print=1;
"Utility, Telecommunications, and Rental Data in Underwriting Credit," Urban Institute & FinRegLab, December 2021, last accessed June 26, 2022, available at: https://finreglab.org/alternative-data-in-underwriting-credit/utility-telecommunications-and-rental-data-in-underwriting-credit

43  *See* Complaint, ¶ 35.
44  *See* "Data Contribution Agreement," received from Mike Toloff, June 19, 2022 at 12:44 PM EST; "TURSS Master Service Agreement," received from Mike Toloff, June 19, 2022 at 12:44 PM EST.
45  *See* Complaint, ¶ 35.
46  *See* "The Power of Rent Reporting Pilot – A Credit Building Strategy," Citi Foundation and Credit Builder Alliance, 2015, footnote 15; "FICO 9 Definition", Investopedia, last accessed June 26, 2022, available at: https://www.investopedia.com/fico-09-5072489.

assessment process."[47] For example in 2021, the Federal Housing Finance Agency announced that to "expand access to credit in a safe and sound manner, […] Fannie Mae will consider rental payment history in its risk assessment processes."[48] Moreover, "FICO Score 9 is already being used by hundreds of lenders, and eight of the nation's top 10 lenders have either evaluated it, are in the process of evaluating it or plan to do so,"[49, 50] with a FICO representative expecting "FICO 9 to overtake FICO 8, but lenders' testing of the new model could take years. Lenders' adoption of newer FICO 10 is also likely to take a long time."[51]

26. The FTC's portrayal of the Credit My Rent product as "useless" and "ineffectual" is inconsistent with the fact that that at least five companies competed with Defendants since 2018. The presence of these competitors suggests that that the FTC's view that Credit My Rent product is "useless" is not shared either by the marketplace or by consumers. Figure 2 lists Defendants' competitors and compares Defendants' Credit My Rent service with similar services offered by Defendants' competitors who do not rely on the MLM model to reach retail customers.

---

[47]  *See* "FICO Score 9: Everything You Need to Know," Avail, last accessed June 26, 2022, 2022, available at: https://www.avail.co/education/articles/fico-score-9-everything-you-need-to-know.

[48]  *See* "FHFA Announces Inclusion of Rental Payment History in Fannie Mae's Underwriting Process," Federal Housing Finance Agency, last accessed June 26, 2022, available at: https://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Announces-Inclusion-of-Rental-Payment-History-in-Fannie-Maes-Underwriting-Process.aspx.

[49]  *See* "FICO Score 9: What You Need to Know," NerdWallet, last accessed June 26, 2022, available at: https://www.nerdwallet.com/article/finance/fico-score-9.

[50]  NerdWallet's editorial team of 130 editors, writers and others is exclusively responsible for creating all editorial content, including articles, reviews, guides and lists. All editorial content is fact-checked for accuracy, timeliness and relevance. NerdWallet's business partners and advertisers do not influence product reviews or other editorial decisions. For more details about NerdWallet's standards, see the editorial guidelines available at https://www.nerdwallet.com/l/editorial-guidelines.

[51]  *See* "FICO Score 9: What You Need to Know," NerdWallet, last accessed June 26, 2022, available at: https://www.nerdwallet.com/article/finance/fico-score-9.

**FIGURE 2: RENTAL PAYMENT REPORTING SERVICES COMPARISON**

|  | Entered Market [A] | Sign-up Fee [B] | Monthly Fee [C] |
|---|---|---|---|
| Credit My Rent | 2018 | $0.00* | $14.95 |
| Rent Reporters | 2015 | $94.95 | $9.95 |
| LevelCredit | 2014 | $0.00 | $6.95 |
| Rental Kharma | 2011 | $50.00 | $8.95 |
| Credit Rent Boost | 2016 | $25.00 | $5.95 |
| Rock the Score | 2018 | $48.00 | $6.95 |

Sources and Notes: In contrast to other products listed in this figure, the Defendants' Credit My Rent service is an add-on to the Protection Plan, and does not entail a sign-up fee per se. The sign-up fee for the Protection Plan is $99, with a monthly fee of $89.

[A]:

E-mail from William Butler, received on June 27, 2022, 1:35 PM ET.

https://www.crunchbase.com/organization/rentreporters.

https://www.levelcredit.com/about-us.

https://www.crunchbase.com/organization/rental-kharma.

https://www.bbb.org/us/az/phoenix/profile/credit-services/credit-rent-boost-1126-1000048271.

https://www.crunchbase.com/organization/rock-the-score.

[B];[C]:

Complaint, ¶¶ 28, 29.

https://www.rentreporters.com/pricing-zero/.

https://www.levelcredit.com/pricing?hsLang=en.

https://www.rentalkharma.com/pricing.

https://www.creditrentboost.com/faqs-for-tenants/.

https://www.rockthescore.com/.

## IV.B.3.  The FTC Complaint Makes No Specific Allegations Regarding the Secured Credit Cards Offering

27. Lastly, the Complaint implies that Defendants made deceptive statements regarding their Credit Building product, which offers customers secured credit cards. Investopedia explains that "[a] secure credit card is a type of credit card that is backed by a cash deposit from the cardholder. This deposit acts as collateral on the account, providing the card issuer with security in case the cardholder can't make payments."[52] Alexandra White, a CNBC Money

---

[52]  *See* "What is a Secured Credit Card," Investopedia,  last accessed June 26, 2022, available at https://www.investopedia.com/terms/s/securedcard.asp.

and Credit Card Reporter,[53] described secured credit cards as "one of the best options for credit newbies or people with less than stellar credit."[54] Secured credit cards are issued by many major banks;[55] although they are an expensive way to access credit, they can be very useful for people looking to rebuild their credit score.[56] The Complaint provides no specific allegations regarding the deceptiveness and efficacy of this particular product.

## IV.C. The FTC Complaint Allegations and Dr. Givens' Conclusion That Defendants Operate an Illegal Pyramid Scheme is Unfounded

28. In addition to the allegations regarding Defendants' products efficacy, the FTC also alleges that the Defendants operate an illegal pyramid scheme.[57] In support of the FTC's allegations, Dr. Givens prepared a Declaration, which concludes that Defendants operated a pyramid scheme.[58] I disagree with this conclusion. In the remainder of this section, when addressing the allegations that Defendants operated an illegal pyramid scheme, I will focus

---

[53]  Alexandra White Reporter Profile, CNBC, last accessed June 26, 2022, available at https://www.cnbc.com/alexandria-white/.

[54]  *See* Alexandria White, "Everything you need to know about getting a secured credit card," last accessed June 26, 2022, available at https://www.cnbc.com/select/how-secured-cards-work/ .

[55]  Examples include, "Platinum Secured from Capital One," Capital One, last accessed June 26, 2022, available at: https://www.capitalone.com/credit-cards/platinum-secured/;

"Secured Credit Card," Bank of America, last accessed June 26, 2022, available at: https://www.bankofamerica.com/credit-cards/products/secured-credit-card/;

"How to use a secured credit card to establish a credit history," Chase, last accessed June 26, 2022, available at: https://www.chase.com/personal/credit-cards/education/build-credit/how-to-establish-credit-with-secured-credit-card;

"Citi Secured Mastercard", Citi, last accessed June 26, 2022, available at: https://citicards.citi.com/usc/LPACA/Citi/Cards/Secured/ps/index.html?cmp=knc|acquire|2006|CARDS|Google|BR&gclid=Cj0KCQjw2MWVBhCQARIsAIjbwoP2ROMAX8_CalqNWAhUrHYVIKuZ4ZpJmG0p1DydJpyF1n6mr8UVySYaAu1AEALw_wcB&gclsrc=aw.ds&ProspectID=PK0xzLXJF6zmMDjua6xq7qt5tQjrzYgX; and others.

[56]  *See* "What is a Secured Credit Card," Investopedia, last modified March 4, 2022, last accessed June 26, 2022, available at https://www.investopedia.com/terms/s/securedcard.asp.

[57]  *See* Complaint, ¶ 3.

[58]  *See* Givens Declaration, ¶ 21.

on the Givens Declaration since the FTC Complaint largely recites the arguments developed therein.

## IV.C.1. Overview of MLMs and Application to the Matter at Hand

29. Defendants' companies have several key features differentiating them from typical MLM companies and which mitigate common sources of potential harm to MLM distributors, which I outline below.

30. *No incentive for inventory loading and front loading.* Two common sources of potential harm to MLM distributors are inventory loading[59] and front loading,[60] whereby the distributor accumulates inventory at their own cost, which they may or may not be able to sell at a later date. However, because of the nature of Defendants' products (including the Protection Plan), FESAs have no incentive to accumulate an inventory of product.

31. *Visibility into final consumers.* The majority of companies with an MLM compensation model do not require sale receipts to document sales to ultimate customers, and therefore have little or no visibility into the demand for their product.[61] In contrast, Defendants have a full visibility into the purchases of ultimate customers.

---

[59] The FTC uses the term "Inventory loading" to describe "a participant's wholesale product purchases that are made in an attempt to advance in the marketing program, rather than made to satisfy actual consumer demand in the marketplace for those products." *See* "Business Guidance Concerning Multi-Level Marketing, Question 7, What is "inventory loading"? Do buyback provisions cure inventory loading?" January 2018, last accessed June 26, 2022, available at https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing.

[60] Front loading, which occurs when new distributors drive a disproportionately large share of total sales in an effort to advance in the compensation plan, is a common characteristic of pyramid schemes. When front loading is prevalent, new distributors are encouraged to purchase substantially more product than they can expect to sell to retail customers, and are therefore not purchasing products to satisfy genuine consumer demand.

[61] *See* Wosinska, M., Givens, D., Lau, Y., D. Smith, C. Tylor and B. Wallace (2021) "Economics at the FTC: Multi-level Marketing and a Coal Joint Venture," *Review of Industrial Organization* 59, pp. 629–650: "MLMs generally do not track retail sales by their distributors in the field, and MLM participation often creates incentives for distributors to purchase product independent of consumption demand."

32. *No continuous consumption.* An additional distinction between the Defendants and other MLM companies is that the nature of Defendants' products is such that it may not necessitate continuous consumption—while some of the offered products provide lasting benefit (for example Budgeting and Credit Monitoring), others may be of limited use to customers once they have accomplished their goals (for example Will and Trust, Credit Repair, and Credit My Rent). Retail customers and FESAs who are interested in the latter type of product may opt to discontinue their product subscription, if they represent the majority of all FESAs and retail customers, we would expect to see a relatively small share of FESAs and retail customers to remain "active" for more than several months.

## IV.C.2.  Summary of Dr. Givens' Conclusions

33. Distinguishing companies with legitimate MLM compensation models from those that operate as pyramid schemes is not a straightforward endeavor. Although the Federal Trade Commission has created a body of literature through which it has communicated features of MLM companies that it views as problematic,[62] the exact criteria for establishing the differences between a legitimate MLM company and one operating as a pyramid scheme remain unfortunately vague. While there seems to be a general understanding regarding what constitutes a pyramid scheme (at least in its simplest form known as the "chain letter"), to the best of my knowledge, there is no definition of what constitutes a legitimate MLM company.

---

[62] Since 2014, the FTC has investigated Vemma Nutrition, Herbalife, and Advocare, releasing Complaints and Stipulations that define aspects of each company's business model that it views unfavorably. Furthermore, the FTC has released guidance to inform consumers how they can detect and avoid participating in pyramids schemes, FTC economists have written academic papers on the subject (*see i.e.*, Wosinska, M., et al. (2021) and Stivers, A., Smith, D., Jin, G., "The Alchemy of a Pyramid: Transmutating Business Opportunity Into a Negative Sum Wealth Transfer" (December 3, 2019). Available at SSRN: https://ssrn.com/abstract=3497682 or http://dx.doi.org/10.2139/ssrn.3497682). The FTC Directors gave speeches to the Direct Selling Association. For example, see the remarks delivered by Andrew Smith, Director of the FTC's Bureau of Consumer Protection, to the participants of the DSA Legal and Regulatory Seminar on October 8, 2019. The excerpts of Director Smith's speech are included in Plaintiffs' Original Verified Complaint for Declaratory Judgment, Preliminary, and Permanent Injunctive Relief, Nerium International and Jeffrey Olson v. Federal Trade Commission, Civil Action No. 1:19-cv-7189, The United States District Court for the Northern District of Illinois, Eastern Division, filed on November 1, 2019.

34. This conundrum seems to inform Dr. Givens' approach: Dr. Givens does not attempt to compare Defendants' business model with those of legitimate MLM companies. Instead, he starts with a premise that Defendant's operate an illegal pyramid scheme and proceeds to either search for support to validate his initial premise (through the review of Defendants' compensation model) or make assumptions that are designed to directly support his conclusion. A striking example of Dr. Givens' tautological approach is his characterization of a pyramid scheme as "a recursive arrangement in which a participant pays into a scheme in return for the right to earn commissions on the payments made by others whom she recruits and convinces to chase the same opportunity," where "[t]he right to earn commissions may extend down many levels of what is known as a participant's 'downline.'"[63] The existence of these downlines, however, is the very characteristic of *all* MLM compensation models.

35. To reach his conclusions, Dr. Givens conducts two analyses: an analysis of Defendants' compensation plan, and what he describes as an optimal scenario analysis.[64] For these two analyses, he applies the methodology described in a recent paper by Wosinska, M., et al.[65] This paper also describes a third type of analysis which Dr. Givens is *not* able to perform: analyses of distributors' data. Dr. Givens readily admits that he is not able to analyze distributors' data because these data were unavailable to him at the time he prepared his Declaration.[66] Without the ability to analyze Defendants' data, Dr. Givens conclusions are based on nothing more than speculations and devoid of any reliable empirical support.

---

[63]    *See* Givens Declaration, ¶¶ 25–27.

[64]    *See Ibid*, ¶ 43.

[65]    *See* Wosinska, M., Givens, D., Lau, Y., D. Smith, C. Tylor and B. Wallace (2021) "Economics at the FTC: Multi-level Marketing and a Coal Joint Venture," *Review of Industrial Organization* 59, pp. 629–650.

[66]    *See* Givens Declaration, ¶ 24.

36. Dr. Givens makes four key assumptions and observations regarding the Defendants' business activities:[67] Defendants offer a non-viable product;[68] Defendants' compensation plan incentivizes recruitment over retailing;[69] the Majority of the FESAs being at the lowest rank implies that Defendants operate a pyramid scheme;[70] and Defendants' have no (official) return policy.[71] As I show below, each of these assumptions and observations is demonstrably wrong.

## IV.C.3. There Exists Genuine Demand for Defendants' Products

37. Dr. Givens makes no effort to analyze the demand for Defendants' products, and instead explicitly assumes that Defendants' products are non-viable and that FESAs received no benefit for the payments they made to Defendants (another example of Dr. Givens' tautological approach). In my opinion, both assumptions are wrong. Dr. Givens makes little effort to understand the nature of the products Defendants offer[72] and does not offer a single analysis attempting to evaluate empirically whether FESAs receive rewards that are unrelated to end-user product sales.

38. From an economic perspective, the key question when assessing whether an MLM operates as a legal organization is whether there is genuine demand for the company's product. It is therefore crucial to establish whether Defendants' products provide real consumption value for consumers, regardless of whether those consumers are also participants in the

---

[67]  These "four key assumptions and observations" should not be confused with Dr. Givens' "Key assumptions" laid out in Section IV.B.3 of the Givens Declaration.

[68]  *See* Givens Declaration, ¶ 14.

[69]  *See Ibid*, ¶ 20.

[70]  *See Ibid*, ¶ 29.

[71]  *See Ibid*, ¶ 55.

[72]  While the FTC focuses only on a subset of Defendants' products. Dr. Givens goes a step further – he erroneously assumes that Protection Plan offers only one product, Credit Repair, which might not be suitable for FESAs with good credit. As I explained in Section IV.B, Protection Plan is a bundle of different products, which are suitable for different financial needs.

business opportunity.[73] An FTC Staff Advisory Opinion explains that, "[t]he critical question for the FTC is whether the revenues that primarily support the commissions paid to all participants are generated from purchases of goods and services that are not simply incidental to the purchase of the right to participate in a money-making venture."[74]

39. If a substantial share of revenue comes from sales to consumers who do not receive any compensation from the Defendants, *i.e.* retail customers, not FESAs, then the commissions are "primarily" generated from purchases that are not incidental to the business opportunity. Any reasonable allowance for personal consumption by FESAs would only reinforce this conclusion.

40. Contrary to Dr. Givens' assumption that Defendants' products are non-viable, genuine demand accounts for a large fraction of total volume. Figure 3 shows that sales to retail customers accounted for between 63.8% and 67.9% of Defendants' average monthly revenues from Protection Plan sales during the 2019–2021 period.

**FIGURE 3: SHARE OF PROTECTION PLAN REVENUES ATTRIBUTABLE TO PURCHASES BY RETAIL CUSTOMERS**

| Year | Average Monthly Number of Customers Enrolled in Protection Plan | Average Monthly Number of FES Agents Enrolled in Protection Plan | Share of Retail Customers | Average Monthly Protection Plan Revenue | Average Monthly Protection Plan Revenue Attributable to Retail Customers |
|---|---|---|---|---|---|
| [A] | [B] | [C] | [D] | [E] | [F] |
| 2019 | 38,833 | 22,002 | 63.8% | $5,292,616 | $3,378,478 |
| 2020 | 73,818 | 34,894 | 67.9% | $9,457,966 | $6,422,159 |
| 2021 | 72,340 | 37,149 | 66.1% | $9,634,042 | $6,365,261 |

Sources and Notes:
I assume that Defendants' average monthly revenue per FESA and Retail Customer are equal.
[B]: Average Monthly Number of Customers Enrolled in Protection Plan was calculated using the data on number of monthly customers reported in "PROTECTION PLA.xlsx," received from Mike Toloff, June 17, 2022 at 12:21 PM EST.

---

[73] The existence of genuine demand is a key factor when using the Koscot test, which Dr. Givens describes in paragraphs 37–42 of his Declaration, to assess whether a company operates as a pyramid scheme.

[74] *See* "Staff Advisory Opinion - Pyramid Scheme Analysis," by Acting Director of Marketing Practices James A. Kohm, January 14, 2004.

[C]: Average Monthly Number of FES Agents Enrolled in Protection Plan was calculated using data on number of monthly agents reported in "PROTECTION PLA.xlsx," received from Mike Toloff, June 17, 2022 at 12:21 PM EST.
[D]: [B]/([B]+[C])
[E]: Average Monthly Protection Plan Revenue was calculated using monthly revenues from the sale of Protection Plan reported in "PROTECTION PLA.xlsx," received from Mike Toloff, June 17, 2022 at 12:21 PM EST.
[F]:  [D]*[E]

41.   Results in Figure 3 contradict the assumptions Dr. Givens adopts in his "optimal scenario" analysis—Dr. Givens assumes, without any empirical support, that an FESA enrolls five new Agents and only three retail customers, which results in a larger share of FESAs than retail customers in the FESAs downline. Actual results in Figure 3 directly contradict this assumption. Because the revenues Defendants draw from retail customer purchases are generally *lower* than those from FESAs, the results in Figure 3 suggest that there are significantly more retail customers than agents.

42.   It is notable that Dr. Givens, despite claiming to depict an "optimal" scenario based on a "conjectured profit-maximizing strategy,"[75] provides no rationale or empirical findings to show that his assumptions are realistic or that they would construe true profit maximizing-behavior on behalf of FESAs. The assumption that the "uniform strategy" of every FESA consists of enrolling five new FESAs and three retail customers is entirely arbitrary—the "optimal scenario" does not entail any optimization behavior. All result in Dr. Givens' "optimal scenarios" are entirely driven by his assumptions. Essentially, consistent with his tautological approach, Dr. Givens assumes his results.[76]

43.   For example, consider Dr. Givens' assumptions regarding the number of enrolled FESA and retail customers per Agent. Increasing the number of assumed enrolled retail customers (consistent with the results in Figure 3) would increase the share of rewards tied to sales to

---

[75]   Givens Declaration, ¶ 182.

[76]   This is evident in Givens Declaration, ¶ 196: Dr. Givens states that "assuming more (>3 customers) would ignore the fact that retailing is poorly compensated and is not required for advancement or earnings." These "facts" are actually Dr. Givens' conclusions untethered from empirical data and were entirely based on his interpretation of Defendants' compensation plan.

retail customers shown in Givens Declaration Figure 10. Further, to the extent that Agents' own purchases correspond to genuine demand, which I discuss in Section IV.C.3, would bring the share of rewards tied to sales to ultimate users to 100%.[77]

44. Furthermore, results in Figure 3 likely underestimate the proportion of revenue attributable to genuine demand as it assumes, as does Dr. Givens, that FESAs purchases are incidental and not driven by demand for Defendants' products. However, it is generally recognized that distributors of products offered by MLM companies often willingly consume those products as well. Indeed, as noted earlier, many MLMs are built on the premise that product users will be more effective salespersons in promoting products. The FTC and courts have long recognized that distributors can be considered ultimate end-users and that the presence of personal consumption does not determine whether the FTC will consider an MLM's compensation structure unlawful. The FTC's guidance even allows reasonable levels of personal consumption to be used for payment qualification.[78] The courts have also recognized that personal purchases for internal consumption count as purchases by "ultimate users" of the product.[79] Thus, it is important to consider FESA's personal consumption of products as a component of genuine demand.[80]

---

[77] Furthermore, the "optimal scenario" assumptions disregard enrollment costs (both monetary and opportunity costs) which one could argue are higher for recruiting FESAs than retail customers. Accounting for these costs would increase the profitability of retail customers relative to FESAs and thus change Dr. Givens' results.

[78] *See* "Business Guidance Concerning Multi-Level Marketing," FTC, January 2018, accessed April 28, 2021, available at: https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing.

[79] According to the Ninth Circuit Court of Appeals, "BurnLounge is correct that when participants bought packages in part for internal consumption…, the participants were the 'ultimate users' of the merchandise and that this internal sale alone does not make BurnLounge a pyramid scheme." *See* FTC v. BurnLounge, Inc., No. 12-55926, Ninth Circuit, 2014. The Ninth Circuit decision cited an FTC Staff Advisory Opinion which stated that "…the amount of internal consumption in any multi-level compensation business does not determine whether or not the FTC will consider the plan a pyramid scheme." *See* "Staff Advisory Opinion - Pyramid Scheme Analysis," by Acting Director of Marketing Practices James A. Kohm, January 14, 2004.

[80] In its 2008 Proposed Business Opportunity Rule, the FTC stated that "[t]he record in this proceeding to date is largely comprised of thousands of letters from consumers who operate as MLM distributors. Many of these commenters extolled the benefits of the products they sell." *See* "Federal Register, Part II, Federal Trade Commission, 16 CFR Part 37, Business Opportunity Rule; Proposed Rule," Federal Trade Commission, March 26, 2008, last accessed June 26, 2022, p. 16118, available at:

45. Figure 4 shows the share of FESAs and retail customers who have expressed interest in individual services provided by the Defendants. For example, of all FESAs that enrolled in 2019, 37.1% have expressed interest in the Wills & Trusts service as of June 2022, while 24.5% of retail customers have expressed interest in that service. Generally, FESAs and retail customers tend to express interest in individual services at a similar rate, with FESAs generally more interested in the Defendants' services—the only exceptions being the Credit Monitoring and Credit Restoration services that appear to be more interesting to Retail Customers. Results for 2020 (Figure 6) and 2021 (Figure 7) can be found in Appendix C that reveal qualitatively similar results.[81]

---

https://www.ftc.gov/sites/default/files/documents/federal_register_notices/business-opportunity-rule-16-cfr-part-437/080326businessopportunityrule20.pdf.

[81] In 2020, retail customers tended to express more interest for the Identity Monitoring, Credit Restoration and Credit Monitoring products. In 2021, retail customers tended to express more interest for the Identity Monitoring, Credit Restoration, Credit Monitoring and Credit Builder products.

**FIGURE 4: SHARE OF SERVICES IN WHICH FESAS AND RETAIL CUSTOMERS EXPRESSED INTEREST AS OF JUNE 2022: 2019 ENROLLMENT YEAR**



Source: "UCESPP_2019.xlsx," received from Mike Toloff, June 22, 2022 at 11:30 AM EST.

46. Figure 4: suggests that, FESAs and retail customers showed similar interest in Defendants' products. Assuming that FESAs and retail customers interest in different services available within the Protection Plan correlates to the actual usage of these services, it would seem that Defendants' requirement that FESAs be active (i.e., pay their monthly Protection Plan fee) likely falls well within reasonable level of FESAs' personal consumption. Therefore, Dr. Givens' concern that Defendants' activity requirement is a form of inventory loading, which rests on the assumption that FESAs derive no value from the monthly access to Protection Plan, is misplaced.

## IV.C.4.  Dr. Givens' Criticism that Defendants' Compensation Plan Incentivizes Recruitment Is Misplaced

47. Dr. Givens further supports his conclusion that Defendants operate an illegal pyramid scheme by observing that Defendants' compensation plan "incentivizes a singular focus on building a downline of recruitment-focused Agents,"[82] who are "paid in connection with recruiting other participants."[83] Because there exists genuine demand for Defendants' products, from an economic standpoint, there is nothing wrong with using recruitment to grow the business of FESAs and encouraging recruitment to grow an organization and sell more products to end users. Indeed, that practice is fundamental to every legal MLM plan.

48. Dr. Givens specifically points to the Customer Acquisition Bonus ("CAB") as evidence of Defendants offering recruitment-only rewards.[84] United Wealth Education Compensation Plan[85] allows that new FESAs who enroll new Protection Plan customers will be eligible for CAB bonus.[86] The CAB bonus consists of two parts;[87] each part requires FESAs to meet certain requirement, either by enrolling new FESAs or new customers. While the "initial" CAB does require new FESAs to enroll new Agents who purchased Protection Plan, the "remaining CAB" can be earned only by enrolling new customers who have no interest in participating in the compensation model. In fact, the majority of CAB payments were made in a form of the "remaining CAB"; the "initial CAB"—tied to enrolling new agents— accounted between 10.1 and 14.2 percent of total CAB payments.[88]

49. Dr. Givens "suspects" that other bonuses and rewards in Defendants' compensation plan are dependent on FESAs' ability to enroll new customers and new FESAs. In my opinion

---

[82] *See* Givens Declaration, ¶ 20.
[83] *See Ibid*, ¶ 14.
[84] *See Ibid*, Section IV.2.a.ii.
[85] *See* "United Wealth Education, Compensation Plan Overview," #57.1.
[86] *See Ibid*, pp. 5 and 6.
[87] *See Ibid*, pp. 5 and 6.
[88] *See* "FreePP & CAB Reports.xlsx," Received from Mike Toloff, June 21, 2022 at 8:09 PM EST.

the practice of rewarding with bonuses and commissions FESAs who successfully recruit and train other individuals necessary for replacement and for growth cannot be viewed as proof that a company operates as a pyramid scheme. In any event, the extent to which these bonuses are earned through recruitment of new FESAs as opposed to new customers is an empirical matter. Without evaluating the Defendants' business intelligence data, something that Dr. Givens did not do, one can only speculate on the source of these rewards.

50. Putting aside the exact source and mechanism of various rewards, Figure 5 below shows that over 50% of Defendants' revenues are paid back to FESAs in form of various commission and bonuses.

**FIGURE 5: DEPOSITS AND COMMISSIONS**

|  | 2019 | 2020 | 2021 |
| --- | --- | --- | --- |
| Retail Customers | 465,997 | 885,815 | 868,076 |
| FES Agents | 264,019 | 418,732 | 445,787 |
| Deposits | $73,117,017 | $134,228,464 | $113,033,672 |
| Commissions | $39,164,761 | $79,578,886 | $67,081,144 |
| Share of Commissions of Deposits | 54% | 59% | 59% |

Sources and Notes:
Deposits refer to Defendants' revenue generated from the sale of all products, including the Protection Plan.
Data for deposits and commissions are reported in "CASH DEPOSITS.xls," Received from Mike Toloff, June 17, 2022 at 12:03 PM EST.
"PROTECTION PLA.xlsx," Received from Mike Toloff, June 17, 2022 at 12:21 PM EST.
Four weeks of revenue from 2021 are missing due to the freezing of FES's accounts.

### IV.C.5.   The Observation that the Majority of the FESAs Are at the Lowest Rank of the Organization Does Not Imply that Defendants Operate a Pyramid Scheme

51. In Section III of his Declaration, Dr. Givens describes "an illustrative example of a pyramid scheme":[89] A chain letter scheme, where the only value to participants is derived from receiving compensation for recruiting other participants, and the majority of participants find themselves at the lowest ranks of the organization.[90] In Section IV.B of his Declaration, which purports to describe "the optimal scenario", he also observes that the majority of FESAs will find themselves at the lowest ranks of the compensation structure.

52. As a general matter, the real-world implication of Dr. Givens' observation that the majority of FESAs find themselves at the lowest ranks of the compensation structure is the near antithesis of his conclusion that the Defendants operate an illegal pyramid scheme. All MLM organizations and most other legitimate enterprises operate with a hierarchical organizational structure that has many more participants at low levels of the organization than it does at higher levels. Moreover, all such organizations depend on an "endless recruiting chain,"[91] both for growth and to replace departing agents or employees.

53. For example, the FTC's "Business Guidance Concerning Multi-Level Marketing" states that:

> *Multi-level marketing is one form of direct selling. Generally, a multi-level marketer (MLM) distributes products or services through a network of salespeople who are not employees of the company and do not receive a salary or wage. Instead, members of the company's salesforce usually are treated as independent contractors, who may earn income depending on their own revenues and expenses. Typically, the company does not directly recruit its salesforce, but relies upon its existing salespeople to*

---

[89]   *See* Givens Declaration, ¶¶ 32.
[90]   *See Ibid*, ¶¶ 30–32.
[91]   *See Ibid*, ¶ 36.

*recruit additional salespeople, which creates multiple levels of "distributors" or "participants" organized in "downlines." A participant's "downline" is the network of his or her recruits, and recruits of those recruits, and so on.*[92]

54. Based on his "optimal scenario analysis,"[93] Dr. Givens concludes that the Defendants' investment opportunity "results in the vast majority of participants operating at a financial loss."[94] Implicit to Dr. Givens' conclusion is that Defendants' product is entirely non-viable, which leads to the need for FESAs to fully recoup the fees associated with the Protection Plan membership. However, a simple example suffices to show that even given Dr. Givens' wrong assumption that FESAs do not derive any value of the Defendants' Protection Plan, it is entirely possible for FESAs to never operate at a financial loss even without any recruitment activities: A new FESA who does not recruit any new agents and conducts only three sales to retail customers in her first month will instantly break-even.[95] Conducting a single additional sale to a retail customer in subsequent months will always leave her with a net profit, even without her retail customers subscribing for more than three months.[96]

---

[92] *See* "Business Guidance Concerning Multi-Level Marketing," FTC, January 2018, last accessed June 26, 2022. Available here: https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing.

[93] *See* Givens Declaration, Section IV.B.

[94] *See Ibid*, ¶ 247.

[95] This is the case when the new FESA collects three setup fees at $99, thereby earning three one-time $100 commissions, which will cover both her one-time sign-up fee of $199 and the monthly fee of $89.

[96] In this scenario, she would earn $313 (or approximately $22 per enrolled retail customer) by the end of her first year. Adopting different assumptions will improve this FESA's prospects. If she were to consistently enroll two retail customers per month with none of them subscribing for more than three months, she would break even by her second month and would already have earned $134 (or approximately $22 per enrolled retail customer) by the end of her third month. It is important to note that none of these examples considered here should be considered "optimal," leaving the hypothetical FESA nevertheless with profits after expenses.

### IV.C.6. Defendants' Refund Policy Resulted in Non-Trivial Share of Revenue Being Channeled Back to FESAs and Retail Customers

55. In, Section IV.C.1, I outlined the key distinctions between Defendants' products and those offered by the majority of other MLM companies. In brief, Defendants' products are not physical goods (e.g., laundry detergent) for which there is necessarily a continuous demand, but bundles of services which are meant to satisfy various financial needs at different points in time. MLM distributors who are entrusted with placing physical goods may decide to return the inventory of goods that they are unable to sell or consume and request a refund. The nature of the Defendants' products is such that there is no inventory of goods—FESAs sell Defendants' products directly to retail customers. Therefore, it would not be entirely surprising if the Defendants did not have an official return policy[97], as returning the type of product that the Defendants offer would be nonsensical.

56. Defendants do offer newly enrolled FESAs and retail customers an option to "undo" their commitment within three days of enrolling.[98] I further understand that Defendants offered a generous refund policy for up to six months to FESAs and retail customers who wished to discontinue their Protection Plan subscription,[99] even though this policy was not widely publicized. These policies resulted in a non-trivial share of revenues refunded to retail

---

[97]  *See* Givens Declaration, ¶ 55.

[98]  *See* UCES Protection Plan Agreement, #66.1:"You may cancel this contract within three (3) business days after enrollment and receive a full refund. After three (3) business days, you may be eligible to receive a refund on the current month's payment. No refunds will be issued on past billing cycles, or similar products previously purchased." *See* also "UWE AGENT AGREEMENT.pdf" received from Mike Toloff, June 27, 2022 6:02 PM EST: "You may request a refund on your enrollment fee if it is done within three business days from the date of enrollment. If you cancel, any enrollment fees paid will be returned within TEN BUSINESS DAYS following receipt by UWE of your cancellation notice. To cancel this transaction, notify agent support by phone or email not later than midnight of the third business day following the date of this agreement. No refunds will be issued after the cancellation period."

[99]  On September 20, 2020, Pat Karas, VP of Operations for YFL, sent an email allowing all call center associates to approve a 3 month refund before having to escalate the call to a team lead. See "Refunds.doc" received from Mike Toloff, June 22, 2022 3:55 PM. On November 20, 2020, Pat Karas extended the refund period to 6 months. See E-mail from Michael Toloff, received on June 27, 2022 at 6:02 PM EST.

customers and FESAs during the 2019–2021 period—between 3 and 4 percent,[100] which is in my experience roughly in line with the share of refunded sales in MLMs that offer traditional, physical goods.

Branko Jovanovic, Ph.D.

June 27, 2022

---

[100] *See* "CASH DEPOSITS.xls," received from Mike Toloff, June 17, 2022 at 12:03 PM EST.

## Appendix A: Curriculum Vitae

# Branko Jovanovic

## PRINCIPAL

| Washington, DC | +1.202.419.3336 | Branko.Javanovic@brattle.com |
|---|---|---|

Dr. Jovanovic is an economist with over 20 years of experience providing economic and statistical analyses in litigation, government investigations, and regulatory proceedings. He has deep expertise in matters including securities, finance, and consumer protection.

Dr. Jovanovic has served as a testifying and consulting expert on a number of cases that have required sophisticated econometric analyses to address class certification, liability, and damages issues in securities and consumer class actions and market manipulation matters. He has extensive experience analyzing multi-level marketing compensation models in the nutrition, supplements, and cosmetics sectors.

A significant focus of Dr. Jovanovic's work has involved assisting clients in responding to formal investigations and requests for data and analyses from regulatory entities such as the Federal Trade Commission (FTC), the US Securities and Exchange Commission (SEC), offices of State Attorneys General, and self-regulating organizations such as the Financial Industry Regulatory Authority (FINRA) and US stock exchanges. Dr. Jovanovic has provided testimony before the SEC, the International Chamber of Commerce's International Court of Arbitration, the American Arbitration Association, and various federal and state courts.

Dr. Jovanovic's research has been published in a number of academic and professional journals. He has lectured on economic issues in a variety of continuing legal education forums and previously taught graduate econometrics courses at New York University and Johns Hopkins University.

EDUCATION

- **Texas A&M University**
  PhD in Economics

- **Central European University**
  MA in Economics
- **University of Belgrade**
  BS in Economics

## PROFESSIONAL EXPERIENCE

- **The Brattle Group (April 2022–Present)**
  Principal (2008–2021, 2022–Present)
  Senior Consultant (2017–2018)

- **Bates White (2012–2015, 2021–2022)**
  Partner (2021–2022)
  Managing Economist (2012–2015)

- **NERA Economic Consulting (2005–2011, 2016–2017)**
  Senior Consultant

- **Econ One Research (2015–2016)**
  Principal

- **AFE Consulting (2011–2012)**
  Principal

- **CapAnalysis (2001–2003)**
  Economist

- **The World Bank (1998–2001)**
  Consultant

## EXPERT TESTIMONY

- ***Matson, et al. v. NIBCO, Inc.*** | US District Court for the Western District of Texas, San Antonio Division | No. 5:19-cv-00717-RBF | Expert Report (August 30, 2021) Submitted on Behalf of the Defendant

- ***Ambac Assurance Corporation, et al. v. First Franklin Financial Corporation*** | Supreme Court of the State of New York | Deposition Testimony (November 12, 2019) and Rebuttal Expert Report (June 14, 2019) Submitted on Behalf of the Plaintiff

- ***In the Matter of Houston American Energy Corp., et al.*** | US Securities and Exchange Commission | Administrative Proceeding File No. 3-16000 | Rebuttal Expert Report (December 12, 2014) and Expert Report (November 21, 2014) Submitted on Behalf of the Plaintiff

- ***Magic Hour Productions, Inc. v. TIME of My Life Pty Ltd. and Glebe Point (London) Limited*** | American Arbitration Association | ICDR Case No. 50 140 T 00647 11 | Testimony (January 23, 2013) and Expert Report (November 16, 2012)

- ***Joseph v. Hogan*** | US District Court for the Eastern District of New York |No. 06 CV 1042 (BMC/SMG) | Declaration (June 16, 2011), Deposition Testimony (February 3, 2011), Rebuttal Expert Report (January 5, 2011), and Expert Report Submitted on Behalf of the Plaintiff

- ***Countrywide Financial Corp. Securities Litigation*** | US District Court for the Central District of California | Lead Case No. 07-CV-005295-MRP (MANx) | Declaration (March 24, 2010)

- ***Tabbane v. Colgate Palmolive Services*** | International Chamber of Commerce | Rebuttal Expert Report (January 30, 2009) and Expert Report (December 19, 2008) Submitted on Behalf of the Defendant

- ***David Calvert-Jones v. Helinet Aviation Services, LLC.*** | Superior Court of California, County of Los Angeles Declaration (December 12, 2007)

---

## SELECTED ARTICLES & PUBLICATIONS

- "A Look Into FTC's Thinking On Pyramid Scheme Potential," with Pablo Robles and Jeremy Smith, *Law360* (2020)

- "Target Date Funds: Economic, Regulatory and Legal Trends," with Chris Laursen and Ioannis Gkatzimas, *Law360* (2017)

- "Proposal to Remedy Horizontal Shareholding is Flawed," with Elaine Buckberg, Steven Herscovici, and James D. Reitzes, *Law360* (2017)

- "Testing for Materiality in Volatile Markets," with Edward Fox**,** *Securities Law360* (2010)

- "Do Options Backdating Class Actions Settle For Less? May 2010 update" with Robert Patton and Svetlana Starykh, NERA Working Paper (2010)

- "Do Options Backdating Class Actions Settle For Less? October 2008 update" with Robert Patton and Svetlana Starykh, NERA Working Paper (2008)

- "Do Options Backdating Class Actions Settle For Less?" with Robert Patton and Svetlana Starykh, NERA Working Paper (2008)

- "Options Backdating: The Statistics of Luck," with Patrick Conroy and Renzo Comolli, NERA Working Paper (2007)

- "Wage Differentials between the Private and the State Sector in Moscow," with Michael Lokshin, *Review of Income and Wealth* (2004)

- "Public-Private Sector Employment Choice and Wage Differentials in Yugoslavia," with Michael Lokshin, *Economics of Transition 11* (2003)

- "Russian Roller Coaster: Expenditures Instability in Russia, 1994–1998," *Review of Income and Wealth* (2001)

- "Change in the Perception of the Poverty Line During the Times of Depression: Russia, 1993–1996," with Branko Milanovic, *World Bank Economic Review* (1999)

SELECTED PRESENTATIONS & SPEAKING ENGAGEMENTS

- "Finding Success: Sexual Orientation, Gender Identity, and Expression," Panelist, Section of Antitrust Law, ABA Diversity (July 23, 2021)

- "Addressing Payments Defaults and Flow of Funds Difficulties during the COVID-19 Crisis," Panelist, Virtual seminar (November 25, 2020)

PROFESSIONAL ASSOCIATIONS & MEMBERSHIPS

- American Economic Association
- American Bar Association

# Appendix B: Materials Relied Upon

"About Us," Level Credit. Available at: https://www.levelcredit.com/about-us.

"BankAmericard Secured Credit Card," Bank of America, available at:

https://www.bankofamerica.com/credit-cards/products/secured-credit-card/.

"Business Guidance Concerning Multi-Level Marketing," FTC, January 2018,
https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing.

"CASH DEPOSITS.xls," Received from Mike Toloff, June 17, 2022 at 12:03 PM EST.

"Compensation Plan Overview Presentation," Financial Education Services, #154.1.

"Credit for Renting: The impact of positive rent reporting on subsidized housing residents," Experian Rent Bureau,  2013, last accessed June 26, 2022, available at: http://www.experian.com/assets/rentbureau/white-papers/experian-rentbureau-credit-for-rent-analysis.pdf.

"Credit Rent Boost," Better Business Bureau. Available at:
https://www.bbb.org/us/az/phoenix/profile/credit-services/credit-rent-boost-1126-1000048271/.

"CREDIT RESTORATION.xlsx," Received from Mike Toloff, June 16, 2022 at 3:37 PM EST.

"CREDIT RESTORATION.xlsx," Received from Mike Toloff, June 18, 2022 at 11:58 AM EST.

"Data Contribution Agreement," received from Mike Toloff, June 19, 2022 at 12:44 PM EST.

"Do Credit Repair Companies Really Work?" Investopedia, last modified November 14, 2021. Available at: https://www.investopedia.com/do-credit-repair-companies-really-work-5076928

"Editorial Policy," Investopedia, last modified August 8, 2019. Available at:
https://www.investopedia.com/legal-4768893#EditorialPolicy.

"Expanding Credit Building Opportunities for Latino & Immigrant Renters," National Association of Latino Community Asset Builders, August 2020. Available at: https://nalcab.org/wp-content/uploads/2020/09/Prudential-Rent-Reporting-Report_final-9.2.20.pdf.

"FAQs for Tenants," Credit Rent Boost. Available at: https://www.creditrentboost.com/faqs-for-tenants/.

"Federal Register, Part II, Federal Trade Commission, 16 CFR Part 37, Business Opportunity Rule; Proposed Rule," Wednesday, March 26, 2008. Available at: https://www.ftc.gov/sites/default/files/documents/federal_register_notices/business-opportunity-rule-16-cfr-part-437/080326businessopportunityrule20.pdf.

"FHFA Announces Inclusion of Rental Payment History in Fannie Mae's Underwriting Process," Federal Housing Finance Agency, last modified August 11, 2021. Available at: https://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Announces-Inclusion-of-Rental-Payment-History-in-Fannie-Maes-Underwriting-Process.aspx.

"FICO 9 Definition", Investopedia. Available at: https://www.investopedia.com/fico-09-5072489.

"FICO Score 9: Everything You Need to Know," Avail, last modified February 7, 2020. Available at: https://www.avail.co/education/articles/fico-score-9-everything-you-need-to-know.

"FICO Score 9: What You Need to Know," Nerdwallet, last modified November 22, 2021. Available at: https://www.nerdwallet.com/article/finance/fico-score-9.

"FreePP & CAB Report.xls," Received from Mike Toloff, June 21, 2022 at 8:09 PM EST.

"Financial Education Services Compensation Plan Overview," Financial Education Services, #140.1

"Financial Education Services Statement of Policies and Procedures DRAFT," Financial Education Services, May 15, 2020 #4.1

"How to use a secured credit card to establish a credit history," Chase. Available at: https://www.chase.com/personal/credit-cards/education/build-credit/how-to-establish-credit-with-secured-credit-card.

"In FTC Study, Five Percent of Consumers Had Errors on Their Credit Reports That Could Result in Less Favorable Terms for Loans," Press Releases, FTC, last modified February 11, 2013, https://www.ftc.gov/news-events/news/press-releases/2013/02/ftc-study-five-percent-consumers-had-errors-their-credit-reports-could-result-less-favorable-terms.

"Making Rent Count: How NYC Tenant Can Lift Credit Scores and Save Money," New York City Office of the Comptroller, October 2017. Available at: https://comptroller.nyc.gov/reports/making-rent-count/rent-and-credit-report/ .

"Platinum Secured from Capital One," Capital One, available at: https://www.capitalone.com/credit-cards/platinum-secured/.

"Potential Impacts of Credit Reporting Public Housing Rental Payment Data," U.S. Department of Housing and Urban Development submitted by Policy and Economic Research Council, October 2019. Available at: https://www.huduser.gov/portal/sites/default/files/pdf/Potential-Impacts-of-Credit-Reporting.pdf .

"Price," Rent Reporters. Available at: https://www.rentreporters.com/pricing-zero/.

"Pricing," Level Credit. Available at: https://www.levelcredit.com/pricing?hsLang=en.

"Products," United Wealth Education. Available at:

https://www.myuwe.net/Product.aspx?rid=uwedemo.

"PROTECTION PLA.xlsx," Received from Mike Toloff, June 17, 2022 at 12:21 PM
EST.

"Protection Plan," United Credit Education Services. Available at:

https://ucespp.memberaccount.net/UCESPP/Default.aspx.

"Refunds.doc" received from Mike Toloff, June 22, 2022 3:55 PM.

"Rental Kharma," Crunch Base. Available at:

https://www.crunchbase.com/organization/rental-kharma.

"Rental Kharma Pricing Guide," Rental Kharma. Available at:

https://www.rentalkharma.com/pricing.

"Rent Reporters," Crunch Base. Available at:

https://www.crunchbase.com/organization/rentreporters.

"roadmap.pdf," Received from Mike Toloff, June 16, 2022 at 2:41 PM.

"Rock the Score," available at: https://www.rockthescore.com/.

"Rock the Score," Crunch Base. Available at:

https://www.crunchbase.com/organization/rock-the-score.

"Secured MasterCard", Citi. Available at:

https://citicards.citi.com/usc/LPACA/Citi/Cards/Secured/ps/index.html?cmp=knc|a
cquire|2006|CARDS|Google|BR&gclid=Cj0KCQjw2MWVBhCQARIsAIjbwoP2RO
MAX8_CalqNWAhUrHYVIKuZ4ZpJmG0p1DydJpyF1n6mr8UVySYaAu1AEALw
_wcB&gclsrc=aw.ds&ProspectID=PK0xzLXJF6zmMDjua6xq7qt5tOjrzYg.

"Staff Advisory Opinion - Pyramid Scheme Analysis," by Acting Director of
Marketing Practices James A. Kohm, January 14, 2004.

"The Power of Rent Reporting Pilot: A Credit Building Strategy," Credit Builders Alliance, 2015. Available at: https://www.creditbuildersalliance.org/wp-content/uploads/2019/06/CBA-Power-of-Rent-Reporting-Pilot-White-Paper.pdf .

"TransUnion Analysis Finds Reporting of Rental Payments Could Benefit Renters in Just One Month," Transunion, 2014. Available at: http://newsroom.transunion.com/transunion-analysis-finds-reporting-of-rental-payments-could-benefit-renters-in-just-one-month .

"TransUnion Research Finds Rent Reporting Will Motivate Seven in 10 Renters to Make More On-Time Payments," Transunion, 2019. Available at: https://www.globenewswire.com/news-release/2019/06/26/1874348/0/en/Rent-Reporting-Will-Motivate-Seven-in-10-Renters-to-Make-More-On-Time-Payments.html?print=1 .

"TURSS Master Service Agreement," received from Mike Toloff, June 19, 2022 at 12:44 PM EST.

"UCESPP_2019.xlsx," received from Mike Toloff, June 22, 2022 at 11:30 AM EST.

"UCESPP_2020.xlsx," received from Mike Toloff, June 22, 2022 at 11:30 AM EST.

"UCESPP_2021.xlsx," received from Mike Toloff, June 22, 2022 at 11:30 AM EST.

"United Wealth Education Compensation Plan Overview," United Wealth Education, #57.1

"Utility, Telecommunications, and Rental Data in Underwriting Credit," Urban Institute & FinRegLab. December 2021. Available at: https://finreglab.org/alternative-data-in-underwriting-credit/utility-telecommunications-and-rental-data-in-underwriting-credit.

"UWE AGENT AGREEMENT.pdf" received from Mike Toloff, June 27, 2022 6:02 PM EST.

"What's in my FICO® Scores?" myFICO, last accessed June 20, 2022, https://www.myfico.com/credit-education/whats-in-your-credit-score.

"What is a Secured Credit Card," Investopedia, last modified March 4, 2022, https://www.investopedia.com/terms/s/securedcard.asp.

Alexandra White Biography, CNBC, Money Reporter, Credit Cards, available at: https://www.cnbc.com/alexandria-white/.

Alexandria White, "Everything you need to know about getting a secured credit card," April 25, 2022, available at: https://www.cnbc.com/select/how-secured-cards-work/.

Complaint for Permanent Injunction, Monetary Relief and Other Relief, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-11120-BAF-APP, May 23, 2022.

Declaration of Dr. David Givens, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-11120-BAF-APP, May 23, 2022.

Declaration of Michael Toloff, Pursuant to 28 U.S.C. § 1746, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-11120-BAF-APP, June 27, 2022.

E-mail from William Butler, received on June 27, 2022, 1:35 PM ET.

E-mail from Michael Toloff, received on June 27, 2022 at 6:02 PM EST.

Experian Rent Bureau, 2013. Available at: http://www.experian.com/assets/rentbureau/white-papers/experian-rentbureau-credit-for-rent-analysis.pdf

FTC v. BurnLounge, Inc., No. 12-55926, Ninth Circuit, 2014.

FTC's *Ex Parte* Motion for Temporary Restraining Order With an Asset Freeze, Appointment of Received, and Other Equitable Relief, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-11120-BAF-APP, May 23, 2022.

FTC's *Ex Parte* Motion to Temporarily Seal Case File, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-11120-BAF-APP, May 23, 2022.)

FTC's Recommendation for Temporary Receiver, In the United States District Court for the Eastern District of Michigan, Case No. 11120-BAF-APP, May 23, 2022.

FTC's *Ex Parte* Motion to Lift Temporary Seal and Memorandum Support Therof, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-11120-BAF-APP, May 26, 2022.

Order Lifting Temporary Seal from Entire File, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-11120-BAF-APP, May 27, 2022.

Rocket Lawyer, available at: https://www.rocketlawyer.com/

Sable Credit Card, Sable. Available at: https://sablecard.com/credit.

Stipulated Motion to Continue Hearing on Preliminary Injunction and Continuing Temporary Restraining Order, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-1112-BAF-APP, June 1, 2022.

Stipulated Order Continuing Preliminary Injunction Hearing and Continuing Temporary Restraining Order, In the United States District Court for the Eastern District of Michigan, June 2, 2022.

Stivers, A., Smith, D., Jin, G., "The Alchemy of a Pyramid: Transmutating Business Opportunity Into a Negative Sum Wealth Transfer" (December 3, 2019). Available at SSRN: https://ssrn.com/abstract=3497682 or http://dx.doi.org/10.2139/ssrn.3497682.

Temporary Restraining Order, In the United States District Court for the Eastern District of Michigan, Case No. 2:22-cv-11120-BAF-APP, May 24, 2022.

UCES Protection Plan Agreement, #66.1

UCES Protection Plan Membership, United Credit Education Services, #63.1.

Utilization Report, #153.1.

Verified Complaint for Declaratory Judgment, Preliminary, and Permanent Injunctive Relief, Nerium International and Jeffrey Olson v. Federal Trade Commission, Civil Action No. 1:19-cv-7189, The United States District Court for the Northern District of Illinois, Eastern Division, filed on November 1, 2019.

Wosinska, M., Givens, D., Lau, Y., D. Smith, C. Tylor and B. Wallace (2021) Economics at the FTC: Multi-level Marketing and a Coal Joint Venture. Review of Industrial Organization 59.

## Appendix C:Share of FESAs and Retail Customers Who Have Expressed Interest in Individual Services Provided by the Defendants

**FIGURE 6: SHARE OF SERVICES IN WHICH FESAS AND RETAIL CUSTOMERS EXPRESSED INTEREST AS OF JUNE 2022: 2020 ENROLLMENT YEAR**



Source: "UCESPP_2020.xlsx," received from Mike Toloff, June 22, 2022 at 11:30 AM EST.

**FIGURE 7: SHARE OF SERVICES IN WHICH FESAS AND RETAIL CUSTOMERS EXPRESSED INTEREST AS OF JUNE 2022: 2021 ENROLLMENT YEAR**



Source: "UCESPP_2021.xlsx," received from Mike Toloff, June 22, 2022 at 11:30 AM EST.

# Appendix D: Description of Defendants' products

57. The Protection Plan is composed of the following products:[101]

1. <u>**Credit Attorney**</u> – The Credit Attorney service provides consumers with access to a credit attorney. Credit attorney service is designed to inform consumers about their rights under the Fair Debt Collection Practices Act, and to prevent harassment from debt collectors. Credit attorney's also assist consumers in challenging and understanding credit report errors, and other financial issues.

---

[101] For information regarding products included in the Protection Plan, see "Protection Plan," United Credit Education Services, last accessed June 26, 2022, available at: https://ucespp.memberaccount.net/UCESPP/Default.aspx.

2. <u>**Will & Trust –**</u> The Will & Trust service is designed to allow consumers to protect their loved ones/family members and organize business affairs in the event of death or incapacitation. This service allows consumers to create an estate plan by assisting them in creating a Last Will, Healthcare Power of Attorney, Financial Power of Attorney, and a Living Trust.

3. <u>**Debt Payoff –**</u> The Debt Payoff system is designed to help consumers understand the most efficient way to pay-off outstanding debts. It is designed to save consumers time and money by allowing them to track accounts, such as mortgages, credit cards, and auto loans, and providing them with the tools to track current balances, outline monthly payments, and calculate monthly interest. By tracking this information, the Debt Payoff service provides consumers with a Real Debt Report, summarizing how much money consumers owe, how much interest they will pay given current monthly payments, how many months it will take to pay-off each account, and a projected date upon which all debts/balances, including interest, will be paid. This service also provides consumers with a Debt Payoff Plan, offering alternative pay-off schedules to reduce the amount of interest paid, and the time it takes to pay-off each account.

4. <u>**Net Worth –**</u> The Net Worth Service is designed to help consumers understand the total value of what they own. A Net Worth Report helps consumers track the value of current assets, their evolution over time, and to enter and continue tracking assets as they are acquired. The Net Worth Report tracks both assets, such as savings accounts, vehicles, and real estate, and liabilities, such as credit card and other types of debt, to give consumers a holistic understanding of their net worth.

5. <u>**Budgeting –**</u> The budgeting service allows consumers to understand and track monthly spending. This service is designed to help consumers avoid accumulating more debt, while also increasing total savings, by tracking total income and

deducting monthly expenses and ongoing debt. This service generates a Budget Report that provides transparency for consumers in seeing where their money goes each month, and whether or not they are meeting their financial obligations from month to month.

6. **Savings Goal –** The Savings Goal service is designed to enable consumers to develop a plan of action in saving for potential upcoming expenses, such as vacations, down payments on a new car or house, college courses, or even an emergency fund. By identifying a target amount and date for an upcoming expense, a Savings Goal Report is generated, showing how long it will take to save for a given expense and how often money should be set aside for each expense. This service even provides consumers with the option to set text reminders, ensuring that the appropriate amount is set aside each month/week.

7. **Financial Lockbox –** This product is generally used in conjunction with the Will & Trust service, Financial Lockbox provides consumers with the tools to store important contact information in a secure, password-protected location online. This service tracks contact information related to bank accounts, credit card accounts, attorneys, and even real estate holdings and is an important tool that can be accessed by family members in the cases of incapacitation or death.

8. **Credit Builder –** The Credit Builder service is an online learning tool. It teaches users about how their credit scores are determined, how they can be improved, and provides information to better understand credit reports and the credit industry in general.

9. **Credit Restoration –** The Credit Restoration service promotes credit literacy and credit building by encouraging consumers to monitor credit reports and scores, to pay bills on time, to use multiple credit accounts, and to grow their credit history

generally. It also helps consumers in generating dispute letters to challenge obsolete, unverifiable, and inaccurate items on their credit reports.

10. **Identity Monitoring –** The Identity Monitoring service allows consumers to proactively protect and monitor their personal information and to prevent fraud through the use of Allstate's Privacy Armor Identity Monitoring service. Privacy Armor tracks credit transactions, credit bureau reporting, dark web monitoring, and non-credit transactions for compromised credentials. This service includes an online portal that allows consumers to input information to be monitored, and allows them to respond to potential identity theft threats in real time. This service also monitors banking activity, such as large transactions, suspicious withdrawals, and changes to account balances. This service also offers social media marketing, by linking and protecting accounts, such as Facebook, Instagram, Twitter, and LinkedIn. This service includes a $1,000,000 identity theft insurance, assistance in opting into or out of the National Do Not Call Registry, a digital exposure report detailing what personal information is publicly available online, and a lost wallet protection service allowing consumers to store important credit cards, credentials, and other important personal documents.

11. **Credit Monitoring –** The Credit Monitoring service allows consumers to easily access credit reports, monitor daily transactions, view their auto and insurance scores, and will provide consumers with reminders to pay bills on time. It will also track various credit accounts to avoid potential fraudulent activity.

12. **Rocket Lawyer –** Available to consumers 4 months into the Protection Plan, the Rocket Lawyer service allows consumers to connect with lawyers online in order to seek answers to various legal questions. It also gives consumers the ability to incorporate new businesses online, and offers templates for creating legal documents, such as Non-Disclosure Agreements, LLC Operating Agreement, Lease

Agreements, Eviction Notices, Intent to Purchase Real Estate, Divorce Settlement Agreement, and more.[102]

58. In addition to the Protection Plan, Defendants offer six additional products available either as standalone products, or as add-ons to the Protection Plan:[103]

13. **Credit My Rent –** The purpose of this service is to provide consumers with the ability to build their credit profile by reporting rental payments to credit bureaus. Credit My Rent works with credit bureaus and landlords to verify that rental payments were paid on-time, and reports these timely payments to Transunion and Equifax, helping to build, improve, and further establish credit. This service includes three levels of membership, including one that reports up to two years in previous verified rental payments to credit reporting bureaus.

14. **Secured Card –** In connection with establishing credit history and developing a better credit score, this service gives consumers access to the Sable ONE Secured Credit Card, which can be used "anywhere MasterCard is accepted".[104] In addition to zero annual fees, zero foreign transaction fees, and no minimum deposits required, the Sable ONE Secured Credit Card includes 2% cash back on products and websites like Amazon, Spotify, Netflix, Uber, Hulu, and Whole Foods. It also provides 1% unlimited cash back on all other purchases, protection for stolen or damaged cell phones, rental car insurance, zero liability for unauthorized purchases, and price protection, covering the difference in price on eligible products that were purchase than found for a lower price. This premium secured credit card allows consumers to build positive payment history without the need

---

[102] For information regarding Rocket Lawyer, see RocketLawyer.com, available at:
https://www.rocketlawyer.com/.

[103] *See* "Product," United Wealth Education, last accessed June 26, 2022, available at:
https://www.myuwe.net/Product.aspx?rid=uwedemo .

[104] *See* "Sable Card," Sable, last accessed June 26, 2022, available at: https://sablecard.com/credit.

for a U.S. Credit Score or a credit check to apply. It is also available for those without Social Security Numbers.

15. **<u>My Care Plan –</u>** Similar to the Will & Trust service in the Protection Plan, the My Care Plan offers consumers with the ability to create a Last Will, Healthcare Power of Attorney, Financial Power of Attorney, and a Living Trust without having to pay for the full Protection Plan.

16. **<u>MyHealthcare2Go –</u>** Providing consumers with access to affordable, high-quality healthcare, this service allows the consumer to go directly to a fully licensed, practicing doctor via video conference, and will provide healthcare for up to six family members at once via an online hub. This service includes online telehealth visits, major discounts to pharmacy prescriptions, diabetic supplies, hearing aids, eyeglasses, contact lenses, Lasik eye surgery, MRIs, X-rays, and lab tests.

17. **<u>Smart Credit –</u>** This service offers consumers with access to a smart credit report and a money manager service that provides comprehensive access to online banking in one place. It allows consumers to see exactly what is helping or hurting their credit scores and provides the Score Master tool to make payments on time and continue building positive credit. It also provides $1 million in fraud insurance, and provides mobile and email alerts about changes in credit.

18. **<u>Ultra Score –</u>** Ultra Score offers consumers with the ability to access their online account and credit file 24 hours a day, 7 days a week. It provides consumers with the ability to understand the breakdown of their credit file, tips on how to build positive credit, how to maintain a positive credit score.