# EXHIBIT 1
# First Interim Report of
# Patrick A. Miles, Jr.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

**FEDERAL TRADE COMMISSION**,

Plaintiff,

v.

**FINANCIAL EDUCATION SERVICES, INC.**, *et al.*,

Defendants.

Case No. 2:22-cv-11120

Hon. Bernard A. Friedman

---

## FIRST INTERIM REPORT OF TEMPORARY RECEIVER

Patrick A. Miles, Jr., as temporary receiver ("**Receiver**") for Financial Education Services, Inc., United Wealth Services, Inc., VR-Tech, LLC, VR-Tech MGT, LLC, CM Rent Inc., and Youth Literacy Foundation and each of their subsidiaries, affiliates, successors, and assigns (collectively, "**Corporate Defendants**"), together with any other entity that has conducted any business related to the Defendants'[1] credit repair services or investment opportunity, including receipt of any legal or equitable interest in, right to, or claim to, any property,

---

[1] The term "Defendants" means the Corporate Defendants together with Defendants Parimal Naik, Michael Toloff, Christopher Toloff and Gerald Thompson, individually and collectively (collectively, "**Individual Defendants**" or individually as "**Individual Defendant**").

Page 1 of 42

wherever located and by whomever held ("**Asset**") derived from any activity that is the subject of the Complaint for Permanent Injunction, Monetary Relief, and Other Relief filed by the Plaintiff Federal Trade Commission ("**FTC**") with this Court on or about May 23, 2022, Case No. 2:22-cv-1120-BAF-APP (together with the Corporate Defendants, collectively, "**Receivership Entities**"), hereby files this First Interim Report of Temporary Receiver ( "**First Report**"), documenting the current status of the receivership estate and his activities since his appointment as Receiver on May 24, 2022.

## I.    INTRODUCTION

On May 24, 2022, this Court entered in this case that certain Temporary Restraining Order [ECF No. 10] ("**TRO**"), pursuant to which I was appointed Receiver of the Receivership Entities. I submit this First Report pursuant to Paragraph XXI of the TRO.

## II.    STEPS TAKEN TO IMPLEMENT TRO

### A.    **Immediate Access**

We implemented the immediate access provisions of the TRO (Paragraph XIII) at approximately 1:00 p.m. (ET) on Wednesday, May 25, 2022 when we took possession of the primary offices of the Corporate Defendants located at 37735 Enterprise Court, Suites 500 and 600 in Farmington Hills, Michigan 48331 (the "**Premises**").

I was accompanied by my counsel, David Hall of Barnes & Thornburg LLP, as well as Gene Kohut and Michael Dery of Riveron RTS, LLC, my financial advisors in this matter. We coordinated our efforts with Gregory Ashe and Julia Heald, on-site attorneys for the FTC, Michael Goldstein, lead FTC investigator, and the Farmington Hills Police Department.

Upon our arrival at the Premises, we were met by approximately 25 to 35 employees of the Corporate Defendants. None of the Individual Defendants were present at the Premises. A customer service training session was in progress for approximately 15 to 20 newly hired customer service representatives, including several individuals attending virtually. We initially gathered all on-site employees into a common area in the Premises and announced that I was appointed as Receiver of the Corporate Defendants and gave an overview of the TRO and its implications.

Rank and file employees were permitted to leave the Premises and instructed not to return until further notice. I and my team then proceeded to interview more senior level employees with knowledge of the Corporate Defendants and their operations. Those employees included:

- Patricia Karas, Senior Vice President of Operations

- Susan Griffin, Senior Vice President, Agent Support

- Rohil Ratanpara, Vice President of Technology

- Kyle Panackia, Information Systems, Help Desk Specialist

- Pranav Yadav, Financial Analyst

- Sarah Hoard, Human Resources and Workforce Analyst

- Brandon Clark, Customer Support Supervisor

- Anise Mydini, Customer Support Manager

- Laura Cisneros, Payment Department Manager

Individual Defendants Parimal Naik and Michael Toloff later arrived at the Premises in the evening of May 25, 2022 accompanied by attorney Kerry Morgan. Messrs. Naik and Toloff, along with Mr. Morgan, met with me and my team together with Mr. Ashe and Ms. Heald for an extended interview lasting approximately two hours.

An initial interview with Individual Defendant Christopher Toloff took place on May 26, 2022 at the Premises, lasting several hours.  Mr. Toloff was accompanied by attorney David Warren.

Subsequent interviews of the following employees occurred remotely on June 13, 2022 and June 20, 2022, respectively, conducted by me, my counsel David Hall and my financial advisor Michael Dery[2]:

---

[2] Also present remotely for the interviews of Messrs. Seely and Short on June 13, 2022, were Attorneys Erica Hollar and Matthew Rapkowski, as counsel for Michael and Christopher Toloff, and Aaron Williams, representing Parimal Naik and FES as counsel. They were not invited by me or my team, but we did not object to their presence as they did not interfere with the interviews and only appeared to take notes.

Page 4 of 42

- Chet Seely, Vice President of Organizational Growth and Development

- Jason Short, Research & Development Assistant

- Mohamad Alawa, IT Project Manager

- Mr. Yadav

- Ms. Griffin

The Individual Defendants and the employees noted in this First Report have shown a high degree of cooperation in this process to date, including, in particular, Christopher Toloff and Rohil Ratanpara.

My team and I were on-site at the Premises on May 25 and 26, 2022 together with representatives of the FTC. During that time, in addition to conducting the above noted interviews, the following actions were taken in furtherance of the TRO:

- All locks on the Premises were changed, and electronic entry disabled

- Imaging of personal computers and lap computers of several key employees and Individual Defendants, including computers belonging to, among others, Parimal Naik, Michael Toloff, Christopher Toloff, Gerry Thompson, Patricia Karas, Susan Griffin, Rohil Ratanpara, and Pranav Yadav;

- Reviewing, analyzing, and imaging files, books, records, documents, and business records located at the Premises;

- Executing and confirming service of the TRO on deposit and merchant banks, among others, and confirming freezes of the Corporate Defendants' accounts;

- Disabling customer and Agent enrollment on the Corporate Defendants' websites and terminating automatic payment functions for existing customers to prevent future payments;

- Securing cloud-based storage and customer relationship management ("**CRM**") systems and disabling remote accessing capabilities;

- Recording a message to incoming callers regarding the status of the suspension of the Corporate Defendants' business operations;

- Shutting off employee access to network servers, including email;

- Taking possession of the Corporate Defendants' post office box located in Farmington Hills, Michigan and procuring control of mail receipt; and

- Worked with Individual Defendants' counsel to provide remote access to company information systems and back office data.

## B.   **Additional Actions Taken in Furtherance of TRO**

In the weeks following the entry of the TRO, my team and I took several additional steps to implement the TRO.

### *Bond*

As required by Paragraph XX of the TRO, on June 14, 2022 I obtained a bond in the sum of $10,000 from Nationwide Mutual Insurance Company.

### *Stretto Retention*

Pursuant to an Escrow Services Agreement dated June 3, 2022, I engaged Stretto, Inc. to provide certain treasury management services and, potentially, claims and noticing services as may be needed in connection with this matter.

### *Additional Leased Location*

In addition to the Premises, there is a leased office in the Metro Detroit area located at 28345 Beck Road, Suite 210, Wixom, Michigan. This office was intended to serve as an operating location for Corporate Defendant CM Rent Inc., which was previously located at 1415 Park Ave. West, Denver, Colorado.  I understand that the landlord terminated the Denver lease upon receiving notice of this matter and my appointment as receiver.  My team inspected the Wixom office, and found it largely vacant, other than articles of office furniture and a server. I concluded the office space is not a necessary expense for the receivership estate and have been in discussions with the landlord about terminating the associated lease.

### *Company Vehicles*

I identified one vehicle – a 2020 Lincoln Navigator – leased by Corporate Defendant Financial Education Services, Inc. I concluded this vehicle is not a necessary expense for the receivership estate. As such, on June 22, 2022, I directed that the vehicle be turned in and the related lease terminated.

I identified one owned vehicle – a 2022 Lincoln Aviator – titled in Parimal Naik's name. Nevertheless, bank records I reviewed show that the funds used to purchase this vehicle were sourced directly from Corporate Defendant Financial Education Services, Inc. on October 28, 2021 to Hines Park Lincoln, apparently a Lincoln Auto Dealership located in Plymouth, Michigan, in the amount of $84,400.

As such, on June 13, 2022 my counsel directed counsel for Mr. Naik – Richard Epstein – to mail the vehicle's title and keys to my attention and to safeguard the vehicle pending further direction regarding disposition of the vehicle. On June 19, 2022, Mr. Epstein informed my counsel that the 2022 Lincoln Aviator was securely stored and keys to the vehicle were turned over to my team on June 20, 2022. My counsel was further informed that no physical title exists for this vehicle because vehicle titles in Florida are electronic.

### *Florida Real Estate*

I identified real property located at 1529/1531 Hendry Street, Fort Myers, Florida 33901 (the "**Fort Myers Property**") purchased for approximately $1,150,000 by Victory 5 LLC on or around May 10, 2022. Upon information and belief, Victory 5 LLC is an entity owned and/or controlled by Parimal Naik. My team traced the Fort Myers Property purchase down payment of $20,000 to Steward Title Company on April 11, 2022, as coming from an account of FES held at Citizens Bank. My team further traced the payment of the balance of the purchase price for the Fort Myers Property to an account of VR Tech, LLC in an amount equal to $1,127,889.57 made on May 9, 2022. Consequently, on June 6, 2022, a miscellaneous civil case was filed by me in the United States District Court for the Middle District of Florida, Case No. 2:22-MC-9-SPC-MRM and on June 8, 2022, a

Notice of Lis Pendens was recorded in Lee County, Florida in respect of the Fort Myers Property.

### *Payments from Receivership Estate*

Pending the hearing on the preliminary injunction in this case on June 30, 2022, I felt it necessary to make the following payments:

- Payroll for Corporate Defendants' employees in the aggregate amount of approximately $91,519.36 covering the week of May 23, 2022 through May 27, 2022;

- Health insurance and welfare benefits for the Corporate Defendants' employees paid to Priority Health in an approximate aggregate amount of $11,700.97 covering employee benefits for the month of June, 2022[3];

- A reimbursement to ADP in the amount of $122,095.20 on account of Corporate Defendants' payroll funded by ADP on the eve of the entry of the TRO, which was unreimbursed by the Corporate Defendants as a result of bank accounts being frozen on May 26, 2022;

- Rent at the Premises for the month of June 2022 in the approximate aggregate amount of $19,305; and

- Various utilities at the Premises in the approximate aggregate amount of $19,300.[4]

---

[3] The Corporate Defendants also maintain a health insurance benefits plan with Health Alliance Plan. It is my understanding, based on discussions with the Corporate Defendants, that the Corporate Defendants have either prepaid or otherwise had a credit that covered the month of June 2022 for this benefits plan. As such, no additional payments were made on account of this benefits plan for the month of June 2022.

[4] These payments include: Consumers Energy ($1,160.34); DTE ($2,348.35); Teoma Systems ($4,720); Avaya ($9,150.21); and AT&T ($1,886.20).

## IV.   ASSETS AND LIABILITIES OF CORPORATE DEFENDANTS

### A.   <u>Assets</u>

#### *Bank Accounts*

The Corporate Defendants respectively maintained checking accounts at two

banks – Citizens Bank and Level One Bank – as follows:

| <u>Corporate Defendant</u> | <u>Bank</u> | <u>Account Number Ending</u> | <u>Balance (as of May 25, 2022)</u> |
|---|---|---|---|
| FES | Citizens Bank | 9459 | $4,084,323.68 |
| United Wealth Services, Inc. | Citizens Bank | 9483 | $426,391.15 |
| YFL | Citizens Bank | 9440 | $5,955,165.16 |
| VR-Tech, LLC | Citizens Bank | 9467 | $815,848.09 |
| VR-Tech MGT, LLC | Citizens Bank | 9475 | $767,490.30 |
| CMR | Level One Bank | 1934 | $298,046.16 |

On or around June 23, 2022, I opened receivership accounts at TriState Capital

Bank (the "**Receivership Accounts**"). As of the date hereof, I am in the process of

transferring the balance of all of the above accounts to the Receivership Accounts.

Additionally, Corporate Defendant funds were located at merchant banks Maverick

and Valmar, and my team is in the process of transferring those funds to the

Receivership Accounts. In the near term I anticipate an aggregate amount of cash

equal to approximately $12,000,000 being deposited in the Receivership Accounts.

### *Real Property and Vehicles*

I noted in Section II.B above the existence of the Fort Myers Property and the two vehicles I identified thus far in my investigation, and the disposition of each asset.

### *Additional Assets*

To date, my review of the books and records of the Corporate Defendants has uncovered no other material assets owned directly by the Corporate Defendants.

As of the date hereof, however, I have not seen or reviewed the corporate financial disclosures of the Corporate Defendants mandated by the TRO. Members of my team have given supervised access to Christopher Toloff to company books and records in order to complete the required disclosures, and I believe they continue to be in process. I will have greater visibility into the assets and liabilities of the Corporate Defendants following receipt of such disclosures.

Additionally, I continue to review the Corporate Defendants' historical bank records and other books and records of the Defendants in an effort to identify additional assets that may be properly brought into the receivership estate. For instance, based on my team's review of the Corporate Defendants' bank records, I believe funds from an account owned by VR Tech, LLC were used to make a down payment of $317,590 on May 17, 2022 in respect of a condominium located in

Miami, Florida purchased by Parimal Naik in May, 2022 in the total amount of $3,175,900.

I requested files and records in the possession of certain professionals who have historically performed legal and accounting services for the Corporate Defendants, including Michael T. Scullen (counsel to some or all of the Defendants) and Anthony "Tony" Hawkins (accountant for the Corporate Defendants). My review and investigation in this regard are on-going.

### B. **Liabilities**

I identified no indebtedness secured by assets of the Corporate Defendants and understand based on disclosures from the Corporate Defendants that there is no bank or other third-party funded indebtedness outstanding as of the date hereof. UCC lien searches indicated no lien filings by financial institutions. We identified no other material liabilities other than ordinary course accounts payable.

### V. **BUSINESS OPERATIONS OF CORPORATE DEFENDANTS**

The Corporate Defendants consist of:

- Financial Education Services, Inc., d/b/a United Wealth Education, a Michigan corporation ("**FES**" or "**UWE**")

- United Wealth Services, Inc., a Michigan corporation ("**UWS**")

- Youth Financial Literacy Foundation, d/b/a United Credit Education Services, Inc., a Michigan nonprofit corporation ("**YFL**" or "**UCES**")

- CM Rent, Inc., a Colorado corporation ("**CMR**")

- VR-Tech, LLC, a Michigan limited liability company

- VR-Tech MGT, LLC, a Michigan limited liability company

Products and services are sold using FES, UWS, YFL and CMR. It is my understanding that Parimal Naik owns 100 percent of the stock of FES and UWS. VR-Tech, LLC and VR-Tech MGT, LLC are companies wholly-owned and controlled by Parimal Naik (VR-Tech, LLC) and Michael Toloff (VR-Tech MGT, LLC), respectively. They use such entities to receive distributions or payments from the other Corporate Defendants and run through their corporate-related expenses (and, upon information and belief, some personal expenses). For instance, I understand Michael Toloff, who is not employed by FES, UWS, CMR, or YFL, incurs the expense of a cellular phone plan for himself, together with Christopher Toloff and his wife, as well as personal health insurance coverage through VR Tech MGT, LLC.

CMR is owned by Parimal Naik (40%), Michael Toloff (40%), and William Butler (20%). Upon information and belief, YFL is a nonstock, directorship nonprofit corporation with Gerald R. Thompson (President), Steve Cojei (Treasurer), and Michael Curry (Secretary) as its three directors.

*Products*

The principal products offered by the Corporate Defendants (collectively,

"**Products**" or individually, "**Product**") are as follows:

| **Corporate Defendant** | **Product** | **Price** |
|---|---|---|
| FES/YFL | Protection Plan | $89, charged monthly for months 1-3<br><br>$69, charged monthly for months 4-12<br><br>$49, charged month for months 13+<br><br>In addition to the monthly fee, there is a one-time set up fee of $99, which can be reduced to $49 or $0, under certain circumstances. |
| CMR | Credit My Rent[5] | $9.95, charged monthly<br><br>One-time charge of $99 for a one-year look back on rental payment history<br><br>One-time charge of $149 for a two-year look back on rental payment history |
| CMR | MyCare Plan | $499, one-time charge |
| CMR | My HealthCare2Go | $25, charged monthly, plus a one-time set up fee of $99 |

---

[5] Credit My Rent purports to improve a customer's credit rating through the reporting of consistent and timely rent payments to credit reporting agencies. Similar to credit restoration, it is my understanding that the customer is primarily responsible for preparing and submitting communications to the credit reporting agencies using materials provided by CMR. This product is offered in three variations: (i) on-going monthly reporting only, (ii) on-going monthly reporting, plus submission of one year prior rental payment history, and (iii) on-going monthly reporting, plus submission of two years' prior rental payment history.

| CMR | My Student Loan Manager | $19, charged monthly <u>plus</u> a one-time set up fee of $129 |
| FES | Secured Card | Third party product offering, no direct fee to Corporate Defendants |

The key Product is the Protection Plan, accounting for nearly 100 percent of the Corporate Defendants' revenues (exclusive of CM Rent), which is a bundle of 12 distinct products and services either developed by the Corporate Defendants or third party products offered to customers via the Corporate Defendants. These Protection Plan Products and services include:

| **Product/Service** | **Summary[6]** | **Third Party/Proprietary** |
|---|---|---|
| Budgeting | An online tool where customers enter their income and expenses for the prior year, current month, and going forward. It then tells them the amount they spend and shows what they can save and cut. The customer does the input and analysis, not the company. | Proprietary |
| Credit Restoration | Helps the customer dispute inaccurate, obsolete or erroneous information on the customer's credit report by sending the customer a form letter to complete and deliver to a credit reporting agency. | Proprietary |
| Credit Builder | Offers educational services, credit tips and resources to help customers take the necessary steps to enhance their credit score and manage their finances. | Proprietary |

---

[6] The summary of Products contained herein is based on employee interviews and information made publicly available by the Corporate Defendants on their websites and have not been independently verified by my team.

| Credit Attorney | Refers customers to an Arizona law firm for legal services, which are available in all 50 states and U.S. territories.<br><br>Purports to protect consumers against inaccurate information on their credit reports, debt harassment and identity theft. | Third Party |
|---|---|---|
| Credit Monitoring | Provides customer access to an interactive credit report anytime to see credit scores, auto scores, insurance scores and hiring risk index for job seekers, and to set up alerts to prevent unauthorized use of credit and stop identity theft. | Proprietary/Third Party |
| Debt Payoff | Customers input online their income and debt payments to create and follow a personal payment plan for debt repayment. | Proprietary |
| Financial Lockbox | Facilitates online storage of important customer financial information, such as bank account, utilities, personal attorney, emergency contact, in one secure location. | Proprietary |
| Identity Monitoring | Identity theft prevention through All State at a discounted price and a commission is paid to the Corporate Defendants. | Third Party |
| Net Worth Calculator | Customers input online their income, savings, property values, and expense amounts to calculate their net worth and quarterly increases or decreases in same. | Proprietary |
| Rocket Lawyer | Refers customers to a legal document preparation service similar to Legal Shield. | Third Party |
| Savings Goals | Customers input online their savings goal (e.g., cost to purchase a vehicle) and frequency of their expected weekly or monthly savings deposits, and this tool calculates the amount of time it takes to reach the goal. | Proprietary |
| Will & Trust Document Preparation | A package of form documents, such as a will, living trust and power of attorney, which are sent to the customer. | Proprietary |

| YFL Family Mint | Online money management and goal-setting application for 5th to 9th graders (with parents' help). | Proprietary |
| Life Insurance | Term life insurance product up to $100,000 provided by Symetra Insurance Company on a group basis to active 1099-paid Agents eligible for coverage. | Third Party |

Of these Products, it appears that credit restoration is the most popular and highly used Product, with 34,480 customers (out of the total 48,441 customers) active in the last 12 months as of May 31, 2022. The only other Products close to that level of customer activation are the credit monitoring Product (22,359 as of May 31, 2022) and identity monitoring Product (24,709 as of May 31, 2022). These figures are based on reports prepared by Rohil Ratanpara.

Credit repair/restoration products and services are purportedly provided by YFL, a tax-exempt 501(c)(3) charitable organization.[7] The remainder of the products and services in the Protection Plan are provided by FES or, more recently, UWS. Revenues from the Protection Plan are divided between FES and YFL, with YFL receiving $9.00 of each monthly charge, and FES receiving the balance of each monthly charge. This delineation in service offerings is apparently an effort to establish YFL and the companies' credit repair and restoration Product as exempt

---

[7] I note that in January 2022 YFL notified 65 recipients of its intention to award each a scholarship. The aggregate scholarship award amount for the upcoming 2022-2023 academic year is approximately $600,000. From the January 2022 notification to the date hereof, none of these scholarships have been paid by YFL for the 2022-2023 academic year.

from regulation under the Federal Credit Repair Organizations Act (15 U.S.C. §§1679, et seq.) ("**CROA**" or "**Credit Repair Organizations Act**") as well as various similar state statutes. Indeed, in multiple publications of policies, procedures and contracts, the Corporate Defendants state that YFL is exempt from the Credit Repair Organizations Act as a 501(c)(3) charitable nonprofit organization, is not a credit repair organization, and that all credit restoration services and products are performed by YFL employees.

As noted in the above chart summarizing the Products, it appears that the credit restoration and repair Product consists of a form letter customers themselves complete and submit to credit agencies. Based on my interviews with employees, it does not appear that YFL employees spend any individualized time with customers to customize or otherwise assist in the analysis of their credit problems, nor in the preparation or submission of any correspondence to the credit agencies.

### Agents

The Products are sold through a network of approximately 25,166 active sales agents ("**Agents")** throughout the country. The Agents are independent contractors and execute an Independent Sale Representative Agreement (an "**ISR**") with both UWE (i.e., FES) and UCES (i.e., YFL). In an effort to distinguish between credit repair and restoration Products and services and the other Products offered under the Protection Plan, the ISR between an Agent and UCES states that "[s]imultaneously

Page 18 of 42

with your enrollment as an Independent Agent of UWE for the purpose of selling its various non-credit repair services and products, you may also enroll as an Independent Agent for the purpose of selling the credit restoration products offered by UCES." The UCES ISR then goes on to restate the disclaimer noted above regarding YFL/UCES's status as a 501(c)(3) nonprofit organization, exempt from regulation under the Credit Repair Organizations Act.

The "package" of documents that governs the relationship between the Corporate Defendants and the Agents are the ISR, the Statement of Policies and Procedures of United Wealth Education, effective as of February 1, 2022 ("**Policies and Procedures**"), and the United Wealth Education Compensation Plan Overview ("**Comp Plan**"), collectively attached hereto as **Exhibit A**.

It is my understanding that an individual may become an Agent by either:

- Purchasing the Protection Plan for $89, paid monthly, <u>plus</u> a one-time $199 enrollment fee; or

- Paying a one-time enrollment fee of $249.

It is my further understanding based on interviews with employees that the overwhelming majority of Agents enroll as a customer of the Protection Plan, paying an initial enrollment amount of $288 ($199 one-time enrollment fee plus an $89 first month fee).

I reviewed the Comp Plan. The commission and bonus structure are convoluted, and it is difficult to clearly decipher the formula for compensating Agents. For instance, I believe that commissions are based on certain assumptions, including assumptions regarding the number of payments a customer will make in regards to a purchased Protection Plan.

The Comp Plan places Agents in one of 13 levels, beginning with the entry level Agent and ascending to the highest level of "Pinnacle." The entry level Agent has no "downline" of sales associates (i.e., other Agents recruited by such Agent), and obtains commissions only on direct sales of Products.

Each title of Agent beyond the entry level Agent has a varying degree of downline sales associates. According to the Comp Plan, and based on my discussions with employees, while commissions are technically tied to sales of Products, commissions and total compensation for an Agent are enhanced depending on the size and sales scope of an Agent's downline.

For instance, with respect to a commission that could be earned by an Agent from the sale of a Protection Plan membership to a new customer, it appears that an entry level Agent can obtain a topline commission from such sale of $100, while the highest level Agent – a "Pinnacle" Agent – could receive as high a commission as $560 from the same sale of a Protection Plan membership.

As noted, an entry level Agent has no downline. Based on my review of the Comp Plan, a Pinnacle Agent has eight personally sponsored active Agents, five separate "teams" operating under him or her, and a monthly group volume of $10,000,000 or more. Thus, the same sale of the same product appears to generate a vastly different commission for an Agent depending on the number of Agents operating under him or her. While sales generate commissions under the Comp Plan, it appears that Agents are heavily incentivized to recruit other potential Agents to increase their compensation.

Commissions and bonuses under the Comp Plan include (but are not limited to):

- Direct commissions to an Agent derived from a sale of Product;

- Customer Acquisition Bonuses ("**CAB**"), which are generated when an Agent is enrolled as a sales agent and produces two customer payments in respect of the Protection Plan within 70 days of enrollment in the business. The CAB is paid to both the Agent, as well as to the eligible "upline". As noted above, the amount of the CAB earned by an Agent and the eligible upline is determined by a participant's title;

- Infinity Bonus, which is a monthly bonus paid to Agents with a title of "Elite" or higher. The Infinity Bonus is paid as a percentage of lineage group volume (i.e., downline sales) ranging from 0.5 percent for Elite Agents to 3.0 percent for Pinnacle Agents; and

- Generation Bonuses, which are paid to Agents with a title of "Executive Elite" or higher as a percentage of downline sales and generational levels.

It is my understanding from the Corporate Defendants' employees that the company's ratio of commissions to revenues has historically been approximately 65 percent. I also understand based on interviews with employees that commissions are paid entirely from FES or UWS, despite sales of the credit repair and restoration Product purportedly being sold by YFL. Moreover, commissions are paid to Agents by FES or UWS only by direct deposit, according to the Comp Plan, and each such deposit is assessed a $4.00 "processing fee."

### *Customer Contract*

I reviewed the form of Protection Plan Agreement attached as **<u>Exhibit B</u>**, which I understand consumers sign with UCES in connection with their enrollment in the Protection Plan. I note the following disclosures:

- UCES states it cannot guarantee specific results of the Protection Plan.

- On-going monthly charges are disclosed.

- Consumers are notified that they may cancel the contract within three business days after enrollment and receive a full refund together with contact information for customer support.

- That credit reporting agencies have no obligation to remove accurate, verifiable information unless it is listed beyond the period of time in which it is lawful to report it.

- That UCES is exempt under the Credit Repair Organizations Act as a 501(c)(3) charitable nonprofit organization and is not a credit repair organization, and that all credit repair services and products are performed by employees of UCES.

Payments from customers to FES or UWS and YFL under the Protection Plan are charged on a monthly basis by credit or debit card, which are the only forms of payment accepted by the Corporate Defendants. It does not appear, based on my review of the customer contract for the Protection Plan, that the term and scope of service, particularly credit repair and restoration, are clearly defined. What is clear, however, is that payment is taken by the Corporate Defendants from customers at the <u>initiation</u> of enrollment prior to any service or product being provided by the Corporate Defendants, much less being completed, as required by Section 1679b(b) of the Credit Repair Organizations Act. This is evident by the fact that in order for credit repair services to begin, a customer must first pay for services, and then activate the service through the FES website for the Protection Plan.

### *Customer and Agent Retention*

At my team's direction, Rohil Ratanpara ran a series of reports illustrating customer and Agent turnover and retention. These reports indicate that customer and Agent turnover in the businesses is extremely high.

For instance, the following charts set forth the rates of customer and Agent enrollment for the years 2019, 2020 and 2021, together with rates of attrition and the total of those customers still active.

**Customers**

| Year | Total Customer Enrollment | Declined Charge/ Chargebacks[8] | Refund/Cancellation[9] | Online Cancellation [10] | Percentage Active as of June 21, 2022 |
|------|------|------|------|------|------|
| 2019 | 84,103 | 44,171 (53%) | 38,678 (46%) | 466 (1.0%) | 720 (1%) |
| 2020 | 205,958 | 106,787 (52%) | 79,079 (38%) | 15,286 (7.0%) | 4,763 (2.0%) |
| 2021 | 142,178 | 70,066 (49.28%) | 35,070 (25%) | 16,209 (11%) | 17,572 (12%) |

**Agents**

| Year | Agent Enrollment | Declined Charge | Refund/Cancellation | Online Cancellation | Percentage Active Today |
|------|------|------|------|------|------|
| 2019 | 33,905 | 18,221 (54%) | 13,418 (40%) | 427 (1.0%) | 1,559 (5.0%) |

[8] Denotes that a credit card company declined a charge to a customer or Agent. Mr. Ratanpara informed me that the most likely scenario a declined charge occurs includes when a customer or Agent ordered a stop payment, if bad or inaccurate information was entered, insufficient funds in relation to a debit card, or credit card fraud.

[9] Denotes that a customer or Agent called into the company customer service line and cancelled services and/or demanded a refund. The company is unable to distinguish between these two scenarios.

[10] Denotes that a customer or Agent cancelled services via the company's on-line portal.

| 2020 | 76,518 | 41,718 (55%) | 24,938 (33%) | 4,060 (5.0%) | 4,686 (6.0%) |
|------|--------|--------------|--------------|--------------|--------------|
| 2021 | 54,687 | 26,597 (48.63%) | 13,491 (25%) | 3,392 (6%) | 9,147 (17%) |

As illustrated above, of the 84,103 new customers who enrolled in 2019, only 720, or less than one percent, remain active customers as of June 21, 2022. The vast majority of these customers either declined the charge (53%) or otherwise cancelled and/or demanded a refund (46%).

For the year 2020, the figures are even more telling. Of the 205,958 new customers who enrolled as customer of the Corporate Defendants, only 4,763, or about two percent, remain active customers as of June 21, 2022. The vast majority of those customers either declined the charge (52%) or otherwise cancelled (online or via customer service) and/or demanded a refund (45%).

For Agents, the chart above tells a similar story.

Another report prepared by Mr. Ratanpara shows the month-by-month rate of attrition of customers and Agents who enrolled in January, 2019, January, 2020 and January, 2021, respectively, with the following results:

### Customers enrolled in January 2019

| Month | Customer Count | Percentage Remaining | Percentage Cancel |
|---|---|---|---|
| January, 2019 | 6,028 | 100% | 0.00% |
| February, 2019 | 4,340 | 72% | 28% |
| March, 2019 | 3,450 | 57% | 43% |
| April, 2019 | 2,635 | 44% | 56% |
| May, 2019 | 2,015 | 33% | 67% |
| June, 2019 | 1,491 | 25% | 75% |
| July, 2019 | 1,067 | 18% | 82% |
| August, 2019 | 815 | 14% | 86% |
| September, 2019 | 622 | 10% | 90% |
| October, 2019 | 511 | 8% | 92% |
| November, 2019 | 426 | 7% | 93% |
| December, 2019 | 358 | 6% | 94% |
| January, 2020 | 294 | 5% | 95% |

### Customers enrolled in January 2020

| Month | Customer Count | Percentage Remaining | Percentage Cancel |
|---|---|---|---|
| January, 2020 | 5,672 | 100% | 0.00% |
| February, 2020 | 4,052 | 71% | 29% |

| March, 2020 | 3,087 | 54% | 46% |
| April, 2020 | 2,411 | 43% | 57% |
| May, 2020 | 1,903 | 34% | 66% |
| June, 2020 | 1,539 | 27% | 73% |
| July, 2020 | 1,245 | 22% | 78% |
| August, 2020 | 993 | 18% | 82% |
| September, 2020 | 783 | 14% | 86% |
| October, 2020 | 630 | 11% | 89% |
| November, 2020 | 506 | 9% | 91% |
| December, 2020 | 415 | 7% | 93% |
| January, 2020 | 329 | 6% | 94% |

## Customers enrolled in January 2021

| Month | Customer Count | Percentage Remaining | Percentage Cancel |
|---|---|---|---|
| January, 2021 | 6,020 | 100% | 0.00% |
| February, 2021 | 3,562 | 59% | 41% |
| March, 2021 | 2,891 | 48% | 52% |
| April, 2021 | 2,265 | 38% | 62% |
| May, 2021 | 1,752 | 29% | 71% |
| June, 2021 | 1,322 | 22% | 78% |

| July, 2021 | 1,041 | 17% | 83% |
| August, 2021 | 785 | 13% | 87% |
| September, 2021 | 620 | 10% | 90% |
| October, 2021 | 493 | 8% | 92% |
| November, 2021 | 416 | 7% | 93% |
| December, 2021 | 362 | 6% | 94% |
| January, 2021 | 305 | 5% | 95% |

### Agents enrolled in January 2019

| Month | Agent Count | Percentage Remaining | Percentage Cancel |
| --- | --- | --- | --- |
| January, 2019 | 2,201 | 100% | 0.00% |
| February, 2019 | 1552 | 71% | 29% |
| March, 2019 | 1233 | 56% | 44% |
| April, 2019 | 941 | 43% | 57% |
| May, 2019 | 743 | 34% | 66% |
| June, 2019 | 598 | 27% | 73% |
| July, 2019 | 468 | 21% | 79% |
| August, 2019 | 358 | 16% | 84% |
| September, 2019 | 295 | 13% | 87% |
| October, 2019 | 234 | 11% | 89% |

| November, 2019 | 198 | 9% | 91% |
| December, 2019 | 171 | 8% | 92% |
| January, 2020 | 140 | 6% | 94% |

## **Agents enrolled in January 2020**

| **Month** | **Agent Count** | **Percentage Remaining** | **Percentage Cancel** |
|---|---|---|---|
| January, 2020 | 2,317 | 100% | 0.00% |
| February, 2020 | 1,655 | 71% | 29% |
| March, 2020 | 1,347 | 58% | 42% |
| April, 2020 | 1,097 | 47% | 53% |
| May, 2020 | 908 | 39% | 61% |
| June, 2020 | 786 | 34% | 66% |
| July, 2020 | 676 | 29% | 71% |
| August, 2020 | 578 | 25% | 75% |
| September, 2020 | 503 | 22% | 78% |
| October, 2020 | 421 | 18% | 82% |
| November, 2020 | 360 | 16% | 84% |
| December, 2020 | 317 | 14% | 86% |
| January, 2021 | 273 | 12% | 88% |

**Agents enrolled in January 2021**

| Month | Agent Count | Percentage Remaining | Percentage Cancel |
|---|---|---|---|
| January, 2021 | 2,525 | 100% | 0.00% |
| February, 2021 | 1,091 | 43% | 57% |
| March, 2021 | 835 | 33% | 67% |
| April, 2021 | 668 | 26% | 74% |
| May, 2021 | 546 | 22% | 78% |
| June, 2021 | 443 | 18% | 82% |
| July, 2021 | 355 | 14% | 86% |
| August, 2021 | 282 | 11% | 89% |
| September, 2021 | 227 | 9% | 91% |
| October, 2021 | 185 | 7% | 93% |
| November, 2021 | 160 | 6% | 94% |
| December, 2021 | 146 | 6% | 94% |
| January, 2022 | 119 | 5% | 95% |

The foregoing charts demonstrate a high-degree of turnover in customers and Agents, which starts to materialize almost immediately following enrollment.

Each of the forgoing reports are attached hereto as **Exhibit C**.

### *Legal Compliance*

Based on employee interviews, I understand that legal compliance for the Corporate Defendants was primarily overseen by Ms. Griffin, Michael Toloff, Gerald Thompson, and Robert Franklin.[11]

In my review of the Corporate Defendants' compliance materials, I was directed to the Policies and Procedures, the ISR, certain Agent training materials and certain contracts and disclosures relating to the Products. I further understand from interviews with employees of the Corporate Defendants that the foregoing materials were primarily developed by Parimal Naik, Michael Toloff, and Gerald Thompson. At no point in my interviews with employees, despite direct inquiry, was I directed to, or notified of, any external law firm or compliance expert that assisted or advised in any material way on the Corporate Defendants' legal compliance materials.

---

[11] Mr. Seely, in particular, specifically identified Michael Toloff, Ms. Griffin, and Mr. Franklin as the "compliance team" working with three attorneys whose names reportedly he did not know. He also briefly mentioned "very assertive compliance protocols," but did not indicate or offer any documentation of same other than the Policies and Procedures for Agents in the field and Agent Terms and Conditions. My team and I were not provided with the "SOP for Daily Compliance Tasks and Notifications" document that was attached as Exhibit 10 to Mr. Seely's June 27, 2022 Declaration. Mr. Seely indicated there was an internal email with a daily and task notification process originated by Michael Toloff. He noted Ms. Griffin and Mr. Franklin prepared reports, often weekly, identifying Agents in violation of the Policies and Procedures.

I noted in my interview with Michael Toloff that he indicated that managing the activities and conduct of the Agents was the "most difficult" part of the Corporate Defendants' business.

The Corporate Defendants' compliance infrastructure and protocols were of significant interest to me, given the seriousness of the allegations raised by the FTC, and prior litigation with the State of Georgia dating back to 2019, which I understand raised many of the same issues with regards to the Corporate Defendants' business practices as those raised in the Complaint by the FTC.

On or around April 9, 2019, FES, Michael Toloff, and Parimal Naik (the "**Georgia Defendants**") entered into a Consent Judgment and Injunction dated July 18, 2019 entered by the Superior Court of Fulton County, State of Georgia in the case of State of Georgia v. Financial Education Services, Inc., Michael George Toloff and Parimal Madhusudan Naik, Case No. 2019cv321591 (the "**Consent Judgment**") with the State of Georgia relating to certain business practices of FES. The Consent Judgment is attached hereto as **Exhibit D**. The Consent Judgment is extensive and contains a number of mandates, requirements and restrictions.

Notably, among other things, the Consent Judgment bars the Georgia Defendants or any Agent:

- from advertising, offering, selling, or engaging in credit repair services in the State of Georgia or otherwise creating the perception that they offer credit repair services in the State of Georgia; and

- creating the perception that payment is required or would otherwise be accepted from any customer before any credit repair services will be performed for customers in the State of Georgia.

The Consent Judgment further mandates the Georgia Defendants to make certain communications to their Agents regarding agent recruitment and sales practices designed to ensure future compliance with Georgia state law and the Consent Judgment. The Georgia Defendants were further ordered to:

- make all necessary revisions to all materials, policies and procedures applicable to the Agents to ensure compliance with the Consent Judgment;

- promulgate rules and regulations for training Agents in the State of Georgia consistent with the Consent Judgment;

- disseminate quarterly rules and regulations for the training of Agents in the State of Georgia; and

- create, and/or revise existing, policies and procedures to ensure compliance with the Consent Judgment and setting forth disciplinary procedures for Agents found to be in violation of Georgia law or the Consent Judgment.

The Policies and Procedures and the ISR appear to contain many of the mandates required by the Consent Judgment, although I did not review them specifically to determine such compliance. I also reviewed what appears to be a company created "Compliance Do's and Don'ts", a three page set of guidelines presented to Agents regarding online marketing, social media, flyers and other marketing media (attached as part of **Exhibit A**). The Corporate Defendants appear

Page 33 of 42

to have directed Agents to use only company-prepared marketing materials in their marketing efforts to customers.  It is unclear how this directive was enforced and to what degree.

As mandated by the Consent Judgment, the Corporate Defendants kept a running total of Agents who violated the company Policies and Procedures in the State of Georgia. It is unclear whether a similar tally is maintained for Agents who violated company policies in any state other than Georgia.

I note that Section 10 of the Policies and Procedures sets forth the sanctions and procedures for disciplining an Agent for violating the ISR, the Policies and Procedures or any other applicable law. In general, for a first and second offense, an Agent's website, provided by the Corporate Defendants, is shut down until corrective action is taken. For a third offense, an Agent is suspended for 60 days and ostensibly is unable to collect any commissions for sales made in the Agent's downline. Following a fourth offense, an Agent is permanently terminated.

It does not appear, based on my review of written materials and interviews with employees, that a formal process or structure is in place for monitoring compliance by the Agents of the Policies and Procedures, the ISR, and the other written policies and directives of the Corporate Defendants or applicable law.

It appears that compliance monitoring was largely conducted by Ms. Griffin and Mr. Franklin, consisting of randomized reviews of the social media accounts of

thousands of Agents. There does not appear to be any written policy setting forth specific protocols for monitoring or otherwise ensuring Agent compliance. The Corporate Defendants, I was told, often relied on Agents to report the misconduct of other Agents.

Ms. Griffin indicated that she had no formal training or education with regard to compliance matters and that her training was "on the job." Ms. Griffin indicated that Michael Toloff was her mentor in this regard, and that Michael Toloff works with Gerald Thompson, a lawyer who is president of YFL and receives a monthly retainer payment from FES, to review and develop compliance language in the Corporate Defendants' internal and external documents.

Thus, while the Corporate Defendants have what appears to be credible, albeit limited, written policies and procedures and other written mandates in place to govern Agent actions and conduct, there appears to be no formal and regular practice by the Corporate Defendants to enforce compliance, other than a single employee – Mr. Franklin – attempting to monitor social media for problematic statements and communications. Moreover, all matters and decisions regarding compliance appear to run to Michael Toloff and Parimal Naik, individuals with a significant financial interest in a strong sales culture.

As noted above, it is unclear that the Corporate Defendants track violations by Agents outside the State of Georgia. Ms. Griffin was unable to state with certainty

how many Agents had been terminated pursuant to the Policies and Procedures, but estimated around 30, out of thousands of Agents.

Based on my interviews with Ms. Griffin, there is no regular company produced and required formal compliance training conducted by the Corporate Defendants for the Agents or customer service representatives. Moreover, the Corporate Defendants lack any formal external or internal reporting structure and independent resolution for compliance concerns or issues.

It appears that company sponsored meetings took place periodically around the country with Agents, and I am informed that compliance as a general topic often was covered during these meetings, most frequently as a topic initiated by high-level Agents. I was neither provided with any specific material nor given a description of the types of topics typically addressed at these meetings but I was informed that these materials were always reviewed and approved by the company, namely Ms. Griffin, Chet Seely, and Michael Toloff. I am told these meetings took place at least quarterly, but often more frequently.

## VI.   LEGALITY AND PROFITABILITY OF BUSINESS

My review of the businesses of the Corporate Defendants raises significant concerns regarding their ability to operate legally and profitably.

The Corporate Defendants presumably take the position that because credit repair and restoration Products and services purportedly are provided through YFL,

a supposed nonprofit 501(c)(3) organization, that these products and services are not provided by a credit repair organization, and thus, are not subject to the restrictions and regulations of CROA.

The FTC disputes this contention. I understand the FTC's position to be that in order to be exempt from the definition of a credit repair organization under CROA, an entity must be both a "nonprofit" organization <u>and</u> be exempt from taxation under Section 501(c)(3) of Title 26 of the United States Code. I further understand that the FTC contends that YFL is not operating as a nonprofit organization given the significant volumes of revenue that flow into the organization from the credit repair and restoration business.

Given this legal dispute, to the extent I would continue operating the businesses, and to the extent I were to continue offering credit repair and restoration products and services through the Corporate Defendants, I believe I would need to manage operations as though they were subject to CROA in order to ensure legality. In my review of the Protection Plan, significant modifications to the Protection Plan are required in order to ensure compliance with CROA. In particular, I believe at a minimum I would need to make the following modifications to the existing Product structure:

- Update customer disclosures to comply with CROA requirements, including disclosures required under 15 U.S.C. §1679c;

- Prior to entering into future sales contracts with customers, obtaining written acknowledgments from customers stating they have received a statement of customer's rights under federal and state law, which does not appear to be part of the current enrollment process for customers enrolling in the Protection Plan;

- Make the provision of services under the Protection Plan contingent upon receipt of a written and dated contract that contains the information required by 15 U.S.C. §1679d(b), and in particular, the date by which services will be completed or the length of time necessary to perform services, which do not appear in existing customer terms and conditions; and

- Modify existing payment processing policies to ensure that payment is not received prior to the completion of services in respect of credit repair and restoration Products and services to ensure compliance with 15 U.S.C. §1679b(b); currently, payment for credit repair services are taken upon enrollment and each month thereafter, regardless of whether a customer actually initiates the credit repair process and prior to any service being provided.

Assuming the foregoing could be adequately addressed through modifications to existing processes and written materials and policies, monitoring and enforcing legal compliance present another material challenge to the continued operation of the Corporate Defendants' businesses. As this Court is aware, the use of untrue and/or misleading statements in the provision of credit repair services is a violation of 15 U.S.C. §1679b(a) and is an unfair trade practice under CROA.

The Corporate Defendants' current system of compliance is inadequate to ensure company and Agent compliance with applicable law, including CROA. While the Policies and Procedures and the ISR contain useful components of

compliance, the processes employed by the Corporate Defendants to ensure compliance in practice are insufficient. As noted above, there are neither an Agent compliance training program with respect to their orientation nor regular compliance trainings offered by the Corporate Defendants. Further, the actions of the Corporate Defendants to actively monitor Agent activity appear inadequate given the number of Agents.

Moreover, compliance ultimately is overseen by the individuals at the companies who benefit most monetarily from a robust sales culture – Individual Defendants Parimal Naik and Michael Toloff. The employees tasked with day-to-day compliance have no formal training in compliance beyond guidance provided by Messrs. Naik, Toloff, and Thompson. Such employees are not familiar with CROA's requirements. And they do not consult with outside legal and/or compliance experts regarding legal compliance best practices or protocols.

A substantially more robust compliance regime is needed to ensure the Corporate Defendants and the Agents are in compliance with applicable law. Beyond regular Agent compliance training, this type of overhaul – particularly, an active Agent monitoring program – likely would be extremely time consuming and complex with substantial related expenses. Furthermore, it is unclear whether Agents would be able – or willing – to effectively sell the Products following the implementation of strong compliance protocols that strictly monitor and enforce

Page 39 of 42

bans on untrue and misleading statements regarding the efficacy of the credit repair and restoration Product.

Absent the necessary compliance measures and with the exception of the Credit Restoration services, the Products still could be offered legally. However, the sales history casts significant doubt on whether they could generate a profit without credit repair and restoration sales and marketing. Excluding credit repair and restoration services from the Protection Plan likely would have a materially adverse effect on the profitability and on-going viability of the businesses. As noted above, I understand that the Protection Plan accounts for most, if not all, of the sales revenues of FES and YFL. And of the Products offered within the Protection Plan, the credit repair and restoration Product has by far the most customer and Agent activation of all the Products. Moreover, based on my review of relevant marketing materials, it appears that Credit Restoration is the primary Product driving sales of the Protection Plan.

In addition to the foregoing, after reviewing the Comp Plan and the attrition rate of customers and Agents, I believe there are significant questions regarding whether the Corporate Defendants' multilevel distribution model constitutes an unlawful pyramid scheme. The Corporate Defendants' business model is heavily dependent upon the continued recruitment of new customers and Agents, and sales to nonparticipants (i.e., customers) are not required as a condition to receiving

commissions. Indeed, based on my interview with Susan Griffin, Vice President, Agent Support, any purchase of a Protection Plan is considered eligible for purposes of calculating an Agent's commission, regardless of whether such Protection Plan was purchased by a customer or an Agent. To the extent operations were to continue, I would want to clarify and streamline the Comp Plan so that sales to customers are compensated in a more straight forward manner, which may in turn reduce profitability.

As noted above, the rate of cancellation among customers and Agents is staggering. When reviewing the data over the last three years, a clear pattern emerges – within two to three months of enrolling as a customer, the majority of customers (i.e., more than 50 percent) cancel their services – a percentage that steadily grows each month until almost all customers have cancelled their services within a year of enrollment. The story is similar for Agents.

The Comp Plan also supports this conclusion, as compensation levels increase markedly based on an Agent's downline.

This rate of attrition by customers and Agents is a red flag that strongly suggests the Products are of very dubious quality and effectiveness, and supports a conclusion that Agents are more motivated to bring in new Agents (rather than procuring sales of low quality products). Indeed, as recently as June 8, 2022, I received a notice of complaint from the State of Alabama Attorney General's

Page 41 of 42

Consumer Interest Division attached as **<u>Exhibit E</u>** regarding a customer complaint alleging that the company is "scam based company." My team is reaching out to the Attorney General's office to address this notice. But these types of consumer complaints only deepen my concern regarding the legality of the business model employed by the Corporate Defendants.

Given the significant challenges noted above in maintaining the Corporate Defendants' business operations, it is my opinion that the businesses cannot be operated legally at this time and without significant modifications, which would likely have a materially adverse effect on the profitability of the Corporate Defendants' businesses.

Dated: June 28, 2022

By: */s/ Patrick A. Miles, Jr.*
      Patrick A. Miles, Jr.
      Court-Appointed Temporary Receiver

**Exhibit A**

**Exhibit B**

**<u>Exhibit C</u>**

**<u>Exhibit D</u>**

**Exhibit E**