# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**FEDERAL TRADE COMMISSION**,

    Plaintiff,

       v.

**FINANCIAL EDUCATION SERVICES, INC.**, *et al.*,

      Defendants.

Case No. 2:22-cv-11120-BAF-APP

Hon. Bernard A. Friedman

## FTC'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.  INTRODUCTION ...............................................................................1

II.  THE FTC HAS MET THE STANDARD FOR ENTRY OF A PRELIMINARY INJUNCTION.........................................................................................2

    A. The FTC Established a Likelihood of Success on the Merits .........................3

        1.  Defendants Misrepresent the Efficacy of their Credit Repair Services .....3

        2.  Defendants Fail to Make Required CROA Disclosures and Provide Consumers with Written Contracts ...........................................................9

        3.  Defendants Collect Prohibited Advance Fees...........................................9

        4.  Defendants Make False Claims Regarding the Amount of Income Consumers Can Earn as FES Agents .......................................................10

        5.  Defendants' Investment Opportunity Is an Illegal Pyramid Scheme.......12

        6.  Defendants Provide FES Agents with the Means and Instrumentalities to Engage in Deceptive Practices ...............................................................16

        7.  Defendant Youth Financial Is Subjec to CROA ......................................17

        8.  Defendants' Activities Are Covered by the Telemarketing Sales Rule...21

        9.  Defendants Fail to Refute That They Operate as a Common Enterprise.22

        10. Defendants Fail to Refute That the Individual Defendants Are Liable for Injunctive and Monetary Relief................................................................23

    B. Defendants Fail to Refute the Other Preliminary Injunction Factors............26

III.  THE COURT SHOULD ENTER THE FTC'S PROPOSED PRELIMINARY INJUNCTION.......................................................................................26

IV.  CONCLUSION..................................................................................29

# TABLE OF AUTHORITIES

## CASES

*Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*,
796 F.3d 636 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1246 (2016) ...............2

*AMG Cap. Mgmt. v. FTC*,
141 S.Ct. 1341 (2021)....................................................................................27

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999).......................................................................................18

*Cmty. Blood Bank of the Kansas City Area v. FTC*,
405 F.2d 1011 (8th Cir. 1969) ..................................................................18, 19

*FTC v. Ameridebt, Inc.*,
343 F. Supp. 2d 451 (D. Md. 2004)..................................................................19

*FTC v. Amy Travel Serv. Inc.*,
875 F.2d 564 (7th Cir. 1989) .............................................................................9

*FTC v. BurnLounge, Inc.*,
753 F.3d 878 (9th Cir. 2014) ...........................................................................13

*FTC v. Cardiff*,
2019 U.S. Dist. LEXIS 232069 (C.D. Cal. May 16, 2019)...........................29

*FTC v. Credit Bureau Ctr., LLC*,
*937* F.3d 764 (7th Cir. 2019) ..........................................................................25

*FTC v. E.M.A. Nationwide, Inc.*,
767 F.3d 611 (6th 2014) ..................................................................................23

*FTC v. Equinox Inter. Corp.*,
1999 WL 1425373 (D. Nev. Sep. 14, 1999)....................................................12

*FTC v. Five-Star Auto Club*,
97 F. Supp. 2d 502 (S.D.N.Y. 2000) .................................................................9

*FTC v. Gill*,
　　183 F. Supp. 2d 1171 (C.D. Cal. 2001) ..........................................................19

*FTC v. J.K. Publ'ns, Inc.*,
　　2000 WL 35594143 (C.D. Cal. Aug. 9, 2000) ................................................8

*FTC v. Noland*,
　　2021 U.S. Dist. LEXIS 182346 (D. Ariz. Sep. 23, 2021) ................27, 28, 29

*FTC v. Noland*,
　　2021 WL 4318466 (D. Ariz. Sep. 23, 2021) ..................................................13

*FTC v. On Point Cap. Partners LLC*,
　　17 F.4th 1066 (11th Cir. 2021) ....................................................................29

*FTC v. Ross*,
　　743 F.3d 886 (4th Cir. 2014) ........................................................................23

*FTC v. USA Fin., LLC*,
　　415 Fed. Appx. 970 (11th Cir. 2011) ...........................................................23

*FTC v. Vemma Nutrition Co.*,
　　2015 WL 11118111 (D. Ariz. Sep. 18, 2015) ...............................................12

*FTC v. VPL Med., Inc.*,
　　846 Fed. Appx. 561 (9th Cir. 2021) .............................................................29

*FTC v. Vyera Pharms., LLC*,
　　479 F. Supp. 3d 31 (S.D.N.Y. 2020) .............................................................25

*King v. Capital One Bank (USA), N.A.*,
　　2012 U.S. Dist. LEXIS 163562 (W.D. Va. Nov. 15, 2012) ..........................17

*In re Koscot Interplanetary, Inc.*,
　　86 F.T.C. 1106 (1975) ...................................................................................12

*Polacsek v. Debticated Consumer Counseling*,
　　413 F. Supp. 2d 539 (D. Md. 2005).............................................................17

*United States v. Gold Unlimited, Inc.*,
    177 F.3d 472 (6th Cir. 1999) .........................................................................12

*United States v. Offices Known as 50 State Distrib. Co.*,
    708 F.2d 1371 (9th Cir. 1983) .........................................................................8

*Zimmerman v. Cambridge Credit Counseling Corp.*,
    409 F.3d 473 (1st Cir. 2005) ..........................................................................17

## STATUTES

15 U.S.C. § 45(a) ................................................................................................1

15 U.S.C. § 53(b) ..............................................................................................25

15 U.S.C. § 57b(b) ............................................................................................28

15 U.S.C. § 57b(d) ............................................................................................24

15 U.S.C. §§ 1679–1679j ....................................................................................1

15 U.S.C. § 1679h(b)(1) ....................................................................................28

15 U.S.C. § 1679h(b)(2) ....................................................................................28

16 C.F.R. Part 310 ..............................................................................................1

16 C.F.R. § 310.2(gg) ........................................................................................22

16 C.F.R. § 310.4(a)(2) ........................................................................................7

## MISCELLANEOUS

Keith Anderson, *Consumer Fraud in the United States: An FTC Survey* 80 (Aug.
2004), *available at*
https://www.ftc.gov/sites/default/files/documents/reports/consumer-fraudunited-
states-ftc-survey/040805confraudrpt.pdf..................................................8

## I.   INTRODUCTION

Plaintiff, the Federal Trade Commission ("FTC"), submits this supplemental brief in support of its motion for preliminary injunction.  (ECF No. 3.)[1]  The FTC brought this action to halt a pernicious credit repair and pyramid scheme that has defrauded hundreds of millions of dollars from consumers nationwide.  The FTC has already shown in its memorandum in support of a TRO ("TRO Memo") and accompanying exhibits (ECF Nos. 3, 5 – 5-31) that Defendants have violated Section 5 of the FTC Act, 15 U.S.C. § 45(a), multiple provisions of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679-1679*l*, and multiple provisions of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.  Additional confirmatory evidence obtained during the inspection of Defendants' business premises bolsters the FTC's case.  Further, the Receiver's Preliminary Report (ECF No. 55-1), based in part on this additional evidence as well as his own independent investigation, corroborates the FTC's position that a preliminary injunction should issue and that the receivership and asset freeze should remain in place.

---

[1] The Court considered the FTC's motion for temporary restraining order to be the FTC's motion for preliminary injunction and permitted the FTC to file this supporting brief.  (ECF No. 10 at 44.)

Neither should Defendants' Oppositions (ECF Nos. 50, 51, 52)[2] change the Court's mind that it got things right the first time—preliminary injunctive relief is warranted. Defendants use misguided legal arguments and elevate form over substance in an attempt to obfuscate the issues of well-settled FTC law. The remainder is irrelevant or unconvincing factual assertions. In short, the Court should issue the FTC's proposed preliminary injunction, continuing (with few modifications) the terms of the TRO until a final decision on the merits is made.

## II. THE FTC HAS MET THE STANDARD FOR ENTRY OF A PRELIMINARY INJUNCTION

A party seeking a preliminary injunction in the Sixth Circuit must establish (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2016). As discussed in the TRO Memo, and amply supported by the evidence already on the record and submitted with this brief, Defendants have engaged in unlawful practices related to the marketing and sale of their credit repair services and investment opportunity, and preliminary injunctive relief is necessary to prevent ongoing consumer injury.

---

[2] Defendant Gerald Thompson's opposition is filed as ECF No. 50, Defendants Financial Education Services, Inc., United Wealth Services, Inc., VR-Tech, LLC, Youth Financial Literacy Foundation, and Parimal Naik ("FES Defendants") is ECF No. 51, andDefendants VR-Tech MGT, LLC, CM Rent Inc., Michael Toloff, and Christopher Toloff ("Toloff Defendants") is ECF No. 52.

2

## A. The FTC Has Established a Likelihood of Success on the Merits

As discussed in the TRO Memo, Defendants, operating as a common enterprise, have deceptively marketed credit repair services and an investment opportunity online and through telemarketing.  In particular, the FTC has demonstrated that Defendants:

- falsely promise that they will substantially improve consumers' credit scores by removing negative information and adding credit building products (ECF No. 3 at 30-48),

- fail to make required CROA disclosures and provide written contracts (*Id*. at 48-50),

- collect illegal advance fees (*Id*. at 50-52),

- falsely promise that consumers will earn substantial income by becoming FES Agents (*Id*. at 53-60),

- operate their investment opportunity as an illegal pyramid scheme (*Id*. at 60-73), and

- provide consumers with the means and instrumentalities to commit deceptive acts and practices.  (*Id*. at 73-75)

And the Individual Defendants either participated in, controlled, or had the authority to control these practices and had the requisite degree of knowledge to hold them liable for injunctive and monetary relief.

### 1.  Defendants Misrepresent the Efficacy of their Credit Repair Services

Evidence gathered at and since the inspection of Defendants' offices corroborates the FTC's complaint allegations that Defendants ran an illegal credit

3

repair scam as the "cover" sales service for their pyramid scheme. Defendants

promised to remove negative credit entries from any and all consumers' credit

histories, thereby substantially raising their credit scores.

Documents obtained from Defendants confirm that they were responsible for

widespread credit repair representations. For example:

- Financial Education Services is . . . the top credit restoration company in this country and we have a 100% customer satisfaction guarantee. What happens when you get started: your credit is pulled, a team of trained professionals and attorneys dispute every negative item on the reports from the three credit agencies. . . You will begin seeing items removed from your credit reports between 45-90 days after signing up for the service. (PX27 Att. F at 50.)

- Text #2 Hey (Name) if your credit score begins with a 4,5 or 6 you NEED to watch this NOW. (PX27 Att. N at 585.)
  N
- Post #2: Anyone need to improve their credit? I found a service that has gotten over a million items deleted from people's credit scores. PM or comment below for more information. (PX27 Att. N at 586.)

- Hello Kristin, here is the information on increasing your credit. My score went up over xxx points using this amazing credit restoration service. The company has been doing this for clients for over 14 years and they have an A++ BBB rating. Plain and simple it just works. (PX27 Att. N at 586.)

- How soon will I see results? Many of our customers have seen an increase of 100 points or more. (PX27 Att. M at 565 (customer support answers for "Frequently Asked Questions").)

Meanwhile, emails indicate Defendants attempted to conceal from law

enforcement the credit repair nature of their business because of their perception

that the credit repair industry is subject to enforcement lawsuits.  For example,

emails from Michael Toloff to employees contained the following: "No one in the

credit world post (sic) their process…it tells the regulators exactly what we do and

that is credit repair." (PX27 Att. Q at 688.)  "Avoid using credit repair in print

material on our sites, use credit education." (PX27 Att. Q at 689.)

Defendants attempt to argue that credit repair is really just a small part of

multiple "services" they offer consumers.  (*See, e.g.*, ECF No. 51 at 2.)  Their

expert declaration makes much about the FTC's focus on Defendants' credit

restoration product and not the others.  (ECF No. 52-11at 8-11.)  Indeed, after the

Complaint in this case was filed, FES agents received an impassioned message

from FES employee Chet Seely to have customers in their downlines report

positive experiences with the UCES Protection Plan, notably to report using

products other than the credit restoration:  "[T]he experiences they share shouldn't

just be about credit restoration" and "The emails your customers should send

should share their personal experience with as many products as possible other

than credit restoration." (PX28, Att. A) However, Defendants' own documents

admit that credit repair "is the bread and butter of the entire UCESPP."  (PX27 Att.

L at 280, Att. M at 544.)  Defendants' internal correspondence shows that 85% of

their customers used the credit restoration product and conversely, for example,

only 9% use their budget calculator product. (PX27 Att. T at 705.) The Receiver

has also concluded that Defendants' credit restoration product is far and away the

most used:  "[I]t appears that credit restoration is the most popular and highly used

Product." (ECF No. 55-1 at 17.).

Moreover, Defendants' credit repair services routinely failed to produce the

promised results.  Defendants concede that their information about the results of

their credit repair products does not come from the credit bureaus. (ECF No. 51-3,

p. 6.)  Defendants' expert, based solely on the analysis of Defendant Michael

Toloff, claims Defendants' promises to improve consumers' credit scores must be

true because, for 2019-2021, Defendants "successfully removed over 300,000

obsolete, unverifiable, and inaccurate credit events from their credit reports."

(ECF No. 51-21, p. 13.)  However, even if Defendants could substantiate that

300,000 deletions occurred, there is no indication of whether the negative items

remained off consumers' credit histories for any amount of time.  Testimony from

the credit bureaus is that manual letter writing campaigns are not an effective

method of removing negative items from consumers' credit histories.  (*See* ECF

No. 5-20, pp. 3-5(Equifax); ECF No. 5-23, pp. 3-4(TransUnion).)  Indeed, the

FTC's investigator found numerous letters from TransUnion rejecting Defendants'

letters.  (PX27 Att. G at 118-21 (samples).)  As discussed more below, Defendants

did not produce proof of credit score improvements six months after their letter

writing services, and they have failed to produce any evidence that Defendants are

even aware of whether or not their customers' scores improved.  The TSR requires

Defendants to produce proof of results at the six month mark prior to collecting

fees.  *See* 16 CFR 310.4(a)(2).  Defendants have not produced proof that their letter

writing business model produces results.

With respect to their Credit My Rent ("CM Rent") service, while reporting

rental income can have some modest effect on a consumer's credit score, that

improvement only occurs if Defendants actually do what they promise.  In a

December 2, 202,1 email from Anthony Fuller to Christopher Toloff regarding CM

Rent, Fuller admits "Between you & me, 80% of the customer base should've

never been charged because they were never worked.  So you had a large total

revenue & basically no expenses because the day to day function of the business

wasn't being executed."  (PX27 Att. I at 145.)

Defendants filed a Declaration of Counsel in opposition to the Preliminary

Injunction that quibbles about the dates and details cited in FTC's consumer

declarations and offers Defendants' own customer notes in evidence. (ECF No. 51-

3).  However, Defendants' notes corroborate the FTC's core allegation that

consumers did not receive the credit improvement they purchased.  For example:

- I wanted to help people fix their credit but I feel like this is a scam.
  ECF No. 51-3 (email 12/18/2019 11:56:57)

- Amber Harris called to cancel PP account due to not seeing any
  results on her credit. (ECF No. 51-3 (email 12/13/2019 15:08:23))

- i contacted this company to find help to repair my credit score. They told me my account in collettion (sic) when are very old it would be easier and fast for fix it.it take no more than 4 month to my credit appear in 620.it was not true.i started paying from february an my credit is down. (ECF No. 51-3 (email 8/6/2021 10:22:37).)

- THIS PROGRAM HAS DONE NOTHING FOR MYSELF NOR THE PEOPLE I ENROLLED AND PAID FOR OUT OF MY POCKET TO ASSIST WITH THERE CREDIT AMONG OTHERS. (ECF No. 51-3 (email 2/8/2021 17:46:38).)

Defendants assert that the FTC consumer declarations contain similar allegations of deception because they are contrived. However, the FTC has received at least 489 complaints from consumers that contain echoes of the same credit repair (and pyramid scheme) allegations from these declarations.[3] (*See* PX 28 at Att. B.)

As outlined in the TRO Memo and supported by declarations from the credit bureaus and FICO, filing manual dispute letters does not result in permanent credit repair for most people. *See* ECF No. 3, Page ID 100-106, PX20 at 3-4 ¶ 14; PX23 at 3-4 ¶ 17. Defendants' declarations of some happy customers is insufficient to

---

[3] These complaints are likely just the tip of the iceberg. *United States v. Offices Known as 50 State Distrib. Co.*, 708 F.2d 1371, 1374-75 (9th Cir. 1983) (noting that actual consumer complaints represent only the "tip of the iceberg"); *FTC v. J.K. Publ'ns, Inc.*, 2000 WL 35594143, *15 (C.D. Cal. Aug. 9, 2000) ("[T]here are undoubtedly injured [consumers] who will never file a complaint . . . ."). In the FTC's experience, the raw number of complaints actually reported to government and consumer protection agencies represents only a fraction of consumer harm. *See* Keith Anderson, *Consumer Fraud in the United States: An FTC Survey* 80 (Aug. 2004), *available at* https://www.ftc.gov/sites/default/files/documents/reports/consumer-fraudunited- states-ftc-survey/040805confraudrpt.pdf (FTC Bureau of Economics report noting that only 8.4% of consumer fraud victims complain to an "official source" such as the federal government or the BBB).

defeat the evidence of widespread false credit repair promises. "The existence of some satisfied customers does not constitute a defense under the FTC [Act]." *FTC v. Five-Star Auto Club, Inc*., 97 F. Supp. 2d 502, 530 (S.D.N.Y. 2000) (quoting *FTC v. Amy Travel Service, Inc*., 875 F.2d 564, 572 (7th Cir. 1989)). Defendants' promises to improve consumers' credit scores were deceptive violations of the Federal Trade Commission Act, the TSR, and CROA.

### 2. Defendants Fail to Make Required CROA Disclosures or Provide Consumers with Written Contracts

Defendants do not dispute the FTC's allegations that they fail to make specific disclosures and provide consumers with written contracts that comply with the requirements of CROA. Indeed, the Receiver's report describes the disclosures as not being conducted, noting that implementing CROA-required disclosures would be a step required to operate the credit repair function of Defendants' business. (ECF No. 55-1 at PageID 4299.)

### 3. Defendants Collect Prohibited Advance Fees

Defendants do not dispute that they collect advance fees for their credit repair services. Additional evidence confirms these facts. For example, Defendants' Protection Plan Credit Restoration script includes collecting payment and contact information as the first step in enrollment. (PX 27 Att. N at 614.) In the call notes filed by Defendants' counsel, the earliest dated entry for several consumers is "CC Approved" with a redacted credit card number. (*See* ECF No.

51-3 at PageID 3816, 3836, 3851, 3862, 3870, 3877, 3880.)  The Receiver also

notes: "currently, payment for credit repair services are taken upon enrollment and

each month thereafter, regardless of whether a customer actually initiates the credit

repair process and prior to any service being provided."  (ECF No. 55-1 at 38.)

### 4.  Defendants Make False Claims Regarding the Amount of Income Consumers Can Earn as FES Agents

Defendants fail to refute the substantial evidence that they and their agents

claim that FES Agents will earn substantial income from their sale of Defendants'

products.  For example:

- Defendants provide scripts and guidance for recruiting new agents focus on earned income and other financial rewards.  (PX27 Att. N at 585 (text message scripts state "I found the best kept secret… 14 years of success, Billionaire owner, A++ BBB and the best bonus structure I've ever seen" and "(Name) do you know anyone that needs to increase their credit score and would be interested in earning an extra 500 dollars per week?"); *Id.* at 585 (social media post suggestion states "If you're my Facebook friends and you need to improve your credit score and would like to earn some serious extra money per week… Comment now."); *Id.* at 588–89 (proposed ad scripts state "WIFE WANTED! . . . IF YOU, have the desire to earn excellent part-time (establish your own hours) or full-time income, apply here . . . This is a lucrative commission only position with all the training and tools to make you successful" and "Thanks, Trump, for my amazing new side hustle! . . . [O]ur agents and affiliates are experiencing record levels of inquiries – and record levels of revenue.").

- Defendants promote testimonials purporting to describe significant income and wealth derived from work as FES Agents. (*E.g.*, PX13 at 7 ¶ 31, Att. D at 33; PX24 Att. JJ at 629; PX27 Att. L at 361 (agent testimonials claim "Becoming an entrepreneur with UWE has transformed my life," "I became an entrepreneur and achieved the American Dream!")

- Defendants' training materials encourage consumers to "SECURE YOUR FINANCIAL FUTURE" by joining "THE 16.5 MILLION AMERICANS WHO ARE ALREADY MAKING ADDITIONAL INCOME." (PX27 Att. L at 349.)  Defendants tell consumers that work as an FES Agent can "work for you!" because it is "the complete turnkey business." (PX27 Att. L at 356.)

Nor have Defendants demonstrated that these express claims of substantial income are realized for more than a small percentage of FES Agents.  To the contrary, the available evidence indicates that few, if any, consumers earn the promised income.  For example:

- Internal documents reveal that the income disclosure Defendants post on their website (which itself is poorly disclosed, and reveals that Defendants' earning claims are false for most consumers, *see* ECF No. 3 at 38–39 & n.8) significantly overstates amounts earned by those at the bottom of Defendants' compensation structure.  Defendants report that, in 2021, 91.59% of FES Agents were at the lowest rank, and that their average annual income was $3,636.78.  (PX24 Att. MM at 689.)  Defendants' internal documents reveal, however, that these earnings figures considered only those FES Agents who were actually paid, and excluded the vast majority who earned nothing. (PX27 Att. J at 173.)  When *all* of the lowest-ranked FES Agents are taken into account, their true average weekly income was just over $2.25, which converts to only $117.36 per year. (PX27 Att. J at 195.)

- Of the 16 consumers who submitted declarations in support of the FES Defendants' opposition claim to have earned substantial income as FES Agents, only one states that he has earned enough with FES to leave his full-time job, and even so he continues to work as a personal trainer.  (ECF No. 51-16 at 6 ¶ 22.)

- Indeed, in May 2022, the BBB's National Programs initiated an inquiry into Defendants' questionable earnings claims.  (PX27 Att. O at 628-42.)

- Paralegal Elena Hoffman found recent consumer complaints submitted to the FTC since the filing of the complaint in this action, and interviewed Everett

11

Johnson, Jr. whose experience corroborates the failure of other consumer witnesses to obtain the earnings they were promised by FES. (PX28 ¶¶ 7-19.)

### 5. Defendants' Investment Scheme Is an Illegal Pyramid Scheme

Defendants leave the FTC's allegations that they operated an illegal pyramid scheme largely unchallenged. Courts in this Circuit use the test set forth in *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1180 (1975), which defines an illegal pyramid scheme as one characterized by "the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users." *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 484 (6th Cir. 1999). In their oppositions, however, Defendants make no mention of the *Koscot* standard—or any standard—for determining whether a business engaged in multi-level marketing is an illegal pyramid scheme or not. The FES Defendants rely almost exclusively on the Declaration of Branko Jovanovic to support their position that it is too early to make the necessary factual determination about whether Defendants operated an illegal pyramid scheme. Courts, however, frequently issue preliminary injunctions against alleged pyramid schemes. *E.g.*, *FTC v. Vemma Nutrition Co.*, 2015 WL 11118111, at *4 (D. Ariz. Sept. 18, 2015) (imposing preliminary injunction against alleged pyramid scheme); *FTC v. Equinox Intern. Corp.*, 1999 WL 1425373, at

*10 (D. Nev. Sept. 14, 1999) (imposing preliminary injunction against alleged

pyramid scheme); *see also FTC v. Noland*, 2021 WL 4318466, at *3–4 (continuing

asset freeze and preliminary injunction).

Defendants do not dispute that their business satisfies the first prong of the

*Koscot* test: payment of money in exchange for the right to sell a product or

service.  Defendants charge consumers an upfront fee in order to become agents

and require that agents enroll in the $89 per month Protection Plan. (*E.g.*, PX27

Att. F at 24; ECF No. 55-1 at 19; PX24 Att. UU at 858.)

Nor do Defendants dispute in their briefing the second element of the *Koscot*

test: the payment of money by participants for right to receive rewards for

recruiting others which are unrelated to the sale of products to ultimate end users.

"Courts have consistently found MLM businesses to be illegal pyramids where

their focus was on recruitment and where rewards were paid in exchange for

recruiting others, rather than simply selling products." *FTC v. BurnLounge, Inc.*,

753 F.3d 884 (9th Cir. 2014).  Based on his evaluation of the FES compensation

plan and policies and procedures, the FTC's expert Dr. David Givens determined

that Defendants' payment and bonus structure for FES Agents incentivize

recruiting new FES Agents rather than focusing their time or energy on selling FES

products.  (PX22 at 27-28, ¶¶ 155–56.)  Additional evidence supports Dr. Givens's

initial conclusions.  For instance, the Receiver reports that "it appears that Agents

are heavily incentivized to recruit other potential Agents to increase their compensation." (ECF No. 55-1 at 21.).

Dr. Jovanovic's declaration submitted in support of the FES Defendants Opposition suffers from numerous flaws that make it insufficient to refute the evidence of Defendant's illegal pyramid structure. Dr. Jovanovic offers no standard or framework for evaluating whether any multi-level marketing operation could be an illegal pyramid scheme, opining only that "the exact criteria for establishing the differences between a legitimate MLM company and one operating as a pyramid scheme remain unfortunately vague." (*Id.* at 20, ¶ 33.) Dr. Jovanovic's fuzzy criteria for what constitutes an illegal operation leads him to the remarkable and unsupported declaration that *all* "legitimate enterprises . . . depend on an 'endless recruiting chain'" in order to grow and replace departing employees. (*Id.* at 30, ¶ 52.) This is entirely insufficient to refute the clear analytical framework set forth by Dr. Givens in his analysis of the FES structure.

Dr. Jovanovic's analysis suffers from additional flaws. For instance, Dr. Jovanovic makes clear that, despite his access to numerous reports and data gathered and prepared by Michael Toloff, he did not review or evaluate data that he claims is necessary to determine whether Defendants' business in fact operated as an illegal pyramid scheme.[4] (ECF No. 51-24 at 7, ¶ 11.) Dr. Jovanovic

---

[4] Dr. Jovanovic states that he has "no reason to doubt the accuracy" of the "number

criticizes Dr. Givens for, he says, wrongly assuming that Defendants offer a non-viable product. (*Id.* at 22 ¶ 36.) But Dr. Givens is clear that his "conclusions about the investment opportunity would hold even if the services offered by FES . . . delivered real value to consumers." (PX22 at 52 ¶ 320.) Dr. Jovanovic also asserts, without support, that the existence of "genuine demand" for a company's product is sufficient to establish that a multi-level marketing business operates legally. (*Id.* at 22, ¶ 38.) However, Dr. Jovanovic's determination that genuine demand exists for FES's services rests on flawed assumptions. Dr. Jovanovic states that FES Agents' required personal purchases of FES services throughout their tenure as agents should be "consider[ed] . . . as a component of genuine demand." (ECF No. 51-21 at 25 ¶ 44.) Elsewhere, however, he acknowledges that most of FES's services, including "Will and Trust, Credit Repair, and Credit My Rent," do not "necessitate continuous consumption" and would "be of limited use to customers once they have accomplished their goals." (*Id.* at 20, ¶ 32.) Figure 4 in Dr. Jovanovic's declaration purports to show that over 90 percent of FES Agents and customers who enrolled with FES in 2019 "have expressed interest in" the Credit Restoration product "as of June 2022," and that 37.1 percent of FES Agents and 24.5 percent of retail customers, respectively, similarly "expressed interest" in

---

of reports prepared by Mr. Michael Toloff," but that he has not verified them independently. (ECF No. 51-21 at 7, ¶ 12.) Mr. Toloff, however, states that he retired from FES in September 2019, and that his continued part-time work since then did not relate to day-to-day business operations. (ECF No. 48-3 at 2 ¶ 5.)

the estate planning services. (*Id.* at 26–27, ¶ 45.)  Dr. Jovanovic does not explain

when or how consumers "expressed interest," let alone whether they actually used

the services.  The Receiver's report indicates how flawed these figures are as

illustrations of consumers' experiences with FES, revealing that just 1 percent of

customers and 5 percent of FES Agents who enrolled in 2019 remained as of June

2022.  (ECF No. 55-1 at 24.).[5] These are just some of the internal contradictions

and flaws within Dr. Jovanovic's report.

### 6. Defendants Provide FES Agents with the Means and Instrumentalities to Engage in Deceptive Practices

Defendants do not dispute that, by providing FES Agents with marketing

materials, they provide consumers with the means and instrumentalities to commit

deceptive acts and practices.  Additional evidence confirms these facts, including:

- ECF No. 51-1 at 8 ¶ 37, Ex. 11 at 89-95, Ex. 12 at 96-106(samples of advertisements provided to FES Agents)

- PX27 Att. F at 41-42 ("New Agent To Do List" instructs FES Agents to go to "Marketing Tab" to get marketing materials), 45-46, 48-49, 54 (sample scripts), 50 (sample marketing email stating that FES will "dispute every negative item," and consumers "will begin seeing items removed" in 45-90 days), 55-61 (sample social media posts)

---

[5] Dr. Jovanovic criticizes Dr. Givens's "optimal scenario" as at odds with reality (ECF No. 51-21 at 24 ¶ 41), but this reflects a misreading of Dr. Givens's report. The "optimal scenario" Dr. Givens constructed reflects an individual agent's optimization of their individual earnings with the FES compensation structure; it is admittedly "unrealistically optimistic" about an agent's earnings. (PX22 at 31 ¶¶ 179, 181.)

- PX27 Att. N at 578-599, 610-626 (sample scripts and other marketing materials).

### 7.  Defendant Youth Financial Is Subject to CROA

Defendants spill much ink on the fact that Defendant Youth Financial Literacy Foundation ("Youth Financial") is registered as a 501(c)(3) organization and, therefore, not subject to CROA.[6]  (*See* ECF No. 50 at 14-20; ECF No. 51 at 52-56.)  As discussed in the TRO Memo, courts have held that CROA's nonprofit exemption requires both that the organization hold 501(c)(3) status and "actually operates as a nonprofit entity."  *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 475 (1st Cir. 2005); *King v. Capital One Bank (USA), N.A.*, 2012 U.S. Dist. LEXIS 163562, at \*5 n.3 (W.D. Va. Nov. 15, 2012); *Polacsek v. Debticated Consumer Counseling*, 413 F. Supp. 2d 539, 550 (D. Md. 2005) (to be exempt under CROA "a corporation must not only be organized as a non-profit, it must actually operate as one.  To the extent that it does not, it may be held subject to CROA whether or not the IRS has granted it § 501(c)(3) status.  If this were not so, a credit repair organization, having once gained § 501(c)(3) status, could engage in outrageous credit repair abuses without impediment until such time as the IRS might act.").

---

[6] Notably, Defendants are silent about CM Rent, which is clearly subject to CROA. It took in $3,390,186 in prohibited advance fees between January 2020 and January 2022.  (PX27 Att. M at 368, 379.)

The crux of Defendant Thompson's argument is that neither the FTC nor the Court can challenge Youth Financial's exempt status—"[t]hat issue is between Defendants and the IRS." (ECF No. 50 at 19.) The FTC does not dispute, for purposes of argument, that only the IRS can revoke Youth Financial's 501(c)(3) status; but whether Youth Financial operates as a nonprofit or for-profit for the purposes of the FTC Act is a question that is well within the Court's authority. *See Cal Dental Ass'n v. FTC*, 526 U.S. 756, 767-68 (1999); *Cmty. Blood Bank of the Kansas City Area v. FTC*, 405 F.2d 1011, 1017-18 (8th Cir. 1969). Meanwhile, on the issue of whether Youth Financial in fact operates for the profit of others, the FES Defendants argue that the FTC "offers no evidence of that nature." (ECF No. 51 at 44.)

On the contrary, as demonstrated in the TRO Memo, while Defendants seek to elevate form over substance, the facts show that Defendants operate Youth Financial as a for-profit entity. Additional evidence confirms this fact. First, Youth Financial was expressly organized

> exclusively for charitable and educational purposes *to provide undergraduate and graduate university scholarships* for financially disadvantaged students within the purposes set forth in Section 501(c)(3) and Section 509(A)(2) of the Internal Revenue Code of 1986 (as amended), including for such purposes, the making of distributions to educational organizations that qualify as exempt organizations under Section 501(c)(3) of the Internal Revenue Code.

(PX24 Att. B at 189, ECF No. 5-24 (emphasis added).)  Yet Defendants use Youth

Financial to market, sell, and provide credit repair services, an activity wholly

inconsistent with its purported mission.  *See FTC v. AmeriDebt, Inc*., 343 F. Supp.

2d 451, 460 (D. Md. 2004) (noting that activities intended to "seek[] monetary

gain" are inconsistent with nonprofit status).  Second, as discussed in the TRO

Memo, Youth Financial commingles its funds and blends its operations with

multiple for-profit entities forming a common enterprise for-profit organized solely

for their profit.  *See, e.g., FTC v. Gill*, 183 F. Supp. 2d 1171, 1184 (C.D. Cal.

2001) ("[W]hile certain nonprofit corporations are exempt from liability for

violations of section 5(a)(1) of the FTC Act, the exemption does not apply to sham

corporations that are the mere alter ego of the [defendant]").  Finally, a touchstone

for determining whether a nonprofit is exempt is whether it uses its "non-profit

status as an instrumentality of individuals or others seeking monetary gain."

*AmeriDebt*, 343 F. Supp. 2d at 460 (citing *Cmty. Blood Bank*, 405 F.2d at 1019-

20).  Here, the evidence clearly shows that Defendants use Youth Financial solely

to end-run CROA (and in particular its ban on advance fees) (see PX27 Att. H at

126, 131-33, Att. K at 231-35 (Youth Financial turns over 75% of its revenue to

FES), 236-40 (same percentage to United Wealth which replaced FES), 241-43

(Youth Financial pays both fixed and variable fees to VR-Tech), Att. L at 263, Att.

M at 367 (February 9, 2022 Chris Toloff email stating that half of CM Rent's

19

payroll was funded by Youth Financial), Att. M at 381 (March 18, 2022 Michael

Toloff email regarding transfer of funds from Youth Financial: "We should keep

about 1 million dollars in YFL.  $600,000 to pay for the scholarships and $400,000

to have on hand to start with new projects that I am working on," and Christopher

Toloff response that "YFL is still transferring to FES 75%."), 506, Att. Q at 689 (in

January 2022 email, Michael Toloff notes that nonprofits "can talk to consumers

and charge their fees all day long").)

Even Defendants recognize they are elevating form over substance.  In a

February 10, 2022 email from Michael Toloff to Parimal Naik, after discussing

splitting consumer payments between Youth Financial and FES "only for a

regulator purpose," Toloff then states:

> I am really struggling with this from a regulator standpoint and would $5 fly
> if we were every [sic] challenge.  Knowing that 100% of our agents market
> the credit product and most of our customers are using the credit product can
> we get away with it.  This only concerns is if the FTC or protection bureau
> ever hit us.  Now they never have and many never, let's hope that is the case.
> States, not a problem, we can win that battle because they cannot dig that
> deep.

(PX27 Att. M at 380).  Previously, in October 2021, Toloff suggests that "we

separate the charging into UWE and UCES" and "[t]he story if questioned in the

field, is that money going to uces is non profit money, and we are separating funds

into the non profit for our scholarship and school programs.  We are not going to

mention anything about credit, or product separation.  The less they know the

better.  That will fit well in case any regulators question it." (PX27 Att. O at 647.)

In November 2021, Toloff proposed "we create a dba (for descriptor reasons only)

for UWE with same initials as UCES…To a regulator all the money is still going

to the non profit. . . That way it will look like the same company is charging . .

.This will be 100% internal, no one on the outside will know." (PX27 Att. O at

648.)  In January 2022, Toloff states "We can still move money back and forth

internally, without anyone knowing, but I just don't think any regulator will buy

the non profit is doing credit repair." (PX27 Att. O at 651.)  Meanwhile, Toloff

reminds Christopher Toloff in an April 15, 2022 email "always leave your name

off the external YFL stuff" (PX27 Att. M at 384), which information Christopher

relays to another employee "Dad and I usually fill this stuff out but just keeping

our names off anything YFL." (PX27 Att. M at 382).  And Defendants sign

responses to BBB inquiries "Financial Education Services" while the letters are on

Youth Financial letterhead.  (*E.g.*, PX27 Att. M at 385, 389, 392, 395, 398, 401-02,

405, 409, 412, 415, 418, 421, 426, 430-34, 437, 445, 448, 452-53, 456, 459, 462,

466, 469, 472, 475, 478, 481, 484, 487, 490, 495, 501.)

**8.  Defendants' Activities Are Covered by the Telemarketing Sales Rule**

Defendants assert that they did not engage in telemarketing and, thus, are not

covered by the TSR.  (ECF No. 50 at 21-24; ECF No. 51 at 38-39.)  Their

argument is based on the assertion that "no sales are conducted over the phone" but

instead through Defendants' website.  (ECF No. 51 at 39.)  Whether this is true is

immaterial—"telemarketing," as defined in the TSR, means any "plan, program, or

campaign" to "induce the purchase of goods or services" "by use of one or more

telephones and which involves more than one interstate telephone call."  16 C.F.R.

§ 310.2(gg).  The manner in which a sale is consummated is of no import.  As

demonstrated in the TRO Memo, Defendants' FES Agents make numerous

representations regarding Defendants' credit repair services and investment

opportunity during telephone conversations.  Thus, they are subject to the TSR.

### 9. Defendants Fail to Refute That They Operate as a Common Enterprise

Defendants do not substantively dispute that the various corporate

Defendants operated as a common enterprise, thus each is liable for the activities

of the whole.  Additional evidence confirms these facts.  For example, agreements

among the various corporate Defendants spell out each entity's role in the overall

operation.  (PX27 Att. K at 227-230, 231-35, 236-40, 241-43.)  Defendants sign

responses to BBB inquiries "Financial Education Services" while the letters are on

Youth Financial letterhead.  (*E.g.*, PX27 Att. M at 385, 389, 392, 395, 398, 401-02,

405, 409, 412, 415, 418, 421, 426, 430-34, 437, 445, 448, 452-53, 456, 459, 462,

466, 469, 472, 475, 478, 481, 484, 487, 490, 495, 501.)  And Defendants move

funds freely among the entities, including to fund payroll and bonuses.  (PX27 Att.

L at 263 (CM Rent's payroll funded by Youth Financial), 148 (December 22, 2021

Michael Toloff email to Christopher Toloff confirming FES's reimbursement for CM Rent employee bonuses).)

### 10. Defendants Fail to Refute That the Individual Defendants Are Liable for Injunctive and Monetary Relief

Defendants offer no evidence refuting the substantial role played by Defendant Parimal Naik.  With respect to Defendants Thompson and Christopher Toloff, they do not dispute the FTC's evidence but argue, instead, that such activity is insufficient to warrant injunctive or monetary relief and, thus, a freeze over their assets.  (ECF No. 50 at 21-22, 25-26; ECF No. 52 at 12-17,.)  The law and evidence say otherwise.  They ignore well-established case law that an individual's position as a corporate officer or authority to sign documents and control bank accounts on behalf of a corporate defendant is sufficient to show requisite control.  *FTC v. E.M.A. Nationwide, Inc*., 767 F.3d 611, 636 (6th Cir. 2014); *FTC v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014); *FTC v. USA Fin., LLC*, 415 Fed. Appx. 970, 974-75 (11th Cir. Feb. 25, 2011).  Whether they exercise that authority is immaterial.  Moreover, Defendants cite no legal authority to support their claim that involvement in "daily operations" or developing "policy or business strategy" is the touchstone for individual liability.  Likewise, they ignore that if an individual has knowledge of unlawful practices, it is appropriate to hold him liable for monetary relief.  *E.M.A. Nationwide*, 767 F.3d at 636.

And additional evidence supports the requested relief against Thompson and

Christopher Toloff.  For example, the Receiver reported his understanding that

Defendants' policies and procedures, independent sales representative agreements,

and certain FES Agent training materials, contracts, and disclosures were

developed in part by Thompson, (ECF No. 55-1 at 32) and that Thompson works

with Michael Toloff to review and develop compliance language.  (*Id*. at 36.)  He

also receives and responds to BBB and other law enforcement queries.  (PX27 Att.

H at 131-44, Att. R at 692-99.)  And emails between Christopher Toloff and other

managers show that he was actively involved in pricing decisions for Defendants'

credit repair services.  (PX27 Att. I at 151 (May 19, 2022 email from Christopher

Toloff regarding CM Rent "Just off the cuff, break even adding any other service

would be .50c per customer.  Not sure what we can add for that price, refund rate

feels pretty low to me"),152-53.)  Christopher Toloff was listed as "Chief Financial

Officer" as of November 2021 with annual salary of $376,730, although he had

already earned $599,999 (PX27 Att. J at 157-58.)  He is also designated as

"Executive/Senior Level Officials and Managers."  (PX27 Att. J at 159, 196 (paid

$81,250 as of March 31, 2022).)

With respect to Michael Toloff, Defendants argue that the three-year statute

of limitations in Section 19(d) of the FTC Act, 15 U.S.C. § 57b(d), bars relief

against him.  (ECF No. 52 at 18-19.)  He argues that because he sold his interest in

FES in September 2019, he can only be responsible for activity between May 2019 and September 2019.  (*Id*.)  Defendants are wrong on the law and the facts.  Section 19(d)'s statute of limitations applies only to the monetary relief sought by the FTC.  The FTC also seeks injunctive relief under Section 13(b) of the FTC Act, and Section 13(b) contains no statute of limitations.  15 U.S.C. § 53(b); *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 783 (7th Cir. 2019) ("Section 13(b) has no statute of limitations"); *FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31, 53 (S.D.N.Y. 2020).

Defendants are also wrong on the facts.  By their own admission, Michael Toloff continues to play a role in Defendants' operation as a consultant (ECF No. 52 at 18-19), and as 40% owner of CM Rent.  (ECF No. 52-2 at 3 ¶ 9.)  And additional evidence shows his continued substantive role.  For example, the Receiver reports that Michael Toloff is part of Defendants' "compliance team." (ECF No. 55-1 at 32, 36, 37.)  The Receiver also noted that when he interviewed Michael Toloff, Toloff indicated that managing (in the present tense) the activities of the FES Agents was the "most difficult" part of Defendants' business.  (*Id*. at 33.)  See also PX27 Att. I at 149 (May 18, 2022 email from Michael Toloff discussing CM Rent business operations concluding, "These are the 3 things we need to get going asap.  Let me know the time line on each"), 150 (CM Rent operations email from Michael Toloff dated May 13, 2022), 152-53.  A UWE

Departmental Handbook dated February 2022 states United Wealth Education is

owned and operated by Parimak Naik and Michael Toloff.  (PX27 Att. L at 247).

In response to a May 2022 inquiry from the BBB's National Program regarding

Defendants' earnings claims, Michael Toloff emails Naik regarding the fact that

Defendants' logos are on the marketing materials stating "Let's talk about it, its

one more thing that regulators will not be able to find us if we don't have the

logos."  (PX27 Att. O at 643.)  Toloff also emailed Sue Griffin "I want to take the

logos off that's how they [the BBB] found us."  (PX27 Att. O at 644.)

## B. Defendants Fail to Refute the Other Preliminary Injunction Factors

With respect to the other three requirements, Defendants offer no evidence

or argument that (1) the public equities do not weigh in favor of the requested

injunction, (2) irreparable harm will not occur absent preliminary relief, or (3) a

preliminary injunction is not in the public interest.  Accordingly, preliminary

injunctive relief is warranted.

## III.    THE COURT SHOULD ENTER THE FTC'S PROPOSED PRELIMINARY INJUNCTION

The scope of the proposed Preliminary Injunction is appropriate in light of

Defendants' past conduct and the likelihood of recurrence absent such relief.

Indeed, none of the Defendants raise objection to the majority of the preliminary

injunction.  They object only to the continuation of the asset freeze and

receivership.

The FES and Toloff Defendants also claim that the Court lacks authority to enter an asset freeze or receivership.  (ECF No. 51 at 22-35; ECF No. 52 at 17-18.)  The crux of their argument is that when the Supreme Court held in *AMG Cap. Mgmt., LLC v. FTC*, 141 S.Ct. 1341, 1344 (2021), that Section 13(b) of the FTC Act does not authorize the imposition of equitable monetary relief, the FTC lost its "ability to obtain, and a court's authority to impose, an asset freeze or receivership as ancillary to such monetary relief."  (ECF No. 51 at 23.)

Defendants' argument is without merit.  First, with respect to a receivership, the FTC sought a receiver not only to preserve assets in anticipation of a future monetary judgment but more importantly "to take control of the corporate defendant's operations; prevent the destruction of documents and computer records; [and] help identify injured consumers and the extent of consumer harm." (ECF No. 3 at 93.)  "[C]ourts have the equitable authority to appoint a receiver for the purpose of preventing future harm."  *FTC v. Noland*, 2021 U.S. Dist. LEXIS 182346, at *12 (D. Ariz. Sep. 23, 2021) (decided after the Supreme Court's *AMG* decision).  Further, *AMG* overruled one thing only—the FTC's ability to obtain monetary relief under Section 13(b); it left intact the FTC's ability to obtain preliminary and permanent injunctive relief.  As the Noland Court held:

> just as it remains permissible, post-*AMG Capital*, to issue a permanent injunction under § 13(b) of the FTC Act for the purpose of preventing future deceptive conduct that might harm consumers, it remains permissible, post-*AMG Capital*, to issue a preliminary injunction that includes a receivership

27

component if the purpose of the receivership is to prevent the same sort of ongoing harm that the ultimate object of the § 13(b) litigation—the issuance of a permanent injunction—is intended to achieve.

*Noland*, 2021 U.S. Dist. LEXIS 182346 at *14-15.  Thus, the Court has the authority to continue the receivership over the Corporate Defendants.

With respect to continuing the asset freeze, the FTC does not dispute that, post-*AMG*, it cannot seek monetary relief under Section 13(b) for violations of Section 5 of the FTC Act.  But the FTC is seeking monetary relief under Section 19(b) of the FTC Act for Defendants' violations of CROA and the TSR.  The express language of Section 19(b) authorizes the Court to grant "such relief as the court finds necessary" for violations of CROA[7] and the TSR, including "the refund of money or return of property."  15 U.S.C. § 57b(b).  The FTC has estimated that relief to be approximately $281 million.  The FTC recognizes that Defendants take issue with that number (*see* ECF No. 51 at 28-35), but the preliminary injunction stage is not the time to calculate final monetary relief.  In similar fashion, the *Noland* Court held "[a]lthough the Individual Defendants have identified various grounds for challenging [the FTC's] damages methodology, the bottom line is that the FTC has advanced a non-frivolous reason why a substantial damages award

---

[7] Section 410(b)(1) of CROA, 15 U.S.C. § 1679h(b)(1), states that a violation of CROA "shall constitute an unfair or deceptive act or practice in commerce in violation of section 5(a) of the Federal Trade Commission Act." Section 410(b)(2) of CROA, 15 U.S.C. § 1679h(b)(2), provides that the FTC may enforce violations of CROA "in the same manner as if the violation had been a violation of any Federal Trade Commission trade regulation rule."

may be in the offing in the near future" which was sufficient to support "the continuation of an asset freeze." *Noland*, 2021 U.S. Dist. LEXIS 182346 at *18.

None of the cases cited by Defendants supports their argument. In those cases the FTC sought money under Section 13(b) only, not Section 19. *See FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066 (11th Cir. 2021); *FTC v. VPL Med., Inc.*, 846 Fed. Appx. 561 (9th Cir. 2021); *FTC v. Cardiff*, 2019 U.S. Dist. LEXIS 232069, at *3 (C.D. Cal. May 16, 2019). Curiously, Defendants also cite *Noland*, 2021 U.S. Dist. LEXIS 182346, but as discussed above, *Noland* supports the continuation of an asset freeze.

In short, nothing in *AMG Capital* prohibits this court from continuing both the asset freeze and the receivership, as numerous other courts have concluded.

## V.    CONCLUSION

Accordingly, the reasons set forth herein and in the FTC's TRO Memo, the Court should enter the attached proposed preliminary injunction against Defendants.

Dated:  June 29, 2022                    Respectfully submitted,


                                         */s/Gregory A. Ashe*
                                         GREGORY A. ASHE
                                         K. MICHELLE GRAJALES
                                         JULIA E. HEALD
                                         Federal Trade Commission
                                         600 Pennsylvania Avenue NW
                                         Washington, DC 20580
                                         Telephone: 202-326-3719 (Ashe)
                                         Telephone: 202-326-3172 (Grajales)
                                         Telephone: 202-326-3589 (Heald)
                                         Facsimile: 202-326-3768
                                         Email:gashe@ftc.gov, mgrajales@ftc.gov,
                                                 jheald@ftc.gov

                                         DAWN N. ISON
                                         United States Attorney

                                         SUSAN K. DECLERCQ (P60545)
                                         Assistant United States Attorney
                                         211 W. Fort Street, Suite 2001
                                         Detroit, MI 48226
                                         Telephone: 313-226-9149
                                         Email: susan.declercq@usdoj.gov

                                         Attorneys for Plaintiff
                                         FEDERAL TRADE COMMISSION

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 29, 2022, a true and correct copy of **FTC'S SUPPLREMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION** was filed electronically with the United States District Court for the Eastern District of Michigan using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

        */s/Gregory A. Ashe*
        Attorney for Plaintiff Federal Trade Commission