```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION


FEDERAL TRADE COMMISSION,

                Plaintiff,
                                    HONORABLE BERNARD A. FRIEDMAN
      v.
                                    No. 22-11120
FINANCIAL EDUCATION SERVICES,
INC., UNITED WEALTH SERVICES,
INC., VR-TECH, LLC, VR-TECH
MGT, LLC, CM RENT, INC., YOUTH
FINANCIAL LITERACY FOUNDATION,
PARIMAL M. NAIK, MICHAEL
TOLOFF, CHRISTOPHER TOLOFF AND
GERALD THOMPSON,

                Defendants.
_____/
```

**HEARING ON MOTION FOR PRELIMINARY INJUNCTION**
**Thursday, June 30, 2022**

-   -   -

*To obtain a certified transcript, contact:*
*Timothy M. Floury, CSR-5780*
*Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard*
*Detroit, Michigan  48226*
*(313)234-2607 · floury@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Hearing on Motion for Preliminary Injunction*
*Thursday, June 30, 2022*


Appearances:

Gregory A. Ashe                    Richard W. Epstein
Julia Heald                        Matthew S. Rapkowski
Federal Trade Commission           Greenspoon Marder, PA
600 Pennsylvania Avenue NW         200 East Broward Blvd, #1800
Washington, DC  20580              Ft. Lauderdale, FL  33301
202.326.3719                       954.491.1120
  On behalf of Plaintiff             On behalf of Defendants

George S. Fish                     David W. Warren
Young Basile Hanlon MacFarlane     Joelson, Rosenberg
3001 W. Big Beaver, #624           30665 Northwestern, #200
Troy, MI  48084                    Farmington Hills, MI  48334
248.649.3333                       248.855.2233
  On behalf of Defendants            On behalf of Defendants

Lisa Messner & Helen Mac Murray    Kerry L. Morgan
Mac Murray & Shuster, LLP          Pentiuk, Couvreur
6525 West Campus Oval #210         2915 Biddle Avenue, #200
New Albany, OH  43054              Wyandotte, MI  48192
614.939.9955                       734.281.7100
  On behalf of Defendants            On behalf of Defendants


ALSO PRESENT:
     Patrick A. Miles, Jr. - Receiver
     Anthony C. Sallah
     David Hall

*Hearing on Motion for Preliminary Injunction*
*Thursday, June 30, 2022*

**I N D E X**

<u>Motion Hearing</u>                                        <u>Page</u>


Hearing on Motion for Preliminary Injunction

Argument by Mr. Ashe  ...........................13

Argument by Mr. Epstein  ........................15

Argument by Ms. Messner  ........................36

Argument by Mr. Morgan  .........................41

Argument by Mr. Epstein  ........................46

Argument by Mr. Ashe  ...........................49

Ruling of the Court .............................53

Certification of Reporter .......................65

- - -

**E X H I B I T S**

<u>Number</u>      <u>Description</u>              <u>Id'd</u> <u>Rcvd</u> <u>Vol</u>.


***None Marked, Offered or Received***

- - -

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday, June 30, 2022*

Page 4

1              Detroit, Michigan

2              Thursday, June 30, 2022

3              11:08 a.m.

4                    -   -   -

5          **THE CLERK:**  The United States District Court for the

6      Eastern District of Michigan is now in session.  The Honorable

7      Bernard A. Friedman presiding.

8          **THE COURT:**  Thank you.  You may be seated.

9          Okay.  Excuse my attire.  This afternoon -- we have this

10     case in the morning and we have only one other case that we're

11     doing by Zoom.  It's a case that we have in New York, so when

12     we're through with this case, we're going to take my interns as

13     well as my junior law clerk on a walking tour of Detroit

14     because they have not had one yet.  We didn't realize at the

15     time that it was going to be so hot out so we may have to

16     divert to a little -- but some of the history of Detroit that

17     they don't know, I thought it would be interesting to do today.

18     And Detroit's a very interesting city and has lots of quirks.

19         Anyhow, it's good to see everybody.  And this is the

20     matter of the Federal Trade Commission versus Financial

21     Education Services, et al., Case No. 22-11120.

22         May we have appearances, please, starting with the

23     Government plaintiff.

24         **MR. ASHE:**  Gregory Ashe for the Federal Trade

25     Commission.

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday, June 30, 2022*

*Page 5*

| | |
|---|---|
| 1 | **THE COURT:**  Okay.  One more time. |
| 2 | **MR. ASHE:**  Gregory Ashe for the Federal Trade |
| 3 | Commission. |
| 4 | **THE COURT:**  Okay.  Great.  And? |
| 5 | **MS. HEALD:**  And Julia Heald from the Federal Trade |
| 6 | Commission. |
| 7 | **THE COURT:**  Okay.  Thank you very much. |
| 8 | And for the defense, first starting with Financial |
| 9 | Education Services and any other ones that you may represent. |
| 10 | **MR. EPSTEIN:**  Good morning, your Honor. |
| 11 | **THE COURT:**  Morning. |
| 12 | **MR. EPSTEIN:**  Richard Epstein, and with me is Matthew |
| 13 | Rapkowski for the defendants, Financial Education Services, |
| 14 | United Wealth Services, VR-Tech, LLC, Youth Financial Literacy |
| 15 | Foundation and Parimal Naik. |
| 16 | **THE COURT:**  Thank you.  And sitting next to |
| 17 | co-counsel, just so I have -- |
| 18 | **MR. EPSTEIN:**  Matthew Rapkowski. |
| 19 | **THE COURT:**  And right next-door to him. |
| 20 | **MR. MORGAN:**  Thank you, your Honor.  Kerry Morgan |
| 21 | appearing on behalf of defendant Gerald Thompson only, your |
| 22 | Honor. |
| 23 | **THE COURT:**  Good.  The reason I'm kind of going in |
| 24 | order is when we're going through, I'd know who's speaking and |
| 25 | who's representing who.  Thank you. |

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday, June 30, 2022*

*Page 6*

1    Counsel?

2         **MS. MESSNER:**  Thank you, your Honor.  Lisa Messner

3    appearing on behalf of individual defendants Christopher and

4    Michael Toloff, on behalf of CM Rent, Inc., and on behalf of

5    VR-Tech MGT, LLC.

6         **THE COURT:**  Thank you.

7    Counsel?

8         **MR. FISH:**  Morning, your Honor.

9         **THE COURT:**  Morning.

10        **MR. FISH:**  George Fish on behalf of Financial

11   Education Services, Inc., United Wealth Services, Inc, VR-Tech,

12   LLC, Youth Financial Literacy Foundation and Parimal Naik.  I'm

13   local counsel.

14        **THE COURT:**  Nice to see you.

15   Counsel?

16        **MS. MAC MURRAY:**  Good morning, your Honor.  I'm

17   counsel with Lisa Messner for the same defendants, Michael and

18   Christopher Toloff, VR-Tech MGT, LLC, as well as CM Rent.

19        **THE REPORTER:**  Could I get your name?

20        **MS. MAC MURRAY:**  Helen Mac Murray.

21        **THE REPORTER:**  Thank you.

22        **MR. WARREN:**  Nice to see you, your Honor.

23        **THE COURT:**  Nice to see you.

24        **MR. WARREN:**  David Warren on behalf of Michael

25   Toloff, Christopher Toloff, VR-Tech Management and CM Rent.

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday, June 30, 2022*

Page 7

1    I'm local counsel.

2              **THE COURT:**   Thank you.   Just so you know, I'm glad we

3    have local counsel here.   It's always nice to have local

4    counsel; however, you're always Welcome to attend.   From my

5    experience sometimes that's all they're really doing is

6    attending, and that's good, and that's what our rule requires.

7    But in the future, if they -- if there's no reason to have them

8    here, they may be excused, depending on each client and how

9    each client feels about having local counsel present in the

10   courtroom.   I don't require your presence in the courtroom and

11   -- but it's really up to the attorneys.   I don't want to -- I

12   don't want to interfere with anybody's practice or with the

13   case at all.   So all welcome.   I see we have a lot of folks in

14   the audience.   Welcome, also.

15       We have a few matters up today.   We have -- I suspect the

16   most important one is whether or not we are going to continue

17   the TRO to a preliminary injunction.   We just received some --

18   as to the defendant's, certain defendant's requests for limited

19   modification of the order, and those just came in two days ago,

20   so I think that's what we have.

21       Starting with the plaintiff, is there anything else that

22   we have before the Court that I have not indicated?

23              **MR. ASHE:**   I think that's all, your Honor.

24       Also would just say, not on behalf of the Federal Trade

25   Commission, but the court-appointed receiver and his counsel

*22-11120; FTC v. Financial Education Services, Inc., et al.*

1   are also here.

2           **THE COURT:**  Good.

3       Thank you.  Where is the receiver?

4       Good.  Tell us your name again.

5           **MR. MILES:**  Your Honor, this is Patrick Miles, Jr.

6   I'm the court-appointed receiver.

7           **THE COURT:**  Good.  And with you?

8           **MR. HALL:**  I'm David Hall.

9           **MR. LEARY:**  Michael Leary (phonetic) of Riveron

10  (phonetic), financial advisor to the receiver.

11          **THE COURT:**  And at the end?

12          **MR. SALLAH:**  Anthony Sallah, your Honor, counsel for

13  the receiver.

14          **THE COURT:**  Thank you.  Okay.  Okay. I read your

15  report last night.  I assume that each side has received the

16  receiver's report.

17      Plaintiff, have you received it?

18          **MR. ASHE:**  We have, your Honor.

19          **THE COURT:**  Has each defendant received it?

20          **MR. EPSTEIN:**  We have, your Honor.

21          **MS. MAC MURRAY:**  Yes.

22          **THE COURT:**  Okay.  Good.  I assumed you all did.

23          **MR. EPSTEIN:**  Your Honor, there is one other

24  procedural matter for which I believe there is no dispute.  We

25  filed a motion to seal certain of the exhibits to the

*Hearing on Motion for Preliminary Injunction*
*Thursday, June 30, 2022*

Page 9

1  opposition memorandum that was filed on behalf of our clients

2  because it contained personal financial information concerning

3  the customers of several of the defendant companies.

4           **THE COURT:**  Is there any objection?

5        **MR. ASHE:**  We have no objection to that.

6           **THE COURT:**  I did not see that motion, but obviously

7  if there's no objection, it makes some sense to me that it

8  should be sealed, unless counsel has an objection.

9           **MS. MAC MURRAY:**  I do not, but there was actually two

10 motions to seal before you.  One is with regards to the

11 obligation of the trust.

12           **MR. EPSTEIN:**  As I understand, your Honor --

13           **THE COURT:**  Wait.  Counsel didn't finish.

14           **MS. MAC MURRAY:**  Thank you, your honor.

15    It's to seal the trust, the Gayle Toloff Revocable Trust,

16 and there was no opposition by the FTC.

17           **MR. ASHE:**  We had no objections.

18           **THE COURT:**  Okay.  Both motions to seal will be

19 granted and will be sealed until further order of the Court

20 because down the line we may have to unseal them, but since

21 there's no opposition, we'll seal it until further order of the

22 court.

23           **MS. MAC MURRAY:**  Thank you.

24           **MR. EPSTEIN:**  For purposes of the Court's review, the

25 CM/ECF filings that were made were redacted pending a motion to

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday, June 30, 2022*

Page 10

1  seal.  Accompanying the motion to seal, which was filed,

2  itself, in a sort of sealed --

3          THE COURT:  Right.

4          MR. EPSTEIN:  -- fashion, the unredacted versions are

5  there, so for the benefit of the Court, those are the ones that

6  need to be substituted for --

7          THE COURT:  Yes.

8          MR. EPSTEIN:  -- for the Court's review of the

9  documents.

10          THE COURT:  Great.  Good.

11      Okay.  Any other housekeeping matters?

12      Okay.  So I think this is the Government's request to

13  extend the -- or convert the TRO, so you may go first.

14      You may use the podium.  It's funny being back in court,

15  we haven't been here in so long, and the time we were, we had

16  glass everywhere?

17          MR. EPSTEIN:  Before we get started, would -- is the

18  Court's preference to use the podium or may I work from --

19          THE COURT:  You may work from there, absolutely.

20  It's not my preference, but I just wanted to make sure that it

21  was available, because for so long it has not been available

22  and so the --

23          MR. EPSTEIN:  If I could take 30 seconds.

24      I had my first hearing in person last week where I live in

25  Fort Lauderdale at -- in probably 16, 17, months, 18 months,

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday, June 30, 2022*

*Page 11*

1  and we were all there in person, the judge, the opposing

2  counsel, all the lawyers that were involved, some other

3  interested persons, everybody except the court reporter.  The

4  court reporter was going to attend by Zoom.  Okay?  This was

5  last Tuesday.  I don't know if anyone remembers, Zoom had

6  outages last Tuesday, so we couldn't connect her, so all of

7  this planning, all of these people showing up for the first

8  time in a year and a half, hearing couldn't go forward because

9  we couldn't get a court reporter, and, of course, there's no

10  court reporters wondering around the courthouse.

11          **THE COURT:**  Not anymore.

12          **MR. EPSTEIN:**  Not anymore, you know, so -- we're

13  still not there yet.

14          **THE COURT:**  There's still a lot of kinks to get out,

15  and one of them is our sound system.  Our sound system used to

16  be great, it was the best one in the courthouse, and now -- we

17  haven't had many in-court experiences, but now for some reason

18  it's not working the way it should.  We'll get them all out one

19  of these days, but it is very nice to be back in court.  I'm

20  sure most of you feel the same way.  And the first couple times

21  we were in court we had glass, glass all over here, just like

22  it is in the witness box.  And in the jury box, we had a jury

23  with glass all around them, you know.  They were kind of like

24  this, and we finally took it down and just forgot to take that

25  one down.  Hopefully COVID will slow down and we'll all be well

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday, June 30, 2022*

*Page 12*

1    and next year at this time it will be a long memory, that's

2    all.

3        Counsel?

4        **MR. ASHE:**  I was just going to -- you were mentioning

5    your walking tour.  I run and I got up extra early to run on

6    the Detroit RiverWalk.  It's quite spectacular.

7        **THE COURT:**  It's great.

8        **MR. ASHE:**  Going through some of those urban parks as

9    you're running, I guess you're running north.

10       **THE COURT:**  Oh, you went down to Davison cutoff.

11   You're heading north, yeah, yeah.

12       **MR. ASHE:**  Lovely trail.

13       **THE COURT:**  I used to be a runner and we ran at noon

14   for probably 20 years with my clerks and -- we ran all around

15   Detroit.  And I had one law clerk back then, and I said, look

16   at this.  And she'd say, I'm going to be part of this having --

17   revival.  And we went up to neighbors -- and I said no way.

18   And this was 30 years ago.  She was one of my first clerks.

19   And we'd run every day and I'd say that.  And it has really

20   turned itself around.  And every time I see her -- and she has

21   been very much a part of it.  She was a very active attorney;

22   she was the U.S. Attorney for a while.  She's teaching as a

23   professor at Michigan now and so she had really -- it's

24   unbelievable what's happened to her.

25       **MR. ASHE:**  Yeah, it's great.  I mean, it's a great

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 13

1  way to see the city.

2          **THE COURT:**  Yeah, you probably ran into Rachel.

3  Where's Rachel?  She ran about 7:00 this morning.  You may have

4  run into her.

5          **MR. EPSTEIN:**  Your Honor, we're not hearing Mr. Ashe

6  particularly well.  I don't know, maybe he needs to get closer

7  to the mic.

8          **MR. ASHE:**  Can you hear me now?  I apologize.

9          **THE COURT:**  No problem.  If you can't hear anybody,

10  including the people in the audience, raise your hands.

11  Everybody's got to hear.

12      Okay.  You may proceed.

13          **MR. ASHE:**  Okay.  May it please the Court, your

14  Honor, Gregory Ashe for the Federal Trade Commission.  As you

15  know, we're here on the FTC's motion to convert the temporary

16  restraining order that was entered in May into a preliminary

17  injunction.

18      The defendants are masters at elevating form over

19  substance, but the law looks to substance.  The FTC has

20  presented substantial evidence, both in its initial filing and

21  in its supplemental briefing, which is corroborated by the

22  receiver's preliminary report findings that the defendants

23  first violated -- well, first -- the defendant's credit repair

24  and investment opportunity scheme violated Section 5 of the FTC

25  Act, the Credit Repair Organizations Act, also known as CROA,

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

*Page 14*

1    and the Federal Trade Commission's Telemarketing Sales Rule.

2          In particular, the evidence has demonstrated that the FTC

3    is likely to succeed on the merits in showing that the

4    defendants, one, misrepresented the efficacy of the credit

5    repair services; two, charged prohibited advance fees; three,

6    failed to make critical and required CROA mandated disclosures;

7    four, misrepresented the amount of income that their agents

8    could earn by selling the opportunity; five, their investment

9    opportunity was, in fact, an illegal pyramid scheme; and, six,

10   that they provided the means and instrumentalities by providing

11   marketing materials so that others could commit deceptive

12   practices.  Second, the evidence shows that the corporate

13   defendants operated the scheme as a common enterprise, a fact

14   which is not substantively disputed in the various opposition

15   briefs; and, finally, that the individual defendants have the

16   requisite degree of control and knowledge as laid forth in

17   Sixth Circuit case law to make them liable for injunctive and

18   monetary relief.

19         Accordingly, we believe that the entry of the preliminary

20   injunction is appropriate, including continuing the asset

21   freeze and of the receivership.  And the FTC's legal arguments

22   in the factual basis are presented in great detail in our TRO

23   memo and the supplemental filing that we filed last night, so

24   we're really here to answer questions that the Court may have

25   to aid in its determination that the preliminary injunction

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 15

1   should issue.

2       We also do recognize that we filed a supplemental brief

3   late last night.

4           **THE COURT:**  I have it right here.  I skimmed it.

5           **MR. ASHE:**  I can highlight some of the key points,

6   that is if the Court finds it helpful, otherwise we really --

7   we're here to serve as an aide to the Court in answering what

8   questions that the Court may have.

9           **THE COURT:**  I appreciate that.  I have read

10  everything I could find, except the motion's seal, I guess, you

11  know, and I appreciate that.

12      At this point I'd like to hear from the other side and I

13  may have some questions.

14          **MR. ASHE:**  Thank you, your Honor.

15          **THE COURT:**  Thank you.

16      Who's going to go first?

17          **MR. EPSTEIN:**  I think I'm the first one in the

18  barrel, your Honor, thank you.

19          **THE COURT:**  Good.

20          **MR. EPSTEIN:**  I do intend to speak much longer and

21  anticipate some of your questions and hopefully answer them

22  even before you've had a chance to ask them.

23          **THE COURT:**  That's fine.  I'm not limiting anybody, I

24  just wanted to let you know I've read it, and please highlight

25  those things that you believe should be highlighted.  I have no

*22-11120; FTC v. Financial Education Services, Inc., et al.*

1  problem with that.

2        **MR. EPSTEIN:**  And, your Honor, if I may, I'm not sure

3  I heard you correctly.  Did you have an opportunity to read the

4  reply memorandum that the Commission filed?

5        **THE COURT:**  I did not read it, I skimmed it.

6        **MR. EPSTEIN:**  Okay.

7        **THE COURT:**  Just came out.  My clerk just handed it

8  to me this morning.

9        **MR. EPSTEIN:**  Very good.  I have no problem with

10 that.  Obviously, all of us were doing stuff that was probably

11 not conducive to being the most effective advocates today in

12 order to get caught up on all of that stuff.

13     I feel a different theme is -- is appropriate here.

14 Mr. Ashe has characterized our collective position over here

15 and clients and parties as being masters of form over

16 substance.  Well, first of all, I don't think any of us will

17 ever disagree that in the law, form is important, but here's

18 the counterpoint I'd like to make.  I think the real theme here

19 is that the Federal Trade Commission is a master of ipse dixit.

20 They have presented a narrative that they say exists but is

21 belied by the record, is simply not supported by the record,

22 and most importantly is actually not even supported by the

23 receiver that you appointed early on in this case.

24     The receiver's report, read carefully, says very different

25 things, sends very different messages than corroborating the

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 17

1  notion that a company or a series of companies that have been

2  actively doing business for nearly 20 years, that have

3  serviced -- well, I did the math -- just since 2015, have

4  enrolled 622,908 customers.

5       **THE COURT:**  Where are you getting the math?

6       **MR. EPSTEIN:**  Well, unfortunately, I didn't know that

7  I needed to get 2015 through 2018 until last night about

8  11:00 when I got their brief.  The 2019, '20 and '21 numbers

9  are in everybody's papers.  They're in the receiver's report.

10      **THE COURT:**  Okay.

11      **MR. EPSTEIN:**  They're in our report.  So in 2019, '20

12  and '21, the last three years which would have at least fit

13  within the statute of limitations in Section 19, there's

14  roughly 420,000 or so customers.  There are -- I have this

15  elsewhere -- roughly about 160,000, 170,000 agents, discrete

16  people that these companies have serviced, so to say in

17  broad-sweeping terms that this is widespread fraud, that this

18  is a pyramid scheme, without taking into account the actual

19  data that exists that could have allowed for an appropriate

20  evaluation of the direct marketing plan, there simply is not a

21  proper foundation to continue any sort of injunctive relief

22  against any of the corporate parties in this action.  And, of

23  course, if there's no immediate relief, interim or preliminary

24  relief as to the corporate defendants, then, of course, the

25  relief as to the individuals would necessarily fall because its

*22-11120; FTC v. Financial Education Services, Inc., et al.*

1   derivative.

2        So let me deconstruct that a little bit if we could.

3   Their argument of widespread fraud in connection with the

4   operation of the multilevel marketing plan is based upon their

5   claim of misrepresentations regarding earning potential and

6   then a declaration without meaningful support that it's a

7   pyramid scheme.  Well, as I'm sure the Court has recognized

8   from the cases that have been already cited in the moving

9   papers in this case, there is no difference in form between a

10  pyramid scheme and a multilevel marketing plan.  They are

11  exactly the same form of organization.  It's how it's used.

12  It's how it operates that's important.  And what is missing

13  from the Commission's submissions?  Why is it that this is a

14  case of ipse dixit?  There is no operational data, none, that

15  concerns any of these companies that is figures in their

16  assertion that it's a pyramid scheme or in the expert report of

17  Dr. David Givens, who, let's just be clear, is employed by the

18  Federal Trade Commission, so it's not exactly hard to see

19  exactly what his opinion is going to be.  You don't generally

20  formulate opinions, you know, that offend your master if you

21  intend to keep your job.

22        Nonetheless, I will give credit to Dr. Givens.  He uses 40

23  some odd pages in as creative a manner as I can imagine, given

24  that he has absolutely no data.  He has no operational data,

25  and the conclusion that one has to draw, that the Court has to

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 19

1    be convinced of here that this is a pyramid scheme, is that it

2    emphasizes the recruitment of agents over the sale of the

3    product.  That, if anything, is sort of the baseline element of

4    a pyramid scheme:  Recruitment for the business opportunity

5    versus sale of the product.

6         One would seemingly want to know, how much revenue was

7    generated by the sale of the product?  How much revenue was

8    generated by the sale of the business opportunity?  They never

9    asked.  They never got it, because they didn't ask.

10        Based on the declarations that we have seen here -- and

11   I'll get to those in a couple of minutes -- based on the

12   declarations, they've been conducting an investigation of this

13   company since at least 2020, if not earlier.  It's 2 1/2 years

14   now.  Never sent out a CID to the company.  Never sought

15   operational data.  They did get lots and lots and lots and lots

16   and lots and lots and lots of bank records.  But the bank

17   records only tells them money came in and money went out; it

18   doesn't tell them where that money came from.  It doesn't tell

19   them the source of the money.  It doesn't tell them whether

20   this is from customers buying the product, which would -- which

21   would suggest/indicate that this is a legitimate marketing --

22   multilevel marketing plan versus money coming from the sale of

23   the business opportunity, which is one element of a

24   determination it's a pyramid scheme.

25        Judge, it just isn't there.  The report comes to the

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 20

1  conclusion it's a pyramid scheme without knowing what the
2  actual data would reveal on the central element in what a
3  pyramid scheme is.  They dance around while looking at the
4  compensation arrangement, which everybody seemingly agrees is
5  complicated, but then if all you're starting with is the
6  contract and a schedule of how the agents get paid for selling
7  the product, how they get paid, if at all for recruiting agents
8  without knowing the success of each of those endeavors, you
9  can't tell what the balance is, because it's not a fixed
10  amount.

11      As Dr. Jovanovic points out, our expert rebuttal to
12  Dr. Givens, there is no set standard.  There is no bright line
13  that anyone has drawn.  The cases haven't drawn, and,
14  importantly, the Federal Trade Commission has not drawn.

15      I want to be clear about this because this is a legal
16  issue that goes to other parts of our argument.  There is no
17  rule implicated in a Section 5 case attacking a multilevel
18  marketing plan.  There is no rule.  It is based on
19  Section 5(a).  Fine, that's not a problem.  They have every
20  right to bring a claim based on 5(a), and they have two ways of
21  bringing it, under Section 13(b) or under Section 19(b).  So --
22  which I'll, again, get to in a minute because that is a very
23  important part of our argument.

24      What do we know about the multilevel marketing plan, how
25  it operates?  The only information -- I don't want to use the

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 21

1   word "evidence" -- the only information you have before you are

2   15 declarations from actual customers of the corporate

3   defendants.  These are the first-party declarations, which I

4   will observe.  We appreciate the quick turnaround on the order

5   on the motion to strike the other declaration I'll mention in a

6   minute.  We didn't move to strike those declarations because

7   those are appropriately used.  You know, they are first-party

8   declarations.  They were the actual declarant, you know,

9   signing a statement of what they actually declared.  There are

10   15 of those.  Only one of them relates to conduct that actually

11   occurred into 2021.  All the other ones relate to conduct that

12   occurred between 2000, as far back as '16, through 2020, so

13   most of them are, if you will, ancient history.

14       There is another declaration, the one that we moved to

15   strike, Elena Hoffman.  She recites her recollection of

16   interviews that she conducted sometimes a year, two years ago

17   from people who had filed complaints typically with the Better

18   Business Bureau.  There are 11 of those to begin with, and a

19   12th arrived last night.  I don't have it up in front of me,

20   but I thought that the beginning of that recitation of that

21   declaration -- what was the guy's name?  Kendrick?  The one

22   from last night?

23           **THE COURT:**  I haven't read the report.

24       **MR. EPSTEIN:**  Whatever.  Ms. Hoffman starts out her

25   written statement by --

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 22

1          **THE COURT:**  Fuller.

2          **MR. EPSTEIN:**  -- by saying -- by reciting that -- the

3    husband is speaking, if I remember correctly.  I can bring it

4    up.  I apologize for the imprecision -- husband is telling her

5    in 2016 or '17 or 2017 and '18, my wife told me this.

6          So this is representative of the 11 other so-called

7    witnesses that Ms. Hoffman presents.  This is -- Ms. Hoffman

8    talks to a man who is telling her about what his wife told him

9    as long ago as five or six years.  Now, how reliable can that

10   be?  How trustworthy can that be?  And that is the, you know,

11   the sort of the benchmark that we asked the Court to apply to

12   at least the 11 other statements that Ms. Hoffman relates to

13   the Court.  This is her words, her recollection of what she was

14   told by others, and in the main, almost every one of those

15   statements said Jane told John told George who told me, and

16   then that person told Ms. Hoffman, double, triple, quadruple

17   hearsay.  Yes, I understand, your Honor, and will not argue the

18   point that it goes to the weight, it goes to the reliability,

19   but there is a limit.  There ought to be a line that is drawn,

20   and this is beyond that line.

21         Those -- regardless of what they say, they really ought to

22   be ignored because they cannot be relied on, and suggesting

23   that they have the trustworthiness of residual hearsay under

24   807 is, in a word, laughable.  I mean, I've litigated that

25   issue extensively, and believe me, I can't get sworn testimony

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 23

1   under oath admitted under the residual hearsay exception, much

2   less this kind of double, triple and quadruple hearsay.

3        So I think our first point is there simply isn't a factual

4   basis for continuing the preliminary injunction, because in

5   order to continue the preliminary injunction, you're going to

6   have to make a finding, and in particular with respect to the

7   Credit Repair Organizations Act, that the defendants violated

8   it, not that there is the potential of producing evidence that

9   they violated, but they did violate it, because of the way CROA

10  works, because of the issue with respect to CROA, which I'll

11  turn to now.

12       The Federal Trade Commission has described this -- these

13  companies as a credit repair scam.  What they ignore is, well,

14  basically, facts, facts that credit repair was one of one

15  products that were sold to the customers, that there were six

16  additional products that were sold to the customers, all of

17  which products had utilization, all of which products had

18  value.  Was the lead product credit repair?  Fine, yes, it was.

19  Was much of the advertising geared toward that?  In the main,

20  it was, because it's really the starting point for the rest of

21  the package.  The rest of the bundle of services all relates to

22  allowing the user to develop a better credit life, and that's

23  what it was designed to do, education, other kinds of tools

24  that would allow for not only the improvement of their credit

25  standing through the credit repair, but also the development of

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 24

1    better habits and better credit-related skills.  And we, I

2    think, supported that more than adequately with the 16

3    declarations that we submitted from customers who had quite a

4    different story to tell about how the YFL and FES products

5    improved their lives, changed their lives in many instances.

6    There's a couple that I would just direct your attention to as

7    being, in particularly, I think, not only moving stories, but

8    representative of what has got to be a substantial population

9    here.

10       Marlene Reyes, which is docket entry 51-13, Karaunda Hurt,

11   H-u-r-t, docket entry 51-14, Robert Rodriguez, 51-15, Andrea

12   McKeithern, 51-18, and Jennifer Stamm, 51-19, what they say is

13   the counterpoint to what the FTC portrays their declarations as

14   saying, but we know they do not, and we point this out

15   repeatedly.

16       The FTC on the one hand presents at least two people who

17   complain that the credit repair product didn't work.  One of

18   them stayed in the program for six weeks, the other one for two

19   months.  Well, I mean, I don't often use colloquialisms --

20   actually, I do -- but, duh.  This is a program that takes time,

21   and staying in it six weeks or two months is never going to

22   achieve those results, and that was never -- they were never

23   misled about that.

24       The lead-off declaration they have, person never bought

25   the product.  Never bought the product.  He came to the -- his

*22-11120; FTC v. Financial Education Services, Inc., et al.*

1   own unique, individualized conclusion that this was perhaps a

2   scam, maybe, but he never bought the product.  How does that

3   support any relief at all?  There are plenty of people who

4   aren't going to buy this product, but what we do know is that

5   lots of people have.

6        Now, on the credit repair issue there is a legal issue

7   that the Court needs to confront, and it creates, I think,

8   the -- a basis for -- a second basis for denying the

9   preliminary injunction here.  YFL, the seller of the credit

10  repair product and the entity that would be considered to be a

11  credit repair organization under the Credit Repair

12  Organizations Act is a Michigan not-for-profit corporation and

13  it -- that has been given 501(c)(3) tax-free or tax-exempt

14  status by the IRS.  That is a fact.  No one is disputing that.

15  What is being disputed is not what it is, what is being

16  disputed is how it operates, and the question that the IR --

17  that the Commission has raised is not that it's a

18  not-for-profit; it is a not-for-profit.  I don't think they're

19  disputing that.  Not that the IRS has given it 501(c)(3)

20  status; I don't think they dispute that, but whether it is, in

21  fact, operating in a manner that justifies the tax exempt

22  status that is bestowed upon it by virtue of the IRS's

23  determination, which, by the way, your Honor, occurred in

24  December of 2003.  It's been a long time since this company's

25  been a 501(c)(3), and it is, at least from the standpoint of

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 26

1  its relationship with the Internal Revenue Service, it has done

2  all of the things that are appropriate.

3         **THE COURT:**  I think their position is not that, I

4  think they're position is how it is being used --

5         **MR. EPSTEIN:**  Yes, exactly, right.

6         **THE COURT:**  -- opposed to its status and so forth.

7  It's the use of it and its relationship with the other

8  entities, and that's, I think, what the whole subject of that

9  is about.  They don't believe --

10        **MR. EPSTEIN:**  And that is -- I agree with you

11  entirely, and that is exactly what I was about to say.  It

12  comes down to whether it is operating -- and I don't believe

13  I'm misstating their position -- operating in a fashion that

14  would entitle it to claim that tax exempt status.  And there

15  are a number of different tests that are applicable to that.

16     But here's the point:  Assuming, which we will for

17  purposes of today's hearing, that the Commission has standing

18  to make that claim, we have argued that it really is up to the

19  IRS, but for today's hearing alone without prejudice to our

20  position, we'll accept that the Commission has the ability to

21  challenge that aspect of it.  I went through the other part to

22  make sure that everyone knows all of those other statuses are

23  etched in stone, if you will, so this is operational.  This is,

24  again, data-driven, which you do not have.

25     In order for you to decide if the business conducted, if

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 27

1   the activities conducted by YFL fit within the framework of a

2   tax-except entity, you need to know everything it does.

3            THE COURT:  Well, I'm not -- first of all, you keep

4   saying I have to decide.  I can't decide.  I'm not the ultimate

5   decider of the facts here.  My -- what I have to take into

6   consideration are not necessarily definitive positions, No. 1,

7   but more importantly, I think they're position, from the way I

8   read it, is that even if they were not a nonprofit, the way it

9   was being used, the way it was being used as a tool for the

10  other -- the other entities, that's -- I think that's their

11  main argument, if I'm not -- it could be the nonprofit, but I

12  don't think that that's their --

13           MR. EPSTEIN:  No, they -- well, they are definitely

14  challenging --

15           THE COURT:  Absolutely.

16           MR. EPSTEIN:  -- the nonprofit status.  They have to.

17           THE COURT:  Because that changes the flow of their

18  ability to do certain things if they're nonprofit.

19           MR. EPSTEIN:  Well, it actually changes the law

20  that's applicable, because it's --

21           THE COURT:  That's true.

22           MR. EPSTEIN:  If it is a not-for-profit tax-exempt

23  entity under 501(c)(3) --

24           THE COURT:  Right.

25           MR. EPSTEIN:  -- then it is not and cannot be a

*22-11120; FTC v. Financial Education Services, Inc., et al.*

1  credit repair organization; and if it is not and cannot be a

2  credit repair organization, then CROA does not apply to it, and

3  that means that the first three of the so-called violations

4  that prompted this case, the efficacy of the credit repair

5  product, the advance fees and the disclosures, the CROA

6  disclosures, those would be inapplicable; that would not be a

7  tool available to the Commission because YFL is not subject to

8  CROA, and if CROA doesn't provide the framework for the

9  enforcement action here, then many of the other things that

10  they're asking for necessarily fail.

11       And here's why you -- I agree with you, your Honor,

12  there's -- this is very factual.  This is what lawsuits are

13  made out of.  This is what you go and you do discovery about

14  and you go in and you do a, you know, a proctological

15  examination of how the company operates and you present it to

16  the Court and you say this is -- tilts on the other side of

17  what a not-for-profit is supposed to do, but that's

18  fact-driven, that's evidence-driven, that's data-driven, and

19  you don't have any of that in front of you.  Yet, if you do

20  what the Commission is asking you to do, and that is continue

21  the preliminary injunction, you are expressly finding that YFL

22  is not exempt because there's no other way that you would have

23  the authority to enter relief against it under CROA, and they

24  are definitely asking for relief under CROA.  So you -- the

25  very act of doing what they're asking is a final determination

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 29

1    of this case as it relates to YFL, because there's no way the

2    injunction could ever have stood if CROA wasn't there.

3           So you have -- you know, so what we're basically

4    suggesting is that this is a factual issue, and when there are

5    material facts in dispute and there is not a clear path of

6    undisputed facts that would suggest that the Commission, you

7    know, has a likelihood of success on the merits, then the

8    injunction cannot survive and it just becomes a case that the

9    Commission is entitled to conduct all the discovery that they

10   wish to do and present it to you in the ordinary course once

11   the facts have been developed.

12          So asking for preliminary injunction essentially preempts

13   the ability of YFL to defend itself, because it's already

14   enjoined under a law that it ostensibly is exempt from, and you

15   can't have it both ways.

16          **THE COURT:**  And you also can't take them out.  Say --

17   because we have so many other entities that are connected.  So

18   assuming you're right, we can't take YFL out.  Assuming I said,

19   okay, we're going to extent it, but it won't apply to YFL.  The

20   whole thing falls apart, anyhow.

21          **MR. EPSTEIN:**  It depends on what kind of relief

22   you're considering giving, so that I think is a good segue --

23          **THE COURT:**  They're asking for permanent injunctive

24   relief similar to that which was temporary.  And if I were to

25   take YFL out, say, okay, you're right, they're a nonprofit and,

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 30

1  therefore, they have no jurisdiction, it wouldn't make any

2  difference because the whole thing is based upon everybody

3  together.

4         **MR. EPSTEIN:**  Not quite.

5         **THE COURT:**  Where am I wrong?

6         **MR. EPSTEIN:**  Because of the basis for the relief

7  that they're seeking.  Now we're getting into AMG Capital.

8      The Supreme Court, a year ago, April of 2021, determined

9  that the Federal Trade Commission does not have the authority

10  under Section 13(b) of the Federal Trade Commission Act to seek

11  monetary relief.  Why is that important here?

12         **THE COURT:**  Yeah.

13         **MR. EPSTEIN:**  Because it now creates a divide between

14  the two types of relief that have already been granted in this

15  case.  You've entered the temporary restraining order that

16  recites a variety of conduct-related injunctive directives,

17  affirmative and negative.  Certainly 13(b) authorizes that.

18  It's not a problem.  We're not arguing to the contrary.  Court

19  has the authority to enter that kind of TRO that governs

20  conduct, but you also imposed an asset freeze and you appointed

21  a receiver.

22      The purpose of the asset freeze, and I will quote from the

23  order, itself.  First in finding of fact I -- this is docket

24  entry 10, page 5 of the TRO -- and, remember, I'm sure this

25  order was presented to you by the Commission.

*22-11120; FTC v. Financial Education Services, Inc., et al.*

1          **THE COURT:**  I didn't draft it.

2          **MR. EPSTEIN:**  Yeah.  "This Court has authority to

3    issue this order pursuant to Section 13(b) of the FTC Act,

4    15 U.S.C. § 53(b); Federal Rule of Civil Procedure 65; and the

5    All Writs Act, 28 U.S.C. § 1651."

6          That's fine.  That's what you based your decision on

7    because that's what the Federal Trade Commission told you they

8    were basing their request on.

9          Note that there is no other cited authority in the body of

10   the TRO to any other procedural or remedial basis for the

11   issuance of this injunction.  They've hung their hat on 13(b).

12         Then in Finding of Fact F, there is good cause to believe

13   that immediate and irreparable harm to the Courts ability to

14   grant effective final relief for consumers -- effective final

15   relief for consumers, including rescission or reformation of

16   contracts and the refund of money or return of property will

17   occur from the sale transfer destruction or other disposition

18   or concealment by defendants of their assets or records unless

19   defendant are immediately restrained and enjoined by order of

20   this Court.

21         So the order is --

22         **THE COURT:**  What's wrong with that?

23         **MR. EPSTEIN:**  There's nothing wrong with that, except

24   that you're not authorized to -- you're authorized to issue an

25   injunction that says, don't destroy your records.  Okay?

1   That's fine.

2          **THE COURT:**  Okay.

3          **MR. EPSTEIN:**  Okay?  But the only basis cited in the

4   order for the asset freeze, which is a by-product of this

5   provision, the only basis cited in the order for the asset

6   freeze is rescission or reformation of contracts and refund of

7   monies or property.  This is monetary relief.  That is what the

8   Supreme Court in AMG Capital said you cannot do as a judge,

9   what the FTC cannot ask for.

10         **THE COURT:**  Read it one more time, please.

11         **MR. EPSTEIN:**  What?

12         **THE COURT:**  Read it one more time.  I don't think it

13  says quite what you said.

14         **MR. EPSTEIN:**  "There is good cause to believe that

15  immediate and irreparable damage to the Court's ability to

16  grant effective final relief for consumers, including

17  rescission or reformation of contracts and the refund of money

18  or return of property" --

19         **THE COURT:**  Okay.

20         **MR. EPSTEIN:**  -- "will occur."

21       That is monetary.  That is the -- that is the consumer

22  monetary relief.

23       The Supreme Court has drawn a very bright line between

24  structural types of injunctive orders and orders that relate to

25  monetary relief.  Under 13(b), you can't enter a money judgment

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 33

1    for restitution.

2           **THE COURT:**  No, but I can protect the -- I can

3    protect that money, which this injunctive relief does.  I can't

4    say you must pay it out or something of that nature, but I can

5    protect it.  If there's another lawsuit, they can -- they can,

6    you know, do whatever they want with that money, or it may be

7    released, I mean, but I'm not giving a monetary judgment, I'm

8    just protecting.

9           **MR. EPSTEIN:**  Well, but if you don't have the

10   authority to give a monetary judgment, then what are you

11   protecting it for?  It's not got any use if there's not ever

12   going to be a monetary judgment.  You're just holding up their

13   money in the absence of any use that the money could --

14          **THE COURT:**  There may be a definite use for that

15   money.  If you read the receiver's report there's going to be,

16   not a non- -- not a judgmental kind of judgment, kind of, but

17   we don't know what's going on, so, I mean, I'm just giving

18   you -- you know, I don't think that violates the Supreme Court.

19   It may violate the Supreme Court if I were to distribute it or

20   if I were to use it for something other than holding it to take

21   a look in terms of what the receiver may need, where the --

22   where everything stands, where it came from.  I mean, there's a

23   big dispute in this -- in the pleadings in here as to YFI [sic]

24   in terms of, you know, how they were related and not related

25   and so forth.

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 34

1       Anyhow, anything else?  Why don't you wrap it up because

2   it's getting late.

3               **MR. EPSTEIN:**  Your Honor, this is a really key point.

4               **THE COURT:**  Okay.

5               **MR. EPSTEIN:**  Because, remember, the asset freeze is

6   the individuals.  The asset freeze is the individuals, it's not

7   the corporations.  Rescission of contracts is the corporations.

8   You've appointed a receiver over the corporations.  The

9   individuals can't give rescissionary relief; they're not

10  parties to the contract, so it doesn't apply to that.  And

11  any -- any other monetary relief for consumers, again, isn't a

12  Section 13 issue.  There is a very recent decision from the

13  11th Circuit.  There are no Sixth Circuit decisions on this,

14  so, your Honor, respectfully, the 11th Circuit is essentially

15  controlling law here.

16      I'm going to quote.  It's Federal Trade Commission versus

17  On Point Capital Partners cited at 17 F.4th 1066, 2021.  This

18  is the 11th Circuit speaking regarding this very issue.  "As

19  monetary relief is no longer available under 53(b)", that's

20  Section 13(b) --

21              **THE COURT:**  Right.

22              **MR. EPSTEIN:**  -- "there is no need to preserve

23  resources for a future judgment."  Consequently, the imposition

24  of an asset freeze or receivership premised solely on 53(b),

25  not on facts, but on 53(b), which this one is --

    *22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 35

1        **THE COURT:**  Not solely.

2        **MR. EPSTEIN:**  -- is inappropriate.

3        **THE COURT:**  This one is not solely?

4        **MR. EPSTEIN:**  Yes, it is.  There is no other basis

5   that is cited in the order other than 13(b).

6        **THE COURT:**  Okay.

7        **MR. EPSTEIN:**  Now, the Commission may argue that

8   19(b) gives them scope here, but 19(b) has huge flaws.  First

9   of all, it is very limited in its scope.  It only applies for

10  the violation of a rule or -- for the violation of a rule here.

11  It could also apply for the violation of a cease and desist,

12  but there is none, so it has to be a rule violation.  And this

13  now goes back to the CROA argument.  We will acknowledge that

14  CROA is typically read as if it were a rule, but, again, if

15  there is a legitimate debate over whether CROA, applies here

16  because of the not-for-profit 501(c)(3) status, then it also

17  can't really be the basis for the kind of relief that they're

18  seeking here, plus the approach to calculating it is quite

19  difficult.  They've got to show individual consumer relief --

20  harm in order to get any kind of money judgment under 19(b).

21        **THE COURT:**  Okay.  We got to wrap it up.  Give me

22  your last, best argument.

23        **MR. EPSTEIN:**  Okay.  I would just also point out, in

24  their reply brief, they cited to case Federal Trade Commission

25  versus Noland, what we've referred to in our papers as

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 36

1   Noland 2, as justifying this kind of relief under

2   Section 19(b).  What the FTC omits in their reference to this

3   is really, really, really important, because it is the huge

4   contradistinction between that case and this case.

5        In this case there's been no ruling on the facts, because

6   you haven't been presented with the facts, so you've not

7   determined the facts.  In Noland, summary judgment on liability

8   was entered against the defendants, so when they argued that

9   AMG freed them of the asset freeze, then they were already

10  facing a liability determination.  That is the case that the

11  FTC wants you to rely on, so if you rely on that and say it's

12  applicable, you're making a finding of liability today on a

13  preliminary injunction, which, I guess, goes without saying, is

14  not proper, and we all recognize it's not proper.

15       **THE COURT:**  We do?  Who's all?

16  Okay.  That's good.

17  Okay.  Let me hear from anybody else, any of the other

18  defendants wish to speak.

19       You can stay there or you can come to the podium,

20  whichever makes you -- and give me your name, again, please.

21       **MS. MESSNER:**  Good afternoon, I guess afternoon now,

22  your Honor.  I'm Lisa Messner.  I'm going to make some remarks

23  on behalf of my clients which are the individual defendants,

24  Michael Toloff and Christopher Toloff, and on behalf of one of

25  the corporate defendants, CM Rent, and I will, out of

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 37

1  efficiency for the Court, not overlap any of my remarks with

2  those of Mr. Epstein.

3          **THE COURT:**  Thank you.

4          **MS. MESSNER:**  So, specific to Christopher Toloff,

5  there are a lot of allegations in the complaint and in the

6  filings by the FTC that just have factual inaccuracies to the

7  individual defendant, Christopher -- I'll just refer to him as

8  Christopher.  In the time that he worked there, he had kind of

9  a couple of different titles, and I think the last one was

10 chief financial officer.  It was a title, and in reality, it

11 was a total only.  His job duties were really more in the

12 nature of operating the finances of the company, paying

13 vendors, reconciliating [sic] the books, administering payroll,

14 things of that nature.  He had no actual decision-making

15 authority within the company.  And I just want to highlight

16 that we have briefed that.  We've provided the case law to the

17 Court in our briefs that talk about how that analysis on

18 individual liability does not end with just the title.  It does

19 have to actually look to the -- to the job duties of the

20 individual defendant.

21      And then I just wanted to briefly respond to the Court.  I

22 know you had indicated, your Honor, that you just had an

23 opportunity to skim through the FTC's response last night, but

24 they do cite --

25          **THE COURT:**  No, this morning, but go on.  They just

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 38

1    handed it to me this morning.

2         Go on.

3         **MS. MESSNER:**  This morning, right.

4         The FTC cites three cases in there to suggest that the

5    title alone is determinative for the Court in terms of looking

6    at individual liability.  I would just note for the court that

7    those three cases are FTC versus Ross, FTC versus EMA

8    Nationwide, and FTC USA Financial, and in each of those

9    instances, there's a very marked factual distinction between

10   this case in that those corporate officers had authority to

11   borrow funds on behalf of the companies.  They had the

12   authority to sign corporate resolutions on behalf of the

13   companies.  They had personally been involved with the actual

14   creation of the product, services or advertisements that were

15   alleged and found to have been violative of the Act, and so we

16   would just highlight for the Court that the case is relied upon

17   in the filing, the most recent filing by the FTC as to the

18   individual defendant, Christopher Toloff, are distinguishable.

19        And you heard Mr. Epstein talk about how under

20   Section 19 -- he explained the different between 13 and 19 --

21   in the event that the Court does rely on Section 19 in making

22   any determinations as to the preliminary injunction specific as

23   to the individual defendant Michael Toloff, that Section 19

24   carries a three-year statute of limitations.  The reason that

25   that is significant as to the individual defendant, Michael, is

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 39

1   that he actually retired and sold his interest in FES in May of

2   2019.  He was diagnosed with a long-term medical condition and

3   that just became, you know, the reality for him, but given

4   that, the three-year statute of limitations captures him for

5   only about three months, four months' time period, and in that

6   three- or four-month time period within the FTC submissions,

7   there's no quantification of what damage might actually -- what

8   consumer harm might actually exist during that time.

9        And then, lastly, as to our corporate defendant, CM Rent,

10  this is a company that is somewhat of a stand-alone company

11  from the other entities.  It is based out of Colorado, and the

12  company's objectives are to report rental income data to the

13  credit reporting agencies, and in the FTC's original

14  submissions, there is information that is submitted by the FTC

15  that is the declaration of at least one witness is just

16  demonstrably false.  The declaration that was submitted by Lisa

17  Willis of Equifax contains the statement that they've never had

18  a relationship with CM Rent and that they never took this

19  rental reporting income as --from this furnishing, and that's

20  not true.  They signed a contract with CM Rent in 2021 that has

21  been proffered to the Court as part of our filings, and you

22  will see it within the evidence that we've presented.

23       Significantly, the FTC didn't even refute that in the

24  filing that they submitted last year.

25       And the other two filings we would just highlight don't

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 40

present to the Court credible evidence, and I'll just highlight briefly why that would be:  First, a declaration was submitted by the FTC of Ethan Durham with FICO, and he essentially says rental history is not significant under the FICO scoring mechanism, is inconsistent with the statements within his own declaration to the point that every scoring program of FICO since 2014 has had rental history as a factor, and that 35 percent of a person's FICO score under any scoring mechanism is based on payment history.

So we just would highlight those issues for the Court, and then, lastly, we would point out that, similarly, the FTC submitted a declaration from Marianne Litwa of TransUnion, and although she does not include this within her declaration, TransUnion has also contracted with CM Rent to receive the furnishing of the rental information.

And then, lastly, I would conclude as to CM Rent that your Honor has in front of him in the submissions, the declaration of Dr. Jovanovic in which he opines about many, many different things, but specific to CM Rent he discusses white paper and historical data to strongly suggest that rental income is an extremely important furnishing to the credit reporting agencies, particularly for persons who have traditionally been not having the same equal access to credit, and that would be people typically in a lower socioeconomic status that have limited access to credit and affordable housing, and all of

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 41

1   that information is before your Honor in our submissions, and

2   otherwise I will rest on my remarks and ask if you have any

3   questions that I might answer for you.

4           **THE COURT:**  No, I don't at this time.  Thank you very

5   much.

6           **MS. MESSNER:**  Thank you so much.

7           **THE COURT:**  Anyone else?

8       Please.  And may I have your name one more time.

9           **MS. MAC MURRAY:**  May it please the Court, my name is

10  Helen Mac Murray, and I want to speak to the motion for limited

11  modification of the TRO.

12          **THE COURT:**  You know, yeah, I was going to do that

13  separately.

14          **MS. MAC MURRAY:**  Okay.

15          **THE COURT:**  Because I have not -- it just came in,

16  too, and I just looked at it very quickly, but it's an issue I

17  want to talk about, but let's get our primary issue out of the

18  way first and then intend to talk about that one.

19          **MS. MAC MURRAY:**  That's fine.  Thank you, your Honor.

20          **THE COURT:**  Okay.  Does the --

21      Come on.  It's okay.

22          **MR. MORGAN:**  All right.

23          **THE COURT:**  Your name again one more time.

24          **MR. MORGAN:**  Kerry Morgan appearing on behalf of

25  defendant Gerald Thompson who's in the courtroom today, your

    *22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 42

1    Honor.

2          THE COURT:  Great.  I always like the clients here

3    because then they know what's going on, so --

4          MR. MORGAN:  Well, he's a transactional guy so I had

5    to kind of show him how to get through security and everything.

6          THE COURT:  Right, the whole show.

7          MR. MORGAN:  I had to say, don't stand up and say

8    "That's not true" or something like that, so --

9          THE COURT:  You have to show him how to practice law.

10   That's what trial attorneys say, you got to tell the

11   transactionals how to practice law.

12         MR. MORGAN:  There you go.

13         THE COURT:  Okay, Kerry.

14         MR. MORGAN:  Your Honor, we filed a brief, Document

15   No. 50, and said, I think, what we should have said.  We also

16   filed a supplemental declaration of Mr. Thompson last night,

17   which underscores a few of the things I want to mention here

18   today.

19       Mr. Thompson is in this suit essentially because he was

20   the president of YFL, the non-profit, the 501(c)(3) exempt

21   nonprofit, but what I think is not well appreciated is the fact

22   that he's also an attorney.  He's licensed in the state of

23   Michigan.  He's a P29003.  I know you probably know where that

24   fits into the hierarchy.

25         THE COURT:  I'm P13221, so --

*22-11120; FTC v. Financial Education Services, Inc., et al.*

1       **MR. MORGAN:**  All right.  So you got yours when they

2   first started giving out Bar numbers.

3               **THE COURT:**  I did.

4               **MR. MORGAN:**  I'm not quite there.  I'm in the 32000s,

5   but he's been around.  And being a transactional lawyer, he

6   represents clients that do nonprofit, that do IRS tax

7   exemption, bylaws, articles, contracts, the usual stuff you

8   would always expect a competent transactional attorney to

9   perform.  And, in fact, he did perform those functions for some

10  of the corporate defendants here, YFL and FES.  And he

11  originally billed for those through his law firm.  He and his

12  father were originally a law firm together, he practiced law

13  before he passed away, and to have more of an administrative

14  convenience, they set up a retainer agreement where

15  Mr. Thompson would be paid monthly for providing legal

16  services.  The receiver, in his report at page 35, notes that

17  Mr. Thompson is an attorney and does provide services, and I

18  don't think that's generally disputed, but in the Government's

19  case, they look upon Mr. Thompson's conduct in whatever he does

20  is all under his president hat, not under his lawyer,

21  arm's-length, providing legal services hat.  And, of course, as

22  an attorney, I would hope that the Court would see that the

23  practice of law doesn't really come within the regulation of

24  the FTC.  I did review the supplemental brief filed by the

25  Government, and they talk about Mr. Thompson on page 24 and

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 44

1  they state, "Additional evidence supports the requested relief

2  against Thompson and Christopher Toloff."

3         **THE COURT:**  So what you're asking today is to exclude

4  Mr. Thompson from any relief I may give or not give?

5         **MR. MORGAN:**  I don't think he should be in this case,

6  your Honor.

7         **THE COURT:**  I don't know about in the case, I'm just

8  talking about today the issue is whether or not we should --

9         **MR. MORGAN:**  I would ask that --

10        **THE COURT:**  You would say that you would like --

11 based on his professional services and so forth, that he should

12 be an excluded person from this particular, if I was to enter a

13 preliminary injunction, I can't do anything about the case.  Is

14 that basically your bottom line?

15        **MR. MORGAN:**  The scope of relief, yeah, the TRO and

16 the preliminary injunction.

17     You didn't happen to see my notes before I got up here,

18 did you?

19        **THE COURT:**  No, I didn't, but I know that makes good

20 sense.  It's a good argument.

21     Let me look at the plaintiffs.  You would have no

22 objection to that as to him only as to the injunctive relief,

23 would you?

24        **MR. ASHE:**  Actually, we would respond that, you know,

25 there is no attorney exception in Section 5.

*22-11120; FTC v. Financial Education Services, Inc., et al.*

1    **THE COURT:**  I'm not making that ruling, I'm making a

2    ruling just based upon an attorney's relationship with the

3    client, it's probably -- he didn't intend to be in part of

4    this, and he still has to be part of the lawsuit, because I

5    can't make a factual -- but I think it makes some sense just to

6    exclude him from any relief that the Court may or may not give.

7    **MR. ASHE:**  Obviously that's, you know, in the Court's

8    discretion.

9    **THE COURT:**  Good.  If I decide to give some relief,

10   I'm going to exclude him based upon his attorney-client.  And

11   he'll still be part of the case and I'm sure he'll file the

12   appropriate motions and stuff.

13   **MR. MORGAN:**  So, your Honor, if I --

14   **THE COURT:**  You don't have to argue --

15   **MR. MORGAN:**  You know, my years of practice tell me

16   to sit down right now.

17   **THE COURT:**  Yes, right.  As they say, when you're

18   winning, have a seat.

19   **MR. MORGAN:**  I just wanted to let you know my client,

20   you know, it's like, I'm doing my job, so --

21   **THE COURT:**  No, no, I agree with you.  You did a good

22   job.  You pointed out the things that I wanted to know about,

23   and I have heard that argument in other kinds of cases, and I

24   tend to say we're going to assume that he was acting in his

25   attorney role.  I suspect he was getting paid in his -- but

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 46

1  that's not here nor there, and I don't think that excluding him

2  has any bearing on anything at this point.

3        **MR. MORGAN:**  And he was not even a paid -- he

4  received no compensation.

5        **THE COURT:**  Okay.  You won.  Your winning, so --

6        **MR. MORGAN:**  Thank you, your Honor.  I'll sit down

7  and hopefully my client will pay me for all this.

8        **MR. EPSTEIN:**  This is our only opportunity to talk to

9  you.  If I could get a couple more minutes, I wanted to finish

10  the point on the statistics that I had started on you asked

11  about, I didn't finish that, and I wanted just to point out a

12  couple of things about the receiver's report as you go through

13  that, because you're obviously going to place great weight on

14  it.

15        **THE COURT:**  Great weight.

16        **MR. EPSTEIN:**  Okay.  If you can just give me three,

17  four minutes.

18        **THE COURT:**  Go on.  Three, four minutes.

19        **MR. EPSTEIN:**  Now we had gone back -- the reason I

20  come back to 2015 and came up with the numbers that I did,

21  623,000 customers since 2015, is that yesterday the FTC filed a

22  spreadsheet that showed their complaints since 2015, a total --

23        **THE COURT:**  I have not seen it, but go on.

24        **MR. EPSTEIN:**  Yeah, it's in there.  That's why this

25  is a pertinent observation.

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 47

1     So they start January of 2015, they run it through January

2   of 2022.  They show 454 complaints during that time, so I asked

3   the client, you know, we already have the numbers for '18, '19

4   and -- strike that -- '19, '20 and '21, what are the other

5   numbers?  Turns out that during the period of time that the

6   consumer sentinel report, that's their consumer complaint

7   portal, provides the 454 reports, they had 62 -- 623,000

8   customers enrolled during that period of time.  The number of

9   complaints that they are showing there -- now, it may not be

10   the entire universe of complaints, but if it is to be given

11   relevance.  454 complaints amounts to point -- I believe.

12   Could be off a digit -- .007 percent, seven 1000ths of a

13   percent of the customers.  Could be seven 100ths, but I'm not

14   real good with this calculator, so an infinitesimal number of

15   complaints versus customers.  If you add the agents to it, a

16   discrete group, it's 881,000 discreet individuals, it drops

17   done to .005 percent, five 1000ths of a percent.  You're being

18   asked to make a determination of a likelihood of success on the

19   merits on a number of complaints -- this is the only evidence

20   you have of any wrongdoing -- a number of complaints that

21   doesn't even go to the left of the decimal point.  So we're

22   saying, this is -- you know, and, of course, the same thing

23   could be said about ours.  We put in 14 -- excuse me -- 16 that

24   said wonderful things about the company.  There's a lot of

25   people out there that haven't said anything about the company.

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 48

1  But all it's saying to you, Judge, is that you don't have

2  enough to make any determination as to likelihood of success on

3  the merits, because if you just balance our declarations

4  against theirs, they cancel each other out and there's nothing.

5      Now, the second thing, be very careful about this

6  receiver's report.  I am going to ask the Court to not go to

7  the end and see how the book ends, go on and see what the

8  conclusion is, because --

9          **THE COURT:**  I've already read it.

10         **MR. EPSTEIN:**  -- in our view, the conclusion is

11 completely disconnected from the body of the report.

12     At about a dozen places, the receiver talks about the

13 procedures, the programs, the policies that are already in

14 place.  Talks about the Georgia consent agreement that was

15 entered into in July of 2019.  He says that the Georgia consent

16 agreement, about it, he says the company has complied with it.

17 They have done the things that the state of Georgia told them

18 to do that they agreed to do.  They've done those things.

19 That's not a company that is permeated by widespread fraud,

20 it's a company that follows the directions it's given by a

21 regulator.

22     There's --

23         **THE COURT:**  Okay.  Two minutes.

24         **MR. EPSTEIN:**  -- policies and practices -- here's the

25 basic premise.  The receiver has told you in this report

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 49

1  there's an infrastructure in place, a good infrastructure, one

2  that would be -- that would be capable of running a business

3  legally -- not that it's not being run legally.  So it's

4  already there.  This isn't one of these that there's nothing

5  there.  The entire infrastructure is in place.  They even talk

6  about, you know, the vetting of advertising.  Didn't say that

7  it's not being done, it says that there's not enough people

8  doing it.  So what does that tell you, your Honor?  It tells

9  you that if you have the infrastructure in place, you have the

10 policies, you just need to staff it up.  And there's plenty of

11 ways to do that, and what that means is that the company gets

12 to make that decision.  The decision of how to implement the

13 existing policies belongs to the company.  The decision at the

14 conclusion as to whether this can make a profit, that is a

15 decision for the companies to make, not for a receiver or the

16 Federal Trade Commission to make.

17          **THE COURT:**  Okay.

18          **MR. EPSTEIN:**  Thank you.

19          **THE COURT:**  Commission have any rebuttals, any short

20 rebuttal?

21          **MR. ASHE:**  It'll be short, your Honor.

22          **THE COURT:**  Thank you.

23          **MR. ASHE:**  I would like to just start off, with

24 respect to CM Rent and the declaration from Equifax, I guess we

25 have a little egg on our face on that one.  Equifax is a big

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 50

1  company and I don't believe it was intentional on the part of

2  Ms. Willis, who is a corporate officer, that they may have

3  overlooked that, but, you know, I certainly apologize to the

4  Court if that statement turned out to be inaccurate.  I don't

5  think it changes anything.  It doesn't change, certainly, what

6  the FICO declaration talks about, that even if the rent is

7  being reported, it's only going to -- it's only a small part of

8  what goes into the FICO score.  You know, we certainly think,

9  you know, reporting rent's important, and we're glad FICO is

10  finally doing it.  I think what -- something about the FICO

11  scores.  FICO 8 -- they have numbers -- FICO 8 and before, rent

12  was not reported to it.  Starting in FICO 9, it is.  Most

13  lenders still use FICO 8, but that's -- the main thing I wanted

14  to say, and maybe the Court doesn't need to hear more on this,

15  is two points, one on the nonprofit status, and the second on

16  the AMG issue.

17      I think the defense seemed to conflate -- the First

18  Circuit in Zimmerman versus Cambridge Credit Counseling says

19  that the language of CROA, it's two parts, nonprofit and 508.

20  You know, they've read that -- every district court, you know,

21  that it's interpreted, said it's two parts:  You have to be

22  nonprofit and you have to be 501(c)(3) exempt.  You know, for

23  purposes of this position, we concede that, you know, it's up

24  to the IRS to determine 501(c)(3) status, but the courts have

25  long held that whether it operates as a non-property is an

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 51

1   issue for the Court, and the record is clear that it is, and I

2   think just -- I know we have in our brief, but I think it's

3   worth repeating, even the defendants, you know, recognize that

4   they're elevating, you know, form over substance.  In February

5   2022, Mr. Michael Toloff says, you know, "Knowing that a

6   hundred percent of our agents market the credit product and

7   most of our customers are using the credit product, can we get

8   away with it.  This only concerns us if the FTC or Protection

9   Bureau ever hit us.  Now they may never have and -- they never

10  have and they never.  Let's hope that is the case.  States, not

11  a problem.  We can win that battle because they cannot dig that

12  deep."

13      Later they said, "We're not going to mention anything

14  about credit.  The less they know, the better.  That will fit

15  well in case any regulators question it.  To a regulator, all

16  the money is still going to the nonprofit.  This will be a

17  hundred percent internal, no one on the outside will know."

18      In another email, "We can still move money back and forth

19  intentionally without anyone knowing, but I just don't think

20  any regulator will buy the nonprofit is doing the credit

21  repair."

22      So, clearly, they even know that this is all one big

23  operation that is subject to CROA.

24      Briefly on the AMG issue, just to clear it, because it is,

25  I think, a little bit confusing.  So, yes, the Supreme Court

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 52

1  last year ruled that under 13(b) of the FTC Act, the FTC cannot

2  seek money for violations of Section 5 of the FTC Act.  The

3  Supreme Court said nothing about our ability to seek money

4  under Section 19, which is for violations of rules.  So clear

5  the TSR falls under that.

6        In the statute of CROA, Congress expressly states that for

7  purposes of FTC enforcement, a violation of CROA is deemed a

8  violation of a trade regulation rule.  So, therefore,

9  Section 19 allows us the ability to seek monetary relief for

10  violations of CROA.

11        With respect to the issue at hand whether an asset freeze

12  should be in play, the court in Noland, which the fact that it

13  was summary judgment on liability had been issued is a

14  distinction without a difference in the case.  What the Court

15  held, as long as the Commission has a nonfrivolous argument for

16  monetary relief, which we do here, because this Court can enter

17  monetary relief under Section 19; therefore, it is appropriate,

18  as this Court, you know, pointed out earlier, to preserve

19  assets, and Section 13(b) gives that authority to enter the

20  injunction of the asset freeze to preserve the ability for

21  Section 19 later on, because, as this Court pointed out, this

22  is not a final ruling on the merits, this is just is there a

23  likelihood of the success on the merits, and, you know, unless

24  the Court has any further issues --

25              **THE COURT:**  No, thank you.

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 53

1      **MR. EPSTEIN:**  Your Honor, if I may.

2      **THE COURT:**  No.

3      **MR. EPSTEIN:**  What I just heard from Mr. Ashe is that

4  they're seeking an amendment, an effective amendment to the

5  TRO.

6      **THE COURT:**  It's okay.  That's okay.

7      **MR. EPSTEIN:**  It doesn't cite to Section 19, and he

8  wants to support it on that basis.  Is he moving to amend?

9      **THE COURT:**  It doesn't make any difference.  Okay.

10  Have a seat, please.

11      **MR. ASHE:**  One more point.  Since we're at the

12  conclusion of the issue of the preliminary injunction hearing,

13  we know that the temporary restraining order, I believe, and

14  correct me if I'm wrong, expires today, and I'm assuming the

15  Court's going to take this under advisement, so we ask that the

16  TRO be --

17      **THE COURT:**  I'm not taking it under advisement, I'm

18  going to rule in about --

19      **MR. ASHE:**  Oh, well, never mind.

20      **THE COURT:**  -- as soon as Mr. Epstein sits down.

21      Okay.  Hold on one second.  I have to first take my pill.

22      I'm sorry.  That's how I know what time it is every day,

23  it rings at 12:30.

24      Okay.  This is a very unusual case for me because I

25  can't -- can say that I've never had anything close and I've

*22-11120; FTC v. Financial Education Services, Inc., et al.*

1  never had a FTC case before and I've done a lot of reading,

2  that's for sure, because each side has done a lot of filing.

3  I've looked at everything and I've thought about things.  I've

4  listened to the arguments on the defense side and also read

5  everything that the plaintiffs have to say, and it's just

6  interesting because I've learned a lot, and the receiver, I

7  believe, did a fabulous job, also, in putting things together.

8      We know that injunctive relief is extraordinary relief.

9  It's the kind of relief that the Court has to think about, the

10 Court has to justify, the Court -- it's relief that should not

11 be given until such time as there's adequate reason to do so.

12 And then I started thinking about, especially listening to the

13 argument today, what standard.  You know, when I was putting

14 this together in my mind, what standard do I use?  Do I use by

15 preponderance of the evidence?  But I don't have any evidence

16 so I can't use preponderance of the evidence, all I have are

17 pleadings, and pleadings, as we all know, are not evidence.  I

18 have affidavits that are disputed, so what do I use as a

19 factor?

20     Most cases that I've always had in terms of injunctive

21 relief have been, you know, kind of cut and dry.  A broker

22 leaves their firm and the firm sues them because they violated

23 their noncompete clause and they want an injunction for their

24 book of business, those kind of injunctions.  Or where

25 there's -- they come in and there's a really [sic] safety

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

*Page 55*

1  hazard.  This is one that is based upon a lot of statutory as

2  well as case law as well as administrative law, and I think,

3  whether it is a complicated case like this one or it is a

4  simple case, I think that there's still four factors,

5  injunctive relief.  It doesn't make any difference what kind of

6  case it is or how much money is involved or whether there's no

7  money involved but there's other things involved, so I still

8  use the four factors.  And, again, using the four factors in

9  this case and using a standard, something less than -- or I

10  shouldn't say less, but some standard, you know, of putting it

11  all together.

12      So I first look at the likelihood of success, and I, at

13  this point I've heard -- I've read first and, of course, heard

14  argument today of each side.  I think I heard your opening

15  statements today.  And I don't think one side or the other has

16  more of a likelihood of success than the other.  I think it is

17  a complicated case.  I think there's lots of rules and

18  regulations and things that are involved.  And the other thing

19  is, is that we have multiple entities, and that's why when

20  counsel was arguing about the status of whether it's nonprofit

21  or profit and the Government is saying that, you know, hey,

22  they're facilitating this, no matter what it is, they're

23  facilitating, basically, is what they're saying.  So I don't

24  think there's any more likelihood or non-likelihood for either

25  side at this point.  The irreparable harm is -- and, again,

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 56

1    there's -- the plaintiff alleges irreparable harm to the

2    community and to those persons that are involved and credits in

3    seeking their credit scores to be higher so that they have an

4    opportunity to be able to function in terms of loans or rents

5    and so forth, but also we have -- so that's -- we have

6    irreparable harm also to the defendants.  They have a business

7    and I've read the report of the receiver, and the receiver's

8    bottom line is, he doesn't believe that it can be run at this

9    point.  But they have a -- they have a core there already, and

10   so I think that there is going to be irreparable harm to both

11   sides and I'm very concerned about both sides.  I won't lie to

12   you, I'm very, very concerned about the public and the

13   allegations that are made by the plaintiffs in this matter, but

14   if I were not to issue any extraordinary relief in this matter,

15   I have another solution to that, and I would imagine that with

16   all the allegations that are made in this lawsuit, that

17   there's -- that everybody is going to be straight and forward

18   because everybody would be looking at them, the plaintiffs as

19   well as each defendant and so forth, and we all know what's

20   happening.

21       So I think there is irreparable harm to both sides, very

22   frankly, and I don't know if the harm to the public is going to

23   continue, or the harm to the system, and there is harm to the

24   system.  The Federal Trade Commission has a statutory

25   obligation to do certain things, but I don't think that

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 57

1    anything after what's been filed here and what we've heard here

2    in open court and what we see in the orders and what we've seen

3    in the affidavits and we've seen in the statistics and we've

4    seen in the report of the receiver, that it's likely at all

5    that anything that may have been done -- and I'm not saying

6    there was anything done at all.  I have no idea.  I'm not here

7    to do the facts.  The jury will tell us what the facts are, but

8    I don't think there's any -- any chance of anything to continue

9    with all the eyes and ears that are going to be on this case.

10        The equitable balances, I mean, I think that, again, the

11   equitable balance is very strong on the Government because

12   that's their duty and they are out there to protect certain

13   things that no one else can do but the Government.  But, again,

14   the equities of the defense also have equities, and their

15   equities are that they have a business.  If it's run illegally,

16   as I indicated before, it's not going to be from this day

17   forward, for sure, because there's a lot of eyes and ears on

18   that business, and in the public interest -- and I think the

19   public interest -- we always talk about the public interest.

20   The public interest, yes, is usually, you know, the enforcement

21   of regulations and laws and making sure that that which is

22   alleged in this complaint does not happen.  But we also have a

23   public interest of promoting entrepreneurial endeavors and we

24   have public interest in allowing people to conduct their

25   business in a lawful manner.  And, again, I say lawful, because

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 58

1    I'm not saying this was unusual or anything else, but, again, I

2    presume it's going to be totally lawful after today because

3    everyone's going to be watching.  And I'm not saying that

4    anything happened before.

5        So I think the solution is to convert the receiver to a

6    monitor, and I'm going to appoint the receiver as a monitor so

7    that we have a situation where, as I indicated, we know that

8    both sides are adequately protected -- and I said both sides

9    have to be protected -- and I think that the receiver -- and I

10   compliment Mr. Miles.  I think he did a lot of work and his

11   staff did a lot of work, and I think he'll be an excellent

12   monitor because now he knows everything about it and he's had

13   experts with him and so I am going to appoint him as a monitor.

14   And we can talk about what a monitor's obligation or, you

15   know -- but I think we all know it's monitored to make sure

16   that the businesses are being conducted according to the law,

17   that he may speak to each side ex parte, he may, you know,

18   gather you together to speak and so forth.

19       And if you want to try between yourselves putting together

20   an order, that's fine; if not, we'll put together an order.

21   But the reason for the monitor is two-fold:  No. 1, to satisfy

22   the obligation to the Court under the injunctive relief to

23   satisfy -- to protect the public and to protect -- when I say

24   "the public," the defendants are public too, so both sides.  I

25   think it's one of those win/win situations.  And so I will

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

*Page 59*

1  appoint him there.  That -- his fee will -- if there's money in

2  the pot, so to speak, his fee will come out of that.  If

3  there's no money in the pot, then the plaintiffs and defendants

4  will split his fee, but from what I've read, there's some money

5  in the pot, so I don't think it's going to be a problem.

6       Mr. Miles, are you willing to accept as the monitor?

7            **MR. MILES:**  Your Honor, I am.

8            **THE COURT:**  Okay.

9            **MR. MILES:**  I have experience being a monitor.

10           **THE COURT:**  That's even better.

11           **MR. MILES:**  I understand my role perfectly well.  And

12  when I was U.S. Attorney, I appointed monitors.

13           **THE COURT:**  That's right.  I forgot.  That's right.

14  So we have a perfect candidate.

15       And your report was excellent.

16           **MR. MILES:**  Thank you, your Honor.

17           **THE COURT:**  So, Mr. Epstein?

18           **MR. EPSTEIN:**  Defendants are fine with that, your

19  Honor.  I suggest, since we've all done this before, that we

20  have a meet and confer amongst the three of us, of our group

21  and the FTC, come up with the terms of the monitorship order.

22  I think we can do that.

23           **THE COURT:**  Good.  And Mr. Miles, I'm sure, has a lot

24  of experience in doing this, so why don't you do that.  Let's

25  say within the next 10 days, that should -- we have the holiday

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 60

1    coming, so let's say two weeks, because I know we're closed

2    tomorrow and so -- within two weeks present an order, but

3    Mr. Miles may continue as he's doing now but as a monitor,

4    so --

5           **MR. EPSTEIN:**  All right.  So as of today on the basis

6    of the order, he's now been denoted as the monitor so that the

7    parties can then retake possession --

8           **THE COURT:**  Yes.

9           **MR. EPSTEIN:**  -- of business in his oversight.

10          **THE COURT:**  Yeah.  He'll -- he's the monitor, so you

11   can't just all of a sudden he'll tell you how to do it.  And

12   you guys will figure it out.  And the temporary restraining

13   order is -- it expires today, anyhow.

14          **MR. EPSTEIN:**  Yeah, I just wanted to make sure, as of

15   today, the transition will occur as of today, even in the

16   absence of the written order based on the oral order that you

17   made today?

18          **THE COURT:**  Yes.

19          **MR. EPSTEIN:**  Thank you.

20          **THE COURT:**  Tomorrow, you know, commerce is closed,

21   so it'll take two weeks to get everything organized.  Okay?

22       And then we have not done a scheduling conference, and we

23   can do that -- I wanted this in person.  We can do that by

24   Zoom.  And I'll -- maybe you can put together -- you guys know

25   more about the Rule 26, and now I like to do scheduling

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 61

1  conferences in person because I like to see the people, but

2  I've seen everybody today and I'm glad to have seen you.

3      Yes.

4      **MR. MILES:**  Your honor, just to clarify on the point

5  that counsel just made about effectiveness of the transition,

6  because, as a receiver, we took control of the company,

7  obviously, and all of its assets and accounts.

8          **THE COURT:**  Right.  It'll take you a while to --

9          **MR. MILES:**  Right.

10         **THE COURT:**  That's why I said within the two weeks --

11  you're still the receiver until we get the monitor in place,

12  because otherwise things would be crazy.  You'll notify the

13  banks and each side and so forth.

14         **MR. MILES:**  Thanks for that clarification, your

15  Honor.

16         **MR. EPSTEIN:**  What's going to be -- presumably -- you

17  haven't said it out loud yet, but presumably, the motion to

18  convert to a preliminary injunction is denied in part, granted

19  in part to appoint the monitor, but the injunctive

20  provisions -- there's two parts of it, the injunctive

21  provisions and the asset freeze that you have not addressed.

22  Can we assume --

23         **THE COURT:**  Those also, as of today, are subject to

24  the receiver doing it in an orderly fashion.  That's why I'm

25  saying, it's as of today, but the receiver has jurisdiction to

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 62

1  do it, so it make take two weeks to do it.  I'm not -- you

2  know, I don't want somebody running to the bank and say -- you

3  know, the receiver will do it.  He'll contact the bank.  He'll

4  do all the things that are necessary to unwind the temporary

5  restraining order as of today.  That means, like, if there's an

6  obligation or something that's next week and he hasn't had a

7  chance to do it, it's still the obligation.  I can't think

8  exactly of all the things, but it can't happen all of a sudden;

9  it's going to take --

10        **MR. EPSTEIN:**  No question there's going to be some

11  time involved, because mechanically in order to free up

12  accounts, things like that, we're going to need your order.

13        **THE COURT:**  I know.  And also we're going to need the

14  receiver, now the monitor, to facilitate it.

15        **MR. EPSTEIN:**  And that's as to the companies, but as

16  to the individuals --

17        **THE COURT:**  Individuals, all you need is my order.

18        **MR. EPSTEIN:**  Yeah, we just need your order.

19        **THE COURT:**  And as soon as we get the order, we'll

20  sign it.

21     Anything else?

22     Okay, let's do a Zoom scheduling conference.  I think it's

23  better.  Why don't you guys meet and confer, do all the things

24  in 26, see how much time you need for certain things, you know,

25  and then we can talk about it.

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 63

1        **MR. EPSTEIN:**  I'm about to embarrass myself because I

2    normally do this right first thing or have my trusty associate

3    do it, but we didn't check your website.  Do you have a form of

4    a case management report or Rule 26(f) order --

5             **THE COURT:**  We do.

6             **MR. EPSTEIN:**  -- that you prefer?

7             **THE COURT:**  It's on there.  As I say, often do them,

8    anyhow, because I like to see who we're doing it with.  Here we

9    may not need a meeting together.  You guys can put it together.

10   Oftentimes I'm asked, how much time can we have?  I say, take

11   as much time as you need, but once we get dates, I don't

12   adjourn them because I don't have a trailing docket.  You know,

13   allow time in there for discovery and vacations and your family

14   and all that stuff, because once we get discovery over, we'll

15   give you a date, a motion cutoff date, and at the same time

16   you'll get a pretrial conference for the trial and a trial

17   date, and our trial dates, those are them.  Sometimes we're off

18   a day, maybe two days, but I used to hate trailing dockets.

19   You tell the client, hey, we're going to trial on a certain

20   date, maybe.  You know, you get all your witnesses lined up.

21   So we give definite dates.  It's good for the attorneys.  And

22   my wife calls them spending dates because I have two weeks free

23   because we thought -- you know, it settled and we couldn't

24   finish it up so we'll go shopping and have a good time,

25   so . . .

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

Page 64

1   Okay.  Oh, and the other thing is, any time that you have

2   something you want to talk to me about, I'm always willing to

3   take a phone call or Zoom.  Rather than you spend a whole lot

4   of money and time filing motions or, you know -- and I assume

5   you guys -- guys and ladies -- are going to get along.  You

6   know, civility in practice is important.  You know, sometimes

7   you make a phone call, we'll talk about it and you solve it.

8   If it's something you can't solve, you know, rather than

9   spending time on filing motions, if I'm here, we'll talk about

10  them.  I want to save as much time and money for everybody and

11  then we'll go from there.  Anything you need, though, before

12  you start filing motions and stuff, call here and we'll --

13          **MR. EPSTEIN:**  Is there any particular format you have

14  for discovery motions?  Do you like a pre-motion --

15          **THE COURT:**  No, no.  I'm not like New York.

16          **MR. EPSTEIN:**  -- anything like that?

17          **THE COURT:**  No.  In fact, we have a case in New York.

18  We have to --

19          **MR. EPSTEIN:**  New York -- lots of places --

20  California.

21          **THE COURT:**  Yeah.  I mean, I didn't know California,

22  but, you know, they -- you got to look at it before it can be

23  filed and, no, we don't do that.

24      Okay.  Thank you very much.  Stay safe that's the most

25  important thing.

*22-11120; FTC v. Financial Education Services, Inc., et al.*

*Hearing on Motion for Preliminary Injunction*
*Thursday/June 30, 2022*

*Page 65*

1          **MR. EPSTEIN:**  Thank you, your Honor.

2          **THE COURT:**  Thank you.

3                    -   -   -

4                **C E R T I F I C A T I O N**

5      I certify that the foregoing is a correct transcription of

6   the record of proceedings in the above-entitled matter.

7

8   s/ Timothy M. Floury, CSR-5780          7/6/2022
    Timothy M. Floury, CSR-5780             Date
9   Official Court Reporter

10                   -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

        *22-11120; FTC v. Financial Education Services, Inc., et al.*