## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**FEDERAL TRADE COMMISSION,**

        Plaintiff,

        v.

**FINANCIAL EDUCATION SERVICES, INC.,** *et al.*,

        Defendants.

Case No. 2:22-cv-11120

Hon. Bernard A. Friedman

---

## NOTICE OF FILING SECOND WRITTEN REPORT OF COMPLIANCE MONITOR

The Monitor, Patrick A. Miles, Jr. ("Monitor"), hereby submits the attached Second Written Report of Compliance Monitor for Financial Education Services, Inc. et al., for the period beginning October 16, 2022 and ending March 31, 2023.

Dated:  April 27, 2023

BARNES & THORNBURG LLP

*/s/ Patrick A. Miles, Jr.*
Patrick A. Miles, Jr. (P46379)
David A. Hall (P81426)
Anthony C. Sallah (P84136)
171 Monroe Ave NW, Suite 1000
Grand Rapids, Michigan 49503
P: (616) 742-3930; F: (616) 742-3999
Patrick.Miles@btlaw.com
David.Hall@btlaw.com
*On behalf of the Court-appointed*
*Monitor Patrick A. Miles, Jr.*



**BARNES & THORNBURG LLP**

171 Monroe Avenue, NW, Suite 1000
Grand Rapids, MI 49503-2694 U.S.A.
(616) 742-3930
Fax (616) 742-3999
www.btlaw.com

Patrick A. Miles Jr.
Direct (616) 742-3939
patrick.miles@btlaw.com

April 27, 2023

Honorable Bernard A. Friedman
United States District Court
Eastern District of Michigan
Theodore Levin U.S. Courthouse
231 W. Lafayette Blvd
Detroit, MI 48226

## SECOND WRITTEN REPORT
## OF COMPLIANCE MONITOR PATRICK A. MILES, JR.
## FOR FINANCIAL EDUCATION SERVICES, INC. ET AL.,

## FOR THE PERIOD BEGINNING OCTOBER 16, 2022
## AND ENDING MARCH 31, 2023

Atlanta   Boston   California   Chicago   Delaware   Indiana   Michigan   Minneapolis
New Jersey   New York   Ohio   Philadelphia   Raleigh   Salt Lake City   Texas   Washington, D.C.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

# TABLE OF CONTENTS

Page

I.   BACKGROUND ..................................................................................1
   A.   Brief Overview of the Monitored Entities ....................................2
   B.   Products........................................................................................3
   C.   Monitoring Actions ......................................................................8
II.  EXECUTIVE SUMMARY AND OBSERVATIONS ......................10
III. MONITORED ENTITIES' RESPONSES TO MONITOR
    RECOMMENDATIONS ..................................................................12
   A.   Recommendations and Company Responses ...............................12
IV.  PYRAMID SCHEME ALLEGATIONS AND ADDITIONAL MONITOR
    RECOMMENDATIONS ..................................................................23
   A.   Federal Trade Commission Allegations ......................................23
   B.   Legal Standard ...........................................................................25
   C.   Monitor Observations .................................................................26
     1.   Genuine Demand and Sales. ...............................................27
     2.   Compensation Plan. ............................................................30
   D.   Monitor Recommendations.........................................................39
V.   THE TELEMARKETING SALES RULE ........................................40
   A.   The Monitored Entities' Responses to Information Requests Monitor
   Team Agent Interviews.......................................................................41
   B.   The Monitor's Observations Concerning the TSR. .....................46
VI.  NEW COMPANY FINTECH PRODUCTS .....................................49
   A.   UWE Business Loan Program .....................................................49
   B.   Consumer Loans .........................................................................52
   C.   Legal Compliance Analysis ........................................................52
VII. AGENT AND COMPANY EVENTS..........................................57
   A.   Super Saturdays..........................................................................57
     1.   Super Saturday in Atlanta on October 22, 2022. ...................58
     2.   Super Saturday in New York on November 19, 2022. ............59

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

3.   Super Saturday in Ft. Lauderdale via Zoom Webinar on December 10, 2022. ...................................................................................61

4.   Super Saturday in Atlanta via Zoom Webinar on December 17, 2022. ....................................................................................................62

5.   Tuesday Zoom Webinar in New York on December 20, 2022. ..............63

6.   Super Saturday in Los Angeles on January 21, 2023. ............................64

B.   UWE National Convention ........................................................................66

1.   Leadership Breakfast. ...............................................................................66

2.   Friday General Session. ............................................................................69

3.   Saturday General Session. ........................................................................70

4.   Sunday General Session. ...........................................................................74

VIII.   OVERVIEW OF THE MONITORED ENTITIES' TREASURY ACCOUNTS ...............................................................................................76

A.   General Overview ......................................................................................76

B.   FES Bank Account Transactions ...............................................................77

C.   UWE Bank Account Transactions .............................................................77

D.   YFL Bank Account Transactions ..............................................................78

E.   VR-TECH LLC, VR-TECH MGT, LLC and CMR Bank Account Transactions ...............................................................................................78

IX. CONCLUSION .................................................................................................79



171 Monroe Avenue, NW, Suite 1000
Grand Rapids, MI 49503-2694 U.S.A.
(616) 742-3930
Fax (616) 742-3999
www.btlaw.com

This *Second Written Report of Monitor Patrick Miles, Jr. (the "Monitor") for Financial Education Services, Inc. [1] ("FES" or "Company"), United Wealth Services, Inc. ("UWS"), VR-TECH, LLC, VR-TECH MGT, LLC, CM Rent, Inc. ("CMR"), and Youth Financial Literacy Foundation[2] ("YFL")(collectively, "Monitored Entities" or individually, "Monitored Entity") for the period beginning October 16, 2022 and ending March 31, 2023* ("Second Report") is the second report of the Monitor and his team (collectively, "Monitor Team") pursuant to the Order inter alia Converting Receivership to Monitorship, dated July 18, 2022 and covers the reporting period of October 16, 2022 through March 31, 2023.

## I.   BACKGROUND

This monitorship arises from a lawsuit commenced by the Federal Trade Commission (the "FTC") on May 23, 2022 with a Complaint for Permanent Injunction, Monetary Relief, and Other Relief (the "Complaint") (ECF No. 1) against the Monitored Entities, as well as Parimal Naik, Michael Toloff, Christopher Toloff, and Gerald Thompson (the "Individual Defendants" and together with the Monitored Entities, collectively, "Defendants").[3]

The FTC alleges that since at least 2015 Defendants have operated an unlawful credit repair scam deceiving consumers and otherwise violating multiple provisions of the Credit Repair Organizations Act, 15 U.S.C. §§ 1679-1679 et seq. ("CROA") and Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15

---

[1] Financial Education Services, Inc. also does business as United Wealth Education ("UWE") according to an assumed named filing with the State of Michigan Department of Licensing and Regulatory Affairs ("LARA"), dated July 12, 2021.

[2] Youth Financial Literacy Foundation assumed the name United Credit Education Services ("UCES") on October 24, 2011. Additionally, according to LARA, YFL assumed the name United Credit Education Services on the same date FES's assumed name usage of the name United Credit Education Services expired.

[3] On March 23, 2023 the FTC filed its First Amended Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief (ECF No. 121), among other things, adding LK Commercial Lending LLC, Statewide Commercial Lending LLC, and Gayle L. Toloff, individually and as trustee, grantor, and beneficiary of the Gayle L. Toloff Revocable Trust, as Defendants ("First Amended Complaint").

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

U.S.C. § 45(a). (ECF No. 1, at PageID.2, ¶ 2). The FTC further alleges that Defendants market a business opportunity with false or misleading representations as well as encourage and incentivize consumers to become agents and then to recruit other consumers to purchase Defendants' credit repair services as an illegal pyramid scheme in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). (*Id*. at PageID.3, 33, ¶¶ 3, 69). Moreover, the FTC alleges Defendants violated the FTC's Telemarketing Sales Rule, 16 C.F.R. Part 310 ("TSR") in connection with their marketing and sale of credit repair services and investment opportunities. *(Id*. at PageID.2, ¶ 1). In addition, per the First Amended Complaint, the FTC alleges Defendants violated the Fair Credit Reporting Act, 15 U.S.C. §15 U.S.C. §§ 1681-1681x ("FCRA") and Section 521 of the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. § 6821 in connection with inappropriately obtaining and using consumer credit information. (ECF No. 121 at PageID. 6378-6382, ¶¶ 134-144).

On July 18, 2022, the Court entered an Order Denying Motion for Preliminary Injunction, Vacating Temporary Restraining Order, Terminating Asset Freeze, and Converting Receivership to Monitorship (the "Monitor Order"), whereby Mr. Miles was appointed Monitor for the Monitored Entities, as that term is defined in the Monitor Order (the "Conversion"). (ECF No. 76). Mr. Miles, in his capacity as the Court-appointed temporary receiver – prior to being named Monitor – filed the *First Interim Report of Patrick A. Miles, Jr.* on June 28, 2022 (ECF No. 55-1) ("Receiver's Report").

Since the entry of the Monitor Order, the Monitor and the Monitor Team undertook the duties outlined in the Monitor Order and submitted the First Written Report of Compliance Monitor Patrick A. Miles, Jr. for the period July 18, 2022 to October 15, 2022 ("First Report") on November 16, 2022. (ECF No. 127). The Monitor now hereby submits the Second Report.

## A.  Brief Overview of the Monitored Entities

The Monitored Entities operate a multi-level marketing ("MLM") business, which offers for sale an assortment of credit restoration and financial literacy-related products and services. FES/UWE and UWS are Michigan corporations based in Livonia, Michigan owned by Parimal Naik. YFL/UCES is a Michigan nonprofit corporation formed on a nonstock directorship basis with tax-exempt status under Section 501(c)(3) of the Federal Internal Revenue Code, 26 U.S.C. § 501(c)(3). CMR is a Colorado corporation evidently owned 40 percent by Mr. Naik, 40 percent by Michael Toloff, and 20 percent by William Butler. VR-TECH, LLC is a Michigan limited liability company owned by Mr. Naik. VR-TECH

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

MGT, LLC is a Michigan limited liability company owned by Michael Toloff. The latter two entities are used by Messrs. Naik and Toloff, respectively, to receive distributions or consulting fees from the other Monitored Entities and to run through their business-related expenses.

As to the additional Defendants, LK Commercial Lending LLC is a Michigan limited liability company reportedly owned by Michael Toloff and possibly Parimal Naik. Defendant Statewide Commercial Lending is a South Carolina limited liability company reportedly owned by Byron Stokes, who apparently is a UWE agent based in Columbia, South Carolina. And Defendant Gayle L. Toloff evidently is married to Michael Toloff.

### B.    Products

The principal products promoted and offered by the Monitored Entities (collectively, "Products" or individually, "Product") are as follows, with new or revised Products rolled out since the First Report identified in bold print:

| Corporate Defendant | Product |
|---|---|
| UWE & UCES | Protection Plan |
| UCES | **UltraScore** |
| UWE | MyCare Plan |
| UWE | My HealthCare2Go (being terminated) |
| CMR | My Student Loan Manager (no longer on the Company's website) |
| UWE | **Secured Card** |
| UWE | **Business Secured Card** |
| UWE | **Business Lending** |
| UWE | **Business Credit Building** |
| UWE | **Personal Lending** |
| UWE | **Auto Loan Refinancing** |
| UWE | **High Yield Savings** |
| UWE | **Student Loan Refinancing** |

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

The Protection Plan includes a "Budgeting" calculator tool, "Credit Restoration," "Credit Builder," access to "Credit Attorney," "Credit Monitoring," a "Debt Payoff" payment plan, the "Financial Lockbox," "Identity Monitoring," a "Net Worth Calculator," access to "Rocket Lawyer," a "Savings Goals" calculator, and "Will & Trust Document Preparation." The Products are more fully described in the Receiver's Report. (*See* Receiver's Report at 14-18).

**UltraScore** is described as "A comprehensive online credit monitoring solution with helpful tools." UltraScore is a web-based application developed and sold by ConsumerDirect, Inc.® which is based in Irvine, California. Apparently, YFL entered an arrangement with ConsumerDirect to offer customers the UltraScore Product and to use ConsumerDirect's "SmartCredit® system." The Monitor understands this is not an exclusive arrangement since ConsumerDirect partners or co-brands its platform of online products with other credit or financial services companies.

UltraScore is accessible online, including as a mobile phone app, as a platform containing different pages for each Product. SmartCredit is a credit monitoring tool which includes "Score Tracker" that shows a customer's auto insurance rating, auto loan credit score, and hiring risk index used by potential employers. It also provides the customer access to their credit report.

According to YFL President Michael Curry, FES/UWE agents have sold ConsumerDirect's products as part of the Protection Plan since the Company's inception. According to Mr. Curry, UltraScore is available to the public and UCES/YFL's customers as a stand-alone Product for $19.95 per month. Apparently, however, no customers have purchased it on a stand-alone basis through YFL and an UWE agent would not receive any commission from such a sale.

Evidently in February 2023 the ConsumerDirect products were "upgraded" and rebranded in the UltraScore platform with the following names and claimed benefits:

- **Score Tracker** – Shows the customer's current Vantage credit score (which is not a FICO credit score).
- **Score Builder** – Shows how much the customer's credit score could increase if the customer eliminates negative items. It also provides guidance

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

on how to address inaccuracies and educational videos to explain what helps or hurts credit scores.

- **Score Boost** – Shows how much the customer's credit score could increase if the customer removes credit card balances and when to do so in order to maintain the lowest balance reported to maximize credit score points.
- **Track Score** – Is a review of credit score factors with detailed explanations of what affects the credit score. It allows the customer to simulate credit score changes from different purchases (such as a car or insurance).
- **Smart Credit Report option** – Generates the customer's credit bureau report and score (1B) from TransUnion data. It allows the customer to sort information by negative items, balances, alphabetically. It also shows payment information.
- **Three Credit Bureau (3B) Report option** – Generates the customer's credit bureau reports and scores from TransUnion, Experian, and Equifax with a 45-day refresh.
- **Privacy Master** – Scans internet every 14 days and looks at sites reselling personal information (e.g., Spokeo) such as home address, birthdate, and names of relatives. The customer is able to request removal of personal information from sites through the app.
- **Money Manager** – The customer can monitor all of its bank accounts as well as credit card transactions, receive daily alerts of transactions, and receive payment due alerts.
- **Identity Theft Insurance** – ConsumerDirect also offers one million dollar coverage in identity theft insurance. Apparently a customer's "membership" provides full identity and house title theft coverage for the customer's entire household family but the customer must first activate the policy.

As described in the First Report, when a UWE customer purchases the Protection Plan, $9.00 of the $89.00 monthly fee goes to YFL. In turn, YFL reimburses ConsumerDirect $8.00 upon a customer's activation for the first month's enrollment and then $2.50 each month a customer is purchasing the Protection Plan.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

As noted in the First Report, the Credit My Rent Product apparently is no longer offered by CMR or any of the Monitored Entities.[4]

The **MyCare Plan** says it allows customers to customize estate planning to their needs with products such as living trust, will, health care power of attorney, and financial power of attorney.

Apparently MyHealthCare2Go is also no longer offered by the Monitored Entities.

The **Secured Card** is a third party credit card offering that, according to Jason Short, UWE Director of Emerging Technologies and Strategic Retention, UWE began promoting in 2020 in a partnership with First Progress Bank.[5] Then in 2021, UWE began promoting the Sable Secured Credit Card issued by Coastal Community Bank based in Everett, Washington. Mr. Short reported that in the Spring of 2022 UWE terminated its relationship with the Sable card due to its lack of sufficient customer support and service as well as payment issues and returned to offering the First Progress card in October 2022. For individuals, Mr. Short represented that the First Progress Secured Card requires a $200 down payment and has a 22.24% annual percentage rate (APR) with a $19.99 one-time activation fee, $25 first year annual fee, and $35 annual fee thereafter. Further, the card holder receives a one percent cash back annual reward. The individual's credit is reported to all three credit bureaus – Dun & Bradsteet, Experian, and Equifax.[6]

Mr. Short said the secured card for businesses, such as those owned by agents, is offered through Tillful, requires a minimum $500 deposit, and provides

---

[4] As described in the Receiver's Report, the Credit My Rent Product "purports to improve a customer's credit rating through the reporting of consistent and timely rent payments to credit reporting agencies. Similar to credit restoration . . . the customer is primarily responsible for preparing and submitting communications to the credit reporting agencies using materials provided by CMR. This product is offered in three variations: (i) on-going monthly reporting only, (ii) on-going monthly reporting, plus submission of one year prior rental payment history, and (iii) on-going monthly reporting, plus submission of two years' prior rental payment history." (Receiver's Report at 14).

[5] The Monitor Team was unable to find information about First Progress Bank, but identified a First Progress Secured Credit Card issued by Synovus Bank of Columbus, Georgia as well as a First Latitude Credit Card also issued by Synovus Bank. These appear to be the individual secured cards promoted by UWE.

[6] The agent receives $3.00 for each card it sells. The Company earns revenue from each "click" or visit to the issuer's website.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

up to $100,000 in credit. The Tillful card apparently has a zero percent APR and a one percent cash back annual reward. A personal banking balance evidently is not required. The card reportedly must be used for business purposes and provides a free credit score for the business.[7]

UWE promotes **Business Loans** through Lendflow which, as described in more detail below in Section VI.A, essentially is a gateway to potential lending institutions or banks for businesses with poor credit seeking a loan or line of credit.

**Business Credit Building** apparently is instruction on how to register a business, create a profile with the three credit bureaus, and obtain a free DUNS number.

Since late October or early November 2022, Company agents and customers can obtain **Personal Loans** through access to a "network of premium connected providers." The Company advertises that these personal loan programs can offer "APRs as low as 5.99%," personal loans up to $250,000, and loan terms from six to 144 months. The Company's advertised lending partners include SoFi, LightStream, Prosper, LendingClub, BestEgg, and Avant. However, Mr. Short only identified Even Financial (now known as Engine by Money Lion) to the Monitor Team as UWE's partner for consumer loans.

Another recent offering is **Student Loan Refinancing** consisting of "options for refinancing and consolidating student loan debt for the best available rates and terms." The Company advertises that the student loan refinancing program can offer "APRs as low as 4.49%," loans up to $500,000, and loan terms from 60 to 240 months. The program supposedly allows customers or agents to "[l]ower the monthly payments on your existing student loans, with funds available in 5 business days." The Company's advertised partners include SoFi, LendKey, Earnest, and Splash Financial.

The Company also launched a new **Auto Loan Refinancing** program consisting of "options for refinancing auto loans for the best available rates and terms." The Company advertises that the auto loan refinancing program can offer "APRs as low as 2.49%," loans up to $10,000-$100,000, and loan terms from 24 to 84 months. The program description says it allows customers or agents to

---

[7] For each business card issued through the Company, the selling agent receives $25 of the $50 Tillful pays the Company.  But such sales do not count toward Title level production according to the Company.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

"[r]efinance your existing auto loan for more preferred rates and terms via personalized auto loan refinancing offers." The Company's advertised partners include Caribou, RefiJet, Upgrade, Upstart, Gravity Lending, and iLending.

The new Business Loan, Personal Loan, Student Loan Refinancing, and Auto Refinancing offerings (collectively, "Fintech Products") are discussed in more detail in Section VI of this Second Report.

Nevertheless, the key Product remains the Protection Plan – a bundle of 12 distinct Products and services either developed by the Monitored Entities or third party products offered to customers via the Monitored Entities.

In addition to the foregoing, the Monitored Entities now also offer an initial consultation as part of the Protection Plan, which is designed to educate new customers to the range and substance of the Products and customize the use of the Products to a customer's particular needs.

## C.   Monitoring Actions

During the reporting period from October 16, 2022 through March 31, 2023, the Monitor Team, among other things —

- Attended remotely or in person and observed seven "Super Saturday" events (each, a "Super Saturday Event") organized by the Company to train and meet with agents and prospective agents, on the following dates and in the associated cities:
  - o    October 22, 2022, in Atlanta, GA
  - o    November 19, 2022, in New York City, NY
  - o    December 10, 2022, Online Zoom Webinar/Fort Lauderdale, FL
  - o    December 17, 2022, in Atlanta, GA
  - o    December 20, 2022, in New York, NY
  - o    January 21, 2023, in Los Angeles, CA
  - o    January 23, 2023, in Queens, NY

- Attended and observed the UWE National Convention in Orlando, Florida from February 24 to 26, 2023, and interviewed several of the Monitored Entities' employees, representatives, and agents who attended;

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

- Interviewed Michael Curry, YFL President;

- Interviewed Jason Short, UWE Director of Emerging Technologies and Strategic Retention;

- Interviewed Kori Maher, UWE Marketing Manager

- Interviewed Sue Griffin, UWE Compliance Lead

- Interviewed Robert Franklin, UWE Compliance Manager

- Interviewed Javier Canales, UWE Compliance Specialist

- Requested pertinent information from the Monitored Entities;

- Reviewed the Company's compliance-related policies and procedures, training materials and disciplinary procedures;

- Met with Richard Epstein, Matthew Rapkowski, and Chris Meier, the Company's attorneys from Greenspoon Marder LLP ("Greenspoon");

- Reviewed the Company's updated Compensation Plan, which was provided to the Monitor on April 7 and 10, 2023 (the "Compensation Plan");

- Reviewed weekly discipline action reports submitted by the Company; and

- Reviewed weekly banking transactions for each account utilized by the Monitored Entities.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

## II.   EXECUTIVE SUMMARY AND OBSERVATIONS

The leaders of the Monitored Entities continue to appear sincere in their desire to comply with applicable laws and regulations and improve their compliance. The Monitor appreciates the policies and actions announced by the Monitored Entities in response to the First Report's 13 recommendations, which are detailed below in Section III. The Monitor believes the Monitored Entities have changed their corporate culture to "striving to do the right thing," from the apparent pre-Complaint position of "having the right things nominally in place so we can point to those if someone challenges us."

That said, the Monitor remains concerned that the Monitored Entities either do not fully embrace or comprehend what compliance entails. Specifically, by way of example, the Company introduced new Fintech Products apparently without any advance awareness, comprehensive legal identification or review of potential regulatory issues. It appears the Company began offering these Fintech Products to satisfy promptly agent needs in the marketplace in order to match offerings by competitors. Nevertheless, the Company evidently never sought legal advice on the regulatory implications of these Fintech Products nor on how to ensure full regulatory compliance until shortly prior to announcing them publicly at the February 24-26 National Convention. Simply matching competitors' offerings is not sufficient without fully understanding either what competitors have done to comply with applicable laws and regulations or whether competitors are complying with applicable laws and regulations.

The Monitor views the inability of the Monitored Entities to recognize when legal consultation is prudent or even necessary as a significant shortcoming. But it is not a fatal one. The Monitor again recommends that the Monitored Entities' leaders responsible for compliance, namely Mr. Naik, Mr. Curry, and Ms. Griffin, receive thorough compliance training from legal counsel and more guidance on when legal review and advice are necessary.

As discussed in detail Section IV below, the Monitor has concerns relating to the Compensation Plan, and in particular:

- the high concentration of compensation among a small number of agents

- the significant amount of internal consumption of the Monitored Entities; Products by agents

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

- the emphasis placed on recruiting other agents into the business opportunity

- the confusing and difficult to understand nature of the Compensation Plan. The Monitor sets forth several recommendations in the regard in Section IV below.

In addition, as discussed in Section V, the Monitor also has concerns that the Company's agents conduct sales calls with customers that could constitute "telemarketing" under the TSR. Specifically, the Monitor investigated whether the Company's agents engage in conduct encompassed by the TSR by making calls to, or receiving calls from, customers to sell the Company's services. Based on interviews with a randomly selected agents (admittedly, a small sample size), the Monitor believes that agents do, at times, engage in conduct potentially encompassed by the TSR.

The Monitor's impression is that, at its most base level, the Monitored Entities are selling a "lifestyle" without explicitly saying so. It is noteworthy that, from their inception, the Monitored Entities' entire network of agents and customers and their target market of potential agents and customers are evidently middle to lower income individuals, over 95% of whom are African American or of Hispanic origin. Yet, in the United States the vast majority of middle to lower income households are white. The Monitored Entities largely ignore this huge market both in geographic locations for events as well as messaging. The audience and marketing message at UWE events (e.g., Super Saturdays and the National Convention) are remarkably consistent and tailored for either an African American or Hispanic origin audience rather than one that is white, Asian America, Indian American, and/or of Middle Eastern origin. The Monitored Entities' themes of financial literacy, financial success, owning one's own business, and supporting one's family are fairly universal American values across racial and ethnic lines. But, the Monitored Entities clearly are narrowly focused in their approach in an apparent effort at selling a particular type of affluent lifestyle to those with low credit scores in specific racial and ethnic groups.

Moreover, the Monitored Entities continue to blur the line between FES/UWE and YFL/UCES. Indeed, the legal and practical operational distinction between the two entities is not understood by agents (and customers), and never appears to be mentioned to them. The agents consider themselves agents of UWE selling UCES Products and the Monitored Entities describe the charitable purposes of YFL, but the reason YFL exists is not made clear to them. If YFL was needed to

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

offer credit restoration services as a tax-exempt nonprofit entity without being subject to CROA, then such need is not present as long as UWE (or UCES, for that matter) complies with CROA's requirements which the Monitored Entities appear to seek to do. The charitable purposes of YFL, such as scholarships and supporting financial literacy among young people, are admirable. It seems administratively simpler, as well as legally easier, to support same with periodic contributions from UWE rather than the $9.00 per month fee and employing personnel who evidently support customers of both entities.

## III. MONITORED ENTITIES' RESPONSES TO MONITOR RECOMMENDATIONS

The Monitor made 13 specific recommendations in the First Report (the "Recommendations") for the Monitored Entities to implement as changes in their business operations in order to strengthen their compliance with applicable law. The Monitored Entities apparently instituted a number of changes to their operations, policies and procedures based on the Recommendations. These changes are summarized below, together with the Monitor's view of their adequacy.[8]

### A. Recommendations and Company Responses

**Recommendation 1**: The Company should update and publicize its written "SOP for Daily Compliance Tasks and Notifications" to agents and employees so that it is a robust, comprehensive, current, and relevant compliance plan with applicable compliance training protocols, policies, and procedures.

The Monitored Entities evidently adopted new standard operating procedures for agents (attached as Exhibit A) (the "Agent SOP") and the Monitored Entities (attached as Exhibit B) (the "Company SOP").

---

[8] The Monitor notes that counsel to the Monitored Entities proactively scheduled a meeting with the Monitor Team to provide an overview of the updates and to solicit feedback, and subsequently followed up with supporting documentation. This dialogue was transparent and constructive in assisting the Monitor Team in connection with the preparation of this Second Report.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

### ***Agent SOP***

The Agent SOP contains key compliance guidance and protocols to agents in the field, including the following:

- Requiring agents to provide the Company via email addresses for any social media account used to market Company Products and services. Agents failing to comply are subject to disciplinary action (although the specific remedial action is not specified).

- Advising agents not to use marketing materials that are not provided by the Monitored Entities in the agent's online back office.

- Setting forth guidance on proscribed actions by agents, including:

  o Promising specific results from services;

  o Showing credit bureau results on consumer credit reports;

  o Representing that the Monitored Entities can remove negative items on a credit report;

  o Advertising a 100% money back guarantee;

  o Making lifestyle claims, or false, misleading or obscene statements; and/or

  o Posting pictures of commission checks or promising regular earnings.

- Setting forth approved representations agents may make when selling the Products.

- Regarding potential income claims, providing:

  o An express disclaimer for agents to use regarding the potential to earn income as a sales agent;[9]

---

[9] "Income and lifestyle claims must reflect what is typical. Claims about the potential to achieve a wealthy lifestyle, career-level income or significant income are false or misleading if

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

    o  Income related phrases to never use (i.e., "set for life," "unlimited income," "retire from your job," and "creating millionaires"); or

    o  Income related phrases that can be used (i.e., "financial literacy," "supplemental income," "work at your own pace," "organize your finances," and "protect your family").

- Advising prospective agents that becoming an active agent and remaining active will require taking a compliance course and passing a compliance test based on the materials presented.

- A description of the Company's four-tier disciplinary action process, which appears to be updated from the First Report. The disciplinary process is as follows:

    o  **<u>First Offense</u>**

        ▪  Agent website is shut down until corrective action is taken
        ▪  Company provides agent with a compliance course and related test, which is recommended by the Company but not required
        ▪  Agent is placed on a compliance watch list for 30 days, during which time the Monitored Entities manually reviews the agent's online marketing for compliance on a regular basis.

    o  **<u>Second Offense</u>**
        ▪  Same protocol as a first offense, but the agent is required to take a compliance course and pass the related test and the agent is suspended for a period of 30 days (following passing compliance test) before being reinstated.

    o  **<u>Third Offense</u>**
        ▪  Same protocol as a second offense, but following an agent taking the required compliance course and passing the related compliance test, the agent is suspended for a period of 60 days.

---

participating agents generally do not achieve such results. Agents [are] strictly prohibited from making income claims that are not representative of what a typical distributor earns." (*See* Ex. A at 5).

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

- o **Fourth Offense**
  - ▪ Agent is terminated and no further payments are made to the terminated agent.

- Notice that agents are monitored using Field Watch to ensure compliance.

In general, the Agent SOP is a constructive set of standard operating procedures that provide guidance to agents on best practices, Company policies and disclosures regarding disciplinary protocols. Implementing, monitoring and enforcing the Agent SOP by the Company is paramount to its success. The Agent SOP, in connection with the compliance training and testing developed by the Company, as described below, are significant improvements to the Monitored Entities' policies and procedures.

### *Company SOP*

The Company SOP is directed at employees of the Monitored Entities. The Company SOP appears to be an outline of compliance monitoring tasks that certain employees are expected to undertake on a regular basis. Highlights of the Company SOP include:

- Daily review of results from Field Watch, the agent monitoring software previously purchased by the Monitored Entities, as described and discussed in the First Report;

- Weekly manual review of online marketing by agents who earned more than $200,000 in the prior calendar year;

- Weekly manual review of online marketing by agents who have been placed on the compliance watchlist as a result of prior violations;

- Mandated actions to be taken upon the discovery of a rules violation by an agent in the field, including disabling the agent's website, providing required notices to the agent, placing the agent on the compliance watchlist, maintaining a record of, and the details regarding, the violation, and other required actions set forth in the disciplinary protocols; and

- Form email correspondence to be sent from Company officials to an agent who has violated marketing rules.

The Monitored Entities' development of the Company SOP, in conjunction with the Monitored Entities' use of the Field Watch technology, appears to increase their ability to monitor compliance of agents in the field.

Additionally, manually monitoring high-earning agents – a step suggested by the Monitor in the First Report that the Company undertook – is also a positive enhancement to the Company's compliance monitoring. The highest earning agents are a model for other agents in their downline, and other agents in the business opportunity more generally. Ensuring strict compliance by the highest earners sets a good example for the field.

The Monitored Entities strengthened their agent disciplinary process in other important ways:

- Instituting mandatory compliance training and testing for second and third offenses;

- Placing agents who violate compliance mandates on a compliance watchlist and manually monitoring online activity for a 30-day period; and

- Suspension of agents for second (30 days) and third (60 days) offenses.

It is imperative that the Monitored Entities maintain a strong practice of monitoring compliance and following through on the directives set forth in the Company SOP.

**<u>Recommendation 2</u>**:  On an annual basis, the Company should implement and require all active agents (a) to attend an in-person or live remote compliance training program developed and led by the Company focusing on specific CROA and TSR requirements as well as Company compliance policies and procedures, (b) take and pass an on-line test with questions and compliance-focused hypothetical scenarios based on the training, and (c) keep a record of all agents attending such training, and passing or failing the applicable test. Agents who pass such test (a limited number of multiple

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

attempts is acceptable), should receive a "renewed annual compliance certification" from the Company. However, agents who do not pass the test after a certain number of attempts, or who do not complete the proscribed training and receive certification by a date certain, should be suspended by the Company and have their "back office" website account frozen until they either pass the test or complete the required training, as the case may be.

The Monitored Entities developed an "Integrated Solutions Certificate Program," which the Monitor understands is intended to respond to Recommendations 2 and 3. A draft of the program document dated February 17, 2023 is attached as Exhibit C.

The certificate program requires that all prospective agents, prior to becoming an active agent, complete a two-part video series covering certain topics and pass a test covering such topics. Additionally, active agents, in order to remain active, must complete annually a two-part video series and pass a related test.

Topics covered by the program appear to include:

- Compliance

    o Regulatory agencies that regulate the multi-level marketing industry

    o Overview of the Credit Repair Organizations Act

    o Key "do's and don'ts" for compliance

    o Use of compliant marketing materials and making lawful representations regarding the Company's Products, services and business opportunity

- Company disciplinary policies

- Product overview and education

- Company history and mission

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

As noted above, the Company also began requiring agents who repeatedly violate Company policies to take a compliance-related test following their second and third offenses.

Beyond the program document attached hereto, the Monitor Team has not observed the two-part video series or the testing materials. Based on the program document, however, the tests are apparently 25 questions, and the Company requires participants to achieve a minimum score of 80%. It is unclear if the Monitored Entities have instituted these compliance protocols, or how the Monitored Entities will track whether active agents have complied with the annual certification requirement.

The Monitor welcomes the opportunity to review the testing materials closer.  Nevertheless, the certificate program is a positive development and appears to cover critical topics that should enhance compliance education among agents in the field. One item of note, it does not appear that the training protocol will cover the TSR, which the Monitor believes is an important component of any compliance training and should be included.

Consistently executing on, and monitoring, the required training and testing are important. Additionally, keeping training and testing current and relevant, including updates for developments in the law and best practices, are also important.

**Recommendation 3**:  The Company should require each newly enrolled agent to (a) to attend an in-person or live remote compliance training program focusing on specific CROA and TSR requirements, Company policies and procedures, (b) take and pass an on-line test with questions based on the training, and (c) keep a record of all agents attending such training, and passing or failing the applicable test. New agents who pass such test (a limited number of multiple passage attempts is acceptable), should receive an "initial annual compliance certification" from the Company. However, new agents who do not pass the test after a certain number of attempts, or who fail to complete the required training and receive certification, should be prevented by the Company from actively enrolling as an agent.

See above regarding Recommendation No. 2.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

**Recommendation 4**:  The Customer Contracts and Disclosures should be clear that if the credit restoration services will be complete (i.e., fully performed) only after six months, then the five $9.00 monthly installments will not be charged and collected before the completion date. If the credit restoration services are completed on a monthly basis so that the five $9.00 monthly installments will be charged and collected, then the Customer Contracts and Disclosures should clearly state as much.

The Monitored Entities apparently updated the UCES customer contract, which governs the provision of credit repair services, to clarify following the fees and payment timing:

- Service fees are due only after the completion of the services set forth in the contract;
- A $99 consultation fee is charged after UCES provides the initial credit consultation service outlined in the contract; and
- A monthly $9.00 fee is charged, "but only after the Client has been provided the Credit Repair Services listed above, as needed, the month prior."

The revised customer contract is attached as Exhibit D. The customer contract appears to now clarify that the monthly service fee is only charged following the provision of services, as needed, for the prior month. It is not clear, however, that the provision of services is actually tracked on a monthly basis. The contract neither expressly states that credit repair services performed will be tracked monthly, nor that in months where no services are provided, a monthly fee will not be charged. To the extent a $9.00 monthly fee is charged routinely, without an accounting for services actually rendered, the timing of the monthly payment for credit repair services continues as an issue of concern.

**Recommendation 5**:  The Company should assess the cost of upgraded software to monitor all online agent activity and statements (namely, live streams, and social media videos on platforms such as YouTube, Instagram, Facebook, and TikTok, which are increasingly popular platforms for agents) compared to the cost of hiring or engaging additional personnel to do so and ensure such activity and statements are adequately monitored.

The Monitored Entities initially represented to the Monitor that an upgrade in software will not provide meaningful additional monitoring capabilities with

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

regard to live streams and video platforms. The Monitored Entities later indicated to the Monitor Team that the Company did in fact upgrade its Field Watch software to include "Field Watch Live", which apparently does allow the Company to view TikTok and other live videos and stories. The Monitor has also learned that the Company has apparently purchased a "Targeted Surveillance" program, which allows the Company to perform surveillance on agents when they "go live" with Zoom, Facebook and other live social media platforms. The Monitor Team has not been able to verify with the Company how these enhanced technologies have improved the Company's ability to monitor agent activity. Nevertheless, the Monitor welcomes the Company's approach to using all available technologies to enforce a strong culture of Compliance.

The Monitored Entities also indicated that they now require agents to disclose all social media addresses that are used to market Products and services, which "will allow Field Watch to operate more efficiently." It is unclear to the Monitor how disclosure of social media addresses facilitates more efficient monitoring by the Field Watch software. Nevertheless, tracking agent social media addresses was a Recommendation of the Monitor in the First Report (*See* Recommendation No. 13 below) and is a good practice.

Additionally, the Monitored Entities noted they will manually monitor the online activity of high-earning agents, as well as agents on the compliance watchlist (i.e., agents with a compliance policy violation).[10]

**Recommendation 6**:  The Company should (a) require all of the Company's compliance officers, including Susan Griffin, Robert Franklin, and Javier Canales, to undergo a comprehensive and thorough compliance training provided by a knowledgeable attorney focusing on the requirements of CROA and applicable state laws and/or (b) formally incorporate outside legal counsel more frequently and on a regular basis to review specific CROA-related compliance matters.

---

[10] In certain disclosures to the Monitor Team, the Company indicated that (i) the threshold for being a "high-earning" agent is $50,000 of income in the prior year, and (ii) agents will remain on the compliance watchlist for a period of three months. The Company SOP and the Agent SOP, however, describe the threshold for being a "high-earning" agent as $200,000 of income in the prior calendar year, and note agents remain on the compliance watchlist for a period of 30 days.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

The Monitored Entities have represented to the Monitor that Sue Griffin "is very knowledgeable on CROA and MLM related compliance," noting that she has served as the head of compliance for the Company for 12 years. The Monitored Entities represented to the Monitor that for CROA, multi-level marketing and general marketing compliance, Ms. Griffin references the materials attached as Exhibits E-G.

Additionally, the Monitored Entities have represented that on a go-forward basis Ms. Griffin, Mr. Franklin and Mr. Canales will meet monthly with compliance counsel from Greenspoon to review Company policies and procedures and to ensure continued compliance with applicable laws, regulations and guidelines.

The Monitor welcomes the regular interaction by Company officials with outside compliance counsel, which is a material improvement on the Company's prior practice of managing compliance almost exclusively internally and without outside expert assistance.

While the Monitor appreciates Ms. Griffin's long-time experience with the Company and dedication to reviewing industry materials for compliance best practices, the Monitor continues to encourage the Monitored Entities to have its head of compliance receive comprehensive and substantive external training from legal experts versed in CROA and other relevant regulatory subjects periodically as well as obtain pertinent certifications.

**Recommendation 7**:  The Company should develop new and improved marketing materials, possibly with agent input, and in close collaboration with external compliance legal counsel, to ensure that all materials (including PowerPoint presentations) are reviewed and approved by external legal counsel with expertise in such matters.

The Monitored Entities have apparently made updates to certain of the marketing materials that are made available to agents. Certain of those materials have been provided to the Monitor Team. It is unclear what changes have been made, or the involvement of external counsel or what input agents provided, if any, in the preparation of these materials.

**Recommendation 8**:  The Monitored Entities should offer more individualized services to credit restoration customers.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

The Monitored Entities represented to the Monitor that customers are now provided with an initial Zoom meeting at the outset of a customer's enrollment in the protection plan. The Zoom meeting is apparently designed as an opportunity for a customer to review his or her credit report with a UCES representative and identify erroneous entries that could be challenged. A UCES representative apparently provides individual instruction during this meeting on steps a customer can then take to dispute inaccurate items.

As a secondary function, the Monitored Entities indicated that this initial meeting is also an opportunity to educate a customer on the additional Products in the Protection Plan and how best to utilize the Products to address a customer's specific needs.

It is the obligation of the customer to schedule this initial Zoom meeting. The Monitored Entities indicated customers are contacted by email and text message to encourage them to schedule their initial Zoom meeting shortly after enrollment, and sent follow up text messages monthly until such time as a customer schedules a consultation Zoom meeting.

**Recommendation 9**:  The Company's agents should receive specialized financial literacy training in order to offer more educated guidance to both prospective and enrolled customers.

See above for Recommendations Nos. 2 and 3. The Monitored Entities have also represented to the Monitor that, in addition to the above-mentioned training, agents receive a Power Point document, which is attached hereto as Exhibit H, which addresses topics including factors affecting a credit score, length of credit history, credit inquiries, and different types of loans and credit.

**Recommendation 10**:  The Monitored Entities should develop a clear, written set of standards for what constitutes a violation of the Company's policies and procedures, which should be closely aligned with applicable law, and how an agent will be disciplined for a violation.

The Agent SOP, as described above, sets forth the discipline protocols for agent violations of Company policies. The Agent SOP also contains a number of "do's and don'ts" and guidance regrading use of Company prepared marketing materials (and prohibitions against using marketing materials that are not Company prepared). The Agent SOP also contains approved disclaimers regarding income representations, and prohibited income and lifestyle claims. Agents apparently are

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

required to review and sign each page of the Agent SOP acknowledging the information contain therein. As noted above, the development of the Agent SOP is a positive update to the Monitored Entities' policies and procedures.

> **Recommendation 11**:  The Company's Compliance Team should improve follow-up with agents regarding corrective actions for violations of its compliance policies to ensure agents correct or remove offending posts and/or take other corrective action demanded by the Company.

The Company SOP, outlined above, addresses this Recommendation.

> **Recommendation 12**:  As part of its discipline protocols, the Company should require mandatory compliance training sessions and testing for agents with multiple violations of the Company's policies.

The Agent SOP and the discipline protocols described therein, outlined above, address this Recommendation.

> **Recommendation 13**:  The Company should require all existing and new agents to provide their website addresses (and changes to same) for all social media and online platforms they use to market and promote the Products and services.

The Agent SOP and the discipline protocols described therein, outlined above, address this Recommendation.

## IV.  PYRAMID SCHEME ALLEGATIONS AND ADDITIONAL MONITOR RECOMMENDATIONS

### A.  Federal Trade Commission Allegations

One of the central allegations set forth in the Complaint is that the Monitored Entities operate an illegal pyramid scheme. The FTC's allegations, as set forth in the First Amended Complaint in this regard, are principally as follows:

- The Monitored Entities' Compensation Plan incentivizes recruiting new agents over selling credit repair services, and few consumers ever realize the promised earnings. (First Amended Complaint, ECF. No. 121, at PageID. 4, ¶ 3).

- The Monitored Entities claim that consumers who enroll as agents will earn substantial income, typically in the form of commissions and bonuses, for the

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

recruitment of new agents and downstream revenue from the purchases of consumers of credit repair services. (*Id*. at PageID. 23-24, ¶ 51).

- The Monitored Entities require consumers who want to become agents to enroll in credit repair services, regardless of credit score; the monthly fee associated with the credit repair services can be waived if an agent recruits and maintains a certain number of new agents in a month. (*Id*. at PageID. 29-30, ¶ 56).

- Agents are eligible to receive payment through a myriad of commissions and bonuses that incentivize recruiting new agents over the sale of credit repair services. (*Id*. at PageID. 31, ¶ 61).

- The primary way agents are compensated is by creating downline, which provides an agent with the ability to make significantly more money by recruiting other agents than selling credit repair services. (*Id.* at PageID. 31-32, ¶ 64).

- The Monitored Entities' Compensation Plan compensates agents based on "titles," which are earned by creating a larger downline comprised of agents that have also achieved their own titles and certain amount in downline revenue per month. (*Id.* at PageID. 32-33, ¶¶ 64-67).

- The Compensation Plan does not require that sales necessary to achieve titles be generated from sales to "non-agents" (i.e., customers who are not agents), and thus, sales targets can be satisfied solely by internal consumption. (*Id.* PageID. 33, ¶ 66).

- An agent earns bonuses under the Monitored Entities' Compensation Plan when such agent enrolls a new agent who in turn produces a certain minimum of personal revenue within a specific time frame; these bonuses increase as an agent achieves higher titles and grows a larger downline. (*Id.* PageID. 33, ¶ 67).

- The Monitored Entities encourage agents to sponsor new recruits by paying some or all of the fees required for a recruit to become an agent in order to boost a participant's downline and qualify such participant's downline for compensation purposes. (*Id.* at. PageID. 34, ¶ 69).

- The Monitored Entities operate or promote participation in a scheme in which consumers pay money to the Monitored Entities in return for which they receive (1) the right to market and sell credit repair services, and (2) in return for recruiting other consumers to sell credit repair services, the right to receive

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

rewards that are unrelated to the sale of credit repair services to end-users, which is a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). (*Id.* at PageID. 36-37, ¶¶ 80-81).

In support of its allegations that the Monitored Entities operate an illegal pyramid schedule, the FTC also submitted to this Court an expert report of Dr. David Givens (the "Givens Report"), which was filed as Exhibit 22 to the FTC's Motion for Temporary Restraining Order (ECF No. 5-22). Also relevant to the FTC's pyramid scheme allegations, the Monitored Entities submitted to this Court the Declaration of Branko Jovanovic, Ph.D. (ECF No. 51-21) (the "Jovanovic Declaration") in connection with their opposition to the FTC's Motion for Temporary Restraining Order.

The Monitor Team reviewed both the Givens Report and the Jovanovic Declaration in connection with the submission of this Second Report.

## B.    Legal Standard

Unlawful multi-level marketing structures are enterprises that are "characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to the sale of the product to ultimate users." (*In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975)). The "critical question for the FTC is whether the revenues that primarily support the commissions paid to all participants are generated from purchases of goods and services that are not simply incidental to the purchase of the right to participate in a money-making venture." (*Staff Advisory Opinion – Pyramid Scheme Analysis dated January 14, 2004*). Consequently, a "compensation system funded primarily by payments made for the right to participate in the venture is an illegal pyramid scheme." (*Staff Advisory Opinion – Pyramid Scheme Analysis dated January 14, 2004*). Multi-level marketing companies "must incentivize real sales – in other words, profitable and verifiable sales – to real customers – specifically, those outside the MLM network. Any compensation paid to distributors must be driven by such sales." (*FTC Opinion Letter dated January 19, 2017*).

Determining whether a multi-level marketing enterprise constitutes an illegal pyramid scheme is fact specific, and appears to turn on an assessment of:

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

(i)     Marketing representations by the enterprise (i.e., must be truthful and not misleading);

(ii)    Analysis of the enterprise's compensation plan;

(iii)   A determination of whether there is genuine demand for the product or service; and

(iv)    Whether sales are profitable and verifiable.

The Givens Report concludes the Monitored Entities operate an illegal pyramid scheme based in key part on the following findings:

(i)     Success in the Monitored Entities' Compensation Plan depends largely on recruitment, not customer sales, and the biggest income and rewards come in the form of overrides associated with level titles, which in turn, are earned based on recruitment.

(ii)    Compulsory and continual enrollment in the Protection Plan product is the only way an agent can enter the business opportunity and remain active.

(iii)   Mandatory agent purchasing of the Monitored Entities' products is likely funding a significant fraction – if not majority – of rewards paid to successful recruiters.

(iv)    Many of the bonuses and rewards under the Compensation Plan – Level Overrides, Generation Bonus, Infinity Bonus, R&R Club Rewards –

     i.   Do not require retail sales

     ii.  Require recruitment of agents

     iii. Permit earning on multiple levels of downline agents

     iv.  Are contingent upon an agent's title

(v)     Compensation for retail sales alone will generate only modest income under the Compensation Plan.

## C.     Monitor Observations

The Monitor Team reviewed the Monitored Entities' recently modified and updated Compensation Plan. The Monitor Team also reviewed various other documents and data provided to the Monitor in response to requests for

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

information submitted to the Monitored Entities and conducted interviews of Company officials and agents.

The essence of the pyramid scheme analysis is whether verifiable sales are made to third party retail customers based on genuine demand. If determined affirmatively, a MLM enterprise likely does not operate as an illegal pyramid scheme. Conversely, should sales of Products simply be a condition precedent to the right to recruit other agents into the enterprise, then such a multi-level marketing enterprise is more likely to operate as an illegal pyramid scheme.

### 1.    <u>Genuine Demand and Sales.</u>

As noted, an illegal compensation structure encourages consumption of products and/or services for reasons other than satisfying genuine customer demand or participant demand.

Agent interviews conducted by the Monitor Team suggest anecdotally that some legitimate demand exists for the Monitored Entities' services. Several agents the Monitor Team interviewed indicated that their association with the Monitored Entities began as customers in need of restoring their credit scores, or as both an agent and a customer, with a strong interest in the Products offered by the Monitored Entities. These agents include Alfred Nickson, Josseny Cadestin, Johnnie Newsome, Lakeisha Marion, and Victoria Sparks. It is worth noting that most of these are some of the most highly compensated agents under the Compensation Plan.

Data from the Monitored Entities provided to the Monitor appears to support the premise that some genuine demand for the Monitored Entities' Products and services exists among customers who are not also agents. For example, during the months of October, 2022 through March, 2023, on average, approximately 60% of Company's total revenue was derived from sales to customers who are not also agents, with the remaining 40% of total revenue derived from sales to agents, as set forth below:

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

### Sales and Revenue Breakdown – Non-agent Customers vs. Agent Customers (USD in 000s)

| Month | New Customer Enrollment Revenue | Existing Customer Revenue | Total Customer Revenue | Customer Revenue as a % of Total Revenue |
|---|---|---|---|---|
| Oct-22 | $110 | $478 | $588 | 63% |
| Nov-22 | $119 | $420 | $539 | 63% |
| Dec-22 | $132 | $414 | $546 | 61% |
| Jan-23 | $186 | $391 | $576 | 59% |
| Feb-23 | $223 | $418 | $641 | 59% |
| Mar-23 | $353 | $470 | $823 | 61% |
| Total | $1,123 | $2,591 | $3,715 | 61% |

| Month | New Agent Enrollment Revenue | Existing Agent Revenue | Total Agent Revenue | Agent Revenue as a % of Total Revenue |
|---|---|---|---|---|
| Oct-22 | $59 | $286 | $345 | 37% |
| Nov-22 | $56 | $255 | $311 | 37% |
| Dec-22 | $122 | $234 | $355 | 39% |
| Jan-23 | $118 | $291 | $409 | 41% |
| Feb-23 | $142 | $302 | $444 | 41% |
| Mar-23 | $191 | $347 | $537 | 39% |
| Total | $687 | $1,715 | $2,402 | 39% |

| Month | Total Enrollment Revenue | Total Existing Revenue | Total Revenue | Enrollment Revenue as % of Total Revenue |
|---|---|---|---|---|
| Oct-22 | $169 | $764 | $933 | 18% |
| Nov-22 | $175 | $675 | $850 | 21% |
| Dec-22 | $254 | $648 | $901 | 28% |
| Jan-23 | $304 | $682 | $985 | 31% |
| Feb-23 | $365 | $721 | $1,085 | 34% |
| Mar-23 | $544 | $817 | $1,361 | 40% |
| Total | $1,810 | $4,306 | $6,116 | 30% |

The final table in the chart above illustrates an increasing trend in new enrollment revenue as a percentage of total revenue. The Monitored Entities appear to be focusing on recruiting new customers and agents in order to offset the loss of existing customers and agents.

High cancellation rates among customers and agents were an issue highlighted to this Court in the Receiver's Report. (*See* Receiver's Report at 23-

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

30). The Monitored Entities supplemented the cancellation data and provided new customer and agent retention data for agents and customers who enrolled in the months of August, September, October, November and December 2022 and January 2023, which are summarized and reflected as set forth below:

| Percentage of Customers Retained | | | | | | | Retained Averages by Month | |
|---|---|---|---|---|---|---|---|---|
| Month | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Aug-22 through Jan-23 | |
| Aug-22 | 96% | 73% | 53% | 42% | 34% | 31% | *Same Month* | *97%* |
| Sep-22 | | 96% | 72% | 54% | 43% | 39% | *1st Month* | *75%* |
| Oct-22 | | | 96% | 71% | 55% | 51% | *2nd Month* | *57%* |
| Nov-22 | | | | 98% | 75% | 68% | *3rd Month* | *45%* |
| Dec-22 | | | | | 98% | 85% | *4th Month* | *36%* |

| Percentage of Customers Lost | | | | | | | Loss Averages by Month | |
|---|---|---|---|---|---|---|---|---|
| Month | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Aug-22 through Jan-23 | |
| Aug-22 | 4% | 27% | 47% | 58% | 66% | 69% | *Same Month* | *3%* |
| Sep-22 | | 4% | 28% | 46% | 57% | 61% | *1st Month* | *25%* |
| Oct-22 | | | 4% | 29% | 45% | 49% | *2nd Month* | *43%* |
| Nov-22 | | | | 2% | 25% | 32% | *3rd Month* | *55%* |
| Dec-22 | | | | | 2% | 15% | *4th Month* | *64%* |

| Percentage of Agents Retained | | | | | | | Retained Averages by Month | |
|---|---|---|---|---|---|---|---|---|
| Month | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Aug-22 through Jan-23 | |
| Aug-22 | 93% | 75% | 60% | 49% | 38% | 35% | *Same Month* | *95%* |
| Sep-22 | | 95% | 70% | 57% | 47% | 43% | *1st Month* | *75%* |
| Oct-22 | | | 94% | 71% | 52% | 46% | *2nd Month* | *59%* |
| Nov-22 | | | | 96% | 73% | 66% | *3rd Month* | *47%* |
| Dec-22 | | | | | 98% | 85% | *4th Month* | *40%* |

| Percentage of Agents Lost | | | | | | | Loss Averages by Month | |
|---|---|---|---|---|---|---|---|---|
| Month | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Aug-22 through Jan-23 | |
| Aug-22 | 7% | 25% | 40% | 52% | 63% | 65% | *Same Month* | *5%* |
| Sep-22 | | 5% | 30% | 43% | 53% | 57% | *1st Month* | *25%* |
| Oct-22 | | | 6% | 29% | 48% | 54% | *2nd Month* | *41%* |
| Nov-22 | | | | 4% | 27% | 34% | *3rd Month* | *53%* |
| Dec-22 | | | | | 2% | 15% | *4th Month* | *60%* |

    As illustrated above, cancellation rates among customers and agents are relatively consistent, with approximately 60% of new customers and agents cancelling their participation with the business by the fourth month following enrollment.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

High cancellation rates among customers and agents suggest an inferior Product offering and/or a non-viable business opportunity, raising questions regarding whether sales are reflective of genuine Product demand, as opposed to simply a cost of entering the business opportunity.

### 2. **Compensation Plan.**

The Compensation Plan contains certain updates that were recently implemented by the Monitored Entities to modify the existing compensation structure and reflect changes necessary to address compensation relating to new product offerings. This Second Report highlights certain of those changes in connection with the pyramid scheme analysis.

### (i) *Agent Titles, Levels and Compensation.*

The Compensation Plan still has the following titles (each, a "Title" and collectively, the "Titles") for agents (from highest to lowest):

- Pinnacle
- Senior Executive Vice President
- Senior Regional Vice President
- Senior Vice President
- Executive Vice President
- Regional Vice President
- Vice President
- Executive Sales Director
- Regional Sales Director
- Sales Director
- Senior Field Trainer
- Field Trainer
- Agent

The Compensation Plan sets forth the requirements to achieve each Title. Compensation in the form of commissions, bonuses and other rewards under the Compensation Plan are determined based on an agent's Title.

While the Compensation Plan remains difficult to interpret — a point discussed in the First Report and below — it is still apparent that the larger an

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

agent's downline of other agents, the higher the associated Title and the greater the compensation amount such agent receives under the Compensation Plan.

### (ii)    *Concentration of Compensation.*

It is also apparent, based on data provided by the Monitored Entities, that a very high concentration of compensation exists among a small number of agents holding the highest Titles. In particular, the Monitored Entities reported the following earnings for agents in the months noted below:

| Agent Title | Aug-22 No. of Agents | Comm. Paid | Avg. Comm. | Sep-22 No. of Agents | Comm. Paid | Avg. Comm. | Oct-22 No. of Agents | Comm. Paid | Avg. Comm. | Nov-22 No. of Agents | Comm. Paid | Avg. Comm. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Senior Executive Vice President | 1 | $ 56,240 | $ 56,240 | 1 | $ 38,180 | $ 38,180 | 1 | $ 40,389 | $ 40,389 | 1 | $ 30,063 | $ 30,063 |
| Senior Regional Vice President | 1 | 15,724 | 15,724 | 1 | 28,050 | 28,050 | 1 | 17,286 | 17,286 | 1 | 13,198 | 13,198 |
| Senior Vice President | 7 | 65,555 | 9,365 | 3 | 34,501 | 11,500 | 3 | 32,200 | 10,733 | 4 | 44,101 | 11,025 |
| Regional Vice President | 16 | 77,348 | 4,834 | 8 | 45,301 | 5,663 | 7 | 29,602 | 4,229 | 5 | 24,134 | 4,827 |
| Executive Vice President | 8 | 34,752 | 4,344 | 7 | 43,999 | 6,286 | 7 | 37,864 | 5,409 | 7 | 37,371 | 5,339 |
| Vice President | 44 | 63,943 | 1,453 | 32 | 60,153 | 1,880 | 31 | 71,437 | 2,304 | 15 | 43,018 | 2,868 |
| Executive Sales Director | 15 | 12,081 | 805 | 12 | 11,588 | 966 | 12 | 12,417 | 1,035 | 9 | 8,299 | 922 |
| Regional Sales Director | 109 | 39,032 | 358 | 65 | 35,146 | 541 | 63 | 50,583 | 803 | 28 | 24,592 | 878 |
| Sales Director | 237 | 50,742 | 214 | 161 | 56,551 | 351 | 154 | 53,866 | 350 | 57 | 39,828 | 699 |
| Senior Field Trainer | 207 | 22,823 | 110 | 193 | 32,831 | 170 | 179 | 36,492 | 204 | 62 | 18,490 | 298 |
| Field Trainer | 376 | 31,149 | 83 | 375 | 39,722 | 106 | 312 | 34,022 | 109 | 253 | 32,024 | 127 |
| Agent | 343 | 24,780 | 72 | 357 | 29,667 | 83 | 333 | 30,718 | 92 | 444 | 39,547 | 89 |
| Agents earning zero commission | 2,490 | - | - | 4,887 | - | - | 3,942 | - | - | 3,706 | - | - |
| Total | 3,854 | $494,167 | $ 128 | 6,102 | $455,687 | $ 75 | 5,045 | $446,876 | $ 89 | 4,592 | $354,665 | $ 77 |

| Agent Title | Dec-22 No. of Agents | Comm. Paid | Avg. Comm. | Jan-23 No. of Agents | Comm. Paid | Avg. Comm. | Feb-23 No. of Agents | Comm. Paid | Avg. Comm. | Mar-23 No. of Agents | Comm. Paid | Avg. Comm. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Senior Executive Vice President | 1 | $ 46,337 | $ 46,337 | - | $ - | $ - | - | $ - | $ - | - | $ - | $ - |
| Senior Regional Vice President | 1 | 22,243 | 22,243 | - | - | - | - | | | - | | |
| Senior Vice President | 4 | 61,917 | 15,479 | 1 | 42,699 | 42,699 | 1 | 38,756 | 38,756 | 1 | 61,856 | 61,856 |
| Regional Vice President | 6 | 38,862 | 6,477 | 5 | 58,962 | 11,792 | 5 | 53,858 | 10,772 | 5 | 92,645 | 18,529 |
| Executive Vice President | 7 | 68,635 | 9,805 | - | - | - | - | | | - | | |
| Vice President | 21 | 88,513 | 4,215 | 6 | 44,842 | 7,474 | 6 | 42,307 | 7,051 | 7 | 97,363 | 13,909 |
| Executive Sales Director | 11 | 16,421 | 1,493 | 8 | 39,894 | 4,987 | 8 | 35,236 | 4,405 | 3 | 24,376 | 8,125 |
| Regional Sales Director | 34 | 42,280 | 1,244 | 13 | 62,079 | 4,775 | 15 | 54,008 | 3,601 | 15 | 83,888 | 5,593 |
| Sales Director | 65 | 61,779 | 950 | 39 | 39,660 | 1,017 | 50 | 61,339 | 1,227 | 54 | 126,135 | 2,336 |
| Senior Field Trainer | 90 | 31,730 | 353 | 54 | 27,762 | 514 | 62 | 22,623 | 365 | 71 | 44,584 | 628 |
| Field Trainer | 325 | 51,449 | 158 | 247 | 47,363 | 192 | 292 | 55,275 | 189 | 358 | 99,535 | 278 |
| Agent | 683 | 74,152 | 109 | 580 | 64,376 | 111 | 568 | 72,956 | 128 | 922 | 141,227 | 153 |
| Agents earning zero commission | 2,050 | - | - | 2,676 | - | - | 2,765 | - | - | 2,888 | - | - |
| Total | 3,298 | $604,319 | $ 183 | 3,629 | $427,637 | $ 118 | 3,772 | $436,359 | $ 116 | 4,324 | $771,610 | $ 178 |

The highest level of commission compensation (i.e., greater than $20,000 in a month) for the months noted above were paid to four agents holding one of four Titles — Senior Executive Vice President (Alfred Nickson), Senior Regional Vice President (Ashton Henry), Senior Vice President (Lakeisha Marion), and Regional Vice President (Johanna Morales).

In the months set out above, on average, approximately 73% of agents earn zero commissions, and approximately 83% of agents earn less than the "Total" average commission for each month set forth above. For those agents earning no commissions, when compulsory monthly Protection Plan payments are factored in,

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

these agents would appear to lose money. Of the commissions set out above, approximately 50% of commissions are paid to approximately 1% of the agents.

One element of a lawful multi-level marketing enterprise is a compensation structure that produces "non-trivial" income to a "non-trivial" population of agents. The Monitor has significant concerns about the structure of the Compensation Plan in this regard.

### (iii)    Incentive to recruit.

It is also apparent that success in the Compensation Plan is dependent, in material respects, on agent recruitment. In part, this observation is evidenced by the data cited above, as the highest levels of commission compensation generated by the Compensation Plan are concentrated among agents with the highest Titles. Titles, in turn, are earned as an agent expands his or her downline.

In the current iteration of the Compensation Plan, Titles are awarded based on minimums of "Monthly Protection Plan Membership (PPM)," "Agent Requirements," "New PPM Requirements," and "Team (Leg) Requirements." (*See* p. 9 Compensation Plan). Title qualifications, and many other components of the Compensation Plan, are not adequately defined or explained. As such, any analysis of the Compensation Plan is qualified by the unclear nature of the plan in its current written form.

"Monthly PPM" appears to be a measurement of Protection Plan members an agent has in his or her downline on a monthly basis. In the prior version of the Compensation Plan, the plan measured "Monthly Group Volume," which appeared to be a measurement by dollar amount of the sales of Products generated by an agent and his or her downline. In measuring Monthly PPM, it appears that the Compensation Plan incentivizes agents to enroll and keep enrolled Protection Plan members in his or her downline, which, as discussed below, could be viewed as a system of internal consumption.

"Agent Requirements" is apparently a measurement of the number of "personally sponsored active agents" in an agent's downline (i.e., downline agents that were personally brought into the business opportunity by an agent). Whether a downline agent is "active" is presumably a reference to whether an agent is enrolled as a participant in the business opportunity and paying a recurring monthly Protection Plan fee of $49 to $89 per month depending on the number of months an agent has been enrolled (i.e., the longer an agent remains enrolled, the

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

lower the month Protection Plan fee).[11] The more personally sponsored active agents in an agent's downline, the higher the Title an agent can earn.

Compulsory enrollment in the Protection Plan for agents to remain in "active status" creates a strong incentive for "upline" agents not only to recruit, but to keep downline agents consuming the Monitored Entities' Products.[12] Internal consumption generated the following revenue for the months noted below:

| Month | Revenue Generated by Agent Consumption |
|---|---|
| October, 2022 | $345,000 |
| November, 2022 | $311,000 |
| December, 2022 | $355,000 |
| January, 2023 | $409,000 |
| February, 2023 | $444,000 |
| March, 2023 | $537,000 |

The total revenue from internal agent consumption during the months from October 2022 through March 2023 — $2,401,000 — represents approximately 39% of the Monitored Entities' revenue over that time period. Use of the Products is encouraged by the Monitored Entities to foster a deeper level of knowledge about the Products among the agents, and more effective sales, which was a theme the Monitor Team observed at the Company's February 2023 annual convention in Florida.

Courts and the FTC alike historically viewed internal consumption with skepticism. While internal consumption does not appear to be evidence of an unlawful pyramid scheme per se, excessive internal consumption of products or services by sales agents is a factor for consideration. The Monitored Entities' use of mandatory internal consumption, which creates a material percentage of revenue

---

[11] The Monitored Entities provide prospective agents the option to enroll as a "standard" agent, without enrolling in the Protection Plan, for a one-time fee of $249. These agents, however, do not receive access to the Protection Plan and represent less than 1% of active agents. Additionally, an agent's requirement to pay a monthly fee in connection with the Protection Plan is waived in the event that an agent has recruited five or more other agents who are actively enrolled in the Protection Plan.

[12] The FTC has alleged that, in some instances, the incentive for agents to stay enrolled in the Protection Plan drove agents to pay the monthly fees of recruits in order to entice an individual to sign on as an agent. (*See* First Amended Complaint at PageID. 34, ¶ 69)  The Monitor Team has seen no evidence to confirm this allegation.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

for the Monitored Entities and incentivizes agents to recruit other participants in order to have their monthly enrollment fees waived, is a concern for the Monitor.

"New PPM Requirements" appears to be a requirement for the minimum number of new Protection Plan members introduced into an agent's downline every 90 days.

"Team (Leg) Requirements" apparently measures the amount of downline (i.e., "legs") that extends from and beyond a downline agent, and the revenue generated by such downline. Each Title requires more legs consisting of agents of specified Titles and with minimum sales requirements.

For instance, to hold the Title of "Field Trainer," an agent must have:

- A minimum of five Monthly Protection Plan members
- Two personally sponsored active agents
- One new Protection Plan member every 90 days
- Two separate legs, with a total of five Protection Plan members

To the hold the Title of Senior Field Trainer — the immediately next Title in the Compensation Plan following Field Trainer — an agent must have:
A minimum of 20 Monthly Protection Plan members

- Two personally sponsored active agents
- One new Protection Plan member every 90 days
- Two separate legs, (i) with a minimum of six Protection Plan members per leg, and (ii) containing at least two active Field Trainers, one must be lineage[13]

To hold the Title of Sales Director — the immediately next Title in the Compensation Plan following Senior Field Trainer — an agent must have:

- A minimum of 50 Monthly Protection Plan members
- Three personally sponsored active agents
- One new Protection Plan members every 90 days

---

[13] "Lineage Leg" means "[a] recruitment line that comes from Agents you personally enrolled and whom those Agents personally enrolled." (*See* Compensation Plan at 13).

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

- Three separate legs, (i) with a minimum of seven Protection Plan members per leg, and (ii) containing at least three active Field Trainers, two must be lineage

Building upon the above, each successive Title in the Compensation Plan follows the above pattern, requiring a bigger downline containing agents with higher Titles, together with a larger volume of Protection Plan members. The highest Title — Pinnacle[14] — requires the following:

- A minimum of 60,000 Monthly Protection Plan members
- Eight personally sponsored active agents
- Two new Protection Plan members every 90 days
- Five separate legs, as follows:
  - One "PSL" (i.e., Personally Sponsored Leg) with one active Senior Regional Vice President
  - Two "PSL" separate legs, each with one Senior Vice President
  - Two separate legs, each with one Executive Vice President

In each facet of the Compensation Plan, a higher Title translates into higher compensation.

Compensation under the Compensation Plan is comprised, principally, of the following:

- Direct commissions and level overrides
- Customer Acquisition Bonuses ("CABs")
- Generation Bonuses
- R&R Club Rewards
- Medallion Club

Direct commissions appear to be the only form of compensation that is not dependent on an agent's Title, and is received directly on account of a sale of a Product to a consumer. Direct commissions are payments to an agent as either a one-time $100 commission or what appears to be a monthly $12 commission, depending on whether a sale of a Protection Plan includes an initial consultation. On each sale of a Protection Plan, a level override ranging between $3.00 and

---

[14] It does not appear that any agent currently holds a Pinnacle Title. The Monitor understands that Alfred Nickson held the Pinnacle Title in the past.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

$2.25 is also earned by upline agents in six different levels, which are determined by Title.

Each other form of compensation set forth in the Compensation Plan appears to be determined based on an agent's Title, and in cases of payments to upline agents, based solely upon downline activity.

For instance, CABs (structured as "initial" and "remaining" bonuses) are bonuses beyond a direct commission that are paid to an "Enrolling Sponsor"[15] and upline agents when a new agent is recruited into the business opportunity. The initial CAB appears to be paid when the sale is initially consummated. The remaining CAB is paid only if the customer then makes two monthly payments within the new agent's first 70 days in the business opportunity. A remaining CAB can be retracted by the Monitored Entities if three total monthly payments are not made by the customer in respect of the Protection Plan.

The total CAB earned by the Enrolling Sponsor depends on the Title held by the Enrolling Sponsor, and ranges from $100 (Agent) to $560 (Pinnacle). CAB overrides earned by upline agents also depend on the Title held by an upline agent and range from $10 to $140.

Generation bonuses and R&R Club rewards also appear to be Title dependent and increase in value as an agent's downline grows.[16] Further, R&R Club level rewards changed such that 40% of each monetary reward now is invested in a so-called "private investment account" (i.e., a savings account) held by the Company, while the other 60% is paid immediately to the agent.[17] Agents forfeit the invested portion of the award if he or she leaves the Company before the third year from the date of the reward or the agent is suspended or terminated.

---

[15] "Enrolling Sponsor" is defined in the Compensation Plan as an agent responsible for "introducing and bringing in" as a customer a new agent.

[16] The prior version of the Compensation Plan contained Infinity bonuses, which were monthly payouts paid expressly based on an agent's Title for agents holding the Title of Sales Director and above. It appears that Infinity bonuses are no longer awarded under the Compensation Plan.

[17] For instance, level 1 members of the R&R Club receive $700 per month in residual payments and a one-time $3,500 bonus. Level 2 members' residual payments increase to $1,200 per month and the one-time bonus is $15,000, with the same 60/40 payout split.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

The current version of the Compensation Plan was updated to include the commissions for the Monitored Entities' new Fintech Products — UWE Business Funding and UWE Personal Lending (including Auto Refinance and Student Loan Refinance).  In each case, there is a direct commission paid to the selling agent and level overrides paid to the agent's upline.

The Medallion Club rewards appear to have changed in the current version of the Compensation Plan.  The prior version of the Compensation Plan gave out rewards paid in the form of Company-labelled goods, such as business card holders, briefcases, backpacks, watches and similar items. The Medallion Club under the current version of the Compensation Plan now appears to give out cash rewards based on the number of Protection Plans sold by an agent and a minimum of number of payments made by customers made in connection with such Protection Plans.

In most cases, sales of Products appear to be ultimately required to trigger most forms of compensation under the Compensation Plan. It is not clear, however, whether agents are ever compensated solely on account of enrolling an agent into the business opportunity, without the need for a sale of the Company's Products. For instance, certain information regarding a previous iteration of the Compensation Plan provided by the Monitored Entities to agents suggested that CABs are paid when a new agent is enrolled, without any mention of a Product sale. (*See* Exhibit I).

It is apparent that the highest levels of compensation are determined by an agent's Title, which in turn is primarily determined by the size of an agent's downline. In order to receive higher levels of compensation under the Compensation Plan, and "passive" income generated through level overrides, agents are highly incentivized to recruit other agents and to generate sales of the Protection Plan for internal consumption.

### (iv)  *Compensation Plan difficult to interpret.*

Section 5 of the FTC Act requires that messaging by a multi-level marketing enterprise to its participants be truthful and not misleading.

The Monitored Entities appear to message to agents in the field that lifestyle claims and income representations are not appropriate. It also appears the Monitored Entities represent to prospective agents that income is not guaranteed and success in the business opportunity is dependent on high levels of effort. The

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Monitored Entities, as part of their regular compliance monitoring function, regularly monitor and reprimand agents in the field — primarily through its Field Watch technology (as discussed in the First Report) — who make improper lifestyle claims or otherwise represent the business opportunity in a manner inconsistent with the Monitored Entities' guidelines. Additionally, as described in Section VII.A(1), Company representatives do make certain representations at Super Saturday Events that the Monitor has observed, which could be construed as misleading income claims. Continued monitoring of representations in the field is important. The Monitored Entities should continue these efforts and continue making efforts to strengthen and enhance their monitoring and compliance methodologies as possible.

Relatedly, however, the Monitor has observed that the Compensation Plan is vague, often written in inconsistent jargon and shorthand, and generally difficult to interpret. The Monitor has not seen any evidence that the Compensation Plan is drafted with an intent to mislead agents. Nevertheless, it is likely that a potential agent, who may have little experience in the MLM industry, would not be able to effectively interpret the various formulas for generating commissions and bonuses. In that regard, the Compensation Plan could be characterized as untruthful or misleading.

The Monitor also recently learned of a class action complaint filed against FES/UWE and UWS (the "Class Action Defendants") in the United States District Court for the Eastern District of Michigan (Case No. 4:22-CV-12759-FKB-KGA) by eight former agents, in which the plaintiffs allege, among other things, that:

- Agents are not provided copies of their signed independent contractor agreements.

- The Class Action Defendants change the terms of agent independent contractor agreements without notice to agents.

- The Class Action Defendants do not adequately disclose how commissions and bonuses are calculated.

- Commissions and bonuses are calculated using an internal methodology maintained by the Class Action Defendants.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

- The Class Action Defendants published an annual disclosure stating that agents could earn income ranging from a few thousand dollars to over two million dollars, annually.

(*See* Exhibit J).

Ultimately, the plaintiffs allege the Class Action Defendants wrongfully refused to permit the plaintiffs to re-enroll as agents of the Class Action Defendants following the "re-opening" of the Monitored Entities after the Conversion. The Monitor has not independently investigated or verified the allegations made in the class action complaint.

Nevertheless, the allegations are serious and reinforce the Monitor's concerns that the Compensation Plan and the Company's administration of it, could be characterized as misleading.

### D.    Monitor Recommendations

The Monitor makes the following recommendations relating to the Compensation Plan and the structure of compensating agents:

**Recommendation No. 14**: The Monitored Entities should communicate the compensation structure and earnings potential relating to the business opportunity in a clear and understandable manner. The Compensation Plan, as currently drafted, is not clear and could be characterized as misleading. The Compensation Plan should be significantly updated and revised by counsel to the Monitored Entities so that it can be more easily read and interpreted by agents and prospective agents, and in particular, so that such parties can easily calculate anticipated income.

**Recommendation No. 15**:  Agents should be clearly informed when they enroll as an agent that the Compensation Plan governs their compensation. Agents should be given a hard copy and a digital file of their independent contractor agreement with the applicable Compensation Plan attached as an exhibit. Informed consent from agents, or at minimum advance notice to agents, should be required when any subsequent change to the applicable Compensation Plan is made by the Company.

**Recommendation No. 16:**  The Monitored Entities should evaluate the structure and incentives of the Compensation Plan in order to enhance the

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

promotion and compensation of agents at lower Titles in order to reduce the high level of concentration in income, and more evenly distribute profits, enhance agent retention and sell more Company Products.

**Recommendation No. 17:**  The Monitored Entities should establish a benchmark whereby a significant majority of compensation paid by the Monitored Entities must be based on sales to retail customers, not consumption by agents participating in business opportunity, and track such benchmark on a monthly basis. Compensation paid on the basis of internal consumption needs to be limited and not a material source of compensation paid out in commissions and other compensation under the Compensation Plan.

**Recommendation No. 18:**  In addition to existing disclosures, the Monitored Entities should make the following disclosures to prospective agents:

- The number and percentage of agents who earn a commission; and
- The average and median commission earned.

**Recommendation No. 19:**  The Compensation Plan and related disclosures should be revised to clarify the following:

- No compensation is paid to any agent solely on account of recruiting an agent into the business opportunity without a sale of a Product or service to a customer;
- No purchases of Products or services are required by an agent in order to participate in the business opportunity;
- An agent will not necessarily recover any part of any payments he or she makes in respect of a Protection Plan by referring other consumers; and
- Required fees charged to become or remain an independent sales person should be fully refundable within a reasonable amount of time from payment.

## V.    THE TELEMARKETING SALES RULE

On January 16, 2023, the Monitored Entities provided written responses and documents in response to the Monitor's Information Request No. 2. In part, the Monitor's Information Request No. 2 sought to determine whether the Monitored

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Entities (or third-parties on their behalf) engage in conduct potentially encompassed by the TSR. Specifically, whether the Monitored Entities currently could be considered a telemarketer or seller, and whether the Monitored Entities or their agents engage in telemarketing as defined by the TSR. Under the TSR:

- **Telemarketer:** The TSR defines a "telemarketer" to mean "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." (16 C.F.R. § 310.2(ff)).

- **Seller:** The TSR defines a "seller" to mean "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." (16 C.F.R. § 310.2(dd)).

- **Telemarketing:** The TSR defines "telemarketing" to mean, subject to various exceptions, "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." (16 C.F.R. § 310.2(gg)).

### A. The Monitored Entities' Responses to Information Requests and Monitor Team Agent Interviews.

The Monitor requested that the Monitored Entities produce, among other things, documents evidencing outbound calls made by the Company to customers, or made by third-party telemarketers on the Company's behalf. The Monitored Entities responded as follows (responses in bold):

18) Provide the following documents:
   a) Contracts with any third parties who provide or have provided outbound calling services for the Company to sales leads or potential or actual customers, including any telemarketers

   **Answer: Company doesn't use outbound calling services/sales leads/telemarketing etc. Our call centers are set up to provide support for our existing agents and customers. They take inbound calls to help with service issues and answer questions.**

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

   b)  Written policies of the Company regarding telephone calls to sales leads or potential customers, including any required disclosures and documenting do-not-call requests.

**Answer: Company don't make any out bound calls, Our call center supports existing Customers & Agents with services issues and answer Question. We don't have lead generation services.**

   c)  Lead lists acquired by the Company for potential customers as well as contracts with any third parties who provide lead generation services.

**Answer: None, we don't have lead generation services.**

   d)  Documents maintained by the Company (or provided to the company by any third-party who provides calling services for the Company) documenting or summarizing telephone calls to sales leads or potential customers.

**Answer: Company doesn't use outbound calling services/sales leads/telemarketing etc. Our call centers are set up to provide support for our existing agents and customers. They take inbound calls to help with service issues and answer questions.**

(Responses to Monitor's Information Request No. 2).

As indicated in the Monitored Entities' responses, the Monitored Entities represented that they do not – either directly or through any third-party outbound calling service – utilize formal outbound calling services to call prospective or existing customers. The Monitored Entities' call centers provide inbound calling services to existing agents and customers for service and customer-related issues. Based on the Monitored Entities' responses, it does not appear that these calling centers are for the purpose of inducing "the purchase of goods or services," at least not principally. (16 C.F.R. § 310.2(gg)).

Moreover, according to the Monitored Entities' responses, the Monitored Entities do not utilize any formal lead generation service or otherwise obtain lead lists for use in an outbound calling campaign. The Monitor notes, however, that the

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Monitored Entities' responses represent "we don't have lead generation services." The Monitor is continuing to investigate whether this is true, or not. For example, Michael Toloff, the Company's former co-owner, advised the Company's executives in correspondence as recently as January 24, 2022 to "Make sure **any leads that come in from corporate** are not given to the agent directly, we give the agents number to the customer, they can call – Sue confirmed this is good." (ECF No. 64-6, PageID. 5217 [emphasis added]). This correspondence suggests that the Monitored Entities have received "leads" at the Company level in one form or another, as opposed to at the agent level. The Monitor will continue to confirm the veracity of the Monitored Entities' responses above.

Following receipt of the Monitored Entities' responses, the Monitor Team conducted interviews of randomly selected agents to determine whether those agents make outbound calls (or receive inbound calls) with prospective or existing customers. The Monitor sought to better understand whether agents themselves could potentially be classified as a seller or telemarketer under the TSR, and whether the agents' conduct in speaking with customers over the phone could be considered telemarketing services.

As indicated below, the Monitor Team conducted numerous interviews of agents at the UWE National Convention in Orlando, Florida. Company attorney Sean Scullen, in conjunction with others at the Company, assisted in selecting the agents and coordinating the interviews. During the interviews, the Monitor Team inquired as to, among other things:

- Whether the agent makes outbound calls to or receives inbound calls from prospective or existing customers and, if so, how often;
- Where those customers are located (intrastate or interstate);
- The substance of those phone calls;
- Whether the agents engage in any upselling – that is whether the agent speaks initially with a customer about one Product, but then markets a separate Product to the customer during the call; and
- From which telephone the call is made or received (e.g., a mobile phone).

Below is a general summary of the Monitor's observations from these interviews:

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

1. The most common form of marketing used by the agents whom the Monitor Team interviewed is word of mouth. Most often, an agent speaks in person with another person, for example a colleague, about the Products.

2. Some agents the Monitor Team interviewed are active on social media, and use social media in their marketing efforts. For example, one agent represented that they use Instagram to promote the Products and include their mobile phone number in the Instagram post, or on their Instagram page. Another agent conducts educational webinars on social media to speak about the Products, and in doing so provides the agent's cell phone number.

3. It is evident that agents use the telephone – most often a mobile phone – to speak with prospective and existing customers about the Products. Many agents indicated they receive inbound calls from prospective customers, where the prospective customer obtained the agent's phone number from word-of-mouth marketing or on social media. However, at times, agents interviewed by the Monitor Team represented that they also make an initial outbound call to new or existing customers to speak about the Products. Agents also frequently utilize text messaging in their communications with prospects.

4. Several agents interviewed by the Monitor Team represented that the initial conversation between the agent and a prospective customer concerned the credit repair services. Agents indicated they often inquire more about why the prospective customer may be interested in the Products, speak to the customer about financial literacy, and then speak to the prospective customer about the Protection Plan's bundle of Products. This includes budgeting, credit restoration, creditor monitoring, debt payoff, and credit builder.

5. Agents indicated that even where the initial call with a prospective customer is to discuss only credit repair services, the agent may speak to the prospective customer about all Products offered by the Company (and presumably YFL) – not simply, for example, the Protection Plan.

6. Some interviewed agents indicated they have customers both in-state and out of state. The agents indicated they speak on the phone with out-of-state customers regarding the Products.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

7.      Many agents are beginning to use Zoom or another videoconference technology to speak with current and prospective customers, as opposed to using the telephone.

8.      None of the agents interviewed by the Monitor Team represented that they use any lead-generation services, direct mail solicitations, or otherwise engage in a repeated pattern of cold calling. Many agents stressed a personable approach.

9.      Agents indicated that, by far, prospective customers are most interested in the Company's credit-related Products.

10.     Most agents indicated that they typically do not keep detailed records of their phone calls with customers from their cell phone.

11.     Agents make no distinction between FES/UWE and YFL/UCES when it comes to selling Products.

Based on the Monitor Team's interviews with agents it is clear that agents speak with customers over the phone to sell the Products. This includes both inbound calls (whereby a prospective or existing customer calls the agent, and the agent then sells the Products), and outbound calls (whereby the agent calls a prospective or existing customer to sell the Products). The agents most often speak with customers that are within the state where the agent is located, but some agents indicated that they also have out-of-state customers. The agents that do have out-of-state customers indicated there is no distinction as to how they may market and sell the Products over the phone, except that the agent is more likely to speak with a prospective or existing customer over the phone if they are out of state, rather than in person.

In addition, it is evident that at times agents solicit customers during the same telephone call in which a prospective or existing customer may call to discuss the Products. For example, certain agents represented that when a prospective customer calls them to discuss the credit restoration services, the agent will also discuss the full suite of Products – including budgeting, credit monitoring, and other Products. In addition, at least one agent indicated that they intend to discuss with prospective and existing customers some of the new Fintech Products, such as the new business loan program.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

It is also clear, however, that there is a growing trend by agents to speak with prospective and existing customers about the Products via Zoom, rather than over the phone. For example, some agents with whom the Monitor Team spoke represented that they prefer Zoom, rather than the telephone, because it offers a more personable approach to speak about the Products as opposed to speaking over the phone.

## B.    The Monitor's Observations Concerning the TSR.

As indicated above, concerning the TSR, the Monitor Team sought to determine whether the Monitored Entities engage in telemarketing services. To date, the Monitor has not uncovered any evidence or documentation tending to suggest that the Monitored Entities engage in any outbound calling campaign from designated call centers at the Company level. Nor has the Monitor uncovered any evidence or documentation tending to suggest that the Monitored Entities utilize any third-party telemarketer to call prospective or existing customers. From what the Monitor is able to discern, the Monitored Entities do not engage in these activities.

Notwithstanding the foregoing, the conduct of the Monitored Entities' agents could, and potentially does, fall within the scope of the TSR.[18] The TSR defines "telemarketing," to mean any "plan, program, or campaign" to "induce the purchase of goods or services" "by use of one or more telephones and which involves more than one interstate telephone call." (16 C.F.R. § 310.2(gg)). It is evident that at least some of the Monitored Entities' agents make outbound calls to prospective and existing customers to solicit the Monitored Entities' credit repair (and potentially debt relief) services. Admittedly, the Monitor has not uncovered a similar circumstance – specifically, independent agents of a company soliciting customers for goods and services from their individual cell phones, as opposed to from a formal call center or using autodialing technology – where a company was found to have violated the TSR. Nonetheless, through the Monitor Team's select agent interviews, the Monitor has observed that, at a minimum, the agents make outbound telephone calls to sell Products to in-state and out-of-state prospective and existing customers to solicit business in the normal course of their business.

---

[18] This excludes any potential exemption from the TSR for charitable organizations. According to the FTC, tax-exempt non-profit charities that conduct their own telemarketing are not covered by the TSR. (*Complying with the Telemarketing Sales Rule*, *infra* p. 48).

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Some of the Monitored Entities' agents also receive inbound calls from prospective and existing customers in response to advertisements (*e.g.*, social media posts) and, during those calls, sell the Monitored Entities' credit repair services. In at least one instance, an agent represented that, even after an inbound call initiated by a prospective customer regarding one component of the Protection Plan, the agent would explain the full suite of Products offered. This conduct, too, could be considered telemarketing as defined by the TSR.

Specifically, inbound calls initiated by a customer are typically exempt under the TSR. (16 C.F.R. § 310.6(b)(5)). However, calls initiated by a customer in response to an advertisement relating to debt relief services, or for services represented to "remove derogatory information from, or improve, a person's credit history, credit record, or credit rating," are not exempt. (16 C.F.R. § 310.6(b)(5)(i); 16 C.F.R. § 310.4(a)(2)). If the Monitored Entities' agents' conduct consists of telemarketing as defined under the TSR, then even inbound calls initiated by a customer to an agent would be encompassed within the TSR if the call concerns debt relief or credit repair services. Here, the Monitor has observed through agent interviews that the Monitored Entities' agents – at least those with whom the Monitor Team spoke – do sell debt relief and credit repair services in response to calls initiated by customers to the agent.

Furthermore, an agent's practice of "upselling" the Products during an initial transaction may also independently encompass the Monitored Entities' agents' conduct under the TSR. "Upselling" under the TSR is defined to mean "soliciting the purchase of goods or services following an initial transaction during a single telephone call." (16 C.F.R. § 310.2(hh); 16 C.F.R. § 310.6(b)(4), (5)(iii), (6)(iii)). While inbound telephone calls are typically exempt, if an upsell occurs during the inbound call, then the upsell constitutes a separate telemarketing transaction covered by the TSR.

Any "upselling" practice would also apply to the Company's own call centers. In response to the Monitor's information requests, the Company represented that "[o]ur call centers are set up to provide support for our existing agents and customers. They take inbound calls to help with service issues and answer questions." However, if in response to customer inquiries concerning service issues the Company's call centers convert those service calls into sales calls, that upsell could be separately covered. (*See United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1166 (C.D. Cal. 2021) [holding that a company's practice of converting calls from consumers who wish to have their profile

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

removed from the company's website to sales calls constituted "upselling" under the TSR and, thus, were subject to the TSR]). The Monitor has not uncovered any evidence that the Company's call centers engage in upselling, but is continuing to review this issue, including whether any "leads" come directly to the Company (as opposed directly to agents).

The Monitor is concerned that, from what the Monitor is able to discern, the Monitored Entities do not provide any formal training or guidance to agents specifically addressing TSR compliance. The Monitor also has not seen any evidence that the Monitored Entities produce the documentary information required by the TSR. For example, the TSR requires, among other things, a seller or telemarketer requesting or receiving payment of any fee for services "represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating," to produce documentation establishing that the "the promised results have been achieved" prior to receiving the fees, at least at the six month mark. (16 C.F.R. § 310.4(a)(2)). The Monitor sees no evidence that the Monitored Entities produce this information.

Lastly, the TSR "generally does not cover telephone transactions where the sale of goods or services or a charitable contribution is not completed until after a face-to-face presentation by the seller or charitable organization, and the consumer is not required to pay or authorize payment until then." (FTC, *Complying with the Telemarketing Sales Rule*, (last edited Aug. 30, 2021), *available at* https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule; *see also* 16 C.F.R. § 310.6(b)(3)). The FTC emphasizes "direct, substantive and personal contact between the consumer and seller" to fall outside the TSR's scope. *Id*. As indicated above, agents represented to the Monitor a growing trend towards the use of Zoom or another videoconference technology to speak with customers about the Products and services, including new customers.[19] It is not clear to the Monitor whether the use of a videoconference technology would constitute a "face-to-face" transaction, thus removing the transaction from the TSR's scope. The Monitor has located only one resource indicating that Zoom or videoconference calls do not satisfy the face-to-face exemption. (*See* FTC, *Debt Relief Services & the Telemarketing Sales Rule: What People Are Asking*, (last accessed Apr. 21, 2023), *available at* https://www.ftc.gov/business-guidance/resources/debt-relief-services-telemarketing-sales-rule-what-people-are-

---

[19] As noted above, a new customer is charged a $99 consultation fee after UCES provides the initial credit consultation service outlined in the contract. Reportedly, such initial consultations typically are done via Zoom video conference.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

asking ["Webcam conversations and other online interactions don't count as face-to-face meetings. To qualify for the exemption, face-to-face sales presentations have to be in person."]). However, the Monitor has not located any judicial decision in which a court interpreted Zoom or another videoconference technology to comply, or not to comply, with the face-to-face exclusion. All else equal, given that this may be a gray area, the Monitored Entities should continue to explore methods other than an initial telephone call to sell the Products.

## VI.   NEW COMPANY FINTECH PRODUCTS

### A.   UWE Business Loan Program

Prior to the National Convention, the Monitored Entities disclosed to the Monitor's Team a new business loan program.

On February 24, 2023 during the National Convention, Monitor Team members interviewed Jason Short, UWE's Director of Emerging Technologies and Strategic Retention. Mr. Short spearheads the Company's business loan program. The Monitor conducted a follow up interview with Mr. Short on April 12, 2023 regarding the Fintech Products.

Mr. Short described the new business loan program as providing access to business loans by non-traditional lenders to the Monitored Entities' customers and agents. Mr. Short explained that these non-traditional lenders are lenders that have increased willingness to lend to customers that might not otherwise qualify for a loan through a traditional bank. According to Mr. Short, the minimum loan requirements set by these non-traditional lenders are less than what would be required by a traditional banking institution.

As part of the program, UWE agents are asked to market the business loan program to prospective or existing customers or agents. According to Mr. Short, the business loan program offers access not only to business loans via non-traditional lenders with increased approval rates, but also an advisor who negotiates the loan terms (such as loan amount, interest rate, duration) with lenders on the customer's behalf. If the customer or agent wishes to proceed with applying for a business loan, the UWE agent sends the customer a link to a webpage that appears to comprise of UWE's website, where the customer applies for the loan.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Mr. Short explained that the webpage is not operated by UWE, but by a company called Lendflow. Mr. Short described Lendflow as a "Fintech" company that provides integration services and directs the potential customer to a network of non-traditional lenders. According to Mr. Short, after the customer applies via the UWE link, a Lendflow advisor (or a third-party representative acting on Lendflow's behalf) will contact the customer to verify the customer's business lending needs and further define the desired loan parameters. For example, Lendflow may ask the customer or agent the type of business expense(s) the loan will fund, such as an equipment purchase, advertising or marketing expense, payroll, inventory, or another business use. If the customer qualifies, Lendflow will send the completed business loan application to its network of non-traditional lenders for potential loan approval.

Mr. Short explained that the loans are strictly for business use, and reserved for those businesses which satisfy certain qualifications. Such qualifications include the signatory to the loan having a personal credit score greater than 550, a minimum of six months in operation, and roughly $8,000 to $10,000 in monthly business revenue. Mr. Short has some access to the outcome of the loan application through a Lendflow web portal. For example, Mr. Short explained that he is able to, and does, monitor which loans are ultimately declined, approved, and funded. However, Mr. Short did not know the process by which Lendflow or the lender investigate and confirm the ultimate use of the loan proceeds. As of April 20, 2023, there were 949 loan applications, 223 loan offers, 37 loans funded, and a total of $705,519 in loans funded. The average loan size to date is $16,407.42. Over the last six months, the average length of the loans has been 6.7 months, with the longest being 60 months and the shortest being two months. As of April 20, 2023, the Company has earned $35,276.03 in revenue from the business loan program.

As of the date of his first interview, Mr. Short indicated that approximately 10% to 15% of the funded loans were to UWE agents, and the remainder were to UWE customers for the customer's respective business. Mr. Short did not know if the purpose of the funded loans were through the agent's UWE business, or a separate business with no UWE affiliation.

Mr. Short explained that UWE's only role in the loan process is to market the program to its customers and agents, and provide the link to the UWE

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

webpage. Mr. Short described them as "finders." Mr. Short represented that UWE does not otherwise facilitate the loan process, negotiate terms, or assist in preparing or reviewing the loan documents. Mr. Short also represented that he did not have access to the loan documents executed between the lender and customer, although he did have access to loan applications.

UWE and Lendflow are parties to a Lendflow Services Agreement ("Lendflow Agreement") in connection with the Company's business loan program. Mr. Short explained that when a loan is processed and finalized, Lendflow receives a commission payment from the lender calculated as a percentage of the size of the business loan. That is, the higher the loan, the higher the payment received by Lendflow. Mr. Short said the percentage Lendflow receives from its lending partner is in the 5.0% to 16% range and averages about 8.0%. UWE, in turn, is paid a percentage (currently 40% under the Pro Plan described below) of Lendflow's commission payment from the lender. Specifically, under the Lendflow Agreement, UWE is paid a "referral" or "commission payment" that is calculated based upon the "gross revenue on originated volume per month." The Lendflow Agreement provides that "no referral or commission payments shall become due to [UWE] until such amounts are received by Lendflow from the applicable third-party." (Lendflow Agreement, § 6.2).

Under the Lendflow Agreement, UWE can opt into different Lendflow platform plans that vary depending on the monthly fee paid by UWE, with associated commissions paid to UWE based on the size of each loan. The UWE agent who solicited the borrower, in turn, receives 50% of the amount paid to UWE as a commission. The platform plans are:

1. **Growth Plan:** $2,500 per month paid by UWE. In exchange, UWE receives 30% of the gross revenue Lendflow receives on originated loans per month.
2. **Pro Plan:** $5,000 per month paid by UWE. In exchange, UWE receives 40% of the gross revenue Lendflow receives on originated loans per month.
3. **Enterprise Plan:** $10,000 per month paid by UWE. In exchange, UWE receives 50% of the gross revenue Lendflow receives on originated loans per month.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Currently, UWE is in the Pro Plan. According the Mr. Short UWE originally selected the Growth Plan, but 50% of UWE's 30% commission was "not enough value add to agents" to incentive them to solicit business loan customers, so UWE opted into the next level for a 40% commission from Lendflow.

Lendflow reportedly performs all of the integration services throughout the application process, client support, and other services in exchange for UWE's monthly fee.

The Company initially made the business loan program available to all agents in November 2022. However, at the time, the Company had not formally promoted or provided any training to explain the program to agents, except by generally discussing the program during select "Leaders Calls." The Leaders Calls, according to Mr. Short, consist of Zoom meetings among Company executives and participating agents. The Company then formally launched the business loan program to attending agents during the 2023 National Convention.

### B.    Consumer Loans

According to Mr. Short, as of early April 2023, UWE promotes consumer loans through Even Financial (apparently now known as Engine by Money Lion) which "offers more in its product line up than other lending platforms" with debt consolidation loans, personal loans, auto refinancing, student refinancing, and high yield savings (money market, interest checking, and investment accounts). Mr. Short said that UWE's competitors are selling such products and agents were asking for these to match them. The Monitor Team does not yet have a copy of the agreement between UWE and Even Financial or any other consumer lending company. Hence, the compensation arrangement details are not yet clear to the Monitor. But, Mr. Short indicated that UWE is paid by Even Financial or its partner banks based on the number of clicks (or visits) to its website through UWE, and a UWE agent receive $3.00 for each bank account that is opened by an Even Financial customer it solicited.

### C.    Legal Compliance Analysis of the New Fintech Products

The Monitor understands that the Company offered some of the new Fintech Products without prior compliance legal review or input. Apparently, the Company's legal counsel from Greenspoon only received information about the Company's new business loan offering and Fintech Products in early February

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

2023. The Monitor has concerns that the Company at times places the importance of legal and regulatory compliance below and after sales and marketing. The Monitor observes that the Company requires a more sophisticated approach and understanding of when laws, rules, and regulations could or do apply to its Products, services, and arrangements with third parties.

Moreover, as explained above, the Company is now marketing and advertising consumer loans that are primarily for personal, family or household use – as opposed to strictly business loans. The Monitor, having only very recently learned about these new Fintech Products, is continuing to review the scope of the Monitored Entities' actions with respect to these programs. The Monitor understands that the Company will rely on third-party "partners" to facilitate consummating transactions relating to personal loans, student loan refinancing, and auto loan refinancing through third party lenders. Depending on the extent of the Company's role in these transactions with respect to credit applicants and, now, business and consumer lenders, the shift to these new programs potentially implicates additional laws which do not appear to have been considered by the Company prior to launching these new Fintech Products.

For example, the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq*., prohibits "creditors from discouraging or discriminating against any credit applicant 'with respect to any aspect of a credit transaction' on a variety of bases, including 'race, color, religion, national origin, sex or marital status, or age.'" (*Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 576 (6th Cir. 2016) [citing 15 U.S.C. § 1691(a)]). ECOA generally requires creditors to provide applicants with written notice of the specific reasons why an adverse action was taken in regard to their credit. Regulation B of the Consumer Financial Protection Bureau ("CFPB") (12 C.F.R. Part 1002) implements ECOA. Regulation B defines a "creditor" to include "a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made," but solely for purposes of ECOA's prohibition on discriminating against or discouraging a loan applicant on a prohibited basis. (12 C.F.R. § 1002.2(l)). In other words, "[u]nder Regulation B … 'creditors' who act as mere middle-men between applicants and lenders have no affirmative obligation to provide applicants with notice stating the reasons for any adverse action." (*Tyson*, 836 F.3d at 578). However, while the Monitored Entities may not ultimately be obligated to comply with the notice requirements under ECOA to applicants associated with the new Fintech Products, the Monitored Entities are likely subject to ECOA's prohibitions on discrimination and

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

discouragement when advertising and soliciting customers for personal loans. (*See also* 12 C.F.R. Pt. 1002, Supp. I, cmt. 2(l)–2 [explaining that creditors "who do not participate in credit decisions" are still subject to the Act's discrimination and discouragement provisions]).

Moreover, if the Monitored Entities or their agents regularly participate in credit decisions, or set the terms of credit, they may be subject to ECOA's written disclosure requirements as well. (*See Tyson*, 836 F.3d at 579 ["[U]nder certain circumstances, creditors purporting to be mere middle-men may still be required to provide notice of an adverse action."]).

In addition, the Truth in Lending Act, 15 U.S.C. § 1601 ("TILA") and its implementing Regulation Z of the CFPB (12 C.F.R. Part 1026) are meant to promote the "informed use of credit by assuring meaningful disclosure of credit terms to consumers." (*Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559 (1980)). The Monitor understands that the FTC enforces TILA and Regulation Z with regard to most nonbank entities. (15 U.S.C. § 1607(c)). Persons subject to TILA are generally required to "provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." (*Beach v. OcwenFed. Bank*, 523 U.S. 410, 412 (1998)). In part, Section 144 of TILA provides restrictions on these advertisements that, among other things, requires certain disclosures in advertisements (such the amount of a downpayment, installment payment, or terms of repayment if one is required). (15 U.S.C. § 1664). Section 144 applies to "any advertisement to aid, promote, or assist directly or indirectly any consumer credit sale, loan, or other extension of credit." (15 U.S.C. § 1664). Advertisement is defined to mean "a commercial message in any medium that promotes, directly or indirectly, a credit transaction." (12 C.F.R. § 1026.2(a)(2); 12 C.F.R. Part 226 Supp. I § 226.2(a)(2) ["Messages inviting, offering, or otherwise announcing generally to prospective customers the availability of credit transactions, whether in visual, oral, or print media, are covered by Regulation Z."]).

TILA generally applies only to "creditors" – defined to mean, in part, "a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required." (15 U.S.C. § 1602(f)). However, Regulation Z's restrictions on advertising, discussed above, apply to any person who transmits a commercial message that promotes a credit transaction, and not just to persons who qualify as

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

creditors. (12 C.F.R. Part 226 Supp. I cmt. 2(a)(2)-2 ["All persons must comply with the advertising provisions in §§ 226.16 and 226.24, not just those that meet the definition of creditor in 226.2(a)(17)."]). Persons "who are not themselves creditors must comply with the advertising provisions of the regulation if they advertise consumer credit transactions," including through telephone solicitations and print or digital media. (12 C.F.R. Part 226 Supp. I § 226.2(a)(2)). With the launch of these new Fintech Products, the Monitored Entities should ensure compliance with TILA's applicable advertising requirements.

The Monitored Entities should also ensure that the Company's new business loan program through Lendflow does not run afoul of any broker/dealer registration requirement under Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act"), or any state law equivalent. Section 3(a)(4)(A) of the Exchange Act generally defines the term "broker" as any person engaged in the business of effecting transactions in securities for the account of others. (15 U.S.C. 78c(a)(4)(A)). Section 15(a)(1) requires any broker effecting transactions in securities, or inducing or attempting to induce the purchase or sale of securities, to register with the Securities and Exchange Commission ("SEC") pursuant to Section 15(b) of the Exchange Act. Violations of the Exchange – or a state law equivalent – can result in significant monetary penalties.

The Company and its agents are likely acting as "finders" as that term has been used with reference to the Exchange Act. The SEC has found that certain categories of persons, such as "finders" and "business brokers" who find "investors or customers" and then split commissions with registered broker dealers "or other securities intermediaries," may be required to register as a broker/dealer.[20] The SEC has determined that a "person's receipt of transaction-based compensation in connection with" effecting or inducing transactions in securities "is a hallmark of broker-dealer activity." (*Brumberg, Mackey & Wall, P.L.C.*, SEC No–Act at 1–2 (May 17, 2010)).[21]

Here, the Company receives transaction-based compensation in the form of commissions paid on consummated business loans through an intermediary. The transaction-based compensation that the Company receives is conditioned on the

---

[20] *See* U.S. Securities and Exchange Commission, *Guide to Broker Dealer Registration* (April 2008), https://www.sec.gov/about/reports-publications/investor-publications/guide-broker-dealer-registration#II.
[21] Available at https://www.sec.gov/divisions/marketreg/mr-noaction/2010/brumbergmackey051710.pdf.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

loan being funded to the Company's customer. However, based on the information available to the Monitor to date – which, to be clear, does not include the executed loan agreement between the lender and the Company's customer – it does not appear that the Company's new business loan program would subject the Monitored Entities to the Exchange Act's broker/dealer requirements because it does not involve a transaction with a security. The United States Supreme Court held that while the definition of "security" includes "any note … debenture, certificate of interest" and other instruments, *see* 15 U.S.C. § 78c(a)(10), certain "instruments commonly denominated 'notes'" may "nonetheless fall without the 'security' category." (*Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990)). These include:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business.

(*Id*. [citation omitted]; *Banco Espanol de Credito v. Security Pacific Nat. Bank*, 973 F.2d 51 (2d Cir. 1992) ["certificates evidencing loans by commercial banks to their customers for use in the customers' current operations are not securities."]).

Thus, while the Company is likely acting in a finder capacity, it does not appear that these pure business loans by non-traditional lenders to customers for business operations would be deemed a security under the Exchange Act. However, determining whether an instrument is a security can be lengthy and complicated, can (and has) fluctuated with varying jurisprudence, and almost always depends on a review of the various contracts or documents that give rise to the instrument (or instruments). The Monitor has not been able to review any loan agreement, in draft or final form, in connection with the Company's business loan program. As a result, the Monitor cannot rule out whether these business loan transactions could constitute a security under the Exchange Act without a review of contract executed between the UWE customer and lender. If the business loan transaction includes a security transaction, then the Company's conduct may be covered by the Exchange Act's broker/dealer requirements, particularly given that the company receives transaction-based compensation.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

The Company has now launched a variety of new business- and consumer-related Fintech Products, in which the Company markets and advertises personal and business loans and then refers the customers to a lender. These programs implicate federal and state laws. While the Monitor believes that the Company has placed an increased emphasis on compliance following Greenspoon's and the Monitor's involvement, the Monitor continues to have concerns that the Company is emphasizing sales and marketing over compliance concerns. The Company must rely on external professionals for compliance-related guidance before launching such programs.

## VII.   AGENT AND COMPANY EVENTS

### A.   Super Saturdays

The Monitor Team asked the Company to provide the Monitor Team details for all events (i.e., trainings, conferences, seminars, workshops, etc.), below is a listing of such events disclosed to the Monitor Team during the reporting period.

| Event Title | Event Date | Event Location | Total Approx. Attendees | Monitor Team Attendees |
|---|---|---|---|---|
| Super Saturday Atlanta | October 22, 2022 | Marriott Hotel Buckhead | 80-100 | Patrick Miles, Elizabeth Zezula |
| Super Saturday New York | November 19, 6, 2022 | JFK Hilton Hotel, Queens | 60-80 Reported | Via Zoom: Patrick Miles, Gene Kohut |
| South Florida Super Saturday Webinar | December 10, 2022 | Zoom & Ft. Lauderdale | 240 | Via Zoom: Patrick Miles |
| Super Saturday Atlanta | December 17, 2022 | Zoom & Atlanta | Unkown | Via Zoom/partial: Elizabeth Zezula, Anita Peterson |
| New York Training | December 20, 2022 | Zoom & New York City | 15-20 | Via Zoom: Allison Cole, David Hall |
| Los Angeles Training | January 21, 2023 | Los Angeles | 30-40 | Patrick Miles (via Zoom), Peter Morris |

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

| Sales and Compliance Training | January 23, 2023 | Hilton Hotel, Queens | 10-15 | Via Zoom: Patrick Miles, Peter Morris |
| UWE National Convention | February 24 – 26, 2023 | J.W. Marriott Bonnet Creek, Orlando | 450-500 | Patrick Miles, David Hall, Anthony Sallah, Michael Dery, Elizabeth Zezula |

### 1. <u>Super Saturday in Atlanta on October 22, 2022.</u>

The Company held a Super Saturday Event on October 22, 2022, at the Marriott Hotel in Buckhead, Atlanta. On October 14, 2022, Company attorney Sean Scullen described event as a "single training session for a small group," attaching a "current registration list, consisting of 21 individuals" via email. After arriving at the event, registration personnel claimed over 100 people registered for the event. All guests at the event appeared to be African American. Chris Holder, Michael Burgos, Alfred Nickson, and Alisa Barnes were the primary presenters during the event.

Chris Holder presented statistics about American households to provide magnitude of potential future customers and agents, stating there are 84 million families that need financial literacy, 65 percent of Americans reported having no budget in place, 1 in 5 Americans did not save any money last year, the average balance of credit card debt is $14,000, and 48 percent of households over the age of 50 had zero dollars saved for retirement. Mr. Holder explained the importance of educating others and that people like learning from someone they know, prompting the crowd to think of how many people they may know already that would benefit from joining the Company. He went on further noting that it is the agent's job to refer others and that the credit restoration, technology, paperwork, and customer service would be handled by the Company.

Agent Michael Burgos told the audience his personal story, noting he was celebrating five years with the Company. Mr. Burgos explained he made Regional Ambassador in 90 days, earning an extra $5,000-$6,000 per month.

During a session break, Company attorney Matthew Rapkowski from Greenspoon spoke with the Monitor Team pointing out a disconnect between the slides presented and changes that were made. Mr. Rapkowski noted the Company decided "tax benefits" being listed as an advantage of the business are no longer a claim the Company will make. Additionally, he noted the need to add further

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

explanation of "qualified agents" in the life insurance benefits and similar rewards. Mr. Rapkowski noted the slides need updating, including the testimonials presented during the presentation.

Agent Alfred Nickson presented on the Compensation Plan, noting agents had the potential of getting paid seven different ways. Mr. Nickson gave an example of yielding $5,000 in income per month in direct residual income, which was presented as an achievable outcome to the audience. Agents earn $12 per month per person actively enrolled under the agent. To earn $5,000 per month in direct residual income, agents would need over 400 active people enrolled in their downline. Based on conversations had with agents, many have less than 100. Mr. Nickson continued his presentation, stating so-called private business receptions (i.e., "PBRs") were the method to gain new customers and agents quickly. He also noted developing connections with mortgage lenders and car salespeople in effort to tap into their networks of clients.

In the afternoon session, Mr. Burgos kicked off the conversation noting a multi-millionaire was coming to his home this evening. Mr. Burgos further noted the job of a new agent is to invite and to let an expert speak. He noted "We do not close anyone over the phone, we don't use the term 'close,' we don't 'close' anything. We invite." Mr. Burgos concluded by saying the PBR might include small snacks, not serve alcohol, ensure guests are comfortable, focus on educating and not to oversell the products, but simply to share personal story about how the products and services are working for them.

Agent Alisa Barnes lead a conversation from a slide on how to "close your customers" (in apparent contrast to Mr. Burgos' previous statements noted above), explaining how important it is to create relationships and build trust with potential new customers and agents. Ms. Barnes told the audience to break topics down so they are easy to understand, encouraged authenticity and advised not to be overly sales focused. She stated that "people close themselves" by deciding to join the Company and the role of the agent is to educate and get the person to know, like, and trust them.

## 2. Super Saturday in New York on November 19, 2022.

The Monitor Team did not attend the November 19, 2022 New York City Super Saturday in person, only via Zoom. As such, the Monitor Team neither saw the audience to determine its size nor received an attendee list from the Company. Mr. Holder opened the meeting and told his personal story. He invited Mr. Nickson

to share his story. Mr. Nickson said his "credit score increased 95 in the first [inaudible] months" after joining the Company. He noted he built two homes in the past year and took care of his mother. Mr. Nickson remarked that the "Compensation Plan dictates your behavior" and to maximize it "can be a game changer."

Mr. Nickson told the audience to enroll customers and to enroll agents as well as "to teach and encourage your team to do the same." He noted the importance of volume and that each customer is 200 volume points and each agent is 400 volume points. He pointed out that a certain amount of volume is needed to achieve different levels. He also described the seven different ways agents are paid. He highlighted "Strive for 5" also called "the Power of 5" (i.e., enrolling five agents immediately) which he called the "back bone of the Compensation Plan." He advised the agents in the audience to "master this" concept in order to go to the next level.

Mr. Holder returned to cover the compliance topic by first noting its "purpose is to zone in on what to do and how to do it and what to avoid." He said there were layers of support for agents and noted the Monitor was on the Zoom but is normally in attendance. He provided examples of non-compliant social media posts. He also advised the agents to focus on their personal story for a conversation. He then introduced the Monitor Team members attending remotely via Zoom. The Monitor noted that he is Court-appointed and is neither the Company's nor the Government's lawyer. The Monitor described his role as observing and making recommendations to improve the Company's compliance. Mr. Holder also introduced the Company's attorney, Matthew Rapkowski, who was attending in person. Mr. Rapkowski repeated the Monitor's role and noted the First Report recommended improvements. He stressed that the Company's compliance documents must be reviewed by agents and that they need to review them. Second, he told the audience to ask questions of the Company's leadership in the room. Third, he said they should police themselves – if they see a social media post that is wrong, report it – reporting is helping each other.

Mr. Holder then provided training on how to build a team and introduced Michael Burgos who he said is helping with the Company's "Spanish expansion." Mr. Burgos remarked that they are "not selling UWE, not selling UCES, you're selling yourself." Introducing Mr. Nickson, he noted that Mr. Nickson had $10,000,000 per month production. Mr. Nickson then lead the "How to Close Your Customer" section (replacing Crown Ambassador Alisa Barnes) from a slide

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

presentation. He said that he has personally enrolled over 1,000 customers in his seven year UWE career. The structure, he advised, is 1) to understand the client's problem and goals, 2) build credibility with people they know, trust, and like, 3) add value about what they're getting, and 4) close with the price.

A panel discussion with five agents talking about their respective experiences ensued. The Monitor requested Mr. Holder and Mr. Rapkowski to provide the names, titles, and locations of such panelists, but such information was never provided.

### 3.   Super Saturday in Ft. Lauderdale via Zoom Webinar on December 10, 2022.

The Company held a Super Saturday Event on December 10, 2022, in Fort Lauderdale, Florida with attendees in person and via Zoom webinar. The Monitor Team requested the agenda, names and titles of speakers, and names of attendees. The Monitor Team received list of attendees and speaker's list on December 15, 2022 from Sean Scullen. Chris Holder, Alfred Nickson, Josseny Cadestin, Albert Espinoza, Johnnie Newsome, and Michael Burgos were the primary presenters during the event.

Josseny Cadestin began with the mission of the Company, which is to educate others and enhance financial literacy. It was noted that UCES is UWE's partner and has been around for 18 years, claiming it is the number one financial literacy company in the nation. Mr. Cadestin stated "54 percent of Americans don't know their credit score" and presented slides on how a credit score is calculated and what is considered a "good" and "bad" credit score. Additional topics presented were on budgeting, credit card debt and costs to enroll in the Company's Personal Protection Plan.

Alfred Nickson presented on income generation, noting agents had the opportunity to get paid six different ways. During Super Saturday in Atlanta on October 22, 2022, Mr. Nickson presented seven different ways of getting paid. He went on further to state "You are not fixing anyone's report or credit. You are referring people." The Customer Acquisition Bonus and Infinity Bonus were described.

Albert Espinoza introduced Lakeisha Marion and Alisa Barnes to give personal testimonials. There was a similar theme, agents reported starting the Company with a credit score in the 400s and now have scores in the 700-800s,

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

earning a significant income through the Company, many referencing a six- and seven- figure annual income.

Johnnie Newsome gave an overview of the Compensation Plan, stressing the importance of planning with upline sponsor to determine best allocation of new agents. Mr. Newsome explained that agents have six ways of getting paid and provided examples on how to earn direct commissions, direct residual income, Customer Acquisition Bonuses, Infinity Bonuses, Generational Bonuses, and R&R Club benefits.

Michael Burgos presented on the importance of PBRs, beginning with his backstory prior to joining the Company working as a banker with a low credit score. Mr. Burgos went through how productive PBRs can be and best practices on scheduling, hosting, presenting, and closing individuals at the PBRs. He stressed the importance of recruiting people to join the Company, stating, "Every successful organization is recruiting all the time."

Mr. Nickson returned to present a second time during the event, with a slide titled "Building a Dynasty" and stating at one point he had over 100,000 agents in his network. He told the audience the importance of being an influencer, which he described as an independent problem solver that is consistent, creates action and has a big vision. Mr. Nickson then presented a slide "How to Become a 6-Figure Earner. Develop 10 influencers in your organization" and mentioned Billy Scott and Morgan Hardman as top influencer agents.

### 4.  **Super Saturday in Atlanta via Zoom Webinar on December 17, 2022.**

The Company held a Super Saturday Event on December 17, 2022, in Atlanta, Georgia with attendees in person and via Zoom webinar. Audio quality on the Zoom webinar was poor and consistently cutting in and out; therefore, it was difficult for the Monitor Team to hear topics being presented. Likewise, the video quality was poor, which made it difficult to read the slides being projected. The webinar ended abruptly although the event was scheduled for several additional hours, and it was announced there were additional presenters prepared to speak. The webinar began at 10:14 am EST and ended at 12:35 pm EST. Alfred Nickson, Alisa Barnes, and Andrea Mckeithern were the primary presenters during the portion of the event observed by the Monitor Team.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Alfred Nickson introduced Alisa Barnes who began her presentation by giving her personal story. Ms. Barnes explained her credit score was in the 400s, had a family member that was experience medical problems, had a business and was intimidated because her credit was so poor. She explained the importance of financial literacy, outlined pricing for the Personal Protection Plan, and urged everyone in the audience to immediately connect with several people that may be interested in the products and services provided by the Company.

The Monitor Team was unable to hear or read the name of the next speaker due to audio and visual issues. The presenter explained that prior to 1989 there were no guidelines to determine credit, then formulas were written. The speaker discussed how there were multiple credit scores per person, all yielding different results. It was noted companies are required to report to all three credit reporting firms by law and that 90 percent of lenders use FICO score.

Andrea Mckeithern gave a personal testimony and explained to the audience she was targeting the wrong people while marketing in the past and that the focus should be on education, giving the example "give a man a fish, he eats today, teach a man to fish, he eats forever." Ms. Mckeithern urged the audience to send voice messages rather than typing out long written messages since voice messages create a sense of familiarity and comfort. She urged agents to recruit the right people to join and then to consistently follow-up to ensure the new members have activated all of the tools provided by the Company. Lastly, Ms. Mckeithern told the audience to review their personal social media accounts and to "stay out of the box," avoid posting the same content over and over, to be different and stand out, to be authentic, and to show others you care about them and not the sale.

Albert Nickson briefly spoke before announcing a break on sales and marketing compliance, noting how it is imperative to the overall business that everyone complies to the Company's compliance rules. Mr. Nickson urged agents to utilize pre-vetted materials in the online back office, control their personal social media accounts, and train new agents on compliance. He mentioned thoroughly walking through the Company's compliance document while onboarding new agents.

### 5.   Tuesday Zoom Webinar in New York on December 20, 2022.

The Company held an event on December 20, 2022, in New York, which was attended via Zoom webinar by the Monitor Team. Audio quality on Zoom webinar was poor; therefore, it was difficult for the Monitor Team to hear topics

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

being presented. The camera was pointed toward the audience, so the Monitor Team was unable to see the slides being presented. There were less than 10 people in attendance. Chris Holder was the primary presenter during the event.

Mr. Holder gave a background of the business opportunity offered by the Company, discussed sales and marketing compliance importance, how to build a team, and how to invite prospective customers and agents to learn more about the business opportunity. While discussing compliance, Mr. Holder gave an overview of the discipline system. When presenting on how to build a team, he urged the audience to collaborate with other professionals for faster growth. Professionals in the real estate, mortgage, accounting, car sales, and general business owners were mentioned as good people to target. Methods to invite prospective customers and agents were in-person, Zoom, social media, e-mail, or traditional mail. Attendees were encouraged to come to the annual convention and challenged to bring at least three people with them.

### 6.    <u>Super Saturday in Los Angeles on January 21, 2023.</u>

The Company held a Super Saturday Event on January 21, 2023, in Los Angeles, California. There were approximately 35 people in attendance. Chris Holder, Alfred Nickson, Ajeya Hongo, and Morgan Hardman were the primary presenters during the event.

Mr. Holder started the presentation by explaining how the process works at the Company. He explains there are 84 million families in America that can utilize the Company's products and services and the Company is a leader in the financial education industry. He instructs everyone to first begin the journey by utilizing the products and services offered by the Company that will help attendees personally. Then, after learning about and benefiting from the products and services offered by UCES, agents can receive compensation through UWE in a multitude of ways.

Mr. Holder stated there are 1.4 million identity theft claims, 14.6 trillion in total household debt, 54 percent of Americans do not know their credit score, 65 percent of Americans do not have a budget in place, 1 in 5 Americans did not save during 2021, and that the average credit card debt balance is $14,000. He goes on to explain how a credit score is calculated, and what a "good" and "bad" credit score is. Mr. Holder presents the Personal Protection Plan as the answer to solving these problems. He explains it is the agent's responsibility to focus on referral marketing, while the Company handles technology and customer service. Mr. Holder explains how individuals can earn a commission on sales, customer

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

acquisition bonuses, and infinity bonuses. Mentioning "turnkey" business being offered with website and marketing materials provided.

Alfred Nickson reiterated Mr. Holder's point stating "What we do is enroll customers and agents" and how they are rewarded is getting paid seven different ways. This mirrors what was said during prior events, except during Super Saturday in Ft. Lauderdale on December 10, 2022 where six ways of earning income were mentioned. Mr. Nickson mentioned getting paid both weekly and monthly.

Mr. Holder spoke to the audience again, this time with a live English to Spanish interpreter. He discussed sales and marketing compliance, explained the importance of doing the right thing so the Company can stay in business and noted that when agents' observe policy, it has a significant impact on credibility. Mr. Holder described non-compliant posts and the respective disciplinary actions taken, noting no one has gone beyond the second tier. He mentioned that the Company is working to update all materials in both English and Spanish. Additionally, he discussed the required compliance documents in the back office.

Mr. Nickson gave a presentation on how to build a team and the live interpretation from English to Spanish occurred during the remainder of the program. He stated the importance of partnering with real estate, mortgage, accounting, car sales, and business owners. Mr. Nickson urged the audience to launch the business with massive action for 90 days. When bringing on a new agent, launch them quickly and take responsibility for their success. He encourages the audience to bring as many people as possible to the events and Zoom calls.

Ajeya Hongo went over the inviting process with the audience. She started by stating she is the youngest Vice President in the history of the Company, was able to buy her first home at 25 years old, top one percent of people in the industry and that she was from Las Vegas. Ms. Hongo went on to explain the ways to invite people to learn more about the Company, mentioning social media, phone, and text message. Her key to success is to expose the business to as many people as possible and then actively follow up.

Morgan Hardman discussed how to close a customer. She mentioned being top one percent in the industry and that she was able to close so many people because she truly cares about what her customers and agents are going through day to day. Ms. Hardman mentioned that people are struggling with financial literacy and that with the Company she is able to educate and change lives.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Mr. Holder provided remarks on the upcoming annual convention, stating "major" and "game changing" announcements would be made and it was important to invite and bring as many people as possible to the annual convention and other events. He then introduced a leadership panel consisting of Alfred Nickson, Dr. Norman Quintero, Gloria Quintero, Morgan Hardman, and Ajeya Hongo.

## B.      UWE National Convention

UWE held its annual national convention from Friday, February 24 through Sunday, February 26, 2023 at the J.W. Marriott Bonnet Creek Resort Hotel in Orlando, Florida (the "Convention"). Members of the Monitor Team attended, observed the proceedings, and interviewed several UWE and YFL leaders, representatives, and agents. In total, approximately 500 people attended the Convention and at least 95% of the attendees were people of color – either of Black or Hispanic origin.

The Convention clearly was well planned and organized. It promoted some of the top agents with large picture banners outside the main ballroom, had a hired "master of ceremonies" for the general sessions, employed a professional DJ to play hip hop, urban pop or salsa dance music during the general sessions, deployed a sound and light show team in the main ballroom, used slide deck and video presentations with each speaker, and featured giant on-stage video screens showing live shots from multiple fixed and mobile cameras in the main ballroom. A semi-formal gala awards event was held on Saturday evening which the Monitor Team chose not to attend. The following sections are National Convention highlights noted by the Monitor Team.

### 1.      __Leadership Breakfast.__

The first Convention event was a "Leadership Breakfast" at 9:00 a.m. on Friday, February 24, 2023 in a break out room. The Company's leadership team of Parimal Naik, Jason Short, Rohil Ratanapura, Chris Holder, and Sue Griffin along with Greenspoon attorney Matthew Rapkowski provided an update to about 50 top agents. Mr. Naik opened by referring to the FTC's lawsuit and calling what happened in 2022 "devastating." He noted some "major changes" were necessary and that more are coming. He said these changes are "great for the future." He encouraged the audience to "do the right thing" noting the "great Product" and "Product line." He also said the "caliber of the Monitor Team helps us to be better…we listened."

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Mr. Naik described changes being launched in March 2023 based on input from the field, namely the need for financial products for businesses – i.e., the Business Loan and Business Credit Card described above in Section I.B. Mr. Short then spoke about the Business Loans and said "within the past four months, without any marketing," 35 loans were closed totaling $680,000 since the beginning of November 2022. He noted the Company had 13 or 14 Products in April 2022 and now has 23 Products less than a year later. Mr. Short said the Company is moving beyond personal Products to the business side. He also said they were completely changing the back office agents use. He then presented a PowerPoint slide deck about the new auto refinance, student debt refinance, and Fintech Products. He said these Products will be available on agents' website in March 2023 and the primary partner is Lendflow which has a special promotion from March 1 to April 30, 2023 for agents to procure borrowers.

Mr. Short announced the Company is adding a "high yield savings account on the consumer side" and the new Products will be available on the Protection Plan dashboard in March 2023.

Mr. Ratanpura then described the Company supporting the "business side" with loans, business credit building, how to register a limited liability company, how to establish a business line of credit, how to activate trade lines with, for example, Experian and Dun & Bradstreet, based on vendor, fleet, service, business, and vehicle financing, as well as how to report positive trade lines from paying vendors and creditors.

Mr. Naik returned to say the Company now has a compliance department and noted that if the Company leaders, including those in the audience, make a mistake, people will copy them. He repeated the leaders must say and do the right thing.

Mr. Holder provided a PowerPoint slide deck presentation on the Compensation Plan updates. He said they want to make it simple as we grow. He noted the transition from volume-based requirements to the number of Protection Plans sold as the basis for compensation being a "major shift." Ms. Griffin continued the Compensation Plan update highlighting the new certification program for agents' back office. She said there are "courses agents can follow to be certified at different levels which are almost finalized." She noted the courses will provide Product knowledge so the agents will know how Products work and they will not misinform people. She told the audience the courses will include a test requiring at least a 90% score to receive certification and a seal on the agent's

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

website.[22] This will give the agent credibility with prospects she said. She also said there is no firm launch date for the courses and tests, but they are expected in March 2023.

Parimal Naik added that previously when an agent had a violation, they received an email. Now, he said, agents must go through a test before their website is up and running. He announced Greenspoon attorney Chris Meier as the Company's compliance attorney and noted the work of the Monitor.

Mr. Rapkowski of Greenspoon then told the audience not to look at compliance as a negative but as a benefit with tools they can use to teach future agents and customers. He noted that, as a benefit for everyone, people in these leaders' downline must know the compliance and marketing do's and don'ts as well as they do so that all are selling and marketing the Products the same way. He said that compliance is more than marketing, it is also understanding the Products and how they work, which will improve customer retention. He encouraged the audience members to go through the documents and see the changes (which include the right to cancel and Product descriptions) as well as what the customer signs to enroll. He reported that the Company will start capturing how agents met future customers.

Mr. Holder then gave a PowerPoint presentation on the R&R Club rewards update (with the same information described above in Section IV.C.2(iii)). Michael Curry, YFL's president and board member, then spoke about his professional background and career.

Mr. Ratanpura talked briefly about the UltraScore Product. Customer Support Supervisor Brandon Clark then described the UCES onboarding consult call and the on-line calendar to schedule this initial consultation. He said a member of his team of Anisa Mydini (Customer Service Manager), Yvonne Fowler (Customer Support), and Laura Cisneros (Customer Support) will reach out to the customer every 30 days after enrollment. He then described the new "do it yourself" dispute letter with different online options. He noted there is a 45-day auto letter update option as well.

---

[22] It is noted that other materials reviewed by the Monitor indicate a passage percentage of 80% is required.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Mr. Holder then introduced his tax accountant Marcus R. Lubin who presented a Power Point slide deck with the following tax advice for the audience:

- Take advantage of tax deductions for business owners.
- Consider forming a limited liability company or S corporation or C corporation with a recommendation to start as a sole proprietorship.
- Maximize your retirement contributions.
- Hire a tax professional.

Mr. Holder concluded the Leadership Breakfast with a "leadership mindset" speech.

### 2.    Friday General Session.

The first general session of the UWE National Convention was from 4:30 pm to 7:00 pm on Friday, February 24 in the Griffin Ballroom with about 450 to 500 people attending. The "Rise" theme was shown on the large video screens on stage. YFL President Michael Curry welcomed the crowd and introduced the Company's attorney, Richard Epstein, and the Monitor. He said the Company benefitted from the input of its legal team and the Monitor Team. He noted the Protection Plan launched in 2010 is different than the one offered today. He identified two key Products were added – business loans to small and medium-size businesses and credit cards for businesses and individuals. He said customer service is improved with an experienced, vetted professional with training including customer relationship management (CRM) and business principles. He said agents will work under an expert in the customer service department before they engage clients.

The Convention Host/MC Mr. Chris Cruz introduced Ms. Griffin as "the glue of the Company," as well as the UWE corporate team (Ms. Maher, Mr. Short, Ms. Fowler, Ms. Mydini, and Mr. Holder) and the YFL corporate team (Mr. Clark, Mr. Ratanpura, Mr. Curry, and Aaron Blandzy who was unable to attend).

For the first of many times during the general sessions over the weekend, Mr. Naik presented $100 bills to winners of the "Money Ball" whose names were shown on the video screen after an apparently "random" drawing of all attendees and who selected one of three boxes with cash inside. In this first Money Ball contest, Mr. Ronnie Cavertt from Texas, Mr. Josseny Cadestin from Florida, and Ms. Shawn Brown from Texas each received $700.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Mr. Short presented the new Products consisting of the Fintech Products (i.e., personal loans, auto refinance, high yield savings, and student loan refinance) which he said will go live in March 2023. He highlighted that the personal loans have an annual percentage rate (APR) as low as 5.99% and a term of 60 to 240 months, student loans have a 4.49% APR and can be up to $500,000, and the auto refinance rate is 2.49% APR in an amount of $10,000 to $100,000 and a term of 24 to 84 months. He noted the high yield savings rate is 2.00% to 3.50% and is FDIC insured. Mr. Short described the personal secured card issued by First Latitude. He noted it is not meant for those with a 750 credit score. It is to rebuild credit. He remarked that First Latitude used to work with the Company, but had a service issue. It has since assigned more people to its marketing and customer service teams. He said UWE staff is testing First Latitude's service for 60 days.

Mr. Short went on to announce the new business Products, namely loans from $8,000 to $10,000, the Tillful secured card, and business credit building to improve Fundability™. He highlighted the "partner's promotion" from March 1 to April 30, 2023 when an agent qualifies a small business (or self), applies for lending, and receives funding (in as little as 24 hours, with an average of 80 hours), the agent will receive an additional $150 from Lendflow in addition to the usual payout (which is described in Section VI). In addition, the agent could receive an additional $300 per loan after it procures 10 loans.

Mr. Holder concluded the session with a "Getting Started" message noting his "goal is to support all of the top leaders and the Company level goal is to provide the support [agents] need from the beginning." He noted "to grow a massive organization, duplication is the key." He encourage the audience to arrange weekly or monthly meetings. He brought Agent Elvis Espinoza to the stage to provide a testimonial. Mr. Holder said there are two in-person versions of PBRs, "the first is for someone who has influence, the second type is for someone who has no influence and is building influence." He noted that if an agent has influence and makes a phone call invitation, "people will show up out of respect." He advised the agents to have a sign in sheet at their PBRs and follow up regularly via email or text messages.

### 3.   <u>Saturday General Session.</u>

An estimated 500 people attended the Saturday, February 25, 2023 general session which began at 9:30 a.m. and ended mid-afternoon. It started with the second Money Ball and the winners were:

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

- Mr. Faletolu Katima, Reston, WA received $700
- Otillia Demciott, Salisbury, NC [who was called, but not present]
- Ms. Alisa Barnes, Atlanta, GA received $800
- Ms. Lakeisha Manor, Parkland, FL received $900
- Ms. Autumn Bellamy, Hicksville, NY received two gift cards worth $600

Ms. Griffin and Mr. Canales then took the stage to cover the topic of Compliance. Mr. Canales said "He's know [Company attorney Kevin Thompson] for 13 or 14 years, and doesn't want to go through the [FTC litigation] experience again." But, he continued, it was a "great learning experience…a life lesson…and invaluable." Ms. Griffin said that Robert Franklin "Googles and watches the internet all day and uses FieldWatch" to scrutinize agents' social media posts. She called him a "valuable member of the team."

Ms. Griffin then went through PowerPoint slides and said, "Everyone has a negative connotation of the word compliance. Compliance means observe a policy or rule. For us, it is giving accurate information when explaining the business opportunity in a clear and concise way that they can expect when they use the services and results. Complying with state and federal laws that apply to our industry." She advised the audience to "teach to your new team members." She noted it "builds credibility with customers and the reputation of the Company." She said they must give customers realistic expectations of the business and its services to customers and agents. She noted that "if in doubt call agent support. You don't have to know everything. Call customer support. Call agent support. Refer them to the corporate office. This prevents complaints. We don't want people complaining to the Better Business Bureau [and/or] Attorney General Offices asking for refunds."

Ms. Griffin called lifestyle posts with words or images are "high risk claims." Noting that it takes "hard work and time to work up to certain level in the business, "not to give the impression it comes easily and quickly. As examples, Ms. Griffin cited stating agents can achieve specific results from services in a specific time. She showed an example of a non-compliant post that "people re-post and share" which says "I restore credit." Instead, she said they should show people how it is done and say outcomes depend on many things they cannot predict. She called Protection Plan offerings, financial literacy, financial fitness, supplemental income, and savings "low risk statements."

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Ms. Griffin announced there are "new policies coming" including an "online course and test coming soon which will launch in March." These will cover general knowledge and compliance policies, she said. She noted the test passing score is "90% or above to get a certificate and compliance certified title – such as a seal or something on the website showing. Which will give credibility." She said agents must take a test to be reinstated as an agent after violations and to reinstate their website. She assured the audience that the tests will be "open book" and they "can refer back to information in the course to answer questions."

Mr. Canales then spoke about his career in MLM business and noted the "biggest thing with compliance is integrity and accountability in what you say." He noted that "Avacare was a business for around 20 years and was shut down by the FTC a year or so ago. Management did not put up a fight and took away the multi-level pay structure so that 90% of the people lost their income. We are here because management is putting up a fight."

Dr. Norman Quintero then spoke on the topic of "Becoming a Leader" and encouraged the audience to send "texts inviting people to PBRs." A "Social Media Panel Discussion" then ensued featuring Morgan Hardman, Executive VP from California, Ajeya Hongo, Senior VP from California and now Las Vegas now, and Barbara Cheng, Regional VP from Venezuela originally. They noted the reasons social media is a key component to build the business due to it being a fast way to connect and build relationships.

The third Money Ball was next with the following winners:

- Rasheeda Collins, Silver Spring, MD [who was not present]
- Mr. Marquis Jenkins, Detroit, MI received $700
- Ms. Denise Frist, Naples, FL received $800
- Ms. Leslie Epps, North Las Vegas, NV received $800

Mr. Nickson then addressed the audience advising them to build a "Farm system with customers, agents, field trainers, potential leaders, and rock star leaders" and "a team that duplicates." He identified and sorted different groups as follows: "Group 1 – consumers who only buy the Product and do not sign up as an agent. Group 2 – social enrollers who share the Product but do not build a team. Group 3 – retailers who sell and service customers. Group 4 – recruiters who sell and train sales people."

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

After the lunch break, the fourth Money Ball winners were:

- Ms. Francesca Colbert, Harlem, GA received $700
- Ms. Giselle Balarezo, Miami Lakes, FL received $700
- Ms. Kailey John, Fayettevulle, AR received $800
- Ms. Anastasha Anderson, Washington, DC received $700

Mr. Short spoke about the number of Products going from 13 to 22, Fintech Products, loans and credit offerings coming in March, the website redesign as UWE 2.0, new Product line marketing and marketing tools from corporate coming, and a call and retention center being built in Florida.

Steve Reger from UltraScore spoke. He said SmartCredit has been a partner with UWE for nine or ten years and Mr. Naik asked for a new lifestyle credit product. Mr. Reger then presented PowerPoint slides about Ultra Score, which he described as a "comprehensive online credit monitoring solution with helpful tools to get one percent better with credit and finances. An ad free, simple, easy to navigate platform with interactive tools."

Alisa Barnes then covered the "Mastering Client Retention" topic. After that speech, Chris Holder announced an "UWE App Update." He said the app is now in both English and Spanish and when an agent sends out a video, it will show how much the recipient watched. J.J. Oswald, via Zoom video, provided a demonstration of the app. He noted that the agents can share content in the app, but it's best to first "reach out to the individual, preferably by phone" and offer to send a video via text message, Whats App, or Facebook Messenger.

Messrs. Naik, Ratanpura, and Holder then presented the "Compensation Plan Updates." They noted the volume-based compensation plan "was complicated" and there was "some confusion." "Now, UWE 2.0 and each agent starts from zero" starting March 1, 2023. Each agent's results at the end of March will be the level they qualify. The said the Medallion Club level is updated and the rewards are based on the number of Personal Protection Plan Members enrolled as follows:

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

| Reward Level | Personal PPM | Rewards |
|---|---|---|
| Bronze | 20 | $200 |
| Silver | 30 | $350 |
| Gold | 50 | $500 |
| Platinum | 75 | $750 |
| Crystal | 100 | $1,000 |
| Diamond | 250 | $2,500 |

As to the R&R Club Update, Mr. Naik said starting March 2023, the four levels and associated rewards are:

- Level one: $700 monthly payments plus a one-time $3,500 check.

- Level two: Monthly payment of $1,200 plus a $15,000 check: the agent receives $9,000 (60%) of that amount "for debt payoff and savings" and $6,000 (40%) goes into a private investment savings account which vests after three years of service.

- Level three: Monthly payment of $1,500 plus a one-time $25,000 check: $15,000 to agent, and $10,000 into an investment account that vests after three years of service.

- Level four: Monthly to $3,000 per month plus a one-time $40,000 check: $24,000 to agent, $16,000 into an investment account that vests after three years of service.

## 4.   <u>Sunday General Session.</u>

The general session on February 26 began at 9:45 a.m. with approximately 475 people in attendance. The fifth and final Money Ball winners were:

- Alton Brown, Miami Gardens, FL received $1,100
- James Smith, Atlanta, GA received $900
- Kira Jordan, Newark, CT [was not present]
- Ajeya Hongo, North Las Vegas, NV received $1,100

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Mr. Curry presented an update on YFL saying that it "exists to enhance finance literacy." He reported that in 2022 YFL began a new program with Central Detroit Christian Community Development (whose stated mission is to educate, employ, and empower people) and donated 15 laptop computers. He also said YFL is now taking scholarship applications electronically from high school seniors and first year college/university students who can complete an online application, take a financial literacy quiz, and submit an original essay. He reported 11 scholarship finalists and the first place winner during the 2022-2023 academic year.

The Monitor notes, however, that in none of the National Convention presentations about YFL was any information given about its role and relationship with UWE (as the credit restoration provider) nor about why it receives a portion of the monthly customer fee ($9.00).

Testimonials were given by Elvis Espinoza and his son Jake, Aaron Blandzy, Josseny Cadestin, Marlene Reyes, Krystal Penafiel, DJ Dinero, and James Smith about the Company and/or the UCES Debt Payoff Plan.

Marcello Fuentes spoke about the Rocket Lawyer Product. He said the "Ask A Lawyer" service price is 40% off the attorney's hourly rate and it takes two days to arrange a call with an attorney. He said the Rocket Lawyer membership is available to the customer's immediate family is available in all 50 states. He informed the audience that Rocket Tax is a new Product this year. It provides "on demand attention from tax professionals and filing state and federal income taxes." Giselle Balarezo, Ajeya Hongo, Billy Scott, and Johnny Newsome provided Rocket Lawyer and Protection Plan membership testimonials.

Mr. Curry returned to the stage with Messrs. Ratanpura and Clark to cover "UCES Updates" discussing the improvements to "help clients work through their credit score." Specifically, they spoke about UltraScore/SmartCredit, UCES customer onboarding, the updated dispute letter, and the "do it yourself" (DIY) dispute letter process. Customer onboarding was described as a consultation call where the customer service team goes through the credit restoration process with the new customer, analyzes their credit report, explains the dispute process, and lays out options to take advantage of paying debt down or off. They said the previous webpage responses to the dispute letter were reviewed and the dispute letter is now "more precise to match the exact discrepancy on the customer's credit report" and is tailored for the customer's situation with new and more comprehensive language. They said the customer can design the DIY dispute letter and select the reasons for the dispute with custom options.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

The remainder of the session included testimonials from agents regarding the budgeting and savings tool (testimonials from Carnell Newsome and Lakeisha Marion), the estate planning tool (testimonials from Anthony Jackson, Morgan Hardman, and Adriana Nielson), the power of building with events (testimonial from Bruce Rochester), and the power of PBRs (testimonial from Mike Burgos). Mr. Burgos brought a significant amount of energy to the stage and aggressively encouraged agents to host "more PBRs".

## VIII.  OVERVIEW OF THE MONITORED ENTITIES' TREASURY ACCOUNTS

### A.  General Overview

The Monitor's financial consultants on the Monitor Team review all bank accounts of the Monitored Entities on a routine basis and conduct follow-up interviews with the Company's finance team, primarily Aaron Blanzy, to understand the nature of inflows and outflows among the various bank accounts as well as obtain and review documentation supporting selected transactions. Below is a chart of the cash balances for the Monitored Entities' three operating accounts through which the Monitored Entities conduct their operations, FES/UWE and YFL.[23]

| Entity | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 |
|---|---|---|---|---|---|---|---|---|---|
| FES | $ 3,000 | $ 2,611 | $ 2,337 | $ 2,586 | $ 2,354 | $ 2,210 | $ 1,973 | $ 1,509 | $ 1,472 |
| UWE | 196 | 1,151 | 1,137 | 1,053 | 1,035 | 598 | 669 | 637 | 617 |
| YFL | 3,000 | 3,564 | 2,982 | 2,807 | 2,560 | 2,808 | 2,488 | 2,287 | 2,351 |
| Total Cash | $ 6,196 | $ 7,327 | $ 6,457 | $ 6,446 | $ 5,949 | $ 5,615 | $ 5,130 | $ 4,433 | $ 4,440 |

As illustrated above, the Monitored Entities' overall cash position has declined since the beginning of the monitorship as they resumed operations in August, commenced re-building their customer and agent base, funded the cost of the ongoing litigation, invested in the re-development of Protection Plan Products and services, and held multiple agent conventions. Below is a brief discussion of each of the three operating accounts.

---

[23] Although FES and UWE are the same corporate entity, the Company maintains two different accounts because the FES bank account receives payments from all of the customers and agents that existed prior to the Company changing its advertised name/brand from FES to UWE in 2021. The UWE bank account receives all the credit card payments from the new customers and agents since that change.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

### B.  FES Bank Account Transactions

Protection Plan payments received into the FES account from October 2022 through March 2023 totaled approximately $1.2 million. As previously discussed in the First Report, this account receives payments from pre-monitorship customers and agents and, therefore, Protection Plan payments were expected to decrease month by month as customers and agents either cancelled their subscriptions or un-enroll. While this trend was observed from October 2022 through February 2023, there was a significant increase in Protection Plan payments in March 2023 (i.e., $145,000 in February vs. $351,000 in March) driven by former agents who elected to re-enroll in the Protection Plan.

Primary outflows from the FES account are related to payroll for all corporate employees (except those employed by YFL), as well as third party Protection Plan vendors such as Allstate Identity Theft, agent conventions, and certain legal fees.

From October 2022 through March 2023 cash outflows have been in excess of Protection Plan payments resulting in a decline in FES's account balance from approximately $2.6 million in October 2022 to approximately $1.5 million in March of 2023.

### C.  UWE Bank Account Transactions

Protection Plan payments received into the UWE account from October 2022 through March 2023 totaled approximately $3.6 million. As previously discussed in the First Report, this account receives payments from all new customers and agents.

In addition, commissions earned from the Monitored Entities' new business and personal loan/refinance offerings are now received into the UWE account. These new Fintech Products were officially communicated to agents during a February 2023 convention in Florida. Through March 2023, a nominal amount of commissions (approximately $6,200) were earned on these Products and according to management, such offerings have gained little traction in the market. While these are a new service Product, based on the first full month of sales, they do not appear to be profitable to the Company as they cost $10,000 per month.

Primary outflows from the UWE account are related to agent commissions and totaled approximately $3.0 million from October 2022 through March 2023.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Other outflows are for agent life insurance (Symetra) and other third-party service providers in connection with the protection plan such as Rocket Lawyer and Hurdlr (tax software for agents only), and merchant banking processing fees.

Similar to the FES account, the UWE account has declined from a balance in October 2022 of approximately $1.1 million to a balance of approximately $600,000 in March 2023, as cash outflows have been in excess of Protection Plan payments. One of the primary drivers of this decline was intercompany transfers of approximately $500,000 to the YFL bank account in December of 2022.

### D. YFL Bank Account Transactions

Protection Plan payments received by the YFL account represent the charitable portion of the Protection Plan (i.e., $9.00 per month) and the initial enrollment fee charged to customers which is typically $99. Protection Plan enrollment fees charged to agents are received by the UWE bank account. Total Protection Plan payments and start-up fee receipts into the YFL account from October 2022 through March 2023 totaled approximately $1.1 million.

YFL also received approximately $500,000 (as noted above) from the UWE bank account as well as a merchant banking reserve release of $280,000 in March of 2023 due to the reduced number of credit card transactions being processed by the merchant banks.

The primary outflows from the YFL account from October 2022 through March 2023 were related to legal, consulting and monitorship fees which totaled approximately $1.2 million.

Other outflows were related to YFL payroll (approximately $700,000), which has been decreasing since December as the Company moved employees to FES/UWE, third-party vendor services in connection with the Protection Plan such as Smart Credit (Credit Monitoring services), and new application development. YFL scholarship and related payments totaled approximately $45,000 for previous committed scholarship winners.

Since October of 2022, the YFL bank account balance has declined from approximately $2.8 million to $2.4 million.

### E. VR-TECH LLC, VR-TECH MGT, LLC and CMR Bank Account Transactions

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

Throughout this reporting period, there was only one distribution from UWE to VR-TECH in the amount of $50,000 that occurred in February of 2022. The Monitor Team understands from management that a portion of this transfer (approximately $35,000) was a reimbursement of expenses incurred by Mr. Naik in connection with UWE's development of its Florida office and the remaining portion (approximately $15,000) was utilized by Mr. Naik to pay personal expenses.

Consistent with the First Report, Credit My Rent (CMR) remains in suspension and minimal activity has occurred in the bank account which had a balance of approximately $176,000 at the end of March 2023.

The VR-TECH and VR-TECH MGT bank accounts have declined to approximately $100,000 and $260,000, respectively, as of March 2023 as Mr. Naik and Mr. Toloff have either spent or transferred funds out of such accounts for personal use. Both accounts had approximately $700,000 in July when the monitorship began.

## IX. CONCLUSION

As set forth above, the Monitor is pleased by the Monitored Entities' willingness to improve their compliance policies and procedures. The Monitor continues to have reservations about certain aspects of the Monitored Entities' business. Moreover, the Monitor hopes the Company begins to place legal compliance at the same level of importance as sales and marketing so that potential compliance-related issues are identified and legal review and advice are received in that regard prior to the introduction of new Products. Nevertheless, the Monitor appreciates the Monitored Entities viewing the monitorship as a collaborative effort and thoughtfully considering and implementing the Monitor's recommendations.