Exhibit F

uses permitted by the Privacy Act, see *https://www.ftc.gov/site-information/privacy-policy.*

**List of Subjects in 16 CFR Part 255**

Advertising, Trade Practices

Accordingly, the Federal Trade Commission proposes to amend Title 16, Chapter I, Subchapter B, of the Code of Federal Regulations as follows:

**PART 255 – GUIDES CONCERNING USE OF ENDORSEMENTS AND TESTIMONIALS IN ADVERTISING**

Sec.

255.0  Purpose and Definitions.

255.1  General Considerations.

255.2  Consumer Endorsements.

255.3  Expert Endorsements.

255.4  Endorsements by Organizations.

255.5  Disclosure of Material Connections.

255.6  Endorsements Directed to Children.

1. The authority for part 255 continues to read:

**Authority:** 38 Stat. 717, as amended; 15 U.S.C. 41-58

2. Revise part 255 to read as follows:

**§ 255.0 Purpose and definitions.**

(a)      The Guides in this part represent administrative interpretations of laws enforced by the Federal Trade Commission for the guidance of the public in conducting its affairs in conformity with legal requirements.  Specifically, the Guides address the application of

35

Section 5 of the FTC Act (15 U.S.C. 45) to the use of endorsements and testimonials in advertising. The Guides provide the basis for voluntary compliance with the law by advertisers and endorsers. Practices inconsistent with these Guides may result in corrective action by the Commission under Section 5 if, after investigation, the Commission has reason to believe that the practices fall within the scope of conduct declared unlawful by the statute.

The Guides set forth the general principles that the Commission will use in evaluating endorsements and testimonials, together with examples illustrating the application of those principles. The Guides do not purport to cover every possible use of endorsements in advertising.[1] Whether a particular endorsement or testimonial is deceptive will depend on the specific factual circumstances of the advertisement at issue.

(b)      For purposes of this part, an "endorsement" means any advertising, marketing, or promotional message (including verbal statements, tags in social media posts, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser.[2] The party whose opinions, beliefs,

---

[1]  Staff business guidance applying Section 5 of the FTC Act to endorsements and testimonials in advertising is available on the FTC website. Such staff guidance addresses details not covered in these Guides and is updated periodically, but is not approved by or binding upon the Commission.

[2]  A paid or otherwise incentivized negative statement about a competitor's product is not an endorsement, as that term is used in the Guides. Nevertheless, such statements, *e.g.*, a paid negative review of a competing product, can be deceptive in violation of Section 5.

findings, or experience the message appears to reflect will be called the "endorser" and could be or appear to be an individual, group, or institution.

(c)     The Commission intends to treat endorsements and testimonials identically in the context of its enforcement of the Federal Trade Commission Act and for purposes of this part.  The term endorsements is therefore generally used hereinafter to cover both terms and situations.

(d)     For purposes of this part, the term "product" includes any product, service, brand, company, or industry.

(e)     For purposes of this part, an "expert" is an individual, group, or institution possessing, as a result of experience, study, or training, knowledge of a particular subject, which knowledge is superior to what ordinary individuals generally acquire.

(f)     For purposes of this part, "clear and conspicuous" means that a disclosure is difficult to miss (*i.e.*, easily noticeable) and easily understandable by ordinary consumers.  If a communication's representation necessitating a disclosure is made through visual means, the disclosure should be made in at least the communication's visual portion; if the representation is made through audible means, the disclosure should be made in at least the communication's audible portion; and if the representation is made through both visual and audible means, the disclosure should be made in the

---

The use by endorsers of fake indicators of social media influence, such as fake social media followers, is not itself an endorsement issue.  The Commission notes, however, that it is a deceptive practice for users of social media platforms to purchase or create indicators of social media influence and then use them to misrepresent such influence to potential clients, purchasers, investors, partners, or employees or to anyone else for a commercial purpose.  It is also a deceptive practice to sell or distribute such indicators to such users.

communication's visual and audible portions.  A disclosure presented simultaneously in both the visual and audible portions of a communication is more likely to be clear and conspicuous.  A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, should stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.  An audible disclosure should be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.  In any communication using an interactive electronic medium, such as social media or the Internet, the disclosure should be unavoidable.  The disclosure should not be contradicted or mitigated by, or inconsistent with, anything else in the communication.  When an endorsement targets a specific audience, such as older adults, "ordinary consumers" includes members of that group.

> **Example 1:**  A film critic's review of a movie is excerpted in an advertisement placed by the film's producer.  When so used, the excerpt is an endorsement because readers would view it as a statement of the critic's own opinions and not those of the producer.  If the excerpt alters or quotes from the text of the review in a way that does not fairly reflect its substance, the advertisement would be deceptive because it distorts the endorser's opinion.  [*See* § 255.1(b).]

> **Example 2:**  A television commercial depicts two unidentified shoppers in a supermarket buying a laundry detergent.  One comments to the other how clean the advertised brand makes the shopper's clothes.  The other shopper then replies, "I will try it because I have not been fully satisfied with my own brand."  This obviously fictional dramatization would not be an endorsement.

38

**Example 3:**  In an advertisement for a pain remedy, an announcer unfamiliar to consumers except as a spokesperson for the advertising drug company praises the drug's ability to deliver fast and lasting pain relief.  The spokesperson purports to speak, not on the basis of their own opinions, but rather in the place of and on behalf of the drug company.  The announcer's statements would not be considered an endorsement.

**Example 4:**  A manufacturer of automobile tires hires a well-known professional automobile racing driver to deliver its advertising message in television commercials.  In these commercials, the driver speaks of the smooth ride, strength, and long life of the tires.  Many consumers are likely to believe this message reflects the driver's personal views, even if the driver does not say so, because consumers recognize the speaker as primarily a racing driver and not merely as a spokesman.  Accordingly, consumers may well believe the driver would not speak for an automotive product without actually believing in their statements and having personal knowledge sufficient to form the beliefs expressed.  The attribution of these beliefs to the driver makes this message an endorsement under the Guides.

**Example 5:**  A television advertisement for a brand of golf balls includes a video of a prominent and well-recognized professional golfer practicing numerous

drives off the tee. The video would be an endorsement even though the golfer makes no verbal statement in the advertisement.

The golfer is also hired to post the video to their social media account.  The post is an endorsement if viewers can readily identify the golf ball brand, either because it is apparent from the video or because it is tagged or otherwise mentioned in the post.

**Example 6:** An infomercial for a home fitness system is hosted by a well-known actor.  During the infomercial, the actor demonstrates the machine and states, "This is the most effective and easy-to-use home exercise machine that I have ever tried.  Even if the actor is reading from a script, the statement would be an endorsement, because consumers are likely to believe it reflects the actor's personal views.

Assume that, rather than speaking about their experience with or opinion of the machine, the actor says that the machine was designed by exercise physiologists at a leading university, that it isolates each of five major muscle groups, and that it is meant to be used for fifteen minutes a day.  After demonstrating various exercises using the machine, the actor finally says how much the machine costs and how to order it.  As the actor does not say or do anything during the infomercial that would lead viewers to believe that the actor is expressing their own views about the machine, there is no endorsement.

40

**Example 7:**  A consumer who regularly purchases a particular brand of dog food decides one day to purchase a new, more expensive brand made by the same manufacturer.  The purchaser posts to their social media account that the change in diet has made their dog's fur noticeably softer and shinier, and that in her opinion, the new dog food definitely is worth the extra money.  Because the consumer has no connection to the manufacturer beyond being an ordinary purchaser, their message cannot be attributed to the manufacturer and the post would not be deemed an endorsement under the Guides.  The same would be true if the purchaser writes a consumer product review on the manufacturer's website, a retailer's website, or an independent review website.

Assume that rather than purchase the dog food with their own money, the consumer receives it for free because the store routinely tracks purchases and the dog food manufacturer arranged for the store to provide a coupon for a free trial bag of its new brand to all purchasers of its existing brand.  The manufacturer does not ask coupon recipients for product reviews and recipients likely would not assume that the manufacturer expects them to post reviews.  The consumer's post would not be deemed an endorsement under the Guides because this unsolicited review cannot be attributed to the manufacturer.

Assume now that the consumer joins a marketing program under which participants periodically receive free products from various manufacturers and

41

can write reviews if they want to do so.  If the consumer receives a free bag of the new dog food through this program, their positive review would be considered an endorsement under the Guides because of their connection to the manufacturer through the marketing program.

**Example 8:**  A college student, who has earned a reputation as an excellent video game player, live streams their game play.  The developer of a new video game pays the student to play and live stream its new game.  The student plays the game and appears to enjoy it.  Even though the college student does not expressly recommend the game, the game play is considered an endorsement.

**Example 9:**  An influencer who is paid to endorse a vitamin product in their social media posts discloses their connection to the product's manufacturer only on the profile pages of their social media accounts.  The disclosures are not clear and conspicuous because people seeing their paid posts could easily miss the disclosures.

Assume now that the influencer discloses their connection to the manufacturer in the posts themselves, but that, in order to see the disclosures, consumers have to click on a link labeled simply "more."  Those disclosures are not clear and conspicuous.

42

Assume now that the influencer relies solely upon a social media platform's built-in disclosure tool for one of these posts. The disclosure appears in small white text, it is set against the light background of the image that the influencer posted, it competes with unrelated text that the influencer superimposed on the image, and the post appears for only five seconds. The disclosure is easy to miss and thus not clear and conspicuous.

**Example 10:** A television advertisement promotes a smartphone app that purportedly halts cognitive decline. The ad presents multiple endorsements by older senior citizens who are represented as actual consumers who used the app. The advertisement discloses via both audio and visual means that the persons featured are actors. Because the advertisement is targeted at older consumers, whether the disclosure is clear and conspicuous will be evaluated from the perspective of older consumers, including those with diminished auditory, visual, or cognitive processing abilities.

**Example 11:** A social media advertisement promoting a cholesterol-lowering product features a testimonialist who says how says by how much they lowered their serum cholesterol. The claimed reduction greatly exceeds what is typically experienced by users of the product and a disclosure of typical results is required. The marketer has been able to identify from online data collection Spanish speaking individuals with high cholesterol levels who are unable to understand English and microtargets a Spanish-language version of the ad to them, disclosing

43

the typical results in English.  The adequacy of the disclosure will be evaluated from the perspective of the targeted individuals.

Assume now that the ad has a disclosure that is clear and conspicuous when viewed on a computer browser but that is not clear and conspicuous when the ad is rendered on a smartphone.  Because some consumers will view the ad on their smartphones, the disclosure is inadequate.

### § 255.1 General considerations.

(a)     Endorsements must reflect the honest opinions, findings, beliefs, or experience of the endorser.  Furthermore, an endorsement may not convey any express or implied representation that would be deceptive if made directly by the advertiser.  [*See* §§ 255.2(a) and (b) regarding substantiation of representations conveyed by consumer endorsements.]

(b)     An advertisement need not present an endorser's message in the exact words of the endorser unless the advertisement presents the endorsement as a quotation.  However, the endorsement may not be presented out of context or reworded so as to distort in any way the endorser's opinion or experience with the product.  An advertiser may use an endorsement of an expert or celebrity only so long as it has good reason to believe that the endorser continues to subscribe to the views presented.  An advertiser may satisfy this obligation by securing the endorser's views at reasonable intervals where reasonableness will be determined by such factors as new information about the performance or

effectiveness of the product, a material alteration in the product, changes in the performance of competitors' products, and the advertiser's contract commitments.

(c)     When the advertisement represents that the endorser uses the endorsed product, the endorser must have been a bona fide user of it at the time the endorsement was given. Additionally, the advertiser may continue to run the advertisement only so long as it has good reason to believe that the endorser remains a bona fide user of the product.  [*See* § 255.1(b) regarding the "good reason to believe" requirement.]

(d)     Advertisers are subject to liability for misleading or unsubstantiated statements made through endorsements when there is a connection between the advertiser and the endorser, or for failing to disclose unexpected material connections between themselves and their endorsers.  [*See* § 255.5].  An advertiser may be liable for an endorser's deceptive statement even when the endorser is not liable.  Advertisers should:  (1) provide guidance to their endorsers on the need to ensure that their statements are not misleading and to disclose unexpected material connections, (2) monitor their endorsers' compliance, and (3) take action sufficient to remedy non-compliance and prevent future non-compliance.

(e)     Endorsers may be liable for statements made in the course of their endorsements, such as when an endorser makes a representation that the endorser knows or should know to be deceptive.  Also, an endorser who is not an expert may be liable for misleading or unsubstantiated representations regarding a product's performance or effectiveness when the representations:  (1) are inconsistent with the endorser's personal experience, or (2) were not made or approved by the advertiser and go beyond the scope of the endorser's personal experience.  [For the responsibilities of an endorser who is an expert, see §

45

255.3.] Endorsers may also be liable for failing to disclose unexpected material connections between themselves and an advertiser, such as when an endorser creates and disseminates endorsements without such disclosures.

(f)      Intermediaries, such as advertising agencies and public relations firms, may be liable for their roles in disseminating what they knew or should have known were deceptive endorsements.  They may also be liable for their roles with respect to endorsements that fail to disclose unexpected material connections, whether by disseminating advertisements without necessary disclosures or by hiring and directing endorsers who fail to make necessary disclosures.

(g)      The use of an endorsement with the image or likeness of a person other than the actual endorser is deceptive if it misrepresents a material attribute of the endorser.

> **Example 1**:  A building contractor states in an advertisement disseminated by an
> advertiser, "I use XYZ exterior house paint because of its remarkable quick
> drying properties and durability."  This endorsement must comply with the
> pertinent requirements of Section 255.3 (Expert Endorsements).  Subsequently,
> the advertiser reformulates its paint to enable it to cover exterior surfaces with
> only one coat.  Prior to continued use of the contractor's endorsement, the
> advertiser must contact the contractor in order to determine whether the contractor
> would continue to use the paint and to subscribe to the views presented
> previously.

46

Assume that, before the reformulation, the contractor had posted an endorsement of the paint to their social media account. Even if the contractor would not use or recommend the reformulated paint, there is no obligation to modify or delete their post as long as the date of that post is clear and conspicuous to viewers. If the contractor reposts or the advertiser shares the contractor's original endorsement after the reformulation, consumers would expect that the contractor continued to hold the views expressed in the original post.

**Example 2:** In a radio advertisement, a well-known DJ talks about how much they enjoy making coffee with a particular coffee maker in the morning. The DJ's comments likely communicate that they own and regularly use the coffee maker. If they do not own it or used it only during a demonstration by its manufacturer, the ad would be deceptive.

**Example 3:** A dermatologist is a paid advisor to a pharmaceutical company and is asked by the company to post about its products on their professional social media account. The dermatologist posts that the company's newest acne treatment product is "clinically proven" to work. Before giving the endorsement, the dermatologist received a write-up of the clinical study in question, which indicates flaws in the design and conduct of the study that are so serious that they preclude any conclusions about the efficacy of the product. Given their medical expertise, the dermatologist should have recognized the study's flaws and is subject to liability for their false statements made in the advertisement. The

47

advertiser is also liable for the misrepresentation made through the endorsement. [*See* § 255.3 regarding the product evaluation that an expert endorser must conduct.]  Even if the study was sufficient to establish the product's proven efficacy, the pharmaceutical company and the dermatologist are both potentially liable if the endorser fails to disclose their relationship to the company.  [*See* § 255.5 regarding the disclosure of unexpected material connections.]

Assume that the expert had asked the pharmaceutical company for the evidence supporting its claims and there were no apparent design or execution flaws in the study shown to the expert, but that the pharmaceutical company had withheld a larger and better controlled, non-published proprietary study of the acne treatment which failed to find any statistically significant improvement in acne.  The expert's "clinically proven" to work claim would be deceptive and the company would be liable for the claim, but because the dermatologist did not have a reason to know that the claim was deceptive, the expert would not be liable.


**Example 4:**  A well-known celebrity appears in an infomercial for a hot air roaster that purportedly cooks a chicken perfectly in twenty minutes.  During the shooting of the infomercial, the celebrity watches five attempts to cook chickens using the roaster.  In each attempt, the chicken is undercooked after twenty minutes and requires forty-five minutes of cooking time.  In the commercial, the celebrity places an uncooked chicken in the roaster.  The celebrity then takes from a second roaster what appears to be a perfectly cooked chicken, tastes the chicken, and says that if you want perfect chicken every time, in just twenty minutes, this

48

is the product you need.  A significant percentage of consumers are likely to believe the  statement represents the celebrity's own view and experience even though the celebrity is reading from a script.  Because the celebrity knows that their statement is untrue, the endorser is subject to liability.  The advertiser is also liable for misrepresentations made through the endorsement.

**Example 5:**  A skin care products advertiser hires an influencer to promote its products on the influencer's social media account.  The advertiser requests that the influencer try a new body lotion and post a video review of it.  The advertiser does not provide the influencer with any materials stating that the lotion cures skin conditions and the influencer does not ask the advertiser if it does.  However, believing that the lotion cleared up their eczema, the influencer says in their review, "This lotion cures eczema.  All of my followers suffering from eczema should use it."  The advertiser is subject to liability for misleading or unsubstantiated representations made through the influencer's endorsement. Furthermore, the influencer, who did not limit their claims to their personal experience and did not have a reasonable basis for their claim that the lotion cures eczema, is subject to liability for the misleading or unsubstantiated representation in endorsement.  The influencer and the advertiser may also be liable if the influencer fails to disclose clearly and conspicuously being paid for the endorsement.  [*See* § 255.5.]

In order to limit its potential liability, the advertiser should provide guidance to its influencers concerning the need to ensure that statements they make are truthful and substantiated and the need to disclose unexpected material connections and take other steps to discourage or prevent non-compliance.  The advertiser should also monitor its influencers' compliance and take steps necessary to remove and halt the continued publication of deceptive representations when they are discovered and to ensure the disclosure of unexpected material connections.  [*See* §§ 255.1(d) and 255.5]

**Example 6**:  The website for an acne treatment features accurate testimonials of users who say that the product improved their acne quickly and with no side effects.  Instead of using images of the actual endorsers, the website accompanies the testimonials with pictures of different individuals with near perfect skin.  The images misrepresent the improvements to the endorsers' complexions.

The same website also sells WeightAway shakes and features an accurate testimonial from an individual who says, "I lost 50 pounds by just drinking the shakes."  Instead of accompanying the testimonial with a picture of the actual endorser, who went from 300 pounds to 250 pounds, the website shows a picture of an individual who appears to weigh about 100 pounds.  By suggesting that WeightAway shakes caused the endorser to lose one-third of their original body weight, the image misrepresents the product's effectiveness.  Even if it is

accompanied by a picture of the actual endorser, the testimonial could still communicate a deceptive typicality claim.

**Example 7:**  A learn-to-read program disseminates a sponsored social media post by a parent saying that the program helped their child learn to read.  The picture accompanying the post is not of the endorser and their child.  The testimonial is from the parent of a 7-year-old, but the post shows an image of a child who appears to be only 4 years old.  By suggesting that the program taught a 4-year-old to read, the image misrepresents the effectiveness of the program.

## § 255.2 Consumer endorsements.

(a)     An advertisement employing endorsements by one or more consumers about the performance of an advertised product or service will be interpreted as representing that the product or service is effective for the purpose depicted in the advertisement. Therefore, the advertiser must possess and rely upon adequate substantiation, including, when appropriate, competent and reliable scientific evidence, to support express and implied claims made through endorsements in the same manner the advertiser would be required to do if it had made the representation directly, *i.e.*, without using endorsements. Consumer endorsements themselves are not competent and reliable scientific evidence.

(b)     An advertisement containing an endorsement relating the experience of one or more consumers on a central or key attribute of the product or service will likely be interpreted as representing that the endorser's experience is representative of what consumers will generally achieve with the advertised product or service in actual, albeit

variable, conditions of use.  Therefore, an advertiser should possess and rely upon adequate substantiation for this representation.  If the advertiser does not have substantiation that the endorser's experience is representative of what consumers will generally achieve, the advertisement should clearly and conspicuously disclose the generally expected performance in the depicted circumstances, and the advertiser must possess and rely on adequate substantiation for that representation.[3] The disclosure of the generally expected performance should be presented in a manner that does not itself misrepresent what consumers can expect.

(c)     Advertisements presenting endorsements by what are represented, expressly or by implication, to be "actual consumers" should utilize actual consumers in both the audio and video, or clearly and conspicuously disclose that the persons in such advertisements are not actual consumers of the advertised product.

(d)     In procuring, suppressing, boosting, organizing, or editing consumer reviews of their products, advertisers should not take actions that have the effect of distorting or

---

[3] The Commission tested the communication of advertisements containing testimonials that clearly and prominently disclosed either "Results not typical" or the stronger "These testimonials are based on the experiences of a few people and you are not likely to have similar results."  Neither disclosure adequately reduced the communication that the experiences depicted are generally representative.  Based upon this research, the Commission believes that similar disclaimers regarding the limited applicability of an endorser's experience to what consumers may generally expect to achieve are unlikely to be effective.  Although the Commission would have the burden of proof in a law enforcement action, the Commission notes that an advertiser possessing reliable empirical testing demonstrating that the net impression of its advertisement with such a disclaimer is non-deceptive will avoid the risk of the initiation of such an action in the first instance.

otherwise misrepresenting what consumers think of their products, regardless of whether the reviews are considered endorsements under the Guides.[4]

> **Example 1:**  A web page for a baldness treatment consists entirely of testimonials from satisfied customers who say that after using the product, they had amazing hair growth and their hair is as thick and strong as it was when they were teenagers.  The advertiser must have competent and reliable scientific evidence that its product is effective in producing new hair growth.

> The web page will also likely communicate that the endorsers' experiences are representative of what new users of the product can generally expect.  Therefore, even if the advertiser includes a disclaimer such as, "Notice:  These testimonials do not prove our product works.  You should not expect to have similar results," the ad is likely to be deceptive unless the advertiser has adequate substantiation that new users typically will experience results similar to those experienced by the testimonialists.

> **Example 2:**  An advertisement disseminated by a company that sells heat pumps presents endorsements from three individuals who state that after installing the

---

[4] Sellers are not required to display customer reviews that contain unlawful, harassing, abusive, obscene, vulgar, or sexually explicit content, or content that is inappropriate with respect to race, gender, sexuality, or ethnicity, or reviews that the seller reasonably believes are fake, so long as the criteria for withholding reviews are applied uniformly to all reviews submitted.  Neither are sellers required to display reviews that are unrelated to their products or services.  Customer service, delivery, returns, and exchanges are related to the seller's products and services.

company's heat pump in their homes, their monthly utility bills went down by
$100, $125, and $150, respectively.  The ad will likely be interpreted as
conveying that such savings are representative of what consumers who buy the
heat pump can generally expect.  The advertiser does not have substantiation for
that representation because, in fact, fewer than 20% of purchasers will save $100
or more.  A disclosure such as, "Results not typical" or "These testimonials are
based on the experiences of a few people and you are not likely to have similar
results" is insufficient to prevent this ad from being deceptive because consumers
will still interpret the ad as conveying that the specified savings are representative
of what consumers can generally expect.  The advertiser should clearly and
conspicuously disclose the generally expected savings and have adequate
substantiation that homeowners can achieve those results.  There are multiple
ways that such a disclosure could be phrased, *e.g.*, "the average homeowner saves
$35 per month," "the typical family saves $50 per month during cold months and
$20 per month in warm months," or "most families save 10% on their utility
bills."

These disclosures could still be misleading, however, if they only apply to limited
circumstances that are not described in the advertisement.  For example, if the
advertisement does not limit its claims by geography, it would be misleading if
the disclosure of expected results in a nationally disseminated advertisement was
based on the experiences of customers in a southern climate and the experiences

54

of those customers was much better than could be expected by heat pump users in
a northern climate..

**Example 3:**  An advertisement for a cholesterol-lowering product features
individuals who claim that their serum cholesterol went down by 120 points and
130 points, respectively; the ad does not mention the endorsers having made any
lifestyle changes.  A well-conducted clinical study shows that the product reduces
the cholesterol levels of individuals with elevated cholesterol by an average of
15% and the advertisement clearly and conspicuously discloses this fact.  Despite
the presence of this disclosure, the advertisement would be deceptive if the
advertiser does not have competent and reliable scientific evidence that the
product can produce the specific results claimed by the endorsers (*i.e.*, a 130-point
drop in serum cholesterol without any lifestyle changes).

**Example 4:**  An advertisement for a weight-loss product features a formerly
obese person.  The endorser says in the ad, "Every day, I drank 2 WeightAway
shakes, ate only raw vegetables, and exercised vigorously for six hours at the
gym.  By the end of six months, I had gone from 250 pounds to 140 pounds."
The advertisement accurately describes the endorser's experience, and such a
result is within the range that would be generally experienced by an extremely
overweight individual who consumed WeightAway shakes, only ate raw
vegetables, and exercised as the endorser did.  Because the endorser clearly
describes the limited and truly exceptional circumstances under which they

55

achieved the claimed results, the ad is not likely to convey that consumers who weigh substantially less or use WeightAway under less extreme circumstances will lose 110 pounds in six months.  If the advertisement simply says that the endorser lost 110 pounds in six months using WeightAway together with diet and exercise, however, this description would not adequately alert consumers to the truly remarkable circumstances leading to the endorser's weight loss.  The advertiser must have substantiation, however, for any performance claims conveyed by the endorsement (*e.g.*, that WeightAway is an effective weight loss product and that the endorser's weight loss was not caused solely by their dietary restrictions and exercise regimen).

If, in the alternative, the advertisement simply features "before" and "after" pictures of a woman who says "I lost 50 pounds in 6 months with WeightAway," the ad is likely to convey that the endorser's experience is representative of what consumers will generally achieve.  Therefore, if consumers cannot generally expect to achieve such results, the ad would be deceptive.  Instead, the ad should clearly and conspicuously disclose what they can expect to lose in the depicted circumstances (*e.g.,* "women who use WeightAway for six months typically lose 15 pounds").  A disclosure such as "Average weight loss is 1-2 pounds per week" is inadequate and likely deceptive.  It does not communicate the period over which such weight loss can be expected and likely implies that such weight loss continues at that rate indefinitely.

If the ad features the same pictures but the testimonialist simply says, "I lost 50 pounds with WeightAway," and WeightAway users generally do not lose 50 pounds, the ad should disclose what results they do generally achieve (*e.g.,* "women who use WeightAway lose 15 pounds on average"). A disclosure such as "most women who use WeightAway lose between 10 and 50 pounds" is inadequate because the range specified is so broad that it does not sufficiently communicate what users can generally expect.

Assume that a WeightAway advertisement contains a disclosure of generally expected results that is based upon the mean weight loss of users. If the mean is substantially affected by outliers, then the disclosure would be misleading. For example, if the mean weight loss is 15 pounds, but the median weight loss is 8 pounds, it would be misleading to say that the average weight loss was 15 pounds. In such cases, the disclosure's use of median weight loss instead could help avoid deception, *e.g.,* "most users lose 8 pounds" or "the typical user loses 8 pounds."

Assume that WeightAway's manufacturer procured a fake consumer review, reading "I lost 50 pounds with WeightAway," and had it published on a third-party review website. This endorsement is deceptive because it was not written by a bona fide user. [*See* § 255.1(c)]. Moreover, the manufacturer would need competent and reliable scientific evidence that WeightAway is capable of causing 50-pound weight loss.

Assume that WeightAway is a diet and exercise program and a person appearing in a WeightAway ad says, "I lost 50 pounds in 6 months with WeightAway." Very few WeightAway users lose 50 pounds in 6 months and the ad discloses, "The typical weight loss of WeightAway users who stick with the program for 6 months is 35 pounds." In fact, only one-fifth of those who start the WeightAway program stick with it for 6 months. The disclosure is inadequate because it does not communicate what the typical outcome is for users who start the program. In other words, even with the disclosure, the ad does not communicate what people who join the WeightAway program can generally expect.

**Example 5:** An advertisement presents the results of a poll of consumers who have used the advertiser's cake mixes as well as their own recipes. The results purport to show that the majority believed that their families could not tell the difference between the advertised mix and their own cakes baked from scratch. Many of the consumers are pictured in the advertisement along with relevant, quoted portions of their statements endorsing the product. This use of the results of a poll or survey of consumers represents that this is the typical result that ordinary consumers can expect from the advertiser's cake mix.

**Example 6:** An advertisement appears to show a "hidden camera" situation in a crowded cafeteria at breakfast time. A spokesperson for the advertiser asks a series of patrons of the cafeteria for their spontaneous, honest opinions of the advertiser's recently introduced breakfast cereal. Even though none of the patrons

is specifically identified during the advertisement, the net impression conveyed to consumers may well be that these are actual customers. If actors have been employed, this fact should be clearly and conspicuously disclosed.

**Example 7**: An advertisement for a recently released motion picture shows three individuals coming out of a theater, each of whom gives a positive statement about the movie. These individuals are actual consumers expressing their personal views about the movie. The advertiser does not need to have substantiation that their views are representative of the opinions that most consumers will have about the movie. Because the consumers' statements would be understood to be the subjective opinions of only three people, this advertisement is not likely to convey a typicality message.

If the motion picture studio had approached these individuals outside the theater and offered them free tickets if they would talk about the movie on camera afterwards or post about it on social media, that arrangement should be clearly and conspicuously disclosed. [*See* § 255.5.]

**Example 8**: A camping goods retailer's website has various product pages. Each product page provides consumers with the opportunity to review the product and rate it on a five-star scale. Each such page displays the product's average star rating and a breakdown of the number of reviews with each star rating, followed by individual consumers' reviews and ratings. As such, the website is

representing that it is providing an accurate reflection of the view of the purchasers who submitted product reviews to the website. If the retailer chose to suppress or otherwise not publish any reviews with fewer than four stars or reviews that contain negative sentiments, the product pages would be misleading as to purchasers' actual opinions of the products.

If the retailer chose not to post reviews containing profanity, that would not be unfair or deceptive even if reviews containing profanity tend to be negative reviews. However, it would be misleading if the retailer blocked only negative reviews containing profanity, but posted positive reviews containing profanity. It would be acceptable for the retailer to have a policy against posting reviews unrelated to the product at issue or related services, for example reviews complaining about the owner's policy positions. But it would be misleading if the retailer chose to filter reviews based on other factors that are only a pretext for filtering them based on negativity.

Assume now, that each product page starts with a glowing five-star review that is labeled as "the most helpful review." Labeling the review as the most helpful suggests it was voted most helpful by consumers visiting the website. If the initial review on each such page was selected by the retailer and was not selected as the most helpful review by other consumers, labeling it as the most helpful would be deceptive.

60

**Example 9:**   A manufacturer offers to pay genuine purchasers $20 each to write positive reviews of its products on third-party review websites.  Such reviews are deceptive even if the payment is disclosed because their positive nature is required by, rather than being merely influenced by, the payment.  If, however, the manufacturer did not require the reviews to be positive and the reviewers understood that there were no negative consequences from writing negative reviews, a clear and conspicuous disclosure of the material connection would be appropriate.  [See § 255.5 and Example 6.]

**Example 10:**   A manufacturer threatens consumers who post negative reviews of its products to third-party review websites with legal action or with physical threats in order to coerce the consumers to delete their reviews.  Such threats amount to an unfair practice because consumers would be misled as to purchasers' actual opinions of the product.[5]

**Example 11:**   A marketer contacts recent online, mail-order, and in-store purchasers of its products and asks them to provide feedback to the marketer.  The marketer then invites purchasers who give very positive feedback to post online reviews of the products on third-party websites.  Less pleased and unhappy purchasers are simply thanked for their feedback.  Such a practice may be an unfair or deceptive practice if it results in the posted reviews being substantially

---

[5]  The Consumer Review Fairness Act makes it illegal for companies to include standardized contract provisions that threaten or penalize people for posting honest reviews.  15 U.S.C. § 45b.

more positive than if the marketer had not engaged in the practice.  If, in the alternative, the marketer had simply invited all recent purchasers to provide feedback on third-party websites, the solicitation would not have been unfair or deceptive, even if it had expressed its hope for positive reviews.

## § 255.3 Expert endorsements.

(a)     Whenever an advertisement represents, expressly or by implication, that the endorser is an expert with respect to the endorsement message, then the endorser's qualifications must in fact give the endorser the expertise that the endorser is represented as possessing with respect to the endorsement.

(b)     Although an expert may, in endorsing a product, take into account factors not within the endorser's expertise (such as taste or price), the endorsement must be supported by an actual exercise of that expertise in evaluating product features or characteristics with respect to which the endorser has expertise and which are relevant to an ordinary consumer's use of or experience with the product.  This evaluation must have included an examination or testing of the product at least as extensive as someone with the same degree of expertise would normally need to conduct in order to support the conclusions presented in the endorsement.  To the extent that the advertisement implies that the endorsement was based upon a comparison to another product or other products, such comparison must have been included in the expert's evaluation; and as a result of such comparison, the expert must have concluded that, with respect to those features on which the endorser is expert and which are relevant and available to an ordinary consumer, the endorsed product is at least equal overall to the competitors' products.

Moreover, where the net impression created by the endorsement is that the advertised product is superior to other products with respect to any such feature or features, then the expert must in fact have found such superiority.  [*See* § 255.1(e) and Example 3 regarding the liability of endorsers.]

> **Example 1:**  An endorsement of a particular automobile by one described as an "engineer" implies that the endorser's professional training and experience are such that the endorser is well acquainted with the design and performance of automobiles.  If the endorser's field is, for example, chemical engineering, the endorsement would be deceptive.

> **Example 2:**  An endorser of a hearing aid is simply referred to as "Doctor" during the course of an advertisement.  The ad likely implies that the endorser is a medical doctor with substantial experience in the area of hearing.  If the endorser is not a medical doctor with substantial experience in audiology, the endorsement would likely be deceptive.  A non-medical "doctor" (*e.g.*, an individual with a Ph.D. in audiology) or a physician without substantial experience in the area of hearing might be able to endorse the product, but at minimum, the advertisement must clearly and conspicuously disclose the nature and limits of the endorser's expertise

> **Example 3:**  A manufacturer of automobile parts advertises that its products are approved by the "American Institute of Science."  From its name, consumers

would infer that the "American Institute of Science" is a bona fide independent testing organization with expertise in judging automobile parts and that, as such, it would not approve any automobile part without first testing its efficacy by means of valid scientific methods. If the American Institute of Science is not such a bona fide independent testing organization (*e.g.*, if it was established and operated by an automotive parts manufacturer), the endorsement would be deceptive. Even if the American Institute of Science is an independent bona fide expert testing organization, the endorsement may nevertheless be deceptive unless the Institute has conducted valid scientific tests of the advertised products and the test results support the endorsement message.

**Example 4:** A manufacturer of a non-prescription drug product represents that its product has been selected over competing products by a large metropolitan hospital. The hospital has selected the product because the manufacturer, unlike its competitors, has packaged each dose of the product separately. This package form is not generally available to the public. Under the circumstances, the endorsement would be deceptive because the basis for the hospital's choice – convenience of packaging – is neither relevant nor available to consumers, and the basis for the hospital's decision is not disclosed to consumers.

**Example 5:** A person who is identified as the president of a commercial "home cleaning service" states in a television advertisement that the service uses a particular brand of cleanser, instead of leading competitors it has tried, because of

64

this brand's performance. Because cleaning services extensively use cleansers in the course of their business, the ad likely conveys that the president has knowledge superior to that of ordinary consumers. Accordingly, the president's statement will be deemed to be an expert endorsement. The service must, of course, actually use the endorsed cleanser. In addition, because the advertisement implies that the cleaning service has experience with a reasonable number of leading competitors' brands available to consumers, the service must, in fact, have such experience, and have determined, based on its expertise, that the endorsed product's cleaning ability is at least equal (or superior, if such is the net impression conveyed by the advertisement) to that of the leading competitors' products available to consumers. Because in this example the cleaning service's president makes no mention that the endorsed cleanser was "chosen," "selected," or otherwise evaluated in side-by-side comparisons against its competitors, it is sufficient if the service has relied solely upon its accumulated experience in evaluating cleansers without having performed side-by-side or scientific comparisons.

**Example 6:** A medical doctor states in an advertisement for a drug that the product will safely allow consumers to lower their cholesterol by 50 points. If the materials the doctor reviewed were merely letters from satisfied consumers or the results of a rodent study, the endorsement would likely be deceptive because those materials are not the type of scientific evidence that others with the purported degree of expertise would consider adequate to support this conclusion

65

about the product's safety and efficacy.  Under such circumstances, both the advertiser and the doctor would be liable for the doctor's misleading representation.  [*See* § 255.1(d) and (e)].

**§ 255.4 Endorsements by organizations.**

Endorsements by organizations, especially expert ones, are viewed as representing the judgment of a group whose collective experience exceeds that of any individual member, and whose judgments are generally free of the sort of subjective factors that vary from individual to individual.  Therefore, an organization's endorsement must be reached by a process sufficient to ensure that the endorsement fairly reflects the collective judgment of the organization.  Moreover, if an organization is represented as being expert, then, in conjunction with a proper exercise of its expertise in evaluating the product under § 255.3 (expert endorsements), it must utilize an expert or experts recognized as such by the organization or standards previously adopted by the organization and suitable for judging the relevant merits of such products.  [*See* § 255.1(e) regarding the liability of endorsers.]

**Example 1**:  A mattress manufacturer advertises that its product is endorsed by a chiropractic association.  Because the association would be regarded as expert with respect to judging mattresses, its endorsement must be supported by an evaluation by an expert or experts recognized as such by the organization, or by compliance with standards previously adopted by the organization and aimed at measuring the performance of mattresses in general and not designed with the unique features of the advertised mattress in mind.

**Example 2**:  A trampoline manufacturer sets up and operates what appears to be an independent trampoline review website.  The site reviews the manufacturer's trampolines, as well as those of competing manufacturers.  Because the website falsely appears to be independent, it is deceptive.  [*See* § 255.5].

**Example 3**:  Assume that a third party operates a wireless headphone review website that provides rankings of different manufacturers' wireless headphones from most recommended to least recommended.  The website operator accepts money from manufacturers in exchange for higher rankings of their products.  Regardless of whether the website makes express claims of objectivity or independence, such paid-for rankings are deceptive.  A headphone manufacturer who pays for a higher ranking on the website may also be held liable for the deception.  A disclosure that the website operator receives payments from headphone manufacturers would be inadequate because the payments actually determine the headphones' relative rankings.  If, however, the review website does not take payments for higher rankings, but receives payments from some of the headphone manufacturers, such as for affiliate link referrals, it should clearly and conspicuously disclose that it receives such payments.  [See § 255.5, Example 11.]

**§ 255.5 Disclosure of material connections.**

When there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement and that connection is not reasonably expected by the audience, such connection must be disclosed clearly and conspicuously.  Material connections can include a business, family, or personal relationship.  They can include monetary payment or the provision of free or discounted products or services (including products or services unrelated to the endorsed product) to an endorser, regardless of whether the advertiser requires an endorsement in return.  Material connections can also include other benefits to the endorser, such as early access to a product or the possibility of being paid, of winning a prize, or of appearing on television or in other media promotions.  Some connections may be immaterial because they are too insignificant to affect the weight or credibility given to endorsements.  Material connections do not need to be disclosed when they are understood or expected by all but an insignificant portion of the audience for an endorsement.  A disclosure of a material connection does not require the complete details of the connection, but it must clearly communicate the nature of the connection sufficiently for consumers to evaluate its significance.  Additional guidance is provided by the examples below.

> **Example 1:** A drug company commissions research on its product by an outside organization.  The drug company determines the overall subject of the research (*e.g.*, to test the efficacy of a newly developed product) and pays a substantial share of the expenses of the research project, but the research organization determines the protocol for the study and is responsible for conducting it.  A

subsequent advertisement by the drug company mentions the research results as the "findings" of that research organization.  Although the design and conduct of the research project are controlled by the outside research organization, the weight consumers place on the reported results could be materially affected by knowing that the advertiser had funded the project.  Therefore, the advertiser's payment of expenses to the research organization should be disclosed in the advertisement.

**Example 2:**  A film star endorses a particular food product in a television commercial.  The endorsement regards only points of taste and individual preference.  This endorsement must, of course, comply with § 255.1; but, regardless of whether the star's compensation for the commercial is a $1 million cash payment or a royalty for each product sold by the advertiser during the next year, no disclosure is required because such payments likely are ordinarily expected by viewers.

**Example 3:**  During an appearance by a well-known professional tennis player on a television talk show, the host comments that the past few months have been the best of the player's career and during this time the player has risen to their highest level ever in the rankings.  The player responds by attributing that improvement to seeing the ball better, ever since having laser vision correction surgery at a specific identified clinic.  The athlete continues talking about the ease of the procedure, the kindness of the clinic's doctors, the short recovery time, and now being able to engage in a variety of activities without glasses, including driving at

night.  The athlete does not disclose  having a contractual relationship with the clinic that includes payment for speaking publicly about the surgery.  Consumers might not realize that a celebrity discussing a medical procedure in a television interview has been paid for doing so, and knowledge of such payments would likely affect the weight or credibility consumers give to the celebrity's endorsement.  Without a clear and conspicuous disclosure during the interview that the athlete has been engaged as a spokesperson for the clinic, this endorsement is likely to be deceptive.  A disclosure during the show's closing credits would not be clear and conspicuous.  Furthermore, if consumers are likely to take away from the interview that the athlete's experience is typical of those who undergo the same procedure at the clinic, the advertiser must have substantiation for that claim.

Assume that the tennis player also touts the results of the surgery – mentioning the clinic by name – in a social media post.  Consumers might not realize that the athlete is a paid endorser and, because that information might affect the weight consumers give to the tennis player's endorsement, the relationship with the clinic should be disclosed – regardless of whether it paid the athlete for that particular post.  It should be disclosed even if the relationship involves no payments but only the tennis player getting the laser correction surgery for free or at a reduced cost.

Assume that the clinic uses the tennis player's endorsement in its own social media posts. The clinic should clearly and conspicuously disclose its relationship to the athlete in its posts.

Assume that during the appearance on the television talk show, the tennis player is wearing clothes bearing the insignia of an athletic wear company with which the athlete also has an endorsement contract. Although this contract requires wearing the company's clothes not only on the court but also in public appearances, when possible, the athlete does not mention the clothes or the company during the appearance on the show. No disclosure is required because no representation is being made about the clothes in this context.

**Example 4:** A television ad for an anti-snoring product features a physician who says, "I have seen dozens of products come on the market over the years and, in my opinion, this is the best ever." Consumers would expect the physician to be reasonably compensated for appearing in the ad. Consumers are unlikely, however, to expect that an expert endorser like the physician receives a percentage of gross product sales or owns part of the company, and either of these facts would likely materially affect the credibility that consumers attach to the endorsement. Accordingly, the advertisement should clearly and conspicuously disclose such a connection between the company and the physician.

71

Assume that the physician is also paid to post about the product on social media, a context in which consumers might not expect that the physician was compensated and more likely to expect that the physician is expressing an independent, professional opinion. Accordingly, the post should clearly and conspicuously disclose the doctor's connection with the company.

**Example 5:** In a television advertisement, an actual patron of a restaurant, who is neither known to the public nor presented as an expert, is shown seated at the counter. The diner is asked for a "spontaneous" opinion of a new food product served in the restaurant. Assume, first, that the advertiser had posted a sign on the door of the restaurant informing all who entered that day that patrons would be interviewed by the advertiser as part of its television promotion of its new "meat-alternative" burger. A patron seeing such a sign might be more inclined to give a positive review of that item in order to appear on television. The advertisement should thus clearly and conspicuously inform viewers that the patrons on screen knew in advance that they might appear in a television advertisement if they gave the burger a good review because that information may materially affect the weight or credibility of the endorsement.

Assume, in the alternative, that the advertiser had not posted the sign and that patrons asked for their opinions about the burger did not know or have reason to believe until after their response that they were being recorded for use in an advertisement. No disclosure is required here, even if patrons were also told, after

72

the interview, that they would be paid for allowing the use of their opinions in advertising.

**Example 6:**  An infomercial producer wants to include consumer endorsements in an infomercial for an automotive additive product not yet on the market.  The producer's staff selects several people who work as "extras" in commercials and asks them to use the product and report back, telling them that they will be paid a small amount if selected to endorse the product in the infomercial.  Viewers would not expect that these "consumer endorsers" are actors who used the product in the hope of appearing in the commercial and receiving compensation.  Because the advertisement fails to disclose these facts, it is deceptive.

Assume that the additive's marketer wants to have more consumer reviews appear on its retail website which sells a variety of its automotive products.  The marketer recruits ordinary consumers to get a free product (*e.g.*, a set of jumper cables or a portable air compressor for car tires) and a $30 payment in exchange for posting a consumer review of the free product on the marketer's website.  The marketer makes clear and the reviewers understand that they are free to write negative reviews and that there are no negative consequences of doing so.  Any resulting review that fails to clearly and conspicuously disclose the incentives provided to that reviewer is likely deceptive. [When the resulting reviews must be positive or reviewers believe they might face negative consequences from posting negative reviews, a disclosure would be insufficient, see § 255.2(d) and Example

73

9 of § 255.2.] Even if adequate disclosures appear in each incentivized review, the practice could still be deceptive if the solicited reviews contain star ratings that are included in an average star rating for the product and including the incentivized reviews materially increases that average star rating.

**Example 7:** A woodworking influencer posts on-demand videos of various projects. A tool manufacturer sends the influencer an expensive full-size lathe in the hope that the influencer would post about it. The woodworker uses the lathe for several products and comments favorably about it in videos. If a significant proportion of viewers are likely unaware that the influencer received the lathe free of charge, the woodworker should clearly and conspicuously disclose receiving it for free, a fact that could affect the credibility that viewers attach to the endorsements. The manufacturer should advise the woodworker at the time it provides the lathe that this connection should be disclosed, and it should have reasonable procedures in place to monitor the influencer's postings for compliance and follow those procedures. [See § 255.1(d).]

**Example 8:** An online community has a section dedicated to discussions of robotic products. Community members ask and answer questions and otherwise exchange information and opinions about robotic products and developments. Unbeknownst to this community, an employee of a leading home robot manufacturer has been posting messages on the discussion board promoting the manufacturer's new product. Knowledge of this poster's employment likely would affect the weight or credibility of the endorsements. Therefore, the poster

74

should clearly and conspicuously disclose their relationship to the manufacturer to community members. To limit its own liability for such posts, the employer should be engaged in appropriate training of employees. To the extent that the employer has directed such endorsements or otherwise has reason to know about them, it should also be monitoring them and taking other steps to ensure compliance. [See § 255.1(d).] The disclosure requirements in this example would apply equally to consumer reviews of the product posted on retail websites or review platforms.

**Example 9:** A college student signs up to be part of a program in which points are awarded each time a participant posts on social media about a particular advertiser's products. Participants can then exchange their points for prizes, such as concert tickets or electronics. These incentives would materially affect the weight or credibility of the college student's endorsements. They should be clearly and conspicuously disclosed, and the advertiser should take steps to ensure that these disclosures are being provided.

**Example 10:** Great Paper Company sells photocopy paper with packaging that has a seal of approval from the No Chlorine Products Association, a non-profit third-party association. Great Paper Company paid the No Chlorine Products Association a reasonable fee for the evaluation of its product and its manufacturing process. Consumers would reasonably expect that marketers have to pay for this kind of certification. Therefore, there is no unexpected material

connection between the company and the association, and the use of the seal

without disclosure of the fee paid to the association would not be deceptive.

**Example 11:**  A coffee lover creates a blog that reviews coffee makers.  The

blogger writes the content  independently of the marketers of the coffee makers,

but includes affiliate links to websites on which consumers can buy these products

from their marketers.  Whenever a consumer clicks on such a link and buys the

product, the blogger receives a small portion of the sale.  Because knowledge of

this compensation could affect the weight or credibility site visitors give to the

blogger's reviews, the reviews should clearly and conspicuously disclose the

compensation.

**Example 12:**  Near the beginning of a podcast, the host reads what is obviously a

commercial for a product.  Even without a statement identifying the advertiser as

a sponsor, listeners would likely still expect that the podcaster was compensated,

so there is no need for a disclosure of payment for the commercial.  Depending

upon the language of the commercial, however, the audience may believe that the

host is expressing their own views in the commercial, in which case the host

would need to hold the views expressed.  [See § 255.0(b).]

Assume that the host also mentions the product in a social media post.  The fact

that the host did not have to make a disclosure in the podcast has no bearing on

whether there has to be a disclosure in the social media post.

76

**§ 255.6 Endorsements directed to children.**

Endorsements in advertisements addressed to children may be of special concern because of the character of the audience. Practices which would not ordinarily be questioned in advertisements addressed to adults might be questioned in such cases.


By direction of the Commission.


April J. Tabor,
Secretary