## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**FEDERAL TRADE COMMISSION,**

Plaintiff,

v.

**FINANCIAL EDUCATION SERVICES, INC., *et al.*,**

Defendants.

Case No. 2:22-cv-11120

Hon. Matthew F. Leitman

---

## NOTICE OF FILING FOURTH WRITTEN REPORT OF COMPLIANCE MONITOR

The Monitor, Patrick A. Miles, Jr. ("Monitor"), hereby submits the attached Fourth Written Report of Compliance Monitor for Financial Education Services, Inc. et al., for the period beginning November 1, 2023 and ending April 30, 2024.

Dated: May 29, 2024

BARNES & THORNBURG LLP

*/s/ Patrick A. Miles, Jr.*
Patrick A. Miles, Jr. (P46379)
David A. Hall (P81426)
Anthony C. Sallah (P84136)
171 Monroe Ave NW, Suite 1000
Grand Rapids, Michigan 49503
P: (616) 742-3930; F: (616) 742-3999
Patrick.Miles@btlaw.com
David.Hall@btlaw.com
*On behalf of the Court-appointed Monitor Patrick A. Miles, Jr.*



171 Monroe Avenue, NW, Suite 1000
Grand Rapids, MI 49503-2694 U.S.A.
(616) 742-3930
Fax (616) 742-3999
www.btlaw.com

Patrick A. Miles Jr.
Direct (616) 742-3939
patrick.miles@btlaw.com

May 29, 2024

Honorable Matthew F. Leitman
United States District Court
Eastern District of Michigan
Theodore Levin U.S. Courthouse
231 W. Lafayette Blvd
Detroit, MI 48226

## FOURTH WRITTEN REPORT
## OF COMPLIANCE MONITOR PATRICK A. MILES, JR.
## FOR FINANCIAL EDUCATION SERVICES, INC. ET AL.,

## FOR THE PERIOD BEGINNING NOVEMBER 1, 2023
## AND ENDING APRIL 30, 2024

Atlanta  Boston  California  Chicago  Delaware  Indiana  Michigan  Minneapolis  Nashville  New Jersey
New York  Ohio  Philadelphia  Raleigh  Salt Lake City  South Florida  Texas  Washington, D.C.

*FOIA Exempt*
*Business Confidential Commercial and Financial/Trade*

# <u>TABLE OF CONTENTS</u>

**Page**

**I.**  BACKGROUND ..................................................................2

    **A.**  Brief Overview of the Monitored Entities ......................3

    **B.**  Products ...........................................................................4

    **C.**  Monitoring Actions .........................................................5

**II.**  EXECUTIVE SUMMARY AND OBSERVATIONS ......................6

**III.**  YOUTH FINANCIAL LITERACY FOUNDATION......................7

**IV.**  NATIONAL CONVENTION ....................................................12

    **A.**  Friday General Session...................................................13

    **B.**  Saturday General Session ..............................................16

**V.**  AGENT SOCIAL MEDIA SEARCHES AND MONITORING......16

**VI.**  OVERVIEW OF THE MONITORED ENTITIES' TREASURY ACCOUNTS ....................................................................................22

    **A.**  General Overview...........................................................22

    **B.**  FES Bank Account Transactions....................................24

    **C.**  UWE Bank Account Transactions ..................................24

    **D.**  YFL Bank Account Transactions....................................25

    **E.**  VR-TECH LLC, VR-TECH MGT, LLC and CMR Bank Account Transactions....................................................................25

**VII.**  CONCLUSION ........................................................................26

This *Fourth Written Report of Monitor Patrick Miles, Jr. (the "*Monitor*") for Financial Education Services, Inc.[1] ("*FES*" or "*Company*"), United Wealth Services, Inc. ("*UWS*"), VR-TECH, LLC, VR-TECH MGT, LLC, CM Rent, Inc. ("*CMR*"), and Youth Financial Literacy Foundation[2] ("*YFL*")(collectively, "Monitored Entities" or individually, "*Monitored Entity*") for the period beginning April 1, 2023 and ending October 31, 2023* ("Fourth Report") is the fourth report of the Monitor and his team (collectively, "Monitor Team") pursuant to the Order inter alia Converting Receivership to Monitorship, dated July 18, 2022 and covers the reporting period of November 1, 2023 through April 30, 2024.

## I.    BACKGROUND

As set forth in previous reports from the Monitor, this monitorship arises from a lawsuit commenced by the Federal Trade Commission (the "FTC") on May 23, 2022 with a Complaint for Permanent Injunction, Monetary Relief, and Other Relief (the "Complaint") (ECF No. 1) against the Monitored Entities, as well as Parimal Naik, Michael Toloff, Christopher Toloff, and Gerald Thompson (the "Individual Defendants" and together with the Monitored Entities, collectively, "Defendants").[3]

The FTC alleges that since at least 2015 Defendants have operated an unlawful credit repair scam deceiving consumers and otherwise violating multiple provisions of the Credit Repair Organizations Act, 15 U.S.C. §§ 1679-1679 et seq. ("CROA") and Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a). (ECF No. 1, at PageID.2, ¶ 2). The FTC further alleges that Defendants market a business opportunity with false or misleading representations as well as encourage and incentivize consumers to become agents and then to recruit other consumers to purchase Defendants' credit repair services as an illegal pyramid scheme in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). (*Id.* at

---

[1] Financial Education Services, Inc. also does business as United Wealth Education ("UWE") according to an assumed named filing with the State of Michigan Department of Licensing and Regulatory Affairs ("LARA"), dated July 12, 2021.

[2] Youth Financial Literacy Foundation assumed the name United Credit Education Services ("UCES") on October 24, 2011. Additionally, according to LARA, YFL assumed the name United Credit Education Services on the same date FES's assumed name usage of the name United Credit Education Services expired.

[3] On March 23, 2023, the FTC filed its First Amended Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief (ECF No. 121), among other things, adding LK Commercial Lending LLC, Statewide Commercial Lending LLC, and Gayle L. Toloff, individually and as trustee, grantor, and beneficiary of the Gayle L. Toloff Revocable Trust, as Defendants ("First Amended Complaint").

PageID.3, 33, ¶¶ 3, 69). Moreover, the FTC alleges Defendants violated the FTC's Telemarketing Sales Rule, 16 C.F.R. Part 310 ("TSR") in connection with their marketing and sale of credit repair services and investment opportunities. (*Id*. at PageID.2, ¶ 1). In addition, per the First Amended Complaint, the FTC alleges Defendants violated the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x ("FCRA") and Section 521 of the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. § 6821 in connection with inappropriately obtaining and using consumer credit information. (ECF No. 121 at PageID. 6378-6382, ¶¶ 134-144).

On July 18, 2022, the Court entered an Order Denying Motion for Preliminary Injunction, Vacating Temporary Restraining Order, Terminating Asset Freeze, and Converting Receivership to Monitorship (the "Monitor Order"), whereby Mr. Miles was appointed Monitor for the Monitored Entities, as that term is defined in the Monitor Order (the "Conversion"). (ECF No. 76). Mr. Miles, in his capacity as the Court-appointed temporary receiver – prior to being named Monitor – filed the *First Interim Report of Patrick A. Miles, Jr.* on June 28, 2022 (ECF No. 55-1) ("Receiver's Report").

Since the entry of the Monitor Order, the Monitor and the Monitor Team undertook the duties outlined in the Monitor Order and submitted the First Written Report of Compliance Monitor Patrick A. Miles, Jr. for the period July 18, 2022 to October 15, 2022 ("First Report") on November 16, 2022 (ECF No. 127), the Second Written Report of Compliance Monitor Patrick A. Miles, Jr. for the period October 16, 2022 to March 31, 2023 ("Second Report") on April 27, 2023 (ECF No. 135), and the Third Written Report of Compliance Monitor Patrick A. Miles, Jr. for the period April 1, 2023 to October 31, 2023 ("Third Report") on December 1, 2023 (ECF No. 153). The Monitor now hereby submits the Fourth Report.

## A.    Brief Overview of the Monitored Entities

The Monitored Entities operate a multi-level marketing ("MLM") business, which offers for sale an assortment of credit restoration and financial literacy-related products and services. FES/UWE and UWS are Michigan corporations based in Livonia, Michigan owned by Parimal Naik. YFL/UCES is a Michigan nonprofit corporation formed on a nonstock directorship basis with tax-exempt status under Section 501(c)(3) of the Federal Internal Revenue Code, 26 U.S.C. § 501(c)(3). CMR is a Colorado corporation evidently owned 40 percent by Mr. Naik, 40 percent by Michael Toloff, and 20 percent by William Butler. VR-TECH, LLC is a Michigan limited liability company owned by Mr. Naik. VR-TECH MGT, LLC is a Michigan limited liability company owned by Michael Toloff. The latter two entities are used

by Messrs. Naik and Toloff, respectively, to receive distributions or consulting fees from the other Monitored Entities and to run through their business-related expenses.

As to the additional Defendants, LK Commercial Lending LLC is a Michigan limited liability company reportedly owned by Michael Toloff and possibly Parimal Naik. Defendant Statewide Commercial Lending is a South Carolina limited liability company reportedly owned by Byron Stokes, who apparently is a UWE agent based in Columbia, South Carolina. And Defendant Gayle L. Toloff evidently is married to Michael Toloff.

## B.   Products

The principal products promoted and offered by the Monitored Entities (collectively, "Products" or individually, "Product") are as follows:

| **Corporate Defendant** | **Product** |
|---|---|
| UWE & UCES | Protection Plan |
| UCES | UltraScore |
| UWE | MyCare Plan |
| UWE | My HealthCare2Go (terminated) |
| CMR[4] | My Student Loan Manager (no longer on the Company's website) |
| UWE | Secured Card |
| UWE | Business Lending |
| UWE | Business Credit Building |
| UWE | Personal Lending |
| UWE | Auto Loan Refinancing |
| UWE | High Yield Savings |
| UWE | Student Loan Refinancing |

---

[4] As described in the Receiver's Report, the Credit My Rent Product "purports to improve a customer's credit rating through the reporting of consistent and timely rent payments to credit reporting agencies. Similar to credit restoration . . . the customer is primarily responsible for preparing and submitting communications to the credit reporting agencies using materials provided by CMR. This product is offered in three variations: (i) on-going monthly reporting only, (ii) on-going monthly reporting, plus submission of one year prior rental payment history, and (iii) on-going monthly reporting, plus submission of two years' prior rental payment history." (Receiver's Report at 14). As noted in the First Report, the Credit My Rent Product apparently is no longer offered by CMR or any of the Monitored Entities.

The Protection Plan includes a "Budgeting" calculator tool, "Credit Restoration," "Credit Builder," access to "Credit Attorney," "Credit Monitoring," a "Debt Payoff" payment plan, the "Financial Lockbox," "Identity Monitoring," a "Net Worth Calculator," access to "Rocket Lawyer," a "Savings Goals" calculator, and "Will & Trust Document Preparation." The Products are more fully described in the Receiver's Report. (*See* Receiver's Report at 14-18).

As described in the First Report, when a UWE customer purchases the Protection Plan, $9.00 of the $89.00 monthly fee goes to YFL.

The newer so-called fintech products – i.e., Business Loan, Personal Loan, Student Loan Refinancing, and Auto Refinancing (the "FinTech Products") are described in the Second and Third Report and include small business loans, personal loans, high yield savings accounts, and a secured credit card which are all offered through third party vendors such as Lendflow, Even Financial, and Vervent.

The key Product is the Protection Plan – a bundle of 12 distinct Products and services either developed by the Monitored Entities or third party products offered to customers via the Monitored Entities. Protection Plan sales and new agent activity are below the Company's apparent targets – with only 4,663 agents and 8,243 customers active in the Protection Plan during the month of April 2024 – for a total of 12,906 Protection Plan memberships since the Company indicates its goal is to have 30,000 to 40,000 Protection Plan memberships.

## C. Monitoring Actions

During the reporting period from November 1, 2023 through April 30, 2024, the Monitor Team, among other things —

- Attended and observed the UWE/UCES National convention in Fort Lauderdale, Florida on February 2 to 3, 2024;

- Met in person with UWE CEO Parimal Naik and YFL President Michael Curry;

- Interviewed Jason Short, UWE Director of Product Development and Client Retention;

- Requested pertinent information from the Monitored Entities;

- Reviewed the Company's compliance-related policies and procedures, training and testing materials, and disciplinary procedures;

- Communicated with Matthew Rapkowski, one of the Company's attorneys from Greenspoon Marder LLP ("Greenspoon");
- Reviewed weekly discipline action reports submitted by the Company; and
- Reviewed weekly banking transactions for each account utilized by the Monitored Entities.

## II.    EXECUTIVE SUMMARY AND OBSERVATIONS

The Company continues its efforts, in apparent good faith, to be compliant with applicable laws. As previously reported, since third quarter of 2023 the Company has a training program and testing for agents. (Third Report at 30). The Company bestows agents who pass its compliance test the title of "Certified Wealth Educator." (Third Report at 32-33). The compliance course and related test are required for all new agents joining the business and for their annual certification renewals. The Company also announced earlier this year that beginning February 1, 2024, all agents must get their Certified Wealth Educator designation by May 1, 2024. Such course also is recommended, but not required, for first time violators of the Company's policies. The course and test are required for reinstatement after a 30-day suspension for an agent's second violation as well as for reinstatement after a 60-day suspension for a third violation. These policies are consistent with the Monitor's Recommendations 2 and 3 from the Second Report. (Second Report at 16-18).

During this reporting period the Monitor Team focused on YFL and the Company's annual national convention with its agents in early February 2024. In addition, the Monitor Team conducted its own manual searches of the Company's top performing agents to confirm the Company's self-declared compliance monitoring efforts of agents whose commissions either exceed a certain amount or who have been disciplined for prior violations. Unfortunately, the Monitor Team found over two dozen social media posts by top producing agents during the reporting period which violate Company policies.

The Monitor Team observed an upward trend during this reporting period of the Company's number of agents and a corresponding increase in sales revenue. The Company apparently is hopeful this trend continues, especially after the downward trends in the previous reporting period.

### III.   YOUTH FINANCIAL LITERACY FOUNDATION

This section of the Fourth Report provides details and an update on YFL and its activities since prior reports on YFL's activities. (*See* Receiver's Report at 12-13, 17-19; First Report at 18; Second Report at 11-12). As previously reported, YFL operates under the assumed name United Credit Education Services or UCES.

Michael Curry is YFL's President. YFL has a three member board of directors currently consisting of Mr. Curry, Michael Scullen, and Steve Cojei. Along with Mr. Curry, YFL's corporate team members are Project Manager Aaron Blanzy, Vice President—Technology Rohil Ratanpara, and Customer Support Supervisor Brandon Clark. Mr. Ratanpara apparently is a "shared employee" with FES/UWE.

According to the Monitored Entities, YFL/UCES is a separate and distinct entity from FES/UWE. However, it appears most of the Company's agents do not fully understand or recognize the distinction between the two entities (i.e., UWE and YFL) and that the Protection Plan is a YFL Product. As previously reported by the Monitor, YFL and FES apparently partner together to offer the Protection Plan sold by agents, with the credit repair Products being provided by YFL ostensibly to take advantage of an exemption from CROA in 15 U.S.C. § 1679a(3), which provides in pertinent part as follows: "The term 'credit repair organization' …(B) does not include – (i) any nonprofit organization which is exempt from taxation under 501(c)(3) of title 26." (*See* Receiver's Report at 17-18; First Report at 18). A letter from the Internal Revenue Service, dated August 23, 2010, to YFL states, "Based on the information you submitted, [YFL] is classified as a public charity under the [Internal Revenue] Code section [509(a)(2)]…[and] you continue to be classified as an organization exempt from Federal income tax under section 501(c)(3) of the [Internal Revenue] Code."[5]

The Monitor has discussed with both Mr. Naik and Mr. Curry whether the business partnership between YFL/UCES and FES/UWE is necessary. The Monitor reported that the Monitored Entities evidently made significant modifications to bring the Products and their business practices into compliance with CROA. (*See* First Report at 16-21; Second Report at 19). As such, it is unclear to the Monitor that the continued reliance on YFL's tax-exempt status is needed as a legal strategy to avoid CROA's requirements.

---

[5] YFL, formerly known as The Thompson Scholarship Foundation Inc. f/k/a MSU Common Sense, Inc., was first granted exemption from Federal income tax under Section 501(c)(3) by letter dated December 31, 2003 from the Internal Revenue Service.

According to Mr. Curry, the Monitored Entities do not, at this time, intend to remove YFL's role in the Protection Plan. Mr. Curry indicated that the credit restoration and repair Products, among others, are owned by YFL and a partnership between YFL and FES remains necessary, absent a transfer of ownership of the Products owned and operated by YFL. Moreover, Mr. Curry indicated that in the future, YFL could seek to partner with other third party companies to diversify its revenue streams.

YFL's apparent mission, beyond its role in the Protection Plan, is to promote financial literacy. In his presentation at the Monitored Entities' 2024 national convention, Mr. Curry indicated that YFL exists to:

- Promote financial knowledge and understanding
- Instill habits for money management
- Cultivate lifelong learning

In furtherance of those goals, Mr. Curry represented that YFL seeks to:

- Create learning opportunities for children
- Help rising generations establish financial independence
- Work to create the highest impact and do the most where the need is greatest
- Establish work ethic

According to Mr. Curry, the philanthropic activities of YFL have been impeded as a result of the FTC litigation. Consistent with the Monitor Team's own review of the financial and bank records of the Monitored Entities, Mr. Curry notes that a significant amount of the YFL's cash flow is used to fund the payment of litigation related expenses by the Monitored Entities, which has prevented YFL from engaging in certain activities that were part of its mission prior to the litigation.

In particular, YFL has historically funded college scholarships to selected winners of an essay contest by high school seniors. According to YFL, since the inception of the essay contest 11 years ago, scholarships have been awarded to 351 recipients enrolled at 247 colleges and universities, with approximately $2,700,000 in scholarship funds awarded. The scholarship essay contest is apparently on hold

indefinitely and no scholarships have been announced since the commencement of the FTC litigation.[6]

Mr. Curry says the scholarship program is likely to be reinstated to the extent resources become available, likely as a result of a favorable resolution of the FTC litigation (i.e., which permits the Monitored Entities to continue operating), together with an increase in memberships of Protection Plans. If the scholarship essay contest is restored, the amount available would be a function of available revenues.

According to Mr. Curry, as of April 26, 2024, there were 12,545 active Protection Plan memberships. According to Mr. Naik, the Monitored Entities have a near-term goal of establishing 25,000 to 30,000 active Protection Plan memberships by the end of June, 2024, which would create sustained profitability should the FTC litigation be resolved favorably. According to Mr. Naik, a longer term goal of 30,000 to 50,000 active Protection Plan memberships would create an ideal number of active memberships for the Monitored Entities. According to Mr. Naik, this volume of active Protection Plan memberships would be much more manageable than the scale of memberships prior to the FTC litigation, which was in excess of 100,000 active memberships.

Since being installed as President of YFL, Mr. Curry indicated that he has focused on implementing more formalities for YFL, including more regular meetings of its board of directors. YFL's bylaws apparently require the board to meet only once per year. According to Mr. Curry, the board met three times in 2023 and intends to meet quarterly in 2024 and beyond that, on an "as needed" basis.

According to Mr. Curry, to the extent the FTC litigation is resolved favorably, he would like to explore seeking out additional funding sources beyond revenues derived from its partnership with FES/UWE in order to expand its philanthropic reach and diversify funding sources. In the current posture, he noted however, the FTC litigation would likely prevent any third party from considering making any kind of donation to YFL or otherwise collaborating with YFL/UCES.

Additionally, according to Mr. Curry, in the future, and in particular, if there is an expansion of YFL, full-time leadership may be desirable. Currently, Mr. Curry serves as President of YFL on a part-time basis.

---

[6] The Monitor understands that certain scholarships that had been awarded prior to the commencement of the FTC litigation, but not paid as a result of the receivership, were ultimately paid following the Conversion.

Another aspect of YFL's operations that has continued through the FTC litigation is the Family Mint Program. The Family Mint Program allows agents to present a financial literacy course most commonly in a school, but could be another community organization. Upon completion of the literacy program, YFL donates a $500 stipend to the school or organization.

Attached as **Exhibit A** is the Family Mint instructor guide. Attached as **Exhibit B** is the curriculum workbook in English. Attached as **Exhibit C** is the curriculum workbook in Spanish. The curriculum workbook is referred to herein as the "Workbook". According to the Workbook, the Family Mint Program "is designed to develop money management habits that will benefit children for the rest of their lives." The Workbook apparently teaches the following principles:

- Saving money
- Tracking money
- Setting and achieving financial goals
- Delaying gratification
- Writing checks and deposit slips
- Establishing money habits
- Budgeting
- Teaching about interest and how it works

The number of presentations for 2023 and for 2024 through April 26, 2024, are set forth as follows:

| Year | Presentations |
|------|---------------|
| 2023 | 1,590 |
| 2024 | 1,064 |

Since its inception, according to YFL, the Family Mint Program has been presented in approximately 80 schools, reaching approximately 4,300 kids in grades 5 through 9 (ages 9 through 14).

The Family Mint Program apparently is designed to run for eight weeks. There appears to be an in person introduction session, where participants are given Workbooks with instructions for students to work through over the course of the program. It appears that the program is primarily self-administered using the Workbook.

The introduction sessions appears to guide volunteer agents through the following subjects:

- A discussion of the different types of money and uses for money
- How to earn money (i.e., jobs, household chores)
- Expenses relating to needs (i.e., food, housing, clothing) and wants (i.e., entertainment, video games)
- An introduction to:
  - Money tracking relating to transactions
  - Financial goal setting (i.e., purchasing a car or home, college education)
  - Establishing a budget to accomplish a financial goal(s)
  - Interest, and the difference between simple and compound interest

At completion of the eighth week of the program, participants share what has been learned and financial goals achieved, and participants receive certificates and prizes.

The Family Mint Program is operated on a volunteer basis by the Monitored Entities' agents. Mr. Curry was clear that the Family Mint Program is not a sales or marketing tool, but rather driven by a desire to promote financial literacy in the community, and in particular, in schools. Historically, according to Mr. Curry, in order to have the opportunity to participate in the Family Mint Program, agents have needed a certain minimum level of sales volume, which apparently is a reflection of the belief that an agent with a high sales volume is most knowledgeable about financial literacy. According to Mr. Curry, YFL has begun to abandon this practice, moving instead to a discretionary process where agents are permitted to present the Family Mint Program curriculum on a case-by-case basis. He said YFL may adopt a financial literacy certification requirement to participate in the Family Mint Program.

In that regard, Mr. Curry noted to the Monitor Team that he has identified a population of agents with modest sales who are nevertheless very passionate about financial education. He said YFL has established an informal advisory committee of agents who have indicated a strong interest in financial literacy education, and the Family Mint Program, consisting of approximately ten people, including Mr. Curry. Mr. Curry emphasized that the participating agents are not leaders in the business. It

is the Monitor's understanding that the advisory committee is intended to explore ways to expand YFL's stated mission of promoting financial literacy.

According to Mr. Curry, YFL/UCES has also, on a limited basis, donated Protection Plan memberships to organizations and individuals on a one-off basis. The decision to make such a donation has apparently been on the basis of a single cause or circumstance YFL has chosen to support. Mr. Curry indicated YFL will consider more donations of this type in the future, but did not indicate any overarching plan in this regard.

## IV.    NATIONAL CONVENTION

UWE's 2024 annual national convention was held Friday, February 2 through Saturday, February 3 at the Broward County Convention Center in Fort Lauderdale, Florida (the "Convention"). Members of the Monitor Team attended the Convention, observed the proceedings, and interviewed several UWE and YFL leaders and agents. Reportedly 480 people registered for the Convention and an estimated 98 to 99% of those in attendance were people of color – either of Black or Hispanic origin. Consistent with prior reports and observations of the Monitor, such racial groups apparently are the Company's present target market for agents and customers. (*See* Second Report at 11).

Similar to the 2023 annual national convention the Monitor Team reported on in the Second Report (at 66-76), the Convention:

- Was well planned in advance and produced at a high-level.
- Engaged an energetic professional "master of ceremonies" for the general sessions, employed a professional DJ to play hip hop, urban pop or salsa dance music during the general sessions, deployed a sound and light show by professional crew in the main ballroom, used slide deck and video presentations behind each speaker, and featured giant on-stage video screens showing live shots from multiple fixed and mobile cameras in the main ballroom.
- Had a semiformal gala awards event on Saturday evening which the Monitor Team chose not to attend.

The following sections are Convention highlights noted by the Monitor Team.

## A.    Friday General Session

Mr. Naik opened the Convention Friday morning and told agents "to be humble" and that there is "no need to brag about how much money you make" in an apparent effort to avoid illegal lifestyle claims in promoting the MLM business opportunity. He noted the Company is celebrating 20 years in business. Mr. Curry followed Mr. Naik with a "UWE 20 years in review" presentation. After recognizing the Company's attorneys, he cited the Monitor Team's presence and encouraged all in attendance to engage with the Monitor Team while at the Convention. Interspersed with Mr. Curry's 20 year review was a "Jeopardy"-style game with Mr. Naik posing questions about the Company (with subjects such as types of Products, Compensation Plan elements, corporate office information, and commission payments). Mr. Curry also introduced the respective YFL and UWE corporate teams.

Mr. Naik told the crowd that in 2023 the Company "did not grow as much as we wanted due to competition," but he noted that "competition is mostly gone." He said in 2024 the Company's focus "is strictly on training." Vice President Chris Holder presented the UWE training platform for new agents which has the following topics:

Getting started

- Back office overview/navigation
- Getting promoted
- Compliance
- Compensation Plan
- Wealth Educator

Mr. Holder said the Company is "adding more training so [agents] do not need to do as much training" of newly enrolled agents.

Mr. Naik presented the Company's "Top 10 Earners" (in terms of enrolling new agents and customers directly) with cash awards between $700 and $1,000 as part of its "Money Ball" game in which the following participants selected one of three boxes spelling UWE with cash inside:

10. Ariesa John

9. Carnell Newsome

8. Andrea McKeithern

7. Janessa Joy

6. Jesula Beauchamps

5. Christy Harrison

4. Christopher Hall

3. Alisa Barnes

2. Niurkys Cabrera

1. Erica Sanford

Ms. Griffin spoke about the Wealth Educator Certification course which covers compliance, Product information, and the Compensation Plan.[7] She noted agents earn a badge on their website showing the Certified Wealth Educator designation. She announced that beginning February 1, 2024, all agents have 90 days to get their certification. In terms of commissions, she informed the audience that for "placed sales," the "direct commission is split in half between the enrolling agent and the agent who placed the sale."

UWE Marketing Manager Kori Maher gave a marketing update and said the 2024 focus areas are as follows:

- Marketing focus groups
- Back Office materials and presentations
- Social media strategy and assets
- Training platform assets

Ms. Maher said the Company is working on a new agent website design with a business opportunity page and easy navigation. She noted it will include Compensation Plan and Product information.

Director of Product Development and Client Retention Jason Short gave an update on the Company's FinTech Products noting the current secured and unsecured credit card offerings and identity theft protection from ReliaShield which replaces the Company's use of the LifeLock brand. He said the Company is "rolling

---

[7] The Compensation Plan sets forth the methods agents can earn commissions and payments from the Company as well as the associated titles upon achieving certain targets (the "Compensation Plan"). The most recent version of the Compensation Plan provided to the Monitor was November 17, 2023.

out" 10 new brands of personal unsecured credit cards with 30 card options which will be available in the agents' Company website "back office" in two weeks. He noted the Company's compensation manual also would be updated in two weeks to account for sales of these cards.

Ms. Griffin and Mr. Holder then presented slides on "Compliance and Teaching Your Team" which included "compliance tips" and how to "integrate them into team training." Such slides are attached in **Exhibit D** and include the following points:

- The applicability of state and federal regulations relating to the credit repair industry.

- The need for clear communication with potential agents.

- The importance of customer satisfaction.

- Conveying realistic expectations for potential agent earnings.

- Being cautious with income claims, noting what is typical vs. what is possible for agents.

- Using the phrase "supplement income" instead of "financial freedom".

- Avoiding luxury lifestyle social media posts in words or images.

Ms. Griffin then reviewed the Company's use of FieldWatch, a software system which monitors social media and the Internet to find non-compliant posts and statements by agents. She noted FieldWatch provides reports, documents violation incidents, and keeps records. She said it "does the work of four to five employees and eliminates manual searches." She advised agents that their social media pages must be provided to the Company in their respective online back office.

Ms. Griffin covered the Company's four-step disciplinary action policy, but she did not mention the testing requirement for reinstatement after a suspension. She informed the audience that they cannot use telephone calls or text message to sell the Products or business opportunity. She presented the "Best Practices" for agents as follows:

- Learn Compliance Do's and Don'ts

- Wealth Educator Certification material

- Approved marketing materials

- Call the Agent Support Department

- Focus on introducing the Protection Plan and how people benefit

Mr. Holder noted the Company has a so-called "snitch line" for agents to anonymously report a concerning practice. He encouraged them to send pictures/video of offending posts. He said this will help protect the Company.

Alfred Nickson, the agent with the largest number of "downline" agents under him, presented on how to recruit other agents successfully using PBR, a private business reception, which is a small, invitation-only gathering of prospective agents. He noted that a PBR could be held in person or via ZOOM.[8]

### B. Saturday General Session

YFL President Michael Curry spoke about the differences between UWE and YFL, such as UWE being a for profit corporation and YFL being a non-profit 501(c)(3) corporation. He noted the two "organizations work together, but are not the same. They have separate leadership, staff, and facilities." He said YFL exists (a) to promote financial knowledge and understanding, (b) to increase understanding habits for sound money management, and (c) to cultivate lifelong learning. He noted YFL started in 2010, "six years after UWE."

Mr. Curry then covered the Family Mint program, Central District Christian Development support, and scholarships described in the above section.

The remainder of the Saturday session included more MoneyBall cash awards, agent testimonials, and person financial lessons as well as a panel discussion of agents moderated by Mr. Holder on keys to customer retention.

## V.   AGENT SOCIAL MEDIA SEARCHES AND MONITORING

---

[8] As noted in the Second Report, the FTC emphasizes that "direct, substantive and personal contact between the consumer and seller" fall outside the TSR's scope...." (*See* Second Report at 48-49; FTC, *Complying with the Telemarketing Sales Rule*, *available at* https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule; *see also* 16 C.F.R. § 310.6(b)(3)). The Monitor is unclear whether the use of a videoconference technology such as ZOOM constitutes a "face-to-face" transaction and is outside the TSR's scope. (*See e.g.* FTC, *Debt Relief Services & the Telemarketing Sales Rule: What People Are Asking*, (last accessed Apr. 21, 2023), *available at* https://www.ftc.gov/business-guidance/resources/debt-relief-services-telemarketing-sales-rule-what-people-are-asking ["Webcam conversations and other online interactions don't count as face-to-face meetings. To qualify for the exemption, face-to-face sales presentations have to be in person."]).

As previously reported by the Monitor in prior reports, the Company established compliance policies and procedures for agents, together with compliance monitoring and discipline protocols.

Among the materials developed by the Company, and provided to agents in their back offices, is a manual of "Do's and Don'ts", which is apparently designed as a best practices reference guide for agents when marketing the Company's Products and presenting the business opportunity.

Of note, the Company advises agents not to:[9]

- Focus on luxury lifestyles through words or images such as expensive homes, luxury automobiles or exotic vacations.

- Promise specific results from the services in a specific time frame.

- Promise earnings or income from the business.

- Promise weekly or regular earnings.

- Refer to oneself as a "Credit Consultant," "Credit Agent," "Credit Advisor" or use any title insinuating an agent has a special certification or qualification to give consumers advice about credit or finances.[10]

- Say that the Company removes negative items on consumer credit reports.

- Advise customers not to pay accounts that are in collections or give advice to them regarding how to handle personal finances.

- Use Company logo or trademarks.

- Use a Company name with the word "credit," "credit services" or anything that indicates they are providing financial services.

- Use the following phrases or words:
    - Financial freedom
    - Wealth
    - Retire from your job
    - Financial independence

---

[9] Reference should be made to **Exhibit E** for a complete description of the Company's compliance policies and procedures.

[10] This guidance appears at odds with the Company's Wealth Educator Certification discussed above in Sections II and IV.A.

In addition to automated FieldWatch social media and internet searches for statements or images which violate Company policy, apparently the Company's stated policy is also to manually search weekly the online marketing by agents who:

- Earned in excess of $200,000 in the prior calendar year; or

- Have been placed on the compliance watchlist as a result of prior violations of discipline rules. (*See* Second Report at 15).

The Monitor Team requested from the Company a list of agents whose social media posts are being manually searched. The Company did not provide the requested information prior to the filing of this Fourth Report. These agents are apparently high earning agents or agents subject to the Company's discipline protocols.

The Monitor Team conducted a manual search of agent Andrea Mckeithern during her appearance at the Company's Convention in February, 2024 while she was speaking on stage. The results of the search are attached as **Exhibit F**. A clear violation of the Company's marketing guidelines appeared on her Instagram profile, which stated "I help you reach Financial Freedom!" Mckeithern's Instagram profile picture also shows her posing before a luxury vehicle, together with the title "Wealth Boss CEO", each of which also appear to violate Company policies.

The Monitor Team raised some of these issues to Greenspoon during the Convention and was advised that non-compliant marketing would be addressed. The Monitor Team again searched Mckeithern's online marketing on or around April 15, 2024, and found that the reference to "financial freedom" was replaced with "financial goals." The other aspects of Mckeithern's Instagram profile noted above remained the same. (*See* **Exhibit G**).

Subsequently, the Monitor Team conducted a manual search of the social media sites of the top 40 producing agents, according to the Company, for the four month period of October 2023 through January 2024. This search field included Mckeithern, whose results are not repeated in the summary below.

The search was intended to confirm whether the Company's top agents are in compliance with the compliance protocols of the Company, and to test the efficacy of the Company's compliance monitoring. The agents searched were as follows:

| **Agent Name** |
| --- |
| Alfred Nickson |
| Lakeisha Marion |
| Niurkys Cabera Viuzat |
| Robert Gould |

| |
|---|
| Michael Bien-Aime Burgos |
| Alisa Barnes |
| Bruce Rochester |
| Morgan Hardman |
| Erica Sanford |
| Johnnie Newsome |
| Raysa Santiago |
| Giselle Balarezo |
| Jesula Beauchamps |
| Robin Robinson |
| David Marquez |
| Christy Harrison |
| Elvis Espinoza |
| Nuvia Estrella Castillo |
| Sonya Hamm |
| Patrick Adu |
| Robbin Santiago Cosme |
| Luneida Augustin aka Viviana Pratts |
| Billy Scott |
| Christopher Hall |
| Ariesa John |
| Beatriz Mendez |
| Tishia Rolon |
| Donte Smith |
| Norman Quintero |
| Andreesha Teasley |
| Patricia Amaya |
| Noraika Gonzalez Perez |
| Isaibis Arozarena Alfonso |
| Stephen Woods |
| Devon King |
| Latoya Harris |
| Faletolu Kitiona |
| Jonathan Manjarres |
| Arturo Hernandez |

The Monitor Team found the following instances of apparent non-compliance with Company policies:

| Agent Name | Date Searched | Platforms Searched | Potential Violation |
|---|---|---|---|
| Alfred Nickson | 2/28/2024; 4/15/2024 | Facebook, Instagram, X, TikTok | Uses phrase "financial freedom" in Facebook profile |
| Lakeisha Marion | 2/28/2024; 4/15/2024 | Facebook, Instagram, TikTok | Uses company name with the word "credit" ("Classy Credit Chicks")<br><br>Uses phrases "financial freedom" and "wealth"<br>Agent refers to herself as a "Credit Repair Consultant"<br><br>Facebook profile picture shows agent posing on a boat |
| Niurkys Cabera Viuzat | 2/28/2024; 4/15/2024 | Facebook, Instagram, TikTok | Uses phrase "Financial Credit Advisor" and "Credit Consultant" |
| Robert Gould | 4/10/2024; 4/15/2024 | Facebook | Uses "FES" product logo on Facebook |
| Bruce Rochester | 2/28/2024; 4/15/2024 | Facebook, Instagram, X, TikTok | Advises not to pay collections |
| Erica Sanford | 2/28/2024; 4/15/2024 | Facebook, Instagram, TikTok | Provides advice on personal finance<br><br>Uses phrase "financial freedom" and makes reference to early retirement |
| Raysa Santiago | 2/28/2024; 4/15/2024 | Facebook, Instagram, TikTok | Advises not to pay collections |
| Elvis Espinoza | 2/28/2024; 4/15/2024 | Facebook | Uses company name with the word "credit" ("The Credit Team") |
| Luneida Augustin aka Viviana Pratts | 4/10/2024; 4/15/2024 | Facebook | Promises to fix credit "with a blessing" |
| Billy Scott | 2/28/2024; 4/15/2024 | Facebook, Instagram, | Uses phrases "financial freedom", "establish a main source of income", |

| | | X, TikTok | "build your credit to 750+" and suggests that income can be earned passively |
|---|---|---|---|
| Ariesa John | 4/15/2024 | Facebook, Instagram | Facebook profile picture shows agent posing with luxury vehicle |
| Beatriz Mendez | 4/10/2024; 4/15/2024 | Facebook, Instagram, TikTok | Uses company logo in social media profile<br><br>Social media profile indicates agent is a "financial credit advisor" |
| Tishia Rolon | 2/29/2024; 4/15/2024 | Facebook, Instagram | Advises not to pay collections |
| Andreesha Teasley | 4/10/2024; 4/15/2024 | Instagram | Uses "wealth" in social media name ("weathwithdreesha") |
| Patricia Amaya | 2/29/2024; 4/15/2024 | Facebook, Instagram, TikTok | Social media profile indicates agent can achieve for clients a credit score in excess of 700<br><br>Social media profile indicates that agent is a "Credit/finances expert" |
| Isaibis Arozarena Alfonso | 2/29/2024; 4/15/2024 | Facebook, Instagram, TikTok | Social media profile indicates agent is a "credit repair specialist" |
| Latoya Harris | 4/10/2024; 4/15/2024 | Facebook, Instagram | Advises not to pay collections<br><br>Uses "wealth" in social media name ("wealthbuildingwithtoya") |
| Faletolu Kitiona | 4/10/2024; 4/15/2024 | Facebook, Instagram | Appears to promise specific earnings |
| Jonathan Manjarres | 2/29/2024; 4/15/2024 | Facebook, Instagram, TikTok | Uses phrase "financial freedom" |

Screenshots of the above potential violations are included as **Exhibits H-Z**.

The Monitor has previously reported positively on many of the actions taken by the Company to improve its compliance protocols since the inception of this matter. (*See* First Report at 21-23; Second Report at 12-18, 22-23; Third Report at 27-34). Nevertheless, to the extent that the Company is ultimately successful in operating in compliance with applicable laws, including CROA and the TSA, it is imperative the Company continually and thoroughly monitor agents for compliance

with Company protocols and enforce those protocols. This is particularly the case as it relates to the top producing agents, who in turn set an example to the broader field.

Given the violations of Company policies the Monitor Team found in a random sampling of manual searches, it appears more can be done by the Monitored Entities to identify and correct instances of non-compliance in the field.

While certain of the instances noted above are more serious than others, each appears to be a violation of Company policies. It is unclear why the violations observed were not identified in the Company's compliance monitoring process.

The Monitor continues to encourage the Company to exercise diligence in enforcing its compliance and discipline protocols. The Company's written policies and procedures are only as good as they are enforced. The Company's efforts in this regard must be consistent and evenly applied to the highest and lowest producing agents so that a clear message to the agent field is sent — the Company's compliance policies and procedures are carefully developed and taken seriously by the Company.

## VI.   OVERVIEW OF THE MONITORED ENTITIES' TREASURY ACCOUNTS

### A.   General Overview

The Monitor's financial consultants on the Monitor Team review all bank accounts of the Monitored Entities on a routine basis and conduct follow-up interviews with the Company's finance team, primarily Aaron Blanzy, to understand the nature of inflows and outflows among the various bank accounts as well as obtain and review documentation supporting selected transactions. Below is a chart of the cash balances for the Monitored Entities' three operating accounts through which the Monitored Entities conduct their operations, FES/UWE and YFL, agent/customer counts by month, and total commissions paid to agents.[11]

---

[11] Although FES and UWE are the same corporate entity, the Company maintains two different accounts because the FES bank account receives payments from all of the customers and agents that existed prior to the Company changing its advertised name/brand from FES to UWE in 2021. The UWE bank account receives all the credit card payments from the new customers and agents since that change.

Cash Balances (000s)

| Entity | Sep-23 | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 | Apr-24 |
|---|---|---|---|---|---|---|---|---|
| FES | $ 54 | $ 181 | $ 126 | $ 91 | $ 46 | $ 120 | $ 107 | $ 96 |
| UWE | 380 | 465 | 438 | 479 | 357 | 469 | 402 | 325 |
| YFL | 777 | 635 | 487 | 339 | 236 | 240 | 190 | 216 |
| Total Cash | $ 1,210 | $ 1,281 | $ 1,051 | $ 909 | $ 639 | $ 829 | $ 699 | $ 638 |

| Agent/Customer Count | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Active Agents | 2,892 | 2,836 | 2,871 | 2,871 | 3,183 | 3,772 | 4,444 | 4,663 |
| Active Customers | 5,463 | 5,495 | 5,471 | 5,401 | 5,802 | 6,676 | 8,098 | 8,243 |
| Total | 8,355 | 8,331 | 8,342 | 8,272 | 8,985 | 10,448 | 12,542 | 12,906 |

| Protection Plan Payments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| FES | 113 | 124 | 109 | 103 | 120 | 109 | 121 | 122 |
| UWE | 476 | 549 | 500 | 495 | 667 | 702 | 936 | 1,043 |
| YFL | 103 | 115 | 101 | 93 | 135 | 164 | 223 | 205 |
| Total Protection Plan Payments* | $ 691 | $ 788 | $ 710 | $ 691 | $ 923 | $ 976 | $ 1,280 | $ 1,370 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Agent Commissions Paid* | $ 271 | $ 272 | $ 334 | $ 248 | $ 472 | $ 448 | $ 667 | $ 699 |

*Per bank statements

As illustrated above, the Monitored Entities' overall cash position has continued to deteriorate since the issuance of the Third Report in October 2023. It is important to note that total cash balance as of April 2024 would be approximately $250,000 lower but for Mr. Naik's capital contributions of $250,000 into FES's bank account ($150,000 in October of 2023 and $100,000 in February of 2024). These funds were primarily utilized to fund the Company's payroll as all non-YFL employees are paid from the FES bank account, which only receives Protection Plan payments from legacy customers and agents.[12]

Despite the forgoing challenges, the Monitored Entities were able to increase agent and customer counts by over 60% since December of 2023, which has resulted in a similar increase to Protection Plan payments which were approximately $1.4 million in April of 2024, as compared to approximately $700,000 in December of 2023.

Consistent with previous Monitor reports, the Company continues to invest in the development of its agent and customer base by hosting local and regional conventions in its key markets as noted above. Below is a brief discussion of each of the three operating accounts.

---

[12] Note, UWE's February and March of 2024 cash balances include an inadvertent payment of approximately $116,000 from Vervant, the Company's business partner with respect to secured credit card services. This amount was returned to Vervant in April of 2024.

### B.      FES Bank Account Transactions

Protection Plan payments received into the FES account from October 2023 through April of 2024 totaled approximately $810,000, slightly lower than the prior seven-month period. This is expected as previously discussed in prior Monitor reports, this account receives payments from pre-monitorship customers and agents and, therefore, Protection Plan payments were expected to decrease month by month as customers and agents either cancelled their subscriptions or un-enroll. These agents and customers represent a core group of individuals to the business as attrition has leveled off and has remained stable throughout this reporting period at an average of approximately $116,000 per month.

Primary outflows from the FES account are related to payroll and health insurance for all Company employees (except those employed by YFL). Payments to third party Protection Plan vendors have been transitioning over to the UWE bank account for payment.

As mentioned above, Mr. Naik contributed $150,000 of capital into the business bank account in October 2023 and $100,000 in February of 2024 to provide necessary working capital to fund FES's payroll obligations.

### C.      UWE Bank Account Transactions

Protection Plan payments received into the UWE account from October 2023 through April 2024 totaled approximately $4.9 million. As previously discussed in the prior Monitor reports, this account receives payments from all new customers and agents for ongoing services.

Commissions earned from the Monitored Entities' new FinTech service offerings, which include business and personal loan/refinance programs, as well as secured credit cards, are also received into the UWE account. The FinTech Products generated approximately $35,000 in revenue, which after subtracting the monthly $5,000 fee paid to Even Financial (FinTech product service provider) and agent commissions, generated a loss. We understand from interviews with Jason Short that the FinTech products will no longer include re-finance opportunities with respect to student, business, personal, or auto loans.

Primary outflows from the UWE account are related to agent commissions and totaled approximately $3.1 million from October 2023 through April 2024. Other outflows are for marketing events/conferences, legal fees, agent life insurance (Symetra) and other third-party service providers in connection with the Protection

Plan such as Rocket Lawyer and Hurdlr (tax software for agents only), and merchant banking processing fees.

As mentioned above, while the ending March 2024 cash balance was approximately $402,000, it included an inadvertent $116,000 payment from Vervent, which was returned in April of 2024. On an adjusted basis, UWE's March cash balance, approximately $286,000, was at its lowest point since the inception of the monitorship.

### D.   YFL Bank Account Transactions

Protection Plan payments received by the YFL account represent the charitable portion of the Protection Plan (i.e., $9.00 per month) and the initial enrollment fee charged to customers which is typically $99. Protection Plan enrollment fees charged to agents are received by the UWE bank account. Total Protection Plan payments and start-up fee receipts into the YFL account from September 2023 through April 2024 totaled approximately $1 million.

The primary outflows from the YFL account from September 2023 through April 2024 were related to payroll $516,000, vendor services approximately $400,000 (Smart Credit and Identity Theft), as well as legal, consulting and monitorship fees which totaled approximately $350,000.

YFL scholarship payments totaled approximately $15,000 for scholarship winners.

Since September of 2023, the YFL bank account balance has declined from approximately $777,000 to approximately $216,000 in April 2024.

### E.   VR-TECH LLC, VR-TECH MGT, LLC and CMR Bank Account Transactions

Throughout this reporting period, there were no transfers of funds from either FES, YFL, or UWE to either the VR-TECH or VR-TECH MGT accounts.

With respect to VR-TECH, the balance has declined slightly from approximately $11,000 in September 2023 to $10,000 in April 2024 due to monthly account service fees.

The VR-TECH MGT and CMR bank accounts have remained at approximately $261,000 and $195,000, respectively, during this reporting period with no material activity.

## VII. CONCLUSION

The Company continues to implement appropriate compliance policies and procedures. However, the number of social media posts by agents which violate Company policy reveals the Company's messaging to agents is inadequate. The Company's deployment of the FieldWatch software to detect offending social media posts is positive, however it is apparently missing a number of posts which are inappropriate. Further, the Company is failing to detect offending posts by its top producing agents. The Monitor strongly recommends the Company increase its vigilance in this regard.